FILED
U.S. DIST. COURT
MIDDLE DIST. OF LA

2006 OCT 11  PM 1:04

SIGN _____
BY DEPUTY CLERK

# IN THE
# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF LOUISIANA

ALBERT WOODFOX        )
                  )
versus               )
                  )
BURL CAIN, Warden,     )
Louisiana State Penitentiary   )
_____ )

CIVIL ACTION

NO. 06-789-JJB-CN

## MEMORANDUM IN SUPPORT OF PETITION UNDER 28 U.S.C. § 2254

Christopher A. Aberle
Bar Roll # 24006
P.O. Box 8583
Mandeville, LA  70470-8583
(985) 871-4084

*Attorney for Petitioner,* Albert Woodfox



# TABLE OF CONTENTS

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    I.      The prosecution knowingly presented perjured testimony and introduced evidence that unlawfully created a false impression that Mr. Woodfox is guilty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    II.     The State likewise suppressed information that revealed that these witnesses were lying. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    III.    The State's withheld material exculpatory evidence when it refused to disclose the contents of the sheriff's investigative file. . . . . . . . . . . . . . . . . . 82

    IV.    Considered cumulatively, as the *Brady* doctrine requires, the *napue* false evidence violations and the suppressed evidence were material and Mr. Woodfox's conviction must be reversed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    V.     The State violated Mr. Woodfox confrontation clause rights by repeatedly introducing the out of court statements of Chester Jackson. . . . . . . . . . . . . . . . 92

    VI.    Trial counsel rendered ineffective assistance. . . . . . . . . . . . . . . . . . . . . . . . . . 92

    VII.   Mr. Woodfox's conviction must be overturned because of discrimination in selecting the foreperson of the grand jury that indicted him . . . . . . . . . . . . . . 148

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159

## STATEMENT OF THE CASE

Albert Woodfox is challenging his conviction for the 1972 second-degree murder of an Angola prison guard. In 1973, a jury relied on inmate testimony to convict Mr. Woodfox of this murder. Due to ineffective assistance of counsel and a grand jury that systematically excluded women and members of the black race, Mr. Woodfox's conviction was overturned in 1992, at which time the State reindicted him for first-degree murder, a charge that was subsequently amended to second-degree murder.

The State presented its case to a jury in December 1998, relying on the prior testimony of deceased witnesses, including the State's principal eyewitness, Hezekiah Brown, an inmate who had once been on death row but was eventually pardoned in exchange for his 1972 testimony. After seven days of trial, the jury found Mr. Woodfox guilty of second-degree murder.

The court sentenced Mr. Woodfox on February 23, 1999, to life in prison, and he appealed. The First Circuit affirmed the conviction on June 23, 2000, and the Louisiana Supreme Court denied discretionary review on June 15, 2001. The United States Supreme Court denied *certiorari* on November 13, 2001. *State v. Woodfox*, No. 99-2102 (La. App. 1 Cir. 6/23/00) (unpub), *writ denied*, 2000-2225 (La. 6/15/01), 793 So. 2d 1235, *cert. denied*, 534 U.S. 1027 (11/13/2001).

Mr. Woodfox's application for postconviction relief was stamped as filed by the 21st Judicial District court on October 30, 2002. That court denied relief on all claims without a hearing on October 24, 2004, in a ruling in which the court expressly adopted the State's response as its reasons for ruling. The First Circuit denied discretionary review without reasons on August 8, 2005, and the Louisiana Supreme Court denied discretionary review on September 29, 2006. *State v. Woodfox*, 2005-0551 (La. App. 1 Cir. 8/8/05), *writ denied*, 2005-2476 (La. 9/29/06), __ So. 2d __.

1

### *Timeliness*

This petition is filed within the one-year time limit provided by the AEDPA. Mr. Woodfox's direct appeal was final on November 13, 2001, when the United States Supreme Court denied *certiorari*. Mr. Woodfox's mailed his state postconviction application to the state district court, which stamped the application as filed on October 30, 2002, with at least 14 days remaining under the one-year time limit provided by the AEDPA. Mr. Woodfox's postconviction proceedings became final on September 29, 2006, when the Louisiana Supreme Court denied discretionary review. Accordingly, the deadline for filing this petition is no sooner than October 13, 2006. This petition is filed before that date. Accordingly, it is timely.

### *Exhaustion*

All claims raised in this petition were presented to the Louisiana Supreme Court either on direct appeal or in state postconviction proceedings.

### *Statement of Counsel*

The balance of this memorandum, including the statement of facts and claims for relief are culled directly from the postconviction application filed by other counsel. The facts and claims are set out substantially verbatim, though with some redaction and modification. The Petitioner maintains that the state court's adjudication of each of these claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As explained in the motion to amend that accompanies this petition, however, the Petitioner seeks to substantially refine, simplify, and reduce the matters that follow. For that reason, the Petitioner has not, at this time, burdened the court with the filing of the many exhibits referenced below, though all such exhibits are immediately available to the Court upon request.

\* \* \*

## STATEMENT OF FACTS

Albert Woodfox has spent the past 30 years of his life in solitary confinement for the April 17, 1972, murder of Louisiana State Penitentiary security officer Brent Miller – a murder Mr. Woodfox did not commit. As the instant petition conclusively demonstrates, Mr. Woodfox was convicted as a result of prosecutorial misconduct, incompetent defense counsel, perjured testimony, and shoddy police work. The prison administration set their sights on Mr. Woodfox and Mr. Wallace before a full investigation had begun because they were leaders in the prison's chapter of the Black Panther Party and were demanding better treatment of prisoners. The state's case rests entirely upon suspect and unreliable inmate testimony and circumstantial evidence. The only direct evidence came from the mouths of inmates who were rewarded by the prison for their "cooperation." One of the inmates who testified for the state was a blind "eyewitness." There was no physical evidence linking Woodfox and Wallace to the crime. Two of the three living prosecution witnesses – Leonard "Specs" Turner and Howard Devon Baker – have now admitted their lies and recanted their testimony. Critically important is the fact that **Turner acknowledges witnessing the murder and states that Mr. Woodfox was not involved**.

3

In addition, Mr. Woodfox has uncovered new evidence, in the form of new witnesses, which reveals that a deceased Angola prisoner, **Irvin "Life" Breaux, confessed to committing the murder and stated that Albert Woodfox was framed**. Breaux, a militant black Angola inmate, was initially a suspect and many believed him to be the murderer. He was placed in lockdown immediately after the murder and remained there for almost a year. Billy Sinclair, a long-time inmate at Angola, was a close friend of Breaux and Breaux confessed to him. Sinclair states: "One day Breaux told me – and it was the first of several times that he told me – that he and others had actually killed Brent Miller." Exh. XX. Breaux has confessed his involvement in the murder to at least one other inmate.

The prosecution compensated for its weak case by engaging in gross misconduct – presenting evidence it knew or should have known to be false and misleading and by suppressing evidence that would have been favorable to the defense. During trial, the prosecution refused to disclose to the defense the contents of the sheriff's investigative file on the case. When the court warned the state that it would have to live with the consequences if the file contained *Brady* material, the prosecution stated on the record that it would "fully accept that responsibility." The prosecution flatly failed to live up to its responsibility. The file, which was hidden from the defense, now reveals that two of the state's witnesses committed perjury; a number of prisoners were discovered on the day of the murder to have blood on their clothing; that a shoe imprint was found at the scene; and that the state's mass interrogations on the day of the murder focused almost exclusively on black prisoners – almost no white prisoners were questioned. As more fully set forth below, the defense would have used this evidence to weaken the state's case and strengthen the defense by, *inter alia*, impeaching the state's witnesses and attacking the integrity of the investigation.

4

Mr. Woodfox also demonstrates that his appointed trial counsel were woefully inadequate despite the fact that counsel received more money in fees from the state than any other non-capital indigent defenders in Louisiana's history. A total of $82,358.33 was paid to counsel, yet counsel failed satisfy the most rudimentary standards of effective assistance of counsel. R. 473. During their *five years* of pretrial work, the appointed defenders failed to consult with a single expert witness or move for expert assistance to challenge the state's junk science, failed to move for a hearing to discover evidence, failed to properly investigate the case, failed to seek independent testing of evidence, failed to protect Mr. Woodfox's rights by repeatedly allowing inadmissible evidence to enter the courtroom without objection, and failed to conduct adequate voir dire. Individually and cumulatively, these omissions by counsel produced a verdict unworthy of confidence.

### *Introduction*

In order to understand how Mr. Woodfox came to be convicted of a crime he did not commit, it is first necessary to understand the historical context – the Louisiana State Penitentiary in the early 1970s – in which the murder took place. Then, as now, roughly three quarters of Angola's prisoners were African-American. The prison was racially segregated, meaning that black and white prisoners lived, ate, and worked separately. R. 1912.[1] The prison did not have a single African-American employee. R. 1916. Because budget constraints limited the number of free staff, the prison was patrolled by a force of armed inmate guards. R. 1912. According to the warden at the time, C. Murray Henderson, "the only people carrying guns were the prisoners." R. 1912. Henderson has written that inmate guards "all too often . . . blazed away at each other from watchtowers or

---

[1] Citations to the record are as follows: "R." refers to the Record on Appeal. "AW1" refers to Mr. Woodfox's prior trial, "WH" refers to the trial of Herman Wallace. "Def. Exh." and "St. Exh" refers to exhibits presented at trial, and "Exh" refers to exhibits to this petition.

5

'accidentally' settled old scores with bullets." Exhibit C. "Racist Pigs Who Hold Us Captive," from C. Murray Henderson et al., *Dying to Tell* 2 (1992).

Angola was a cauldron of violence, racism, prostitution, and sexual slavery. Today, the Louisiana State Penitentiary states on its official website that, "[d]uring the late 1960's, Angola became known as 'The Bloodiest Prison in the South' due to the number of inmate assaults." *See* www.corrections.state.la.us/lsp/history.htm. According to the prison magazine, the *Angolite*:

> The fabric of life at Angola was woven by the thread of violence. The only law was that of the knife, and the only protection available to you was what you could acquire through sheer force of character and the ability to impose your will upon others . . . The pursuit of survival fueled a heated arms race among the prisoners for the superior weapon: a sword over a knife, a broad ax over a sword, and a gun over everything . . . the knife claimed the lives of 40 prisoners between 1972 and 1975 and left 350 more seriously injured.

Wilbert Rideau et al., *Life Sentences: Rage and Survival Behind Bars* 85-86 (1992).

Violence by staff against prisoners was a central element of prison life. Hilton Butler, a former Angola warden who helped investigate the Brent Miller killing and testified against Mr. Woodfox, boasted to a newspaper that during his tenure at Angola, "I've got just about every finger broke on both hands from punching [prisoners]." Exhibit D, "Angola's Changing of the Guard," *New Orleans Times Picayune*, February 22, 1987. Butler, in fact, has proudly stated that he once tried to kill Mr. Woodfox. During a taped interview conducted by Warden Henderson while researching his book, *Dying to Tell*, Butler discussed a 1973 incident during which the prisoners on Mr. Woodfox's tier refused to return to their cells after their exercise period. Exhibit E, transcript of *Dying to Tell* interviews. Butler rounded up an armed posse and headed for the CCR (solitary confinement) unit:

6

I know that there was three pistols in the bunch – know now, wasn't supposed to be anything [firearms] go inside – cause I know I had my .38 and I know [officer] W.J. Norwood had his and I know [officer] Ray Dixon had his. So I went up there and Bert Dixon brought that big gas gun shoots those gas shells, and I told them to catch their cells . . . and ain't nobody moved, they was all bunched up back there. Well, I told Bert Dixon, I said you shoot that gun down that tier. And I told the rest of them, I said now be ready, soon as it goes off, we're going in there and get 'em. Everybody'd done went to arguing about who was gonna get Woodfox and Wallace. And as luck would have it, I guess the reason we're not all in the federal penitentiary today, that's the first time in history, and that was almost a brand new gun, it snapped . . . If that gun would've went off, we probably would've killed 'em all that day.

*Id.*

Official corruption, at the expense of the inmate population, was similarly pervasive. For example, "inmate canteens, where prisoners were supposed to purchase necessities with coupons torn from individual books at the cash register, were mismanaged to the extent that correctional officers rather than inmates were spending 'wads of coupons as big as your fist,' none of which should have been in their possession." *Dying to Tell* at 2.

Life within the prison was essentially controlled by the inmate power structure. As a consequence, young and/or weak prisoners, on a shockingly widespread scale, were routinely forced into sexual slavery or prostitution. James Dunn, a prisoner who suffered through many years of enforced prison "marriage," described the conditions vividly:

During my first week here, I saw fourteen guys rape one youngster 'cause he refused to submit. They snatched him up, took him into the TV room and, man, they did everything to him – I mean, *everything*, and they wouldn't even use no grease. When they finished with him, he had to be taken to the hospital where they had to sew him back up; then they had to take him back to the nuthouse at Jackson 'cause he cracked up.

*Dying to Tell* at 77 (emphasis in original).

7

Former Corrections Secretary C. Paul Phelps acknowledged to the *Angolite* that the corrections administration allowed these horrors to continue in order to facilitate the smooth functioning of the institution:

> The formation of power groups or cliques is symptomatic of a high level of homosexual activity and enslavement . . . during the ten years preceding 1976, the inmate power structure at Angola was very, very powerful. And anytime that happens and a high level of homosexual rapes and enslavement is taking place, there has to be a tacit trade-off between the inmate power structure and the administration.

*Id.* at 86.

Angola's prisoners, faced with literally life-threatening violence on a daily basis and imprisoned by an administration that refused to intervene (or even benefitted from such conditions), began seeking to improve conditions on their own. Emulating the tactics of the Civil Rights Movement in the "free world," Angola prisoners organized campaigns of non-violent civil disobedience, which attracted wide support among the population. In August 1971, for example, African-American prisoners organized a seven-day dining hall strike. Support among the population was almost total, as only a dozen black prisoners patronized the dining hall during the strike. Exhibit F, "Angola Prisoners Boycott Mess Hall," *Baton Rouge Sunday Advocate*, August 8, 1971. The strikers pledged "no violence" and to obey all orders "within reason." Their demands would not have been out of place in a federal court order – the prisoners asked for an end to racial segregation, better medical care, employment of African-Americans in high-ranking penitentiary positions, freedom from physical abuse, the elimination of armed inmate guards, and the hiring of qualified free personnel. *Id.*

The administration's response to the prisoners' appeals was comparable to the historic reaction of white Southern officials to the demands of the Civil Rights Movement. Warden

Henderson treated the protest not as a rational reaction to unspeakable conditions, but as the fault of "outside agitators." *Id.* Instead of acceding to what were entirely reasonable demands, Henderson blamed Rep. Dorothy Taylor, the only African-American member of the state legislature, who had taken up the cause of prison reform by meeting with Angola prisoners, speaking out against injustices, and leading public hearings into conditions in the Louisiana penal system. After a week, Henderson constructed what he described as a "prisoner-of-war-type compound," surrounded by hurricane fence, in which he segregated 300 men, forcing an end to the strike but doing nothing to improve the situation. Exhibit G, "Angola Inmate Protest Ended," *Baton Rouge State-Times*, August 13, 1971.

Albert Woodfox was a leader among the prisoners who were attempting bring an end to the horrors of 1970s Angola. Along with other prisoners, including his co-defendant Herman Wallace, he helped found an Angola chapter of the Black Panther Party for Self Defense. R. 2370. Their primary activity was a campaign to end rape at Angola. As Mr. Woodfox testified, Thursday at Angola was known as "fresh fish day," because on Thursday newly-admitted prisoners would be assigned to the dormitories. R. 2363-64. Often young and inexperienced, the new prisoners were especially vulnerable to victimization by Angola's rape culture. R. 2364. Mr. Woodfox and other members of the Black Panther Party would escort the new prisoners to their dormitories, offer them protection, and give them advice – such as to avoid gambling or borrowing money or clothing – on how to prevent themselves from being victimized. R. 2364-65. Mr. Woodfox acknowledged that the Panthers carried knives on fresh fish day to protect themselves from prisoners who would attack them because they resented the changes they sought to make. R. 2363.

