interviews, 345 of which were not provided to the defense.   Exhibit R, sheriff's notes of interrogations.

The notes reflect the sheriff's interview of Joseph Richey.   According to the notes of Richey's interrogation, in their entirety, "Joseph Richey, P-4 [Pine 4] 72037" told Sheriff Daniel, "went to chow then went to Hic-4 and gave crutches some cigs came back to dorm."  Another note, which appears to be in the handwriting of Deputy Thomas Guerin, states "Joseph Richey – Pine 4 – 72037 – Gave crutches cigarettes."

The import of the interrogation notes is obvious.  Richey told the authorities on the day of the murder that he had not seen Mr. Woodfox or anyone else running out of Pine 1.  Rather, he was in another dormitory giving cigarettes to a prisoner named "Crutches."   Only on May 17, after spending a month locked down in the cell blocks, did Richey meet with Dees and Dixon and offer up his story about Mr. Woodfox.  R. 1454.  Not surprisingly, given the state's *modus operandi* in this case, Richey was released from the cell blocks only "a few days" after giving the statement.  R. 1455.

The prosecutor's undisclosed notes referenced above prove that she was aware of Richey's initial interrogation.  The notes summarize the information known to the prosecution about Richey, including his past statements.  Among the notes is the notation, "STATEMENT to Daniels/Guerin, April, 1972, Went to chow then went to Hic 4 & gave crutches, some cigarettes, back to dorm." Exhibit NN, Julie E. Cullen's notes on Joseph Richey.

And, of course, Warden Henderson testified regarding Richey at trial, frankly and bluntly, that, "**I don't think he knew anything about the case to begin with.**"  R. 1967.  Henderson believed, correctly, that Warden Dees had induced Richey to lie against Mr. Woodfox.

76

It could not be more unmistakably clear that Joseph Richey was a liar, that he lied under oath at Mr. Woodfox's trial, and that the state knew he was doing it. Importantly, Richey's perjury with respect to his statement to the sheriff was *elicited on direct examination by the prosecution itself*.

### Paul Fobb

Paul Fobb lied just as Joseph Richey did. Fobb testified that on the morning of the murder, he went to the blood plasma plant during breakfast. R. 1612. It was then that he claimed to have seen Mr. Woodfox walk into and out of Pine 1. R. 1612-13.

According to the sheriff's interrogation notes, "Paul Fabre [Fobb] – 65899 – H-1" told the investigators on the day of the murder that "Off [work] – no breakfast – never left dorm. Dorm man can verify." Exh. R at 5.

The prosecutor "fully accept[ed]" her responsibility under *Napue* and *Brady* when she refused to disclose the sheriff's notes to the defense. As a result, Paul Fobb's false testimony went uncorrected before the jury. The prosecution thereby created the false impression that Paul Fobb was honest when he had in fact lied on the witness stand. Mr. Woodfox was unable to inform the jury that Fobb, when first questioned, told the authorities that he had never left his dorm on the morning of the murder, and therefore could not have witnessed what he claimed to have witnessed. Additionally, the prosecution's 26-year suppression of Fobb's statement prevented Mr. Woodfox, probably irreparably, from ever seeking the identity of the "dorm man" who could verify that Paul Fobb was in his dormitory at the time Brent Miller was killed.

Postconviction counsel discovered the above-described interrogation notes in the prosecutor's personal case files in January 2002. Their presence in her files proves the state was aware of Fobb's lies.

77

The prosecutor's placement in the minds of the jury of this false impression regarding Fobb's credibility violated her obligations, and Mr. Woodfox's rights, under *Napue* and *Brady*. This misconduct undermines confidence in the verdict against Mr. Woodfox. The Court must overturn Mr. Woodfox's conviction and sentence.

### Sheriff Daniel

During the clothing room interrogation of Mr. Woodfox, as discussed above, Sheriff Daniel pointed a revolver at Mr. Woodfox's forehead, called him a "goddamned Panther," and threatened, "I'll blow your fucking brains out," and "You Black Panthers need to bring y'all ass down to St. Francisville, we'll show you something." R. 2401-02.

Sheriff Daniel claimed that the above incident did not happen, because "at no time did I go in that penitentiary and interview inmates with a gun. I would always check my gun at the front gate." R. 1315.

The incident recounted above was a vital piece of proof to support Mr. Woodfox's contention that he was falsely charged and wrongly convicted because of the authorities' racial and political animosities towards him. Sheriff Daniel's false denial had the dual prejudicial effect of 1) making Mr. Woodfox look dishonest; and 2) refuting Mr. Woodfox's theory of the case – that the investigation was biased.

Howard Baker corroborates Mr. Woodfox's contention and calls into question Sheriff Daniel's denial. According to his statement, "Daniel and Guerin were very agitated. I can't remember if they wore uniforms but they were armed." Exh. L.

If Mr. Woodfox is granted an evidentiary hearing, he is prepared to call additional witnesses to testify to the fact that Sheriff Daniel did not "check his gun" as he claimed, but rather carried it into the prison on April 17, 1972, and used it to threaten Mr. Woodfox's life.

Sheriff Daniel committed perjury at Mr. Woodfox's trial.  Because he, as the lead investigator, is a member of the prosecution team, his perjury was known to the state and it therefore violates Napue and its progeny.  Mr. Woodfox's conviction must be reversed.

### Chester Jackson's hearsay testimony

The Court of Appeals ruled that Chester Jackson's testimony from the trial of Herman Wallace and Gilbert was not admissible because it was "itself hearsay," and Mr. Woodfox "had no opportunity to develop Jackson's testimony."  First Circuit Court of Appeal, No. 94-KW-2165, November 30, 1994 (unpublished).  In violation of this order, the prosecutor repeatedly informed the jury that Chester Jackson had confessed to killing Miller and had implicated Mr. Woodfox.  The harm to Mr. Woodfox was compounded by the fact that the prosecutor communicated only these bare facts to the jury; they were not informed of the incredible character of Jackson's testimony, nor of the fact that Jackson had given at least one prior statement that completely contradicted his testimony.

When Sheriff Daniel testified, the state produced the Jackson statement and designated it for identification as State's Exhibit 18.  In response to state questions, Daniel identified his signature on the document, identified it as Chester Jackson's statement, and stated that it was headed, "April 19, 1972, at 6:20 p.m., place, Parole Office A Building, Angola, Louisiana," which was the same day as Hezekiah Brown's statement but later in the evening.  R. 1289-90;  Exh. JJ.  He testified that it

was also signed by Hilton Butler, Hayden Dees, Murray Henderson, Deputy Guerin, and Chester

Jackson. R. 1290.

The prosecutor then asked Daniel whether he had "institute[d] the warrants" for the

defendants after Brown's statement but before Jackson's. R. 1290. When he didn't recall, the

prosecutor asked him to review the statement and then the following colloquy took place:

> Q:     Does it [the statement] refresh your memory and appear to be the information
>         that you actually received from Chester Jackson?

A:     Yes ma'am.

> Q:     Whether you had issued a warrant before talking – for Albert Woodfox,
>         before talking to Chester Jackson, or after, did you acquire any information
>         from Chester Jackson that changed your mind about issuing an arrest warrant
>         for murder against Albert Woodfox?

> A:     No ma'am.

> Q:     Okay. Was an arrest warrant and charges filed against Chester Jackson, also?

> A:     Yea, ma'am.

> Q:     -- In connection with the same case?

> A:     Yes.

R. 1289-91.

During the testimony of Warden Henderson, the prosecutor returned to her questioning about

Chester Jackson's out-of-court statements:

> Q:     Without going into anything that Chester Jackson said to you, did you get any
>         information from Chester Jackson that contradicted what Hezekiah Brown had told
>         you about Albert Woodfox's involvement in this case?

> A:     No.

R. 1984

The prosecutor then asked Butler to read Jackson's statement, identify his signature on it and

then questioned him as follows:

> Q:     Is there anything that – any information that you have acquired at any time
> since that time up until today that has caused you to believe that the information
> provided in connection with these statements, as they implicate Albert Woodfox, are
> not correct?
>
> A:     Have not.

R. 2026-27.

> Again, with Lloyd Hoyle:
>
> Q:     Mr. Hoyle, you – was the 19th, that statement that you're talking about, was
> that the statement – was that Chester Jackson?
>
> A:     That was a prelude to the statement of Chester Jackson.
>
> Q:     And was that the only statement that you were present for, during the first
> couple of days?
>
> A:     I didn't even stay for the statement, basically.  I stayed for the minute that a
> certain convict walked into that interrogation room and admitted his role in the thing,
> and named Woodfox and Wallace as the perpetrators of that stabbing, I couldn't even
> stand to be in the room with that pair.  I left.

R. 2044-45.

The collective import of the prosecution's questioning as set forth above could only have left

in the jury's minds the impression that 1) Chester Jackson admitted to killing Brent Miller;  2) he

provided a statement that did not contradict Hezekiah Brown;  and 3) his statement implicated Mr.

Woodfox.

The prosecutor's actions created a false impression in the minds of the jury by introducing evidence regarding Chester Jackson's out-of-court statements. The impression created was false for a number of reasons. Jackson's testimony, for example, did contradict that of Hezekiah Brown. In the most glaring of a number of contradictions, *Brown and Jackson couldn't even agree on who committed the murder*. Brown named the four defendants, including Montegut, while Jackson named only himself, Mr. Woodfox, and Mr. Wallace. Additionally, the prosecutor created the false impression that Jackson had simply confessed and implicated Mr. Woodfox, whereas in truth he had given multiple, conflicting, mutually exclusive accounts that were both internally and externally inconsistent and strongly indicated perjury. *See* discussion of Jackson's testimony, *supra*.

The prosecution's unlawful tactics allowed the state to manufacture another witness for itself by misleading the jury and disobeying the Court of Appeal. This violation, which allowed the prosecution to bolster its weak case to the detriment of Mr. Woodfox, undermines confidence in Mr. Woodfox's conviction.

## III. THE STATE'S WITHHELD MATERIAL EXCULPATORY EVIDENCE WHEN IT REFUSED TO DISCLOSE THE CONTENTS OF THE SHERIFF'S INVESTIGATIVE FILE.

As discussed above, the state refused access to the West Feliciana Parish Sheriff's Office's file on the Brent Miller investigation. Post-trial, postconviction counsel have obtained the file. In addition to the above-discussed *Brady* material relating to Richey, Jackson, and Fobb, the file contains a substantial amount of additional favorable evidence.

The file reveals that Sheriff Daniel's statements regarding the seizure of inmate clothes on the day of the murder was misleading and false. Daniel testified that if **"any inmate came in, we**

82

**would check his clothes, and if it appeared that he might have had a – a blood stain on his clothes**, or on his shoe, we would take that object and label it and send it to the Crime Lab." R. 1247 (emphasis added). When questioned about why he seized the clothes of Albert Woodfox, Gilbert Montegut and Chester Jackson, he stated that it appeared that there may have been blood on those clothes.

However, the interview notes reveal that at least two prisoners other than the defendants were believed to have blood on their clothes, yet their clothes were not seized or submitted tot he Crime Lab for testing. The interview notes indicate that Larry Dyson, who lived in Walnut 1 dorm, had blood on his "left tennis shoe." Exhibit R at 14. Daniel also recorded that Joseph Brown, who lived in Walnut 1, had "blood on shirt." Id 18.

There was also a notation next to the name of prisoner Darryl Howard indicating that he had "scratches on the left back near shoulder blade." Exhibit R. However, there is no indication that there was any follow-up on this individual.

Finally, unbeknownst to the defense, investigators recovered a pair of bloody tennis shoes on the day of the murder. According to an April 19, 1972 FBI letterhead memorandum obtained by postconviction counsel, Warden Henderson told the FBI on April 18 that "[a]lso a pair of bloody tennis shoes were found in the area of the dormitory." Exhibit UU, FBI memorandum.

There is not a single document known to Mr. Woodfox in which the authorities recorded the discovery of the bloody tennis shoes. None of the investigators revealed their existence at trial or at any point prior to trial, to the best of Mr. Woodfox's knowledge. However, the sheriff's notes strongly suggest that he tennis shoes were treated as a key piece of evidence during the April 17 interrogations. The notes reflect that a number of prisoners were questioned about the shoes:

83

| | |
|---|---|
| Henry Batiste: | "wear (sic) 8-9 shoe." |
| Willie Edmondson: | "William Burtha has shoe like these tennis shoes." |
| William Burtha: | "wears shoes 8-9 size." |
| Wilbert Chaney: | "wear (sic) 8-shoe." |

Exhibit R at 1, 2.

The failure of the authorities to document the discovery of a pair of bloody shoes at the scene of a murder is shocking and bolsters Mr. Woodfox's allegation that the authorities disregarded all evidence that did not fit with their preconceived theory of the case. It can only be surmised that the bloody shoes were not helpful to the investigator's desire to blame Mr. Woodfox and the others for the murder, regardless of the evidence.

Additionally, the notes reflect that the authorities possessed information suggesting other suspects in the killing. For example, inmate Joseph Hamilton stated that he "**heard talking the day before about something. Gary Knox was one in the group talking.**" Next to this entry Deputy Guerin wrote a single word: "Plott" [sic]. Exhibit R at 1. Thus, the notes indicate that the sheriff's office suspected an individual named Gary Knox to be part of a plot that resulted in the death of Mr. Miller. The prosecutor took full responsibility to ensure that exculpatory evidence was provided to the defense, yet failed to turn over this evidence. Her failure was material.

The sheriff's notes, along with the Louisiana State Police fingerprint and Crime Lab files, are additionally favorable for what they *do not* include. Exhibits R, LL, and ZZ. The notes overarchingly demonstrate the complete absence of a professional investigation in this case. There is not a single police report of any kind. Nobody documented the search for or discovery of physical evidence. The sheriff's file contains none of the following:

    1.      the names of police personnel who participated in the search for evidence

2.      the names of police personnel who discovered evidence

3.      photographs of the undisturbed crime scene (prison personnel removed Miller's body before the police arrived)

4.      a complete listing of evidence collected

5.      documentation of how, when, and where evidence was collected

6.      photographs or notes explaining locations from which fingerprints were lifted

The above listing is only a beginning. The jury was entitled to be made aware of the complete lack of professional investigation of this case. Competent counsel could have conducted fruitful cross examination of Daniel and the competency of his investigation. The defense theory of the case would also have been supported: Mr. Woodfox was targeted and facts which would have helped exonerate him were ignored and suppressed.

The jury should have had the opportunity to examine the breakdown of number of individuals listed in Daniel's and Guerin's interview notes, cross referenced against the dorm in which they lived:

> Hickory 1: 30
> Hickory 2: 35
> Hickory 3: 37
> Hickory 4: 47
> Total: 149
>
> Pine 1: 14
> Pine 2: 33
> Pine 3: 22
> Pine 4: 26
> Total 95
>
> Walnut 1: 22
> Walnut 2: 25
> Walnut 3: 23

Walnut 4: 27
Total 97

Oak 1: 1
Oak 2: 2
Oak 3: 3
Oak 4: 1
Total: 7

Grand Total: 348

Only 7 individuals were interviewed from the Oak dormitories. Oak was Angola's all-white dorm unit. R. 1427. Apparently the investigators did not believe it necessary to question because they assumed from the beginning that black inmates were responsible. The dorm which contained the next fewest inmates interviewed by Daniel and Guerin is Pine 1, the scene of the crime. **Hezekiah Brown and Leonard "Specs" Turner, the individuals who supposedly "cracked" the case, both lived in Pine 1, and neither were interviewed by either Daniel or Guerin**.

Additionally, there are no interview notes taken by Daniel and Guerin for Paul Fobb. Fobb did not provide a statement until January 1973.

**IV.   CONSIDERED CUMULATIVELY, AS THE *BRADY* DOCTRINE REQUIRES, THE *NAPUE* FALSE EVIDENCE VIOLATIONS AND THE SUPPRESSED EVIDENCE WERE MATERIAL AND MR. WOODFOX'S CONVICTION MUST BE REVERSED.**

In *Kyles*, the Supreme Court made clear that when the State commits multiple *Brady* or *Napue* violations, the materiality of the violations must be assessed by considering their cumulative impact, not the individual impact of each violation. *Id.*, 514 U.S. at 436-37. In this case, the magnitude of the *Brady* violations is overwhelming.