9

It was against this backdrop of upheaval and brutality that Brent Miller was killed.  The day before the murder, on April 16, 1972, another security officer, Michael Gunnells, was doused with flammable liquid and set alight;  a prisoner named Rory Mason was convicted of committing the act. Exhibit H, "Several Suspected in Killing at Angola," *Baton Rouge Morning Advocate*, April 18, 1972;  Exhibit I, "Militants Blamed for Guard Death," *Baton Rouge State-Times*, April 18, 1972; Exhibit J, "Guard Death Pinned on Militants," *Baton Rouge Morning Advocate*, April 18, 1972.  On the morning of the murder, the workers in Angola's dining hall, both black and white, staged a work strike to protest their 16-hour-per-day, six-day-per-week shifts. R. 1939, 2249;  AW1 280;  HW 240.

Brent Miller was killed in an environment in which almost everyone was armed, everyone was desperately angry, and in which attempts to seek redress by petitioning the administration or the courts were doomed to failure.  Given this climate of violence and outrage, it is clear that any of the 5,000 prisoners at Angola on April 17, 1972, had a potential motive to strike out at the administration that confined them.  Even more clear is the fact that Angola's administration had a powerful motive to eliminate Mr. Woodfox from the prison population.

### The Killing of Brent Miller

On the morning of April 17, 1972, inmates at Angola's Main Prison exited their dormitories and headed for breakfast, as they did every day, at around 7:00.  R. 2339, 2071.  The prisoners filed out of their dorms and proceeded down "the Walk," an elevated pathway connecting the Main Prison's four sets of dormitories with the rest of the institution, including the dining hall.  Between the dorm area, termed "the big yard," and the rest of the prison stood a security checkpoint termed the "snitcher gate."  The snitcher gate was manned by a security officer at all times. R. 1166.

10

When the inmates reached the snitcher gate on April 17, security officers did not allow them to pass because of the work strike, or "buck," in Angola parlance, taking place in the kitchen. R. 1939. After several minutes, the inmates who had been held at the snitcher gate were ordered to return to their dormitories. R. 2071. Meanwhile, the warden had arrived and, after some brief negotiations, the disturbance was resolved and the kitchen workers agreed to serve breakfast. R. 1338. About 15 or 20 minutes after the inmates had returned to their dorms, security officers again summoned them to the dining hall. R. 2071. This time, breakfast was served without incident. After breakfast, some inmates reported to work, while others returned to their dormitories.

Proceeding down the Walk from the dining hall, one would pass through the snitcher gate and past four dormitory areas: Oak, Pine, Walnut, and Hickory, in that order. Each dormitory area consisted of four buildings, numbered one through four. See Attachment 1, Layout of the Main Prison. The Oak complex was reserved for white prisoners only. At each dorm complex, two buildings stood on either side of the Walk, with buildings 1 and 2 situated directly across the Walk from buildings 4 and 3, respectively. Two security officers were assigned to each dormitory area. Brent Miller and Lemuel Paul Hunter were the officers assigned to the Pine dormitories that morning. During mealtimes, one officer remained at the dormitory area while the other helped feed prisoners in the dining hall. R. 1142-43. On April 17, Miller had stayed at Pine while Hunter accompanied the inmates to breakfast. R. 1143.

At Mr. Wallace's trial, Brent Miller's brother, Huey Lee Miller, Jr., testified that he had called Brent on the telephone during the kitchen strike. HW 240. Brent was on the telephone in the "guard shack," a small building on the Walk in the Pine area. HW 241. Brent told Huey that the inmates had just returned to their dormitories to wait for the strike to end. HW 240. As the inmates

11

filed back into their dorms to wait out the strike, Brent said that they had spit all over the windows to his guard shack.  HW 240.  According to Huey, Brent said, "it's got so much spit, I can't hardly see out of it."  HW 240.

Officer Hunter returned to the Pine area after breakfast.  According to Hunter's rough estimate, the time was 7:30 or 8:00 a.m.  R. 1163.  He entered the Pine 1 dormitory looking for Miller and hoping to get some coffee from Hezekiah Brown, the Pine 1 dorm orderly who regularly prepared coffee for security officers.  R. 1145.  When he entered the dormitory, Hunter found Brent Miller's body lying on the floor of the lobby in the front of the building.  R. 1147.  Miller had been stabbed to death and was covered in blood.  R. 1149  There was nobody else in the building.  R. 1149.

### The Investigation

Angola officials secured the Pine 1 dormitory and summoned the West Feliciana Parish Sheriff's Office, the Louisiana State Police, and the coroner.  The snitcher gate was locked, halting all inmate movement between the dormitory area and the rest of the Main Prison.  R. 1239. Investigators searched for physical evidence in and around the Pine 1 dormitory, including in trash cans and underneath the buildings.  R. 1180.

Sheriff (then Deputy) Willis Daniel and Deputy Thomas Guerin, both of the West Feliciana Sheriff's office, began interrogating some of the inmates who were in the dormitory area when Miller's body was discovered.  R. 1240.  The inmate population, numbering perhaps 600 or more, was ordered to line up on the Walk and strip off their clothes.  R. 1238.  Daniel and Guerin interrogated prisoners in a clothing room just inside the snitcher gate.  R. 1238.  The interrogations lasted for approximately 24 continuous hours, until the morning of April 18.  R. 1245.  Daniel

12

testified that he and Guerin interviewed several hundred inmates.  R. 1237.  Notes of every interrogation session were recorded on a pad of yellow legal paper.  R. 1277.  Crucially, Daniel testified that authorities only interviewed the prisoners who had been locked into the Big Yard after Miller's body was discovered — meaning that if the killer or killers of Brent Miller had fled from the yard after the murder, they would not have been interrogated.  R. 1275.

The official story of how the authorities came to suspect Mr. Woodfox and the others of the murder is contradictory.  According to Sheriff Daniel, who described himself as the lead investigator, the first break in the case came on April 19, two days after the murder, when he was called out to the prison to take a statement from Hezekiah Brown, an inmate who later testified that he witnessed the murder.  R. 1281, Exhibit K, statement of Hezekiah Brown.  At trial, however, the prosecution introduced an unsigned, undated statement from another prisoner, Leonard "Specs" Turner, that was allegedly taken by officer C. Ray Dixon on the night of April 18.  R. 1568.  The statement – which Turner has always maintained is not true – implicates Mr. Woodfox, Mr. Wallace, and Mr. Jackson, but not the fourth defendant in the case, Gilbert Montegut.  Mysteriously, none of the investigating officers, except for Dixon, was aware of the statement, although, if true, it would have amounted to the first break in the investigation.

Neither Turner nor his statement was ever mentioned at either of the prior trials of this case.  Sheriff Daniel, the lead investigator, never mentioned the statement in his testimony, instead focusing on Hezekiah Brown as being the first witness to provide information.  Neither did Hilton Butler.  Warden Henderson explicitly testified that he was not aware of any statement provided by Turner, even though Dixon claimed that Henderson had ordered him to take the statement.  R. 1581, 1971.  Dixon himself testified that he had no recollection of the statement, even though, if the

13

statement were true, Dixon could probably claim to be the man who solved the murder of Brent Miller. R. 1579, 1587. Moreover, Henderson's recollection of his interactions with Turner do not square with Dixon's. Henderson testified that he spoke to Turner after the murder, and after threatening to revoke his parole (Turner was scheduled to be paroled two days later on April 19), Turner said he couldn't see who committed the murder and suggested Henderson talk to Hezekiah Brown. R. 1948.

Whatever the truth is regarding Turner and Brown, Mr. Woodfox and Mr. Wallace were singled out as suspects almost immediately, well before prison officials had any information that even purported to link them to the murder. Howard Devon Baker, a prisoner who testified – falsely, he now admits – against Herman Wallace, states that, "I had heard that Hooks and Woodfox were suspects it seemed like five minutes after Miller was killed." Exhibit L, statement of Howard Baker, September 19, 2002. On April 17, Warden Henderson told two newspapers that the authorities already had "four or five prime suspects." "Several Suspected in Killing at Angola;" "Militants Blamed for Guard Death," *supra*. On the same day, April 17, Mr. Woodfox and Mr. Wallace were removed from their dormitories and placed into solitary confinement, from which they have never been released. Exhibit M, Lockdown History of Herman Wallace, July 6, 1972; Exhibit N, Louisiana State Penitentiary Housing History of Albert Woodfox.

Sheriff Daniel testified that he signed charges against Mr. Wallace, Mr. Woodfox, and Mr. Jackson on April 19, after Brown provided his statement. R. 1289. Significantly, for reasons that will soon become clear, Daniel could not remember signing charges against Gilbert Montegut that day; he remembered that he may not have signed charges against Mr. Montegut until a later date.

14

Nevertheless, Mr. Wallace, Mr. Woodfox, Mr. Montegut, and Mr. Jackson were shortly thereafter indicted for murder by the West Feliciana Parish Grand Jury.

Mr. Woodfox was tried and convicted, pursuant to a change of venue, in Iberville Parish before an all-white jury in March 1973. Mr. Wallace and Mr. Montegut were tried in East Baton Rouge Parish before an all-white jury in January 1974. Mr. Wallace was convicted. The same jury acquitted Mr. Montegut, who had an Angola security officer for an alibi witness. Chester Jackson agreed to testify against Mr. Wallace and, as a result, was allowed to plead guilty to manslaughter. In 1998, after winning a reversal of his 1973 conviction, Mr. Woodfox was retried and reconvicted, pursuant to a change of venue, in Tangipahoa Parish.

### THE TRIAL OF ALBERT WOODFOX

The State's case against Mr. Woodfox was based on the statements of four Angola inmates whose accounts of the murder were so contradictory and so compromised that they could not possibly have been true. Because the materiality inquiry of a *Brady* or *Strickland* claim "requires the analysis of the evidence adduced at trial and of the probable impact of the undisclosed information," Cannon v. Alabama, 558 F.2d 1211, 1214 (5th Cir. 1977), it is necessary to set forth in detail below the testimony presented by the State.

### The Testimony of Hezekiah Brown

The state presented the testimony of Hezekiah Brown, who died in 1996, by transcript from Mr. Woodfox's 1973 trial. Brown testified that he was a fourth-time Angola prisoner serving time for aggravated rape, for which he had been sentenced to death. R. 1772. By April 1972, Brown lived in Pine 1 dormitory. R. 1773. He kept a coffee pot in the dormitory from which he often

served security officers.  R. 1775.  Brown said that Miller came into Pine 1 on the morning of the murder.  R. 1776.  Brown "didn't see no one else" in the dorm at the time.  R. 1777.

Miller sat on Brown's bed, with his back facing the entrance to the dorm, and waited for Brown to warm up some coffee.  R. 1782.  After Brown and Miller had talked for "a while," Brown claimed that Mr. Woodfox, wearing a blue handkerchief over his face, entered the dorm, grabbed Miller around the neck and stabbed him in the back.  R. 1782-84, 1791.  Herman Wallace, Chester Jackson, and Gilbert Montegut then appeared and allegedly began stabbing Miller, "pulling him over the bed" and stabbing him.  R. 1784, 1193.  According to Brown, all four men had knives (although only one was recovered).  HW 40.  The men eventually stopped stabbing Miller and left Pine 1.  R. 1786.

Brown said that he then ran out of the building, noticed he was wearing his pajamas, and went back in.  R. 1786.  Afraid that he would be charged with the murder, Brown decided to go to the blood plasma plant to create an alibi for himself.  R. 1787.  When he left Pine 1, Brown said, he didn't see anyone else on the Walk.  R. 1817.

Brown's testimony contained many inconsistencies.  His inability to answer a number of important and seemingly simple questions raises grave doubt as to whether Brown actually saw what he claimed to have seen.  Brown said that the men stabbed Miller "many times" while he was on Brown's bed, and then "they takes him up off the bed and carries him into the playroom," where they continued stabbing him  R. 1784;  HW 26.  He also stated that the stabbing had left "blood on my bed – I guess, I don't know."  HW 28.  The investigators did not find any blood on Brown's bed.  R. 1941.

When asked how Miller was dressed, Brown could not answer. He said, "I didn't pay that much attention to how he was dressed," and couldn't even say whether Miller was wearing plain clothes or a uniform. HW 43. When asked what kind of clothes Mr. Woodfox was wearing at the time of the murder, Brown became agitated and again had difficulty answering. He responded, "Penitentiary clothes, I guess . . . Look man, I don't know if they had on blue pants or blue shirts; that's the penitentiary clothes, though," and contended that he had been too scared to notice the men's clothes R. 1807. When asked the color of the handkerchief Brown claimed he had seen on Mr. Woodfox's face, he replied, "I don't know, it could have been blue or red. It could have been blue. It was blue – a blue one . . . Yeah, blue, 'cause, see, I seen it on his face." R. 1807. Significantly, Brown said he "wasn't payin' no 'tention" to whether Mr. Woodfox was wearing a jacket, the item of clothing Sheriff Daniel claims to have seized from Mr. Woodfox. R. 1808.

When shown State's Exhibit 4, the knife recovered from under Pine 1, Brown could not identify it as one of the knives that were used to kill Miller. R. 1191.

Finally, Brown's testimony was contradicted by the testimony of Herbert "Fess" Williams, who saw Brown walking back from the dining hall around the time of the murder. R. 2274. Brown was carrying a plastic bag of sugar, and Williams tried to get some of the sugar from him. R. 2275. Williams testified that he saw Brown around the time that the other inmates were being let out of the dining hall. R. 2276. Brown, of course, did not report going to the dining hall to get a bag of sugar.

Brown said that he was interrogated on the day of the murder and provided the authorities with his alibi. R. 1812. Then, about "four or five days after that," Brown was awakened at around midnight and taken to the administration building. R. 1788; HW 33. "[A]ll the wardens and the whole administration" confronted him. HW 34. According to Brown, "I don't know how they

knowed I knowed anything about it . . . But, they tell me everything that happen." R. 1788.  Brown was terrified that he would be charged with the killing: "I knowed if I said no, I didn't know nothing about it, then . . . I'm going to get punished behind it, I'm going to get throwed in one of them cells, and I done stayed in one of them cells too long on death row . . . I couldn't stand that no more." HW 34.  The authorities placed the institutional files of a number of inmates in front of Brown.  HW 35.  **Because he feared that he would be charged with the murder if he did not provide information**, Brown selected the files of Mr. Woodfox and the others and told the authorities what they wanted to hear.  HW 34.

Since the 1996 death of Brown – and with him, the opportunity for Mr. Woodfox to meaningfully cross-examine him – a vast amount of previously-suppressed impeachment evidence has come to light.  Brown repeatedly said that nothing had been promised him in exchange for his testimony.  R. 1789, 1797.  Rather, he was testifying because he wanted to tell the truth "from the bottom of my heart."  R. 1773.  The new evidence, however, tells a different story:  that the state offered Brown irresistible incentives to lie.

Hezekiah Brown was pardoned by the governor and released from his life (formerly death) sentence – and prison – in 1986, after years of effort by Henderson and other DOC officials.  Def. Exh. 10.  Beginning one month after Brown testified against Mr. Wallace, Warden Henderson wrote at least three letters to Elayn Hunt, the Secretary of Corrections, and Frank Shea, Brown's sentencing judge.  See Def. Exh. 4 and 5; Exhibit O, letter from C. Murray Henderson to Elayn Hunt, April 22, 1974.  In all of these letters, Henderson pleaded for a pardon for Brown, citing in support of his pleas Brown's testimony against Mr. Woodfox and his co-defendants.  At trial, Warden Henderson authenticated all of these letters and acknowledged that he "absolutely" had promised Brown, before

18

he testified, that he would work to win him a pardon "after he . . . cracked the case for us." R. 1949. Henderson even signed a letter authorizing Angola's business manager to pay for Hezekiah Brown's clemency advertisement out of the Louisiana State Penitentiary budget. Def. Exh. 8.