86

In this case, the State has presented no fewer than four irreconcilable theories of who killed Brent Miller. Hezekiah Brown said the murder was committed by Albert Woodfox, Herman Wallace, Chester Jackson, and Gilbert Montegut. Chester Jackson said it was himself, Albert Woodfox, and Herman Wallace. Paul Fobb, the blind sociopath, said he "saw" Albert Woodfox alone. Howard Baker claimed it was Herman Wallace and "Pedro." For the State to have presented so many contradictory theories of the case was fundamentally dishonest. Even without the benefit of any background knowledge as to the back-alley methods the State employed to secure its testimony against Mr. Woodfox, it is obvious that the State's witnesses must have been lying, for logic alone dictates the conclusion that such irreconcilable stories could not possibly all be true.

A detailed comparison of the prosecution witnesses' testimony makes clear that the State's multiple theories of the Brent Miller murder are not to be believed. Brown and Jackson, for example, both claimed to have witnessed the stabbing of Brent Miller. Brown testified that he and Miller were alone in Pine 1 when *four men*, armed with *four separate knives*, entered the building and killed Brent Miller. Jackson, on the other hand, claimed that *three men*, carrying *only two knives*, entered Pine 1 and found Brown, Miller, Specs, and "five or six" other men. Jackson was unable to say whether the five or six men in the back of the room participated in the attack. Brown was positive that the attack began when Mr. Woodfox stabbed Miller in the back. Jackson claimed to be equally sure that Mr. Woodfox stabbed Miller in the *chest*. Brown said that Miller was sitting on the bed *facing the rear of the building*. Jackson testified that *Miller was facing towards the front of the building* (which begs the question: How was Mr. Woodfox able to surprise Miller from behind after entering the room wearing a handkerchief over his face and walking directly past Miller?). Brown testified that the entire attack took one or two minutes and said Miller was

87

incapacitated and fell (or, in his other version, was thrown) to the ground almost immediately. Jackson, on the other hand, testified that the attack took more than 10 minutes and said that Miller stayed on his feet until the very end. Richey said that he saw the men run out of the dorm only two or three minutes after they entered. However long it took, Paul Fobb claimed to be standing outside, "shocked and stunned" and "waiting" for Mr. Woodfox to walk back out of Pine 1. Brown said that he cowered against the wall in fear until Miller was dead and the attackers had left, after which he ran out of the building. Jackson said that Specs — whom Brown never mentioned — and Brown both ran out of Pine 1 *while the attack was taking place*.

Joseph Richey and Paul Fobb's accounts began where Brown's left off — at the point when they claimed they saw the attackers run out of Pine 1. Richey testified that he saw Mr. Wallace, along with Woodfox, Jackson, Montegut, Brown, and Specs, run out of Pine 1. In his trial testimony, all six men ran down the walk towards the dining hall. In his initial statement, Mr. Woodfox went the opposite direction, towards the Hickory dormitories, while only Brown and Jackson went towards the dining hall. In his written statement, Richey didn't know where Mr. Wallace or Specs went (although he was able to remember when he testified nearly two years later). Fobb, on the other hand, said he saw only Mr. Woodfox but none of the people the other witnesses claimed to have seen.

Perhaps most importantly, the prosecution witnesses – who placed themselves only feet apart from one another in the moments after the murder – *failed to notice each other*. Richey said that he didn't see Fobb. Fobb didn't see Richey (even though he claimed, by necessary implication, that Mr. Woodfox threw a rag past Richey). Brown didn't see Baker or Richey or Fobb. Jackson didn't see Baker or Richey or Fobb. Fobb said he didn't "see" anybody else. All of them, in fact, said that

nobody else was present. Yet the state's witnesses would have us believe that they were all present in and around the Pine 1 dormitory when Brent Miller was killed.

If the discrepancies between the prosecution witnesses' accounts were minor, they might comfortably be explained away as understandable human error. But the discrepancies are not minor. *The State's witnesses contradicted themselves and each other on every important detail of the Brent Miller killing.* These are not accidents. They are not innocent lapses in recollection. The contradictions are so numerous and concern such significant details that even without considering the *Brady* violations, the State's case was not to be believed.

The deficiencies in the State's case were not limited to the live witnesses. The case was also characterized by a lack of physical evidence implicating any of the defendants. The physical evidence in this case pointed away from the defendants. No connection has ever been established between any of the defendants and the knife found underneath Pine 1. Neither Hezekiah Brown nor Chester Jackson, who claimed to have witnessed the murder, was able to identify the knife. More importantly, someone other than the defendants left a bloody fingerprint next to Brent Miller's body. It stands to reason that whoever deposited this print was involved in the murder of Officer Miller. As the State has conceded, the bloody fingerprint did not belong to Mr. Woodfox. Nor did it belong to Albert Woodfox, Gilbert Montegut, or Chester Jackson (nor Abraham "Pedro" Thomas, Leonard "Specs" Turner, Joseph Richey, or Hezekiah Brown). The State's failure to make any meaningful effort to determine whom this fingerprint belonged to epitomizes the state's approach to investigating the murder of Brent Miller. Once, on the day of the murder, the State of Louisiana had singled out Albert Woodfox, Herman Wallace, and Gilbert Montegut, the die had been cast. The available information compels the conclusion that the state manufactured the necessary evidence

89

against its chosen defendants while simultaneously ignoring evidence that led to other suspects or other theories of the case.

In their defense, Mr. Woodfox and Mr. Wallace countered the state's botched and implausible theory of the case by presenting an alibi that was confirmed by 10 prisoners and a security captain.

Mr. Woodfox's defense made clear that he could not possibly have been involved in the murder of Brent Miller because he was nowhere near the scene when it took place. It is often assumed that prisoners, because of their status as such, have impaired credibility as witnesses. Whether or not this assumption is correct, this case amounted to a swearing contest between 10 prisoners who testified for the defense and three who testified for the state. The state's witnesses, as we have seen, so completely contradicted themselves and each other that they could not even agree on who actually committed the murder. In contrast, Mr. Woodfox's witnesses consistently and credibly testified that he was in the dining hall, far from Pine 1, at the time of the murder. Unlike the State's witnesses, Mr. Woodfox's witnesses had no incentive to lie. Mr. Woodfox had no ability to pay them, offer them leniency, or transfer them to more comfortable housing arrangements. On the contrary, the witnesses for the defense likely believed that they risked suffering retribution at the hands of prison officials as a result of their testimony. Nevertheless, they came forward to testify, and they provided the most believable testimony of the entire trial.

When the state's evidence at trial is considered in light of the false evidence and suppressed Brady material, confidence in the verdict against Mr. Woodfox is irreversibly undermined. This evidence is material and has rendered this trial unreliable and unfair. If the state had followed the law, the evidence would have shown the following:

1.  Joseph Richey, the only live witness to testify against Mr. Woodfox, lied on the stand and the state knew about it;

2.  The jury would not have heard, falsely, that Chester Jackson had "confessed" and implicated Mr. Woodfox;

3.  Mr. Woodfox could have shown that Sheriff Daniel lied when he claimed he was not armed during the interrogations, and that, consequently, Mr. Woodfox testified truthfully;

4.  Mr. Woodfox could have shown the jury the complete absence of a proper investigation, including the almost-total focus on black inmates to the exclusion of white ones;

5.  Mr. Woodfox could have shown that the sheriff suspected a prisoner named Gary Knox of involvement in the "plot";  and

6.  Mr. Woodfox could have shown that two prisoners had bloody clothes, one had scratches on his body, and that bloody tennis shoes were recovered, yet the state did nothing with this evidence because it did not implicate the chosen defendants.

If Mr. Woodfox had not been denied access to the vast amount of exculpatory evidence in the State's possession, he could have refuted the State's case at every turn.   As noted in Kyles:

> [C]onfidence that the verdict would have been unaffected cannot survive when suppressed evidence would have entitled a jury to find that the eyewitnesses were not consistent in describing the killer, that two out of the four eyewitnesses testifying were unreliable, that the most damning physical evidence was subject to suspicion, that the investigation that produced it was insufficiently probing, and that the principal police witness was insufficiently informed or candid.

514 U.S. at 454.

The above-quoted judgment from *Kyles* could well have been written to describe the case against Mr. Woodfox, although accuracy would demand increasing the tally of unreliable witnesses to four out of four, and adding to the list of considerations militating against a verdict of guilty the fact of admitted witness-tampering on the part of the State, confessed subornation of perjury, the bribing of witnesses, and the concealment of exculpatory witnesses and alternative suspects.

The State of Louisiana's unconstitutional and unlawful actions during the prosecution of this case deprived Albert Woodfox of a fair and unbiased trial and resulted in his conviction for a crime he did not commit.  He is entitled to habeas relief.

## V.    THE STATE VIOLATED MR. WOODFOX CONFRONTATION CLAUSE RIGHTS BY REPEATEDLY INTRODUCING THE  OUT OF COURT STATEMENTS OF CHESTER JACKSON.

By repeatedly introducing inculpatory, testimonial hearsay evidence of Chester Jackson,  as detailed above, the State violated Mr. Woodfox's right to confront his accusers.

## VI.    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE.

To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth by the United States Supreme Court in.  To demonstrate ineffective assistance of counsel, the Petitioner must show that: (1) his attorney's performance fell below an objective standard of "reasonably effective assistance;" and, (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668 (1984).  Further, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 104 S.Ct. at 2068.  Bert Garraway

92

and Clay J. Calhoun, Jr., from appointment to conviction, betrayed Mr. Woodfox's right to a competent preparation and presentation of his case

**1.     Trial counsel were ineffective and Mr. Woodfox was prejudiced by unreasonable failure to file and argue a motion to quash the indictment.**

Mr. Woodfox was indicted in 1972 by a grand jury that was selected using procedures that discriminated against African-Americans and women. After he was convicted, the other indictments returned by the grand jury, including those of Herman Wallace, Gilbert Montegut, and Chester Jackson, were quashed because the grand jury itself was defective. Due to the ineffectiveness of his attorney, Mr. Woodfox's illegal conviction was not remedied until 1992, when his conviction was overturned.

Mr. Woodfox was in the custody of the Louisiana State Department of Corrections the entire time between his first and second indictment. The state of Louisiana should have moved on its own accord to quash his indictment when it became clear that the West Feliciana Parish grand jury that indicted him was invalid. Instead, 26 years passed, a delay which obliterated Mr. Woodfox's ability to defend himself once he was retried.

Garraway and Calhoun should have filed a motion to quash the indictment on this ground. The delay between the first and second indictment was 21 years. The length of this delay is presumptively oppressive given the fact that Mr. Woodfox was in state custody. The reason for the delay was the failure of the state to bring his case before a legal grand jury. The delay of more than two decades has adversely affected his defense. The key witness against him Hezekiah Brown, died before trial, as did Paul Fobb. Evidence could not be found and was thus unavailable for defense testing.

93

Because of counsel's failure to challenge the indictment, Mr. Woodfox's rights to Due Process and Confrontation could not be honored. His conviction must be reversed.

**2.    Garraway and Calhoun failed to investigate the case and consult expert witnesses.**

This case, more than most, required an exhaustive defense investigation. The original investigation was botched from the start because the state, with its immediate focus on Mr. Woodfox and the others as suspects, failed to conduct a meaningful inquiry at the time of the murder. The quarter-century delay between arrest and trial meant that witnesses, mostly former prisoners, had scattered to the wind. Physical evidence, which was never subjected to serious forensic evaluation, should have been tracked down, reassembled, and tested. The defense needed to consult with experts in a number of scientific and forensic disciplines, some of which, such as DNA technology, did not exist at the time of the original trials of this case.

In short, preparation for trial of this case required of defense counsel exceptional skill, creativity, and old-fashioned hard work. The trial performance of Garraway and Calhoun exhibited none of this.

### a.    *Failure to conduct pretrial discovery regarding prosecution experts*

A central allegation of the prosecution in this case was that the authorities seized blood-stained clothes (a right work shoe, blue pants, and a green army jacket) from Mr. Woodfox shortly after the murder. While Mr. Woodfox has compellingly denied that these were his clothes, and the evidence corroborates his denial, it was entirely predictable that the jury would be more likely to believe Sheriff Daniel, the law enforcement officer who claimed he seized the clothes, over Mr. Woodfox, a black prisoner. It was incumbent upon the defense to challenge the Crime Lab's assertion that the questioned clothing 1) belonged to Mr. Woodfox; and 2) was in fact blood-stained.

94

The ineptitude of Sheriff Daniel and the Crime Lab technicians in 1972 provided the defense with a golden opportunity to call into question the validity of the Crime Lab's opinion. Garraway and Calhoun made no attempt whatsoever to take advantage of the opportunity.

The Crime Lab's test results were presented by the transcript testimony of Carl Cobb, a supervisor at the Crime Lab. In part due to the ineffectiveness of Mr. Woodfox's 1973 trial counsel, who barely attempted cross-examination, Cobb's testimony spanned all of 9 pages. R. 1760-1768. Cobb was not even the person who performed the testing on the clothing; it was performed by a technician named Freddie R. Cox. State's Exh. 16; Exhibit LL. The import of Cobb's testimony was that the Crime Lab tested the clothes submitted by Sheriff Daniel and concluded that the blue pants and the shoe had blood on them and that the jacket bore blood that was human. All of the stains were reported to be so small as to barely be visible.

Defense counsel accepted the Crime Lab's conclusions as if they had been passed down by God himself. There was not a single cross-examination question about the validity of the tests that were performed, their error rates, or what, exactly, the test results meant (which was critical because, as discussed, *infra*, Cobb grossly misstated the significance of the test results). There was no inquiry into the conditions under which the tests were performed, the equipment used, or the qualifications of Cox, who performed the tests. Standing alone, Cobb's testimony gave the jury the uncontroverted impression that the Crime Lab test results proved to a certainty that the clothes attributed to Albert Woodfox were stained with human blood.

**b.**     ***Failure to challenge the absence of a chain of custody on the questioned clothing***

It was essential for Mr. Woodfox's 1998 trial counsel to challenge the validity of the Crime Lab's conclusions. The first level of this multi-faceted failure was defense counsel's failure to

95

question, either pretrial or during trial, the complete absence of an authenticated chain of custody on the physical evidence. The record in this case contains not a single document reflecting that the questioned clothing was actually seized from Mr. Woodfox, nothing to indicate that the clothing seized was the same clothing submitted to the Crime Lab, nor anything to indicate that the clothing Cobb brought to court was the clothing submitted by Sheriff Daniel. The only document in the record is Sheriff Daniel's "Request for Scientific Analysis," which poses more questions than answers. State's Exh. 16; Exhibit LL. The request for analysis indicates that the clothing evidence, *which Sheriff Daniel claimed he seized on the day of the murder, was not submitted to the Crime Lab until a week after the murder and a week after all of the other evidence in the case had already been submitted and analyzed*. Why? Given Mr. Woodfox's claim that the clothes did not belong to him, an answer to this question was essential. But nobody asked it.

Mr. Woodfox submits that the clothes were not submitted on the day of the murder because the authorities interested in manufacturing evidence against him, not searching impartially for the truth. If the investigation of this murder had had any integrity, the clothes would have been submitted to the Crime Lab on April 17, the same day as all of the other evidence in the case. Moreover, impartial investigators would also have submitted for testing the bloody tennis shoes, the bloody shoe of Larry Dyson, and the bloody shirt of Joseph Brown.

The Crime Lab records, for all they are worth, indicate that Sheriff Daniel seized clothing on the day of the murder from four prisoners – Mr. Woodfox, Chester Jackson, Gilbert Montegut, and Allen Crosby. State's Exh. 16; Exhibit LL. However, the brief Crime Lab rile raises more questions than answers. There are no records to indicate that Daniel recorded which clothes he had seized from whom and then kept the clothing separate. Daniel claimed that he seized Chester

Jackson's underwear, but there is no mention of his outer clothing. Where were they? Did Chester Jackson's outer clothing become Albert Woodfox's, either through malice or ineptitude? In this connection, it should be noted that prison records indicate that Jackson was wearing a fatigue jacket on January 24, 1972. Did this jacket become attributed to Albert Woodfox?

In addition, Jackson's underwear tested positive for Type B blood. State's Exh. 16; Exhibit LL. Brent Miller's blood was tested as Type A. *Id.* Even if the clothes attributed to Chester Jackson really were his, and even if they really did have blood on them, it was not Miller's blood. Did Daniel mix the clothing attributed to Albert Woodfox with the underwear attributed to Chester Jackson, and thereby contaminate both? The Crime Lab reported that the alleged blood on the alleged clothing of Mr. Woodfox was too minute to type. Were these alleged stains created by contamination from the Type B blood on Jackson's alleged underwear? There is no way to tell because nobody bothered to ask.