Henderson also acknowledged authorizing his staff to prepare a November 4, 1975, letter from Brown to the Board of Pardons, in which Brown informed the Board that a probably-unprecedented number of high-ranking prison and prosecution officials intended to appear before the Board on Brown's behalf. Def. Exh. 7. Individuals listed were Warden Henderson; Warden Hilton Butler; West Feliciana Parish District Attorney Leon Picou (who prosecuted Mr. Wallace); West Feliciana Parish Deputy Sheriff Billy Travis; and correctional officers Bert Dixon and Bobby Oliveaux. Henderson further testified that his successors, including Secretary of Corrections C. Paul Phelps, continued pressing for Brown's release, "on the basis of agreements . . . previously made with Hezekiah Brown." R. 1961.

In addition to pardon, Brown was also paid for his testimony against Mr. Woodfox. Mr. Woodfox obtained 1978 correspondence between Angola Warden Frank C. Blackburn and Secretary of Corrections C. Paul Phelps, in which Blackburn requests authorization

> to have issued to [Hezekiah Brown] one (1) carton of cigarettes per week. This, I feel, would partially fulfill commitments made to him in the past with respect to his testimony in the state's behalf in the Brent Miller murder case.

Phelps authorized the disbursement because "Warden Henderson made the original agreement with Brown . . . I think we should honor the agreement." Def. Exh. 9. At Mr. Woodfox's retrial, Henderson acknowledged that, "I carried [Brown] a carton down there every week." R. 1977.

Brown was also moved, immediately after he agreed to name Mr. Woodfox, to Angola's dog pen, a minimum-security protection area (which historically has been run by the family of C. Ray

Dixon) in which informants are allowed to live in relative luxury, free from the violence of Angola's dormitories. R. 1286. According to Sheriff Daniel, the inmates at the Dog Pen had trustee status, "they had a little house there where Hezekiah stayed at" and "took care of the dogs [the prison's bloodhounds]." R. 1287. Hezekiah's transfer to the dog pen, where he no longer had to fear being stabbed to death, may have been the most valuable reward he received as a result of this case.

The inference that Hezekiah Brown was a liar is confirmed by the beliefs of former Angola Wardens Henderson and Butler. Both say that Brown's story changed even after he initially agreed to falsely accuse Mr. Woodfox. Henderson and Butler state that when Brown first agreed to inform, he named Mr. Woodfox, Mr. Wallace, and Chester Jackson as the killers, but he did not name Gilbert Montegut. Butler and Henderson believe that the security warden, Hayden Dees, induced Brown to add Montegut to the list of alleged killers in order to strengthen Dees' hand in an internecine feud between the old-line families, led by Dees, who had ruled Angola for generations, and the outsider, reform-minded bureaucrats, exemplified by Henderson and his deputy Warden, Lloyd Hoyle, who had been hired to professionalize and racially integrate the prison. Hoyle and Henderson had been in conflict with Dees, who had testified in court hearings of the need to keep "a certain type of militant or revolutionary inmate, maybe even a Communist type," on permanent lockdown status. According to Hilton Butler, when "C. Murray and Hoyle come in, and he resented them coming in, he wanted to be warden." Exhibit E, *Dying to Tell* interview transcript 5. Henderson and Hoyle had ordered Dees to comply with federal court instructions by granting due process rights to prisoners in lockdown. R. 2032. A few days before the Miller killing, Hoyle had ordered Dees to release several prisoners – including Montegut – from lockdown because Dees had not afforded them due process. R. 2032.

20

According to Henderson and Butler, Dees seized on the Miller murder as an opportunity to discredit the reformers by creating the appearance that their allegedly lax treatment of politically-minded African-American prisoners had led to Miller's death. However, the three black prisoners they originally accused of the murder – Mr. Woodfox, Mr. Wallace, and Jackson – turned out not to be among the "militants" released by Hoyle. According to Butler, "Montegut was one of the ones that Hoyle had released from CCR [solitary confinement], and what they was trying to say, a little group of them, was that Hoyle was the cause of Miller's death by releasing those people." Exhibit E at 5.

In an uncharacteristically candid moment – a taped interview with Warden Henderson, who was researching his book, *Dying to Tell* – Butler stated that Dees induced Brown to falsely accuse Montegut sometime after he had originally agreed to inform on the others: **"Hezekiah was one you could put words in his mouth. Hezekiah told Hayden that Montegut was involved, but not in the beginning. Hayden kind of put those words in his mouth."** Exhibit E at 8. At Mr. Woodfox's trial, Butler declined to be so candid. He claimed he couldn't remember stating that Warden Dees had suborned perjury, but admitted that he believed Montegut had been innocent. R. 2012. Henderson agreed with Butler. At trial, he testified that Brown "never named – in my presence, he never, ever named Gilbert Montegut." R. 1964.

Sheriff Daniel's recollection that he signed charges against Mr. Wallace, Mr. Woodfox, and Mr. Jackson on April 19, but may not have signed charges against Mr. Montegut until some later date corroborates the admission of Henderson and Butler that Brown falsely implicated Montegut in the murder for the purpose of embarrassing Hoyle and Henderson. R. 1289.

21

If Dees had programmed Brown to falsely implicate Gilbert Montegut, who is to say that he did not also put the names of Mr. Woodfox and Mr. Wallace into Brown's mouth?  By Brown's admission, the process by which he named Mr. Woodfox, whereby Mr. Woodfox's inmate file was placed in front of the terrified Brown, was highly suggestive and coercive, to say the least.  Moreover, it was well-known among the inmate population that Mr. Woodfox and Mr. Wallace had both been swept up by authorities in the hours after the murder.  It would be very unlikely that Brown would not have known which individuals prison officials wanted him to name.

Brown's testimony, with its contradictions and his inability to answer numerous key questions, is highly dubious.  When coupled with the impeachment evidence, including Henderson's and Butler's assessment as to his honesty, it is simply unbelievable.  Brown, afraid he would be charged with the murder, and confronted by prison officials who told him "everything that happen," acquiesced and said what the authorities told him to say.  For this, he was richly rewarded, with a minimum-security transfer, a cigarette ration, and a pardon.  Presented with a variation on the classical choice between "silver or lead," Brown chose the silver.  Albert Woodfox and Herman Wallace have suffered for 30 years as a consequence of Brown's choice.

### The Testimony of Leonard "Specs" Turner

Former DOC inmate Leonard "Specs" Turner did not want to testify, and when the state called him, he refused to answer almost all of the prosecutor's questions, other than to state, essentially, "I don't remember."  However, the state called Turner to the stand not for the purpose of eliciting his testimony, but with the cynical intent to "impeach" him using a highly questionable written statement that allegedly implicated Mr. Woodfox in the murder.  To compound the prejudice to Mr. Woodfox, the prosecutor asked Turner a long series of leading, testimonial questions that had

22

the effect of improperly – and falsely – telling the jury that Turner had seen Mr. Woodfox commit

the murder and that Turner had given statements to a half-dozen law enforcement officers about what

he had "seen."

On the stand, Turner was willing to answer only a few of the state's preliminary questions.

Turner denied making any of these statements, and he has now signed a written statement

indicating that 1) the statement attributed to him by the prosecution is false; 2) he did witness the

murder of Brent Miller; and 3) neither Albert Woodfox nor Herman Wallace was involved. Exhibit

P, Statement of Leonard Turner, May 21, 2002.

On the stand, Turner was willing to answer only a few of the state's preliminary questions.

He testified that in 1972 he lived in Pine 1 dormitory and worked as an orderly. R. 1368. He

generally did not go to the dining hall for breakfast. R. 1372. And on the morning of the murder,

Turner was standing in the lobby at the front of Pine 1 when he saw Brent Miller enter the building.

R. 1372-73. Beyond the above, Turner refused to answer any of the prosecution's questions. When

asked if he had given the above-cited written statement, Turner said he had not. R. 1407.

In response to Turner's refusal to testify, the prosecutor, Julie Cullen, asked Turner a long

series of testimonial questions, which could only have left the jury with the impression – an

impression we now know to be false – that Turner had seen Mr. Woodfox kill Brent Miller. Over

more than a dozen pages, Cullen asked Turner the following:

> Q:    Do you remember us talking about Albert Woodfox's involvement in the murder of Brent Miller?
>
> A:    Again, I don't remember. I keep telling you the same thing.
>
>                          * * *
>
> Q:    Now, do you remember telling me what you saw Albert Woodfox do on April 17, 1972?

23

A:    No, ma'am, I surely don't remember that.

\* \* \*

Q:    Well, did you see Albert Woodfox do something on April 17, 1972?

A:    I don't remember, I just told you.

\* \* \*

Q:    Now, did you see Albert Woodfox kill Brent Miller April 17, 1972?

A:    I don't think I did, no ma'am.

\* \* \*

Q:    If you had seen someone stabbed 32 times, you wouldn't remember it?

A:    I think I would.

Q:    If you had been about five or six feet away from someone being stabbed 32 times, don't you think you would remember it?

A:    May, and I may not, you know.  I – I can't say what I would do and what I couldn't do.

\* \* \*

Q:    Didn't you tell me that Albert Woodfox and others killed Brent Miller?

A:    No, ma'am, I never told you that.

\* \* \*

Q:    Did you tell C. Ray Dixon back in April of 1972 that Albert Woodfox and others killed Brent Miller?

A:    I don't remember tellin' him that, if I did or not.

\* \* \*

Q:    Do you remember telling Murray Henderson that you weren't in a position to see anything, but that Hezekiah was there?

A:    No, ma'am, I don't.

\* \* \*

Q:    Did you ever tell [Angola officer Bobby] Oliveaux what you had seen?

24

A:    I don't remember ever tellin' him anything.

*  *  *

Q:    All right, did you ever talk to [Angola officer Carl] Kimble about what you saw in the Pine 1 dormitory?

A:    Not that I remember.

Q:    Okay.  You're not denying that you said – that you told him that, you just don't remember?

A:    Told him what?

Q:    That you saw Albert Woodfox kill Brent Miller?  Let's cut to the chase Mr. Turner.

A:    Let's see, I never –

Q:    You know what we're talking about.

A:    I never told him that.

*  *  *

Q:    All right.  Do you remember giving that statement to C. Ray Dixon?

A:    No, I don't remember givin' that statement to anyone.

Q:    All right.  Do you deny giving that statement to C. Ray Dixon?

A:    I really do.

R. 1393-1407.

Beyond the above, Turner refused to testify.  Mr. Woodfox's attorneys did not even attempt cross-examination.

With the acquiescence of the court, and over the objection of Mr. Woodfox, the state attempted to "impeach" Turner's denial of having given a statement *by introducing the substance*

25

*of the statement attributed to him.*  The state called C. Ray Dixon, a former Angola security officer,

for this purpose.  Dixon stated that Turner was his "snitch."  R. 1566, 1584.

The prosecutor produced the aforementioned unsigned, undated statement, in Dixon's

handwriting.  Exhibit Q, statement attributed to Leonard Turner.  Dixon claimed that the statement

constituted his notes of his conversation with Turner on the night before Turner was paroled (Turner

was paroled on April 19).  R. 1569;  State's Exh. 31.  Dixon stated that he could remember nothing

of the substance of the statement.  R. 1574.  Specifically, he had no recollection of "what Leonard

Turner purportedly said about Albert Woodfox," even though, if true, the statement would have

amounted to the authorities' first break in the case.  R. 1579.

Dixon was then allowed to read the following portions of the statement to the jury:

> I was walking towards the front when these men first came in . . . I told Woodfox,
> Miller is right there . . . Woodfox said I know, and began covering up his face . . .
> Woodfox had a black cap that comes down around the ears . . . to help hide his face
> . . . Woodfox went past the bed with his hand covering his handkerchief . . . Then he
> turned and came behind Mr. Miller . . . He grabbed Mr. Miller in a mugger hold from
> behind, and the other men went in to help with the struggle . . . At this time,
> Woodfox struck Mr. Miller around the top of the shoulder.  When Woodfox stabbed
> Mr. Miller, the other two started jugging also . . . I could not count how many times,
> there were quite a few . . . When Mr. Miller quit hollering, the men came out . . .
> Woodfox was taking off a blue jacket;  I did not notice any cap.  The handkerchief
> was dropped around his neck . . . Woodfox went around Pine 1.

R. 1576-1577.

Leonard Turner has now acknowledged that the statement attributed to him is false.  Exhibit

P, Statement of Leonard Turner, May 21, 2002.  According to a statement Turner provided to Mr.

Woodfox's attorneys on May 21, 2002, Turner did in fact witness the murder of Brent Miller, but

Mr. Woodfox and Mr. Wallace were not involved.  Turner stated the following:

In 1972 when Mr. Miller was killed I was an inmate at Angola in the Pine 1 dormitory.

That morning I was doing cleanup in the lobby like I always did.

Mr. Miller was inside the dorm talking with Hezekiah.

While I was cleaning, two guys from another dorm came in. I said to them, "Hey the police in there." "We know," one of them said back. They both walked into the dorm.

Then a third guy came in. He walked straight up to Mr. Miller (who had his back turned to him). The third guy grabbed Mr. Miller around the neck with one arm and stabbed him with a knife he had in his other hand.

Then the other two . . . rushed up with knives and started stabbing him too.

I took off.

I knew Hooks Wallace, Albert Woodfox, and Gilbert Montegut. None of them were in the dorm or the lobby at the time. I saw what happened and **I know for an absolute fact that none of these three guys were involved in killing Mr. Miller**.

Leonard Turner's statement amplifies what should already have been clear from the trial record: the state in this case, in its desire to remove Mr. Woodfox and Mr. Wallace from the prison population, manufactured evidence and used it to obtain wrongful convictions against them.

The Testimony of Joseph Richey

The testimony of Joseph Richey, a former Angola prisoner, was especially important to the state because he was the only living witness who could purportedly tie Mr. Woodfox to the murder. The state called Richey despite the fact that his testimony, at both the instant and prior trials, was fundamentally inconsistent with the written statement he signed a month after the murder.

Richey testified that he lived in Pine 4 dormitory, which was across the Walk from Pine 1. R. 1421. On the morning of the murder, he was on pill call shortly before 6:00 a.m., and then went

27

to breakfast in the dining hall. R. 1422-23. When he arrived at the dining hall, the kitchen workers were striking, and the sick call inmates were ordered back to their dorms. R. 1425. Richey went back to his dorm and went to sleep for at least an hour. R. 1428. When he awoke, almost all of the men in his dormitory had gone to breakfast. R. 1428.

Richey got up and brushed his teeth in the bathroom at the front of Pine 4 (and just across the walk from Pine 1). R. 1430, 1496. While he brushed his teeth, Richey claimed, he could see through the window as Brent Miller walked into Pine 1. R. 1430. According to Richey, he decided to follow Miller into Pine 1 to continue a conversation the two had been having about the Vietnam War. R. 1433-34. He put his toothbrush away and walked out the front door of Pine 4, which was only a few feet across the Walk from the entrance to Pine 1. R. 1435. He estimated that it had been two or three minutes since he had seen Miller enter the dorm. R. 1493. He hadn't seen anyone follow Miller into the dorm and hadn't heard any "screaming or hollering" coming from Pine 1. R. 1495-96. As he exited Pine 4, Richey said he saw Specs run out of Pine 1. R. 1436. According to Richey, Specs was followed by Mr. Woodfox, Gilbert Montegut, Chester Jackson, and Herman Wallace. R. 1437-1441. Next, Richey said he saw Hezekiah Brown emerge from the dormitory wearing pajamas and then run back in. R. 1441. All six men — Specs, Brown, Montegut, Jackson, Wallace, and Mr. Woodfox — allegedly turned right and headed towards the dining hall.

When Richey allegedly saw the men exit Pine 1 and head for the dining hall, Richey merely assumed that they were "stragglers" who were late for breakfast. R. 1488. Nevertheless, instead of continuing into Pine 1, in keeping his plan to talk to Miller, Richey claimed inexplicably that he stood in the Pine 4 doorway, watching, for long enough for all six men to leave the dorm, and then for Brown to go back inside, change out of his pajamas, and re-emerge "fully clothed." R. 1441.

28

Only after Brown had walked off in the direction of the dining hall did Richey go into Pine 1. R. 1443. At Mr. Woodfox's 1973 trial, Richey estimated that "45 seconds to a minute" elapsed between the time Specs exited Pine 1 and the time Hezekiah left for the second time. AW1 152. Richey never explained why he stopped for such a significant period of time to observe what the thought to be an insignificant event — a small group of men hurrying off to breakfast.