All of the authorities have testified that they didn't have any suspects during the interrogations on the day of the murder. Why, then, were three of the four individuals from whom clothes were seized Albert Woodfox, Chester Jackson, and Gilbert Montegut? Everyone agrees that Montegut's clothes tested negative for blood, so it would be difficult for Sheriff Daniel to claim that he seized them because he thought he saw bloodstains. There is no notation in the sheriff's notes that there was suspected blood on the alleged clothes of Jackson or Montegut. The state has never offered any explanation for why their clothes turned up at the Crime Lab, but not the visibly bloody clothes of inmates Dyson and Brown. Moreover, just about everybody except for the Attorney General's office agrees that Montegut was innocent. According to Cobb, the biggest "bloodstain" on Mr. Woodfox's clothes was on the jacket, while the ones on the shoe and the pants were nearly

invisible. Why, then, did Daniel claim he seized the clothing because he saw a stain on the shoe, but not the pants or the jacket?

The failure of the defense to investigate, consult experts, or ask questions at trial in an attempt to answer any of the above questions was gross ineffectiveness and undermines confidence in Mr. Woodfox's conviction.

### c.    Failure to obtain Information on the competency and qualifications of the Louisiana State Police Crime Lab

The defense failed to file any pre-trial motions demanding information on the qualifications and competency of the Crime Lab personnel who evaluated the clothing. The defense should have demanded information on the background of Cox and Cobb; their education and training; how many times they had actually performed the tests about which Cobb testified; how many times they had testified; and how many times they had been wrong.

In the early 1970s, botched crime lab analysis was an epidemic problem. From 1974 to 1977, the U.S. Department of Justice, Law Enforcement Assistance Administration, conducted a nationwide proficiency examination of more than 200 crime laboratories, including the Louisiana State Police Crime Lab. Peterson et al., *Crime Laboratory Proficiency Testing Research Program*, U.S. Department of Justice (1978) 11. The LEAA discovered shocking error rates. The blood evidence question presented the laboratories with two swatches of blood-stained cloth and asked the laboratories to determine whether the blood could have come from the same source. *Id.* at 209. For obvious reasons, the results from individual crime laboratories were not made public. Collectively, however, **71.2 percent of the nation's crime laboratories failed the blood analysis examination**.

*Id.* at 209, 251. For this reason, it was essential that defense counsel uncover the qualifications and

competency of the Crime Lab and its personnel.

For Cobb, Cox, and anyone else who participated in the testing in this case, defense counsel

should have requested, at a minimum, all of the following information relating to their qualifications:

a.  a *résumé*;

b.  All of the technician's educational background, from high school to the present;

c.  The subject, date and location of all courses or seminars attended by the technician relating to his employment as a forensic technician or agent, including all written, taped or videotaped materials which were given out or made available at these courses or seminars (or, if the technician does not have the materials, the best information he or she can provide as to how counsel can secure the materials);

d.  The subject, date, and location of all presentations given by the technician during the course of his employment as a forensic technician or agent, including all written, taped, or videotaped materials which were created, disseminated, or made available at these presentations (or, if the technician does not have the materials, the best    information he or she can provide as to how counsel can secure the materials);

e.  The subject, date, location and results of all proficiency tests in which the technician had participated (as well as the underlying data from those proficiency tests). This should include any testing with respect to eyesight, color-blindness, etc., which has been performed on the technician; and

f.  The technician's personnel file, to the extent it reflects any comments, criticism, or evaluation of the technician's performance on the job.

The defense should additionally have requested the following information with respect to

every case in which the Crime Lab's technicians had testified:

a.  Name of defendant;
b.  Venue of case;
c.  Date of case;
d.  Name(s) of technician(s) who did the examination;
e.  Whether there was any disagreement between technicians or experts;

f.      Certified copies of all available data surrounding each of these cases;

Defense counsel should also have subpoenaed the state police crime laboratory quality control and assurance manuals, the results of any laboratory proficiency testing, and any protocol manuals. Quality control manuals would have detailed the measures taken to ensure that the blood testing results and their interpretations would meet a specified standard of quality. The quality assurance manuals would have set forth the steps taken by the lab to monitor, verify, and document its performance. Proficiency testing ensures accurate quality assurance. Without the access to the results of the proficiency tests, it is impossible to know if the lab technicians individually, and the laboratories as institutions, were performing at the standards established by the profession.

Importantly, if defense counsel had obtained their own expert, she or he could have rendered an opinion on the reports, procedures and standards of the crime lab. Via the testimony of a defense expert, counsel could have brought before the jury the fact that the clothes were unavailable for testing by the defense, and any deficiencies in the state testing procedures and protocols.

Because the defense made no effort to discover any of the above information, Mr. Woodfox was unable to place before the jury even a scintilla of evidence to create doubt about the state's contention that Sheriff Daniel seized bloodstained clothes from him. It is entirely unsurprising, given counsel's failure, that the jury apparently believed the state on this crucial issue.

**d.**      *Failure to make an effort to find the physical evidence*

One of the priorities for defense counsel should have been locating the clothing attributed to Mr. Woodfox. Finding the clothes so that they could be subjected to modern testing by competent experts should have been a priority for the defense. The clothing was introduced into evidence at the first trial in 1973, was not found in 1998. R. 2624-26. Mr. Woodfox's 1973 trial was in Iberville

100

Parish. R. 2623. However, the clothes may have been transported to East Baton Rouge Parish for the 1974 trial of Wallace and Montegut. *Id.* They may also be in the possession of the Louisiana State Police or the West Feliciana Parish Sheriff's Office. The trial court ordered the state to search for the clothes, but it is unclear what, if any, efforts were made. R. 2624. Trial counsel do not appear to have taken any steps to locate the clothes themselves. No subpoenas were issued and they did not request funding for an investigator to conduct a search.

In addition, some of the other physical evidence, if found, could be subjected to modern forensic testing and used to exonerate Mr. Woodfox and Mr. Wallace. The authorities collected fingernail scrapings from Mr. Miller that contained human blood, hair, and possibly cellular material; Miller's clothing, which could contain assailant's blood; and vials of reference blood from Brent Miller, which could be used to exclude whatever stains exist on the clothes attributed to Mr. Woodfox. There is no indication that trial counsel made any efforts at all to locate any of the physical evidence. As a result, Mr. Woodfox lost the opportunity to present evidence that could have exonerated him.

e.    ***Failure to obtain expert opinions on the physical evidence***

Garraway and Calhoun did not hire a single scientific expert to consult or testify on any of the scientific evidence in this case, despite the fact that the trial court was willing to make funds available. In June 1997, 18 months prior to trial, the defense filed a "Motion for Funds for Expert Assistance," in which they sought funds to hire a blood spatter expert. R. 202. At the motion hearing, the court appeared willing to grant funds, stating that there "are several possible funding sources," but that the defense first needed to make a showing of why expert assistance was needed

101

and how much it would cost. R. 2642. The prosecutor acknowledged that the defense had a right to the funds. R. 2642.

The defense never bothered to make the required showing, and the blood spatter expert was never hired. In addition, the defense never even asked for funds to hire any other experts, such as a DNA expert, a fingerprint expert, or an ophthalmologist. As a result, the prosecution's evaluations, interpretations, and conclusions regarding the physical evidence – including the fingerprints, the blood evidence, and the blindness of an "eyewitness" – went unchallenged before the jury.

At trial, defense counsel were blindsided when the state's fingerprint expert, Carol Richard, unexpectedly announced her opinion that the bloody fingerprint that didn't belong to any of the defendants may actually be a less-useful palmprint. Defense counsel's futile objection to her testimony led to the following colloquy with the court, exemplifying the consequences for Mr. Woodfox of counsel's failure to do their job:

THE COURT:     The second question: Have the defense retained any experts in this case?

MR. GARRAWAY:     No, Your Honor.

THE COURT:     **All right, you are aware that the defense, from day one, has had the ability to move the Court to appoint experts at taxpayer expense, because we're dealing with an indigent defendant?**

My question to the defense is: In essence, what you have done is relied upon the state's expert and the state's expert's opinion, solely, in preparation of your defense.

I simply remind you that from the get-go, the defense could retain its own fingerprint analyst, who might contest the opinion of the state's expert, or who might have concurred with the state's opinion, and you would have known about this issue had that been done. That's the first point. The

102

mere fact that the state is calling an expert in no way entitles the defense to rely on that expert for its case-in-chief.

Point two: Experts, like wives, reserve the right to change their mind. And many times, an expert will render a report and then, in open court, give an opinion which is diametrically opposed or at least inconsistent with the previous opinions rendered by the expert. It happens all the time, in both civil and criminal cases, which is why, sometimes, you may wish to retain your own expert.

So, the mere fact that this expert may change a former opinion is not considered by me to be a surprise to anyone. These things always can happen, and that's why we retain our own experts.

\* \* \*

The question is, why are you entitled to rely on some state witness's opinion that's what it is, without doing your own separate and independent investigation in that regard.

R. 1642-49 (emphasis added). The court's condemnation of defense counsel for failing to consult a fingerprint expert would have been equally applicable to counsel's failure to hire any other experts in any disciplines at all.

Mr. Woodfox has now retained the services of experts in several disciplines, experts who should have been retained by trial counsel. Their evaluations of the evidence in the case, summarized in their attached declarations, demonstrate that trial counsel's lack of initiative prevented Mr. Woodfox from placing a vast amount of crucial information in front of the jury and from seeking forensic testing that might still be able to help exonerate him.

The physical evidence collected by the state is summarized in the April 27, 1972, "Results of Laboratory Examination (SP 12655)." State's Exh. 16; Exhibit LL. According to the report, the

103

following items of evidence were analyzed by the Louisiana State Police Crime Laboratory in
connection with the murder of Brent Miller:

| Specimen | Blood Identified | ABO Type | Description |
|---|---|---|---|
| 1 | +* | | Right hand fingernail scrapings |
| 2 | +* | A | Left hand fingernail scrapings + hair found to be of human origin |
| 3 | +* +* | A - | Victim's shirt, pants Victim's boots |
| 4 | +* | A | Reference blood from victim Miller |
| 5 | +* | - | Knife |
| 6 | - | - | Scrapings from table |
| 7 | - | - | Hair (no indication of where seized from or significance to case) |
| 8 | - | - | Paint scraping and stain |
| 9 | - | - | Work shoes (no indication of owner) |
| 10 | - | - | Rubber boots + grey socks (attributed to Allen Crosby) |
| 11 | - | - | work shoes + blue pants (attributed to Gilbert Montegut) |
| 12 | + +* | - - | Right shoe + blue pants jacket (attributed to Albert Woodfox) |
| 13 | +* +* | - B | Shirt Undershorts (attributed to Chester Jackson) |

Note:

+     Indicates the alleged presence of non-species-specific blood based on benzidine
      testing
*     Indicates alleged presence of human blood based upon precipitin testing

104

Mr. Woodfox has now retained the services of Stuart James, a crime scene and bloodstain analyst, Dr. Randell T. Libby, a Member of the University of Washington Medical School and an expert in the fields of DNA testing and molecular genetics, and James Werring, an experienced fingerprint analyst. These experts have rendered opinions demonstrating that his counsel's failure to press the Motion for Funds for Expert Assistance prejudiced Mr. Woodfox.

Stuart James one of the world's preeminent crime scene analysts, as shown by his curriculum vitae. Ex. QQ. He has "reviewed the various police reports, evidence photos, autopsy reports, fingerprint reports, and evidence lists." *Id.* He has offered his expert opinion as to how the state's scientific experts could have been challenged at trial and on the suitability of the evidence for modern forensic testing.

### i.    The clothing

The clothing allegedly seized from Albert Woodfox was a right work shoe, a pair of blue pants, and a green army jacket. State's Exh. 16; Exhibit LL. The state reported that the shoe and the pants tested positive for non-species-specific blood and that the army jacket tested positive for human blood. *Id.* All of the stains were reported to be so small they were nearly invisible, making them too small to determine a blood type.

### a.    Counsel failed to inform the jury that the state misstated the results of its forensic tests

The pants and the shoe reportedly tested positive using a benzidine test and the jacket using a precipitin test. Carl Cobb, the Crime Lab director, wrongly testified that the positive test results meant that the pants and the shoe were stained with blood and the jacket was stained with human blood. R. 1763, 1764. He was not cross-examined as to how he arrived at this conclusion or how firm a conclusion it was.

105

As Stuart James explains in his attached declaration, Cobb misstated the meaning of the tests

results:

> When analyzing suspected bloodstain evidence, the first task is to determine
> whether or not a particular stain is blood. There are two different categories of tests:
> (1) presumptive tests and (2) confirmatory tests. Presumptive tests for blood, such
> as the benzidine test performed by the State Police, are preliminary tests only. They
> cannot confirm that a given sample is blood. These preliminary presumptive tests
> can properly serve as an initial screen, but they are not specific for blood. See De
> Forest, Gaensslen and Lee, *Forensic Science, An Introduction to Criminalistics*,
> (1983).

> The benzidine test was reportedly performed on the right shoe and blue pants
> in specimen 12. Mr. Fleming informs me that based upon the results of benzidine
> testing, the Crime Lab personnel testified that "we were able to show . . . blood" on
> the shoe and pants. However, a positive benzidine test result cannot confirm blood.
> The benzidine test is a presumptive test. It is a preliminary test only. It is neither
> confirmatory nor specific for human blood. A positive benzidine test result indicates
> only that blood may be present. It does not indicate that blood is present, it does not
> indicate whether or not the possible blood is human, and it cannot indicate blood
> type. The benzidine test is useful only to 1) establish the absence of blood through
> a negative test result; or 2) identify items that may contain blood and should be set
> aside for more exact *confirmatory* testing.

> **It has long been understood that benzidine tests are very susceptible to
> generating false positive reactions.** For example, the benzidine test can react to
> vegetable matter (including, but not limited to, lettuce, tomatoes, potatoes,
> horseradish, or bread), various bodily secretions (including nasal secretions),
> chemicals or metals (including copper or nickel), and a number of other
> contaminants. See Brian Culliford, *The Examination and Typing of Bloodstains in
> the Crime Laboratory*, U. S. Dept. of Justice (1971).

> A positive benzidine test may properly be used only to identify evidentiary
> items that should be subjected to further confirmatory testing. **In this case, it does
> not appear that any confirmatory testing was performed. Consequently, the
> Crime Lab's assertion that its test results "proved" the presence of blood on the
> shoe and the pants is scientifically invalid**. *Forensic Science: An Introduction to
> Scientific and Investigative Techniques* 189-199, 222-223.

Once a presumptive benzidine test returns a positive result, confirmatory tests must be performed. The Crime Lab failed to perform any confirmatory tests on the right shoe and blue pants (part of Specimen #12) attributed to Albert Woodfox. Because the presumptive benzidine test cannot prove that an evidence sample is blood, distinguish between animal blood and human blood, or determine how long the substance has been at the scene, one cannot properly conclude that the purported blood stains on these items are actually blood (not to mention human blood) until confirmatory tests have been performed.

7.    Once an evidence sample has been positively identified as blood, it must be determined whether or not the blood is human blood. Determining the presence of human blood in a bloodstain can be done by performing a precipitin test, an ABO antigen (bloodtype) test, or a DNA test. See Stuart James and Jon Nordby, *Forensic Science: An Introduction to Scientific and Investigative Techniques* 189-199, 222-223 (2002).

Although DNA testing was available in 1998, no DNA test results were reported by the state.

ABO antigen testing was performed on the following items in this case using the Absorption-Elution method: Victim's Left hand fingernail scrapings (part of Specimen #2), Victim's shirt and pants (part of Specimen #3), the reference blood sample from victim Brent Miller (Specimen # 4), and a possible blood stain found on a pair of undershorts attributed to Chester Jackson (part of Specimen #13). See the "Louisiana State Police Laboratory Analytical Procedures" report at 2. The Absorption-Elution testing yielded an ABO blood type result for these items. If accepted laboratory procedures were followed when the ABO testing was performed (the state does not appear to have documented the procedures used), it is reasonable to conclude that the above samples did contain human blood.

Additionally, the state performed species testing on a number of items using the precipitin test. Precipitin testing was performed on the following items: Victim's right hand fingernail scrapings (Specimen #1), knife (Specimen #5), and the jacket attributed to Albert Woodfox (part of Specimen #12).