Richey said that he then walked into Pine 1 and found Miller's body in the lobby area in the front of the dorm. R. 1443. Richey then assumed that the men he saw exiting Pine 1 had gone to find a stretcher. R. 1445. Richey walked out of Pine 1, stood on the Walk in front of Pine 2, the next building over, "lit up a cigarette and I waited." R. 1445. After what seemed like "forever," Sergeant Hunter — accompanied by Sergeants Kirk and Bell — came from the direction of the kitchen and entered Pine 1. R. 1447. Richey remained in front of Pine 2, smoking, and watched as others came and entered Pine 1. R. 1448.

Richey also testified about the interrogations that were conducted of the prisoners on the Walk. Men numbering in the hundreds or "maybe close to a thousand" were lined up on the Walk. R. 1448. They were stripped of their clothes and questioned. R. 1448. The administration immediately began locking up prisoners "who they thought were capable." R. 1451. Richey testified that he was interrogated and stated "exactly what I stated today. I've always stated that." R. 1478. Specifically, Richey testified that he gave "a generic answer" to the effect that he "was on the Walk, walked in, I saw Mr. Miller, I came back and . . . I stood on the side of Pine till I smoked a cigarette." R. 1451.

The Sheriff's interrogation notes show that Richey committed perjury. He did not, as he testified, tell the authorities that he had seen Mr. Woodfox and the others run out of the dorm, nor

29

did he tell them that he found Miller's body. According to Sheriff Daniel's notes of the April 17 interrogations, Richey told the authorities that he "went to chow then went to Hic 4 and gave [an inmate named] Crutches some cigs, came back to dorm." Exhibit R, sheriff's notes of interrogations at 35. In fact, Richey did not concoct his story about seeing the men run out of Pine 1 for over a month, a month that he spent locked in a cell block.

Richey was placed in the cell blocks on the day of the murder. R. 1451. At some point, while in the cell blocks, Richey was called out and interrogated by Hayden Dees and C. Ray Dixon. R. 1452. Contrary to his testimony, it was only at this point that Richey agreed to implicate Mr. Woodfox. Richey agreed to sign a written statement implicating Mr. Woodfox and the others on May 16, 1972. R. 1454; Exhibit S, Statement of Joseph Richey. He was released from the cell blocks and returned to Pine 4 dormitory a few days after giving the statement. R. 1455.

According to Warden Henderson, the circumstances surrounding Richey's testimony were highly suspicious. Henderson seems to agree that Richey committed perjury. He testified that **he doesn't "think [Richey] knew anything about the case to begin with**." R. 1967. Rather, he said that Associate Warden Dees spirited Richey from Angola to the State Police Barracks without Henderson's knowledge, which Henderson said "was completely outside the scope . . . of the legitimate investigation." R. 1965. Dees never mentioned any protection concerns that might have justified this transfer. R. 1966. Henderson was not made aware that Richey had given a statement or been moved until "a few days after it was done." R. 1980. Dees' failure to notify Henderson, his superior, of developments in the case was not "the way it was supposed to be handled at all." R. 1981.

Richey's written statement merits close examination, because it cannot be reconciled with his trial testimony. In his statement, Richey did not say that he watched from Pine 4 as the men ran out of the dormitory, but rather that he walked into Pine 1 *while the murder was still taking place*. According to the statement, Richey walked out of Pine 4 and was able to see through the open door to Pine 1 that Miller "was trying to get up off the floor and he fell back down." Richey then walked "about two steps inside the door of Pine 1 and Woodfox, Montegut, Hooks, and Noxema was there," along with Specs and Hezekiah. When the men left, they "went in different directions." "It looked like they expected me to walk in on something." Mr. Woodfox "went back towards his dorm [Hickory 4]," Noxzema and Hezekiah "went towards the gate," and Richey "didn't pay much attention to where Montegut went." According to his statement, Richey didn't see any blood or knives on the men.

Taken together, Richey's testimony and his written statement demonstrate that he lied. At trial, Richey was certain that he had watched from across the Walk as the six men emerged from Pine 1. In his statement, this would have been impossible, because he was already inside the dorm when the men exited. The statement's recitation that, "It looked like they expected me to walk in on something" contradicts his trial testimony that he simply thought the men leaving the dorm were late for breakfast. In his statement, Richey said he watched from across the Walk as Miller tried to raise himself from the floor; at trial, Richey didn't see Miller until he entered the dorm, and Miller was dead when he found him (which as Richey testified, was only two or three minutes after Miller had walked into the dorm). At trial, Richey embellished his alleged recollection that all of the men went towards the dining hall by stating that he assumed that they were going towards the hospital

31

to get a stretcher, whereas in his statement, he was equally sure that Mr. Woodfox went in the opposite direction – towards the Hickory complex.

When questioned about the discrepancies between his sworn testimony and his signed statement, Richey was evasive. He acknowledged signing the statement, but claimed he didn't bother to read it before signing it. R. 1503. Literacy would not appear to be an issue, as Richey boasted of writing writs for other prisoners. R. 1514. He dubiously claimed that the contradictions resulted from a secretary who mis-typed his statement, and suggested that there exists somewhere a "revised" version of his statement which is accurate. R. 1483, 1503. Richey further stated that the discrepancies between his statement and his testimony were resolved "in a previous hearing." Mr. Woodfox is unaware of any previous hearing at which the conflict was resolved; indeed, the conflict could not have been resolved at the prior trials of Mr. Woodfox or Mr. Wallace, as Richey's statement was still being suppressed by the state – and thus unavailable to the defense – at that point.

In addition to the differences between the account Richey provided in his written statements and his trial testimony, Richey's testimony has varied substantially at the three trials he has participated in. For example, at Mr. Woodfox's 1973 trial, Richey stated he first saw Mr. Miller's body "five or 10 seconds after I saw Hezekiah leave." AW1 156. When he testified against Mr. Wallace in 1974, Richey stated that when Specs – the first person he said he saw exiting the dorm – the door hit a trash cart and it stuck open, enabling Richey to "see directly into Pine 1 and I saw a body." HW 207. Richey said he was able to see Miller's body as each of the six men opened the door to exit the dorm. HW 212. By the time of the 1998 trial, Richey returned to his claim that he didn't see Miller's body until the men had left and he walked into Pine 1.

32

At Mr. Woodfox's 1973 trial, Richey said it took less than a minute for all six men to exit the dorm. AW1 208. At Mr. Wallace's trial, Richey said "approximately three minutes" elapsed. HW 233.

At Mr. Wallace's trial, Richey agreed that he had "just happened" to be walking out of Pine 4 when he saw the men exiting the dorm. HW 220. By 1998, Richey had embellished his testimony with his story about walking across the Walk to talk to Brent Miller about U.S. military policy in Vietnam. R. 1433.

At Mr. Woodfox's 1973 trial, Mr. Woodfox's attorney attempted to establish exactly what time it was when Mr. Richey saw what he claimed he saw. He testified that he woke up for the second time at "close to 8:00 a.m." AW1 149. When asked if he meant "five minutes until 8:00 or five minutes after 8:00," Richey said, "I can't determine that." AW1 149. He couldn't remember whether he woke up before or after 8:00. Richey's recollection at Mr. Wallace's trial in 1974 was similarly faulty. HW 228. By contrast, at Mr. Woodfox's 1998 trial, Richey regained his memory and stated that he could remember waking up at exactly five minutes before 8:00 because he was awakened by a radio station from Baton Rouge that always played a Carlos Santana song at five minutes before the hour. R. 1491. As if for effect, Richey allowed that he was "not certain" which Carlos Santana song was played.

As with the other witnesses in this case, Richey apparently had a powerful incentive to testify against Mr. Woodfox. Richey claimed that he was not rewarded for testifying on behalf of the state, but the facts belie his contentions. He acknowledged that in 1974 or 1975 [meaning within approximately a year of testifying against Herman Wallace], he was transferred to minimum-security trustee status at the State Police Barracks in Baton Rouge. R. 1507. He worked at the governor's

33

mansion, where "I was around Governor Edwards, his children," and "I was free to have weekend furloughs." R. 1469, 1507. Richey, in fact, had so much freedom at the State Police Barracks that he was able to commit three bank robberies using stolen police cars during his stay there. *See State v. Richey*, 364 So. 2d 566 (La. 1978). Richey has claimed that his transfer to the State Police Barracks was not a reward. However, it is fair to say that for a man assigned to one of Angola's violent dormitories in the early 1970s, a transfer to trustee status at the State Police Barracks would have been priceless.

### The Testimony of Paul Joseph Fobb

Paul Joseph Fobb, a blind, sociopathic, and mentally retarded man, served as an "eyewitness" for the state. His poor vision and mental condition, not to mention the fact that his testimony contradicted that of every other witness, did not prevent the state from using him to convict Albert Woodfox.

Because Fobb died in 1991, the state used his transcript testimony from Mr. Woodfox's 1973 trial. Fobb testified that he lost sight in his right eye when it was poked with a cotton stick in 1967. R. 1606, 1618. He had a cataract on his left eye, although he was unable to provide a clear answer as to how long he had had it. R. 1606.

Taken at face value, Fobb's testimony was that during the month leading up to the murder, he continually and inexplicably followed Mr. Woodfox around Angola, observing his activities and eavesdropping on his conversations. Fobb claimed that sometime in April 1972, he observed Brent Miller ordering Mr. Woodfox to leave Pine 4 because he didn't live there. R. 1608. Then, on April 10, 1972, Fobb claimed that he was working in the kitchen when he heard Mr. Woodfox say that Miller was "messin' with him" and that he was going to "fix that little bitch." R. 1609. On April

34

16, the day before the murder, Fobb was again hanging around an unspecified location when an unnamed person asked Mr. Woodfox about "the accident" [sic] and Mr. Woodfox said he was going to "go through with it." R. 1609. Fobb said that the dining hall strike was intended to "pull the free mens off the Walk, for to give him a chance to do what he have to do." R. 1611. Fobb did not explain how he knew this.

On the morning of the murder, Fobb claimed he was walking towards the blood plasma plant. When he got near Pine 2, he saw Mr. Woodfox, alone, enter Pine 1. R. 1612. Fobb, for some reason transfixed by the sight of Mr. Woodfox walking into a dormitory, stopped on the Walk and watched for "five, 10 minutes." R. 1613. At some point, Mr. Woodfox came back out of Pine 1 and threw a rag into the door of Pine 4 (the very door Joseph Richey claimed to be standing in). R. 1613. Mr. Woodfox then walked back down the Walk towards the dining hall. R. 1614. Fobb said he was "stunned" by what he had seen. R. 1614. He apparently gave up on his plan to go to the blood plasma plant and instead turned around and walked back to his dormitory. R. 1614.

On cross examination, Fobb was asked if he saw anybody else exit Pine 1 along with Mr. Woodfox. He replied,

> Well, at that time they could've and they could not 'cause at that time, like I said, they could've come out behind him and by me a-looking at him at that time, I couldn't see them . . . Just like I said the first time, I say I seen one particular person. Now, it could have been more behind him, but at the particular time, my sight was just on one person which it shocked me, it stunned me, I just know that it stunned me.

R. 2082-83.

Paul Fobb's testimony was patently perjurious. The information in the record suggests several possible explanations for this. First, according to the DOC's own analysis, Paul Fobb was

35

mentally retarded. Indeed, his DOC "Psychometric Report" indicates that he had an IQ of 63, which placed him in the lowest one percentile of the population. Exhibit T, Psychometric Report. On May 19, 1967, Fobb was admitted to the psychiatric ward of Charity Hospital, New Orleans, where he spent 21 days and was diagnosed with a "sociopathic personality." Exhibit U, DOC Classification Summary; Exhibit V, DOC Psychological Evaluation. On June 15, 1967, a St. John Parish court ordered Fobb, who stood charged with two attempted aggravated rapes, confined to the state mental hospital in Jackson for a 90-day evaluation. Exhibit W, minutes of State v. Paul Fobb, No. 13921. Fobb was eventually ruled competent to stand trial, pled guilty, and was sentenced to 30 years. Fobb's mental retardation, combined with his apparently sociopathic personality, would have rendered him uniquely susceptible to coercion or bribery by the prison officials who sought his testimony.

An additional reason for Fobb's decision to perjure himself against Mr. Woodfox was the state's decision to release him from his 30-year sentence following his testimony. As a result of his testimony, the Department of Corrections sought clemency for Fobb and eventually granted him a medical furlough for which he was not eligible and released him from prison. He remained on furlough for 15 years, even though he committed two serious crimes during that time, and was eventually released from DOC supervision.

In 1970, James C. Williams, the parole department's Thibodaux district supervisor, and William E. Dunn, the DOC's Chief Probation and Parole Officer, had recommended against a time cut for Fobb. Exh. X, 1970 clemency recommendation. Citing Fobb's two violent rapes, Fobb's psychological history, and the opposition of the police, the district attorney, and the sentencing judge,

36

Williams and Dunn concluded that "there is nothing in this subject's background that would even slightly suggest a cut in this subject's sentence." *Id.*

After Fobb testified, the situation changed. Beginning at least as early as June 6, 1974 (only six months after Herman Wallace was convicted), Dunn asked Williams for "a favorable recommendation on [Fobb's] old Pardon Board action," citing as justification that Fobb "was a witness in the Brent Miller case and is now totally blind." Exh. Y, Memo to Mr. J.C. Williams. Three weeks later, on June 24, 1974, Williams and Dunn submitted a recommendation to DOC director Elayn Hunt, seeking a time cut for Fobb. Exhibit Z, 1974 clemency recommendation. Williams and Dunn stated, bluntly, "our office is in favor of clemency in this case due to the attitude of the sentencing judge, because the subject did testify for the state in the murder trial of Brent Miller, and because of subject's present condition (blindness)." *Id.* In spite of the DOC's efforts, and for reasons that are unclear, Fobb did not receive clemency.

The DOC responded by unilaterally releasing Fobb via a medical furlough. By July 24, 1974, according to a memo by DOC penologist Robert Henderson, preparations for Fobb's furlough were underway. Henderson visited Fobb at the St. Francisville Jail, obtained a medical release, and noted that Fobb had "very little vision." State's Exh. 32. On August 22, 1974, Director Hunt ordered her staff to prepare a medical furlough for Fobb. Exh. AA, memo from J.D. Middlebrooks to Elayn Hunt. Ominously, Hunt's handwritten note states, "**please have Mr. Hayden Dees talk to this man prior to release. Director wishes to have Mr. Dees deliver a message.**" Fobb was released on September 5, 1975, subject to 90-day extensions, which were always granted. R. 2123; State's Exh. 34.

37

According to Gary Gremillion, a classification officer who reviewed Fobb's case, Fobb did not satisfy the DOC's requirements for receiving medical furloughs. Gremillion testified that, to his knowledge, DOC policy limited medical furloughs to prisoners "diagnosed as terminally ill with a life expectancy of less than six months." R. 2099. Gremillion said he was familiar with DOC policy going back to 1981, when he was hired, but was not sure about policy in the 1970s. R. 2107. It is unclear what, if any, written policy the DOC had in 1974 regarding the requirements for earning a furlough.

Fobb remained free on furlough for 15 years. During this time, he committed two serious crimes, both of which were known to the DOC. On May 28, 1980, Fobb was arrested for battering his domestic partner, Alberta Jasper. According to a memo to DOC headquarters filed by probation and parole agent Randal Gaines, Fobb "became very hostile and started beating her with an object she believed to be a piece of wood . . . she suffered a broken bone in her nose and had to spend 11 days in the hospital to undergo an operation for the particular injury." Exhibit BB, memo from Randal L. Gaines to Lloyd Blunt and Charlie Abrams. According to a police report on the incident, Fobb pulled a gun on Jasper. Exhibit CC, Supplementary Investigation Report. The officer noted that Jasper's "left side of her face was swollen. Her left eye was completely closed. She had what seemed to be a minor laceration over and around the left eye. There also was blood stains on her clothes." Fobb was convicted of the battery but not sentenced to prison. Even though the Gaines memo demonstrates DOC awareness of Fobb's crime, he was continued on medical furlough. Def. Exhibit 20.