Precipitin tests use species-specific antisera to test for a reaction to the blood of a particular species. Precipitin tests can be unreliable, especially if they are not properly performed. "While precipitin tests are fairly easy to do, they must be done properly if the results are to have meaning. There are two potential problems with

107

these tests: (1) false reactions, positive or negative, because of incorrect dilutions of the antigen or antibody solutions or both and (2) cross-reactivity of anti-sera in which antibodies raised against one species also react with the blood of a closely related species . . . It is also essential to include proper controls (for example, various knowns and blanks) with every precipitin test." *Forensic Science, An Introduction to Criminalistic* 250-51. To give a specific example, the precipitin test can produce false positive reactions to cow blood if the test is not properly performed (that is, if the questioned sample is tested at too high a concentration). *See The Examination and Typing of Bloodstains in the Laboratory* at 60. My understanding is that Mr. Woodfox worked in the prison kitchen and came into contact with food products, including beef and other animal meats. If the state failed to perform the precipitin tests properly, then these substances could generate a positive reaction to human blood, i.e., a false-positive result.

**The reports produced by the Crime Lab officials who performed the testing in this case contain no documentation regarding the conditions under which the tests were performed or the procedures that were used, or the qualifications of the individual(s) performing the testing. I see no mention of controls or blanks having been used in the bench notes from the "Louisiana State Police Laboratory Analytical Procedures" report. I additionally see no discussion of the concentrations at which the questioned samples were tested. These crucial details would be included in any properly prepared lab report.**

**Because the Crime Lab failed to properly document their testing procedures, it cannot reasonably be presumed that the alleged human blood stains present on the knife and jacket attributed to Albert Woodfox are in fact blood or, if they are blood, that they are of human origin. Confirmatory testing coupled with DNA testing of these samples could resolve this issue.**

Exhibit QQ.

Dr. Randell Libby expresses a similar opinion:

According to the Louisiana Department of Public Safety State Police Crime Laboratory, Analytical Procedures, precipitin testing was performed on the jacket in specimen 12 in order to determine the possible presence of human blood. Unfortunately, however, these conventional serological tests rely on the analysis of proteins, enzymes, and other antigens in blood which are often times more susceptible to degradation than the newer DNA-based tests. This effect alone generally leads to the requirement of large samples in good condition for optimal results. Thus, the conventional serological based tests are neither sensitive enough nor robust enough to provide reliable information and data related to the origin or identity of the individuals from whom the sample was derived. It should be noted

that no antigen test results were reported on Specimen 12 clothing items. Therefore, the assumption of the presence of human blood on Specimen 12 has not been confirmed.

Exhibit PP.

Clearly, the results of the crime lab's testing is "scientifically invalid," and the state presented the jury with misleading and false information in violation of *Napue v. Illinois*, *supra*.

Given the limitations of serology testing, there can be no confidence in such testing. In fact, according to the Innocence Project, in over 50% of the recent known cases in which convicted persons have been exonerated, the basis for the convictions was faulty serological evidence.

The jury heard that the shoe and pants attributed to Albert Woodfox had blood on them. This was not true. The "positive" test results on the pants reportedly came from a nearly invisible stain near the pocket. As Mr. James points out, if the wearer of the clothes had recently wiped his nose or touched any number of food items (such as ketchup, which contains tomatoes, or beef) he could have deposited material that would create a positive benzidine test result. Mr. Woodfox worked in the prison kitchen, where he and his clothes daily came into contact with food items.

The testimony that the jacket bore human blood should have been similarly qualified. Cobb testified that the positive precipitin test proved the presence of human blood. Trial counsel's failure to challenge the state's evidence meant that the jury did not have the crucial analysis and information that a defense expert such as Stuart James could have provided. Trial counsel could easily have provided the jury with a basis for discrediting Cobb's testimony and the crime lab's analysis.

### b. Trial counsel failed to seek testing of the alleged bloodstains

Modern forensic testing could have resolved the question of whether the alleged stains on the clothing attributed to Albert Woodfox contained Brent Miller's blood. Even in 1998, DNA

technology existed whereby DNA from the reference samples of Miller's blood could have been compared to DNA extracted from the clothing. Such a comparison could have established conclusively whether or not the alleged stains on the clothing contained Miller's DNA. If the state were truly confident in its evidence, then there is no reason why they – then or now – would oppose such testing. However, the question was never presented because trial counsel did not seek out the clothes and they do not appear to have understood the scientific possibilities that were available to them, if only they had looked.

### c.    Trial counsel failed to seek testing that could have excluded Mr. Woodfox as the wearer of the clothing

The allegedly bloody clothes should have been subjected to DNA testing to determine whether Mr. Woodfox was the wearer of the clothes. As Dr. Libby explains,

> Clothing is routinely subjected to DNA testing to determine who the habitual wearer of the items was. Areas around the collar and cuffs, pant legs and the inside of a pair of shoes can often contain sloughed off skin cells from the habitual wearer of the item. These sloughed off skin cells can be nucleated cells and are suitable for performing STR DNA testing. A genetic profile generated from these items could be compared to Albert Woodfox and Herman Wallace and could exclude or include Albert Woodfox as the wearer of the clothing.

Exhibit PP at 12. Providing scientific corroboration for Mr. Woodfox's claim that Sheriff Daniel falsely attributed the clothes to him would greatly have assisted his defense. Trial counsel was ineffective for failing to test the clothing for DNA.

### ii.    The knife

Garraway and Calhoun did not seek expert advice on the possibilities for testing the knife alleged to be the murder weapon. State's Exh. 4. The state has never connected the knife to the defendants or to anyone else, but claims it to be the murder weapon. In fact, it may be possible to

conduct a number of tests on the knife that could lead to important new evidence and counsel should have sought such testing.

The Crime Lab evaluated the knife and determined (again, using only precipitin testing) that it bore human blood, but not in sufficient quantity to determine blood type. R. 1765. It was not, therefore, definitively connected to Brent Miller. No fingerprints were found on the knife. R. 1210.

Stuart James has examined the knife and reports:

**On August 6, 2002, I examined the knife at the Tangipahoa Parish Clerk's Office at the Court's evidence storage facility in Amite. This knife is reportedly the murder weapon. The knife consists of a metal shank with a handle made of wrapped tape. The layers of tape have been wrapped around the shank multiple times. In the area around the hilt of the knife, I observed a "crust" of possible blood (presumably the victim's). DNA testing should be performed on the possible bloodstain on the knife to obtain a DNA profile. This should be compared with the reference sample from the victim, Albert Woodfox, and Herman Wallace. The handle of the knife appears to have some possible blood smears as well. If it can be established that the substance on the knife is human blood, it can more conclusively be established that the knife is the murder weapon.**

Ex. QQ.

Dr. Libby has evaluated the possibilities for scientific testing of the knife and concludes that
a determination of the genetic profile of the individual who wrapped the tape around the sheath of the knife might be accomplished by analyzing swabs taken from the inside of the handle. In this context, due to the expected small sample size and absence of blood it will be more prudent to extract any possible DNA present and amplify it using the PCR process before performing any presumptive or confirmatory tests for blood.

13.     In order to accomplish DNA testing of the inside of the knife handle, the tape on the handle should be cut away and examined microscopically to reveal the presence of any epithelial cells or hair(s) possibly adhering to the tape which would presumably reveal the genotype of the individual who assembled the knife. Nuclear STR testing may be conducted on epithelial cells or hairs that include roots. The results of this testing would be likely to provide a genetic profile of the person who wrapped the tape around the shank of the knife. This profile could be compared to that of Albert Woodfox and Herman Wallace.

111

Exhibit PP.

The knife evidence was also evaluated by James Werring, a fingerprint analyst with 30 years' experience with the New York Police Department Major Case Squad and the Palm Beach County Sheriff's Office. Exhibit RR, Declaration of James Werring. Mr. Werring believes that if the tape is unwrapped from the handle of the knife, it could be examined for fingerprints, possibly leading to the person who made the knife. *Id.* at 7-8. Werring recommended using the "gentian violet method," a technique that involves placing tape in a liquid solution that "has had great success" in enhancing fingerprints on the adhesive side of tape. *Id.*

The knife discovered at the scene could contain valuable evidence that could exclude Mr. Woodfox and Mr. Wallace and include the perpetrator of the murder. There are many possibilities for uncovering evidence, but they have never been attempted because trial counsel were ineffective.

### iii.     The fingernail scrapings

Right and left hand fingernail scrapings from the victim were submitted to the Louisiana State Police Crime Laboratory for analysis. State's Exh. 16; Exhibit LL. Once again, trial counsel failed to seek out this evidence and move for evaluation and testing. The fingernail scrapings, quite logically, could contain DNA from the killer of Brent Miller. They could be used to exclude Mr. Woodfox and Mr. Wallace and to positively identify the killer of Miller. These scrapings are obviously critical to establishing innocence.

According to the Crime Lab (once again using benzidine, precipitin, and ABO absorption elution testing), human blood (antigen A) and a human hair were found under the fingernails of the Miller's left hand, and blood under the fingernails of his right hand. State's Exh. 16; Exhibit LL. If the Crime Lab is correct, Miller's left fingernails held Type A blood, which was the same type as

112

his blood.  As both Dr. Libby and Stuart James observe, the state's antigen testing is insufficiently

discriminating to determine whether this blood belonged to the Miller, the assailant(s), or both.

> **Antigen testing is simply not as sensitive nor discriminating as DNA profiling.
> The antigen results are not sufficiently accurate to determine if the blood under
> the victim's fingernails came from the victim, the assailant(s), or both.
> Therefore the presumed blood underneath the victim's fingernails, Specimen
> 2, should be separated from the hair and should then be subjected to DNA
> testing.  STR DNA testing is the recommended test as it should reveal whether
> or not mixtures are present.  The results should then subsequently be compared
> to the victim and the petitioners, Albert Woodfox and Herman Wallace.  The
> hair should be evaluated independently.**

Exhibit QQ.

DNA could have established whether the fingernail scrapings contained blood or other tissue

that did not belong to Miller.  *Id.*  If it did, the blood or other tissue could have been used to create

a DNA profile of the assailants, which could both exclude Mr. Woodfox and Mr. Wallace and help

lead to the actual killer.  The same can be said regarding the human hair found under the left

fingernail.

Trial counsel should have attempted to find and test the fingernail scrapings.  Because they

did not do so, they were ineffective to the prejudice of Mr. Woodfox.

### iv.    Failure to retain a fingerprint expert

The most powerful piece of physical evidence in this case has always been the bloody

fingerprint, which did not belong to any of the defendants, which was photographed on the entrance

door to the Pine 1 dormitory.  State's Exh. 14 and 26.  In addition, the state recovered four

simultaneous fingerprints from the same hand and two partial palmprints.  State's Exh. 15, 24, and

25.  None of these prints matched the defendants either.  State's Exh. 27.

Predictably, the state attempted to diminish the importance of the fingerprint evidence, and they used questionable tactics to do so. Just prior to the testimony of Louisiana State Police fingerprint analyst Carol Richard, the state informed the defense that Richard now believed the bloody print recovered from the scene was not a fingerprint, but rather a palm print. R. 1635. Defense counsel immediately objected, claiming surprise and prejudice, noting that they had referred to an unidentified bloody fingerprint in their opening statement. R. 1636.

The trial court overruled the defense objection, blaming the defense for unreasonably relying on the opinion of the state's expert, despite the fact that funds were available for defense counsel to hire their own expert. R. 1641. The court noted that experts frequently disagree and/or change their opinions, which is why both sides often have their own experts. Defense counsel argued that they had relied on the first trial testimony of prosecution witness, Steve Ledell, who had referred to the print as a fingerprint. The trial court was not impressed by this argument, and offered the possibility of a recess for the defense to locate an expert of their own. R. 1651.     The Court went on to state:

| | |
|---|---|
| MR. GARRAWAY: | Judge, nobody has — Ms. Richard has never rendered an opinion; she rendered a factual statement saying that she — that she examined all latents found at the scene and none of them matched, that sort of thing. All right, we relied on the fact that these were fingerprints. |
| THE COURT: | Why? Why did you rely on that? |
| MR. GARRAWAY: | Because of the sworn testimony of Steven Ledell that it was a fingerprint; the – |
| THE COURT: | And that was a State's expert, testifying in a previous – |
| MR. GARRAWAY: | Yes. |
| THE COURT: | Why did you rely on that? |

114

MR. GARRAWAY:     Because a fingerprint is a fingerprint.

THE COURT:     Your expert —

MR. GARRAWAY:     And I also think —

THE COURT:     Your expert may contravene that, though, right?

MR. GARRAWAY:     Well, suppose she — Ms. Richard testifies that this is a paw print, now? You know, I mean, we're in a world of trouble.

THE COURT:     And she might. I don't know what she's going to say. All she is an expert who gives an opinion.

MR. GARRAWAY:     It could be a German Shepard's print or something.

THE COURT:     Maybe so. I understand it creates a problem for you, Mr. Garraway, and I understand the theory of the defense is that — what you thought was a thumb print matched no one who is alleged to have been in that dorm that day. And I understand your position that could create a reasonable doubt in this case. I understand that, one hundred percent.

**The question is, why are you entitled to rely on some State witness' opinion that that's what it is, *without doing your own separate and independent investigation in that regard.***

R. 1642-49 (emphasis added).

The trial court was correct: defense counsel were free to obtain their own fingerprint expert. This print had been available to the defense for years. The defense unreasonably failed to obtain an expert to examine it. The court had even indicated a willingness to pay expert fees. The defense relied exclusively on the prosecution to explain the significance of the prints.

Mr. Werring has analyzed the evidence and has provided the expert opinion and advice that Garraway and Calhoun should have sought prior to trial. Mr. Werring would have provided testimony which would have rebutted Carol Richard's "palmprint theory." After examining the bloody print, Mr. Werring concluded that it is a fingerprint, most probably a thumb, and most

115

definitely not a palm. Exhibit RR at 3. After being informed of Richard's palmprint theory, Werring offered the following expert opinion:

> I disagree with [Richard's] conclusion. Based on my years of experience, I have eliminated the possibility that the print is a palm. The print could possibly be a finger, but I believe that it is a thumb.
>
> Even if we were to accept, for sake of argument, that the bloody print was made by a palm, it would be possible to eliminate the defendants by comparing it to palmprints submitted by them.

*Id.* at 3. **Additionally, Mr. Werring compared all of the prints recovered from the murder scene to Mr. Woodfox's prints, including his palmprints, and excluded him as the donor of the crime scene prints**. *Id.* at 4.

Mr. Woodfox was severely prejudiced in this facet of his trial. His attorneys were surprised in mid-trial by the change in Carol Richard's expert opinion, and they had absolutely nothing with which to counter the change. The defense opening statement relied heavily on the existence of the bloody fingerprint that did not match the defendants. We now know, with the help of Mr. Werring, that defense counsel could have and should have countered Carol Richard's opinion and shown that 1) the bloody print is a palm print that could have been used to identify the person who killed Brent Miller; and 2) even if it were a palm print, it does not match Mr. Woodfox. By allowing the state to present the print to the jury as a meaningless palmprint, Mr. Woodfox lost his most important piece of exculpatory evidence. The jury was left with the perception that Mr. Woodfox's attorneys were not zealously defending him and did not believe in his innocence.

All of the above-described testing could have been attempted in 1998, but trial counsel failed miserably: Counsel did not seek the advice of experts and did not move for testing, all at the expense of Mr. Woodfox.

116

**f.      Failure to challenge the inadmissible testimony of Carl Cobb because the serology techniques employed by the Crime Lab can not meet art. 702's test for admissibility.**

Trial counsel were ineffective for failing to challenge the admissibility of the serological evidence presented by Cobb. Under the case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 113 S.Ct. 2786 (1993), the testimony regarding the serological testing and results of alleged bloodstained clothing items is inadmissible. In *Daubert*, the Court replaced the Frye standard of admissibility "with a new standard that requires the trial court to act in a 'gatekeeping' function to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable,' " *Id.* at 2794, and that the expert's opinion has a reliable basis in the knowledge and experience of his discipline. *Id.* at 2796.