Fobb was arrested again on February 28, 1987, this time for possession of a firearm with an obliterated serial number. Def. Exhibit 23. He was again convicted and given a one-year suspended sentence. His DOC furlough continued.

According to voluminous DOC correspondence, the Department was aware that Fobb was committing serious crimes while on medical furlough. Exhibit DD, memo from Larry Boudreaux to David Stanley, July 17, 1987; Def. Exhibit 19, Memo from Anita Augustus to David Stanley, December 30, 1987; Exhibit EE, Memo from Michael Erwin to Morris E. Easley, Jr., January 5, 1988.

No DOC personnel seem to have questioned Fobb's continued furlough until 1989, when classification administrator Gary Gremillion wrote a memo to Deputy Secretary James E. Morris, stating that, "it is my opinion that Mr. Fobb's medical furlough should have been terminated . . . [when] . . . he was arrested for Possession of a Gun with an Obliterated Serial Number." Def. Exhibit 22. Gremillion noted further that,

> It also appears that Mr. Fobb may have been released on medical furlough for reasons other than his disability. A review of his file indicates that he was that states [sic] witness in the trial of those inmates charge [sic] with the killing of Correctional Officer Brent Miller.
>
> To my knowledge, it has never been the department's policy to release inmates on medical furlough unless they were expected to expire within six months. As such, I believe that Mr. Fobb was given extraordinary consideration due to his protection concerns/testimony rather than the nature of his medical condition.
>
> Since Mr. Fobb has been arrested twice while on medical furlough and due to the serious nature of the crimes for which he has been convicted, I think that serious consideration should be given to terminating his furlough.

39

The DOC did not terminate Fobb's furlough, however. Instead, they released him from custody altogether via an award of good time for which, like the furlough itself, Fobb appears not to have been eligible. On January 19, 1984, the DOC informed Fobb that his release date had been calculated to be 5/26/94, because "offenders who are on medical furlough do not earn goodtime while on medical furlough." Exhibit FF, letter from Vallerie Ibert to Paul Fobb, January 19, 1984. According to a 1983 opinion by attorney Cynthia G. Eyre of DOC Legal Services, "[i]f an inmate's medical furlough is for a long term, we cannot say that he is constructively still within our custody, and good time cannot be earned." Exhibit GG, letter from Cynthia G. Eyre to Mel Pearce, August 12, 1983. Nevertheless, on June 2, 1989, barely a month after Gremillion recommended returning Fobb to prison to complete his sentence, Bruce Lynn, the Secretary of Public Safety and Corrections, approved a grant of good time to Fobb, and Fobb was released from custody. Exhibit HH, memo from Claudia Laperouse to the Office of Adult Services, June 2, 1989.

Clearly, the DOC granted Paul Fobb with valuable compensation in exchange for his testimony. Mr. Woodfox would very much like to know the substance of the "message" Elayn Hunt dispatched Hayden Dees to deliver to Fobb before he was furloughed. When considered in light of the fact that Fobb was almost certainly blind – and, therefore, physically incapable of witnessing what he claimed to have seen – it is obvious that Fobb's testimony against Mr. Woodfox was completely fabricated.

### The Hearsay "Testimony" of Chester Jackson

Chester Jackson testified at Mr. Wallace's 1974 trial, but he did not testify against Mr. Woodfox. For this reason, the First Circuit and the trial court both ruled his testimony inadmissible at Mr. Woodfox's trial. However, the prosecutor at Mr. Woodfox's trial repeatedly elicited

testimony – or testified herself – that made clear to the jury that Jackson had confessed to the murder and implicated Mr. Woodfox and Mr. Wallace.  Standing alone, that bare information must have seemed to the jury to be damning evidence.  If the jury had been aware of Jackson's complete testimony, along with his utterly irreconcilable written statement, Jackson would arguably have been an exculpatory witness for Mr. Woodfox.  Because the substance of Jackson's testimony is important to Mr. Woodfox's contention that Jackson lied and falsely implicated him in the murder, and because the it supports Mr. Woodfox's claim that the prosecution's improper references to Jackson amounted to the introduction of false evidence, Jackson's testimony is set forth in detail below.

Neither defense counsel Charles Garretson nor Jackson's co-defendants had any advance notice that the State intended to call Jackson as a witness.  Jackson had pleaded not guilty and had consistently told Garretson and his co-defendants that he had not participated in the murder.  Exhibit II, Testimony of Charles Garretson, Evidentiary Hearing, *Herman Wallace v. John P. Whitley*, March 27, 1998, at 4.  After a recess on the second day of Mr. Wallace's trial, however, Jackson entered the courtroom in the company of the district attorney and sat down at the prosecution table.  Exhibit II at 15.  The prosecution never consulted with Garretson before approaching his client.  Garretson later testified that, "I was in a complete state of shock . . . it took everything I could glean together to maintain professionalism and sanity and intelligence to go forward after this lunch break."  Exhibit II at 22.  The court granted Garretson less than 30 minutes to regroup, after which he was forced to cross-examine Jackson, his own client.  Exhibit II at 8.

Jackson testified that he lived in Hickory 4 dormitory with Mr. Woodfox.  HW 101.  Just before the inmates were summoned to breakfast for the second time on April 17, 1972, Mr. Woodfox allegedly concealed a knife underneath his sweatshirt.  HW 102.  As Woodfox placed the knife in

41

his clothing, he asked Jackson if he was "ready." HW 103. Jackson said that he knew what Mr. Woodfox meant because the two men had discussed "throwing a free man away" about a week prior to the killing. HW 105.

Jackson stated that he and Woodfox left for breakfast at around 7:20 a.m. HW 101. They walked in the direction of the dining hall, but stopped near the clothing room to wait for Mr. Wallace. HW 107-08. Jackson incorrectly stated that Mr. Wallace lived in Pine 1 dormitory. HW 108. After about 10 minutes, Mr. Wallace appeared. Jackson testified that Mr. Wallace asked Mr. Woodfox whether he had "the weapons." HW 109. Prosecutor Ralph Roy, conducting the examination, then corrected Jackson, who agreed that Mr. Wallace had actually asked whether Mr. Woodfox had "the weapon." HW 109. Jackson did not see a weapon in Mr. Wallace's possession. HW 109. Jackson testified that he did not have a knife. HW 113.

According to Jackson, the three men then walked back down the Walk towards the dormitories. HW 112. Jackson and Mr. Woodfox waited between Oak 1 and Oak 2 (which were whites-only dormitories) while Mr. Wallace "scouted for a free man to kill." HW 111. Mr. Wallace returned after about 15 minutes and stated that there was a man sitting on a bed in Pine 1. HW 112-13. The three then walked to Pine 1. There was nobody else around the Pine or Oak dormitories. HW 114, 167. Mr. Woodfox, Mr. Wallace, and Jackson, in that order, entered Pine 1. Jackson said that when they entered the lobby to Pine 1, all three men placed handkerchiefs over their faces. HW 120-21. There were "five or six" other men in the back of the dormitory, including Leonard Turner. HW 122, 125. Miller was sitting on Hezekiah Brown's bed, facing towards the front of the building. HW 124. He was talking to Brown.

According to Jackson, Mr. Woodfox, who was wearing a handkerchief over his face and wielding a knife, entered the dormitory and somehow walked past Miller, who was facing the front of the dormitory and sitting only a few feet from the door. HW 127. Mr. Woodfox allegedly then approached Miller from behind, grabbed him around the throat, and began stabbing him in the front of his body. HW 127. After Miller had been stabbed approximately twice, Jackson said that Miller jumped up and asked, "Why?" HW 130. He then tried to walk out the door, but Mr. Wallace pushed him back into the sleeping quarters. HW 130. At that point, "everybody" started stabbing Miller. HW 130. Miller didn't fall. HW 131. Jackson then entered the sleeping quarters and "the first knife I got was from Woodfox." HW 131. Jackson then began stabbing Miller, who was still standing. HW 132. Jackson did not know how many times he stabbed Miller. HW 132. Miller "fell after it was over with." HW 133. Mr. Woodfox "snatched" his knife out of Jackson's hand, and after Miller fell, Mr. Wallace and Mr. Woodfox stabbed him about twice more. HW 134. When the struggle ended, Mr. Woodfox and Wallace ran out of the building. HW 134. Jackson lingered over Miller's dying body for "about three seconds," apologized, and ran out. HW 135.

Jackson's placement of the other people in the dormitory at the time Mr. Woodfox allegedly attacked Miller is problematic. He testified that Mr. Wallace was standing in the doorway separating the sleeping quarters from the lobby. HW 129. Specs, who had been in the back of the dormitory, allegedly walked out of the building when the attack began, which would have taken him through Mr. Wallace. HW 128. As for the rest of the "five or six" men in the back of the dormitory, Jackson "believed" that they stayed in place during the struggle, but, "I wasn't looking at them . . . I wasn't paying no 'tention." HW 173.

Jackson's placement of himself during these events is perhaps most incredible. He testified that when he witnessed Mr. Woodfox stabbing Miller in the sleeping quarters, he was "still in the lobby," hiding behind the wall separating two rooms, because he didn't want Brown, his friend, to see him. HW 127, 129. When asked if he was peering through the doorway rather than standing behind the wall, Jackson testified that he was not looking through the doorway, and, "[t]hey are on one side of the partition and I'm on the other side." HW 169. He acknowledged that the partition was "[s]olid concrete . . . [a]ll the way up to the ceiling," and, "I can't see through it." HW 169. Somehow, nevertheless, Jackson claimed he had been able to witness the stabbing from this vantage point.

Jackson testified that when he began stabbing Miller, the struggle was taking place in the doorway to the lobby. HW 133. Brown, who had been pinned against the wall when "all the action was taking place on his bed," walked out of the front door of the building while Jackson was stabbing Miller. HW 132, 172. Brown did not return while Jackson was in Pine 1. HW 172. Jackson could not describe the clothes Brown had been wearing. HW 171. When asked if any of the men in the back of the room had participated in the struggle, Jackson testified that he didn't know. HW 134. Jackson estimated that the struggle had lasted "ten or eleven minutes." HW 135.

When Jackson left the building, he testified, "that's when all the people from the other dormitories came in Pine 1 and I just left and went and changed clothes." HW 135. Mr. Woodfox allegedly ran down the side of Pine 1. HW 136. Jackson said that he and Mr. Wallace went to Pine 3, which was across the Walk and several feet down from Pine 1, to change clothes. HW 137. When asked if there were any people in Pine 3, Jackson stated that, "[t]hey had some people in there, you know, cleaning up, and some guys waiting to go to work or to school, something like that." HW

44

139. Jackson, who said he had blood on his kneecap, took off his clothes and threw them in a trash can in the corner of the dormitory. HW 137. Jackson found a pair of pants on a bed and put them on.

Mr. Wallace, meanwhile, allegedly went behind a bed and found some fresh clothes. HW 138. When asked if Mr. Wallace's clothes had blood on them, Jackson said they did, but when asked where the blood was, Jackson responded, "I can't give you no 'pacific answer on that there, 'cause he could have blood anywheres on him." HW 139. When asked what Mr. Wallace did with the clothes he had been wearing, Jackson stated that, "He left them there," then, "I can't say exactly what he did with them." HW 138. Finally, in response to the prosecutor's prompt of "He left with them?" Jackson replied that, "He left with them, out the door, you know, towards the door. Now what he did with them, I don't know . . . He had them in a bundle." HW 139. Mr. Wallace allegedly left Pine 3 before Jackson, and when Jackson emerged from the building, Mr. Wallace "wasn't nowheres around." HW 177.

Jackson testified that he was interrogated at around 8:15 or 8:30 that morning. HW 142. He was asked if he knew anything about the murder and he said he did not. HW 142. After the interrogation, Jackson said that he walked out onto the yard and talked with Hezekiah Brown. The two did not mention the murder. HW 142. Jackson testified that he was interrogated twice more on April 18, but did not provide any information. HW 143. Finally, Jackson was questioned on the night of April 19, at which time he confessed. HW 143. Jackson acknowledged signing a written confession, which he said, falsely, was identical to his trial testimony, "word for word." HW 179. The prosecutor, who produced the confession in court but did not introduce it into evidence, stated

that, "I notice it's dated 8:50 p.m., April 19 of '72 . . ." HW 187. Jackson testified that he named

himself, Mr. Wallace, and Mr. Woodfox in the confession, but not Mr. Montegut. HW 180.

Jackson appears to have unwittingly acknowledged that he was beaten by correctional

officers shortly before his April 19 confession. Jackson testified that, "I was picked up on the 18th

. . . I was put in the hole." HW 177-78. When asked if he had been beaten, Jackson testified that,

"I got hit," and, "They had a tough meeting when they first locked me up." HW 166, 167. Jackson

admitted that he had informed his lawyer of this "to go to the hospital, try to get me a doctor . . . I

told you how the people harassing me." HW 167. When Jackson was asked if he had ever told his

co-defendants that prison officials had placed a gun to his head on April 17, 18, or 19, Jackson

replied, "[n]ot seriously, no." HW 183. He admitted that he might have made such a statement to

his co-defendants "to protect myself." HW 183.

During the State's examination of Chester Jackson, there was not a single mention of Gilbert

Montegut, even though he was also on trial for the murder. On cross examination, Jackson stated

that, "I just start knowing Gilbert since this incident happened, since we been indicted, that's when

I started knowing him." HW 158. Shortly before he made this statement, however, the following

colloquy between Jackson and defense counsel took place:

> Q:    Yes, April 17, 1972, did you see Gilbert Montegut anywhere?
> A:    I didn't see him when he passed me, when I was waiting on the Walk.
> Q:    You didn't see him when he passed you?
> A:    No.
> Q:    Well, what makes you think he passed you, if you didn't see him?
> A:    I mean, if he'd a passed me . . .
> Q:    You would have seen him?
> A:    He would have said something.

HW 151.

46

When asked if Montegut had been involved in the murder, Jackson replied, "He could have been in the dormitory and I didn't see him probably . . . or he could have came in the dormitory when the struggle was going on . . . I wasn't paying no 'tention about who was coming in or who was going out." HW 150. When asked if Montegut stabbed Miller, Jackson replied, "Well, I can't say definite. I can't give you no definite answer on that." HW 151. Jackson testified that Montegut had not been present when he and Mr. Woodfox were allegedly waiting on the Walk for Mr. Wallace or when the men were walking to Pine 1, and "not during the struggle." HW 152, 157. When defense counsel asked whether Miller had been stabbed when Jackson entered the Pine 1 dormitory, Jackson stated, "He was stabbed when I came through the door." HW 151.

In addition to his trial testimony, Jackson signed a statement on April 19, 1972. The statement warrants detailed examination because it amounts to a completely different, yet equally fanciful, allegation against Mr. Woodfox. According to the statement, Mr. Woodfox was "eight or nine" men ahead of Jackson in the line of inmates walking to the dining hall during the second trip to breakfast on the day of the murder. Jackson saw Mr. Woodfox, wearing a "cap with the flap turned down," drop out of the line near the clothing room. Jackson, for some reason intrigued by Mr. Woodfox's hat, stood outside the dining hall to watch Mr. Woodfox. Jackson, inexplicably, claimed he then became concerned that he had not seen Mr. Wallace enter the dining hall, so he walked down the walk to look for him, "feeling that something was wrong."

As Jackson proceeded down the walk, he saw Mr. Wallace and Mr. Woodfox standing in the yard near the Pine dormitories. Jackson then stopped near Pine 1. Mr. Wallace fleetingly appeared on the walk, then disappeared. Mr. Woodfox then appeared and informed Jackson that he was going to "kill a pig." Mr. Wallace then reappeared, said, "I didn't see nobody," and walked into Pine 1.

47

When he returned, he said, "The chump's in there." Jackson "wanted no part of this," so he started walking towards Oak dormitories.

A few minutes later, Jackson claimed he heard screaming coming from Pine 1. Incredibly, he ran back to the dormitory. He looked through a window and allegedly saw Mr. Wallace and Mr. Woodfox stabbing Miller. After seeing this, he decided to enter the dormitory. Mr. Wallace allegedly pushed Jackson out of the way and left with Mr. Woodfox, after which Jackson walked away. Noticing that he had blood on his hand, Jackson went to his dormitory and washed it off.