The Louisiana Supreme Court has adopted the Daubert standard for admissibility, holding that the standard must be met in order for a court to admit expert testimony under La.C.E. art. 702. In *State v. Foret*, 628 So.2d 1116 (1993), the court stated:

> The reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." This connection is to be examined in light of "a preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." The court went on to make some suggestions as to how a court could fulfill its gatekeeping role. These involve whether or not the technique had been subjected to peer review and/or publication, the "known or potential rate of error", the existence of "standards controlling the technique's operation", the technique's "refutability" or, more simply put, testability, and, finally, an incorporation of the *Frye* general acceptance in the scientific community as only a factor in the analysis.

628 So.2d at 1122 (citations omitted).

Thus, to be admissible, the party must show that the 1) a valid scientific connection to the pertinent inquiry, 2) the reasoning or methodology of the testimony is scientifically valid, 3) the

117

reasoning or methodology properly can be applied to the facts in issue, 4) the scientific technique has been subjected to peer review, 5) the scientific technique has an acceptable known or accepted error rate, 6) there are standards controlling the technique's operation, 7) the technique's testability, and 8) whether the scientific technique has a general acceptance in the scientific community. In this case, a pretrial hearing would have shown that Cobb's testimony was not admissible for a variety of reasons.

As shown by the declarations of Dr. Randell Libby and Stuart James, the state would not have been able to prove that the serological methodology employed by the crime lab was scientifically valid, was subjected to peer review, had an acceptable error rate, and had standards controlling the technique's operation. Most importantly, the admissibility would have been denied based upon the well-known error rate of serological testing. Stuart James explains "that benzidine tests are very susceptible to generating false positive reactions," because many vegetable matters, metals, bodily secretions and other contaminants appear to be blood using benzidine. Ex. QQ. Additionally, the crime labs use of the precipitin test on the jacket is unreliable for showing the presence of blood. James explains: "There are two potential problems with these precipitin tests: (1) false reactions, positive or negative, because of incorrect dilutions of the antigen or antibody solutions or both and (2) cross-reactivity of anti-sera in which antibodies raised against one species also react with the blood of a closely related species . . . It is also essential to include proper controls (for example, various knowns and blanks) with every precipitin test." *Id.*

Additionally, did not document the proper use of controls, which is an essential element of precipitin testing. Paul Cobb's testimony and the relevant reports "contain no documentation regarding the conditions under which the tests were performed or the procedures that were used, or

118

the qualifications of the individual(s) performing the testing.  I see no mention of controls or blanks having been used in the bench notes from the 'Louisiana State Police Laboratory Analytical Procedures' report.  I additionally see no discussion of the concentrations at which the questioned samples were tested.  These crucial details would be included in any properly prepared lab report."

*Id.*

> **g.     Trial counsel were ineffective for failing to properly investigate the location of witnesses and ensure either their presence at trial or their unavailability**

Given the age of this case, it was entirely predictable that a number of witnesses for both sides would be either dead or impossible to locate and their testimony would therefore have to be presented by transcript from the prior trial.  It was vitally important for defense counsel to establish the unavailability of witnesses for the defense so that Mr. Woodfox would be able to present their prior testimony to the jury.  Defense counsel did not do their job, instead relying on the prosecution to search for out-of-state witnesses and to request subpoenas. R. 2625.  As a result, Mr. Woodfox was deprived of the testimony of two witnesses, Clarence Franklin and Colonel Nyati Bolt, and nearly deprived of another, Herbert Williams.

Clarence Franklin testified for the defense at Mr. Woodfox's first trial.  He provided crucial proof of Mr. Woodfox's claim that Paul Fobb, one of the state's "eyewitnesses," was virtually blind, and therefore lying when he said he "saw" Mr. Woodfox leaving the scene of the murder.  At trial, defense counsel asserted that Franklin was unavailable, and requested that his trial transcripts be read to the jury.  The prosecution objected, arguing that there was an insufficient showing of availability.  The trial court ruled that defense counsel had not made sufficient efforts to establish unavailability and refused to admit the transcript testimony.

Garraway asserted that the defense had been unable "to even get a – a home town on this guy." However, Garraway did not indicate what attempts had been made, whether the DOC had been contacted, whether an investigator had been contacted, or whether any other steps had been taken. The prosecutor responded that she had not been asked to help locate Mr. Franklin, and would not stipulate to his unavailability. Counsel attempted to argue that Franklin was unavailable "due to the passage of time." The trial court correctly ruled that a showing of unavailability was "going to take more than mere assertions by counsel." R. 2220. The trial court found that the efforts of defense counsel insufficient to sustain a showing of unavailability.

Similarly, the defense failed to make reasonable efforts to establish the unavailability of Colonel Nyati Bolt, a crucial alibi witness who testified at the 1973 trial. Bolt testified that he at breakfast with Mr. Woodfox at the time the murder took place. His testimony was vital to corroborating the testimony of Mr. Woodfox, Everett Jackson, and Clarence Sullivan, all of whom said that Mr. Woodfox was in the dining hall at the time of the murder.

When the time came to introduce Bolt's prior testimony, the state objected. R. 2056. Defense counsel Garraway admitted that "Ms. Cullen offered to have Colonel Bolt picked up and brought here in chains . . . as a material witness." R. 2055. He also admitted that he knew Bolt "was reluctant about coming." R. 2055. Nevertheless, Garraway relied on reluctant assurances from Bolt, over the telephone, that he would come to Mr. Woodfox's trial, scheduled at that time for September 1998. R. 2055. He told Cullen that a material witness warrant "would not be necessary." R. 2055. When the trial actually commenced in December 1998, Garraway was no longer able to locate Bolt. R. 2056. In Cullen's words, "I had offered the resources of the state and I was told it wasn't necessary." R. 2058. The court sustained the objection.

120

Defense counsel did not comply with the mandate of Article 804(A) of the Louisiana Code of Evidence, requiring that a showing that the defense had been unable "to procure [their] attendance by process or other reasonable means." *See also State v. Adams*, 609 So.2d 894 (La. App. 4 Cir. 1992). With the information available from the DOC, such as date of birth and social security number, a competent private investigator would have been able to conduct a cost effective computer search which would have, at least, found Franklin's "home town." If the defense had accepted the assistance of the state, Colonel Bolt would have been present for trial.

Finally, as an illustration of defense counsel's incompetence and laziness, it was Albert Woodfox's family, not counsel, who established the unavailability of another defense witness, Herbert Williams. At trial, the defense attempted to introduce Williams' transcript testimony. The state objected, claiming that there was no showing of unavailability, and the state sustained the objection, ruling Williams' testimony inadmissible. After five years of trial preparation, defense counsel had not made sufficient efforts to demonstrate that they could not locate Williams. Mr. Woodfox's brother-in-law, Michael Augustine, and family friend, Ernest Johnson, were sitting in the gallery and realized that they could prove what Mr. Woodfox's well-paid counsel could not. Exhibit AAA, en globo, Affidavits of Michael Augustine and Ernest Johnson. They knew that Mr. Williams had died in New Orleans. They immediately went home, conducted their own investigation, leading to one of Williams' relatives, learned that he was dead. They then contacted the coroner's office, obtained a certified death certificate, and returned to the courthouse by noon the next day. The court reconsidered its objection and admitted the transcript testimony. What Garraway and Calhoun had not accomplished in five years, Mr. Woodfox's family accomplished in

less than 24 hours. This episode is emblematic of counsel's performance throughout their representation of Mr. Woodfox.

This failure on the part of the defense was inexcusable. Garraway and Calhoun didn't even have to find Franklin or Bolt; they only had to satisfy the court that they had made reasonable efforts to do so. Their failure amounted to little more than common laziness, and Mr. Woodfox was prejudiced as a result.

**h.     Paul Fobb's eyesight and mental condition**

Trial counsel was ineffective for failing to obtain expert testimony regarding Paul Fobb's poor eyesight, his IQ, which was at a level indicating mental retardation, and his diagnosis of sociopathic personality disorder. An expert could have testified that it was impossible for Fobb to identify Mr. Woodfox given his deteriorated eyesight. Additionally, an expert in cognition could also have addressed the manner by which a person with a 63 IQ and a sociopathic personality can be manipulated to lie.

If trial counsel had done their job, they could have proven that Fobb was a liar by demonstrating that he was too blind to have seen what he claimed he had seen. They lost one opportunity to impeach Fobb when they failed to establish the unavailability of Clarence Franklin. They lost another by failing to consult with expert on Fobb's vision and mental disorders.

Mr. Woodfox has now retained the services of Dr. Daniel Pope, a board-certified ophthalmologist. He has reviewed Fobb's medical records, which were available to trial counsel. Exhibit SS, Declaration of Daniel B. Pope, MD (exhibits attached). The records "very probably" indicate that Fobb's vision was too severely impaired for him to have seen what he claimed to have seen on the day of the murder. Fobb's medical history indicates that he was diagnosed with juvenile

glaucoma at least as early as May 1968. He was hospitalized for his eye condition at least five times at Charity Hospital in New Orleans prior to 1972, and that he underwent two eye surgeries during that time. Exhibit SS at 2. In addition, Fobb was hospitalized at Angola 24 times prior to 1972. *Id.* It is presumable that many, if not most, of these hospitalizations were for his eye problems.

Fobb's attending physician noted that his vision in both eyes in 1974 was 20/400. *Id.* According to Dr. Pope, "a person with 20/400 vision can identify the shape of a gallon plastic milk jug at 20 feet (approximately). Detailed descriptions would be difficult. If, as Fobb indicated, he was blind in his right eye and was limited to 20/400 vision in his left eye it would be difficult to give an accurate visual description of someone 30 to 40 feet away." *Id.* at 4. Dr. Pope opined that Fobb's vision would have to have been better than 20/70 to identify anyone at 30-40 feet distant. *Id.*

Mr. Woodfox has also recently obtained the declaration of an optometrist, Lesli Handmacher, O.D., who reviewed Fobb's medical records and has concluded in a detailed analysis that "it would have been impossible" to identify a person from a distance of 30 to 40 feet on the day of the murder. Exhibit is in counsel's possession.

If trial counsel had consulted with Dr. Pope, he would have testified that, "[i]n view of Mr. Fobb's history of injury to his right eye and multiple surgeries for glaucoma in both eyes, it is reasonable to question the visual capabilities of Mr. Fobb . . . Mr. Fobb in all likelihood was significantly visually impaired on April 17, 1972." *Id.* at 5. Likewise, Ms. Handmacher would have concluded that it was in fact impossible for Fobb to have been able to identify anyone coming out of Pine 1. *See also* Exhibit III, Charity Hospital of New Orleans Records Relating to the Care of

Paul Joseph Fobb, submitted to the district court in Mr. Woodfox's second supplemental brief in support of his postconviction application.

The failure to challenge Fobb's vision was a grave error on the part of trial counsel. Paul Fobb's testimony, as outlined in the Statement of Facts, *supra*, was, Mr. Woodfox submits, quite obviously perjured. It was incumbent on Garraway and Calhoun to use every possible means to demonstrate this to the jury. Fobb claimed to have seen Mr. Woodfox, but none of the other defendants, running out of Pine 1 at the time of the murder. According to his story, he was heading down the Walk when he observed the completely mundane sight of Mr. Woodfox walking into a dormitory, yet he claimed the sight was so out of the ordinary that he stopped in his tracks and stared for five or 10 minutes until Mr. Woodfox came back outside. Why did he care that Mr. Woodfox was walking into a dormitory? What made him so sure that Mr. Woodfox was going to come back out? If he was so fascinated, why didn't he just go into Pine 1 to see what was happening?

When Mr. Woodfox did come back out of the dormitory, Fobb claimed he threw a rag into the door of Pine 4, the dormitory directly across the walk. However, Joseph Richey testified that he was standing in the door of Pine 4 when Mr. Woodfox came out of the dormitory. He certainly didn't claim that Mr. Woodfox had thrown a rag at him. And Fobb concluded by stating that the whole episode – Mr. Woodfox entering and then exiting a dormitory, and throwing a rag away – "shocked" and "stunned" him. Why? Fobb's testimony makes no sense and it conflicts with the state's stated theory of the case – that four individuals killed Brent Miller and all of them ran out of the dormitory.

Fobb additionally testified that, just coincidentally, he had been around Mr. Woodfox on three occasions in the month before the murder and he just happened to overhear Mr. Woodfox

planning to kill Brent Miller over such petty grievances as Miller kicking Mr. Woodfox out of a dorm he didn't live in. Never mind that the state's theory of the case was that Mr. Woodfox killed Miller for ideological reasons – because Mr. Woodfox was a "racist." And never mind that several representatives of the state have said that the target of the murder was either Officer Hunter (it has been said that Miller was supposed to go to the dining hall that day, leaving Hunter alone in the dorm) or a random white person (Chester Jackson's testimony that, minutes before the murder, Mr. Wallace "scouted for a free man to kill." HW 111). The state's decision to use Fobb's testimony, when every aspect of it conflicts with the state's stated theory of the case and its other witnesses, is logically equivalent to the knowing use of perjured testimony. The knowing use of perjured testimony in a murder case is grave prosecutorial misconduct.

Additionally, Fobb's claim that the dining hall strike was intended to "pull the free men off the walk," leaving Miller alone to be killed (R. 1611) – which the state seems to have adopted as part of its theory of the case – defies reality. As Officer Hunter testified, only two officers were assigned to each dormitory unit, one of whom went to breakfast with the inmates. R. 1143. If the strike had drawn the other officer off of the walk – Milller, in this case – there wouldn't have been anybody left to kill. Given Angola's chronic understaffing problem, and the standard operating procedure of leaving one officer alone in the dormitories during breakfast, there was no need to "draw the free men off the Walk," as Fobb claimed.

Garraway and Calhoun barely even tried to impeach Fobb's testimony, even though the opportunities to do so existed on a number of levels. To be presented with a blind "eyewitness" is a defense lawyer's dream. Garraway and Calhoun didn't bother to take advantage of the opportunity. They could have exposed Fobb's blindness, but they failed to establish Clarence Franklin's

125

unavailability, and they failed to make use of his ophthalmological records. In addition, although Fobb's testimony was replete with logical impossibilities and inconsistencies, Garraway and Calhoun didn't point out any of them to the jury during their arguments. If they had done so, they could have discredited not only Fobb, but the state's entire case, for the prosecution's decision to use Fobb as a witness was fundamentally dishonest and contrary to basic notions of fair play. Instead of taking advantage of this opportunity, Garraway and Calhoun left the jury to retire for deliberations with little basis for doubting Fobb's veracity.

### 3. Counsel were ineffective for failing to object to the introduction of Carl Cobb's testimony, resulting in a denial of Mr. Woodfox's right of Confrontation

The defense failed to object to the introduction of the first trial testimony of Carl Cobb, the Crime Lab supervisor, via transcript. There is no record of why, or if, Cobb was unavailable. The introduction of the first trial transcript of Carl Cobb's testimony violated Mr. Woodfox's right of confrontation. The 1973 cross-examination of Cobb was woefully inadequate. The introduction of this transcript at the second trial violated the right of Confrontation because Mr. Woodfox did not have the opportunity to explore the weakness of the state's testing of the alleged blood stains.

Garraway and Calhoun continued their inadequate representation of Mr. Woodfox on this issue. They failed to conduct adequate pre-trial investigation into the testing and procedures of the state police crime lab. They failed to investigate the qualifications and competency of Carl Cobb. They failed to object, and subpoena witnesses, who could address the total lack of testimony/evidence regarding the chain of evidence of the clothes. They failed to conduct any independent investigation to locate or test the clothes. They failed to bring the fact of the missing clothes to the attention of the jury. They failed to bring any focus to bear on the missing clothes and the precluded testing at closing argument.

126

Importantly, Carl Cobb did not conduct the actual analysis of the stains recovered: Freddie R. Cox was the actual lab technician. Exhibit LL. As with Mr. Cobb, the defense failed to conduct any pre-trial discovery regarding Mr. Cox.

### a.    Cobb's testimony.

The transcript of the 1973 testimony of criminalist Carl Cobb was introduced regarding the blood testing of the clothes allegedly worn by Mr. Woodfox. R. 1760-1768. Defense counsel joined the prosecutor in stating that the witness was unavailable. R. 1759. The transcript reflects that defense counsel at the first trial stipulated to Cobb's qualifications as a criminalist, so there is no description of his education, experience, qualifications or proficiency. When asked whether he was "competent to make examinations of human blood," Cobb simply replied in the affirmative. R. 1762.

Cobb described that he received from Deputy Daniel one pair of brown shoes, one green jacket and one pair of blue pants, supposedly belonging to Mr. Woodfox. R. 1761. Cobb mis-described the "benzine test" (sic) as the standard test to detect blood, and a precipitant test as one to determine whether the blood is human. R. 1763-64. There were no notes of any of his tests.