Jackson's bizarre trial testimony, standing alone, was plainly not believable. Jackson's version of events brimmed with internal contradictions. He was unwilling, for reasons that may never be known, to implicate Gilbert Montegut in the murder. And his testimony was thoroughly irreconcilable with the testimony of the other prosecution witnesses.

The incredible character of Jackson's trial testimony warrants detailed discussion. To begin with, Jackson admitted that he had not been in a position to witness the events he described at trial. Rather, when Albert Woodfox allegedly stabbed Officer Miller, Jackson said he was in another room, the lobby, standing behind, in his words, "a solid concrete" wall through which he "can't see through." He explicitly denied peering around the wall and through the doorway into the sleeping quarters. Nevertheless, he described the stabbing in fine detail. He claimed that he saw Mr. Woodfox grab Miller from behind and stab him in the chest, and he claimed he was able to see through the wall when "everybody" joined in the attack.

At the same time, Jackson contradicted himself and was unable to recount crucial details of the murder. He admitted to stabbing Miller, but didn't know how many times he stabbed him. He stated that "the first knife I got was from Woodfox," but never mentioned a second knife. He was

48

unable to identify the bloody knife found near the scene of the murder.  And he testified that Miller "fell after it was over with," yet also said that Mr. Wallace and Mr. Woodfox continued stabbing Miller after he had fallen to the ground.

Jackson admitted to being part of a plot to kill a security officer, but never gave any explanation as to why he or any of his co-defendants would want to commit such a grave crime.  He never explained why Mr. Wallace and Mr. Woodfox would have allowed Jackson, who was unarmed, to join them in their alleged plot.  Mr. Woodfox's alleged act of ceremoniously handing a knife to the superfluous Jackson simply to allow him to take part in the murder defies belief.

Jackson said that Hezekiah Brown had been his friend for a long time, yet he acknowledged that he agreed, without any apparent reservation, to kill Brown along with Miller.  When the murder actually took place, however, there is no indication that Jackson or anyone else attempted to kill Brown or, for that matter, any of the other "five or six" men Jackson claimed were in the dormitory during the murder.  In fact, Jackson claimed that he hid in the lobby during the murder because he was afraid Brown would be able to identify him, which does not comport with his claim that he planned to kill Brown.

Jackson claimed that he threw his bloody clothes in a trash can in the Pine 3 dormitory, yet no bloody clothes were ever recovered by investigators, who specifically stated that they searched in trash cans.  He swore that Mr. Wallace had blood on his clothing, yet he had no idea where the blood was.  He testified that Mr. Wallace left his bloody clothes in Pine 3, but when the prosecutor corrected him, he decided that Mr. Wallace had actually left the building with his bloody clothes in a bundle.

Other details of Jackson's version of events simply do not make sense. He claimed that Specs, who had been in the back of the building when the attack began, calmly and without fear walked past Mr. Wallace, who was allegedly armed with a knife and in the process of stabbing someone to death, and left the building. As for the "five or six" unnamed men in the back of the room, Jackson could not even say for sure whether or not they had participated in the killing. Inexplicably, Jackson testified that immediately after the murder "all the other people from the other dormitories came in Pine 1." There has never been any testimony that any group of people entered Pine 1 in the minutes after the murder, and it is difficult to believe that prisoners assigned to other dormitories would voluntarily present themselves at the scene of a just-murdered security officer.

Jackson's statement demonstrates that he had previously sworn to the accuracy of another, entirely different, version of the murder. Exhibit JJ, Statement of Chester Jackson, April 19, 1972. In that version, Jackson, rather than being part of a premeditated plot to kill a security officer, served as a curious intermeddler in the affairs of Herman Wallace and Albert Woodfox. Strangely fascinated by Mr. Woodfox's hat, Jackson decided to forgo breakfast in order to follow Mr. Woodfox around the prison grounds. When he learned that Mr. Woodfox and Mr. Wallace were preparing to murder a security officer, Jackson left, because he "didn't want no part of this." But when he heard the screaming of that same security officer being stabbed to death, Jackson turned and rushed to the scene.

Because Jackson's testimony was not admitted, Mr. Woodfox's jury learned only what the prosecution was able, in violation of the orders of the Court of Appeal and the trial court, to sneak in, i.e., the bare fact that Chester Jackson had confessed and implicated Mr. Woodfox. The jury did not learn that Jackson's so-called "confession" really amounted to two stories, neither of which was

independently believable and which, taken together, mutually excluded the possibility of either being true. Once the prosecution had introduced the substance of Jackson's testimony, it was ineffective assistance of counsel for the defense to fail to place the actual testimony, as well as Jackson's written statement, before the jury so that they would understand Jackson's lack of credibility. *See* argument, *infra*.

### The Testimony of Howard Devon Baker

The state presented the testimony of Howard Devon Baker at Mr. Wallace's trial but did not present it against Mr. Woodfox, presumably because Baker's testimony implicated only Mr. Wallace. Baker has now admitted, in a written statement, that he fabricated his testimony from whole cloth in an attempt to win favors for himself. Exhibit L, Statement of Howard Baker. It is important for the Court to consider Baker's testimony, because it demonstrates the state's willingness to utilize perjured testimony in this case, and Baker's motivation for lying – an attempt to win a transfer from the violence of Angola's Big Yard -- appears to have motivated most of the other witnesses in this case.

Baker testified that he was a "runner" for an inmate gambling operation. HW 375. He testified that on the morning of the murder, at around 8:00 a.m., he was carrying some money down the Walk towards the Hickory dormitories, which were past the Pine area. After he passed Pine, he heard the sound of a guard's whistle from the direction of Hickory. HW 376. The whistle frightened him because he had money in his jacket, so he turned and headed the opposite direction, which led him back towards the Pine dormitories. HW 377.

Baker testified that as he approached Pine 1, the door to the dormitory opened and Mr. Wallace ran out of the building. HW 378. Baker said that Mr. Wallace had blood on "his sweatshirt

and down the front of his pants," "enough to become, you know, readily visible if you would look at it." HW 379. The blood splotches were the size of quarters or fifty-cent pieces. HW 393. According to Baker, Mr. Wallace turned right and headed down the side of Pine 1. At this point, an inmate named "Pedro" (Abraham Thomas) also emerged from Pine 1 with blood on his clothing and followed Mr. Wallace down the side of Pine 1. HW 324, 381-82, 394. Baker did not see Albert Woodfox, Chester Jackson, Gilbert Montegut, Joseph Richey, Hezekiah Brown, or Brent Miller. HW 402-03.

Baker continued down the Walk, and as he reached Oak 4, he said he saw Mr. Wallace return to the Walk, go through the snitcher gate (manned by a security officer), walk around the laundry, go through another security gate (also manned by a security officer), and then proceed to the license tag plant. HW 383. At the entrance to the tag plant, Mr. Wallace would have been required to check in with a security officer. When questioned by defense counsel, Baker insisted that Mr. Wallace, covered in blood, "could have" walked past several security officers and then checked in with the officer at the tag plant without arousing suspicions. HW 395.

Baker said that he also went to the tag plant. "About six minutes" after Baker arrived at the tag plant, he saw Mr. Wallace, allegedly still wearing his bloody clothes. HW 383. Baker testified that Mr. Wallace approached him and asked for the key to a box containing work clothes. HW 384. Mr. Wallace opened the box, changed clothes, and placed his bloody clothes on top of the box. HW 384. Pedro then appeared, still wearing his bloody clothes, and engaged in a conversation with Mr. Wallace. HW 398. Mr. Wallace then picked up his clothes, carried them to a furnace in the front of the plant, and burned them. HW 385.

52

Baker did not inform prison officials of his story until four or five months after the murder, at which point he came forward to provide information "because of my conscience." HW 373, 389. Baker provided a written statement to prison officials on October 16, 1972. HW 373, Exhibit KK, Statement of Howard Devon Baker, October 16, 1972. The statement indicates that Baker's address at the time he provided information was Cell Block "B." After giving the statement implicating Mr. Wallace, Baker was moved from the cell blocks to Camp A, where he served as a "clerk of security," and then to the dog pen, the same low-security, highly-privileged and prized assignment that Hezekiah Brown received after agreeing to testify for the state. HW 402.

Mr. Woodfox's attorneys located Howard Baker and asked him about his testimony. Baker readily admitted that his testimony was fabricated and provided a sworn statement to that effect. Exhibit L, Statement of Howard Devon Baker, September 19, 2002. Baker stated the following:

> Angola in [1972] was life and death, buying and selling people, and the officers knew it was happening . . . Weapons were everywhere. You could shake down for weapons one night and have just as many the next. I saw as many as four stabbings a week, week after week. I was attacked and got 22 stitches in my head and only had an inmate to sew me up . . . When Miller was killed, I wasn't called in for questioning right away. The word went around from administration that it would be in an inmate's best interest to say what he knew about Miller's killing. So I looked at the situation like this, I got 60 something years, and I got a chance to help myself – so I was going to do something to help me get out of this cesspool.

> So, I gave a statement on 10/16/72, to Warden Dees, which was a lie. And my testimony based on that statement was a lie. I really thought this would help me because Dees told me my statement would get my sentence commuted . . .

> Dees just wanted a statement. If they could have hung and burned the guys involved they would have. But there was too much light on the situation.

I had heard that Hooks and Woodfox were suspects it seemed like five minutes after Miller was killed. It was all over the penitentiary that they were the ones that administration thought was involved. So I gave a statement.

I was surprised that anyone didn't pick my statement apart. It was foolish to think that anyone could get to the tag plant with blood all over them, especially that day. And there was no furnace in the tag plant to burn clothes. There was only a heater to dry paint on the tags. You could not burn clothes in it and Dees knew that. And Dees knows that you have to go through two manned security checkpoints to get to the tag plant. You could not get there with blood on you.

I never saw anyone come out of Pine 1. I was not near Pine 1 at the time Miller was killed. I lied to try to help myself.

Howard Baker's statement is a testament of the willingness of the state in this case to use whatever means were necessary to win convictions of Albert Woodfox and Herman Wallace, regardless of their innocence or guilt, and regardless of the plausibility of the testimony of its perjurious witnesses. The Court should be mindful of the new admission of Howard Baker when it considers the credibility of Hezekiah Brown, Paul Fobb, Joseph Richey, and Leonard Turner, for their testimony, replete with inconsistencies, contradictory accounts, the inability to answer key questions, and incentives to lie, is no more convincing, and often less so, than Baker's.

### The Physical Evidence

At trial, the state introduced three pieces of physical evidence: fingerprints, including a bloody fingerprint, located at the scene of the murder; clothing, allegedly bloody, which was attributed to Albert Woodfox; and a knife, alleged to be the murder weapon.

### Fingerprints

The fingerprint evidence should have been key to exonerating Mr. Woodfox and Mr. Wallace. Alton Baxter and Steven Ledell of the Louisiana State Police Bureau of Identification collected fingerprint evidence inside the Pine 1 dormitory. Baxter testified at trial that he located

and photographed a bloody fingerprint on a door facing in the Pine 1 dormitory. R. 1206; State's Exh. 26. Baxter and Ledell also located and lifted several other latent prints near Miller's body, including four latent fingers (State's Exh. 15, 24, and 25), and a partial palmprint (State's Exh. 14). Baxter testified that the bloody print was identifiable and the four latents were "strongly identifiable." R. 1218-19. None of the prints belonged to Mr. Woodfox or any of the other suspects in the case. R. 1214.

Baxter testified that the Bureau of Identification had the fingerprints of every Angola inmate on file. R. 1215-16. However, once the prints failed to implicate the state's chosen suspects, it appears that they were discarded as meaningful evidence, even though it is logically presumable that whomever deposited the bloody print was involved in the murder. At Mr. Woodfox's 1973 trial, Baxter's partner, Officer Ledell, was asked who, other than the suspects, the crime scene fingerprints were checked against, and he replied, "We just compared them with the suspects." AW1 96. At the 1998 trial, Baxter testified that "we were given many names of possible suspects," but he also testified that he had no independent recollection of the investigation and had to consult his prior testimony in order to testify. R. 1195, 1199-1202, 1208.

A July 9, 1997, memorandum by Louisiana State Police latent fingerprint analyst Carol Richard states that the prints recovered from Pine 1 were checked against 17 individuals in 1972. State's Exh. 27; Exhibit ZZ, Louisiana State Police fingerprint investigation file. Four of these were the defendants, six were witnesses for either the defense or prosecution (Herbert Williams, Howard Baker, Larry Robinson, Colonel Bolt, Leonard Turner, and Joseph Richey), three (Linwood Shaw, John Lee Watson, and Robert Sherman) were inmate workers who removed Miller's body from the dorm, and one was officer Hunter. One of the individuals checked in 1972 was Abraham Thomas,

who was named by Howard Baker as having been involved in the murder, another was Willie Holmes, who is listed in the Leonard Turner statement as having been in Pine 1 at the time of the murder, and one, James Reddick, is listed in the sheriff's file as possibly having information about the murder. Other than the above individuals, it does not appear that anyone else's fingerprints were compared to the ones uncovered at the scene. It is also important to note that with the exception of the white inmate workers who removed Miller's body, the authorities only compared the fingerprints to African-American prisoners; not a single white prisoner was checked.

Richard testified at trial that she also compared the prints of a number of law enforcement officers, including Warden Henderson, Richard Cotton, Robert Bryan, Hilton Butler, Bobby Oliveaux, R.E. Barrera, Connie Dufour, and Gerald Rheams. R. 1681. None of the prints the state has compared match those found at the crime scene. R. 1668. Despite the failure of the forensic evidence to implicate Mr. Woodfox and the others, and despite the facts that 1) the bloody fingerprint must necessarily have been left by someone connected with the murder, and 2) the state has fingerprints for every former Angola inmate on file, there is no indication that any other comparisons have ever been made. R. 1684.

Richard further testified that she ran the lifted prints (State's Exh. 24) through the AFIS (Automated Fingerprint Identification System) computerized database, but they did not return a match. R. 1677. Richard did not run the bloody print because she did not believe it was detailed enough to run. R. 1680. Richard acknowledged that the Louisiana State Police AFIS database does not contain the fingerprints of everyone who was at Angola in 1972. Richard stated that fingerprint cards for the 800 or so prisoners who lived in Angola's dormitories in 1972 could be entered into the state's AFIS database in "a couple of days," but it has never been done. R. 1685.

The fact that the bloody fingerprint found at the scene did not belong to any of the defendants was arguably the most valuable piece of evidence in the case. The state attempted to diminish its importance at trial by advancing a new theory that the bloody print was actually a palmprint, not a finger or thumb. R. 1670. Richard testified that she did not have any reference palmprints on file, meaning that the print, if it is a palm, could not be compared to prints on file. R. 1671.

On cross-examination, Richard admitted that she had developed her palmprint theory in April 1997, and she informed prosecutor Cullen at that time. R. 1695-96. The defense moved for a mistrial for prosecutorial misconduct because the state did not inform the defense of this theory until the day of Ms. Richard's testimony. R. 1729. The court denied the motion for a mistrial, ruling that "the defense, from day one, has had the ability to move the Court to appoint experts at taxpayer expense," but failed to do so. R. 1642.

### The Clothing

At trial, the state presented, by transcript testimony, the results of tests performed by the state in 1972 that purport to have found a minute amount of blood on clothing attributed to Mr. Woodfox. Mr. Woodfox has always denied that the clothes belonged to him – a claim corroborated by the state's own witnesses – and additionally claims that the state, either through ineptitude or dishonesty, misstated the significance of the test results.

Sheriff Daniel claimed that he seized Mr. Woodfox's clothes, along with those of Chester Jackson, Gilbert Montegut, and a prisoner named Allen Crosby, during the interrogations on April 17 and submitted them to the crime lab for analysis. R. 1247, 1299. According to the Crime Lab's evidence submittal sheets, Daniel did not submit these clothes to the Crime Lab until April 24, 1972, a week after the murder. State's Exh. 16; Exhibit LL. All of the other evidence collected in the

case, including the knife, the fingerprints, Miller's clothing, and several samples of physical evidence, was submitted to the Crime Lab on the day of the murder. *Id.* The sheriff has never been asked to explain why the clothing did not appear at the Crime Lab for a week after it was supposedly seized, and for a week after every other item of evidence in the case was submitted to the Crime Lab.