Cobb testified that on the pants there was a small area above the pocket which tested positive for blood, but was of insufficient quantity to determine if it was human. R. 1763-64. Regarding the shoes, there was a small stain on the edge of the right shoe which again could only be typed as blood. R. 1764. The jacket had a small stain which was determined to be human blood, but it could not be typed. R. 1763. Regarding the knife, it tested positive for human blood, but there was no attempt to determine blood type due to insufficient quantity. R. 1765.

127

On cross examination, Cobb could only state that it "is hard to say for sure" how much blood is required for typing. R. 1767-68. There were no questions regarding evidence transportation and storage, from the scene, to the lab, to court, and back to storage.

**b.     The introduction of Carl Cobb's transcript testimony violated Mr. Woodfox's right of Confrontation**

Defense counsel failed to ensure the constitutional guarantee of Mr. Woodfox's right to be confronted with the witnesses against him by failing to object to the introduction of the transcript of Carl Cobb's first trial testimony.     Defense counsel were ineffective for failing to argue that 1973 trial counsel's examination of Cobb regarding his qualifications as a blood expert, the chain of evidence, and the tests and procedures utilized was completely inadequate, and amounted to the lack of cross-examination.     Therefore the use of this transcript violated Mr. Woodfox's right of confrontation.

As the Court is aware, extreme care must be taken in the collecting, labeling and preserving of any forensic evidence collected at a crime scene.  Law enforcement authorities must be able to prove that the evidence was always in their possession from the time it was taken at the crime scene until the time it appears in court.  Of course, anyone who has access to the material must be documented.  The prosecution must prove that the object shown in court is the same object that was tested in the laboratory.  If these conditions cannot be proven, then the evidence may be ruled inadmissible.  The transcript of Carl Cobb's testimony fails to address any of these issues.  Defense counsel should have objected in the strongest possible terms to the introduction of the Cobb transcript, especially in light of the missing evidence.  Their failure in this regard is beyond ineffectiveness – it is unconscionable. The 1973 transcript also fails to note where the evidence was

128

stored, i.e., a secure evidence locker. Nor is there any testimony about who had access to the evidence.

Further, defense counsel was ineffective in not forcing the prosecution to place on the record the evidence showing Cobb's unavailability and what effort if any by the state to locate the witness.

Defense counsel's performance on this issue was substandard pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, the Louisiana Constitution and Louisiana law. Mr. Woodfox had been prejudiced.

> **10.    Mr. Woodfox was denied effective assistance of counsel by defense counsel's failure to object to prosecutorial misconduct**

The state eagerly wanted to use Chester Jackson's testimony from Herman Wallace's trial against Mr. Woodfox. When the trial court ruled it inadmissible, the state sought a writ from the Court of Appeal. The Court of Appeal denied the writ because Mr. Woodfox was not afforded the opportunity to cross-examine Jackson, and the admission of his testimony would therefore offend the Confrontation Clause.

Nevertheless, the prosecutor, throughout Mr. Woodfox's trial, repeatedly attempted to elicit testimony (or asked leading, testimonial questions) regarding the substance of Jackson's testimony. The prosecution's tactic was a violation of Mr. Woodfox's due process confrontation rights and undermined the reliability of his trial.

The prosecution's repeated violations of Mr. Woodfox's rights:

During Sheriff Daniel's testimony, the prosecutor produced Chester Jackson's written statement and asked Daniel to read it. She then asked Sheriff Daniel the following:

Q:    Whether you had issued a warrant before talking –for Albert Woodfox, before talking to Chester Jackson, or after, did you acquire any information

from Chester Jackson that changed your mind about issuing an arrest warrant for murder against Albert Woodfox?

A:     No ma'am.

R. 1291.  The defense objected to the question.  The next day.  On the next day of trial, defense counsel Calhoun, during his motion for a mistrial following C. Ray Dixon's testimony, complained to the court about the prosecutor's questioning of Sheriff Daniel:

MR. CALHOUN:     For the record, too, Your Honor, I would just like the record to note that – that this is not – this has not just occurred with this witness.  This has been a series and a pattern of attempts by the State to get in – in the back door, what they couldn't get in the front door.

Yesterday, they were allowed to get into whether or not Sheriff Daniel's conclusions about whether or not he had Albert Woodfox, right or wrong, were changed by talking to Chester Jackson, which the First Circuit Court of Appeals has completely said was inadmissible.

THE COURT:     I didn't hear an objection –

THE COURT:     – To that, Counsel.

MS. CULLEN:     – I didn't either, Your Honor

MR. CALHOUN:     Your Honor, it may be ineffective assistance on our part, you know, I – I – it was quick –

MS. CULLEN:     Well, that's – there was a ground –

MR. CALHOUN:     –It was–it was a sudden happening, but we were alert to it–

THE COURT:     **And I had my gavel raised, and I was ready to rule.**

MR. CALHOUN:     It happened so quickly, Your Honor, and believe me, I – I – I got on top of that tactic right after that, and we were alert for it, and we did object one other time, in a similar context, it escapes me now, how – what it was, but that has been the pattern and the approach that the prosecutors have taken in

130

this case, and I think it's now confirmed by – by this sham process, and I ask the Court to please consider a mistrial.

THE COURT:     Thank you Counsel. Ms. Cullen, I will be the first to tell you, that it is a very risky and dangerous game that you play, when you play it out this way.

R. 1595-96 (emphasis added).

The trial court denied the Motion for Mistrial, although the judge stated that it was "extremely prejudicial" and "dangerously close to a mistrial." R. 1599. The prosecutor implicitly stated on the record that she knew she was asking objectionable questions, but apparently felt justified in testing defense counsel's ability to timely object.

Despite the court's warning to the prosecutor, she continued with her improper and unethical questioning. She subsequently posed the same impermissible question to Warden Henderson:

Q:     Without going into anything that Chester Jackson said to you, did you get any information from Chester Jackson, that contradicted what Hezekiah Brown had told you about Albert Woodfox's involvement in this case?

A:     No.

R. 1984. The defense did not object.

The prosecutor then posed the following question to Henderson, specifically referencing the content of Turner's statement for the truth of its content:

Q:     Now, Mr. Dixon has testified that he spoke to Specs, and that Specs, prior to his leaving, being discharged to the Federal Marshall's Office, that Specs gave him a statement, as far as what he had personally seen in the dormitory and in fact, named people that he had seen and particularly, Albert Woodfox. Did – do you have – did you have any knowledge of that statement, prior to – or during the course of the investigation?

A:     No.

131

R. 1971. The defense, again, did not object.

Given the trial court's previous strong condemnation of this prosecution tactic, it is probable that a timely objection and motion for mistrial in response to the prosecution's repeated violations, the court would have granted the mistrial.

It this case not only did the prosecution offend the rules of evidence and the rules of professional conduct, but also the order of the First Circuit Court of Appeal. The deliberate use of impermissible testimony by the prosecution followed a pattern of illegally attempting to do whatever was necessary to bolster its feeble and unconvincing case.

The ruling of the First Circuit made clear that Jackson's statement was hearsay. The prosecutor nevertheless knowingly offered it to prove the truth of the matter asserted. See Article 801C, Louisiana Code of Evidence. The prosecution's repeated questions sought testimony to relate the substance an out-of-court statement: that there was nothing in Chester Jackson's statement which changed Warden Henderson's mind about Mr. Woodfox's involvement. Or put another way, that Jackson's statement implicated Mr. Woodfox. The result was that four prosecution witnesses, all law enforcement officials, testified that Chester Jackson implicated Mr. Woodfox in the murder without Mr. Woodfox being able to confront his accuser.

The effect of the prosecution's misconduct was that Chester Jackson was able to "testify" against Mr. Woodfox without being subject to cross-examination. The United States Supreme Court has addressed the issue of out-of-court co-defendant statements and has consistently found them to be uniquely unreliable and therefore inadmissible. In the *Douglas v. Alabama*, 380 U.S. 415 (1965), a unanimous Court held that the confrontation clause is violated where the state called a codefendant

132

(who was tried separately). The codefendant exercised his Fifth Amendment privilege and refused to answer questions. The prosecutor then posed 21 questions based on his transcribed statement which implicated the defendant. *Id.* at 417-18. The prosecutor essentially placed the statement before the jury by going through the statement line by line and asking the witness whether he had made the statement. The state then called three police officers to testify that the statement was the witness's confession. As with Chester Jackson in the instant case (and with Leonard Turner, as will be discussed below) the statement was not offered in evidence. The Court found that this was a confrontation clause violation. Cross examination was not possible unless the witness admitted the statement was his. Further, cross-examination of the officers could not redress "this denial of the essential right secured by the Confrontation Clause," for a cross-examination of the officers could not test the truth of the statement. *Id.* at 420. Only the cross-examination of the witness himself could satisfy the defendants right of Confrontation.

In *Lee v. Illinois*, 476 U.S. 530 (1986), codefendants were tried together in bench trial. Both had signed confessions. The judge agreed to use each defendant's confession against that defendant only. In closing argument, the district attorney cited codefendant's confession against Lee as substantive evidence of her guilt. The Court ruled:

> The Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination . . . such a confession "is hearsay, subject to all the dangers of inaccuracy which characterize hearsay generally . . . more than this, however, the arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.

*Lee*, 476 U.S. at 541. Accomplice confessions are "presumptively unreliable." The conviction was reversed.

In *Lilly v. Virginia*, 527 U.S. 116 (1999), it was again held that the hearsay statement of accomplice is "presumptively unreliable." Under some circumstances, hearsay statements may be admitted against a defendant if they fall within a "firmly rooted" exception to the hearsay rule. Statements by accomplices inculpating defendants are not such an exception. *Id.* at 134. *See also U.S. v. Gomez-Lemos*, 939 F.2d 326 (6th Cir. 1991); *U.S. v. Torrez-Ortega*, 184 F.3d 1128 (10th Cir. 1999).

This was not an instance where a prosecutor inadvertently asked an impermissible question. The questions were deliberately asked for the obvious purpose of strengthening a weak case by circumventing the rules of evidence and the command of the Court of Appeal. "The probative value of the mere fact that an out-of-court declaration was made is generally outweighed greatly by the likelihood that the jury will consider the statement for the truth of the matter asserted." *State v. Cowart*, 01-1178 (La. App. 5 Cir. 3/26/02), 17, 815 So.2d 275, 288 (quoting *State v. Hearold*, 603 So.2d 731, 737 (La. 1992).

Mr. Woodfox was prejudiced by this prosecutorial misconduct. His conviction should be reversed because trial counsel was ineffective for failing to object to the misconduct, and because the prosecutor's deliberate eliciting of the substance of Jackson's testimony violated Mr. Woodfox's right of Confrontation and due process.

**11.    Defense counsel were ineffective for failing to present the full transcript of Chester Jackson's testimony to the jury.**

After failing to prevent exposure to the jury of the substance of Jackson's testimony, the defense was faced with the challenge of mitigating the impact of it. The defense should have presented the full content of Jackson's testimony and statement. As discussed at the Statement of

134

Facts, Jackson's testimony and statement are not only rife with internal contradictions, but also glaring inconsistencies between. Jackson could not keep straight what he saw, where he saw it, and who was involved. Importantly, he never stated that he saw Gilbert Montegut at the scene of the stabbing. Effective counsel could have shown that Jackson's reliability and credibility were nonexistent.

The failure to prevent disclosure of the content of Jackson's statement was prejudicial ineffective assistance of counsel. The failure to then perceive this prejudice to Mr. Woodfox, and strategically respond to mitigate the prejudice, was no assistance of counsel. Mr. Woodfox's right of confrontation has been irreparably compromised.

### 11. Mr. Woodfox's right of Confrontation was violated by the introduction of the Leonard Turner statement and defense counsel were ineffective for failing to properly object

#### a. The testimony of Turner and Dixon.

The trial court's decision to allow C. Ray Dixon to read Leonard Turner's alleged statement to the jury violated Mr. Woodfox's right to Confront the Witnesses against him.

Mr. Turner, called as a state witness, had never testified at any other proceeding involving this incident. In April 1972, Turner was incarcerated at Angola at Pine 1. R. 1368. During direct examination, Mr. Turner was asked if he had ever had a private meeting with C. Ray Dixon. He responded that if he had, he could not recall. R. 1375. At this point the jury was retired and defense counsel objected that the state was attempting to place into evidence a statement allegedly made by Turner to Dixon. The state countered that it was laying a foundation for impeaching Turner through the testimony of Warden Dixon, who would be called as a witness. R. 1383. Additionally, the prosecution acknowledged that she had visited Turner several times, and on the first visit had told

135

her everything, but that he did not want to get involved. R. 1385. The Court overruled the objection to Turner's testimony, provided the State could establish authenticity of the statement and lay the proper foundation to impeach her own witness. R. 1389.

Resuming Turner's examination, the witness acknowledged that the prosecutor had visited him, but could not remember what was discussed, nor that she would try to help him. R. 1391-94.

The prosecutor then questioned Turner regarding the specifics of the conversation, thus becoming a witness for the state. Turner testified that he did not remember telling her that he saw Mr. Woodfox do anything on April 17, 1972. R. 1398. He also denied telling her that he saw Mr. Woodfox kill Brent Miller. R. 1400.

The prosecution then asked whether Turner had stated to Dixon on April 17, 1972 that Mr. Woodfox and others had killed Brent Miller. Turner stated he did not remember, but did not think so. R. 1400. Further, Turner did not remember talking to Warden Henderson on April 17, 1972 regarding his parole hearing, and also denied telling him that Hezekiah was in a position to see the stabbing. The prosecution showed Turner the statement allegedly given to Dixon. He did not remember giving the statement, nor was it in his handwriting. R. 1406. The defense did not object or cross examine Turner.

Prior to Dixon taking the witness stand, there was a hearing on the admissibility of his testimony. Defense counsel argued in objection, but the testimony was permitted. R. 1545, 1551.

This was also the first time Dixon had testified in an proceeding involving this incident. R. 1565. Dixon testified that Hayden Dees had called him and informed that Warden Henderson wanted him to interview Turner. (Henderson has no memory of this R.  ) Dixon stated that he spoke with Turner the day before he was released(either April 18 or 19, 1972) R. 1568. Dixon was shown

136

the statement, S-21, and recognized his handwriting, however he acknowledged that it contained neither his nor Turner's signature. R. 1571. According to Dixon, Turner did not want to sign it and did not want to testify. Dixon alleged that he wrote the statement and then read the statement to Turner, and everything was, "ok." However, Dixon had no independent recollection of what Turner had told him. R. 1574. Most importantly, the prosecution asked if Turner had given Dixon "information about the involvement of Mr. Woodfox in the murder of Brent Miller." R. 1574. Over defense objection, the prosecution directed Dixon to specific lines in the statement and asked to read them to the jury. R. 1576-77. The statement was not offered into evidence.

At the conclusion of Dixon's testimony the court on its own motion gave a limiting instruction, and denied the defense Motion for Mistrial based on the introduction of Turner's inconsistent statement. R. 1600.

### b.    Defense counsel were ineffective for failing to cite and argue Cousin and related jurisprudence

The limited purpose of attacking the credibility of a Article 607D(2) of the Louisiana Code of Evidence permits the introduction of a prior inconsistent statement, even though it is inadmissible hearsay. The statement is admissible only on the issue of credibility and not as substantive evidence of the defendant's guilt. *State v. Cousin*, 710 So.2d 1067, 96-2973, (La. 1998) is the leading case in this area. However, defense counsel failed to cite *Cousin* during the critical argument regarding the admissibility of Turner's statement. R. 1389.

The Cousin decision provided defense counsel with the legal authority to support their objection to the testimony of Leonard and Dixon:

> Even with a limiting instruction, the potential for great prejudicial impact (i.e. the substantive use of the statement by the jury) substantially outweighed its marginal tendency to neutralize evidence which was merely unhelpful to the prosecution.

137

\* \* \*

> The prosecutor's using the prior inconsistent statement of a non-party principally to reveal to the jury inadmissible evidence of the guilt of the accused simply was not impeachment of the witness, but was an obvious attempt to put both statements of the witness before the jury and allow the jury to decide which one was true. Both the federal and state legislatures rejected this strategy in the use of prior inconsistent statements.

*Cousin*, 710 So.2d at 1072.