At trial, the state introduced the 1973 transcript testimony of Carl Cobb, the director of the Louisiana State Police Crime Lab. Cobb testified regarding lab testing that was performed on the clothing, although he was not the person who performed the tests. Cobb testified that the lab examined a brown work shoe, a pair of blue pants, and a green army jacket, which allegedly belonged to Mr. Woodfox. R. 1761. Cobb testified that benzidine tests were performed on the shoe and the blue pants, and told the jury that the positive results of the test proved that both articles contained blood. R. 1764. Cobb stated that the benzidine test "proved" that an edge of the shoe and "a very light area" of the pants (in an area above the pocket) where "you cannot see a whole lot of indication of blood stain" were stained with blood, but there was too little material on either to perform a precipitin test to determine whether it was human or animal. R. 1764. Cobb further testified that a precipitin test performed on "a very small stain" on the army jacket resulted in a positive test for human blood. R. 1763.

According to the Crime Lab's "Results of Laboratory Examination," the benzidine and precipitin testing was performed by a police lab technician named Freddie R. Cox. Exhibit LL, en globo, Louisiana State Police Crime Lab serological evaluation documents. Thus, the state's witness, Carl Cobb, did not personally perform the tests about which he testified. As Mr. Woodfox argues below, Cobb's testimony was scientifically incorrect and highly misleading to the jury. The benzidine test, which he stated "proves" the presence of blood, does no such thing. It is a

presumptive test which is properly used only to identify an article for further confirmatory testing. See attached declaration of Randell T. Libby. The benzidine test reacts not only with blood, but with many food items, mucus and other bodily fluids, and metals. *See* argument, *infra*. Similarly, the precipitin test, which Cobb alleged "proved" the presence of human blood on the green jacket, is unreliable, especially when not properly performed. At trial, however, Mr. Woodfox's attorneys essentially accepted the state's conclusions by failing to inquire into the reliability of the state's tests and by failing to provide the jury with evidence that the tests do not mean what the state's witness claimed.

Mr. Woodfox has always denied that the allegedly bloody clothes belonged to him. Mr. Woodfox testified that on April 17, 1972, he was wearing a pair of "free world" Sears and Roebuck jeans, a gray sweatshirt, and a pair of rubber boots that he always wore because he worked in water in the scullery. R. 2379, 2381. As the prisoners waited in line outside the interrogation room, they were ordered to strip down to their pants. R. 2348. When Mr. Woodfox entered the interrogation room, Warden Henderson ordered him to remove his pants as well, and then took all of this clothes and threw them into a corner into a pile of clothes taken from other prisoners. R. 2348. Mr. Woodfox says that the brown work shoe, the green army jacket, and the jeans attributed to him were not his.

Sheriff Daniel claimed at trial that, during the interrogations, he would check inmates' clothes "for possible stains that could have been blood stains," and would then take their clothes if they looked suspicious. R. 1276. But Mr. Woodfox's account of the mass seizure of clothes during the interrogations is corroborated by Joseph Richey and Hezekiah Brown. Richey stated that, after Miller's body was discovered, the inmates were lined up on the Walk, and "[w]e were stripped."

R. 1448.  Hezekiah Brown said that Hilton Butler "had us all lined up, pulling all us clothes off, it was cold out there, naked and cold."  HW 33.  Sheriff Daniel's account of the individualized examination and seizure of suspicious clothing simply does not square with the testimony of any of the other witnesses.

Significantly, none of the state's witnesses reported that Mr. Woodfox was wearing the green army jacket that Sheriff Daniel claimed to have seized from him.  Hezekiah Brown said Mr. Woodfox was wearing "penitentiary clothes," meaning a blue shirt and blue pants.  R. 1807.  Joseph Richey said he was wearing a "state issue" long-sleeve light blue shirt and blue pants.  R. 1438.  Paul Fobb said he was wearing a state issue blue shirt with a white T-shirt underneath and a pair of blue jeans.  R. 1621.  Leonard Turner's alleged statement says that Mr. Woodfox was wearing a blue jacket.  Chester Jackson stated in his 1974 testimony that Mr. Woodfox was wearing a light gray hooded sweatshirt.  HW 102.  In his written statement, Jackson claimed Mr. Woodfox was wearing a blue jacket and a sweatshirt.  In short, if the state's witnesses and Sheriff Daniel were all telling the truth, the witnesses would have reported that Mr. Woodfox was wearing a green army jacket.  Not a single one of them did.

### The Knife

The final piece of physical evidence introduced at Mr. Woodfox's trial was a prison-made knife that was purported to be the murder weapon.  Security officer Gerald Rheams testified that he found the knife in a ventilation hole underneath Pine 1 dormitory shortly after the murder.  R. 1181.  The knife was covered in blood.  Paul Cobb, Jr., the supervisor of the State Police crime lab, testified that the blood on the knife was determined to be human, but there was not enough blood on the knife to type it.  R. 258.  Officer Baxter testified that no fingerprints were found on the knife.  R. 1210.

60

No evidence has ever been presented to connect the knife to Mr. Woodfox or any of his co-defendants.

### The Defense

Mr. Woodfox, Mr. Wallace, and Mr. Montegut all presented alibi defenses that demonstrated that none of them was in the dormitory area at the time Brent Miller was killed, and none of them, therefore, could have committed the murder. Mr. Woodfox testified that he and the other prisoners in his Hickory 4 dormitory left for breakfast on April 17 at around 7:00 or 7:10 a.m. R. 2339. When they reached the snitcher gate, it was locked. R. 2339. The prisoners stood around talking for several minutes until one of the officers announced that the dining hall workers were striking and ordered the prisoners back to their dormitories. R. 2340. Mr. Woodfox returned to Hickory 4. R. 2340. The prisoners were summoned to breakfast a second time at, Mr. Woodfox estimated, between 7:35 and 7:50 a.m. R. 2342. Mr. Woodfox went to breakfast and ate with prisoners Colonel Nyati Bolt, Everett Jackson, Willie Tubby, and Chester Jackson. R. 2342.

Mr. Woodfox estimated that he finished eating breakfast at around 8:00 or a few minutes after. R. 2342. He and Everett Jackson left the dining hall and went to the A Building (which was in the opposite direction down the walk from the dormitory area). R. 2343. Mr. Woodfox stood outside while Jackson, who was helping Mr. Woodfox with an appeal, went inside to get some papers. R. 2397. Mr. Woodfox then walked back to his dormitory. R. 2344. As he returned down the Walk, a number of prisoners were milling about, either waiting to go to work or because they were off-duty. R. 2398. Mr. Woodfox estimated that he returned to his dormitory at 8:15 or 8:30 a.m. R. 2344. After a while, he heard a whistle blowing and the men in his dorm were ordered on to the Walk, lined up, and taken towards the clothing room for interrogation. R. 2344-45.

Mr. Woodfox was interrogated in the clothing room by Hilton Butler, Sheriff Daniel, Warden Henderson, C. Ray Dixon, and Capt. Bergeron. R. 2347. Butler and Dixon began calling Mr. Woodfox a nigger. R. 2400. Sheriff Daniel then approached Mr. Woodfox and called him a "goddamn Panther." R. 2401. The officers questioned Mr. Woodfox about his political beliefs and accused him of killing Miller. R. 2401. Sheriff Daniel became agitated, pulled out his revolver, and pointed it at Mr. Woodfox's forehead. R. 2401-02. He said, "I'll blow your fucking brains out," and then said, "You Black Panthers need to bring y'all ass down to St. Francisville, we'll show you something." R. 2401. Mr. Woodfox was escorted from the interrogation to the "dungeon," or lockdown, between 11:00 a.m. and noon. R. 2347. He was the first inmate to be placed in lockdown after the murder. R. 2347.

During his testimony, Mr. Woodfox emphatically denied that he participated in the murder of Brent Miller and stated that he had no knowledge of who did commit the murder. R. 2344, 2347. He stated that he did not know Miller personally, although he had seen him working on the Walk. R. 2338. Miller had never written Mr. Woodfox up for misconduct. R. 2338. When the prosecutor, on cross-examination, repeatedly badgered Mr. Woodfox by accusing him of being guilty, he responded, truthfully, "Ms. Cullen, you know I didn't kill Brent Miller, and you know I passed a lie detector test." R. 2379. The court ordered Mr. Woodfox's answer stricken from the record, but his answer was truthful. Mr. Woodfox had been subjected to a polygraph examination, and his denials of involvement in the murder were found to be "truthful." Exhibit MM, polygraph results.

Mr. Woodfox's alibi was corroborated by the testimony of Everett Jackson, Clarence Sullivan, and Colonel Nyati Bolt. At trial, Everett Jackson's 1973 testimony was presented by transcript. Jackson said he lived in Hickory 4 dormitory with Mr. Woodfox. R. 2071. He and Mr.

62

Woodfox were acquaintances, but they were not close friends. R. 2070. On the morning of the murder, the men of Hickory 4 left for breakfast at around 7:00 or 7:10 a.m. R. 2071. They were held at the snitcher gate for about 20 minutes, after which they were returned to the dormitory, where they were locked in. R. 2071. Jackson said he walked to breakfast with Mr. Woodfox because they wanted to discuss the possibility of Jackson filing a writ for Mr. Woodfox. R. 2072. Jackson said he ate breakfast with Mr. Woodfox, Chester Jackson, Colonel Bolt, and "Old Model." R. 2070-71.

After breakfast, Jackson said he walked to the legal aid office with Mr. Woodfox. R. 2072. Mr. Woodfox waited on the Walk while Jackson went inside to get some papers, which Jackson estimated took about 10 minutes. R. 2072-73. Jackson estimated that it was after 8:00 a.m. when he was in the legal aid office, because the classes there, which started at 8:00, had already begun. R. 2072. Mr. Woodfox took the papers and headed back down the Walk. R. 2073. Many of the prisoners from breakfast were already going back to their dormitories when Jackson last saw Mr. Woodfox. R. 2073. According to the sheriff's notes from the interrogations on the day of the murder, Jackson has been consistent. The notes indicate that "Everette Jackson" stated during his interrogation that he went from "chow to libraray law – writ writer." Exhibit R at 36.

Clarence Sullivan, an Angola inmate, testified that he saw Mr. Woodfox eating breakfast on the morning of the murder. He said that he knew of Mr. Woodfox because they both worked in the scullery. R. 2224. On the morning of the murder, Sullivan was working in the kitchen. R. 2225. Sullivan saw Mr. Woodfox sitting at table in the dining hall, eating breakfast at, he estimated, about the sixth in a row of 18 tables. R. 2225. Sullivan remembered seeing Mr. Woodfox at breakfast on the morning of the murder because, when he heard that Mr. Woodfox had been charged, he realized he knew him from work. R. 2239.

At their trial 1974, Mr. Wallace and Mr. Montegut also presented an alibi defense that demonstrated that neither of them was in the dormitory area at the time Brent Miller was killed. Several inmates placed Mr. Wallace in the dining hall during breakfast, when Miller was killed. Henry Cage, who lived in Pine 3 with Mr. Wallace, testified that he was directly behind Mr. Wallace in the line of inmates walking to breakfast on April 17. HW 298. Mr. Wallace walked all the way to the dining hall, and Cage saw both Mr. Wallace and Mr. Montegut eating breakfast at around 7:30. HW 297, 298. Clarence Jones and Abraham Thomas both testified that they ate breakfast with Mr. Wallace. HW 341, 328. Gerald Bryant, who worked in the kitchen, testified that he saw Mr. Wallace eating at 7:30 or 7:45 on the morning of the murder. HW 352. He approached Mr. Wallace at his table and gave him some books. HW 354. Clarence Jones confirmed that he saw Bryant hand the books to Mr. Wallace. HW 345.

After breakfast, several of the defense witnesses followed Mr. Wallace to his job at the license tag plant. Abraham Thomas said that he walked with Mr. Wallace directly from the dining hall to the tag plant. HW 329. Clarence Jones testified that he accompanied Mr. Wallace and Mr. Thomas to the tag plant. HW 343-44. And Henry Cage testified that when he arrived at his tag plant job at around 8:00 a.m., Mr. Wallace was already present and working. HW 300.

Several witnesses, including a security officer, provided an alibi for Gilbert Montegut. Gary Knox, a kitchen worker, testified that Mr. Montegut arrived at the dining hall with the sick call inmates at around 6:00 a.m. Knox gave Montegut a key to give to a fellow inmate. HW 280. Because of the buck, the sick call inmates were not fed until later. Knox testified that Mr. Montegut returned to breakfast after 7:00, at which point the two spoke again. HW 286.

64

After breakfast, according to the witnesses, Mr. Montegut reported to the prison hospital. Security Captain Wyman Beck, who was assigned to the hospital on April 17, testified that he saw Montegut in the hospital around the time Miller's body was discovered. Beck remembered that prison officials, apparently aware that Montegut would be in the hospital (and thus unable to participate in the murder), called Beck and asked him to send Mr. Montegut back down the Walk. HW 315. Inmate Jimmy Pelts also testified that he saw Mr. Montegut in the hospital sometime between 7:30 and 8:00 a.m. on April 17. HW 312. Pelts corroborated Capt. Beck's testimony that a warden telephoned the hospital and summoned Montegut. At Mr. Woodfox's trial, former hospital worker Robert Colle also testified that he saw Montegut in the hospital's "bullpen" on the morning of the murder. R. 1885. After he heard that Montegut had been charged with the murder, Colle discussed it with Capt. Beck. R. 1889. Colle said Beck "didn't think [Montegut] could have been involved in the . . .", at which point his testimony was cut off by the prosecutor's objection. R. 1889. Colle did say that he and Capt. Beck agreed that "it would be pretty difficult for Montegut to be involved in the [murder] and be in the hospital at the same time." R. 1890.

In sum, 10 prisoners and a security captain have collectively testified that Albert Woodfox, Herman Wallace, and Gilbert Montegut could not have murdered Brent Miller because they were elsewhere in the prison when the murder took place.

### The Verdict

On December 16, 1998, the jury found Albert Woodfox guilty of murder.

### THE NEW EVIDENCE

Mr. Woodfox has now identified the individual who may be responsible for the death of Brent Miller. According to at least two new witnesses, Irvin "Life" Breaux, a prisoner who was

stabbed to death at Angola in 1973, killed Brent Miller, confessed his involvement, and stated that

Albert Woodfox and Herman Wallace were not involved.

### *Billy Sinclair*

One of the new witnesses is Billy Sinclair, a long-time and well-known Louisiana prisoner

who has an established record of credibility.  Sinclair has provided Mr. Woodfox's attorneys with

a sworn affidavit stating, in relevant part, the following:

> In March or April 1973, I met and became close personal friends with an
> African-American inmate named Irvin "Life" Breaux." I met Breaux through the
> Prisoner Grievance Committee, a 36-inmate grievance committee created at the
> Louisiana State Penitentiary by former Corrections Director Elayn Hunt.  I was on
> the "Executive Committee" of the Prisoner Grievance Committee and a
> representative from the Big Yard.  Breaux was a member of the general committee,
> a representative of the Main Prison's maximum security cellblocks.
>
> * * *
>
> A recognized inmate leader, Breaux had been placed in maximum security lockdown
> status for alleged "black militant activities" following the April 1972 killing of an
> Angola prison guard named Brent Miller.
>
> Breaux and I were part of a seven-member inmate team given quasi-official approval
> to educate and encourage the general inmate population of the Main Prison Complex
> regarding both the need and inevitability of the racial integration of the Louisiana
> State Penitentiary.
>
> In the spring and summer of 1973, Angola was experiencing a horrific wave of
> prisoner violence and homosexual rapes.  Breaux was instrumental in creating an
> organization called the Brotherhood, a group of African-American inmates
> committed to saving young inmates from homosexual rape and slavery.
>
> It was through the integration/Brotherhood efforts that Breaux and I cultivated and
> maintained a very close personal relationship — a relationship fueled by our mutual
> personal and political beliefs that the lawless, corrupt, and evil conditions prevalent
> at Angola had to be changed.
>
> Breaux was possessed by a militant ideology that subscribed to the belief that
> violence was an acceptable, and under specific circumstances, a preferable means to

bring about changes at the state penitentiary. I was a budding "jailhouse lawyer" who believed that concentrated legal action offered the best opportunity to produce the changes we both desired.