Defense counsel should have been prepared to cite *Cousin* and argue that the so-called impeachment evidence would be improperly admitted, as any impeachment of the witnesses' non-evidence by his denial was greatly outweighed by the prejudicial effect of the jury's potential misuse as substantive evidence. Further, Counsel failed to cite any jurisprudential authority in support of their objection. Additionally, they failed to request that the attempt to lay foundation for the testimony be first conducted outside the presence of the jury.

It is inescapable that the jury would reach and weigh the substantive content of the statement. The state needed the substantive weight of the statement. The state's repeated argument has been that it "needed" to introduce the Turner statement to prove just "that a statement was made," which, the argument goes, would neutralize Mr. Woodfox's argument that the state falsely charged him. State's Direct Appeal brief at 5. However, even if the state were right – that a highly prejudicial and unreliable hearsay statement should be admitted simply because the state "needs" it – the statement does not even prove what the state claims. According to the official story, Turner gave his statement on the night of April 18. State's Exh. 31. Thus, Mr. Woodfox had already been placed into isolation and Warden Henderson had already told the newspapers that he had "prime suspects" long

before Turner gave his statement. The state's sole argument for the admission of the statement would have crumbled had defense counsel properly challenged it.

Instead, counsel were unaware of relevant case law and the statement was admitted to the detriment of Mr. Woodfox.

**c.    Defense counsel were ineffective for failing to object to the state's improper argument of Turner's hearsay statement for its truth value**

Precisely as in *Cousin*, the state offered at closing argument the substantive weight of the hearsay statement. The prosecution emphasized the credibility of the statement by noting that Turner received no deals for making the statement.

The prosecution argued the following regarding Turner at close:

But, there were other people who saw some – some events that became critical in this case also. And definitely critical for your review.

**Leonard Turner, in his statement to C. Ray Dixon** the night the murder happened, Mr. Dixon said the it was sometime around midnight, the night before Leonard Turner left the prison.

He also has Albert Woodfox there, with a scarf and he leaves – leaves the Leonard Turner, himself, Specs, leaves Pine 1. Sometime shortly after that, Albert Woodfox leaves Pine 1, then some of the other perpetrators of this crime, and then Hezekiah.

\* \* \*

What Hezekiah didn't know was that Leonard Turner was going to tell exactly what he saw.

\* \* \*

Now, Murray Henderson testified that he talked to Turner, because he knew Turner's parole hearing had been scheduled and he knew Turner was getting ready to leave the prison. You know it's a now or nothing kind of situation. He knew Turner didn't go to breakfast.

139

Did Turner want to get involved. No. Did he want to say anything? No. So he tells Murray Henderson, well, I wasn't in a position to see anything, but Hezekiah was there. Feed them a little bit of information.

But, what happened during that same April 17th day, is the prison officials knew that Leonard Turner knew Ray Dixon. Ray Dixon had a relationship with Leonard Turner, Turner had given him information in the past, and had never asked for anything in return.

**So, Dixon was asked to talk to him, and he takes a statement**, and he says – Mr. Dixon says Turner did not want to get involved, he didn't want to sign anything, he didn't want to testify. **But, he gave him information, and then, was gone. Gone to Atlanta, gone to Federal custody. Did he get a deal? I don't see a deal**.

                              * * *

**But, after he talks about Hezekiah and gives some information about Hezekiah, and then, gives information about Albert Woodfox, then, they start talking to Hezekiah.**

Prison officials have evidence that Hezekiah's alibi just won't fly . . . they've got Joseph Richey . . . and they've got Leonard Turner."

                              * * *

**Now, so far, we've talked about Leonard Turner's testimony**. He didn't get anything. He got to go to Angola – excuse me – he got to go to Atlanta; his parole wasn't revoked, but he didn't get anything that he wasn't already scheduled to get.

                              * * *

Because the officers were asked and various people were asked has there anything – has there been any information, credible information that has come to your attention, **that gives you the slightest idea that Albert Woodfox did not do exactly what** Herman Wallace said, excuse me – exactly what Hezekiah Brown said, and exactly what **Leonard Turner said** and that he was not in the same place where Paul Fobb and Joseph Richey saw him. Not one credible bit of evidence has been presented in twenty-seven years.

R. 2471-72, 2479-80, 2482, 2486 (emphasis added).

Defense counsel failed to object to any of these highly improper arguments by the prosecution. The prosecution's improper use of Turner's statements influenced the jury and

contributed to the guilty verdict. The failure to object waived any argument on appeal. "The issue as to the propriety of the remarks is not preserved for review where defense counsel makes no objection to the statements either during the argument or after the argument. In such a case the defendant is deemed to have waived any such error on appeal. Stated another way, objections to remarks of a prosecuting attorney must be timely made in order to preserve the error on appeal. State v. Craddock, 435 So.2d 1110 (La. App. 1 Cir. 1983); State v. Batiste, 318 So.2d 27 (La. 1975). There can be no tactical decision to not object to these comments.

The Court of Appeal stated that the closing argument by the prosecution did not constitute vigorous argument of the truth of Turner's statement as substantive evidence. It is respectfully submitted that this pattern of argument by the prosecution was vigorous and was deliberately designed to attempt to avoid the strictures of Cousin. The prosecution argued the single most important facet of Turner's alleged statement: that he saw Mr. Woodfox at the crime scene. That is the prejudice which has resulted by defense counsel's failure to object, by their failure to be aware of Cousin, and to forcefully argue Cousin in support of a mistrial.

### d.    Defense counsel were ineffective for failing to object to the state's improper introduction of the content of Turner's conversations with the prosecutor

The prosecutor also elicited testimony regarding her private conversations with Turner. These statements were not made under oath, were not subject to cross examination, and should have been objected to by the defense. *See State v. Floyd*, 544 So.2d 616, 619 (La. App. 3 Cir. 1989). Again, Mr. Woodfox's right of confrontation was violated.

Turner was questioned without objection about others the prosecutor in the instant case claimed to have interviewed, including Bobby Oliveaux and Carl Kimble. R. 1403. Turner testified

141

that he did not tell Kimble about what he saw. R. 1404. When he asked the prosecutor what he told Kimble, she said, "that you saw Albert Woodfox kill Brent Miller" R. 1405. Neither Olivo nor Kimble testified at Mr. Woodfox's trial. Under the guise of laying a foundation to impeach Turner, the prosecutor inserted the content of these highly prejudicial, alleged statements into her questions. Moreover, neither Oliveaux nor Kimble were ever called as witnesses to verify that Mr. Turner had, in fact, given a statement to them. The prejudice of the prosecutor's actions is apparent: the credibility of the content of Turner's alleged statement has been reinforced by out-of-court statements. Her questions were not objected to, and Oliveaux and Kimble never being placed under oath, and not subject to cross-examination. Defense counsel's failures have allowed Mr. Woodfox's right of confrontation to be violated. Mr. Woodfox has been prejudiced.

### 13.    Defense counsel failed to provide a constitutionally effective closing argument

**"And ladies and gentlemen, I want — you know, I'm not going to waste a whole lot of your time here."    R. 2506.**

Defense counsel's closing argument amounts to a mere eleven pages of transcript. R. 2497-2508. None of Mr. Woodfox's testimony was even mentioned, except to state: "that he didn't know a thing about this, was not there, he was eating in the dining room . . ." R. 2507. The prosecution case against Mr. Woodfox was shamefully weak, replete with holes, inconsistencies, obvious perjury, and unanswered questions. Counsel should have spent hours arguing these points, which by extension would have been arguments for innocence, to the jury. Instead, Clay Calhoun made a brief appearance before the jury, barely went through the motions of making a closing argument, and sat down to wait for the guilty verdict to come back.

Counsel failed to review the shocking, unprecedented benefits received by the inmate witnesses for the prosecution. There was no mention of Paul Fobb's poor eyes. There was one

142

reference to Joseph Richey: "He also put words in the mouth of – of Joseph Richey." R. 2502. The inconsistent descriptions of the prosecution's witnesses, as set forth throughout this Application and especially in the discussion of materiality as to Mr. Woodfox's Brady claims, and the confused and contrary placement of the state's witnesses, were not argued – indeed, they appear not even to have been noticed – by counsel.

Incredibly, defense counsel failed to emphasize the testimony of his own defense witnesses, especially Clarence Sullivan and Everett Jackson, who provided an alibi for Mr. Woodfox, and former Warden Henderson. R. 2504; 1948-2000.

Warden Henderson's testimony supported the defense theory that the witnesses against Mr. Woodfox were coerced and promised assistance. Henderson himself believed that Hezekiah Brown, the star witness, lied. He testified that he threatened Specs Turner with the loss of his parole. R. 1947-48. Henderson said he had talked to Leonard Turner, but did not know anything about Turner's alleged statement. R. 1971, 1967. Henderson also stated that he promised to help Brown get a pardon, and in fact he was ultimately pardoned. R. 1948-49; 1961. Henderson even paid for his parole ad to be placed in the newspaper. R. 1978.

Henderson' testimony supported the defense theory that Dees was coercing inmates to incriminate Mr. Woodfox. Henderson testified that he was concerned about Dees being biased in his investigation. R. 1944-45. He stated that Dees had cooperating inmates transferred to the State police Barracks without his knowledge. R. 1965, 1980. Dees transferred Joseph Richey without Henderson's knowledge, even though Henderson believed that Richey lied about his knowledge of the stabbing. R. 1967. Counsel were inexcusably ineffective for failing to argue these points to the jury.

143

Further, it was vital that the background of Hezekiah Brown be forcefully brought to the attention of the jury. Contrary to the assertion of the prosecution that Hezekiah was a "friendly lifer, " and a "good guy," (R. 2466, 2469) Mr. Brown had, in fact, barely escaped a date with the executioner, and he was ready and able to lie to keep from going back to solitary. ("My body couldn't stand no more punishment....but, look, man, I'm an old man, I'm tired. I can't take no more punishment." R. 1788-89)

Defense counsel failed to emphasize for the jury that Brown's testimony was contradicted by that of Fess Williams, who saw Brown walking back from the dining hall around the time of the murder. R. 2274.

Leonard Turner's testimony was ignored, as was his so-called "statement," unsigned, undated, in someone else's handwriting. Defense counsel was obligated to attempt to negate the argument of the prosecution regarding Turner's alleged statement, as they sought to place in the minds of the jurors this unremembered and denied statement as the truth. As noted previously, the prosecution had already argued that the statement was true and accurate, and defense counsel had failed to object. Counsel also failed to argue that Murray Henderson stated that he was unaware that Dixon had interviewed Turner. R. 1971.

Defense counsel was obligated to attack the credibility of the state's witnesses. The timing of the statements, the benefits received for the statements, had to be forcefully presented to the jurors. Defense counsel apparently ran out of steam. Mr. Woodfox has been prejudiced, and has been sentenced to spend the rest of his life in prison as a result.

**14.    Defense counsel were ineffective for failing to properly object to John Sinquefield's hearsay testimony and demonstration**

144

John Sinquefield, assistant district attorney, was allowed to testify regarding the hearsay statements and inadmissible opinion evidence about Hezekiah Brown. Mr. Sinquefield prosecuted Mr. Woodfox at his first trial, and Brown was the state's star witness at that trial. However, as this Court is aware, Brown was deceased at the time of Mr. Woodfox's second trial, and his testimony was introduced via transcript. At Mr. Woodfox's second trial Sinquefield was called as a state witness to describe Brown's testimony.

The Court of Appeal strongly disapproved of Sinquefield stating to the jury that Brown's testimony "took a lot of courage," and that Sinquefield was "proud" of him. However, the Court found no reversible error, citing in part the failure of defense counsel to "enter a specific objection to this portion of Sinquefield's testimony either complaining that it was his opinion or pointing out the lack of any foundation regarding Brown's character for truthfulness, reputation, etc. *See* LA. CODE CRIM. P. art. 841; LA. CODE EVID. Art. 103A(1)." Court of Appeal Ruling, at 10. (This testimony regarding Brown's truthfulness was again emphasized, without objection, or response, from defense counsel. R. 2469.)

Although the Court of Appeal did not find sufficient prejudice on this issue to reverse Mr. Woodfox's conviction, it does not mean that the first prong of the *Strickland* test has not been met. On the contrary, the failure to object fell far below any reasonable standard of effective assistance of counsel. Mr. Woodfox received no assistance of counsel at all. Regarding the prejudice prong, the Court of Appeal was not considering the cumulative effect of ineffectiveness of defense counsel. The fact that the Court of Appeal was gravely concerned that this testimony alone may have been close to a reversal supports Mr. Woodfox's contention that the cumulative effect of defense counsel's failures and omissions undermined the reliability of his trial. Accordingly, consideration

145

of this claim is not precluded by the finding of the Court of Appeal. Hezekiah Brown was the sole eyewitness to this crime. It was incumbent upon defense counsel to make every attempt to limit the prosecution's efforts to increase the credibility and weight of a cold transcript. Mr. Sinquefield was no ordinary witness. The prestige of his position, his years of experience, gave him the authority of an expert witness in his description and characterization of Brown. If hearsay introduced via an average citizen is excluded because the value rests on the credibility of the out-of-court declarant who was not subject to oath and cross-examination, *a fortiori*, Mr. Sinquefield's hearsay should have been excluded. See State v. Smith, 97-1075, p. 7 (La. App. 5th Cir. 4/15/98) 710 So.2d 1187, 1190. The failure to object to the testimony of Mr. Sinquefield caused grave prejudice to Mr. Woodfox. There was no foundation for this testimony. Mr. Sinquefield was not shown to be a member of any community containing Brown, nor was he shown to have any experience of Brown's reputation in that community. Further, Sinquefield was never qualified to testify as an authority for Brown's character for truthfulness. See State v. Terry, 94-0622, p. 17 (La. App. 1 Cir. 4/7/95), 654 So.2d 455, 464, writ denied, 95- 1180 (La. 10/13/95), 661 So.2d 494. (It should also be noted that defense counsel failed to address Sinquefield's testimony at closing argument.)

Additionally, Sinquefield was allowed to demonstrate Brown's first trial re-enactment of Brent Miller's stabbing. Defense counsel failed to object to the re-enactment. Article 801A(2) of the Louisiana Code of Evidence provided the basis for the objection:

A.    Statement. A "statement" is:
(1)    An oral or written assertion; or
(2)    Nonverbal conduct of a person, if it is intended by him as an assertion.

This re-enactment was a non-verbal statement, and thus hearsay, just as surely as if Assistant District Attorney Sinquefield had verbally described what had happened. Because, apparently, they

146

were uninformed about the law, trial counsel failed to properly object to Sinquefield's hearsay testimony.

When a defendant has been denied effective assistance of counsel, his conviction must be reversed if counsel's failures were material. *Strickland v. Washington, supra*. The standard for materiality is the same as that for a Brady claim, as set forth above. Strickland, 466 U.S. at 695. The conviction must be reversed if there is any reasonable probability that, but for counsel's failures, the result of the outcome would have been different:

> The test is not outcome determinative. An individual need not show that counsel's failure more likely than not altered the outcome of the case. The result of the proceeding can be rendered unreliable, and hence unfair, even if the ineffective assistance cannot be shown by a preponderance of the evidence to have determined the outcome.

*Strickland*, 466 U.S. at 693-94.

For all the reasons set forth throughout this Application, the prosecution's case was weak and, in the hands of effective counsel, there is a strong probability that Mr. Woodfox would have been acquitted (although Strickland does not require him to meet this high a burden). Defense counsel, however, failed to take any steps to ensure that Mr. Woodfox received the defense to which he was constitutionally entitled. Defense counsel were paid an unprecedented amount of money. The court was willing to appoint expert witnesses. The evidence in the hands of the state would have amounted to a gold mine in the hands of competent attorneys. Yet, they failed in every conceivable way, as set forth above.

Counsel's failures, the prosecution's misconduct, and the weakness of the state's case, taken together, mandate a conclusion that but for the constitutional violations in this case, the result of the

147

proceeding would have been different.  The verdict against Mr. Woodfox is unworthy of confidence and must be reversed.

## VII.    MR. WOODFOX'S CONVICTION MUST BE OVERTURNED BECAUSE OF DISCRIMINATION IN SELECTING THE FOREPERSON OF THE GRAND JURY THAT INDICTED HIM

The state violated Mr. Woodfox's rights under the Equal Protection Clause of the Fourteenth Amendment by indicting him using a grand jury selected in a manner that discriminated against African-Americans.  The foreperson of the grand jury that indicted Mr. Woodfox was Mary Ann Bilowich, a white woman.  See indictment, R. 1;  State's Response to Motion to Quash, R. 117. Court records demonstrate that, over an extended period of time, West Feliciana Parish has consistently excluded African-American citizens from service as grand jury forepersons.  The parish's longstanding practice of racial discrimination mandates the reversal of Mr. Woodfox's conviction.