Breaux and I frequently discussed and debated our common objectives but different methods of accomplishing those objectives. A strong bond of mutual trust developed between us; we became "comrades in the struggle."

It was during these discussions and debates that the subject of the killing of Brent Miller surfaced, especially since Breaux had been one of the scores of African-American inmates who had been placed in lockdown for "militant activities" in the wake of the Miller killing. In these conversations, Breaux initially alluded to involvement in the Miller killing, stating that prison officials either knew or believed that he was involved in that crime.

It was common knowledge throughout the prison system that four inmates known as "the Angola Four" had been locked up and were placed in CCR as the ones responsible for the killing of Brent Miller. Breaux repeatedly insisted to me that those inmates were "innocent"; that they had been "framed" by Custody Warden Hayden J. Dees. He was contemptuous of the notion that two of the Angola Four inmates, Chester "Noxzema" Jackson and Gilbert Montegut, could even be called "black militants" (a term that Breaux took particular pride in). He became especially incensed when talking about how the other two Angola Four inmates, Albert Woodfox and Herman Wallace, had been "framed" by Warden Dees.

I placed significant credence in what Breaux told me. Hayden J. Dees "ruled" Angola in that era; Angola belonged to him. He operated with an official fanaticism against "black militants" and communism. Following one of the first disciplinary hearings at Angola at which I was allowed to participate as an "inmate counsel," Dees approached me, livid and irrational, and accused me of being a "communist."

So it was natural for Breaux and I — the "black militant" and the "white communist" — to discuss Dees and his role in the "Angola Four" case. One day Breaux told me — and it was the first of several times that he told me — that he and others had actually killed Brent Miller. He stated that in April 1972, he and others were committed to a plot to kill twelve known black "snitches." The plot called for all the snitches to be killed simultaneously in different parts of the prison on the day Miller ended up being killed.

Breaux told me that Brent Miller walked into the Pine dormitory as he and other inmates were separating for distribution the weapons that would be used in the attacks on the snitches. He described a confused scene in which the inmates initially tried to subdue Miller but that Miller was either stabbed or cut. Breaux said a

collective and instantaneous decision was made by the inmates to kill Miller because
he had recognized them, and then to "get rid" of the weapons.

I never once asked or probed Breaux about this incident. The information was far too
sensitive even to know and, frankly, it was not a subject matter that I wanted to talk
about. But there was certainly more than one conversation during which he told me
that he had killed Miller by cutting his throat; that Dees and other prison officials
knew he was involved; that they could not charge him with the crime because it
would expose the fact that the "Angola Four" had been framed; and that he would
eventually "be killed" because of his role in, and knowledge about, the Brent Miller
killing.

Irvin "Life" Breaux was stabbed to death at the Louisiana State Penitentiary on
August 11, 1973, by two inmates named Gilbert Dixon and Willie Carney.

Exhibit XX, Affidavit of Billy Sinclair.

Billy Sinclair's credible, coherent account makes clear that, as Albert Woodfox and Herman

Wallace have maintained for 30 years, they did not kill Brent Miller.

### Noel Murphy

Noel Murphy was the brother of Chester Jackson, now deceased, who confessed to the

murder of Brent Miller and testified on behalf of the prosecution, under highly unusual

circumstances, at the 1974 trial of Mr. Woodfox's co-defendant, Herman Wallace. Jackson did not

testify against Mr. Woodfox, but his thoroughly dubious testimony is discussed at length in Mr.

Woodfox's Application. Noel Murphy has provided Mr. Woodfox with a statement, Exhibit BBB,

that corroborates the already-substantial evidence that Brent Miller was killed by Jackson and

another Angola prisoner, Irvin "Life" Breaux, not by Albert Woodfox or Herman Wallace.

Noel Murphy did not testify at either of the original trials of this case, but the state called him

as a witness at the Mr. Woodfox's 1998 trial. R. 2426. Murphy, in his brief testimony, said that he

was incarcerated at Angola at the time of the Miller murder and acknowledged that he had signed

68

written statements for the prison administration approximately a year after the murder, but said he did not remember the substance of the statements. R. 2448. He said that he was "under pressure" from Warden Hayden Dees at the time he gave his statements because, "I had a half brother that was accused in this killing." R. 2446. The prosecution asked Murphy a series of leading and testimonial questions – such as, "Do you remember giving a statement saying you saw a body in the Pine One dormitory?" – but Murphy testified that he remembered few details from the day of the Miller murder. R. 2442. The court did not allow the prosecution to introduce Murphy's written statements as evidence. R. 2444.

The written statements attributed to Murphy, both dated May 7, 1973, purport that Murphy witnessed, conveniently and improbably, a series of crucial events surrounding the Miller murder and the burning of Officer Michael Gunnells the day before. The first statement, with a time notation of 1:50 p.m. on May 7,1973, states that Murphy witnessed the burning of Gunnells. Exhibit CCC, Statement of Noel Murphy, 1:50 p.m., May 7, 1973. According to the statement, Murphy watched inmates Rory Mason, William Riley, Jules Green, and Gilbert Montegut – who was acquitted of the Miller murder – burn Gunnells with a can of flammable liquid and a "burning mop."

The second statement, dated May 7, 1973, at 2:20 p.m., states that Murphy, dubiously, witnessed a number of important events on April 17, 1972, the day Miller was killed. Exhibit DDD, Statement of Noel Murphy, 2:20 p.m., May 7, 1973. The statement says Murphy witnessed Chester Jackson obtain a knife while in the Hickory dormitory waiting for breakfast. He then walked to the dining hall and watched as all four defendants in the Miller killing dropped out of line and headed towards the Pine dormitories, the scene of the murder. After breakfast, when another inmate told Murphy that a correctional officer was laying dead in Pine 1 dormitory, Murphy went to the dorm

69

and found Miller's body.  Then, after going back to Hickory dormitory, Murphy returned and saw

Hezekiah Brown, the prosecution's star witness, exit Pine 1 dormitory.  Finally, Murphy's statement

says that on the next day, April 18, Chester Jackson admitted to him that he guarded the door to the

dormitory while others, unnamed, committed the stabbing.

In Murphy's new statement, he acknowledges that his prior statements were false, and that

his brother confessed to him and told him that Albert Woodfox and Herman Wallace did not kill

Brent Miller:

> My name is Noel Murphy.  My brother was Chester Jackson.  Chester and I were
> both prisoners at Angola in 1972, at the time guard Brent Miller was killed.  Shortly
> before the killing, Chester told me, "Things are going to change around here."  I
> understood that to mean that he was going to do something about violence from the
> guards.
>
> Chester didn't tell me what happened until after the trial.  Chester told me that he,
> Chester, Irvin "Life" Breaux, and possibly others stabbed Brent Miller.  Chester said
> that their intended target was guard Hunter, who was known for being a rough guard
> at the prison.  He would put you in the hole for anything.  Chester said they didn't
> realize the person they were stabbing was Miller and not Hunter until after they had
> already started stabbing him.  Chester said he and Life continued to stab him because
> they had come this far and it was too late to stop.
>
> Chester told me that Albert Woodfox and Herman Wallace were not involved in the
> stabbing.  He said the authorities set them up with the murder charge because they
> were outspoken about the need for change at the prison.
>
> About a year after the stabbing, I was interrogated by the officers.  I don't really
> remember the interrogation or the statements I gave, which is what I told the court
> at Woodfox's trial in 1998.  I have now read the statements I gave, and they are not
> true.  I just know that I was scared because the guards were capable of anything and
> I didn't want to get killed.  It would have been easy for a guard to shoot me and make
> up any story he liked.  That is the only reason I would have given them statements
> such as these.

The new testimony of Noel Murphy corroborates the statement from Billy Sinclair, Exhibit

XX, who states that Irvin Breaux admitted to him that he killed Brent Miller.  In addition, Murphy's

70

recounting of the intimidation that led him to sign false statements for the prison authorities corroborates the other evidence attached to Mr. Woodfox's Application – including the statement from former prosecution witness Howard Baker – that state officials coerced terrified inmates into falsely implicating Albert Woodfox and Herman Wallace.

Murphy's 1973 statements are implausible for a number of reasons. They ask the reader to believe that Murphy just happened to be in the right place at the right time to witness a half-dozen key events over the course of three days. In the process, they contradict the testimony of the state's other witnesses. For example, Hezekiah Brown claimed that he ran out of the Pine 1 dormitory immediately after Miller was stabbed, R. 1786, and Joseph Richey said he saw Brown exit the dorm either one or three minutes after the killers left. AW1 208, 233. Murphy's 1973 statement, on the other hand, claims that he found Miller's body, then walked all the way back to his dorm, picked up some books, and then returned and saw Hezekiah Brown leave Pine 1 dormitory after what must have been many minutes after the murder. Moreover, neither Brown, Richey, nor any of the other prosecution witnesses mentioned seeing Noel Murphy walk into Pine 1 and discover Miller's body. Indeed, it is virtually inconceivable that an African-American prisoner at Angola in 1972 would voluntarily have gone to inspect the scene of a just-murdered prison guard. Murphy's 1973 statements amount to a transparently crude attempt to falsely blame Albert Woodfox and Herman Wallace for the murder of Brent Miller. Murphy's new statement explains how he – and by implication the other prisoner witnesses in this case – came to bear false witness against Messrs. Woodfox and Wallace, and adds to the already-considerable evidence that they are innocent of the murder.

71

### *Robert Stewart*

Robert Stewart, who has been incarcerated at Angola since 1970, has come forward, at great

personal risk, to state that Chester Jackson, who confessed to involvement in the murder of Brent

Miller, told him that Albert Woodfox and Herman Wallace did not participate in the murder.  Exhibit

EEE, Statement of Robert Stewart.  Stewart also recounts the reign of terror visited upon African-

American inmates in the wake of the murder, which created a climate rife for the production of false

and coerced snitch testimony.  Stewart has signed a declaration stating the following:

> My name is Robert Stewart, DOB 8/3/50.  I am an inmate in Angola.  I have been an inmate here since 1970.
>
> In 1972, when Sgt. Brent Miller was stabbed, the news spread fast.  It was a big, big deal at the prison because a free person was killed and that hardly ever happened.  I first heard about the stabbing that morning, the day it happened.  Later on that day everyone knew that Hooks (Herman Wallace), Albert Woodfox, and Noxzema (Chester Jackson) were suspects.
>
> I knew Noxzema for a long time, for about seven or eight years.  We had done time together in Orleans Parish Prison.  When Noxzema was dying he told me about Hooks and Woodfox, that they didn't commit the stabbing.  Noxzema said that he was forced by guards to testify and that his testimony was a lie.
>
> Back in 1972, force from guards was physical.  Guards would use anything to inflict the force.  They used bats and sticks a lot.  Guys who were in cell blocks could be heard screaming when they were beaten.
>
> Guards also forced homosexual inmates like Noxzema to do things by stealing their galboys.  Noxzema's galboys were taken away by the guards and locked down.
>
> After the stabbing, everyone in Pine 1 and Pine 4 dormitories, all the field workers, were put in the dungeon.  I was one of them.  We were held there for about two weeks.  While I was there, Noxzema's galboys were put in there too.  I knew it was to force Noxzema to testify.
>
> I give my word of honor that this statement is the truth to the best of my knowledge and belief.

Robert Stewart's statement constitutes yet more evidence that Mr. Woodfox is innocent of the murder of Brent Miller.

Mr. Woodfox's efforts at presenting the sworn testimony of these witnesses at an evidentiary hearing was denied by the state courts. In addition, Mr. Woodfox subsequently obtained the sworn statement of Ronald Ailsworth, which Mr. Woodfox presented to state court of appeal:

### Ronald Ailsworth

Mr. Ailsworth, an Angola prisoner, has indicates in his sworn statement that he was incarcerated at Angola in 1972 and that just before the Miller murder, he encountered Erwin Breaux, who told him to be ready because he was about to do "something big." Ailsworth believes that Breaux was referring to the murder of Brent Miller.


## CLAIMS FOR RELIEF

**I.    THE PROSECUTION KNOWINGLY PRESENTED PERJURED TESTIMONY AND INTRODUCED EVIDENCE THAT UNLAWFULLY CREATED A FALSE IMPRESSION THAT MR. WOODFOX IS GUILTY.**

**II.   THE STATE LIKEWISE SUPPRESSED INFORMATION THAT REVEALED THAT THESE WITNESSES WERE LYING.**

The prosecution attempted to compensate for the weakness of its 25-year-old case by allowing its witnesses to perjure themselves and by deliberately placing evidence before the jury, in violation of court rulings, that falsely created the impression that Mr. Woodfox is guilty. In several instances, Mr. Woodfox could have rebutted this false evidence or otherwise impeached the state's case if the prosecution had not suppressed favorable evidence.

73

**Joseph Richey**

Joseph Richey has told the authorities at least twice that he did not see, as he testified, Albert Woodfox leaving Pine 1 at the time of the murder. The prosecution, unconscionably, did not inform the defense of this and nevertheless allowed Joseph Richey to take the stand and falsely implicate Mr. Woodfox.

In January 2002, postconviction counsel obtained the prosecutor's files on this case via the Louisiana Public Records Act. The file contains the prosecutor's personal typed notes on Joseph Richey aka Joseph Bowden. The notes reflect a "T/C [telephone conversation] to JEC [Julie E. Cullen] on 11/17/98, 6:50PM-8:07PM." Exhibit NN, Julie E. Cullen's notes on Joseph Richey. The notes of the telephone conversation state:

> When CJ [Chester Jackson] getting ready to testify and JB [Joseph Bowden aka Richey] heard CJ's family talking was first time really realized that AW [Albert Woodfox] was involved in the murder

The prosecutor's notes could not more clearly indicate that 1) Joseph Richey fabricated his testimony; and 2) the prosecutor knew about it.

Unfortunately, the perjury does not end there. Joseph Richey lied at trial about the initial statement he provided to the authorities.

At trial, the **prosecution** asked Joseph Richey about his interrogation on the day of the murder and he lied by stating that he had consistently told the authorities the same story to which he was testifying:

Q:    Did – were you personally questioned individually?

A:    Yes.

* * *

74

Q:      Do you remember what, if any, information you gave the individual who did question you, as far as what you were doing –

A:      It was a generic answer, I was on the Walk, I walked in, I saw Mr. Miller, I came back and I stood on Pine. – On the side of Pine till I smoked a cigarette, something – something generic.  It wasn't an extensive invest – just a question.

R. 1450-51.  On cross-examination, Richey repeated that during his initial interrogation, "I told him exactly what I stated today [i.e., at trial].  I've always stated that."  R. 1478.

At trial, Sheriff Daniel produced his interrogation notes for in camera inspection at the request of the defense.  Because the prosecution refused to provide all of the notes to the defense, the court was faced with the difficult responsibility of screening the Sheriff's file for impeachment evidence.  The court agreed to "give it a shot," but warned that, "I'm not sure that I would recognize what you would perceive to be exculpatory information . . . and I hate to be placed in the position of being the – the gate keeper of exculpatory information . . . It's a very uncomfortable position to be placed in."  R. 1256.  The court "remind[ed] the state that . . . if I miss something that is exculpatory, then you all are going to have to live with that."  R. 1257.

The prosecutor responded by stating, "**I fully accept that responsibility, your Honor**."  R. 1257.  After the in camera review, the prosecution agreed to turn over the notes of the sheriff's interviews with Albert Woodfox, Chester Jackson, and Gilbert Montegut. R. 1266; Exhibit OO, portion of sheriff's notes provided to the defense.  The notes take up a half of a page.

In August 2001, postconviction counsel obtained the entire file from the West Feliciana Sheriff's Office pursuant to the Public Records Act.  The file contained the authorities' notes of 348