The Supreme Court has held for well over a century that "a conviction of an [African-American] cannot stand under the Equal Protection Clause of the Fourteenth Amendment if it is based on an indictment of a grand jury from which [African-Americans] were excluded by reason of their race." *Alexander v. Louisiana*, 405 U.S. 625, 628 (1972); *Strauder v. West Virginia*, 100 U.S. 303 (1880).

In order to make out a prima facie case of grand jury discrimination, a defendant must show 1) that the population group to which he belongs is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied;  2)  the degree of under-representation, by comparing the population of the group in the total population to the population called to serve as

148

grand jurors over a significant period of time; and 3) a selection procedure that is susceptible of abuse or is not racially neutral. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977); *State v. Langley*, 813 So.2d 356, 363, 1995-1489 (La. 2002). Once a defendant has made out a prima facie case, the burden shifts to the state to rebut the presumption of discriminatory purpose.

The grand jury that indicted Mr. Woodfox was selected using procedures set forth by the pre-1999 version of La.C.Cr.P. art. 413, which stated, in relevant part:

> B.     In parishes other than Orleans, the court shall select one person from the grand jury venire to serve as foreman of the grand jury. The sheriff shall draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number of names to complete the grand jury.

As the U.S. Supreme Court has noted, this system granted judges the authority to select one full-voting member of the grand jury outside of the usual random selection procedures. *Campbell v. Louisiana*, 523 U.S. 392, 396-97 (1998). As a result, claims of discrimination in selection of grand jury forepersons under Louisiana's old system must be treated as claims of discriminatory selection of grand jurors. *Id.*

Prior to trial, Mr. Woodfox filed a Motion to Quash the indictment, alleging that discrimination in the selection of grand jury forepersons violated his right to equal protection under the Fourteenth Amendment. R. 108. The state stipulated that Mr. Woodfox is African-American. R. 2572. It is beyond question that African-Americans are a distinct class who have historically been singled out for unequal treatment under the laws of the United States and Louisiana. *Rose v. Mitchell*, 443 U.S. 545, 565 (1979).

149

It is also well-established that Louisiana's former selection procedure is "unquestionably" susceptible of abuse and is not racially neutral, thus satisfying the third prong of the prima facie case. *Campbell v. Louisiana, supra*, 523 U.S. at 396-97; *Langley, supra*, 813 So.2d at 371.

Only the second prong of the prima facie case – the degree of under-representation – is at issue here. In his original application for postconvction relief, Mr. Woodfox showed that between 1964 and March 1993 (when Mr. Woodfox was indicted), West Feliciana Parish impaneled 58 grand juries. Exhibit WW, records reflecting race of grand jury forepersons. Of these, only seven had African-American forepersons. All of the rest were white. Thus, over a 29-year period, only 12 percent of West Feliciana Parish's grand jury forepersons were African-American.

By contrast, the population of West Feliciana Parish, from which the forepersons were selected, has ranged from 56 percent African-American in 1970, to 46 percent African-American in 1980, to 43 percent African-American in 1990. Voter registration statistics show that African-American and white individuals registered to vote in almost identical proportion to their numbers in the general population. The population figures are set forth in detail below:

150

**1970**

|  | Total | African-American | White | Other |
|---|---|---|---|---|
| Total population | 11,376 | 7,638 | 3,729 | 9 |
| LSP Angola population | 4,828 | 3,971 | 857 | -- |
| Adjusted (free) population | 6,548 | 3,667 | 2,872 | 9 |
| **Percentage of adjusted population** | **100** | **56** | **44** | **0.1** |

**1980**

|  | Total | African-American | White | Other |
|---|---|---|---|---|
| Total population | 12,186 | 7,061 | 5,098 | 27 |
| LSP Angola population | 4,840 | 3,672 | 1,168 | -- |
| Adjusted (free) population | 7,346 | 3,389 | 3,930 | 27 |
| **Percentage of adjusted population** | **100** | **46** | **53** | **0.3** |
| Registered voters | 5,088 | 2,373 | 2,715 | -- |
| **Percentage of registered voters** | **100** | **47** | **53** | **--** |

**1990**

|  | Total | African-American | White | Other |
|---|---|---|---|---|
| Total population | 12,915 | 7,149 | 5,672 | 94 |
| LSP Angola population | 5,018 | 3,716 | 1,302 | -- |
| Adjusted (free) population | 7,897 | 3,433 | 4,370 | 94 |
| **Percentage of adjusted population** | **100** | **43** | **55** | **1** |
| Registered voters | 5,464 | 2,388 | 3,054 | 22 |
| **Percentage of registered voters** | **100** | **44** | **56** | **0.4** |

151

Under the jurisprudence set forth by the United States Supreme Court and other courts, the discrepancy between the percentage of West Feliciana Parish that is African-American (56 to 43 percent) and the percentage of African-American forepersons (12 percent) is sufficient to make out a prima facie case of discrimination. In *Castaneda v. Partida*, 430 U.S. 482 (1977) the Supreme Court overturned a defendant's conviction after he proved that, over an extended period of time, the population of the county that indicted him was 79.1 percent Mexican-American, while only 39 percent of grand jurors were Mexican-American. In *Turner v. Fouche*, 396 U.S. 346 (1970), the Court found substantial under-representation, in a 60-percent black county, when 37 percent of the grand jury venire was black. In *Carter v. Jury Commission of Greene County*, 396 U.S. 320 (1970), the Court found substantial under-representation where 32 percent of the venire was African-American, compared to 65 percent of the general population. And in *Jones v. Georgia*, 389 U.S. 24 (1967), the Court found substantial under-representation where 30.7 percent of the population was African-American but only five percent of the jury list was.

The Louisiana Supreme Court has found under-representation based upon similar figures. In *State v. Langley*, 813 So.2d 356, 1995-1489 (La. 2002), the Louisiana Supreme Court overturned the defendant's conviction after he proved that, over an extended period of time, African-Americans represented only seven percent of grand jury forepersons, while they represented 22.9 percent of the population, 20.3 percent of the registered voters, and 22.9 percent of randomly-selected grand jurors.

The disparity demonstrated by Mr. Woodfox is greater than that shown in any of the above cases. African-Americans represented, beginning in 1970, more than half of the population of West Feliciana Parish. While this figure declined over time, it remained 43 percent as of 1990. Even using the 43 percent figure, the fact that only 12 percent of grand jury forepersons were

African-American amounts to substantial under-representation as outlined by the case law. Mr. Woodfox has satisfied the second prong of the prima facie case.

Morever, in his supplemental postconviction application, Mr. Woodfox presented additional evidence of racial discrimination. With the assistance of the Registrar of Voters for West Feliciana Parish, Mr. Woodfox ascertained the race of nearly all the grand jurors who served in West Feliciana Parish between 1964 and March 1993, the year Mr. Woodfox was indicted. Exhibit FFF, Race and Gender of West Feliciana Parish Grand Jurors, 1964-1993; Exhibit GGG, Declaration of Cheryl B. Decoteau, West Feliciana Parish Registrar of Voters; Exhibit HHH, Declaration of Melissa K. Metz, Deputy West Feliciana Parish Registrar of Voters.

Fifty-nine grand juries served in West Feliciana Parish between 1964 and March 1993, when Mr. Woodfox was indicted. Exhibit WW (to Mr. Woodfox's Application), Records Reflecting Race of Grand Jury Forepersons. Evidence as to the composition of the May 1967 grand jury appears to be missing, leaving 58 grand juries during the relevant period. *Id.*

During the relevant period, West Feliciana Parish had 59 judge-selected grand jury forepersons, of whom seven, or 12 percent, were African-American. During the same period, West Feliciana Parish had an additional 638 randomly-selected grand jurors (58 grand juries with 11 randomly-selected jurors each, excepting the May 1967 grand jury). The names of these grand jurors are set forth in the minutes of the 20th Judicial District Court in St. Francisville. Exhibit WW. Of the 638 randomly-selected grand jurors, Mr. Woodfox has determined the race of 587, or 92 percent of them. The racial proportions of the known grand jurors are as follows:

153

| | Number of Grand Jurors | | Percentage | |
|---|---|---|---|---|
| | African-American | White | African-American | White |
| **1964 to 1993** | 211 | 376 | 36 | 64 |
| **1964 to 1972** | 21 | 143 | 13 | 87 |
| **1973 to 1993** | 190 | 233 | 45 | 55 |

As the chart above shows, from 1964 to 1993, African-Americans constituted an average of 36 percent of randomly-selected grand jurors in West Feliciana Parish. When this figure is compared to the percentage of judge-selected African-American forepersons – 12 percent – it is clear that African-Americans have historically been under-represented as forepersons. Qualified African-Americans were three times more likely to be randomly-selected as grand jurors as they were to be judge-selected forepersons.

This discrepancy – 12 percent to 36 percent – is more severe than the discrepancies in numerous cases in which indictments have been quashed due to discrimination. In *Langley*, for example, the Supreme Court quashed the indictment because 22 percent of the population (and of Calcasieu Parish's grand jurors) was African-American, compared to seven percent of grand jurors. Other cases in which indictments are quashed based on lesser showings of discrimination are detailed at length in Mr. Woodfox's Application.

It is important to point out, however, that the aggregate percentages of grand jurors over time do not tell the entire story. Until 1972, African-Americans did not appear on grand juries in significant numbers. As the chart above shows, from 1964 to 1972, African-Americans made up only 13 percent of grand jurors (and none of the forepersons), as compared to 87 percent for whites. This figure cannot be squared with census figures, which indicate that African-Americans constituted

154

56 percent of the population of West Feliciana Parish in 1970. Exhibit VV, population data for West Feliciana Parish.

The primary explanation for this disparity appears to be racial discrimination in the selection of the venire from which West Feliciana Parish chose its grand jurors. According to an affidavit signed by Mary Nell Marchive, the Clerk of Court for West Feliciana Parish, "Grand Jury and Petit Jury Venires for West Feliciana Parish are randomly selected from the voter registration rolls of West Feliciana Parish." Exhibit WW at D-5. Mr. Woodfox alleges and is prepared to prove that the historic denial of voting rights to the African-American population of West Feliciana Parish, especially prior to approximately 1972, resulted in an under-representation of African-Americans on grand jury venires. Thus, when the court selected grand jury forepersons, it was selecting them from a venire on which African-Americans were already under-represented compared to their proportion of the general population. This under-representation was compounded when the court used racially discriminatory procedures to select forepersons from the venire.

As a result, if one examines the randomly-selected grand jurors who served after 1972, African-Americans constituted 45 percent of them, a roughly similar figure to the number of African-Americans in the general population. This figure suggests that, contrary to the suggestion of the prosecution, African-Americans have not historically been less "qualified" to serve as grand jurors than the white citizens of West Feliciana Parish. Rather, once they began to serve on grand juries in significant numbers, African-Americans were represented in numbers comparable their representation in the general population. However, the judges of West Feliciana Parish continued to discriminate against African-Americans when selecting forepersons.

155

General population figures and voter registration figures have long been used to assess the degree of discrimination in grand jury selection, and the United States Supreme Court has never required a defendant to ascertain the race of all grand jurors who have served over a number of years. The lack of African-Americans on West Feliciana Parish grand juries prior to the early 1970s demonstrates that population figures are a more accurate measure of the base population of African-Americans than are grand juror rolls. Accordingly, the evidence submitted with Mr. Woodfox's original postconviction application is sufficient to demonstrate a *prima facie* case of racial discrimination according to the rules set forth in decades of federal jurisprudence on the issue.

Nevertheless, the evidence submitted in his supplemental application demonstrates that, even under the *Langley* standard, West Feliciana Parish has historically discriminated against its African-American citizens in grand jury selection. Consequently, Mr. Woodfox has made out an unrebutted *prima facie* case of grand jury discrimination, and for that reason, his indictment must be quashed and his conviction and sentence set aside.

On direct appeal, the First Circuit denied Mr. Woodfox's discrimination claim, focusing on the holding in *State v. Young*, 569 So.2d 570 (La.App.1st Cir. 1990). In *Young*, the Court of Appeal held that population figures are insufficient to prove under-representation in grand jury forepersons because forepersons are chosen from a venire composed of qualified individuals selected from the general population. In order to be "qualified" to serve on a grand jury, a person must be 1) a citizen of the United States who has lived in the parish for at least a year; 2) be at least 18 years old; 3) be literate in the English language; 4) not be incapacitated because of physical or mental infirmity; and 5) not be under indictment for or convicted of a felony. La.C.Cr.P. art. 401.

156

*Young* held that population figures do not necessarily correlate to the percentage of a particular race that is "qualified" under art. 401. The Court of Appeals, in citing **Young** to reject Mr. Woodfox's claim, held that the discrepancy between the number of African-Americans in West Feliciana Parish and the number of African-American foreman "might be reduced, if not eliminated, when considering how many of the registered voters were actually qualified to serve." *State v. Woodfox*, Court of Appeal, First Circuit, No. 99-KA-2102, at 21.

The Court of Appeal's rationale is contrary to the case law, logically untenable, and, by presuming that a larger number of African-Americans than whites are "unqualified" to serve as grand jurors, is fundamentally racist. There is no rational basis for assuming, as *Young* does, that a larger percentage of whites than African-Americans are "qualified" to serve as grand jurors.

The method set forth by the U.S. Supreme Court to establish "substantial under-representation" is to "compar[e] the population of the group in the total population to the population called to serve as grand jurors over a significant period of time." *Castaneda, supra*, 430 U.S. at 494; *Langley, supra*, 813 So.2d at 363. The Supreme Court has routinely found under-representation by comparing the percentage of African-Americans in the general population, either by census or voter registration numbers, to the percentage who serve on grand juries. *See Turner v. Fouche, supra*, 396 U.S. 346; *Carter v. Jury Commission of Greene County*, 396 U.S. 320; *Jones v. Georgia*, 389 U.S. 24; *Guice v. Fortenberry*, 722 F.2d 276 (5th Cir. 1976).

If the state can produce evidence that African-American citizens are "unqualified" to serve as grand jurors in greater numbers than whites, the proper forum for consideration of that evidence is in rebuttal of the prima facie case. Once a defendant has made out a prima facie case by means of the three-prong test, the burden of proof shifts to the state to rebut that case by showing "that

permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Alexander, supra*, 405 U.S. at 631-32. In *Castaneda*, for example, the state court suggested that the defendant's prima facie case might be explained by the fact that a substantial number of Mexican-Americans might not be "qualified" to serve. *Castaneda, supra*, 430 U.S. at 498. The Supreme Court suggested that such evidence might serve to rebut the prima facie case, but declined to consider the argument because the state had placed no supporting evidence into the record during its case in rebuttal. *Id.* at 498-99.

Here, the Court of Appeal, relying on arguments propounded by the state, improperly shifted the burden of proof in rebuttal to Mr. Woodfox: it denied his claim because he had not proven that potential white grand jurors were "unqualified" in equal numbers to potential African-American grand jurors. In fact, the burden should have been placed on the state to establish a racially-neutral reason why African-Americans are "unqualified" to serve as grand jurors in greater numbers than whites.

Because Mr. Woodfox has established a prima facie case of discrimination in the selection of grand jury forepersons, the Court should require the state to prove that the substantial under-representation of African-American grand jury forepersons in West Feliciana Parish is not the result of discriminatory selection procedures. If the Court agrees with the decision of the Court of Appeal in this case and in *State v. Young*, then the Court should grant Mr. Woodfox an evidentiary hearing at which he may establish the percentage of African-Americans on West Feliciana Parish's grand jury venires, from which forepersons were selected, over time.

158

## CONCLUSION

For any of the foregoing reasons, the Petitioner requests this Court to grant him habeas relief.

Respectfully submitted,

Christopher A. Aberle  #24006
P.O. Box 8583
Mandeville, LA  70470-8583
(985) 871-4084
*Attorney for Petitioner,* Albert Woodfox

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon, Mimi Hunley and Julie E. Cullen, Office of the Attorney General, P.O. Box 94095, Baton Rouge, LA 70802, by First Class Mail on this 11th day of October, 2006.

Christopher A. Aberle