**EXHIBITS ATTACHED TO THE STATE OF LOUISIANA'S
SUPPLEMENTAL OPPOSITION TO WOODFOX'S MOTION FOR RELEASE**

| Exhibit | Description |
|---|---|
| A | October 22, 2008 deposition of Angola Warden Burl Cain, with exhibits. |
| B | January 30, 2008 deposition of Albert Woodfox. |
| C1-C6 | Woodfox's various aggravated rape and armed robbery arrests. |
| C | Woodfox criminal history supporting documentation. |
| D | Angola visitation records from 1996 to present. |
| E | Criminal history of Michael Mable. |
| F | October 29, 2008 deposition of Dr. Brie Williams. |
| G | Medical records of Albert Woodfox, January 2007 to present. |
| H | Newspaper article "La. Warden Cites 'Army' In Killing dated April 19, 1972. |
| I | Memo to Albert Woodfox Case, dated September 9, 1997 wherein Angola Warden Burl Cain advised The Department of Justice, Criminal Division, he had uncovered a plot to kill witnesses in the Woodfox trial in an attempt to keep said witnesses from testifying at trial. |
| J | Excerpt from Interview of Albert Woodfox by Joel Dvoskin, Psychologist. |
| K | Statement from Angola Assistant Warden Leslie Dupont referring to Woodfox's November 1, 1978 incident report. |
| L | Trial transcript of victims and witnesses in Woodfox's Aggravated Escape trial, dated January 12, 1972 and January 13, 1972. |
| M | Woodfox's refusals of medical treatment/appointments because he had visitors. |
| N | Woodfox's refusal of his diabetic diet, against the advice of medical personnel. |
| O | Woodfox's refusal of the Hepatitis vaccine, against the advice of medical personnel. |
| P | Declaration of Dr. Brie Williams, dated October 24, 2008. |
| Q | 1998 trial testimony of Albert Woodfox. |

# Exhibit A

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

—— SHEET 1  PAGE 1 ——

UNITED STATES DISTRICT COURT
STATE OF LOUISIANA
* * * * * * * * * * * * * * * * * * * * * * *
CIVIL ACTION NO. 06-789-JJB-CN
*   *   *   *   *   *   *
ALBERT WOODFOX, #72148
VERSUS
BURL CAIN, ET AL
* * * * * * * * * * * * * * * * * * * * * * *

        The deposition of WARDEN BURL CAIN, taken in
connection with the above-captioned cause,
pursuant to the following stipulations, at the
Louisiana Attorney General's Office, 1885 North
Street, Baton Rouge, Louisiana, on Wednesday, the
22nd day of October, 2008, beginning at 1:19 p.m.
REPORTED BY:  Angie Henning, CCR, CVR

—— PAGE 2 ——

                A P P E A R A N C E S
REPRESENTING THE PLAINTIFF,
ALBERT WOODFOX, #72148:
  Nicholas Trenticosta, Esquire
  Susan Herrero, Esquire
  Center for Equal Justice
  7100 St. Charles Street
  New Orleans, Louisiana 70118
  (504) 864-0702
REPRESENTING THE DEFENDANT(S),
BURL CAIN, ET AL:
  Attorney General James "Buddy" Caldwell
  Dana Cummings, Esquire
  Terri Lacy, Esquire
  Mary "Mimi" Hunley, Esquire
  Sha Carter, Esquire
  Attorney General's Office
  1885 North Third Street
  Baton Rouge, Louisiana  70802
  (225) 326-6200

—— PAGE 3 ——

REPRESENTING THE DEFENDANT(S),
BURL CAIN, ET AL:
  Brent Hicks, Esquire
  McGlinchey, Stafford, PLLC
  One American Place
  301 Main Street
  Baton Rouge, Louisiana  70825
  (225) 383-9000
ALSO PRESENT:
  Darrel Vannoy

—— PAGE 4 ——

                I N D E X
EXAMINATION:                 PAGE(S)
  By Ms. Cummings        10
  By Mr. Trenicosta      85
RE-EXAMINATION:
  By Ms. Cummings        162
  By Mr. Trenicosta      187
STIPULATIONS PAGE          9; 10
REPORTER'S NOTE 190
CERTIFICATE PAGE           191

Judy P. Foust, Inc.
Certified Court Reporters
(225) 344-2270

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 2  PAGE 5

EXHIBITS:

State's Exhibit No. 1    15; 16; 100
        (5/16/08 - Disciplinary Report)
State's Exhibit No. 2    17; 100
        (12/4/08 - Disciplinary Report)
State's Exhibit No. 3    18; 97; 99; 100
        (9/19/00 - Unusual Occurrence Report)
State's Exhibit No. 4    20; 100
        (5/5/99 - Incident Report)
State's Exhibit No. 5    23; 101
        (9/22/92 - Disciplinary Report)
State's Exhibit No. 6    25
        12/2/87 - Disciplinary Report)
State's Exhibit No. 7    26; 27; 103
        (10/12/87 - Incident Report
State's Exhibit No. 8    29
        (6/19/87 - Disciplinary Report)
State's Exhibit No. 9    30; 103
        (12/4/85 - Disciplinary Report)
State's Exhibit No. 10    32; 33
        (10/23/81 - Disciplinary Report)
State's Exhibit No. 11    34; 109
        (2/15/79 - Disciplinary Report)
State's Exhibit No. 12    35; 109; 174
        (11/1/78 - Disciplinary Report)

PAGE 6

State's Exhibit No. 13    37
        (7/30/78 - Disciplinary Report)
State's Exhibit No. 14    38; 110
        (10/5/77 - Disciplinary Report)
State's Exhibit No. 15    40; 110
        (9/25/77 - Disciplinary Report)
State's Exhibit No. 16    41
        (9/14/77 - Disciplinary Report)
State's Exhibit No. 17    43
        (9/7/77 - Disciplinary Report)
State's Exhibit No. 18    44
        (7/12/77 - Disciplinary Report)
State's Exhibit No. 19    45
        (10/6/76 - Rules Violation Report)
State's Exhibit No. 20    46
        (5/27/76 - Rules Violation Report)
State's Exhibit No. 21    47
        (4/4/75 - Rules Violation Report)
State's Exhibit No. 22    48; 172; 173
        (12/17/72 - Rules Violation Report)
State's Exhibit No. 23    48; 49
        (9/6/72 - Rules Violation Report)
State's Exhibit No. 24    50; 173
        (4/18/72 - Lockdown History)

PAGE 7

State's Exhibit No. 25    51
        (8/19/71 - Violation Report)
State's Exhibit No. 26    59
        (Deposition of Warden Burl Cain
State's Exhibit No. 27    62; 63; 121; 123
        (Rap Sheet)
State's Exhibit No. 28    70
        (3/18/08 Letter to Rheseisha Robertson
 from Darrel Vannoy, CCE)
State's Exhibit No. 29    72; 73; 80
        (Statement of Facts
State's Exhibit No. 30    74
        (9/9/73 Letter to Sister Dianne from
 Albert Woodfox)
State's Exhibit No. 31    77; 80
        (March of 2007 Article on Angola 3)
State's Exhibit No. 32    131; 138
        (Arrest Report - Parish of Lafourche)
State's Exhibit No. 33    177; 187
        (10/3/79 - Lockdown Review Summary)
State's Exhibit No. 34    178
        (4/5/77 - Lockdown Review Summary)
State's Exhibit No. 35    178; 179
        (5/4/76 - Lockdown Review Summary)

PAGE 8

State's Exhibit No. 36    179
        (7/21/77 - Lockdown Review Summary)
State's Exhibit No. 37    180
        (10/4/77 - Lockdown Review Summary)
State's Exhibit No. 38    180
        (1/18/78 - Lockdown Review Summary)
State's Exhibit No. 39    181
        (10/27/73 - Lockdown Review Summary)
State's Exhibit No. 40    181
        (4/18/73 - Lockdown Review Summary)
State's Exhibit No. 41    181
        (4/26/79 - Lockdown Review Summary)
State's Exhibit No. 42    182
        (7/18/79 - Lockdown Review Summary)
State's Exhibit No. 43    182
        (1/9/80 - Lockdown Review Summary)
State's Exhibit No. 44    182; 183
        (4/28/80 - Lockdown Review Summary)
State's Exhibit No. 45    183
        (7/30/80 - Lockdown Review Summary)
State's Exhibit No. 46    183; 187; 189
        (7/26/83 - Lockdown Review Summary)
State's Exhibit No. 47    184; 189
        (10/25/83 - Lockdown Review Summary)

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 3  PAGE 9

S T I P U L A T I O N

It is hereby stipulated by and between/among counsel for the parties in the case above-numbered and entitled that the testimony of
WARDEN BURL CAIN,

be taken before Angie Henning, Certified Court Reporter, by counsel for all purposes, pursuant to notice and to the provisions as authorized under the Louisiana Code of Civil Procedure;

That parties hereto waive all formalities in connection with the taking of said deposition, including the reading and signing thereof, except the swearing of the witness and reduction of the questions and answers to typewriting;

That counsel for all parties reserve all objections, except as to the form of the question and the responsiveness of the answer, at the time of taking said deposition, but they also reserve the right to make objections at the time of said deposition or any part thereof may be offered in evidence, with the same rights as if the testimony had been taken and given in Open Court.

*    *    *    *    *

PAGE 10

MS. CUMMINGS:

We can put the stipulation on the record.  I think the parties stipulate that this deposition will be used for all purposes, and it will be conducted under the Rules of Federal Procedure.  We will reserve all objections, except for those to the form of the question and responsiveness.

MR. TRENTICOSTA:

So stipulated.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

WARDEN BURL CAIN
ANGOLA STATE PRISON
LOUISIANA STATE PENETINTIARY
ANGOLA,LOUISIANA 70712
after having been duly sworn by the court reporter, testified under oath as follows:
EXAMINATION BY MS. CUMMINGS:

Q.    Good afternoon, Warden Cain.  How are you?
A.    Fine.
Q.    Warden Cain, you know why you're here today, don't you?
A.    I do.
Q.    And have we met and discussed this case?

PAGE 11

A.    We have.
Q.    Warden Cain, you previously gave a deposition in a civil matter that's connected -- a civil matter involving Albert Woodfox; is that correct?
A.    Right.
Q.    And was that deposition given on November 30, 2006?
A.    It was.
Q.    All right.  We are going to refer to that deposition if it is okay with you, Warden Cain, as Cain's deposition one?
A.    Okay.
Q.    So that there will be clarity.  In that deposition, did you describe Albert Woodfox as quote, "model prisoner?"
A.    I did in a small, confined description of his environment what he is at that particular snapshot time.  It was not all-encompassing.
Q.    Okay.  And what did you base -- well, first of all, give us the definition.  What is your definition of a model prisoner?
A.    Well, a true model prisoner is someone who has been morally rehabilitated, and who, you know, that you can trust to live and work and move and

PAGE 12

work among anybody.
Q.    Okay.  Do you feel --
A.    In prison.
Q.    Do you feel that that definition fits Albert Woodfox?
A.    Absolutely not.
Q.    Prior to giving the deposition on November 30th -- well, tell me what factors would you take into consideration to determine whether somebody was a quote, "model prisoner?"
A.    Well, number one is, he is not a rule violator, but a rule follower, and someone who goes with the flow as far as what is right and what is wrong, and doesn't do what is wrong, and someone who participates in programs morally; and by that, I mean I'm talking about -- for instance, an example would be like hospice caregivers, active in church, active in clubs and organizations, and not looking out to self and for self gain, but looking out for the good of all like we do as citizens.  We care about each other and we share and we give.  We're not takers.
Q.    Okay.
A.    But moral -- a moral person.
Q.    All right.  In determining whether someone

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 4    PAGE 13

is morally rehabilitated, and whether they are a
model prisoner, would you want to know their
complete disciplinary history?

    A.    Well, you would.

    Q.    Okay.  Did you have an opportunity to
review that history prior to giving your
November 30, 2006, deposition?

    A.    I really didn't.  I hadn't reviewed that
at all too much.

    Q.    Okay.  Have you had an opportunity to do
that for today's deposition?

    A.    I have.

    Q.    And do you have records in front of you
reflecting Albert Woodfox's disciplinary history?

    A.    I do.

    Q.    When was his last -- starting now and
going backwards, when was he last disciplined at
Angola?

    A.    His last actual disciplinary report was
5/16/08 for pornography, which was in May of this
year after he moved to the other dorm.

    Q.    Okay.

    A.    He had five pages of pornography, which is
against the rules at Angola  He had other
infractions that we didn't write him up for, and

PAGE 14

one is he did the three-way phone calls, and did
an interview with the press which is absolutely
illegal at Angola.

    We don't allow inmates to do interviews with
the press unless I personally approve it, or it's
part of something to rehabilitate, to project
Angola's positive side or project the truth.  And
so that event occurred, and also then he and
Herman Wallace swapped their phone ID numbers, pin
numbers -- you know, talking -- calling lawyers
and things like that, and for those infractions,
we didn't write him up on.

    Q.    Why not?

    A.    Well, we just didn't want to look like we
were nitpicky.  The serious rule infraction was to
do the press interview.  But still in all, we just
didn't want to act like we were overbearing and
trying to have an excuse to move him out of the
dormitory that we put him in.  We were trying to
act in good faith.  And so also, we were kind of
curious to see just how far they would go.  And so
-- just to see what rules they would break.  Now,
the pornography we wouldn't let go.  We had to do
something there, because we do not allow that in
the prison.

PAGE 15

    Q.    Why not?  Why is that such a concern to
you?

    A.    Well, pornography we believe can cause
inmates to become predators on other inmates,
because they see -- the sexual thing arouses them.
And so they're in an environment where there are
no females, there is no sexual gratification other
than whatever you can create yourself, and then
what happens is, then we -- and I feel like with
28 years of experience as a warden, that it causes
homosexuality more so than if you don't have it,
because there is that urge in that moment when
he's really aroused and looking at the
pornography, that he will be a predator possibly
on someone else, if he's in that environment, and
they were in a dormitory environment.  And we just
don't allow it in the prison for those reasons,
and it is counterproductive to moral
rehabilitation.  And we're trying to morally
rehabilitate the inmates, so when they're released
from prison, they don't hurt someone again.  So
those things are counteractive and
counterproductive to our overall mission.

    Q.    Okay.  I would like to show you what I'm
going to mark as State's Exhibit No. 1.

PAGE 16

    (The exhibit is marked as State's
Exhibit No. 1 for identification and is
attached hereto.)

    Could you identify that, please, for the court
reporter?

    A.    Right.  This is a write-up, 5/16/08,
8:55 a.m. for contraband.  Do you want me to read
it to you?

    Q.    Sure.

    A.    "On the above date and approximate time,
I, Sergeant J. Rice, was conducting a search of
Inmate Albert Woodfox, #72148 when I found 5 pages
or pornography that had been ripped from a
magazine.  They were in his locker box.  The
pictures were confiscated and locked up in
Shakedown Crew locker box."

    The penalty for that was loss of two weeks
yard time and loss of two weeks canteen, and he
was found guilty.

    Q.    Okay.  So that is the event on 5/16, and
you indicated that he was not written up for the
three-way calls or for the interview at all?

    A.    No.

    Q.    Was that since he was released to the
dormitory from CCR?

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 5    PAGE 17

A.    Yes.

Q.    Okay.  Prior to the event that happened in May of this year -- I am actually going to -- this is one -- so we'll stay on the same page.  I am going to take you to events of 12/4/02.  Well, first can you identify what I'm going to mark as State's Exhibit No. 2?

(The exhibit is marked as State's Exhibit No. 2 for identification and is attached hereto.)

A.    That is a write-up for Albert Woodfox on 12/4/02 for aggravated disobedience.

Q.    And is this the disciplinary report from Angola?

A.    It is.  It says, "On the above date and time, inmate Albert Woodfox #72148 was hollering and shaking the bars on his cell.  I, Sergeant L.R. Montondon, gave inmate Albert Woodfox #72148 several direct verbal orders to "quiet down and step back from the bars."  Inmate Albert Woodfox refused all orders.  Lieutenant Laprarie was contacted, and inmate Albert Woodfox was placed in Adm. Seg."

He had a loss of two weeks canteen here.  This is very serious.

PAGE 18

Q.    Why is that serious?

A.    Well, this is absolutely being defiant, failure to follow orders, and this is just no different than someone just wanting your way.  I'll get it any way I can.  And this kind of action here can cause other inmates to rack the bars.  It can cause a riot on the tier.  It can cause all kind of problems.

Q.    Okay.  Next, I will take you to State's Exhibit No. 3.

(The exhibit is marked as State's Exhibit No. 3 for identification and is attached hereto.)

Can you identify that, please?

A.    Okay.  This is an unusual occurrence report, and this is "On September 19, 2000, at 7:27 p.m., I was notified by Sergeant William Jennings that while he was making rounds in Upper B Tier, he observed that there was food and what appeared to be human waste on inmate Roynell Joshua's cell bars, on inmate Albert Woodfox's cell bars, and the wall in front of inmate Woodfox's cell.  Inmate Calvin Thomas was on the tier for his tier time at the time of the incident.  Inmate Calvin Thomas was placed in

PAGE 19

Administrative Segregation at CBD, and inmate Albert Woodfox and Roynell Joshua were placed in Administrative Segregation on Lower E Tier.  All three inmates were examined by medical personnel and were allowed to take a shower.  Warden Davy Kelone was notified of this incident."

And what this was, they were throwing human waste on each other and obviously having some sort of serious disagreement to resort to that sort of behavior.

Q.    Okay.

A.    Also, on the back page, it was the same thing.

Q.    Okay.  All right.  Does it reflect whether he was disciplined as a result of that?

A.    He was.

Q.    What was his discipline?

A.    Let's see if I can find it here.  (Viewing documents.)  Aggravated fight, Upper B Tier.  I don't see exactly what they did to him on this one.  They locked him in his cell for what he had done, and took him to Lower E Tier.

Q.    Okay.

A.    Again serious.  This is a disagreement, you know, a fight, violence.  If you're not in the

PAGE 20

cell, you would be using some kind of weapon probably, and it can have a disastrous outcome where these inmates are resorting to human waste, and that's why they're in CCR, to protect them from each other and from themselves.

Q.    Okay.  I am going to take you to State's Exhibit No. 4, and I'm just taking them in order, strictly in order.

(The exhibit is marked as State's Exhibit No.4 for identification and is attached hereto.)

Could you identify that?

A.    Okay.  5/5/99, "Threat to security (making threats of start another hunger strike.)"  Hunger strikes are real bad.

"On the above date and approximate time, I called inmate Woodfox into the Major's office to discuss with him his part in the hunger strike that had taken place on CCR 5/3/99 and 5/4/99.  Information received was that Woodfox was getting others to keep the hunger strike going and that Woodfox was a leader of the hunger strike.  Inmate Woodfox stated that he had only participated in the strike, because he felt that CCR inmates had lost too many privileges.  Inmate Woodfox then was

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 6  PAGE 21

very belligerently asked why some of the inmates
who participated in the hunger strike got locked
up.  I told him they were locked up because they
were influencing other inmates into participating
in the hunger strike.  At this point, inmate
Woodfox stated that he did not feel that locking
up those inmates was right.  He then became very
belligerent, and said "you just as soon put me in
Camp J because that's what it's going to come to
because this shit isn't over with yet."  He also
stated "as far as he was concerned, it wouldn't be
over as long as the four inmates remained locked
up."  He said he only organized a peaceful
demonstration, and there wasn't anything wrong
with that.  He said again, "just go ahead and lock
me up at Camp J now, because that's what you're
going to have to do anyway."

    Q.    Okay.  Well, I mean, it's a hunger strike
-- is that --

    A.    A hunger strike is really, really bad,
because you could see he admitted that he was
organizing a peaceful demonstration.  There is no
such thing as a peaceful demonstration in prison.
You know, when you're demonstrating, you're being
defiant to authority, and, therefore, you want

PAGE 22

your way.

    The prison operates with one authentic
authoritarian figure, the warden and the rule
book.  And so if you're going to be defiant and be
belligerent and do a hunger strike, then you're
giving me an ultimatum.  If you don't give me what
I want, I'm going to starve myself to death and
not eat, therefore, do what I say.  So, therefore,
that is absolutely contrary to the administration,
the rule books and so forth.

    He's trying to give us ultimatums.  Ultimatums
is what they give you when they take hostages.
Ultimatums are not what we do in prison.

    This is one of the worst things you do, plus
what you do is, you then get others to
participate, as he encouraged others to
participate, which then causes it to be like a
snowball and can move through your entire prison,
and can cause you really serious problems and
threat to lives, threat to property, and total
unrest in the prison.

    Hunger strikes are bad, and this is what he
was doing.  This is a strike.  There is no
peaceful demonstration.

    Q.    Right.  Okay.  I'll take you to State's

PAGE 23

Exhibit No. 5.

    (The exhibit is marked as State's
Exhibit No. 5 for identification and is
attached hereto.)

    And each one of these that you're identifying,
is each one of these, unless you indicate
otherwise, a disciplinary report from Angola?

    A.    Yes.  He has had a lot of disciplinary
reports at Angola.

    Q.    Okay.  And during the one on 9/22/92, what
happened?

    A.    9/22/92.  "During a routine shakedown, I,
Sergeant Gaspard, along with Sergeant E.C. Wiley,
found a homemade (8 piece) telescopic pole
concealed in a large manila envelope inside of
inmate Woodfox's locker box.  The pole was not
assembled when found.  We also found (1) burnt
empty Coke can."

    Now, this was serious because they use -- the
large telescopic pole can be a spear.  It can be
used for anything like that, and Angola was
notorious -- and there are spears in the museum
where they used spears, not only on those inmates,
but on security guards, security officers, so that
was very, very -- that's a dangerous weapon.  And

PAGE 24

then the can -- the burnt can, you see, he was
notorious also for -- he could tear the can apart
and make the handcuff shims, because all handcuffs
just lock in together.

    If you shim the handcuff --it's easy to do --
push the little mechanism up and you can easily
open then handcuffs.  So the can is aluminum, so
you roll it up and make the little shims, so the
can is really contraband as well.

    The burnt can, he probably was burning
something in his cell obviously, so he was setting
a fire in his cell.  So, therefore, do we want to
have fires in the cell, absolutely not.  You can
then burn the mattress.  You can burn the clothes.
You could make smoke.

    You could cause all kind of chaos, so that we
would have to rapidly evacuate the cell.  And,
therefore, the potential for violence and moving
unrestrained could exist, which then would give
the inmates a chance to take some kind of action
on each other, if they had any hidden weapons, or
on security, or again, the most dreaded crime of
all, take hostages.  So the burnt can represented
the fire that was obviously there.

    Q.    Okay.

SHEET 7    PAGE 25

A.      And it was a serious write-up.

Q.      Okay.  Did he receive a sentence for that one?

A.      Okay.  Deferred sentence for review or something here at the bottom -- and I don't see it on the next page -- yes, "loss of three weeks store, suspended 90 days."  No, this is a different one.

Q.      That's a different one.  That's the next one.

A.      Yeah, that's the next one.  Okay.  I don't know what the sentence was for this one.  I would think -- that was pretty -- not a serious enough sentence for what he did.

Q.      Okay.  Next, State's Exhibit No. 6, which is the next one in order dated 12/2/87.

(The exhibit is marked as State's Exhibit No. 6 for identification and is attached hereto.)

A.      "12/2/87, GAR 3-Lobby, CCR Lockdown.  Aggravated disobedience."  Bad.  "While passing through the GAR 3 lobby in route to a visit, inmate Woodfox stopped at the head of the tier on GAR 3 left and started hollering to inmates down the tier.  I gave him several orders to stop

PAGE 26

hollering.  Inmate Woodfox continued hollering at the inmate, hollering and ignoring my orders.  Steven P. Gaspard."

Q.      Okay.

A.      So one thing is, all of these were with different officers.

Q.      Well, that was my next question.  These are all with different officers.  What does that tell you?

A.      Well, it tells you that these are absolutely no sham, no setup, no nothing.  It's just -- these are the truth.

Q.      Okay.  Was it one officer that went --

A.      If it would have been one officer, it would still mean they were the truth.

Q.      So it wasn't one that like -- he can't claim that one officer was after him?

A.      No.

Q.      Okay.  State's Exhibit No. 7, which is the next one.

A.      This is a bad one, too.  It showed that --

Q.      Let me ask you that, then.

A.      Well, I mean, he's hollering at the other down the tier.  It's like if you're hollering at him down the tier, then you're disagreeing with

PAGE 27

them, and so you have conflict with them.  And so, therefore, you're in the proper environment because you're locked in a cell, so you can't get together with them, because obviously you will have a violent outcome.  So, therefore, he needed to be in CCR.

He needed to be shut away from the others, and then from him, because they're screaming and hollering when you let them together.  They're going to fight and be violent.  And these guys have murdered and killed before, so you don't know what the extent of the violence would be.

Q.      Okay.  That takes us to the next one, which is 10/12/87.  That is State's Exhibit No. 7.

(The exhibit is marked as State's Exhibit No. 7 for identification and is attached hereto.)

A.      10/12/87.  Okay.  "Threat to security.  On 10/8/87, I received information from three confidential informants that inmate Albert Woodfox had made a statement that he was going to get Sergeant David Ross any way he could, that he may have to pay for it in the long run, but it would be worth it to him.  On 10/12/87, after investigating into more of the same, three

PAGE 28

confidential informants stated that if inmate Woodfox was not moved from GAR 3 left that it was going to be problems between inmate Woodfox and other inmates on the tier, because they would not go along with him in trying to cause problems.  Lieutenant Colonel Vannoy was notified of this incident and inmate Albert Woodfox was placed in adm. lockdown."

Q.      Okay.

A.      This is harborly serious, because he was doing time for murder of Correctional Officer Brent Miller.  And so, therefore, any threat on another correctional officer has to be taken very, very seriously, and that is what the three CI's were implying, saying that he did.

Q.      Okay.  And was he -- what type of hearing do they have when they have a disciplinary report written on them?

A.      Well, what they do, they go to court.  We have an inmate paralegal or inmate lawyer that we can them, and the court is recorded.  He will have -- the judges will be -- a security person will be the court chairman, and he could have one other or two others, and they're going to be from different divisions of the prison.

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 8   PAGE 29

        For instance, the treatment side.  It could be
classification.  It could be a social worker.  It
can't be two security officers.  It has to be one
from security and someone else, and they're going
to present their evidence, and he's going to
present his evidence, and they're going to rule
and then that's going to be it.  And he can appeal
that decision to the secretary to the warden.
        Q.      Okay.
        A.      That's how it works.
        Q.      Okay.  And was he found guilty of this
charge?
        A.      Let me see at the bottom.
        Q.      It's written at the bottom of the page?
        A.      Okay.  Inmate was found guilty.  Inmate
was found guilty, yes.
        Q.      Okay.  And that takes us to the next one,
which is State's Exhibit No. 8 on 6/19/87.
                (The exhibit is marked as State's
Exhibit No. 8 for identification and is
attached hereto.)
        A.      This would be aggravated disobedience.
"On the above date and time, I, Officer McMillian,
gave the above inmate several direct verbal orders
to stop the loud hollering and arguing with cell

PAGE 30

number six.  He refused all my orders and
continued the loud arguing."
        He pleaded not guilty.  He got one week.  I
can't read exactly what it was.  He was found
guilty.  This is really bad, because again, he had
no respect, and when the officer is telling him to
do something, he doesn't do it.  He didn't do.  He
refused all orders and continued on arguing, so he
is defiant.
        Q.      Okay.
        A.      Defiant with officers and has no respect
for them.
        Q.      Okay.  Let's go to the next one, which is
State's Exhibit No. 9, and that is for 12/4/85.
                (The exhibit is marked as State's
Exhibit No. 9 for identification and is
attached hereto.)
        A.      Okay.  "12/4/85.  CCR C Tier.  Fighting
and aggravated disobedience.  Approximately,
12:45 p.m., I, Sergeant Thomas, while letting
inmate Otis Lewis back in his cell from his hour
showering, looked down the tier and saw inmate
Albert Woodfox run out of his cell (8) which had
open while I was opening Lewis' cell.  The two
inmates began to fight.  I pressed my beeper and

PAGE 31

gave (4) direct verbal orders to stop.  At that
time, they backed into the front bars still
fighting at that time.  Captain Arnold and
Sergeant Dauzat came in.  Captain Arnold ordered
them to stop but they refused.  Then Captain
Arnold gave me an order to open the tier door,
which I did.  Captain Arnold and Sergeant Dauzat
broke up the fight by grabbing one inmate a piece.
Both inmates were sent to the hospital and then to
adm. lockdown."
        Now, see this is where he's absolutely
obviously the aggressor.  For some reason, the two
doors were open at the same time, and Albert
Woodfox ran out of his cell and ran down and
attacked the other inmate, so he had a propensity
for violence.
        Q.      Okay.  What was the disposition on this
one?
        A.      The disposition on this was 10 days in
isolation, suspended 90 days.
        Q.      Okay.  Was there a reason for that
sentence stated on it?
        A.      Well, they would try to probably -- I
don't see the reason.  Do you see the reason?
Accepted a guilty plea in officer statements.

PAGE 32

Sentence based on good conduct record.
        Q.      Well, I'm a little confused by "sentence
based on good conduct record," since we have all
these reports in front of us.  Is that within a
specific time frame, or what does that mean?
        A.      Well, one thing it means is that he is
already in lockdown.  He's in CCR, so that's a
cell block environment.  He just has more things
in the cell than he would in another cell.  And so
there are a lot of reasons that you would do that.
You would have a shortage of cells in Camp J or
backlog or whatever, and then the other one was --
see, it had been two years from here to this
write-up, so that is what they did.
        Q.      Okay.  And going backwards, this was '85,
so the one prior to that was 10/81.
        A.      10/81, it had been four years.
        Q.      Right.  And that will be State's Exhibit
No. 10.  So it had been four years since he had
been in trouble, at least written up; is that
correct?
        A.      Yes.  And the point that you make right
here is, he didn't ever really get any better.
When an event occurred in his life that he felt
like he needed to resort to violence, he did.  He

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 9   PAGE 33

did.  You know, instead of chilling on out and
coming on progressively to get to where that you
don't resolve conflict with violence, he didn't,
and that's why you see these spaced out like they
were.  He would be okay a while, but then he would
get -- boom, here he would come again.

Q.    Okay.  And you said he would be okay a
while.  During all of these --

A.    Well, maybe nobody disagreed with him.
Maybe he had no conflict.  But when he did, he
resorted to violence, and many times, he did.

Q.    Okay.  Let's go to State's Exhibit No. --

MR. CALDWELL:
          What was the date of State's No. 10?

MS. CUMMINGS:
          That's the one we're going to now.

BY MS. CUMMINGS:

Q.    That was 10/23/81.
          (The exhibit is marked as State's
Exhibit No. 10 for identification and is
attached hereto.)

A.    Okay.  "Disobedience.  At approximately
10:10 p.m., I, Officer Sarpy, gave inmate Albert
Woodfox five direct orders to quit arguing with
inmate Herbert Nicholson and quit sticking his arm

PAGE 34

out of the cell.  Inmate Albert Woodfox kept on
fussing and sticking his hand out of the cell."

          So the plea right there, he pled guilty or was
found guilty, and he received a reprimand.

Q.    All right.  Again, refusing to follow
orders given by the guard?

A.    Yes, defiance.

Q.    Okay.  On 2/15/79 -- that is State's
Exhibit No. 11.
          (The exhibit is marked as State's
Exhibit No. 11 for identification and is
attached hereto.)

A.    It says "while shaking down the above
named and numbered inmate's cell, I found... --"
and that name and number is Albert Woodfox, 72148
-- "...I found two unauthorized containers, an
empty Clorox bottle and an empty Kool-Aid
container.  The Kool-Aid container was half-full
of sugar.  Inmate was allowed to empty the sugar
from the Kool-Aid container.  The empty containers
were then taken from the inmate."

Q.    Okay.  Why aren't they allowed to have
containers?

A.    Well, lots of reasons.  You can have
containers, and you can make home brew.  You could

PAGE 35

store things in it.  And one thing is the Clorox
bottle would bother us because they would store
bottles when they wanted to escape, because the
bottles were flotation devices.  You know, gallon
bottles would be, and so we don't allow them to
have the bottles because of that.  And so the
sugar -- half full of sugar is -- I don't know how
large the Kool-Aid container was, but the sugar
container would be a concern to us, too, because
that is a component of making beer and whiskey.

Q.    And they actually do that in there?

A.    They do.

Q.    What was the disposition on this one?

A.    Okay.  Inmate Woodfox was found guilty
based on the contents of the report which are more
credible than the inmate's testimony.  The
sentence is based on the inmate's previous record
and the seriousness of the report.  Five days
isolation.

Q.    Okay.  State's Exhibit No. 12, and that
was on 11/1/78.
          (The exhibit is marked as State's
Exhibit No. 12 for identification and is
attached hereto.)

A.    "11/1/78, while shaking down the above

PAGE 36

named and numbered inmate, Albert Woodfox, I found
what appeared to be a firing pin for a zip gun
hidden inside a tube of toothpaste.  The object
was about (3") three inches long, sharpened on one
end, and appeared to be the end of a radio
antennae.  A further search of the tier turned up
two 22 caliber bullets hidden under a lavatory
sink by the showers, which further leads us to
believe that this was a firing pin for a zip gun.
This inmate was placed in isolation by order of
Colonel H.D. Byargeon.  The object found in the
tube of toothpaste was locked up in the safe at
R.C. by Lieutenant Honeycutt, Jr., supervisor of
the Outcamp Shakedown Crew.  The two bullets were
turned over by Lieutenant Honeycutt, Jr. to
Colonel H.D. Byargeon."

Q.    Okay.  What is a zip gun?

A.    A zip gun is a homemade gun.  They have a
firing pin and they can even use a radio antennae
as the barrel for the gun.  And then the long nail
would penetrate the primer on the shell, the
22 bullet, and the radio antennae could be the
proper size, because they're multi-sizes as you
send them out, and that would be the barrel for
the bullet.  And two bullets meant two shots, and

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 10   PAGE 37

that meant two people shot.  And the zip gun would
be no different than having any other gun, because
you have a gun.  And a gun in prison is to escape
or get away or either seriously injure someone
else or kill them.
    Q.      Okay.  And was he found guilty of this
infraction?
    A.      Guilty, ten days isolation and lost 25
days good time.
    Q.      Okay.  State's Exhibit No. 13, and that is
July 30, 1978.
              (The exhibit is marked as State's
Exhibit No. 13 for identification and is
attached hereto.)
    A.      Okay.  "At 10:55 a.m. was picking up chow
trays on D Tier when I came to Albert Woodfox
72148 cell.  I saw he had two styrofoam cups, and
I told him to give me one, as one was all he could
have, and he told me no.  I asked him was he
refusing, and he said yes, he was, and I was not
going to get it."
    Q.      Okay.
    A.      Inmate was found guilty based on inmate's
own admissions and due to conduct record, five
days isolation and loss of 10 days good time.

PAGE 38

    Q.      Why is this significant?
    A.      He just didn't do it.  He just wasn't
going to do it.  He was going to be defiant to
security.  He wanted his own way.  I mean, he just
wasn't going to do it -- defiant.
    Q.      State's Exhibit No. 14, and that's
10/5/77.
              (The exhibit is marked as State's
Exhibit No. 14 for identification and is
attached hereto.)
    A.      Okay.  Albert Woodfox.  "Prior to entering
CCR isolation, this inmate was asked by Captain
Travis Jones if he would submit to a complete
shakedown.  Inmate's exact reply was "you're not
looking up my ass, you ain't."  Woodfox was bent
over the A.U. desk (clerk's desk) by the officers,
and his cheeks were searched for contraband.  In
the process of bending this inmate over the desk,
he resisted us and tried to escape from the
office.  He also kicked my right shin with one of
his feet while we were searching him.  The only
forced used was that was needed to restrain inmate
Woodfox."
    Q.      Okay.
    A.      Found guilty.

PAGE 39

    Q.      Are strip searches necessary?
    A.      Yes, because you're looking for handcuff
keys and shims, basically.  And so you have to do
that, and you're also looking for any other
contraband, because it is not unusual at all to
hide contraband in body cavities, be it weapons,
be it drugs, or be it mechanisms to escape.
    Q.      Okay.  And this indicates that he kicked
the guard; is that correct?
    A.      He kicked the guard and kicked him on his
shin and resisted and said you ain't going to do
it.  Again, being very defiant.
    Q.      Okay.  Was found guilty of this
infraction?
    A.      He was.
    Q.      Would you characterize this as a violent
infraction?
    A.      It is.  I mean, he's defiant.  He doesn't
want them to do their job.  He just said okay -- I
guess he thought, well, I'm just going to tell
you-all you can't.  You-all just not going to
search me.  I'm just not going to be searched
anymore in prison.  I mean, that's crazy.  So,
yes, it's very defiant and it's very belligerent,
and it's just not going with the flow.

PAGE 40

      It's no different all the way to the time he
does pornography, because he does what he wants to
do.  He doesn't do what the rules say.  If he has
a whim of what he wants to do, he'll do it.
      He made a three-way phone call and did an
interview, when he knew he was not supposed to.
This is a pattern all the way through his career
at Angola from start to finish.
    Q.      Okay.  State's Exhibit No. 15 occurred on
9/24/77.
              (The exhibit is marked as State's
Exhibit No. 15 for identification and is
attached hereto.)
    A.      Okay.  "9/24/77.  Albert Woodfox.  During
routine strip search procedure, inmate Albert
Woodfox refused to bend over."  Is this the same
one or a different one?
    Q.      No, it's a different one.
    A.      Refused to spread over -- "...refused to
bend over and spread his buttocks.  Lieutenant
Horace Issac and myself ordered inmate Woodfox to
bend over and spread his buttocks and he refused
to do so.  Inmate Woodfox had to be physically
restrained over a desk with his buttocks spread
open by Lieutenant Horace Isaac.  Inmate Woodfox

Judy P. Foust, Inc.
Certified Court Reporters
(225) 344-2270

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 11  PAGE 41

charged into Lieutenant Horace Isaac as if to do
Lieutenant Isaac physical harm.  In the CCR
isolation hallway inmate Woodfox punched Officer
John R. Christen in the mouth, busting his lips,
and loosening the Officer Christen's two front
teeth.  Officer Christen was relieved and treated
in the Feliciana Hospital.  Inmate Albert Woodfox
punched Officer Harry Bereas in his left jaw.
Inmate Woodfox kicked Officer Emus in his left
leg.  An incident report has been submitted
concerning this incident."
    Q.    Okay.  Was he found guilty of this
infraction?
    A.    He was.  He spent ten days in isolation.
This is absolutely horrible because he just took
on all of the security.
    Q.    Okay.  Was this a violent crime?
    A.    It is a very violent crime.  I mean, this
is a violent man.  If he don't get his way, he's
going to do something to you.  You know, he just
was violent his whole career.
    Q.    Okay.  State's Exhibit No. 16.  Date of
incident 9/14/77.
        (The exhibit is marked as State's
Exhibit No. 16 for identification and is

PAGE 42

attached hereto.)
    A.    "9/14/77, Albert Woodfox, while shaking
down the above named and numbered inmate's cell, I
found a handcuff key hidden in a roll of toilet
tissue.  The handcuff key was turned in to Officer
Bill Honeycutt who is in charge of the 2-10
shakedown crew, who in turn turned it over to
Lieutenant Colonel H.D. Byargeon."
    He pled not guilty, and he was found guilty
and transferred to Camp J for extended lockdown.
This is real bad, because the handcuff key gets
you out of the handcuffs, which means you can have
a weapon.  You can grab a weapon or you can get an
officer's weapon.
    If he were to be escorted from one camp to
another, he would try to escape.  He would try to
get a gun.  He would try to do anything.  And as
you saw, he was aggressive -- very aggressive
toward the officers.
    Well, not in restraints, and with one handcuff
even hanging, he had a weapon in his hand with the
other end of the handcuff hanging on his arm is
very bad.
    Q.    Okay.
    A.    Why do you want a handcuff key, if you

PAGE 43

don't want to run away?
    Q.    Okay.  State's Exhibit No. 17, 9/7/77.
        (The exhibit is marked as State's
Exhibit No. 17 for identification and is
attached hereto.)
    A.    "The above inmate refused to give up his
supper tray when told to do so by Jack R. Murray,
L.S.P. Sergeant.  Aggravated disobedience.  Albert
Woodfox."
    Q.    Okay.  Again, why is this important?
    A.    Ten day isolation, 25 days given.  Because
purely defiant.  Inmate refused to give up his
supper tray.  I mean, that is no big deal, but yet
he makes a big deal of it because he wants to act
out and be defiant.  And there probably could have
been other inmates obviously seeing him around who
he would be trying to show them that, hey, I don't
have to do what they tell me.  Very aggressive
toward security and authority.
    Q.    And is that dangerous in jail?
    A.    Very dangerous.
    Q.    Okay.  Number 18 --
    A.    You can look -- it led to Brent Miller.
    Q.    What do you mean by that?
    A.    Well, he finally wound up killing Brent

PAGE 44

Miller and was convicted of it.  He had no fear of
security -- Albert Woodfox.
    Q.    This is State's Exhibit 18, 7/12/77.
        (The exhibit is marked as State's
Exhibit No. 18 for identification and is
attached hereto.)
    A.    Okay.  "While shaking down the above named
and numbered inmate's cell, I, Jack R. Murray,
L.S.P. Sergeant, found (1) razor blade laying on
the bars of his cell.  It is a posted policy that
there will be no razor blades in the cells."
    He was found guilty, and he was sentenced to
ten days isolation and lost 25 days good time.
That was suspended 90 days.  He had -- a razor
blade is a very serious weapon.
    It can cut your throat.  It can cut your
jugular vein, bleed you to death.  It can kill
you, plus it can disfigure you.  And so it's --
also, razor blades -- if you get a match, you can
take your toothbrush and you can melt the plastic
and embed the razor blade into the plastic, and
then you really have a good weapon, because you
have a handle on it.
    And if it were a razor blade that had on side
solid, then it was even stronger.  But in any

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 12   PAGE 45

event, a razor blade is very dangerous -- very
bad.

    Q.    What other use would he have for a razor
blade in jail?

    A.    To cut someone or harm someone, do bodily
harm, or use it as a weapon to put at someone's
throat for a hostage, so that he could force them
to let him out and escape.

    Q.    Okay.  State's Exhibit No. 19.  The date
on that one is 10/6/76.

    (The exhibit is marked as State's
Exhibit No. 19 for identification and is
attached hereto.)

    A.    Okay.  10/6/76, defiance, Albert Woodfox
72148, cursing an officer.  "The above named and
numbered inmate called me a fat mother fucker
while I was shaking down his cell."

    Ten days isolation.  No respect for security.
No respect for another human.

    Q.    Okay.  What do you have next, because I
accidentally forgot to put a sticker on this one.
Let's go ahead and write in --

    A.    5/27/76?

    Q.    Yes.  State's Exhibit 20 is 5/27/76.

    (The exhibit is marked as State's

PAGE 46

Exhibit No. 20 for identification and is
attached hereto.)

    A.    "While shaking down the above named and
numbered inmate's cell, cell #7 D-tier, I, Officer
Ivory Young, found a Crest toothpaste tube which
contained a substance which looked like gunpowder.
This was turned over to Major Norwood for further
investigation.  The inmate living in CCR, cell #7.
Approximately, 1/3 of this substance was poured
into an ashtray and a match was placed onto the
substance and it ignited.  This substance checked
out to be gunpowder."

    Q.    Okay.

    A.    This is an old rule violation report,
1972.

    Q.    Okay.  Does it show the disposition on
this one?

    A.    I don't see disposition on this one.

    Q.    Okay.  But they did check the gunpowder?
They found it in his cell, they checked it, and it
ignited?

    A.    It ignited.  It was gunpowder, and
gunpowder makes a bomb and the toothpaste.  If he
can find a mechanism to ignite it.  Obviously,
they had cigarettes, fire or whatever, if he burnt

PAGE 47

the can.

    Q.    Okay.  State's Exhibit No. 21, and that's
dated 4/4/75.

    (The exhibit is marked as State's
Exhibit No. 21 for identification and is
attached hereto.)

    A.    4/4/75.  Defiance, property destruction.
"The above inmate cursed the correctional officer
for all kind of bitch, mother fucker, and then
threw glass jars at us.  He also tore his commode
out and broke it up and threw it at us.  This was
done while we were trying to get inmate Wilkerson
off the tier to put him in the hole for refusing
to catch his cell."  Ten days isolation.

    Q.    Okay.

    A.    And what he was doing, he was being
belligerent and defiant because they were locking
up his partner.  And the loyalty to his partner
was so great, that he was self-sacrificing.  He
probably wanted to go with him and be locked up,
too.  So then he wanted to inflict all the pain
and injury he could on security.  So he even tore
up his commode and destroyed state property,
because it was porcelain at the time, obviously,
because it broke, so that he could throw it at the

PAGE 48

officers.

    Q.    Okay.

    A.    There's a strong bond between those two.

    Q.    State's Exhibit No. 22, 12/17/72.

    (The exhibit is marked as State's
Exhibit No. 22 for identification and is
attached hereto.)

    A.    Okay.  12/17/72.  "Above named and
numbered inmate used extremely vulgar, profane,
and obscene language in the presence of visitors
and continued to do so after being directed to
refrain.  He stated to go get someone with
authority.  Warden Hoyle denied Rory Mason's visit
due to repeat incidents.  Inmate Woodfox created a
disturbance as a result of this."

    So he was denied a visit, he acted out, threw
a fit, screamed and hollered.  He wanted his own
way.

    Q.    Okay.  And what was the disposition on
that one?

    A.    Ten days -- ten days CCR isolation.

    Q.    Okay.  State's Exhibit No. 23, and that is
12/17/72.

    A.    12/17/72.  Albert Woodfox.  "Above named
and numbered inmate used extremely vulgar,

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 13   PAGE 49

profane, and obscene language in the presence of
visitors and continued to after being directed to
refrain.  He stated to get someone with..." -- is
this the same one?

    Q.    Oh, I'm sorry.  That is the same one.
Yes, I'm sorry.  That is the same one.

    A.    Okay.

    Q.    We will scratch 23 on that -- well, let's
just leave that -- let's scratch 23 on that.  We
won't attach it since it is the same report, and
we'll mark the next one, 9/6/72, as State's
Exhibit No. 23.

                (The exhibit is marked as State's
Exhibit No. 23 for identification and is
attached hereto.)

    A.    Okay.  "The above named and numbered
inmate, Albert Woodfox, came out of his cell to go
to D.B Court.  He refused to come off the tier.
He went to get this subject and he had an armature
in a sock, which he threatened me and other
officers, however, he gave it to Mr. C. Bord and
he came on out and went to court."

    Q.    Okay.  What is an armature?

    A.    An armature is a way -- something with
weights that you put in a sock and you swing

PAGE 50

around and around and you hit people with it and
beat them and use it as a weapon.  And the sock
gives it momentum as you swing it.  It can inflict
great bodily harm.

    Q.    Okay.  And was it a rule relation for him
to have the armature in the sock?

    A.    It was a rule violation, because he turned
it into a weapon.  It would be a rule violation to
have an armature anyway.  An armature would be a
portion of a motor, and it would be in used to
make a tattoo machine and things like that, which
is illegal.  I mean, you don't need an armature in
prison.

    Q.    What was his disposition on that one?

    A.    I can't really tell.  Ten days isolation,
suspended for 90 days.

    Q.    4/18/72, and that is State's Exhibit
No. 24.

                (The exhibit is marked as State's
Exhibit No. 24 for identification and is
attached hereto.)

    A.    "Inmate locked up and charged with the
murder of Brent Miller.  Inmate waiting to be
tried.  The Board feels inmate should remain in
lockdown because he is dangerous to inmates and

PAGE 51

free personnel.  His record shows where he stabbed
another man or inmate."

    Q.    Okay.  Do you know about that incident
that is referred to in here -- the stabbing of the
other --

    A.    The Brent Miller --

    Q.    Well, I know about the Brent Miller one,
but the stabbing of the other inmate?

    A.    Yes.  I have a vague memory of it, because
he did -- I had a report that he had stabbed
another inmate, too.

    Q.    Okay.  State's Exhibit No. 25, which is --

                (The exhibit is marked as State's
Exhibit No. 25 for identification and is
attached hereto.)

    A.    Refusing to work.

    Q.    -- August 19, 1971.

    A.    Albert Woodfox.  Refusing to work.  "The
above inmate was told this morning to get him a
pair of boots and catch the farm line.  He said
that he had 50 years, and he had no intentions of
working in the field.  This inmate had been
advised of this report."  Ten days CCR and loss of
six months good time.

    Q.    Okay.  Again, why is that -- I mean, why

PAGE 52

did he have to work?

    A.    You have to work because you have to work
off energy and because work has to be done to
maintain the farm and to grow the vegetables and
so forth to feed yourselves, and you're sentenced
to hard labor so you're supposed to work.  There's
no reason that you're not supposed to work other
than being sick, and he just again was flat
defiant and belligerent and didn't want to follow
authority.

    Q.    Okay.

    A.    He wanted his own way.

    Q.    Again, was that prior to the time that he
was placed in CCR?

    A.    Yes.

    Q.    For the record, how many total
disciplinary reports do you have?

    A.    I believe you read 26 or 27.

    Q.    So it's much greater than three over the
course of time he was in there?

    A.    Oh, yes.

    Q.    Is that significant to you, the number and
the type of reports that you have?

    A.    The significance of it is he doesn't get
better.  He just keeps on doing it as he becomes

SHEET 14    PAGE 53

-- some will have a lot of write-ups, and you know, will finally say, go six months without any write-ups and don't get anymore and you progress and you start rehabilitating and you don't get anymore.

He never rehabilitated.  He always kept being defiant and wanted his way and do his own thing.  The pornography -- a simple rule.  He knew not to do it, but he is just flat a rule breaker.  When a rule is in his way that he don't like, he just breaks it.

The three-way call -- he knew not to do the press, the interview.  He did the interview right out of his cell along with Herman Wallace.

Q.    Okay.
A.    They did the three-way call.  They know that is illegal.  They did the three-way call, and that is now, so this is no different than the beginning.  This man is not rehabilitated.

Q.    Well, prior to the time that he was moved out of CCR, which I think was when?
A.    March, I believe.
Q.    March of --
A.    Of '08.
Q.    March of '08, prior to that time he was in

PAGE 54

CCR; correct?
A.    He was.
Q.    After the murder of Brent Miller?
A.    Right.
Q.    How much freedom does a prisoner have in CCR?
A.    They have a lot of freedom.  It is not solitary confinement.  Do you want me to describe it for you?
Q.    Yes.
A.    Okay.  In CCR, you have books to read, magazines to read if you want.  You can have the newspaper to read.  You have a television on the wall outside the cell that you can see, and you can within reason watch what you want.  They all agree what they're going to watch and they watch that.  They have a choice.

And so they can live in that -- they get one hour out to be out on the tier.  They get to walk up and down the tier.  They can have isometric exercises at the end of the tier.  And in his case, he did jumping jacks, and he ran in place.  You know, they stay in pretty good shape in there, because you can exercise if you want to you.

Now, the good thing is, three days a week they

PAGE 55

get on the yard to go out and walk in the sunshine and get their vitamin D and exercise on the yard.  Now, if it's raining or the weather is inclement, then you may miss that week, but you normally go.

Now, some inmates don't want to go, and they will tell the officers they don't want to go, and then we don't make them go.  So it's an option.  And so if you want to go, though, we offer you the chance to go.

The cells in the CCR at that time were (7'x10') seven-by-ten, which was 70 square feet, which is pretty large cells.  Now, the cells today are smaller, because we moved CCR to the old death-row.  But at that point in time, they were larger cells, or they were as long as I've been at Angola in the last 14 years.

Q.    Okay.
A.    And you would eat normally what everybody else eats, three meals a day.
Q.    Do you have more supervision in CCR than you do in just regular population?
A.    You would, and you don't, because in regular population, you have a correctional officer sitting at the head of a dorm that can see all of you all the time, so you have eyes on you.

PAGE 56

If you're in CCR in a cell block environment, you have an officer pass by you every 30 minutes to check the cell.  So then, therefore, you have no eyes on you at all 28 out of 30 minutes normally, most of the time.

Q.    But you're confined to one cell?
A.    But you're confined to one cell, but you don't have anybody looking at you.  So in that sense, you don't have, but in the other sense, you do.  But you're in the cell so, therefore, you're confined, so you can't run away and do anything bad, and that's why they don't have to look at you all the time.

Q.    Okay.  So you can't run away and do anything bad?
A.    Right, and that's what it's for, so that you'll be in the cell.  And you only put people in there if they're a threat to themselves, a threat to someone else, or a threat to escape or could cause an unsafe situation for the correctional officers themselves or for anyone else that walks through.

Q.    After you have reviewed all these documents and all these disciplinary reports, would you describe Albert Woodfox as a model

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 15    PAGE 57

prisoner?

A.      He is not a model prisoner at all.

Q.      In your deposition, when you -- okay.
He's not a model prisoner at all?

A.      No.  He is in the same situation as
Derrick Todd Lee.  I wouldn't describe him as a
model prisoner, either.  Derrick Todd Lee has only
had one write-up in four years.  He's not a model
prisoner, and I'm not going to let him out of the
cell.

Q.      Okay.  And why is that?  Why do you feel
that way?

A.      Because of the potential to escape, the
potential to hurt someone else, and the potential
for violence is too great.  And in our business,
we do not gamble because the outcome we can't
afford.  We can't afford the outcome, so don't
gamble, so we don't gamble.

Q.      Okay.  What is it about Albert Woodfox
that gives you such concern?

A.      The thing about him is that he wants to
demonstrate.  He wants to organize.  He wants to
be defiant.  He wants to show to others that he is
powerful and strong.  And so he has also murdered
a correctional officer.  He has no fear of the

PAGE 58

people in blue.  It almost doesn't matter to him.

He will hurt you, so therefore, the
correctional officers want to not be mingling with
him really because of the potential for violence.
The other inmates have a potential for violence,
and if something doesn't go his way, then he's
going to resort to violence.  That has been his
lifelong career to do this.

Q.      And in his disciplinary reports, have you
seen a pattern of any preparation for violence or
escape?

A.      Defiance.  Defiance, escape -- I hate to
say too much in a deposition, but it's real
simple.  A criminal is real simple.  He is
selfish.  He takes your body.  He takes whatever
he wants.  He self-indulges.

One who is not a criminal gives.  He shares
with others.  It's very simple.  Albert Woodfox is
a criminal.  What he wants, he takes.  When he
wants to break a rule, he breaks a rule.  When he
wants pornography, he gets pornography.  He knows
it's against the rules.  He is a rule-breaker.
How can that be rehabilitative when you're a
rule-breaker?

Q.      Okay.  Would you -- you gave a deposition

PAGE 59

previously.  I'm going to mark that as State's
Exhibit No. 26.
You gave a deposition --

            (The exhibit is marked as State's
Exhibit No. 26 for identification and is
attached hereto.)

            MS. CUMMINGS:

                And I am attaching the entire
deposition, by the way.

            MR. TRENTICOSTA:

                Excuse me.  Are you attaching the
exhibits?

            MS. CUMMINGS:

                Yes, I'm going to attach all the
exhibits, Exhibits No. 1 through 26.

            MR. TRENTICOSTA:

                Exhibits to the deposition?

            MS. CUMMINGS:

                I don't have the exhibits to the
deposition.

            MR. CALDWELL:

                To the first deposition -- to Burl
Cain's first deposition?

            MS. CUMMINGS:

                Well, I don't have them today.  I was

PAGE 60

going to attach the deposition itself.  If
you wanted to make other attachments, I
guess that would be your prerogative to do
so.

            MR. TRENTICOSTA:

                Thank you.

BY MS. CUMMINGS:

Q.      So the entire deposition is going to be
attached as well.  In that, you were asked about,
or the issue is whether or not you're comfortable
releasing Albert Woodfox from CCR into general
population.  Is that kind of the gist of what you
were asked?

A.      I would say no.

Q.      You weren't at that time -- at the time
that you gave the deposition.

A.      I weren't what?

Q.      You weren't comfortable with releasing him
from CCR?

A.      No.  I have never been comfortable with
releasing him from CCR -- never, ever.

Q.      And I think you've given us the reasons
for that.  How about -- how would you feel with
releasing him to the public, to the general
population to live amongst the rest of us?

Judy P. Foust, Inc.
Certified Court Reporters
(225) 344-2270

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 16  PAGE 61

A.    I wouldn't release him to the general population to live among the rest of us at all, because he is not a rehabilitated prisoner. He will be a predator when the opportunity comes his way and when he feels the need to be that, to indulge himself in his own wishes and desires. That's what he does. He is not rehabilitated.

Q.    Okay. And I think you've addressed the issue -- how many infractions has Derrick Todd Lee had?

A.    I think he's had only one. He spit on another person in the four years I've had him, and we wouldn't release him. We wouldn't release John Simonis, the ski mask rapist. Some people need to live in the cell. Some people need to live in a cell for public safety and for the safety of the correctional officers and for the safety of the other inmates.

To give you an example, with two cells open, Albert Woodfox ran out of the cell and ran down and just jumped on the other inmate. That was one of the write-ups. He had an issue with the other inmate and he dealt with it.

Q.    Okay.

A.    Right in front of the officers.

PAGE 62

Q.    All right. In addition to his conduct, while he was in -- while he has been in Angola, would his criminal history also be relevant to you in determining whether this is a man that is a predator?

A.    Oh, yes. Our criminal history is who we are, and that is the only thing we have to judge someone by. And his criminal history is that he is a predator.

Q.    Okay.

A.    He has a potential -- he may not be a predator today, but he has the potential to be a predator when he feels himself and justifies himself that he needs to be a predator, he will resort to that extreme. Most people won't.

Q.    I would like to show you what I've marked as State's Exhibit No. 27.

(The exhibit is marked as State's Exhibit No. 27 for identification and is attached hereto.)

MR. TRENTICOSTA:
Do you think I can have a copy?

MS. CUMMINGS:
Sha, could you run copies of the rest?

MS. CARTER:

PAGE 63

Sure.

MS. CUMMINGS:
No, that's okay. I think Terri has it.

MR. TRENTICOSTA:
No. 27?

MS. CUMMINGS:
Yes.

BY MS. CUMMINGS:

Q.    What is State's Exhibit No. 27?

A.    It's a rap sheet, isn't it? Yes, it's a rap sheet. Criminal record of Albert Woodfox.

Q.    All right. And you said that that is significant to you as well?

A.    It is.

Q.    Would you be trying to determine whether or not he committed violent crimes?

A.    From 1964. He wasn't even 20 years old.

Q.    All right.

A.    All his life malicious mischief. He was born in '47, and this was '64 -- 17 years old. '65, loitering. '65, fugitive. Theft, '65. He's a career criminal.

Q.    Okay. And again, I would like to --

A.    '66, stolen vehicle. '67, '69, aggravated

PAGE 64

rape. He was charged with that in 1969.

Q.    Okay.

A.    Multiples -- simple battery, simple battery, dangerous weapon -- just right on, and that's in '69. Simple burglary, criminal mischief. '70, New York City, simple burglary, larceny, fugitive, '71.

Q.    Do you know whether or not he has ever been convicted of any escapes?

A.    Two times, I believe.

Q.    So he has been convicted of escape on two different occasions?

A.    I think so, yes.

Q.    And that is in addition to the violent crimes that are shown on that rap sheet?

A.    Right. (Viewing documents.)

Q.    That's okay. I guess that's good. Have you reviewed it enough?

A.    I reviewed it. I didn't go all the way through it. I just went to when he got to Angola.

Q.    Do you want to look at it some more?

A.    Let's look at it some more. (Viewing documents.) An aggravated escaped here in '81.

Q.    Based on the rap sheet that you reviewed as well as his disciplinary history at Angola --

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 17  PAGE 65

based upon the rap sheet that you reviewed, as
well as his disciplinary history at Angola, do you
feel that he should be released to the general
public?

A.    No.  I do not feel that he should be
released to the general public.  I think it is a
gamble, and I told you, in our business, we don't
gamble, because he will hurt and harm people again
or resort to violence when he feels the need to do
it to get his way.

Q.    Okay.  Is there a difference in a
prisoner's ability to cause trouble when they are
in CCR as compared to when they are in the general
population?

A.    Yes, because he is in the confinement of
the cell.  And, therefore, he has no one to commit
violence upon other than himself, or to reach
through at the correctional officers or someone.
So that's why he's in the cell so that he won't
have an opportunity to cause problems or to hurt
someone or himself or hurt the correctional
officers or other inmates.

Q.    Okay.  So he has less opportunity?
A.    He has less opportunity.
Q.    What are the restrictions for his

PAGE 66

visitation at Angola?

A.    There are numerous different restrictions
for visitation.  It depends.  You can have contact
visits, non-contact visits, and that is pretty
well the type of visits, but who can visit is
another thing.  Could you be more specific?

Q.    Do you-all restrict -- I mean, if I go to
Angola today, if I drive out there this evening,
are they going to search my car?

A.    They are.
Q.    Okay.  And why is that necessary?
A.    Because we don't want the introduction of
contraband, because visitors have the potential to
bring in drugs and weapons and aid and abet in
escape and violence.

Q.    Okay.  During your tenure as warden, as
recently as March -- well, are you familiar with
an occasion that Rheneisha Robertson, Albert
Woodfox's niece, tried to come visit him?

A.    She did.
Q.    And what happened?
A.    Well, she wouldn't submit to the search
and so forth, and so therefore, then the visit was
denied.  And so then she became very belligerent
and whatnot, and wouldn't allow us to search the

PAGE 67

car and so forth, which would indicate that they
were hiding some sort of contraband, and would not
submit to the searches.

Q.    When that happens, or on that particular
occasion, are they just turned away or is the
search forced?

A.    No, the search is not forced.  They are
turned away and sent away.

Q.    And do you know exactly when that
happened?

A.    No, I don't.
Q.    Was it --
A.    It's been -- it was here very recently.
It was in the spring of this year, but I don't
know the exact date, the spring of 2008.

Q.    Spring of 2008?
A.    (Nodded head affirmatively.)
Q.    If I showed you a letter regarding that,
would you -- do you recognize this document?

A.    I do.  This is from March 18, 2008.  Dear
Ms. Robertson -- do you want me to read you the
letter?

Q.    Sure.
A.    Okay.  "This letter is to inform you that
you have been removed from the approved visiting

PAGE 68

list of inmate Albert Woodfox and any other list
for a period of six (6) months.

"On March 16, 2008, Lieutenant Russell was
randomly shaking down vehicles at the front gate,
and Mr. Bernard Robertson refused to consent to
have his vehicle shook down.  Duty Warden Dupont
was summoned to the gate.  Duty Warden Dupont
approached Mr. Robertson to discuss the reason why
he was refusing the shakedown when Mr. Robertson
became very disturbed and denied giving Duty
Warden Dupont his name or any other information.
Warden Dupont again asked Mr. Robertson why he was
denying to have his vehicle shook down.  Duty
Warden Dupont contacted Major Wilson of
Investigative Services and Roving Security to come
to the gate.  Duty Warden Dupont walked to the
rear of your vehicle in an attempt to get the
license plate number.  Mr. Robertson sat on the
bumper of the vehicle in order to block Warden
Dupont's view from obtaining the number.  Ms.
Rheneisha Robertson began questioning Warden
Dupont as to his authority to obtain such
information.  Duty Warden Dupont asked both of the
visitors to leave and that their visit be
canceled.  Mr. Robertson obtained a cell phone

Judy P. Foust, Inc.
Certified Court Reporters
(225) 344-2270

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 18  PAGE 69

from his vehicle and began taking pictures of Duty
Warden Dupont and the officers involved.  Duty
Warden Dupont asked Mr. Robertson to put his cell
phone back in the vehicle, but he refused.  Roving
Security arrived and Duty Warden Dupont ordered
Master Sergeant Smith to notify the West Feliciana
Parish Sheriff's office and summon them to have
the visitors removed from the grounds.  At that
time, the visitors got into their vehicle and
left.

    "Ms. Robertson may appeal this decision within
fifteen (15) days in writing to James M. LeBlanc,
Secretary, Department of Public Safety and
Corrections."
    Signed Darrel Vannoy, CCE, Deputy
Warden/Security.
    Q.    Okay.  So Ms. Robertson was given notice
that she couldn't visit anymore?
    A.    She was.
    Q.    Did you-all later allow her to visit
anyway?
    A.    We did.  We later allowed her to go in and
visit.
    Q.    Why is that?
    A.    Well, because of two things.  State

PAGE 70

Representative Cedric Richmond called and talked
to and me asked me about it and explained to me
that they were upset and this, that, and the
other, and asked me would I give them another
chance and that they would be on their very best
behavior, and it would never happen again.  And so
we decided then to go ahead and let them come
back, since he assured us that they would be good
and would cooperate with us in every way.
    Q.    Okay.
    A.    So that's why we rescinded the letter and
went on and let them go ahead and visit.
    Q.    Do you know how many times Rheneshia
Robertson actually visited Angola?
    A.    I don't know.
    Q.    I'll mark this as State's Exhibit No. 28.
            (The exhibit is marked as State's
Exhibit No. 28 for identification and is
attached hereto.)
        MR. TRENTICOSTA:
            What's the date of that -- March what
-- '08?
        MS. CUMMINGS:
            March 18.
        MR. TRENTICOSTA:

PAGE 71

            May I have a copy?
        MS. CUMMINGS:
            Certainly.  I'll tell you what, why
don't we take a brief break, and I'll get
you a copy of it.
(Off the record.)
BY MS. CUMMINGS:
    Q.    Okay.  Warden Cain, we have just a few
more things to go over.  Were you able to review
the visitor's logs to determine when else
Rheseisha Robertson visited Albert Woodfox.
    A.    I have, and she visited Albert Woodfox on
two occasions.  One was on 1/11/2008, she visited,
his niece, and also on 4/6/2008, those two times.
    Q.    And those are the only two times that your
records reflect that she visited him?
    A.    Right.
    Q.    Okay.
    A.    Correct.
    Q.    We also talked before the break about a
conviction he had for aggravated escape?
    A.    It wasn't '81.  It was 1969 from Orleans
Parish, and also an aggravated escape and a
similar escape was in 1965, that was the two
escapes.

PAGE 72

    Q.    Okay.  I am going to show you what I have
marked as State's Exhibit No. 29.
            (The exhibit is marked as State's
Exhibit No. 29 for identification and is
attached hereto.)
        MS. CUMMINGS:
            Mr. Trenicosta, it is the Statement of
Facts on the aggravated escape.
        MR. TRENTICOSTA:
            Yeah.  If we can -- I'm sorry, he --
if I can just get -- did I hear him say
that there was an escape in '65?
        THE WITNESS:
            In '69.
        MS. CUMMINGS:
            '65 and '69.
        MR. TRENTICOSTA:
            '65?
        MS. CUMMINGS:
            Simple escape in '65 and aggravated
escape in '69.
        MR. TRENTICOSTA:
            Okay.
BY MS. CUMMINGS:
    Q.    Warden Cain, can I have you identify what

Judy P. Foust, Inc.
Certified Court Reporters
(225) 344-2270

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 19  PAGE 73

is marked as State's No. 29?

A.    All right.  Information for Violation R.S. 14:109, and this is State of Louisiana vs. Albert Woodfox, and this is a Summary of Facts. And it says "On October 9, 1969, Albert Woodfox was in lawful custody of the Orleans Parish Criminal Sheriff by reason of having been previously convicted of armed robbery and sentenced to serve fifty (50) years in the Louisiana State Penitentiary.  On October 9, 1969, he was brought back to Section "B" of the Criminal Court in connection with another criminal charge. At some time while the defendant was in the criminal court building someone slipped him a German Lugar pistol.  On being returned to the Parish Prison, he produced this pistol and used it to secure his release and to handcuff two criminal sheriff deputies in the elevator of the Criminal Courts Building.  He then released one of the prisoners and made good his escape through the basement of the criminal courts building.  He was subsequently apprehended in New York, New York and extradited to Louisiana for trial of this charge."

He used a German Lugar that someone slipped to him.

PAGE 74

Q.    Okay.  Does that play any part in your opinion that Albert Woodfox should never be released or should not be released?

A.    He resorts to extreme violence, yes.  He resorts to extreme violence when he needs to to get out.  Also, what else is he's locked in time because someone helped him, someone gave it to him.

Q.    Okay.

A.    Grouped up.

Q.    I would like to show you what I'm going to mark as State's Exhibit No. 30.

(The exhibit is marked as State's Exhibit No. 30 for identification and is attached hereto.)

Are you familiar with this document?

A.    No, not really.  This is -- is the September 9, 1973, "Dear Sister Diane..." --

Q.    Well, let me ask you, was this part of his deal?

A.    It is part of his record.  I can tell that from the size and the way it is, yes.

Q.    This is part of his DOC record?

A.    I think so.  I am sure it is.

Q.    Okay.  And it purports to be a letter

PAGE 75

written to Diane, and who is it from?

A.    Albert Woodfox.

Q.    Okay.  Is this letter significant to you in any way?

A.    It is, because -- yes, it is.  You can read in here "Because I have been told by many of my correspondents, that I am extreme.  But I view amerikkka..." -- and he spelled it real crazy, more like the Black Panther would, I suppose.

Q.    Why do you say like a Black Panther would?

A.    Well, a-m-e-r-i-k-k-k-a.

Q.    Okay.

A.    "...And her lies, capitalism, imperialism, racism, exploitation, oppression, and murder of the poor and oppressed people, as being highly extreme.  It is my opinion that anyone who views these situations as anything other than extreme, is a petty bourgeoise, or a capitalistic fool!!!. History has taught us that revolution, is a violent thing, but a highly necessary occurrence of life.  Revolution, is blood shed, deaths, sacrifices, hardships, nothing can, and will change that.  The passing out of pamphlets, is only a method of avoiding the unavoidable.  It is the job of the revolutionary forces in this

PAGE 76

country, to manufact revolution, instead of trying to avoid it, to do other wise, is the act of an opportunist."

This is very scary because it means that it needs revolution.  That his -- obviously, his branch -- the Black Panthers -- wouldn't want to be the ones who would be the militants to cause it, and it has to happen, and to postpone it is merely postponing the inevitable.  Violent revolution is very scary for America, for us.

Q.    Okay.  What is the date on that letter? Do you see a date reflected?

A.    September 9, 1973.

Q.    Okay.  And do you know whether his political views have changed since that time?

A.    That is what is scary to me.  Because I think not because even in 2007, I think it was, but when I was there as the Warden in the 2000's, we had the protest out front where release the panther and Angola is a shame, Burl Cain to blame, but there was a Black Panther demonstration there. And it seems as though Albert Woodfox and Herman Wallace is locked in time with that Black Panther revolutionary actions they were doing way back when, and that they're still hooked up to that.

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 20   PAGE 77

And that's still their motive and that's still
their goal.  And from that, there's been no
rehabilitation.  And even when Robert King
Wilkerson came with Congressman Conyers to Angola,
he handed me out pralines.  They gave me a little
pack of pralines, Congressman Conyers did, and on
that pack of pralines was a Black Panther.
    Q.    Now, who is Mr. Wilkerson?
    A.    Well, he was an Angola 3, and he is the
one that has been released.  Also, we had a -- I
had a seen a film of somewhere that they had even
a clenched fist of the Black Panther here in
recent times.
    Q.    It's funny that you should mention that.
I would like to show you what I'm going to mark as
State's Exhibit No. 31.
              (The exhibit is marked as State's
Exhibit No. 31 for identification and is
attached hereto.)
    Can you identify that?
    A.    Yes.  That's Albert Woodfox and Herman
Wallace, and they have a clenched fist and this is
dated -- in his own words, Albert Woodfox of the
Angola 3, March 29, 2007, is when this was posted.
    Q.    Okay.  And you said they have the clenched

PAGE 78

fist, what is that a sign of?
    A.    It is a sign of the Black Panther, the
clenched fist.  And it is also a sign in this of
another one of those three-way call interviews
that is illegal out of Angola, because it was
interviewed by Kari Lydersen, in Infoshop News
Exclusive, 2007.  And the way they do that is they
call their attorney, and their attorney then does
a three-way call, which is illegal.  And they
continue to do this.
    Now, let's go back and revisit this.  Here are
these inmates that came into the prison as Black
Panthers and violent, killed the correctional
officer in 1972 and continue on, not
rehabilitated.  And when we started the
deposition, we talked about, who is rehabilitated.
And so they're not, because they haven't changed
from the beginning.
    We didn't see a progressive change as we see
in many, many inmates that come in very violent
and then they settle down as they get older and
they become less violent.  We do not see that with
these two inmates that are still in Angola.
    Q.    Okay.  You indicated -- you talked about
before the demonstrations, the Black Panther

PAGE 79

demonstrations in the 2000's, were they -- do you
know that they were connected in any way to Albert
Woodfox?  Did they have signs with his name,
anything indicating that --
    A.    They were there to free the Panthers.
Free the Panthers.  The Panthers are Albert
Woodfox, Herman Wallace, the Angola 3.  And this
is the scary thing about releasing Herman Wallace
and Albert Woodfox.  When they took Wallace to
Camp J, he acted out, he tore up the toilet, he
threw everything, he was very violent because that
was his partner's comrade.
    It's almost like Robert King Wilkerson is out
waiting for them to come on and join him, so they
can pick up where they left off.  And that is what
is this revolutionary stuff.  How do we know that
is not the case?  And that's what worries me about
him.
    Q.    Did you tell me that Wilkerson actually
visited Angola?
    A.    Wilkerson attempted to visit, changed his
name to King -- well, he changed it one way or the
other.  And so he got through the visiting shed
because he had changed his name where they process
him in, all they way into the prison, all the way

PAGE 80

into CCR when someone recognized him, and then we
stopped and then the visit never occurred.  But
the potential for the visit was there, and he was
trying to get in to visit them.  And so then we
put him out of the prison and kicked him out.  He
was trying to break in the prison there.
    Q.    All right.  He was trying to break in the
prison, that's a new twist, isn't it?
    A.    A little bit.
    Q.    Okay.  This is No. 31, and I just want to
be sure I keep these.  We had to review the
Statement of Facts from the aggravated escape, and
you are also aware you indicated that the --
    A.    I said it was '81, but it wasn't.  I was
confused when I said '81.  The two was when I
later referenced them.  One was in '65 and one
'69.
    Q.    Did those convictions play any -- and
especially the facts of the one reflected with
Exhibit No. 29, does that play any role in your
opinion or play any part in you forming the
opinion that he is likely to flee?
    A.    He is likely to flee.  He is likely to do
what he can to hook up with King Wilkerson, and
they're waiting for Wallace.  I mean, yes, I would

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 21  PAGE 81

come back. I think he would flee. He has not
rehabilitated, and that is what so concerns me.
And when we talk about model prisoner, we're
talking confined only to a small period of time
regarding violence and the violence would have
been in that small period of time while he lived
in CCR, and he couldn't commit violence really
hardly because he was in CCR in a cell
environment. When you move him from the cell
environment on into the prison population -- I
wouldn't put them there, because he has a
potential to start organizing, to organize for
violence, and he has a potential for violence.
 Q. Well, let me ask you this, where is he
now?
 A. Okay. He is in a maximum-security
dormitory.
 Q. Okay.
 A. Okay. And he is in with 13 other inmates
or 12.
 Q. Is this like general population?
 A. No.
 Q. Okay.
 A. This dormitory is where other CCR inmates
are where he has associated with and have known,

PAGE 82

okay. And part of that was we were trying to work
out a settlement really. Warden Vannoy and I had
talked about it and we felt like we could take
those other inmates who had progressed themselves
and had shown very little violence and put them in
with them, and then have strict, strict
restrictions.
 We took a 64 man dormitory and converted it to
like 15 inmates, and then we fenced off part of
the yard. We put this yard right in front of a
tower. I mean, right by the tower, so that all
the time they were on the yard someone was in the
tower with a gun, and so could watch them. And
then we restricted them to that area.
 They moved to the kitchen and to church when
no one else went to church. They were in the
kitchen when no one else was in the kitchen. The
only time we let them be with other inmates was in
the visiting room. The reason being is we have
extraordinary security in the visiting room. We
have cameras there. We also have other inmates
who have their visitors, who I think would act,
you know, really, really negatively towards any
violence in the visiting room. And so they would
be there with their visitors as well, and so we

PAGE 83

felt like we could handle that. And that was the
only time they were there with other inmates.
 Q. Okay. So he still has restrictions and
the security is very heightened?
 A. Very, very.
 Q. Okay. And you did this -- why did you do
this?
 A. Well, we had to sue the Angola three. We
felt like that if we made some gesture, because we
felt like to be candid with you that even a
supermax prison that anyone in extended lockdown
in the country could be at jeopardy, because even
our own death row, because on death row we have
people 22 years there. We certainly want to keep
people on death row in cells.
 We have the same exact rules for death row and
CCR throughout time. It's a little more lax now
for CCR than death row regarding contact visits.
But anyway, we didn't want to jeopardize the
long-term cell block confinement for anybody,
anywhere, in any state, so we felt like we might
could move this suit onto settlement if we created
this maximum-security dormitory and gave them even
more freedom than they had before to try to get
there, and then choose these other inmates that we

PAGE 84

felt like could adapt and live with them.
 This business of corrections is very, very
judgmental and very, very -- you have to have a
lot of experience to determine who can live with
whom safely. And that's why you don't willy-nilly
make these decisions. I mentioned already about
gambling, you can't.
 To release them into the population, general,
I would fear greatly that he would escape. The
very best way to escape from us is to take
hostages, okay. It's a way to commit suicide by
us shooting him, which makes you a martyr or it's
either a way to get out. And as he gets older
then the options for that become greater in my
mind.
 I would never put him in population for those
reasons. Also, he don't want to be there. He
wants to leave really bad. And so bad enough to
use violence to get out.
 Then you go put him in the public. I wouldn't
do that at all. I don't feel like the public
would be safe. I think it's a threat to the
public. He has a life sentence for murder of a
correctional officer, and he needs to stay there.
 Q. Okay.

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 22   PAGE 85

MS. CUMMINGS:

All right.  I will tender.

MR. TRENTICOSTA:

Let's take a ten-minute break, please.

(Off the record.)

EXAMINATION BY MR. TRENTICOSTA:

Q.    Warden Cain, we met in 1995; isn't that right?

A.    Right, I believe so.  I don't remember exactly.

Q.    Is that when you first arrived at Angola?

A.    It was.

Q.    Before -- and you've been the warden ever since; correct?

A.    Ever since.

Q.    And before 1995, did you work for the Department of Corrections?

A.    I did.

Q.    What was your job?

A.    I was the warden at Dixon Correctional Institute from 1981 to 1995;

Q.    Okay.  Were you a corrections officer or warden before 1981?

A.    No.  I was assistant secretary for agribusiness at the time.

PAGE 86

Q.    For DOC?

A.    For DOC.

Q.    Okay.  Let me first begin where you began, I guess, in matters with some of these write-ups. You have no direct knowledge of anything that occurred before you were there; right?

A.    No.

Q.    Do you have any direct knowledge of any of the incidents that occurred since you've been warden that we just went over?

A.    Direct knowledge of the write-ups since I've been the warden?

Q.    Direct knowledge of the incident?

A.    Can you give me -- what do you mean?  Like the porn, like, did I see it, did I go there and get it and find it?

Q.    That's direct knowledge.

A.    No, I have the direct knowledge of it.

Q.    Do you have any direct knowledge of any of the incidents?

A.    No.  Other than the direct reading of the reports and the reports would be accurate.

Q.    You believe they're all accurate?

A.    Oh, yes.

Q.    Sometimes inmates go to DB Court and

PAGE 87

they're found not guilty; correct?

A.    Sometimes.

Q.    Sometimes the reports are inaccurate; correct?

A.    No.

Q.    The reporting officer never writes an inaccurate report, that's your testimony?

A.    I would say that he never writes an inaccurate report unless he makes a typographical or what kind of error because we protect our court, that is our integrity and that is our reputation with the inmate population.  And if we sham the court, we lose control of the prison, because we lose credibility with those in our care.  I would absolutely, just as Judge Frank Palazola would insist that his court have accurate information would I do the same at Angola.  I would never say I have an inaccurate court, no.

Q.    Do you have any knowledge of the accuracy of report writing in the 1970s?

A.    I do not in the '70s.

Q.    All right.  You do have knowledge of report writing in terms of directives to the officers since 1995; correct?

A.    I do.

PAGE 88

Q.    But nothing before that?

A.    I wasn't there.

Q.    Now, at DB Court what rights are afforded to the alleged offender?

A.    The right is that the alleged offender to have an inmate counsel and to make his case.

Q.    Do they have the ability to confront their accusers?

A.    On some occasions.  On some occasions not.

Q.    So the answer would be no?

A.    The answer was sometimes.

Q.    Is it in the rule book?  Does it say sometimes you can confront your accusers?

A.    No, but sometimes we let them confront their accusers.

Q.    But it's not a rule that it's a right to the individual?

A.    I don't believe.

Q.    Okay.  And is the individual afforded counsel?  And I don't mean a prisoner.

A.    No.

Q.    Okay.  Is the inmate afforded any kind of discovery?

A.    No.

Q.    Can the inmate testify?

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 23    PAGE 89

A.    Yes.
Q.    Can the inmate ask questions to the
testifying witnesses?
A.    His counsel can.
Q.    But he can't?
A.    No.
Q.    So we don't -- a disciplinary court is not
like a constitutional court.  In other words,
there is a lot greater rights guaranteed granted
to the accused in a court of law, but not in the
court in a disciplinary court; right?
A.    Correct.
Q.    Now, sometimes, would you agree that the
result is not a correct result?  In other words, a
finding of guilt?
A.    Sometimes we grant the appeal.
Q.    Well, I'm talking about the finding of
guilt?
A.    Correct.
Q.    Always correct in your eyes?
A.    I have to believe it's always correct.
Q.    Do you believe it's always correct in a
court of law?
A.    I have to believe it's a republic, and the
court of law is a court of law and that's what we

PAGE 90

do.
Q.    Do you believe that a verdict of guilty is
always the truth in a court of law?
A.    Not always.
Q.    Do you believe --
A.    I can't go there.
Q.    You've seen some exonerated prisoners out
of your penitentiary, haven't you?
A.    I have.
Q.    Some of them were on death row; correct?
A.    Right.
Q.    For murder; right?
A.    Right.
Q.    Some for rapes; correct?
A.    Right.
Q.    And would you agree that sometimes the
verdict of guilt in a disciplinary court may not
be the truth?
A.    Not really.  I can't question my own court
or then my court is a farce.  I have to believe in
my court, my DB Court.  I have to trust it, and I
have to make sure it is trustworthy.
      I'm not saying there's not a mistake that
could be made, but there's not going -- we're
going to be innocent or guilty, and we're going to

PAGE 91

be accurate and correct, or my credibility with
the inmates is zero, and they will hold me
accountable.
Q.    Witness can lie, can't they, in a DB
Court?
A.    Witness can lie.
Q.    Garbage goes in and then the result maybe
is unreliable; correct?
A.    Yes.
Q.    Sometimes your officers lie; correct?
A.    I hope not.
Q.    Do you believe they do?
A.    No.
Q.    You believe that your officers have never
lied while you've been in administration in DB
Court?
A.    If they lie and I know they lie, I fire
them.
Q.    So sometimes they have lied?
A.    I've never fired one for lying.
Q.    Okay.  I believe -- let's if we can, talk
about a few of these -- do you have inmates at
your penitentiary that have been there for 40
years?
A.    Yes.

PAGE 92

Q.    Do you have inmates who in that span of
time have, quote, unquote, "settled down" from the
rule violations?
A.    Yes.
Q.    Some inmates may have 100 rule violations
in the first decade of their time; correct?
A.    Yes.
Q.    May have 50 the next decade; correct?
A.    Yes.
Q.    The last decade they may have two or
three; correct?
A.    Yes.
Q.    Would you call that person as having a
propensity for violence?
      MS. CUMMINGS:
            I would like to just object to the
form of the question.  I think he would
have to have more information on the
offenses that were committed.
BY MR. TRENTICOSTA:
Q.    Typical offenses.  Typical offenses that
you would see in any case.  Same offenses, let's
say, you would see with Mr. Woodfox, disobedience,
hollering, and those kind of offenses?
A.    That's defiance.

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 24    PAGE 93

Q.    Defiance?

A.    Uh-huh.  But I know Mr. Woodfox hasn't changed.  I know him.

Q.    Have you met him?

A.    Yes.

Q.    How many discussions have you had with him?

A.    I've had a few alone.

Q.    Well, how many and when?

A.    I don't know exactly.

Q.    Well, let's look at the last one.  When is the last time you had a conversation with him?

A.    Oh, I don't remember.  It was when Pastor Sybil (phonetically spelled) was there.  It has been a couple of years.

Q.    When what happened?

A.    I talked to him in the new dormitory.

Q.    So that's twice.  How long was your conversation in the new dormitory?

A.    Not too long.

Q.    Five minutes?

A.    Could have been.

Q.    The time before that, how long was your conversation?

A.    I don't know.  It was a casual

PAGE 94

conversation.

Q.    And where was the casual conversation?

A.    CCR.

Q.    CCR, that's twice.  Can you name another one?

A.    I'm sure I've had more.  I don't remember just exactly when.  I've been there a long time.  I've talked to many inmates many times.

Q.    Sure.  And we -- let's go through some of these, if we can.  On the discussion that you gave on the last write-up which was the possession of pornographic photographs, you said that Mr. Woodfox violated other rules, but that you didn't want to come down hard or something to that effect, explain.

A.    Three-way calls was another rule.  It's illegal.  It's against the rules.  Normally we would take your phone privileges.  That's one.  The other one was when they did the television -- the telephone interview which was a three-way call that resulted in an illegal interview, so that's a double violation.  Those are specific violations.

Q.    So why didn't you write him up?

A.    Because I knew that the folks that were defending him in the lawsuit would accuse us of

PAGE 95

harassing him, and I wanted not to be accused of harassing him.  I wanted to let him just be free, plus it showed me a lot that he was still a rule breaker which means he is not rehabilitated.

Q.    And this showing wasn't harassment for the civil lawsuit?

A.    It showed me one more thing.  He thinks he going to get out.  Therefore, to break the rule and mess himself up was just flat dumb and stupid or defiant.

Q.    Why did you file charges against co-plaintiff?

A.    Wallace?

Q.    For a three-way call?

A.    Wallace did the three-way call, got the attorney to send $60 to another inmate to pay for some jewelry which was illegal, because he was sending money from Wallace to another inmate and involved the attorney to do such, so his infraction was greater than Woodfox.

Q.    Which attorney?

A.    I would have to see the documents.  It starts with an "R".  I believe it's an attorney.  Okay.  (Viewing documents.)  "On June 10, 2008, an employee of inmates account send an email to

PAGE 96

Colonel Bobby Achord of investigation in which he advised that Herman Wallace, Eagle One, sent $60 to Tory -- T-O-R-Y Pegram, P-E-G-R-A-M, 1810 Adams Street, New Orleans.  When she did deposit, she found that T. Pegram sent $60 to inmate..." --

Q.    That's not responsive to my question.  I asked you which attorney?

A.    It was my understanding -- if I keep reading this I'll get to it I think.

Q.    Well, can you read it to yourself?

A.    I think Troy Pegram was an attorney or is an attorney.

Q.    If I told you that Tory Pegram was just put on Mr. Woodfox's visiting list, would that tell you she's not an attorney?

A.    It wouldn't tell me she is or she isn't.

Q.    Okay.  Do you do background checks on visitors?

A.    On visitors we do.  But I don't --

Q.    And Ms. Pegram, as I appreciate it, was just put on Mr. Woodfox's visiting list.

A.    It's my understanding --

Q.    And your background information on her says that she's an attorney?

A.    It's my understanding she's an attorney,

SHEET 25    PAGE 97

but she may not be his attorney. Anyway that's
why --
Q.       Well, we don't know if the accusation of a
three-way call with Mr. Woodfox is correct, do we?
A.       Yes. I know it's correct. I've got the
interview, and he made comments in the interview.
I also have another phone record where Herman
Wallace was talking to his lawyer using Woodfox's
pin number and Woodfox talked to him, too. I have
them both on recordings.
Q.       Let me rephrase my question because I
wasn't clear enough.
A.       All right.
Q.       Mr. Woodfox was never accused of a
three-way call, was he?
A.       Not officially. But I know it. I have a
recording. I can prove it.
Q.       Okay. Let's look at State's Exhibit
No. 3. You stated, if I can paraphrase, maybe I
do have it correctly, they were throwing waste on
each other, and I think that was referring to
Woodfox was throwing human waste?
A.       Apparently, they were throwing human waste
at each other.
Q.       Does it say that on the document?

PAGE 98

A.       It's on their cell bars -- both of them.
So either he had to -- he was throwing it out or
throwing it in.
Q.       Could it possibly be someone throwing
human waste at Mr. Woodfox?
A.       It could be and I would ask why. How did
Mr. Woodfox provoke him to throw human waste at
him, because obviously there's conflict between
the two.
Q.       And you would assume Mr. Woodfox made the
provocation?
A.       I would assume they both.
Q.       Interesting. You have some mentally ill
people that live on CCR, don't you?
A.       I have CCR inmates that live on CCR.
Q.       Do you have mentally ill prisoners living
at CCR?
A.       I have 1,900 inmates taking psychotropic
medicines. I don't know where they live, but I
would hope the medicine would tame them down. I
have some on a different part of CCR, the old CCR
TU.
Q.       I guess the answer would be, yes, then;
right?
A.       The answer would be, I'm not sure who.

PAGE 99

Q.       But you -- I didn't ask who, did I?
A.       I said I have 1,900 taken psychotropic
medicine.
Q.       There's nothing in State's Exhibit No. 3
that suggests that there was provocation from
Woodfox, is there?
A.       Yes.
Q.       What?
A.       That he was involved. They wouldn't throw
it on him if he hadn't caused you to do it, or he
wouldn't be throwing at him if it wouldn't be on
his bars. Absolutely.
Q.       An inmate only gets human waste thrown on
them when they are provoked, when they provoke it
to happen; is that your testimony?
A.       Not only but if you throwing human feces
at somebody, you have to have normally a reason.
You just wouldn't throw it at the wall.
Q.       Right. But we don't know if Woodfox threw
anything, do we?
A.       We know Woodfox was involved for sure.
We know Woodfox had something thrown at
him, don't we?
A.       We know that Woodfox was involved for
sure. We can't gamble that he wasn't.

PAGE 100

Q.       Now, the three -- this was State's Exhibit
No. 3 dated 9/19/2000, and I think the other two
incidences that your question -- State's Exhibit
No. 1 and State's Exhibit No. 2 all occurred in
this decade; correct?
A.       I think so.
Q.       Are there any -- there were three in this
-- so far in this decade that would be like eight
years and ten months. Were there any other
incidences outside of these three?
A.       No. The ones that you told me there were,
were the ones that just happened.
Q.       Thank you. Now, on State's Exhibit No. 4,
I want you please to give us the disposition of
that incident?
A.       I don't see the disposition. I see that
they checked the seriousness of the offense, the
need to protect the institution, the employees of
each other. Those are checked, so therefore I
don't see other than that. I see that he plead
not guilty.
Q.       There is no disposition, is there?
A.       There are two checks that are in the
spaces where you would put it after you have a
guilty plea or a guilty verdict. Seriousness of

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 26   PAGE 101

the offense is checked and the need to protect the
institution of employees from other inmates is
checked, therefore there would have to be a guilty
plea.
    Q.      But guilty is not checked, is it?
    A.      But two things that sustain guilty is
checked.
    Q.      So if Mr. Woodfox testified under oath
that he was cleared of this charge, would you
accept that as true?
    A.      Absolutely not.
    Q.      There's nothing to indicate he wasn't, is
there?
    A.      There are two things I just told you that
indicated he was.
    Q.      Okay.
    A.      For sure.
    Q.      Now on Exhibit No. 5 you testified that --
on State's Exhibit No. 5, you testified that there
was a spear, and we don't know what kind of
material this was, do we?
    A.      A pole.  No, we don't know what kind of
material, but a telescopic pole and that would
mean it had to fold into itself and be a pole.
    Q.      It could have been paper, couldn't it have

PAGE 102

been?
    A.      Paper is very dangerous.
    Q.      Could it have been paper?
    A.      It could have been paper.
    Q.      Okay.  And you suggested that a burn can
or maybe just a can, can be a dangerous weapon.
Are you aware that inmates heat water in cans all
the time in your institution?
    A.      Not all the time.  I'm aware that they do
that.
    Q.      Regularly, let's put it that way.
    A.      They break the rules, too, when they're
doing it.
    Q.      Why would an inmate -- would an inmate
want to heat water to drink instant coffee?
    A.      No.  He might want to heat it to throw it
on somebody.
    Q.      Would he want to heat water to drink
instant coffee?
    A.      No.  He has a microwave.
    Q.      In 1992 on CCR, you're telling us that
there was a microwave?
    A.      That was before my time.  I don't know.
    Q.      Thank you.  Now, what's a snitch?
    A.      A snitch?

PAGE 103

    Q.      Yes.
    A.      An informant.
    Q.      An informant.  Snitches sometimes lie?
    A.      Yes.
    Q.      To gain favor?
    A.      Yes.
    Q.      How do you know when a snitch is telling
the truth?
    A.      When you have more than one and you can
collaborate.
    Q.      If you got two snitches you're good to go?
    A.      Not necessarily, but that's better than
one.
    Q.      Now, in Exhibit No. 7 it's an incident
involving snitches; correct?
    A.      Three confidential informants.
    Q.      Now, are you aware that this write-up
occurred after Mr. Woodfox sued David Ross?
    A.      It wouldn't matter.
    Q.      Are you aware?
    A.      No.
    Q.      Okay.  Take No. 9 for a second -- this is
1985.  The -- you stated he, meaning Woodfox, ran
out of his cell?
    A.      Yes.

PAGE 104

    Q.      Do you know what Mr. Lewis did?
    A.      No.
    Q.      You weren't there?
    A.      No.  But I know Mr. Woodfox was the
aggressor.
    Q.      Are you aware that this is the only
incident of physical violence involving inmate --
an inmate with Mr. Woodfox?
    A.      I think he stabbed another inmate.
    Q.      Why do you think that?
    A.      I think I have the record to prove that.
    Q.      How do you know that proves anything?
    A.      How do you know it doesn't?
    Q.      It could say I stabbed him.  Where does it
say that Mr. Woodfox --
    A.      It didn't say.
    Q.      -- stabbed an inmate?  Do you know?
    A.      It says -- I read it.
          MS. CUMMINGS:
               Hold on.
    A.      "4/18/72 inmate locked up and charged with
the murder of Brent Miller."
BY MR. TRENTICOSTA:
    Q.      Uh-huh.
    A.      "Inmate waiting to be tried.  The Board

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 27   PAGE 105

feels this inmate should remain in lockdown
because he is dangerous to inmates and free
personnel.  His record shows where he stabbed
another inmate."
    Q.    Excuse me, I can't see inmate so may I
look at your copy?
    A.    I'm seeing "i-n-m-" -- that's close enough
for me to believe that says inmate.
    Q.    Okay.  Do we have any record that -- this
is a lockdown report; correct, not an incident
report; right?
    A.    Right.
    Q.    Do we have an incident report of this
so-called stabbing?
    A.    I don't know, if we have it with us.  I'm
sure we have it.
    Q.    Where is it?
    MS. CUMMINGS:
        I'm sure she's looking for it right
down there.
    MR. TRENTICOSTA:
        I'll wait.
    MS. LACY:
        It's a stabbing report.
    MS. CARTER:

PAGE 106

        What's the date on it?
    MS. CUMMINGS:
        It would have been --
    MS. CARTER:
        What's the date?
THE WITNESS:
        4/18/72 is the date of this.  It would
be prior to that.
    MR. CALDWELL:
        That's the day after the incident,
after the murder.  Do we have it?
    MS. CUMMINGS:
        We apparently do not have it with us.
    MR. TRENTICOSTA:
        Can I have a copy?
    MS. CUMMINGS:
        As soon as I get it.
    MR. TRENTICOSTA:
        Where is it now?
    MS. CUMMINGS:
        We're going -- we have records prior
to '70 -- apparently -- Shay, clarify
that.  How far back do we go?
    MS. CARTER:
        Brent, can you help me with that?  I

PAGE 107

mean, we know we have a Brent Miller
murder was April of '72.
    MR. CALDWELL:
        April 17, '72.
    MS. CARTER:
        And so this is before that, this was
part of the lockdown.
    MR. CALDWELL:
        It was some time in '72.
    MR. HICKS:
        The record we have is from his latest
-- the time that he was -- the latest time
that he was institutionalized, so things
that happened before that we wouldn't
have.
    MS. CARTER:
        We can keep trying to get it.  I know
that's one of the --
BY MR. TRENTICOSTA:
    Q.    Warden Cain, if there exists a record that
reflects what's on this last line of this report,
where would it be?
    A.    It could be in the records office at
Angola, because he would have multi records maybe
since he's been there so long, and therefore, they

PAGE 108

could pick up one and leave one, and the early one
would just be inadvertently left behind in our
records office.
    Q.    It would be in Mr. Woodfox's file?
    A.    Well, he could have multi files is what
I'm saying.
    Q.    Well, let's just call a file, and then
have volumes; right?
    A.    Yeah.
    Q.    Volume 1 of a file and volume 3 of a file.
    A.    Yeah.
    Q.    If I told you that in the civil lawsuit we
were presented with what Mr. Hicks and your office
have purported to be, was an entire file of
Mr. Woodfox.  Have we not seen the entire Woodfox
file?
    A.    I would think that -- I don't know what
you've seen.  I just know what that letter says,
what that lockdown report says that is in his
record, that he stabbed another inmate.  And
that's in the report.
    Q.    It could be false, couldn't it?
    A.    It could be true.
    Q.    My question is, it could be false,
couldn't it?

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 28   PAGE 109

A.      It could be true.
Q.      Okay.  Exhibit No. 11 -- do you know --
well, you weren't there in '79.  Do you have any
records of Mr. Woodfox ever making beer?
A.      No.
Q.      Exhibit No. 12, do you have any records
that suggest that Mr. Woodfox had anything to do
with bullets?
A.      Yes.  Guns, bullets, firing pin -- they
are peas in the pod.
Q.      Is there anything to suggest in this
report that Mr. Woodfox had a gun?
A.      Yes.  A firing pin and bullets.  Antennae
to make zip guns.  I've seen many of them.
Q.      Do you see anything in this report that
suggests there was a gun?
A.      Yes.  Firing pin and bullets.
Q.      Your suggesting -- you said something
about an antennae.  An antennae can be used as a
gun?
A.      Yes.
Q.      Was an antennae found during this
shakedown?
A.      Parts of it.  The bullets and the firing
pin.

PAGE 110

Q.      No, no.  Was an antennae found during the
shakedown?
A.      The antennae would have been on his radio.
Just tear it off when you're ready.
Q.      So the answer is, no, to my question or,
yes, to my question?
A.      An antennae wouldn't be found if it was on
the radio, because it would be part of the radio
which would be legal.
Q.      Was there anything in -- do inmates use
pieces of metal as screwdrivers to fix their
radios?
A.      Yes.
Q.      They're not allowed a screwdriver, are
they?
A.      None.  Not any metal supposedly.
Q.      Are you aware -- let's -- I want to refer
to No. 14 and No. 15.  Are you aware or have any
knowledge of the lawsuit that was filed by
Mr. Woodfox after these two incidences?
A.      No.
Q.      Are you aware that in 1977 -- I'm sorry,
in 1978, the federal court found that the
penitentiary was violating civil rights through
strip searches --

PAGE 111

A.      No.
Q.      -- as a result of Albert Woodfox's
lawsuit?
A.      No.
Q.      The strip searches that you conduct now
and the policy for strip searches would have been
informed by the federal court back in 1978, would
it not?  How strip searches are conducted?
A.      How they're done would have been what?
Q.      Informed by the federal court's ruling in
1978?
A.      I don't understand your question.
Q.      Okay.  You understand that Mr. Woodfox is
innocent today of the murder of Brent Miller?
MR. CALDWELL:
              I object to that.  That's
argumentative.  That's a legal
proposition, and I object to the form of
that question.
BY MR. TRENTICOSTA:
Q.      You understand constitutional rights,
Mr. Cain, don't you?
A.      Yes.
Q.      You understand that a person accused of a
crime is presumed innocent?

PAGE 112

A.      Mr. Woodfox had been convicted --
MR. CALDWELL:
              Again, I object to the form that a
person is presumed innocent in a court of
law not when they are arrested in a jail,
or simply arrested in any crime, they're
not presumed innocent by the people
investigating the case.  They're presumed
innocent as a legal proposition in a court
of law.  And I reiterate my objection to
the form of the question.  Subject to that
objection, you certainly should answer it,
if you can.
A.      Would you ask the question again?
BY MR. TRENTICOSTA:
Q.      I might have forgot it.  Do you understand
that Mr. Woodfox is presumed innocent of any crime
today?
A.      No.  He's not presumed innocent.  He was
convicted twice of murdering Brent Miller.
Q.      Do you know that his conviction has been
reversed?
A.      Both times, no, I don't know that.
Q.      All right.  Let's talk about the recent
one.  Are you aware that a federal judge has ruled

Judy P. Foust, Inc.
Certified Court Reporters
(225) 344-2270

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 29   PAGE 113

that Mr. Woodfox's conviction is now reversed?
Are you aware of that?
                    MR. CALDWELL:
                         Again, I object to the form of the
question.  His conviction may have been
temporarily overturned by the court and
that's a legal proposition, so I object to
the form of the question.  And he can
answer if he so chooses subject to that.
        A.       Until we get release papers, he's in our
prison guilty of the murder of Brent Miller.
That's what I think and assume myself as warden of
the prison.  He's still there.
BY MR. TRENTICOSTA:
        Q.       Well, then I'll ask the question, are you
aware that the federal court has reversed
Mr. Woodfox's conviction?
        A.       Not officially.  I don't have any
paperwork to release him or send him to jail in
Baton Rouge.
        Q.       That's not my question, Warden Cain.
That's not my question.  My question is, are you
aware that his conviction has been reversed?
                    MR. CALDWELL:
                         Again, I object to the question as to

PAGE 114

whether or not the conviction has been
reversed or overturned and the legal
impact of it.  The conviction is under
appeal on a right of repeal, and therefore
the conviction -- it's a legal issue.  I
don't know if Warden Cain is a lawyer.  If
he can answer the question, then fine, but
I object again to the form.
                    MR. TRENTICOSTA:
                         This --
                    MR. CALDWELL:
                         Counsel is characterizing the
conviction as reversed.  And we keep
people in jail for murder and pursuant to
investigations, and so the issue that
we're interested in at this point is
whether or not a person who has evidence
in a file, in an investigative file and is
charged.  He is charged by grand jury
indictment, 1996, and that charge is still
pending.  So that charge is pending.
                         Now, the issue, regardless of what has
happened in the court is a legal issue as
to whether it has been reversed or whether
you want to call it overturned.  And if he

PAGE 115

can answer the question, then fine.  If he
can't, I have my objection in the record
for Judge Brady to look at.
BY MR. TRENTICOSTA:
        Q.       Same question.
        A.       I'm not a lawyer.  I assume he's still in
jail, so therefore he's still guilty until the
appeals have all been rendered, and I get some
paperwork that says he's free.
        Q.       So it's your understanding everybody in
jail is guilty?  Come on.
        A.       In Angola.  Because he's in Angola.
That's -- I'm not a lawyer, so I would let him go
if I thought he was free.  Just let him go.  He's
not free.  He's in Angola.
        Q.       You don't have any direct knowledge about
Mr. Woodfox's involvement with Mr. Miller, do you?
        A.       No direct knowledge, no.
        Q.       Thank you.  Would you agree that Mr.
Woodfox has a total of 25 rule violation reports?
        A.       I thought it was 26.
                    MS. CUMMINGS:
                         I think I had a duplicate.
        A.       Okay.  It used to be 27, so if it 25, it's
25.  I would agree then at 25, as far as I know.

PAGE 116

BY MR. TRENTICOSTA:
        Q.       Okay.  Fifteen occurring in the 1970s;
would you agree to that?
        A.       I would have to count them.  I don't know.
        Q.       Would you agree that five occurred in
1980?
        A.       Okay.
        Q.       What's that, one every two years?  And
would you agree two occurred in the 1990s?
        A.       No.  There's more than two.  I got the
pornography one that you don't have.  That's a
write-up.  That's three.  Then I have the others
that I know --
        Q.       In the 1990s.
        A.       Pardon?
        Q.       The decade of the 1990s?
        A.       Oh, you're in '90s not 2000.  I don't
know.
        Q.       Not yet.  Two in 1990, that would be one
every five years; correct?
        A.       If that's what the record says.  I'm not
looking at it.  I don't know.
        Q.       Okay.  If you assume what I'm saying is
correct, do you think that there has been some
progress made in terms of confining himself

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 30    PAGE 117

through the rules?

A.    No.

Q.    Do you have inmates who you regard as
model prisoners who have five write-ups in a
decade?

A.    It's not a matter of write-ups. It's a
matter of attitude and what you are. And they
protested at the front gate in 1997, release the
Panther.

Q.    Did Mr. Woodfox have anything to do
with --

A.    The Black Panthers --

MR. CALDWELL:

Counsel should be allowing the witness
to finish answering the question.

BY MR. TRENTICOSTA:

Q.    Can we be responsive?

A.    And if the -- the Black Panther owned the
praline, so therefore he may have less write-ups,
but he still has the same attitude.

Q.    But, but -- but Warden Cain you don't have
any problem with Black Panthers, do you?

A.    I have problems with defiance and protests
and demonstrations at the prison. I have problems
with that.

PAGE 118

Q.    You have problems with citizens
protesting, petitioning their government?

A.    Violence -- protesting it. That would
cause violence in the prison.

Q.    Have you seen violence being caused in the
prison by people protesting outside of the prison?

A.    No. I have a good tactical team and a
good prison. I have good security.

Q.    Are you suggesting that Mr. Woodfox had
something to do with promoting violence?

A.    Demonstrations, yes. Violence in prison,
yes. I believe that. I believe the potential is
there for that.

Q.    Based upon 15 write-ups that occurred in
the '70s?

A.    No.

Q.    Based upon what?

A.    Based upon his attitude. Based upon
breaking rules. Based upon what he stands for.

Q.    How do you know what his attitude is?

A.    Look at his activities. Look at his
actions. Look at his write-ups.

Q.    Three write-ups in eight and a half years.
Do you think that's typical of a prisoner at
Angola, or do most prisoners have more write-ups?

PAGE 119

A.    Most prisoners at Angola don't have the
potential for violence as he does in my opinion.

Q.    Have you ever looked at statistical
analysis of write-ups that prisoners get?

A.    Referencing what?

Q.    A prisoner that has 25 write-ups in one
year. Does that happen in your prison?

A.    I know that if an inmate uses knives and
perpetuates violence, that he will do it again,
and that's the ones that live in CCR. That's
experience.

Q.    What knives has Mr. Woodfox used?

A.    I'm giving you an example of violence and
why they will do it again.

Q.    Right.

A.    Inmates. I didn't say Woodfox.

Q.    Can you give me an example of a knife that
Mr. Woodfox used?

A.    I didn't say he had a knife. I gave you
an example.

Q.    I asked you to give me an example. If you
can't, you can say no.

A.    I never said he had a knife, and I didn't
say that he doesn't. He stabbed an inmate in the
record way back in 1972 or whenever it was.

PAGE 120

Q.    You're aware that there were scores and
scores and scores of stabbings in 1972, aren't
you?

A.    But there were few killings of
correctional officers in 1972.

Q.    Are you aware that there were scores and
scores and scores of stabbings in 1972?

A.    Yes. And Mr. Woodfox is accused of
stabbing --

Q.    Are you aware that --

MR. CALDWELL:

Counsel, allow the witness to answer
-- finish his answer prior to
interrupting.

BY MR. TRENTICOSTA:

Q.    Are you aware?

A.    Yes.

Q.    Okay. Thank you. Have you seen write-ups
of inmates who have stabbed other inmates?

A.    Yes.

Q.    So they were being written up when they
would find that they had stabbed someone?

A.    Yes.

Q.    It was a regular routine, part of the job;
correct?

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 31   PAGE 121

A.      Yes.
Q.      We had Exhibit No. 27 -- it was called or
referred to as a rap sheet.  Do you recall this
one?
A.      (Viewing documents.)
Q.      Now, I just want to ask you -- you said
this shows that Mr. Woodfox had two escapes;
correct?
A.      (Viewing documents.)
Q.      And I believe you said '65 and '69?
A.      I said he had two escapes.
Q.      Where does it say we have an escape
in '65?
A.      Well, on my sheet here it says Woodfox
criminal history timeline.  3/7/65 -- no, no --
'65.
Q.      I am not sure if I am reading what you're
reading.  Can you hand me what you're reading
there, please?
        MS. CUMMINGS:
            The agg rape was left off.
        MR. CALDWELL:
            The agg rape was left off?
        MS. CUMMINGS:
            Yes.  The agg rape is not on there but

PAGE 122

it's on the rap sheet.
BY MR. TRENTICOSTA:
Q.      Where did you get this from?
A.      Where did I get it?
Q.      Yes.
A.      From my lawyer.
Q.      I'm sorry.  Who is your lawyer?
A.      Well, I got it from the attorney.
Q.      From which attorney?
A.      I don't know.
Q.      Ms. Cummings?  Mr. Hicks?
        MS. CUMMINGS:
            I think I gave it to him.
BY MR. TRENTICOSTA:
Q.      Attorney General?
A.      I'm not sure.
Q.      Okay.  I've never seen it.  I'm trying to
understand.  I'm only dealing with exhibits, and
I'm trying to see when you said on the rap sheet
we had an escape in '65, and I just -- my eyes
aren't that good.  I can't find it.  I'm trying to
figure out where you found it.
        MS. CUMMINGS:
            We're going to get you the minutes of
the conviction.

PAGE 123

        MR. TRENTICOSTA:
            Okay.
        MS. CUMMINGS:
            So that will take care of all --
        MR. TRENTICOSTA:
            I'm just wondering where he read it.
BY MR. TRENTICOSTA:
Q.      Are you testifying off of documents they
gave you but not in the exhibits here?
A.      I had a document --
        MR. CALDWELL:
            I object to the form of the question.
If you want to ask him which documents he
objected to, then the form of the question
would be better, Counsel, if that's what
you're trying to do, and not just a
general thing of your objecting.  If you
want to ask him a question --
        MR. TRENTICOSTA:
            I didn't lodge an objection,
Mr. Attorney General.  I didn't lodge an
objection.  I'm trying to figure out where
the testimony is coming from, and we were
dealing with State's Exhibit No. 27.
        MR. CALDWELL:

PAGE 124

            I know exactly what you're doing,
Counsel.  Ask the question, and he can
answer it if he can.  I'm objecting to the
form of the question.
        MR. TRENTICOSTA:
            That's fine.
BY MR. TRENTICOSTA:
Q.      Answer.
A.      What's the question again?
Q.      Are you testifying to documents that are
not in the exhibits?
A.      I don't have a clue.  I'm not a lawyer.
Q.      Thank you very much.
A.      I'm testifying to this document right
here.
Q.      Is it your testimony that persons who are
on -- who live at CCR -- where is that document
that I had right here that Mr. Cain handed to me.
        MR. CALDWELL:
            I gave it back.  I believe that was
the document that she pulled.
        MR. TRENTICOSTA:
            Well, let me -- just for the record,
the document that Burl Cain was testifying
to that is entitled "Woodfox Criminal

Judy P. Foust, Inc.
Certified Court Reporters
(225) 344-2270

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 32    PAGE 125

History Timeline" is not in evidence.  It
looks like work product of the Attorney
General.

        MS. CUMMINGS:

              We can certainly attach it.

        MR. CALDWELL:

              No.  We ain't going to attach any work
products.

        MR. TRENTICOSTA:

              Sure.  Why don't we attach it?

        MS. CUMMINGS:

              Well, he said it was work product.

        MR. CALDWELL:

              No.  We're not going to attach that.

        MR. TRENTICOSTA:

              Well, then I would like to --

        MR. CALDWELL:

              That's our work product.  And again, I
object to the form of the question.
Counsel is characterizing the form of the
question to suit his own reasons for
characterization.  The witness has
testified from documents that counsel has
watched him testify from, and the fact
that we had summaries in our own files and

PAGE 126

he asked for the documents is immaterial.
So I don't want to attach this.  It's our
work product and so --

        MR. TRENTICOSTA:

              Well, I think we should attach it,
because Burl Cain was testifying to
information off of that document.

BY MR. TRENTICOSTA:

        Q.    Now, Mr. Cain if a person -- if an inmate
is on CCR lockdown or administrative segregation,
whatever phrase you use, so let's just say CCR, is
it your testimony that violence cannot be
committed by the individual because they're in a
controlled environment?

        A.    It's not my testimony that it can't be
committed.  It's my testimony that it reduces the
potential for it to be committed.

        Q.    Inmates can exhibit violence to each other
while on CCR; correct?

        A.    Yes.

        Q.    Inmates can exhibit violence to
correctional officers or other personnel of the
prison while on CCR; correct?

        A.    Yes.

        Q.    And they do, don't they?

PAGE 127

        A.    Yes.

        Q.    Has Mr. Woodfox ever committed violence
against personnel of the penitentiary while on
CCR?

        A.    According to his record he has, yes.

        Q.    The incidents involving the strip search,
is that what you're referring to?

        A.    Yes.

        Q.    Outside of that because I was more
thinking about the physical space of CCR,
Mr. Woodfox has never exhibited violence to
personnel of the penitentiary, has he?

        MS. CUMMINGS:

              Wait.  I object to the form of your
question.  It sounds -- you said you were
going to limit it, but then it didn't
sound like you did.  Are you -- I think he
responded that, yes, there were incidents
of violence while he was in CCR.  Are you
limiting that to a certain area or time
frame?

        MR. TRENTICOSTA:

              I meant physical space in CCR.  I'm
not sure where -- the incidences were in
an office by a desk as I read these

PAGE 128

reports.  I don't know that that's on CCR.

BY MR. TRENTICOSTA:

        Q.    Outside of those two instances, is there
any evidence that Mr. Woodfox displayed any act of
violence to any correctional officer or personnel
in the penitentiary?

        A.    In the penitentiary, yes, when he killed
Brent Miller.

        Q.    You don't know if he killed Brent Miller,
do you?

        A.    Yes.  I know he killed Brent Miller.  I
believe it with all my heart.

        Q.    How do you know?

        A.    I believe it.  I know it.

        Q.    It wasn't on CCR, was it?  No act of
violence -- correct me if I'm wrong.  No act of
violence from Mr. Woodfox to any personnel at the
penitentiary while he's been living on CCR outside
of the two incidences that occurred one month
apart in 1977?

        A.    He ran out of the cell and fought with
another inmate on CCR when he had the doors open.

        Q.    I understand.  Maybe you didn't understand
my question.  I'll repeat it.  Was there any
evidence that Mr. Woodfox committed any act of

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 33  PAGE 129

violence against personnel --
    A.    Okay.
    Q.    -- of the penitentiary --
    A.    No other than Brent Miller.
    Q.    -- outside of the two incidences that
occurred, within a month of each other in 1977?
    A.    That and the Brent Miller killing.  That's
all.
    Q.    You continue to refer to Mr. Woodfox as
being the killer of Brent Miller based on your
belief.  Is it based on any fact?
    A.    I have the arrest report where he escaped.
    Q.    You continue to refer to Mr. Woodfox as
the killer of Brent Miller and you said it was
your belief.  Do you have any facts?
    A.    Do I personally have any facts?
    Q.    Correct.
    A.    I don't personally have any facts other
than he's been convicted twice of doing it.  And
the correctional officers tell me he did it that
were there at the time.
    Q.    Witnesses?
    A.    That's what the correctional officers that
were there at the time tell me.
    Q.    Are you referring to witnesses to the

PAGE 130

crime?
    A.    I don't know if they were witnesses or
not.  Stuck his head and crammed him in a garbage
can head first and left him there.
    Q.    But do you know witnesses -- are you
telling me that there are correctional officials
-- officers --
    A.    I don't know if there were.
    Q.    -- who were witnesses to the crime?
    A.    I said I don't know if they are witnesses
or not.  I am saying what they tell me.
    Q.    They told you they were witnesses?
    A.    No.  They told me that's what he did.
    Q.    Do you know what their knowledge is based
upon?
    A.    No.
        MR. CALDWELL:
            Here's your copy.
        MR. TRENTICOSTA:
            Thank you.
        MR. CALDWELL:
            Let the record show that we have given
Mr. Trenicosta a copy of an in globo
exhibit of, I believe, 11 pages which
purport to be records from Lafourche

PAGE 131

Parish concerning his previous questions
about a 1965 escape, and these records
have been supplied to him in this
deposition and are marked for purposes of
identification as State's Exhibit No. 32.
            (The exhibit is marked as State's
Exhibit No. 32 for identification and is
attached hereto.)
        MR. TRENTICOSTA:
            (Viewing documents.)
BY MR. TRENTICOSTA:
    Q.    Mr. Cain -- I'm sorry, Warden Cain who are
these officers you are referring to?
    A.    Warden Vannoy has told me about it before
about him being put in the garbage can.
    Q.    About who being put in the garbage can?
    A.    Brent Miller.  And Warden Gunnels told me
about the Brent Miller killing one time, and he
was the one in the little house that was set on
fire by the -- about the time Brent Miller was
murdered.  And the other officers I can't identify
in conversation.
    Q.    So Warden Vannoy, who is with us today,
told you that Brent Miller was shoved into a
garbage can?

PAGE 132

    A.    Head first.
    Q.    Head first?
    A.    (Nodded head affirmatively.)
    Q.    He didn't tell you he witnessed the
murder, did he?
    A.    No.  He didn't tell me that.
    Q.    And Warden Gunnels, you said he was the
warden back in the '70s?
    A.    No.  He was just a correctional officer in
the little house that was set on fire.
    Q.    And does he have any direct knowledge?
    A.    I have no idea.
    Q.    Okay.  Now, why did you -- why did you
move -- why did you open up dormitory in April for
some of the CCR inmates?
    A.    Well, it gave me some more CCR cell space
which we needed.  It also gave us a chance to show
good faith that we would try to create a different
atmosphere to get away from what they kept on
claiming was solitary confinement that really
wasn't, as we determine solitary confinement.  And
also with good faith it showed in the lawsuit that
we would do that, and that's why we did it.
    We did it with extreme caution to be sure that
everyone was kept safe and so forth and using

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 34  PAGE 133

veteran officers and so forth, with lots of
precautions.
         Q.      Why was the decision made in April?
         A.      Well, Secretary LeBlanc had just been
appointed secretary of corrections, and he and I
discussed it and talked about it, and I discussed
it with the staff.  We just thought, well, we
could do this.  And probably ten years earlier,
Warden LeBlanc and Warden Vannoy and I had a
conversation about, we wish we could find a place
to just have a big cage like cell thing.  And we
had talked about this for years but never had
really done it.  And then we just thought well
this is a good time to do it.  It might help out.
So we knew we needed the cell space, so we just
would do it, so we did it.
         Q.      So it didn't occur because the dormitory
opened up or space opened up to move them out of
CCR?
         A.      No.
         Q.      Warden Cain under your direction at Angola
you have social workers and psychologists, mental
health professionals that make rounds to the
prisoners?
         A.      Yes.

PAGE 134

         Q.      And what is the purpose?
         A.      To provide mental health treatment, etc.,
and social workers, and because security is the
authoritarian figure and the social worker and the
mental health worker and classification officer
are the side that you go to if you really need
compassion maybe more than you get in the men in
blue, and so they fill that other side of it.
         Q.      And are you aware that CCR inmates in
general are regularly visited by mental health
professionals?
         A.      Yes.
         Q.      Are you aware that Albert Woodfox, in
particular, has been regularly seen by mental
health professionals?
         A.      Not really, but probably so.  I would
expect so.
         Q.      Do you have any knowledge of what those
professionals have found?
         A.      No.
         Q.      Do you think it would be important to
know?
         A.      I don't think he's crazy.  I think he's
mean.
         Q.      Do you think it would be important to know

PAGE 135

what the mental health professionals report about
Mr. Woodfox before making judgment?
         A.      No.
         Q.      Would it surprise you that of the last ten
years of mental health visits and evaluations that
Mr. Woodfox has never seen to be a danger to
others or suicidal, and that his behavior has been
well within the appropriate limits?
         A.      It wouldn't surprise me.
         MR. TRENTICOSTA:
                         Counsel, I have about ten years of
mental health records that mainly were
furnished by Mr. Hicks through discovery
                         -- by Warden Cain through discovery I
should say -- however, they're all
confused as they didn't print out
correctly.  I would like to exchange the
good copies for the bad copies, and if I
can find a few good copies to have
                         Mr. Cain read from.  Is that acceptable?
         MS. CUMMINGS:
                         Do you have a copy -- you obviously
don't have  a copy for us.
         MR. TRENTICOSTA:
                         No, because when I printed them out

PAGE 136

this morning they came out like this.
         MS. CUMMINGS:
                         Are you representing that this is all
the mental health reports, not a portion
of the mental health reports but all of
them over the last --
         MR. TRENTICOSTA:
                         I can't represent it is every one for
ten years.  It's close to it.  I had
computer problems.
         MR. HICKS:
                         Well, I'm obviously not counsel on
this case, but counsel in the civil case
which you are representing that I provided
those documents to you.
                         The documents we gave you were not
messed up in any way that I'm aware of.
I'm not sure what the -- why -- what the
problem in terms of them being messed up
is.  I know that what was given to you was
the entire mental health records.
         MR. TRENTICOSTA:
                         Yes.  They're in New York.  And when
New York tried to send them down to me
electronically, it was in a non-.PDF file.

Judy P. Foust, Inc.
Certified Court Reporters
(225) 344-2270

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 35   PAGE 137

It was .PDX or something like that which
doesn't compute with my computer.  Then
they started to fax them off of their
computer to my fax machine, and I got a
lot of gobbley gook.  And it took all
night long for this to come through, and I
can't -- and there's some missing just by
judging from the numbers on the pages.
                    MR. HICKS:
                         I'm certainly not in a position to
exchange, or do anything with respect to
your documents.
                    MR. TRENTICOSTA:
                         I understand.  You were asking the
question, and I thought I would answer it.
                    MR. CALDWELL:
                         Well, I believe that in order to be
able to verify and examine mental health
reports, that it would behoove us to ask
the court to give us -- let us depose the
mental health folks if the court is so
inclined to do that.  But to what we have
been examining today are business records
or records that are part of the Angola
Prison file, and then some records like

PAGE 138

the LaFourche records that have been
marked as State's Exhibit No. 32, are
LaFourche Parish records, as far as I
remember.
                         I think we would -- in an abundance of
caution, we would need to look at the
records and see what's purported.  But if
you want to mark something and ask him if
he knows what it is, or if he has seen it,
then I still think though we would have to
examine that issue on it's own.  Because
what that's asking us to do is open the
door for health care professionals'
diagnosis or whatnot, so I'm not really
sure whether the court envisioned to do
that or not, and I honestly don't know.
                    MR. TRENTICOSTA:
                         I understand, Attorney General.  I
don't know if the court envisioned that a
document that doesn't have any supporting
information is going to be worth anything.
Maybe we need to depose all of the people
who wrote the offense reports, because
some of them may not be what -- or we can
deal with it another way.

PAGE 139

BY MR. TRENTICOSTA:
     Q.     Warden Cain, in general, the persons who
are at CCR receive periodic reviews; correct?
     A.     Right.
     Q.     And you were aware are you not that for
the last 30 some odd years Mr. Woodfox has
received -- reviewed by the quote, "Board" as to
whether he should be released from CCR; correct?
     A.     Right.
     Q.     And you've seen those documents, haven't
you, the review board's documents?
     A.     Not really.  I've seen them some, yes.
     Q.     You've seen some?
     A.     (Nodded head affirmatively.)
     Q.     And on the document -- let me show you one
just as an example.  Now, again just as example,
now on this document would you -- this is
identified as Woodfox 1, is this the kind of
review board document that is used periodically?
     A.     Yes, I see that.
     Q.     Now have you seen these before?
     A.     I have.
     Q.     Now, you are aware, are you not, that
there's not one review board document that
describes Mr. Woodfox as an escape risk; correct?

PAGE 140

     A.     Described him as what?
     Q.     An escape risk?
     A.     There's none that say that, no.  I think
he is though.
     Q.     And there are none, that you're aware of
are you that describe --
                    MS. CUMMINGS:
                         I would object to the form of the
question.  He just told you he hasn't
reviewed the documents, and you're still
asking him if he's aware of what's in the
documents.
                    MR. TRENTICOSTA:
                         He said he has reviewed some
documents.
                    THE WITNESS:
                         I really haven't.  I don't look at
these.
BY MR. TRENTICOSTA:
     Q.     But we know you have reviewed some,
haven't you?
                    MS. CUMMINGS:
                         You said you reviewed these?
                    THE WITNESS:
                         No.

Judy P. Foust, Inc.
Certified Court Reporters
(225) 344-2270

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 36   PAGE 141

```
            MR. TRENTICOSTA:
                The question --
            MR. CALDWELL:
                Why don't we mark them so it can be
clear.
BY MR. TRENTICOSTA:
    Q.      The question is, are you aware of any
review board documents that states that
Mr. Woodfox is an escape risk?
    A.      No.
    Q.      Okay.  Are you aware of any review board
documents that describes Mr. Woodfox as being
violent?
    A.      No.  Other than that that describes him as
being violent because that talks about the
original reason he's in there which is for the
murder of Brent Miller.  So that's violent right
there.
    Q.      On this document --
            MR. CALDWELL:
                We are referring to Woodfox -- what
Counsel called Woodfox No. 1?
            MR. TRENTICOSTA:
                Sure.  Woodfox No. 1.  Let's call it
that.
```

PAGE 142

```
            MR. CALDWELL:
                Okay.
BY MR. TRENTICOSTA:
    Q.      There are various places where a check
mark can be placed; correct?
    A.      Yes.
    Q.      And when the check mark of not released is
made --
    A.      All right.
    Q.      -- are there -- is there the word reasons:
and more spaces that a check mark can be made?
    A.      Yes.
    Q.      Okay.  Do you see there nature of
commitment offense?
    A.      Yes.
    Q.      Do you see there escape risk?
    A.      Yes.
    Q.      Do you see nearer to the bottom above
signatures physically dangerous to himself or
others as evidenced by?
    A.      Yes.
    Q.      And do you see after by a colon with more
descriptives such as psychiatric evaluation,
pattern of violence, self mutilation and the like?
    A.      Yes.
```

PAGE 143

```
    Q.      Okay.  Have you -- are you aware that
Mr. Woodfox has been before the review board every
90 days and maybe even some more frequently than
every 90 days, but at least every 90 days since he
was placed in lockdown on April 18th, I believe of
1972?
    A.      Yes.
    Q.      Are you aware that the review board in
those 30 some odd years, I think it would be
36 years, has never ever once checked off that
Mr. Woodfox is violent?
    A.      Are you aware that they did check off
nature of original reason for lockdown is checked
and that's violence?
    Q.      Have they -- are you aware of any where
escape risk has been checked off.
            MR. HICKS:
                I found one.
            MR. TRENTICOSTA:
                You found one?
            MS. CUMMINGS:
                Yes, we sure did.
            THE WITNESS:
                Yes, we found one.
            MR. TRENTICOSTA:
```

PAGE 144

```
                Okay.
            MS. CUMMINGS:
                Gee, I wonder if there are others?
            MR. TRENTICOSTA:
                What's the date of it?
            THE WITNESS:
                5/4/76.
            MS. CUMMINGS:
                And we would like to take this out.
            MR. CALDWELL:
                Give us copies.  Counsel, if we can go
off the record a moment.
            MR. TRENTICOSTA:
                Yes, please.
(Off the record.)
BY MR. TRENTICOSTA:
    Q.      Are you aware of any other report that has
a check mark dealing with escape or violence?
    A.      I take issue with your escape and with
your violence, because it is violence to me,
nature of original reason for lockdown.  That's
violence.  How can you say it's not?  I don't mean
to argue with you.
    Q.      Are you aware of any report, outside of
whatever we will find from the copy room in a
```

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 37   PAGE 145

second, that the physically dangerous to himself
or others is checked?

A.      Others is nature of original reason for
lockdown.  I'm not getting away from that.  You're
not going to convince me that he's not -- that
this is not referenced violence.

Q.      Mr. Cain, I'm not trying to convince you
of anything.  I'm only asking you a question.  Are
you aware of any other report --

A.      I'm giving you an answer.  It's violence.

Q.      -- that there is a check mark next to
physically dangerous to others?

MR. HICKS:
            Counsel -- Counsel, I'm sitting here
and in just a couple of seconds found
another one.  If you want us to go through
all of them, we can.

MS. CUMMINGS:
            Let's pull them all out.

MR. TRENTICOSTA:
            That's fine.  I'm asking him if he's
aware of any.

THE WITNESS:
            I am aware of two since '77.

MR. HICKS:

PAGE 146

            Counsel, do you want me to keep doing
this?

MR. TRENTICOSTA:
            Yes.

MS. CUMMINGS:
            Yes.  Let's do it.  Keep doing it.  We
should maybe take a little brief recess
and pull the rest of them.

MR. CALDWELL:
            Yes.

(Off the record.)

BY MR. TRENTICOSTA:

Q.      Warden Cain, back in your deposition one
-- your deposition that you gave for a civil
matter, you were -- you stated that based upon
your review of Mr. Woodfox's expert Steve Martin,
former warden in Texas, that you believed
Mr. Woodfox didn't cause very much trouble.  Do
you recall that?

A.      I don't recall that exactly.

MR. HICKS:
            Well, as the attorney that took that
deposition, I object to the form of the
question as mischaracterization.

MS. CUMMINGS:

PAGE 147

            And I'll second that objection.

MR. TRENTICOSTA:
            Can you show me where that happened?

MR. HICKS:
            Counsel, you asked -- I am not --

MR. TRENTICOSTA:
            I know but --

MR. HICKS:
            But I maintain my objection as to
mischaracterization.

BY MR. TRENTICOSTA:

Q.      Let me show you, it is a page 104
beginning at line number 9, and I'm going to go
through for the moment just because on my page
it's 106, line number two.  If you could read that
to yourself, just to refresh your recollection.

A.      Line number 9, is that where it starts
line 9?

Q.      Well, let's see, page 104, line 9, "We
retained an expert in this case who's reviewed the
inmates' files."  Do you see that?

A.      Yeah.  (Viewing documents.)

Q.      Tell me when you are finished.

A.      (Viewing documents.)  I am finished
through page 106 to 109.

PAGE 148

Q.      Let's see -- on 106, line 3, you were
asked after giving that recitation of Warden
Martin's report, "He could almost be, in the last
five years he could almost be described as a model
prisoner," question.  And in your answer is,
"Yes;" is that right?

A.      The question is "He could almost be in the
last five years."  And see, what that meant to me
was if you took away everything except the last
five years, just that and nothing more.  But there
was so much more from where I got accused of
saying he was a model prisoner almost, that's not
true at all.  This was all taken out of context,
because they whittled me down to just a little,
bitty piece of it and left the whole rest of the
pie out there to stink.

Q.      We're talking -- now, this would be of the
2006 deposition; right, and Mr. Martin's report
only reflected the last five years; correct?

A.      He said "He could almost be in the last
five years," so he brought me right into that last
five years just looking at the record, nothing
else, and then he asked me the question in that
little, bitty ball.

Q.      Right.

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 38   PAGE 149

A.     But that little, bitty ball is inaccurate when you describe me saying that he is a model prisoner almost, absolutely not.

Q.     Understood.  Understood, but in the last five years, he has done pretty good, hasn't he?  I guess, it would be last seven years now.

A.     He is like a man on death row that could do good, but he is still on death row.  He is still dangerous, and I still can't let him out. It's the same deal.  He's just good because he is locked in CCR into that routine and that environment; and so, therefore, that's why he's good, but not because he's good in his heart. It's because he's good in where he lives.

Q.     We are talking about behavior now, aren't we?

A.     We're talking about --

Q.     He's had good behavior?

A.     We're talking about who he is, what he is, what is his potential for violence is, is what I am talking about.

Q.     Okay.

A.     In as a whole.

Q.     Okay.

A.     But he's got me narrowed down to just a

PAGE 150

little, bitty part.  If you look at this little, bitty write-up, it says he can be considered a model prisoner.  Well, yes, if you had somebody who had -- right up as that, and don't look at anything else in him, then he can be -- that's why I answered it that way.  To say, I say he's a model prisoner in any sense of the word is taking it out of context totally.

Q.     Understood.  And you said he didn't cause very much trouble; correct?

A.     Pardon?

Q.     You also said he didn't cause very much trouble based upon what Warden Martin had in his --

A.     Because the lion in a cage can't cause much trouble, you see.  So, therefore, he don't cause no trouble because he's in the cage.  He's in the cell.

Q.     Isn't it your -- I thought you testified that inmates who are in cells, do -- can and do commit acts of violence --

A.     But most don't.

Q.     -- among -- against other inmates and security personnel?

A.     But most don't.

PAGE 151

Q.     That's fine.  They can, they have the ability to do so and they do do so, some, not all?

THE WITNESS:

Am I supposed to elaborate on this because it takes a lot of time.

MS. CUMMINGS:

Pardon?

THE WITNESS:

Am I supposed to elaborate on this because it takes a lot of time.

MR. CALDWELL:

You should explain your answer.

A.     I was trained by inmate Hollingsworth who fought with a lock in a sock when first came there as warden and knocked someone's eyeball out.  He nearly killed him.  After a year in CCR, I let him out again.  Wonderful record.  I let him out again.  He taped a knife to his hand and killed an inmate.

Hollingsworth trained me.  The ones who have a propensity to murder will do it again in prison. Woodfox fits that.  He murdered in prison. Therefore, he gets the same thing as he got.

The reason of balance down at Angola is if you get caught with a knife or trying to kill another

PAGE 152

inmate, I will lock you in CCR and don't let you out anymore because of Hollingsworth.  He trained me.  So, therefore, then the predators are locked in the cell.  And Woodfox fell in that category because of the murder of Brent Miller.

BY MR. TRENTICOSTA:

Q.     The record shows that in the last 18 years, the last 18 years, longer than you have been the Warden, Mr. Woodfox has had five write-ups; correct?

A.     I won't ever let Hollingsworth out, if it's 18 years.  I can't, because that's what trained me.  That is experience teaching me which others don't have and you don't have.

Q.     Warden Cain, with all due respect, I am not asking a question about whether Woodfox should be in or out of CCR at the moment.

A.     Well, I thought you were.

Q.     Okay.

A.     I thought you said he's a model prisoner. He's really not.  If he were a model prison, he wouldn't in CCR.

Q.     Well, the record shows that in the last 18 years, Mr. Woodfox has had five write-ups; correct?

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 39  PAGE 153

MS. CUMMINGS:

You better count them.

A.    I don't know.  In 18 years, five write-ups?  He's got more than that, sure.

BY MR. TRENTICOSTA:

Q.    From 1990 until present day?

A.    I've got to go and count them again?  I guess so.  I don't know.  He could have that many.  It doesn't matter how many write-ups he has to me at all.  It matters why he's in there.

Q.    Well, do you agree that he has five write-ups in the last 18 years?

A.    I guess.

Q.    Okay.  Is that in your experience, good conduct?

A.    Nice good conduct.

Q.    Is it good conduct?

A.    It's good conduct.

Q.    Okay.  All right.

A.    It doesn't reflect on the potential for violence.  Just good conduct, no more, no less.

Q.    And how do you gauge whether Mr. Woodfox has a great potential for a flight potential?

A.    My experience is that one who is in prison who tries to kill another in prison will try to

PAGE 154

kill another in prison again.  And all the ones who tried to kill one in prison are all locked in CCR.

Q.    You have inmates at your penitentiary who are trustees who committed murder inside the prison; isn't that correct?

A.    Sweed (phonetically spelled), he's an old man, and I cut him some slack, because he was like that when I got there.  That's who you're talking about.

Q.    You have inmates who have committed violence against other inmates but now hold what I consider high positions as prisoners; isn't that correct?

A.    Yes.

Q.    You have inmates who were once on death row who now have the highest trustee status in the penitentiary, don't you?

A.    The never demonstrate at the front gate, release the Panther.  The never did what he did, and what he stands for is violence.  I believe that.  I can't get it out of me.  I believe it.  I believe he is violent.

Q.    Although the records don't reflect it, you just believe it?

PAGE 155

A.    I have so much more experience than the record and all the people that make the record.  I have done this 28 years.  I can tell.  It is just what I do.  I know in my heart he needs to be in that cell block.  He does not need to be out of Angola.  Pick me apart.  That's the facts.  I believe it.  He is dangerous.  He is dangerous if he is free in my prison, and he's dangerous on the streets.

Q.    Am I correct, your only basis -- just listen.

A.    Okay.  I will listen.

Q.    I'm sorry, I cut you off.  I will try not to.

A.    Go ahead.

Q.    But you're only basing that, are you not, on your belief that he committed a murder inside the penitentiary?

A.    My belief is so accurate.  It is so true.  I know, I believe it.  I will lay my whole career on it.  He is dangerous.

Q.    Is the basis of your opinion, your belief that he committed a murder --

MR. CALDWELL:

I object to the form of the question.

PAGE 156

Counsel, I believe the witness has testified several times that his basis is on everything that is in this record, all these things we've been talking about for several hours now.  And having said that, I object to the form and the characterization through your question.  If he can answer it, fine.

BY MR. TRENTICOSTA:

Q.    Ready.

A.    Ready.

Q.    Go ahead.

A.    What's the question.

Q.    Are you basing your opinion on your belief -- on your opinion that Mr. Woodfox is dangerous on the belief that he committed a murder?

MR. CALDWELL:

Object to the form of the question.  And here's the reason, if you are objecting to -- if you're asking him if he is forming it on the base of his belief, if you ask him if his basis of belief is solely because he committed a murder, that and nothing else, which is not what he has testified here to; but if that is what you

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 40   PAGE 157

want to ask him, then your question should
be, are you basing this on -- is your
belief based on the fact that he only
committed the murder of Brent Miller, or
is it based on other things?

   MR. TRENTICOSTA:

     Well, it's not a belief.  It's an
opinion.  I'm asking if it is his opinion
that Mr. Woodfox is dangerous.

  A. Based on everything there.  I mean, if he
were a Ku Klux Klan man, he would be in CCR.

BY MR. TRENTICOSTA:

  Q. Are you aware of what Mr. Robert King
Wilkerson has done since he has been released from
the penitentiary?

  A. He is only waiting, in my opinion, for
them to get out so they can reunite.

  Q. Reunite for what reason?

  A. Because he passes out the little cookies
with the Panther on them.  If he passed out those
cookies with KKK on them, it would be no different
to me.  He would be guilty.  If you build your
life on hatred and you're hung up back 20 or 30
years ago, and we have moved onto society past
that, you can't go back reliving in the public.

PAGE 158

You're dangerous.

  Q. Are you aware that Mr. Robert King
Wilkerson has not had any scraps with the law
since he was released after -- in the year 2000?

   MR. CALDWELL:

     I object to the form of the of the
question.  "Are you aware," presupposes a
conclusion that Counsel is stating the
conclusion that he is not committed
anything, and I'm not so sure that that is
correct.  But subject to that, you can ask
it.  That's a bad question.

BY MR. TRENTICOSTA:

  Q. It's your turn.

  A. You can keep until the cows come home, I'm
never going to tell you he's not violent and
dangerous, in my opinion.  I just can't do it.

  Now, you can just keep asking me this a
hundred different ways, but I am going to stick
right where I am.  I'm sorry.  It's what I believe
as a professional in corrections with way more
experience than your consultant, way more, that I
have than he has.  I know better than him.  I am a
consultant, too.

  Q. Well, let me ask you this, lets just for

PAGE 159

the sake assume, if you can, that he is not guilty
of the murder of Brent Miller.

  A. Okay.  I would still keep him in CCR.  I
still know he has a propensity for violence.  I
still know that he is still trying to practice
Black Pantherism, and I still would not want him
walking around my prison because he would organize
the young new inmates.  I would have me all kind
of problems, more than I could stand, and I would
have the blacks chasing after them.  I would have
chaos and conflict, and I believe that.  He has to
stay in a cell while he's at Angola.

  Q. Warden Cain, what is black Black
Pantherism?

  A. I have no idea.  I have never been one.  I
know they hold their fists up, and I know that I
read about them, and they advocated violence.  In
that deal that I read that letter to that woman
that you read earlier -- that we read earlier.
And that is what they stand for is violence.  In
that deal that he talks for, that's what he stands
for.  Maybe they are nice good people, but he is
not.

  Q. In your previous deposition, I think you
stated that you didn't have any problem with Black

PAGE 160

Panthers.

  A. I don't have a problem with them.  I just
have a problem with him, because he's violent with
that stuff.  He's hung up in it, back 20 years
ago.  He stayed in prison.  He never moved on.

  There have been people who were in the Black
Panther religion that clenched their fists and did
horrible things before, that don't anymore.  He
never left where he was before.  He is still
living that stuff, that violence.  I feel, I see,
I live -- I know what he stands for.

  Q. Do you believe the Black Panthers are
religious people, that it is a religion?

  A. Well, I don't know what they were.  I
don't know anything about them.  I am just telling
you, they moved on.  He didn't.  Let's don't get
into what they are and all that.  I don't care and
don't know.  It doesn't bother me.

  Q. Well, I'm trying to get your understanding
because you said because he is a member of Black
Panther that he's involved in religion.

  A. That's not why I say he is --

  Q. I thought that is what you said.  So if
that is the basis of your opinion --

  A. Ask me another question.

SHEET 41  PAGE 161

Q.    If that is the basis of your opinion, I surely want to know what you know about the Black Panther party.

A.    I don't know anything about them.

Q.    Okay.

MS. CUMMINGS:

I think he's answered your question several times.

BY MR. TRENTICOSTA:

Q.    So we can assume, if I can ask you to assume that he did not kill Brent Miller and he is not a member of the Black Panther party --

A.    You're trying to --

Q.    -- because you don't know what the Black Panther party is, then why are you considering him so dangerous?

A.    You would like me to say yes to everything you say, so you can run down there and go say I did, but you can't go there, and you're trying everything in the world to get me there. I'm happy. I'm laughing at you. I'm not mad. You just ain't going to get me there. That's just Angola. What can I say? He's bad. He's dangerous. I believe it. He will hurt you. They better not let him out of prison.

PAGE 162

They're going to make a bad mistake. That is my testimony here. But I ain't the one. I don't have to carry that burden, but I wouldn't do that gamble. That ain't cool.

I'm sorry, Nick. I like you, but I don't trust that dude. You-all can come sing. I like you that much.

Q.    Excuse me.

A.    You-all can come sing. I like you that much.

Q.    I don't know if I'm talking out of school, but maybe we should go off the record.

MR. TRENTICOSTA:

Give me a second, one second please.

(Off the record.)

MR. TRENTICOSTA:

I don't think I have any more questions.

MS. CUMMINGS:

Okay. Well, I've got a few.

RE-EXAMINATION BY MS. CUMMINGS:

Q.    We have a few things that we need to address, Warden Cain. In the deposition, you commented -- a few minutes ago you indicated that you felt that Counsel had taken your comment out

PAGE 163

of context in the previous deposition.

Q.    Only when he said that I said or implied he is a model prisoner all encompassing.

Q.    Okay. In fact, in that deposition, didn't you indicate that he had a potential for violence toward others and you were concerned for the safety of the institution?

A.    I did.

Q.    Didn't you also tell him that if he got away from you, he would kill people? The exact quote, "Well, because if he got away from us, he will kill you. Obviously, I mean, he's done it before under certain circumstances, he would."

A.    I said that, yes. I believe it. I believe he is dangerous.

Q.    Okay. So your belief is that he is dangerous, and a danger not only to other prisoners, guards, but he is also a danger to your institution, and has continued -- existed back in 2006 and has continued?

A.    I believe that. I said that. I testified to that.

Q.    Okay. If you have that much concern that he is a danger inside the institution, what is your fear of him being released into society?

PAGE 164

A.    I think it is a gamble. I think that he has a great potential to escape, to flea. And I think that if I were him, I would. And I think that he has the potential in the right environment to hurt people and do it again.

Q.    You have indicated all through this deposition --

A.    He threatened witnesses, you know, in that trial way back when.

Q.    He threatened witnesses?

A.    Yes. As I understood he has threatened Mr. Sinquefield and he has threatened also one of the Miller brothers, Stan Miller, who worked for us a long time.

Q.    Okay. So he has threatened a prosecutor?

A.    Yeah. Now, this is only hearsay. I've heard that.

Q.    Okay. You have throughout this whole thing, you have been very concerned with the nature of his -- I am not going to say initial offense, because he has had a lot of violent offenses, but I am talking about the murder of Brent Miller. You have been very concerned with the nature of that offense. Is the murder of a guard different to you than the murder of somebody

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 42    PAGE 165

on the outside?

A.    The murder of the guard means you have the courage and the nerve to attack the man in blue who is the authority figure over you; and so, therefore, then there is no limit to what you would do.  If you felt like it served your need and you had a purpose to do, then you would.  And so that is the ultimate is to attack the guard.  If they will attack him, they will attack each other.

When they go after the correctional officer then they go to CCR, and we don't release, because they have -- they are too bold and they are too brave and they are dangerous to us as correctional officers.

Q.    Okay.  So as far as murderers go, they are even worse than others?

A.    They are.  If they will attack the guards, they are.

Q.    You were also questioned about the DB process, to a great extent.  Are you aware that actually Judge Palazola had approved your processing?

A.    He has.

Q.    Okay.  So that was put before Judge

PAGE 166

Palazola --

A.    It was.  It was before the federal court.  That and the administrative remedy procedures, both had been approved, and we were under the consent decree that Judge Palazola authorized us and we used that DB court process as due process.

Q.    Okay.

A.    And we even -- I didn't mention it, but we are also required to bring in outside attorneys, real lawyers, to train these inmate lawyers, and do that periodically to keep their skills fine-tuned as inmate lawyers.

Q.    Okay.  As I understand it, you feel that your integrity depends on the validity of the system and the validity of your discipline?

A.    Inmates have to know that I will not lie, then they can trust me when I say something.  They believe I tell the truth.  I have a word, and, therefore, the court reflects my integrity.  And if I let the court become tainted, then that's me and then my system, and then I fall apart.  They won't trust my administration.  And then we become us and them, and then we have violence and we have problem prison.

Q.    Okay.  Counsel also asked you to a great

PAGE 167

extent about your personal interaction with Woodfox.  I mean, your opinion is not so much based on your personal interaction with Woodfox, is it?

A.    No.  I have 5,000 -- over 5,000 inmates.  I never get to personally interact with any of them a lot and some probably never.

Q.    Okay.  But you spend a great deal of time interacting with guards that supervise him; is that correct?

A.    I do.  I spent a lot of time with the guards that supervise him.  And I just -- I have talked to him some.  I saw his demeanor.  I saw him in the new deal.  I went on and saw him.

You don't have to talk to them to feel what you feel and think what you think.  And I think that is part of the art of the business.  Like, everyone in every profession gets really proficient in certain parts of it, and I think I can tell really pretty good and judge character really well about what people are and what they are about.  But their actions and their past also play a major role in that.  But it's -- it's all the events together.  It is not just a one event thing.

PAGE 168

Q.    Okay.  And back to the credibility of the DB process -- at the risk of everybody in the room protesting -- can you just briefly go through these DB, the disciplinary documents and tell us how many different officers are involved in these?

A.    Oh, there are various -- not often even the same ones.

Q.    Okay.  So it would --

A.    It is more often -- I didn't notice any of the same ones hardly.  I noticed Byargeon a couple of times, but he was the high-ranking person reviewing him just coming in.  Warden Kelone -- just, like, for instance, he's a preacher, and a man of integrity within our church.  And when he's in the free world, that is what he does.  And you just can go through them.

Warden Bonnette, he is retired now.  He went over to Avoyelles.  He's only in there one time.  Warden Bonnette, one time.  He had just seen him one time.  I don't see anybody hardly twice.

Q.    Okay.  You also -- you talked about -- and Counsel asked you about the hunger strike.  You were at Angola during that 1999 hunger strike, weren't you?

A.    I was.

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 43   PAGE 169

Q.    Do you recall it?

A.    Uh-huh.

Q.    Do you recall Albert Woodfox being involved in that hunger strike?

A.    Yes.  He made me pretty angry with that, because, you know, they were trying to run the prison.  They were trying to take it away from us. What do you do with that?  If we give into them, then they're -- they're strong.  I mean, they're strong.  They are not weak.  They're tough, and they were determined.  And we are lucky we got out of it.

Q.    How did you-all get out of it?

A.    We just -- we just -- I didn't talk to them.  I wouldn't talk to them, because I ever caved in and talked to them, then that would be bad.  Warden Vannoy talked to them.  And Warden Vannoy worked with them at that time and Warden Gunnels did, who I believe was there at the time. We just got it resolved.  They didn't get enough to stay with them.  They backed out of it.  They saw we weren't going to give into them.

Q.    Okay.  And there was a report in there and you indicated that there was a spear made of paper that was found, I think, in Albert Woodfox's

PAGE 170

locker.  You indicated that paper is dangerous. Would you explain to us how paper is dangerous?

A.    We have a paper guitar right now that will beat your brains out.

Q.    A paper guitar?

A.    Uh-huh, made out of paper, a guitar.  It's real heavy.  They wet the paper and make the paper mold.  They don't just roll up the piece of paper. They don't have glue, so they soak the paper and they make it and it dries and then it's hard.

It is not just paper like you think of paper. You know, this thing was telescopic, so I don't think it was paper.  I think this was some sort of metal or wood or something, but we don't what it was.  But even the paper is dangerous.

The darts are all made of paper that they shoot you with when you walk through the deal with just the little point and the blow guns they make. And so paper is very dangerous to us, if it was paper.

Q.    Okay.

A.    If it is made to be -- it is going to be rigid enough to telescope and be a pole not matter what it is.  You can stick a straw through an apple, you know.  It is dangerous to us.

PAGE 171

Q.    Okay.  And as Counsel was cross-examining you on all of these disciplinary board reports and wanted to know why you would assume that a can would be used to, you know, make a -- I think something to do -- why you were assuming it would be used for violence rather than something else, why do you make those assumptions?

A.    Because of experience from being in the business.  And I would think that he does want to escape.  He does not want to die in Angola.  And if he doesn't make it through the courts, then we really have to diligent with him.  And right now with the courts -- that's what shocked me so much.

When you think you have a chance to get out, why do you break a silly rule with the porn and the three-way call and all, because now I would be on my very best behavior.  I would be trying to fool you.  I wouldn't still break the rules. That's why it shocked me when I dealt with him and Wallace on these kind of little, old petty things.

And so we just kind of was giving them enough rope to hang themselves.  Just let them see what they will do.  And it really wasn't hurting us. We just knew it.  They didn't know we knew it, but we were monitoring the calls.  No secret and they

PAGE 172

still do it.

Q.    And when he has every reason to obey the rules right now as all the attention is focused on him?

A.    Now more than ever.  He's got high-quality lawyers trying to help him.  And I think he just, you know, poops on them when he does that.  He didn't help their case at all.

Q.    I would like to ask you about -- we talked about one report -- it was No. 22, State's Exhibit No. 22.

A.    (Viewing documents.)

Q.    The date of that is 12/17/72.  Will you look at that again.

A.    Okay.  (Viewing documents.)

Q.    Was this in any way connected to, I think, guard Gunnels being set on fire?

A.    It was.  They were together, Rory Mason was, and this was part of that little deal.  This was a little thing going on.  Warden Gunnels told me this himself.

They were out to get someone.  They had to make a statement, and they were going to get someone, and he told me this.  And that that's why they set him on fire in the little house.  And

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 44    PAGE 173

someone else he told me was warned about going to
the little house because they were going to burn
whoever was in the guard shack.

    I recall him telling me that himself. And
they, meaning this, and this is just exactly when
this happened. And I think -- he told that
Brent Miller was just who happened to be there.
They didn't pick Brent Miller out because he was
Brent Miller. They killed the guard that day that
was there in their dormitory. This was a
statement they were making as the Black Panthers.

    Q.    Okay.

    A.    And Gunnels told me --

    MR. CALDWELL:

        Excuse me, are we talking about
State's No. 22 or State's No. 24?

    MS. CUMMINGS:

        State's No. 22.

    THE WITNESS:

        No. 22, Rory Mason.

BY MS. CUMMINGS:

    Q.    Counsel also asked you about, why would
you presume that a radio antennae was going to be
used as a firing pin for a zip gun.

    MR. TRENTICOSTA:

PAGE 174

        Objection, that is not what I said.

    MS. CUMMINGS:

        I'm sorry.

BY MS. CUMMINGS:

    Q.    Do you recall being question about --

    A.    The zip gun, I do.

    Q.    And did you believe that the -- let's go
ahead and find that one so we can specifically
refer to it. (Viewing documents.) Okay. That is
State's Exhibit No. 12.

    A.    (Viewing documents.)

    Q.    And this is where you found -- a guard
found "what appeared to be the firing pin for a
zip gun hidden inside a tube of toothpaste. The
object was about (3") three inches long, sharpened
on one end and appeared to be the end of a radio
antennae."

    Why do you presume that could be used as a zip
gun?

    A.    I presumed that this was this. This was a
small part of the antennae. This would be the
firing pin mechanism, the 22 bullet would fit into
the bigger part of the antennae, and, therefore,
that would be the barrel of the gun.

    The firing pin would go inside because it was

PAGE 175

obviously the smaller part of the antennae, and
this is what I think the zip gun consisted of.
And so -- and I think there is even one in a
museum that is made out of a radio antennae.

    Q.    Okay.

    A.    And so that's why I said that.

    Q.    And are you aware that in Albert Woodfox's
deposition, he actually admitted that he was
making a zip gun, that he had a zip gun?

    A.    I didn't realize --

    MR. TRENTICOSTA:

        Objection, that is
mischaracterization.

    A.    I wouldn't be surprised. I don't remember
it. I don't recall it.

BY MS. CUMMINGS:

    Q.    On page 68 of the deposition?

    MR. CALDWELL:

        What's the date of the deposition?

    MS. CUMMINGS:

        This is January 31, 2008.

    THE WITNESS:

        I don't have that one. (Viewing
documents.)

BY MS. CUMMINGS:

PAGE 176

    Q.    Question:

        "Q.  Do you remember being caught with
a firing pin for a zip gun?"

        Answer:

        "A.    I remember also taking a
screwdriver I had made to work on my radio
and called him and traded it for a zip
gun."

    Does that sound to you like he had possession
of a zip gun?

    A.    He did, he did, he did.

    MR. TRENTICOSTA:

        Excuse me, can you tell me where it
is?

    MS. CUMMINGS:

        I'm sorry. It's page 68 in the
corner. It's page 66, the second question
down.

BY MS. CUMMINGS:

    Q.    Warden Cain, you were asked -- Counsel for
the defense asked you whether you were aware that
on the lockdown review summaries that are done
every how often --

    A.    Ninety days.

    Q.    Every 90 days that rule infractions and

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 45   PAGE 177

violence have never been checked on Albert
Woodfox's Lockdown Review Summary in the whole
time he was there.  Do you remember him saying
that?

    A.    Yes.
    Q.    And how did you answer that question, if
you remember?
    A.    I answered the question by saying rule
violence was checked because he was in there for
the reason originally which meant the killing of
Brent Miller to me was violence.  But later we
found that there was a lot of them checked.
    Q.    And I would like to show you 33, on
State's Exhibit No. 33 which is dated 10/3/79.
              (The exhibit is marked as State's
Exhibit No. 33 for identification and is
attached hereto.)
          Is there anything checked anything than the
nature of the initial --
          MR. TRENTICOSTA:
              May I have a copy.
    A.    There was a nature of a committed offense.
That he was physically dangerous to himself and
others as evidenced by.  There was serious rule
infractions.  There was a pattern of violence.

PAGE 178

All checked.
BY MS. CUMMINGS:
    Q.    All checked?
    A.    (Nodded head affirmatively.)
    Q.    Okay.  State's Exhibit No. 34, dated
4/5/77.
              (The exhibit is marked as State's
Exhibit No. 34 for identification and is
attached hereto.)
    A.    Same thing with that one.  Investigation
checked.  Nature of original reason for lockdown
checked.  Physically dangerous to himself and
others as evidenced by: serious rule infractions
and conviction for murder of correction officer is
all checked.
    Q.    Okay.  State's Exhibit No. --
    A.    Also, the inmate refused to go to the
board.
    Q.    He refused to go?
    A.    Yes.  He wouldn't go to the hearing.  It's
checked.
    Q.    Okay.  State's Exhibit No. 35.
              (The exhibit is marked as State's
Exhibit No. 35 for identification and is
attached hereto.)

PAGE 179

    A.    On 5/4/76, the same.  Nature of commitment
offense, nature of original reason, physically
dangerous to himself and others as evidenced by:
serious rule infractions and pattern of violence.
    Q.    State's Exhibit No. 36, dated 7/21/77.
              (The exhibit is marked as State's
Exhibit No. 36 for identification and is
attached hereto.)
    A.    Same thing.  Physically dangerous to
himself and others: serious rule infractions and
pattern of violence.  Refused to meet with the
board.
          MS. CUMMINGS:
              Did you get that one?
          MR. TRENTICOSTA:
              I was just handed five documents.  The
last one is 36.  I mean, the second to
last one is 36, dated 5/4/76.
          THE WITNESS:
              I have 36.
          MS. CUMMINGS:
              He has 36.  Did I misnumber them?
          MS. CUMMINGS:
              No. 35 is 5/4/76; 36 is 7/21/77.  Do
you-all have that one?

PAGE 180

          MR. TRENTICOSTA:
              The problem is that I was given two of
4/5/77, and I was given the right ones.
          MS. CUMMINGS:
              Okay.
BY MS. CUMMINGS:
    Q.    All right.  No. 37, this is October 4,
1977.
              (The exhibit is marked as State's
Exhibit No. 37 for identification and is
attached hereto.)
    A.    Same thing.  Nature -- it's all checked.
Physically dangerous to himself and others:
serious rule infractions and refused to meet the
board.  He wouldn't go to court again.
    Q.    Okay.
    A.    He didn't want to say anything.
    Q.    No. 38.
              (The exhibit is marked as State's
Exhibit No. 38 for identification and is
attached hereto.)
    A.    Same thing.  Nature of original reason,
physically dangerous to himself and others as
evidenced by: serious rule infractions.  Refused
to go to meet the board.

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 46    PAGE 181

Q.    No. 39 which is October 27, 1978.
(The exhibit is marked as State's Exhibit No. 39 for identification and is attached hereto.)
A.    Nature of original reason, physically dangerous to himself and others as evidenced by: serious rule infractions and pattern of violence. All checked. Declined to meet the board.
Q.    Let me see, what date was that?  '78, okay. And this would be No. 40, which is dated January 29, 1979.
(The exhibit is marked as State's Exhibit No. 40 for identification and is attached hereto.)
A.    Same thing. Physically dangerous to himself and others: serious rule infractions and pattern of violence. Declined to meet the board. Nature of commitment. New rule infractions since last review, too, is checked on this one.
Q.    Okay. April 26, 1979, and this is No. 41.
(The exhibit is marked as State's Exhibit No. 41 for identification and is attached hereto.)
A.    Okay. And he still didn't go to the board himself.  Nature -- new rule infractions since

PAGE 182

last review. Nature of original reason, physically dangerous to himself: serious rule infractions and pattern of violence.
Q.    No. 42, 7/18/79.
(The exhibit is marked as State's Exhibit No. 42 for identification and is attached hereto.)
A.    Wouldn't go to the board. Nature of commitment offense. Nature of original reason, physically dangerous to himself and others: psychiatric evaluations, serious rule infractions. His evaluation was bad here.
Q.    Okay. No. 43, which is January 9, 1980.
(The exhibit is marked as State's Exhibit No. 43 for identification and is attached hereto.)
A.    Same things. He's got physically dangerous to himself and others: serious rule infractions, pattern of violence. Nature of original reason. Nature of commitment offense. Investigation even.
Q.    No. 44 -- wait, wait, wait. What date is that?
A.    This one is April 28, 1980.
Q.    Okay.

PAGE 183

(The exhibit is marked as State's Exhibit No. 44 for identification and is attached hereto.)
A.    Okay. Investigation is checked. Not released, nature of commitment offense. Nature of original reason for lockdown. Physically dangerous to himself or others: serious rule infractions, pattern of violence. Didn't go to the board.
Q.    No. 45, which is 7/30/80.
(The exhibit is marked as State's Exhibit No. 45 for identification and is attached hereto.)
A.    Wouldn't go to the board this time either. It's checked, physically dangerous to himself or others: serious rule infractions, pattern of violence. Nature of original reason. Nature of commitment. Investigation.
Q.    No. 46, dated 7/26/83.
(The exhibit is marked as State's Exhibit No. 46 for identification and is attached hereto.)
A.    Okay. Nature of original offense. Dangerous to himself and others is checked. Pattern of violence is checked. They are doing

PAGE 184

them different. They just don't have quite as many, but still got more than some. It didn't say he wouldn't go to the board on that one.
Q.    Okay. October 25, 1983, and this is No. 47.
(The exhibit is marked as State's Exhibit No. 47 for identification and is attached hereto.)
A.    Pattern of violence, physically dangerous to himself. Nature of original reason. Not released. Rule violation. He must have went to the board.
Q.    So in answer to Defense Counsel's question, are you aware of any of these lockdown summaries, these lockdown review summaries in which is it indicated that he is kept in lockdown because of serious rule infractions, pattern of violence or because he refused to go to the board?
A.    Well, he's kept in there for all these reasons that they have checked off.
Q.    Absolutely. Okay. And you have reviewed all these and these are documents kept -- the records kept by DOC?
A.    Yes.
MS. CUMMINGS:

Warden Burl Cain
Wednesday, October 22, 2008
Albert Woodfox, #72148 v. Burl Cain, et al

SHEET 47    PAGE 185

If I can just have a minute.

(Off the record.)

BY MS. CUMMINGS:

Q.    Okay.  You indicated during your testimony
that there are disciplinary board indications that
he has been violent to guards a couple of times,
twice at least; he has been violent to other
prisoners, at least once; you indicated that
others heard him threaten witnesses, do you think,
based on your experience, based on everything that
you see in this case, based upon everything we
have talked about today, that he would be a risk
to witnesses in his murder trial?

A.    I do.

Q.    And why is that?

A.    Because of who he is and what he is and in
my experience with him at Angola, and because he
didn't rehabilitate like other people.  He didn't
through the years become more mellow and let it
all go and let the past go and move onto the
future.  He hung with the past.  He hung with his
stubbornness to have it his way, all the time, and
be a revolutionary-type person.

Q.    I don't have any other questions.  Thank
you.

PAGE 186

A.    You're welcome.

MR. CALDWELL:

All right.  Let's shut her down.

MR. TRENTICOSTA:

I have about three hours, Mr. Cain.  I
do have some more questions.

THE WITNESS:

I know you did.

MR. CALDWELL:

All right.  Go on.

MR. TRENTICOSTA:

No offense.

MR. CALDWELL:

Well, we've got the deponent and then
we've got the defense and then we've
got --

MR. TRENTICOSTA:

Well, we just did introduced records,
didn't we?

MS. CUMMINGS:

Records that --

MR. CALDWELL:

Yes.

MR. TRENTICOSTA:

Thank you.

PAGE 187

RE-EXAMINATION BY MR. TRENTICOSTA:

Q.    Now, Mr. Cain --

MS. CUMMINGS:

I take it -- excuse me, excuse me.  I
take it you are going to be limiting your
re-cross to the records.

BY MR. TRENTICOSTA:

Q.    Warden Cain, with the help of your lawyer,
you have reviewed the review board summaries for
Mr. Woodfox; is that correct?

A.    Yes.

Q.    And we just examined State's No. 33 to 46,
have we not?

A.    Yes.

Q.    And the last one No. 46 ends on July 26,
1983; correct?

A.    Right.

Q.    Have you and your lawyer found any other
subsequent report, any report in the last 25 years
that the board has reflected or checked that
Mr. Woodfox is dangerous to himself or others or
an escape?

MS. CUMMINGS:

I object to the form of the question.
There has been no indication that we've

PAGE 188

had an opportunity to review all of the
records.

MR. TRENTICOSTA:

Mr. Cain just said he did.

BY MR. TRENTICOSTA:

Q.    Can you answer that for me?

A.    I didn't review all the records.  I didn't
say that.

Q.    With the help of your lawyer, did you --

A.    I only reviewed what we had right here.
And we just did a few right here.  We could go
back maybe and have to have another whole day and
look at all them.

Q.    Okay.

MR. HICKS:

And let me say for the record -- wait,
let me finish talking.  Let me say for the
record, this was the first we looked
through the records.  It was a very quick
look over the course of perhaps five
minutes.  Given more time, perhaps there
would be more records out there, but this
was a very quick search in response to
your question that you brought up.

MS. LACY:

Judy P. Foust, Inc.
Certified Court Reporters
(225) 344-2270

SHEET 48  PAGE 189

I would like to also add for the record that the last one is No. 47, which is October 25, 1983, not No. 46 dated July 26, 1983.  Just a clarification.

MS. CUMMINGS:

We did have 47, yes.

MR. TRENTICOSTA:

Warden Cain, thank you.

(Off the record at 5:37 p.m., whereupon, the taking of the witness's testimony is concluded.)

PAGE 190

R E P O R T E R ' S   P A G E

I, Angie Henning, Certified Court Reporter, in and for the State of Louisiana, the officer, as defined in Rule 28 of the Federal Rules of Civil Procedure and/or Article 1434(b) of the Louisiana Code of Civil Procedure, before whom this sworn testimony was taken, do hereby state on the record:

That due to the interaction in the spontaneous discourse of this proceeding, dashes (--) have been used to indicate pauses, changes in thought, and/or talkovers; that same is the proper method for a court reporter's transcription of proceeding; that the dashes (--) do not indicate that words or phrases have been left out of this transcript; and that any words and/or names which could not be verified through reference material have been denoted with the phrase "(phonetic)."

PAGE 191

STATE OF LOUISIANA:

PARISH OF EAST BATON ROUGE:

I, Angie Henning, Certified Court Reporter in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that the foregoing pages, constitute a true and correct transcription of the evidence adduced on the taking of the testimony of WARDEN BURL CAIN,

on Wednesday, the 22nd day of October, 2008, at the Attorney General's Office, 1885 North Third Street, Baton Rouge, Louisiana, after the witness had been first duly sworn by me; that the testimony was reported by me in the voicewriting reporting method and thereafter reduced to typewriting by me; that I am not related to counsel or to the parties herein, nor am I otherwise interested in the outcome of this matter.

ANGIE HENNING, CVR, CCR #23023

STATE'S EXHIBIT

LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
DISCIPLINARY REPORT

INSTITUTION: LSP

| 1. Name of Inmate | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| Albert Woodfox | 72148 | 5/16/08 | 8:55 Am |

| 5. Place of Incident | 6. Job Assignment (Inmate) | 7. Housing Assignment (Inmate) |
|---|---|---|
| Eagle 1 | Yard Orderly | Eagle 1 Bed 33 |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| Contraband | 1 |

10. Description of Incident (Include all relevant information - "unusual inmate behavior, staff witnesses, physical evidence & disposition, immediate action including use of force"; use other side, if necessary)

On the above date and approximate time, I sgt. J. Rice was conducting a search on Inmate Albert Woodfox #72148 when I found 5 page's of pornography that had been riped from a magizne they where in his locker box the pictures where confiscated and locked up in Shakedown Crew locker box.

11. Inmate Placed in Adm. Seg. ☐ Yes ☑ No    Well in KADA

| 12. Signature of reporting employee | 13. Name, Title, Assignment (Print) | 17. Inmate's Signature |
|---|---|---|
| Justina Rice, Sgt | Justina Rice Sgt   Shakedown Crew 8hr | Albert Woodfox 7214 |

| 14. Date of Report | 15. Time of Report | 16. Report (copy) given to above inmate by: |
|---|---|---|
| 5/16/08 | 9:00 Am | Sgt |

| 18. Plea by Inmate: ☐ Not Guilty ☐ Guilty | 19. Verdict: ☐ Not Guilty ☐ Guilty |

| 20. Date of Hearing: 5-20-08 | 21. Counsel Substitute: 323037   Stagner |

22. Motions:

23. Reasons for Disposition:
☐ Report is clear and precise.   ☐ Lack of a credible defense/little or no defense.   ☐ Based on his statement.
☐ The officer's version is determined to be more credible than the inmate's.   ☐ Pled guilty/accepted guilty plea.
☐ Only defense is denying contents of report.   ☐ The inmate presented no evidence to refute the charges.
☐ The Investigative officer's testimony was deemed more truthful and accurate than the inmate's.   ☑ Plea bargain.
☐ The inmate's demeanor led the board to believe that the inmate's testimony was untrue.
☐ Other

24. Reasons for Sentence:
☑ Seriousness of offense.   ☑ The need to protect the institution, employees, or inmates
☐ Poor Conduct record. A total of _____ rule violation(s). A total of _____ Schedule B violations since _____
A total of _____ # _____ rule violations since _____
☐ Other

Add'l documents produced to plaintiffs-0745

RECEIVED MAY 28 2008 STATE PENITENTIARY RECORDS OFFICE

| 25. Sentence: Loss of 2 wks yard | Suspended ☐   Imposed ☑   Days |
| 26. Sentence: Loss of 2 wks Canteen | Suspended ☑   Imposed ☐   30 Days |

27. DISCIPLINARY BOARD:
Cost may be imposed for any property loss, damage, or medical expense occasioned through the fault of an inmate who in so causing the loss, damage, or medical expenses also is found

CHAIRMAN (DISCIPLINARY OFFICER)

HC/R

STATE'S
EXHIBIT

Blumberg No. 5138

2

LOUIS. DEPARTMENT OF PUBLIC SAFETY AND C. CTIONS
DISCIPLINARY REPORT

INSTITUTION: _LSP_

| 1. Name of Inmate | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| Albert Woodfox | 72148 | 12-4-02 | 9:54 A.M. |

| 5. Place of Incident | 6. Job Assignment (Inmate) | 7. Housing Assignment (Inmate) |
|---|---|---|
| TU/CCR Upper B Cell #13 | None | TU/CCR Upper B Cell #13 |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| Aggravated Disobedience | 5 |

10. Description of Incident (Include all relevant information - "unusual inmate behavior, staff witnesses, physical evidence & disposition, immediate action including use of force"; use other side, if neccessary)

On the above date and time, inmate Albert Woodfox #72148 was hollering and shaking the bars on his cell. I Sgt. L.R. Montondon gave inmate Albert Woodfox #72148 several direct verbal Orders to "Quiet down and step back from bars." Inmate A. Woodfox refused all Orders. Lt. Laplasie was contacted, and inmate A. Woofox was placed in Adm. Seg.

| 11. Inmate Placed in Adm. Seg. | ☑ Yes | ☐ No |
|---|---|---|

| 12. Signature of reporting employee | 13. Name, Title, Assignment (Print) |
|---|---|
| | L.R. Montondon, Sgt. TU/CCR A-Team |

| 14. Date of Report | 15. Time of Report | 16. Report (copy) given to above inmate by | 17. Inmate's Signature: |
|---|---|---|---|
| 12-4-02 | 10:06 A.M. | | |

| 18. Plea by Inmate: | ☑ Not Guilty ☐ Guilty | 19. Verdict: ☐ Not Guilty ☐ Guilty |
|---|---|---|

| 20. Date of Hearing: | 21. Counsel Substitute: |
|---|---|
| 12/6/02 | DOC#: 122702 |

22. Motions:

23. Reasons for Disposition:
☑ Report is clear and precise.   ☐ Lack of a credible defense/little or no defense.   ☐ Based on his statement.
☑ The officer's version is determined to be more credible than the inmate's.   ☐ Pled guilty/accepted guilty plea.
☑ Only defense is denying contents of report.   ☐ The inmate presented no evidence to refute the charges.
☐ The investigative officer's testimony was deemed more truthful and accurate than the inmate's.   ☐ Plea bargain.
☐ The inmate's demeanor led the board to believe that the inmate's testimony was untrue.
☐ Other

RECEIVED
LA STATE PENITENTIARY
RECORDS OFFICE

24. Reasons for Sentence:
☑ Seriousness of offense.   ☑ The need to protect the institution, employees, or other.
☐ Poor Conduct record. A total of _____ rule violation(s). A total of _____ Schedule B violations since _____.
         A total of _____ # _____ rule violations since _____.
☐ Other

| 25. Sentence: | | |
|---|---|---|
| Loss 2 wks Canteen | Suspended ☑ 90 Days | |
| | Imposed ☐ | |

| 26. Sentence: | | |
|---|---|---|
| | Suspended ☐ _____ Days | |
| | Imposed ☐ | |

27. DISCIPLINARY BOARD:
Cost may be imposed for any property loss, damage, or medical expense occasioned through the fault of an inmate who in so causing the loss, damage or medical expenses also is found guilty through the disciplinary process of violating one or more of the rules set out in the Disciplinary Rules and Procedures for Adult Inmates.

CHAIRMAN (DISCIPLINARY OFFICER)

MEMBER

AW 0084

DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

## UNUSUAL OCCURRENCE REPORT

Blumberg No. 5138

STATE'S
EXHIBIT

3

| NAME | Calvin Thomas<br>Albert Woodfox<br>Roynell Joshua | NUMBER | 94316<br>72148<br>82226 | DORM | CCR U/B-7<br>CCR U/B-13<br>CCR U/B-3 | DATE OF INCIDENT | 09-19-2000 | TIME | 7:2 |
| LOCATION OF INCIDENT | | CCR Upper B Tier | | WITNESSES | | William Jennings, Sergeant | | | |

### TYPE OF INCIDENT — CHECK APPROPRIATE BOX (ES)

| | | | | |
|---|---|---|---|---|
| ASSAULT ON STAFF | MAJOR DISTURBANCE | ROOF SHAKEDOWN | PROTECTION REQUESED | MAINTENANCE |
| AGG. SEX OFFENSE | SEX OFFENSE | SHIFT SHAKEDOWN | VIOLENT DEATH | REPAIR REQUEST |
| AGG. FIGHT | USE OF FORCE | FRONT GATE SHAKEDOWN | DEATH DUE TO ILLNESS | FENCE CHECK |
| FIGHT | MINOR DISTURBANCE | MATTRESS SHAKEDOWN | MENTAL HEALTH | WEEKLY INSPECTION |
| ESCAPE | SEARCH OF INMATE | GROUNDS SHAKEDOWN | MEDICAL | MONTHLY INSPECTIO |
| CONTRABAND   XXX | OTHER   Possible Aggravated Fight | | | |

☐ CHEMICAL AGENTS USED                    ☐ MECHANICAL RESTRAINTS USED

| DESCRIPTION OF INCIDENT (ATTACH ADDITIONAL INFORMATION IF NEEDED) |
|---|

On September 19, 2000 at approximately 7:27PM I was notified by Sergeant William Jennin

that while he was making rounds on Upper B Tier he observed that there was food and what app

to be human waste on Inmate Roynell Joshua's #82226 cell bars, on Inmate Albert Woodfox's #7

cell bars, and the wall in front of Inmate Woodfox's cell.  Inmate Calvin Thomas #94316 was

the tier for his tier time at the time of this incident.  Inmate Calvin Thomas #94316 was pl

in Administrative Segregation at CBD and Inamte Albert Woodfox and Roynell Joshua were place

in Administrative Segregation on Lower E Tier.  All three inmates were examined by Medical

Personnel and were allowed to take a shower.  Warden Davy Kelone was notified of this

incident.

RECEIVED

SEP 28 2000

'A STATE PENITENTIARY
RECORDS OFFICE

RECEIVED

SEP 25 2000

Original:  Warden
Copy:   Deputy Warden
            Deputy Warden/Adm.
            Asst. Warden/Sec.
            Asst. Warden/Trt.
            Colonel/Lt. Colonel
            Camp Major
            Legal Programs

Rev. 10/98

SIGNATURE OF REPORTING EMPLOYEE

_Dale Duplech_

NAME:   Dale Duprechain
TITLE:   Lieutenant
ASSIGNMENT:   TU/CCR  C-Team

ATTEST
A TRUE COPY

_Fran Foster_
CUSTODIAN OF RECORDS

FORM I

DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS

# UNUSUAL OCCURRENCE REPORT

| NAME | Calvin Thomas<br>Albert Woodfox<br>Roynell Joshua | NUMBER | 94316<br>72148<br>82226 | DORM | CCR U/B-7<br>CCR U/B-13<br>CCR U/B-3 | DATE OF<br>INCIDENT | 09-19-2000 | TIME | 7:2 |
|------|------|------|------|------|------|------|------|------|------|
| LOCATION OF INCIDENT | | CCR Upper B Tier | | WITNESSES | None | | | | |

## TYPE OF INCIDENT — CHECK APPROPRIATE BOX (ES)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ASSAULT ON STAFF | | MAJOR DISTURBANCE | | ROOF SHAKEDOWN | | PROTECTION REQUESED | | MAINTENANCE |
| AGG. SEX OFFENSE | | SEX OFFENSE | | SHIFT SHAKEDOWN | | VIOLENT DEATH | | REPAIR REQUEST |
| AGG. FIGHT | | USE OF FORCE | | FRONT GATE SHAKEDOWN | | DEATH DUE TO ILLNESS | | FENCE CHECK |
| FIGHT | | MINOR DISTURBANCE | | MATTRESS SHAKEDOWN | | MENTAL HEALTH | | WEEKLY INSPECTION |
| ESCAPE | | SEARCH OF INMATE | | GROUNDS SHAKEDOWN | | MEDICAL | | MONTHLY INSPECTIO |
| CONTRABAND | XXX | OTHER  Possible Aggravated Fight | | | | | |

☐ CHEMICAL AGENTS USED          ☐ MECHANICAL RESTRAINTS USED

### DESCRIPTION OF INCIDENT (ATTACH ADDITIONAL INFORMATION IF NEEDED)

On September 19, 2000 at approximately 7:27PM while making rounds on Upper B Tier, I

observed that food and what appeared to be human waste had been thrown on the bars of Cell

occupied by Inmate Roynell Joshua #82226, and the wall in front of Cell 13 and cell bars of

Cell 13, occupied  by Inmate Albert Woodfox #72148.   Inmate Calvin Thomas 94316 was on the

tier for his tier time at the time of this incident.  Lt. Duplechain was notified.

RECEIVED

SEP 2 8 2000

A STATE PENITENTIARY
RECORDS OFFICE

RECEIVED

SEP 2 5 2000

Original:  Warden
Copy:      Deputy Warden
           Deputy Warden/Adm.
           Asst. Warden/Sec.
           Asst. Warden/Trt.
           Colonel/Lt. Colonel
           Camp Major
           Legal Programs

Rev. 10/98

SIGNATURE OF REPORTING EMPLOYEE

NAME:          William Jennings
TITLE:         Sergeant
ASSIGNMENT:    TU/CCR  C-Team

ATTEST
A TRUE COPY

CUSTODIAN OF RECORDS

LOUISIANA DEPARTMENT OF PUBLIC SAFETY & CORRECTIONS
LOUISIANA STATE PENITENTIARY
INCIDENT REPORT
PART I - INCIDENT REPORT

*Cover EO*

STATE'S
EXHIBIT
4

| 1. Name of Prisoner | 2. Number | 3. Housing and Job Assignment (Prisoner) | | |
|---|---|---|---|---|
| ALBERT WOODFOX | 72148 | CCR UPPER· F | LOCKDOWN | |

| 4. Date of Incident | 5. Time of Incident | 6. Place of Incident |
|---|---|---|
| 05/05/99 | APP. 2·45PM | CSU/CCR MAJOR'S OFFICE |

7. Nature of Incident

THREAT TO SECURITY (MAKING THREATS TO START ANOTHER HUNGER STRIKE)

8. Description of Incident   (Include all relevant information, use additional page(s), if necessary)

ON THE ABOVE DATE AND APP. TIME I CALLED INMATE WOODFOX INTO THE MAJORS OFFICE TO DISCUSS WITH HIM HIS PART IN THE HUNGER STRIKE THAT HAD TAKEN PLACE ON CCR ON 5/3/99 & 5/4/99.  INFORMATION RECEIVED WAS THAT WOODFOX WAS GETTING OTHERS TO KEEP THE HUNGER STRIKE GOING AND THAT WOODFOX WAS A LEADER OF THE HUNGER STRIKE.  INMATE WOODFOX STATED THAT HE HAD ONLY PARTICIPATED IN THE STRIKE BECAUSE HE FELT THAT CCR INMATES HAD LOST TOO MANY PRIVILEGES.  INMATE WOODFOX THEN VERY BELIGERENTLY ASKED WHY SOME OF THE INMATES WHO PARTICIPATED IN THE HUNGER STRIKE GET LOCKED UP.  I TOLD HIM THAT THEY WERE LOCKED UP BECAUSE THEY WERE INFLUENCING OTHER INMATES INTO PARTICIPATING IN THE HUNGER STRIKE.  AT THIS POINT INMATE WOODFOX STATED THAT HE DID NOT FEEL THAT LOCKING UP THOSE INMATES WAS RIGHT.  HE THEN BECAME VERY BELLIGERENT AND SAID. " YOU JUST AS SOON PUT ME IN CAMP -J BECAUSE THAT'S WHAT ITS GOING TO COME TO BECAUSE THIS SHIT ISN'T OVER WITH YET.  HE ALSO STATED "AS FAR AS HE WAS CONCERNED  IT WOULDN'T BE OVER AS LONG AS THE (4) INMATES REMAINED LOCKED UP.  HE SAID THAT HE ONLY ORGANIZED A PEACEFULL DEMONSTRATION AND THAT THERE WASN'T ANYTHING...

| 9. Signature of reporting employee | 10. Name, Title, Assignment (Print) | 11. Report (copy) given to above prisoner by: |
|---|---|---|
| | DAVID BONNETTE, ASSISTANT WARDEN CAMP-J/CCR/CSU | |

| 12. Plea by Prisoner | ✓ Not Guilty | ___ Guilty | 13. Verdict | ___ Not Guilty | ___ Guilty |
|---|---|---|---|---|---|

| 14. Date of Hearing 5/7/99  5·14·99   5·25·99 | 15. Counsel Substitute Savage 127336 |
|---|---|

16. Reasons for Guilty     ___ Report is clear & precise     ___ Lack of a credible defense/little or no defense.     ___ The officer's version is determined to be more credible than the inmate's.     ___ Based on the inmate's statement.     ___ Only defense is denying contents of report.     ___ Pled guilty/accept guilty plea.     ___ The inmate presented no evidence to refute the charges against him.     ___ The investigative officer's testimony was deemed more truthful and accurate than the inmate.     ___ The inmates's demeanor led the board to believe that the inmate's testimony was untrue.     ___ Nature of the offense.     ___ Based on information received from reliable informants.

Other: *Defer for Clarification (Invt.)        Copies given 5/25/99*

17. Sentence:     ___ Reprimand
Custody changed to: _____     Job change to: _____     Quarters change to: _____
Loss of Privileges:     Canteen _____     Plasma _____     Yard _____
     Other: _____
Sentence: Suspended for _____ days.          ___ Combine all reports
Comment:

18. Reasons for sentence:     ✓ Seriousness of offense     ___ The need to protect the institution, employees or other inmates.
     ___ Poor conduct record     ___ Good conduct record     ___ Plea bargain
Other: _____

RECEIVED
JUN 9 1999
La. State Penitentiary
Records Office

19. DISCIPLINARY BOARD:

CHAIRMAN
*Rachal May*  MEMBER
MEM

AW 0099

★★★ TO BE USED AS ADDITIONAL PAGE FOR INCIDENT REPORTS ONLY WHEN NEEDED ★★★

## LOUISIANA STATE PENITENTIARY
## INCIDENT REPORT

ADDITIONAL PAGE NO. __1__

INMATE'S NAME: ____ALBERT WOODFOX____    NUMBER: ____72148____

DATE: ____5/5/99____  TIME: ____APP. 2:45PM____

...WRONG WITH THAT.  HE AGAIN SAID, "JUST GO AHEAD AND LOCK ME UP AT CAMP-J
NOW BECAUSE THAT'S WHAT YOU ARE GOING TO HAVE TO DO ANYWAY.

*Albert Woodfox*

RECEIVED
JUN 9 1999
La. State Penitentiary
Records Office

COPY GIVEN TO INMATE BY:

REPORTING OFFICER:

_____    ASST. WARDEN I    AW 0100

LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS
LOUISIANA STATE PENITENTIARY
DISCIPLINARY REPORT

1-92

STATE'S EXHIBIT 5

1. Name of Prisoner: *Albert Woodfox*  2. Number: *72148*  3. Date of Incident: *9-22-92*  4. Time of Incident: *approx. 9:25 pm*

5. Place of Incident: *U/CCR-C-Tier Cell #13*  6. Job Assignment (Prisoner): *CCR Ext. 4/D*  7. Housing Assignment (Prisoner): *U/CCRA Cell #13*

8. Rule Title: *Contraband, Unsanitary Practice*  9. Rule Number: *#1-A-#26*

10. Description of Incident (Include all relevant information, use Supplemental Page, if necessary).

*During A Routine Shakedown I Sgt. GASPARD along with Sgt. E.C. Wiley found a homemade (8 piece) telescopic pole concealed in a large manilla envelop inside of inmate Woodfox's locker box. The pole was not assembled when found. We also found (1) burnt empty Coke can.*

11. Signature of reporting employee: *Stephen P. Gaspard*  12. Name, Title, Assignment (Print): *STEPHEN P. GASPARD / Sgt. RC-B-Team*  13. Report (copy) given to above prisoner by: *EC*

14. Plea by Prisoner: ____ Not Guilty  ✗ Guilty  15. Verdict: ____ Not Guilty  ✗ Guilty

16. Date of Hearing: *10-5-92*  17. Counsel Substitute: *E. Wilson*

18. Reasons for Guilty: ____ Report is clear & precise  ____ Lack of a credible defense/little or no defense.  ____ The officer's version is determined to be more credible than the inmate's.  ____ Based on the inmate's statement.  ____ Only defense is denying contents of report.  ____ Pled guilty/accept guilty plea.  ____ The inmate presented no evidence to refute the charges against him.  ____ The investigative officer's testimony was deemed more truthful and accurate than the inmate's.  ____ The inmate's demeanor led the board to believe that the inmate's testimony was untrue.  ____ Nature of the offense.
Other: ____

19. Sentence: ____ Reprimand  ____ Days Extra Duty  ____ Days Isolation  ____ FTE Good Time
Custody changed to: ____  Job change to: ____  Quarters change to: ____
Loss of Privileges:  Canteen *2*  Plasma ____  Yard ____
Other: ____
Sentence: *Guilty*  Suspended for *90* days.  Combine all reports
*10-5-92*
Comment: *Deferred Sentencing for record.*

20. Reasons for sentence: ____ Seriousness of offense  ____ The need to protect the institution, employees or other inmates.  ____ Poor conduct record  ____ Good conduct record  ✓ Improved conduct record  ____ Plea bargain
Other: ____

21. DISCIPLINARY OFFICER

22. DISCIPLINARY BOARD: _____ CHAIRMAN
_____ MEMBER

AW 0140




LOUISIANA DEPARTMENT OF CORRECTION
LOUISIANA STATE PENITENTIARY
DISCIPLINARY REPORT

STATE'S
EXHIBIT
6

PART I - DISCIPLINARY REPORT

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| Albert Woodfox | 72148 | 12/2/87 | approx 11:30 am |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| Gar 3-Lobby | CCR Lockdown | CCR Gar 4 Right |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| Aggravated Disobedience | #5 |

10. Description of Incident (Include all relevant information, use other side, if necessary)

While passing through the Gar 3 Lobby in route to a visit, inmate Woodfox stopped at the head of the tier on Gar 3 left and started hollering to inmates down the tier. I gave him several orders to stop hollering. Inmate Woodfox continued hollering, ignoring my orders.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
|  | STEPHEN P. GASPARD Cpl GAR-3-Unit |

13. Report (copy) given to above prisoner by:

PART II - ACTION TAKEN

| 14. Plea by Prisoner: ☑ Not Guilty ☐ Guilty | 15. Verdict: ☐ Not Guilty ☑ Guilty |
|---|---|

| 16. Date of Hearing | 17. Counsel Substitute (Counsel) |
|---|---|
| 12-4-87 | Sullivan |

18. Summary of the evidence and reasons for the decision:

NO SUMMARY DUE TO TAPE MALFUNCTION

19. Sentence

loss of 3 weeks store, suspended 90 days

Suspended ☒

20. Disciplinary officer:

21. Disciplinary Board: C. Tillery ......... Chairman
................. Member
................. Member

RECEIVED DEC 9 1987 LOUISIANA STATE PENITENTIARY RECORDS OFFICE

Sign 7 copies. (Give inmate one copy and forward 6 copies to disciplinary office).

AW 0175



LOUISIANA DEPARTMENT OF CORRECTIONS
LOUISIANA STATE PENITENTIARY
INCIDENT REPORT

PART I - INCIDENT REPORT

1. Name of Prisoner          2. Number          3. Housing and Job Assignment (Prisoner)

Albert Woodfox    19198    Hos 3 Left    CCR Ext'd Lock Program

4. Date of Report    5. Time of Incident    6. Place of Incident

10-12-87    appr 8°° P.m.    Hos 3 Left

7. Nature of Incident

Threat to security

8. Description of Incident (include all relevant information, use other side, if necessary)

On 10-9-87 I received information from 3 confidential
informants that inmate Woodfox had made a statement that
he was going to get Sgt David Knox any way he could
that he may have to pay for it in the long run but
it would be worth it to him. On 10-12-87 after
investigating into same the 3 confidential informants
stated that if inmate Woodfox was not moved from

9. Signature of Reporting Employee    10. Name, Title, Assignment (Rank)

James Arnold    James Arnold Capt Hos Unit

STATE'S EXHIBIT
Blumberg No. 5138

PART II - ACTION TAKEN

11. Pleas: Present ☑ Not Guilty ☐ Guilty ☐ Mental ☐ Not Guilty ☑ Guilty

12. Date of Hearing

13. Statement of the evidence and reasons for the decision

THE INMATE WAS FOUND GUILTY BASED ON EVIDENCE PRESENTED IN THE REPORT
AND CONFIDENTIAL INFORMANTS.

REVIEW OF INMATE'S CONDUCT RECORD

15. Sentence    SPER JR MAJOR    Extended ☐

Disciplinary Board

AW 0177



said that it was going to be problems between inmate Woodfox & other inmates on the tier because they would not go along with him in trying to cause problems. Lt. Col. Murray was notified of this incident. Inmate Albert Woodfox was placed in Administrative DB.

RECEIVED
OCT 13 1987
DISCIPLINARY OFFICE
LOUISIANA STATE PENITENTIARY

COPY SENT TO
CORRECTIONS ASSISTANT WARDEN FOR SECURITY
FOR REVIEW AND REFERRAL TO DISTRICT ATTORNEY
IF APPROPRIATE

AW 0174




LOUISIANA DEPARTMENT OF CORRECTIONS
LOUISIANA STATE PENITENTIARY
DISCIPLINARY REPORT

### PART I - DISCIPLINARY REPORT

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| Albert Woodfox | 72148 | 6-19-87 | 5:30 Pm |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| GAR 4-L | CCR EXT. L 10 | GAR 4-L-8 |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| Disobedience A99. | #5 |

**10. Description of Incident (Include all relevant information, use other side, if necessary)**

ON The Above DATE AND Time I officer McMillian gave The Above Inmate several Direct verbal orders To Stop The Loud Hollering AND Arguing with cell No. 6 HE Refused ALL My orders AND Continued The Loud Arguing.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| Jack McMiller | JACK McMillian, Sgt. CCR GAR 4 |

13. Report (copy) given to above prisoner by: Jm

### PART II - ACTION TAKEN

| 14. Plea by Prisoner: ☑ Not Guilty ☐ Guilty | 15. Verdict: ☐ Not Guilty ☑ Guilty |
|---|---|

| 16. Date of Hearing | 17. Counsel Substitute (Counsel) |
|---|---|
| 6-24-87 | |

18. Summary of the evidence and reasons for the decision:

JUN 28 1987
LOUISIANA STATE
PENITENTIARY
RECORDS OFFICE

| 19. Sentence | Suspended ☐ |
|---|---|
| One week story | |

20. Disciplinary officer: Capt. J. M. Mule

21. Disciplinary Board: _____ Chairman
_____ Member

Sign 7 copies. (Give inmate one copy and forward 6 copies to disciplinary office.)

AW 0188

LOUISIANA DEPARTMENT OF CORRECTIONS
LOUISIANA STATE PENITENTIARY
DISCIPLINARY REPORT

**PART I - DISCIPLINARY REPORT**

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| ALBERT WOODFOX | 72148 | 12-4-85 | 12:15 PM |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| U/CCR C Tier | L/D | U/CCR L 8 |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| Fighting and Disobedience Agg. | #10, 5 |

RECEIVED
DEC 10 1985
LOUISIANA STATE
PENITENTIARY
RECORDS OFFICE



STATE'S EXHIBIT

Blumberg No. 5138

10. Description of Incident (Include all relevant information, use other side, if necessary)

Approx 12:45 PM I Sgt. Thomas while letting Inmate Otis Lewis back in
his cell from his hour showering. Looked down the tier and saw Inmate
Albert Woodfox #72148 run out of his cell (8) which had open while I
was opening Lewis' cell. The two inmates began to fight. I pressed
my beeper and gave (4) direct verbal orders to stop at that time they
backed into the front bars. Still fighting at that time Capt. Arnold and
Sgt. Dauzat came in Capt. Arnold order them to stop but they refused.
Then Capt. Arnold gave me an order to open the tier door, which I did.
Capt. Arnold and Sgt. Dauzat broke up the fight by grabbing one inmate
a piece. Both the inmates were sent to the hospital and then to Adm L/D.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| Brandon Thomas | B.T. CSOII U/CCR C/O |

13. Report (copy) given to above prisoner by:

**PART II - ACTION TAKEN**

| 14. Plea by Prisoner: ☐ Not Guilty  ☑ Guilty | 15. Verdict: ☐ Not Guilty  ☑ Guilty |
|---|---|

| 16. Date of Hearing | 17. Counsel Substitute (Counsel) |
|---|---|
| Dec-6-85 | 86182 - Smith |

18. Summary of the evidence and reasons for the decision:

Accept guilty plea & officers statements. Sent.
based on good conduct record.

19. Sentence

10 days iso Susp 90                                    Suspended

20. Disciplinary officer:

21. Disciplinary Board:                               Chairman
                                                      Member
                                                      Member

Sign 7 copies. (Give inmate one copy and forward 6 copies to disciplinary office.)

AW 0200

STATE'S
EXHIBIT
10

LOUISIANA DEPARTMENT OF ...
LOUISIANA STATE PENITENTIARY
DISCIPLINARY REPORT

PART I - DISCIPLINARY REPORT

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| Albert Woodfox | 72148 | 10/28/81 | 10:10 p.m. |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| UPper CCR D Tier Cell 8 | Lockdown | UPper CCR D-Tier, Cell 8 |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| Disobedience | #4 |

10. Description of Incident (Include all relevant information, use other side, if necessary)

At approx. 10:10 p.m., I, Officer Sarpy, gave Inmate Albert Woodfox 5 direct orders to quit arguing with Inmate Herbert Nicholson and quit sticking his arm out of his cell. Inmate Albert Woodfox kept on fussing and sticking his hand out of his cell.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| Peter Gerald Sarpy | Peter G. Sarpy, NEW Cadet. UPper CCR C & D Tier |

13. Report (copy) given to above prisoner by: Peter G. Sarpy

PART II - ACTION TAKEN

| 14. Plea by Prisoner: ☐ Not Guilty ☑ Guilty | 15. Verdict: ☐ Not Guilty ☑ Guilty |
|---|---|

| 16. Date of Hearing | 17. Counsel Substitute (Counsel) |
|---|---|
| 10-28-81 | |

18. Summary of the evidence and reasons for the decision:

19. Sentence                                          Suspended ☐
Reprimand & Warned.

20. Disciplinary Officer:

21. Disciplinary Board: _____ Chairman
_____ Member
_____ Member

Sign 7 copies. (Give inmate one copy and forward six copies to Discipl

AW 0220

STATE'S
EXHIBIT
11

LOUISIANA DEPARTMENT OF CORREC...
**LOUISIANA STATE PENITENTIARY**
DISCIPLINARY REPORT

*HC 2/18/2*

## PART I - DISCIPLINARY REPORT

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| ALBERT WOODFOX | 72148 | 2-15-79 | 6:15 Pm |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| C.C.R. "D" TIER | LOCKDOWN | CCR. "D" TIER. CELL #7. |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| DISOBEDIENCE | #6. |

10. Description of Incident (Include all relevant information, use other side, if necessary)

WHILE SHAKING DOWN THE ABOVE NAMED AND NUMBERED INMATE'S CELL I FOUND TWO UNAUTHORIZED CONTAINERS. (1) EMPTY CLOROX BOTTLE & (1) INSTANT KOOL-AIDE CONTAINER. THE KOOL-AIDE CONTAINER WAS HALF FULL OF SUGAR. THE INMATE WAS ALLOWED TO EMPTY THE SUGAR FROM THE KOOL-AIDE CONTAINER THE EMPTY CONTAINERS WERE THEN TAKEN FROM THE INMATE.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| *Paul L. Arndt* | PAUL L. ARNDT (CADET), C.C.R., "C" AND "D" TIERS. |

13. Report (copy) given to above prisoner by:  LARRY GUILLORY.

## PART II - ACTION TAKEN

| 14. Plea by Prisoner: [✓] Not Guilty [ ] Guilty | 15. Verdict: [ ] Not Guilty [✓] Guilty |
|---|---|

| 16. Date of Hearing | 17. Counsel Substitute (Counsel) |
|---|---|
| 2/19/79 | *R. Wilson 80356* |

18. Summary of the evidence and reasons for the decision:

Inmate Woodfox was found guilty based on the contents of the report, which are more creditable than the inmates testimony. Sentence based on the inmates previous record and the seriousness of this report.

19. Sentence    *5 Days iso*                                              Suspended [ ]

20. Disciplinary Officer:

21. Disciplinary Board:  _____ *R. Wyatt* _____ Chairman

_____ *(signature)* _____ Member

_____ Member

Sign 7 copies. (Give inmate one copy and forward six copies to Discip.)

AW 0235

STATE'S EXHIBIT

12

cc Warden Butler

LISIANA DEPARTMENT OF CORRECT
**LOUISIANA STATE PENITENTIARY**
DISCIPLINARY REPORT

PART I - DISCIPLINARY REPORT

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| ALBERT WOODFOX | 72148 | 11-1-78 | 2:30 Pm |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| C.C.R. "D" TIER | LOCKDOWN | C.C.R., "D" TIER /50/ |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| CONTRABAND | #1 |

10. Description of Incident (Include all relevant information, use other side, if necessary)

WHILE SHAKING DOWN THE ABOVE NAMED AND NUMBERED INMATE'S CELL I FOUND WHAT APPEARED TO BE THE FIRING PIN FOR A ZIP GUN HIDDEN INSIDE OF A TUBE OF TOOTH PASTE. THE OBJECT WAS ABOUT 3 INCHES LONG, SHARPENED ON ONE END AND APPEARED TO BE THE END OF A RADIO ANTENNA. A FURTHER SEARCH OF THE TIER TURNED UP TWO 22 CALIBER BULLETS HIDDEN UNDER A LAVATORY (SINK) BY THE SHOWERS WHICH FUTHER LEADS US TO BELIEVE THIS WAS A FIRING PIN FOR A ZIP GUN. THIS INMATE WAS PLACED IN ISOLATION BY ORDERS OF COL. H.D. BYARGEON. THE OBJECT FOUND IN THE TUBE OF TOOTH PASTE WAS LOCKED UP IN THE SAFE AT R.C. BY LT. HONEYCUTT, JR. SUPERVISOR OF THE OUTCAMP SHAKEDOWN CREW. THE TWO BULLETS WERE TURNED OVER BY LT. HONEYCUTT, JR. TO COL. H.D. BYARGEON.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| Leslie Dupont | SGT. LESLIE DUPONT, 2-10 SHAKEDOWN CREW FOR OUTCAMPS. |

13. Report (copy) given to above prisoner by: LESLIE DUPONT.

PART II - ACTION TAKEN

| 14. Plea by Prisoner: | ☐ Not Guilty ☑ Guilty | 15. Verdict: ☐ Not Guilty ☑ Guilty |
|---|---|---|

| 16. Date of Hearing | 17. Counsel Substitute (Counsel) |
|---|---|
| 11-3-78 | P. Wilson 80356 |

18. Summary of the evidence and reasons for the decision:

19. Sentence                                                Suspended ☐

10 days iso loss 25 days H/4

20. Disciplinary Officer:

1. Disciplinary Board: _____ Chairman

_____ Member

_____ Member

Sign 7 copies. (Give inmate one copy and forward six copies to Discip        AW 0237

STATE'S
EXHIBIT

13

LOUISIANA DEPARTMENT OF CORRECT.
**LOUISIANA STATE PENITENTIARY**
DISCIPLINARY REPORT
PART I - DISCIPLINARY REPORT

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| ALBERT WOODFOX | 72148 | JULY 30, 1978 | 10:55 R.M. |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| C.C.R. D-TIER CELL # 2 L/D | | C.C.R. D-TIER CELL # 7 |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| DISOBEDIENCE AGGRAVATED | # 6 |

10. Description of Incident (Include all relevant information, use other side, if necessary)

At 10:55 A.M. was picking up chow trayes on D- Tier when I came to Albert Woodfox 72148 cell.
I saw he had 2 styphone cups and I told him to give me one as one was all he could have and t
he told me no and I asked him was he refusing and he said yes he was and that I was not
going to get it.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| *Connie f Jones* | CONNIE L. JONES, L.S.P. SGT. C.C.R. C & D TIER |

13. Report (copy) given to above prisoner by:
*Connie f Jones*                CONNIE L. JONES, L.S.P. SGT.

PART II - ACTION TAKEN

14. Plea by Prisoner: [✓] Not Guilty  [ ] Guilty   15. Verdict: [ ] Not Guilty  [✓] Guilty

| 16. Date of Hearing | 17. Counsel Substitute (Counsel) |
|---|---|
| 8/2/78 | *R Wilson* |

18. Summary of the evidence and reasons for the decision:

The inmate was found guilty based on his the inmate's own admission.
Sentence due to conduct record.

19. Sentence                                                 Suspended [ ]

*5 days isg  (9 mos) 10 days E/T*

20. Disciplinary Officer:

21. Disciplinary Board:                                      Chairman

                                                            Member

                                                            Member

Sign 7 copies. (Give inmate one copy and forward six copies to Disc        AW 0241

STATE'S EXHIBIT

14

JISIANA DEPARTMENT OF CORRECTI

DISCIPLINARY REPORT

PART I – DISCIPLINARY REPORT

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| ALBERT WOODFOX | 72148 | 10/5/77 | 2:00p.m. |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| A.U. OFFICE | C.C.R. LOCKDOWN | C.C.R. ISOLITION |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| AGGRAVATED, DISOBEDIENCE & DEFIANCE | #1 & #5 |

10. Description of Incident (Include all relevant information, use other side, if necessary)

PRIOR TO ENTERING C.C.R. ISOLATION THIS INMATE WAS ASKED BY CAPTAIN TRVAS JONES IF HE WOULD SUBMIT TO A COMPLETE SHAKEDOWN, THE INMATES EXACT REPLY WAS, (NOT LOOKING UP MY ASS YOU, AINT ) WOODFOX WAS BENT OVER THE A.U. DESK ( CLERKS DESK ) BY THE OFFICERS ,AND HIS CHEEKS WERE SEARCHED FOR CONTRABAND . IN THE PROCESS OF BENDING THIS INMATE OVER THIS DESK HE, RESISTED US AND TRIED TO ESCAPE FROM THE OFFICE. HE ALSO KICKED MY RIGHT SHIN WITH ONE OF FEET WHILE WE WERE SEARCHING HIM. THE ONLY FORCE USED WAS THAT NEEDED TO RESTRAIN INMATE WOODFOX.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| *Joe Hooks* | JOE HOOKS SGT. A.U. SECURITY |

13. Report (copy) given to above prisoner by: *Joe Hooks*

PART II – ACTION TAKEN

*W/STATEMENT*

| 14. Plea by Prisoner: ☑ Not Guilty ☐ Guilty | 15. Verdict: ☐ Not Guilty ☑ Guilty |
|---|---|

| 16. Date of Hearing | 17. Counsel Substitute (Counsel) |
|---|---|
| 10-7-77 | *B Sneed* |

18. Summary of the evidence and reasons for the decision:

*Based on inmates statement and officers report*

19. Sentence   *Transferred to Camp F ext/lock*    Suspended ☐

20. Disciplinary Officer:

21. Disciplinary Board: _____ Chairman

*Robert C. Dawson fr.* Member

_____ Member

AW 0248

Sign 7 copies (Give inmate one copy and forward six copies to Discipl

STATE'S EXHIBIT
15

LOUISIANA DEPARTMENT OF CORRECTIONS
LOUISIANA STATE PENITENTIARY
DISCIPLINARY REPORT

## PART I - DISCIPLINARY REPORT

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| ALBERT WOODFOX | 72148 | 6/24/77 | APP. 1:30 p.m. |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| AU. OFFICE CCR ISOLATION | C.C.R. LOCKDOWN & ISOLATION | C.C.R. |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| DEFIANCE AND DISOBEDIENCE, AGGRAVATED | #s |

10. Description of Incident (Include all relevant information, use other side, if necessary)

DURING ROUTINE STRIP SEARCH PROCEDURE INMATE WOODFOX REFUSED TO BEND OVER AND SPREAD HIS BUTTOCKS. LT HORACE ISAAC AND MYSELF ORDERED INMATE WOODFOX TO BEND OVER AND SPREAD HIS BUTTOCKS AND HE REFUSED TO DO SO. INMATE WOODFOX HAD TO BE PHYSICALLY RESTRAINED OVER A DESK AND HIS BUTTOCKS WERE SPREAD OPEN BY LT. HORACE ISAAC. INMATE WOODFOX CHARGED INTO LT. HORACH ISAAC AS IF TO DO LT. ISAAC PHYSICAL HARM. IN THE CCR ISOLATION HALLWAY INMATE WOODFOX PUNCHED OFFICER JOHN R. CHRISTEN IN THE MOUTH, BUSTING HIS LIPS AND LOOSENING OFFICER CHRISTEN'S FRONT TEETH. OFFICER CHRISTEN WAS RELIEVED AND TREATED AT THE WEST FELICIANA HOSPITAL. INMATE WOODFOX PUNCHED OFFICER HARRY BERZAS IN HIS LEFT JAW AND INMATE WOODFOX KICKED OFFICER HANS BOHRR IN HIS LEFT LEG. AN INCIDENT REPORT HAS BEEN SUBMITTED CONCERNING THIS INCIDENT.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| *Eugene P. Adams Lt.* | EUGENE P. ADAMS, LSP LT., R.C. SHIFT SUPERVISOR, 2-10 |

13. Report (copy) given to above prisoner by:  EUGENE P. ADAMS, LSP LT.

## PART II - ACTION TAKEN

14. Plea by Prisoner: [X] Not Guilty  [ ] Guilty    15. Verdict: [ ] Not Guilty  [X] Guilty

16. Date of Hearing: 9-26-77    17. Counsel Substitute (Counsel): B Sneed 81275

18. Summary of the evidence and reasons for the decision:

Based on contents of report.

19. Sentence: 10 days Isol.    Suspended [ ]

20. Disciplinary Officer: _____ Chairman

21. Disciplinary Board: _____ Member

_____ Member

AW 0259

STATE'S EXHIBIT 16

LOUISIANA DEPARTMENT OF CORRECTIONS
**LOUISIANA STATE PENITENTIARY**
DISCIPLINARY REPORT

PART I – DISCIPLINARY REPORT

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| ALBERT WOODFOX | # 72148 | 9-14-77 | 3:15 P.M. |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| C.C.R. D-TIER | L/D | C.C.R. D-TIER |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| CONTRABAND | # 1 |

10. Description of Incident (Include all relevant information, use other side, if necessary)

While shaking down the above named and numbered inmate's cell, I found a handcuff key hidden in a roll of toilet tissue. The handcuff key was turned in to officer Bill Honeycutt who is in charge of the 2-10 shakedown crew, who in turn turned it over to Lt. Col. H. D. Byargeon.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| Leslie Dupont | LESLIE DUPONT L.S.P. SGT 2-10 SHAKEDOWN CREW |

13. Report (copy) given to above prisoner by:    LESLIE DUPONT, L.S.P. SGT.

PART II – ACTION TAKEN

| 14. Plea by Prisoner: ☒ Not Guilty ☐ Guilty | 15. Verdict: ☐ Not Guilty ☒ Guilty |
|---|---|

| 16. Date of Hearing | 17. Counsel Substitute (Counsel) |
|---|---|
| 9-19-77 | None |

18. Summary of the evidence and reasons for the decision:
Based on Content of Report

19. Sentence    Transfer to Camp J Ex lockdown    Suspended ☐

20. Disciplinary Officer:

21. Disciplinary Board:    Maj ___ ger    Chairman
    Flynn Paul LaBorde    Member
    Member

AW 0278

LOUISIANA DEPARTMENT OF CORRECTION
**LOUISIANA STATE PENITENTIARY**
DISCIPLINARY REPORT
PART I – DISCIPLINARY REPORT

STATE'S EXHIBIT
Blumberg No. 5138

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| ALBERT WOODFOX | # 72148 | 9-7-77 | 4:15 P.M. |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| C.C.R. | L/D | C.C.R. D-TIER CELL # 7 |

| 8. Rule Violated | 9. Rule Number |
|---|---|
| AGGRAVATED DISOBEDIENCE | # 7 |

10. Description of Incident (Include all relevant information, use other side, if necessary)

The above inmate refused to give up his supper tray when told to do so by Jack R. Murray, L.S.P. SGT.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| Jack R. Murray | JACK R. MURRAY, L.S.P, SGT. C.C.R. |

13. Report (copy) given to above prisoner by:     JACK R. MURRAY, L.S.P. SGT.

PART II – ACTION TAKEN

| 14. Plea by Prisoner: [X] Not Guilty [ ] Guilty | 15. Verdict: [ ] Not Guilty [X] Guilty |
|---|---|

| 16. Date of Hearing | 17. Counsel Substitute (Counsel) |
|---|---|
| 9-12-77 | |

18. Summary of the evidence and reasons for the decision:

Based on Content of Report

19. Sentence     10 days loss wages 25 days CT     Suspended [ ]

20. Disciplinary Officer:

21. Disciplinary Board:     _____     Chairman
                            _____     Member
                            _____     Member

AW 0280

Sign 7 copies. (Give inmate one copy and forward six copies to Discipli

STATE'S EXHIBIT

SIANA DEPARTMENT OF CORRECT
**LOUISIANA STATE PENITENTIARY**
DISCIPLINARY REPORT
PART I - DISCIPLINARY REPORT

| 1. Name of Prisoner | 2. Number | 3. Date of Incident | 4. Time of Incident |
|---|---|---|---|
| ALBERT WOODFOX | #72148 | 7-12-77 | 8:10 P.M. |

| 5. Place of Incident | 6. Job Assignment (Prisoner) | 7. Housing Assignment (Prisoner) |
|---|---|---|
| C.C.R. D-TIER | L/D | C.C.R. D-TIER CELL # 7 |

8. Rule Violated

CONTRABAND (RAZOR blade)

9. Rule Number

# 1

10. Description of Incident (Include all relevant information, use other side, if necessary)

While shaking down the above named and numbered inmate cell, I, Jack R. Murray, L.S.P. SGT, found one (1) razor blade laying on the bars of his cell. It is a posted policy there will be no razor blades in the cells on C.C.R.

| 11. Signature of reporting employee | 12. Name, Title, Assignment (PRINT) |
|---|---|
| *[signature]* | JACK R. MURRAY, L.S.P. SGT., C.C.R. |

13. Report (copy) given to above prisoner by:

JACK R. MURRAY, L.S.P. SGT.

PART II - ACTION TAKEN

14. Plea by Prisoner: [✓] Not Guilty [ ] Guilty     15. Verdict: [ ] Not Guilty [✓] Guilty

16. Date of Hearing

7/13/77

17. Counsel Substitute (Counsel)

None

18. Summary of the evidence and reasons for the decision:

Based on contents of report & his own statement board finds him guilty.

19. Sentence

10 days iso, loss 35 days H/7 suspend 90 day

Suspended [✓]

20. Disciplinary Officer:

21. Disciplinary Board:

N. Wyatt — Chairman

W. Clomorate — Member

M. L. ___ — Member

DOC.
INMATE REPORT
1972

STATE'S
EXHIBIT
19
Blumberg No. 5138

LOUISIANA DEPARTMENT OF CORRECTIONS

RULES VIOLATION REPORT

L.S.P.
_____
INSTITUTION

NMATE'S NAME   ALBERT WOODFOX        NUMBER   72148   LOCATION  C.C.R. B-TIER

ULE VIOLATED    6    ,    DEFIANCE                    ,        7:15 PM
                NUMBER          TITLE OR DESCRIPTION              TIME

NMATE GIVEN COPY OF REPORT:   YES ☒    NO ☐           10/6/76
                                                      DATE

PECIFIC ACT OF INMATE  CURSING AN OFFICER.

THE ABOVE NAMED AND NUMBERED INMATE CALLED ME A FAT MOTHERFUCKER WHILE I WAS SHAKING DOWN HIS

IRCUMSTANCES OF INCIDENT:   CELL.

EPORTING EMPLOYEE  Billy Joe Morris      ASSIGNMENT  C C R

NVESTIGATION REPORT:
     IF NEEDED

_____        _____
          DATE                              INVESTIGATING OFFICER

ISCIPLINARY ACTION: INMATE'S PLEA: ☐ GUILTY  ☒ NOT GUILTY   FINDINGS: ☒ GUILTY  ☐ NOT GUILTY

OMMENTS:

ISPOSITION:  10 days isolation

PPROVED: _____        ACTION TAKEN BY:  J C Byrn
         REVIEWING OFFICIAL                                    CHAIRMAN
         (ASSOCIATE WARDEN OR          _____          R Dwight W. Smith
SSISTANT SUPERINTENDENT)                 10-8-76                        MEMBER
                                          DATE
                                                          _____
                                                                  MEMBER

PPEAL ACTION: ☐ APPEALED  ☐ NOT APPEALED   DATE IF APPEALED _____
PPEAL DECISION: ☐ SUSTAINED  ☐ CHANGED   DATE: _____
CTION TAKEN IF CHANGED: _____
REASON FOR CHANGE: _____

                                        _____
                                          WARDEN OR SUPERINTENDENT

( ALL SECTIONS MAY USE REVERSE SIDE OR SEPARATE SHEET IF N        AW 0291

DOC.
INMATE REPORT
1972

 

EXHIBIT
20

LOUISIANA DEPARTMENT OF CORRECTIONS

RULES VIOLATION REPORT

_____
INSTITUTION

INMATE'S NAME _Albert Wood Fox_     NUMBER _22148_   LOCATION _CCR · D-tie_

RULE VIOLATED # _1_ , _Contraband_ , _8 30 Am_
NUMBER           TITLE OR DESCRIPTION          TIME

INMATE GIVEN COPY OF REPORT:   YES [XX]      NO [ ]     _5-27-76_
DATE

SPECIFIC ACT OF INMATE _While shaking down in the above named & numbered_
_inmates cell, Cell # 7 D-tier, I Officer (Ivory Young) found a_
CIRCUMSTANCES OF INCIDENT: _Crest tooth paste tube which contained a_
_substance which lacked Other gun powder - This was then_

REPORTING EMPLOYEE _Ivory Young_      ASSIGNMENT _CCR_
_____

INVESTIGATION REPORT: _____
IF NEEDED    _____

_____

_____            _____
DATE                      INVESTIGATING OFFICER

_____

DISCIPLINARY ACTION: INMATE'S PLEA: [ ]GUILTY [ ]NOT GUILTY  FINDINGS: [ ]GUILTY [ ]NOT GUILTY

COMMENTS:

DISPOSITION:

APPROVED: _____ ACTION TAKEN BY: _____
REVIEWING OFFICIAL                      CHAIRMAN
(ASSOCIATE WARDEN OR                _____
ASSISTANT SUPERINTENDENT)  _____      MEMBER
DATE                _____
MEMBER

_____

APPEAL ACTION: [ ] APPEALED  [ ] NOT APPEALED   DATE IF APPEALED _____
APPEAL DECISION: [ ] SUSTAINED [ ]CHANGED  DATE:_____

ACTION TAKEN IF CHANGED: _____
REASON FOR CHANGE: _____

_____
WARDEN OR SUPERINTENDENT

( ALL SECTIONS MAY USE REVERSE SIDE OR SEPARATE SHEET IF NE      AW 0297

Over to Major Norwood for further investigation.
This inmate lives on CER D. Tier cell # 7
Approx 1/3 of this ~~substance~~ substance was
poured into an ashtray. A match
was ~~placed~~ placed to this substance
& it ignited. This substance
checked out to be gun powder.

AW 0298

DOC.
INMATE RE
1972



LOUISIANA DEPARTMENT OF CORRECTIONS

RULES VIOLATION REPORT



STATE'S
EXHIBIT
21

L S P
INSTITUTION

INMATE'S NAME __ALBERT WOODFOX__        NUMBER __72148__    LOCATION __C.C.R. "D" 7__

RULE VIOLATED __7 & 22__ ,  __DEFIANCE    PROPERTY DESTRUCTION__ ,    __3:00 PM__
            NUMBER              TITLE OR DESCRIPTION                    TIME

INMATE GIVEN COPY OF REPORT:    YES __XX__      NO ____          __4/4/75__
                                                                    DATE

SPECIFIC ACT OF INMATE __The above inmate cursed the correctional officers for all kinds of bitch__

__mother f—kers and threw glass jars at us. He also tore his commode out and broke it up and thr__

CIRCUMSTANCES OF INCIDENT: __it at us. This was done while we were trying to get inmate Wilkerson__

__#73184 off the tier to put him in the hole for refusing to catch his cell.__

REPORTING EMPLOYEE _Charles Jewell_         ASSIGNMENT _R.C._

INVESTIGATION REPORT:
    IF NEEDED

            DATE                        INVESTIGATING OFFICER

DISCIPLINARY ACTION: INMATE'S PLEA: ☐ GUILTY  ☑ NOT GUILTY   FINDINGS: ☑ GUILTY  ☐ NOT GUILTY

COMMENTS:

DISPOSITION: **Ten days isolation.**

APPROVED: _____         ACTION TAKEN BY: _____
    REVIEWING OFFICIAL                                    CHAIRMAN
    (ASSOCIATE WARDEN OR
ASSISTANT SUPERINTENDENT)    __4-8-75__
                              DATE                            MEMBER

                                                            MEMBER

APPEAL ACTION:  ☐ APPEALED   ☐ NOT APPEALED   DATE IF APPEALED _____
APPEAL DECISION: ☐ SUSTAINED ☐ CHANGED  DATE: _____

ACTION TAKEN IF CHANGED: _____
REASON FOR CHANGE: _____

                                        WARDEN OR SUPERINTENDENT

( ALL SECTIONS MAY USE REVERSE SIDE OR SEPARATE SHEET IF          AW 0307

STATE'S
EXHIBIT
Blumberg No. 5118

DOC.
INMATE REPORT
1972

LOUISIANA DEPARTMENT OF CORRECTIONS

RULES VIOLATION REPORT

**Louisiana State Penitentiary**
INSTITUTION

INMATE'S NAME **Albert Woodfox**        **C/M**        NUMBER **72148**        LOCATION **C.C.R.**

RULE VIOLATED **ART II 01-02-08**, **Behavior**,        **11:00 A.M.**
NUMBER                    TITLE OR DESCRIPTION                    TIME

INMATE GIVEN COPY OF REPORT:    YES [XXXX]    NO [ ]        **12/17/72**
DATE

SPECIFIC ACT OF INMATE: **Above named and numbered inmate used extremely vulgar, profane, and obscene language in the present of visitors and continued to do so after being directed to refrain**

CIRCUMSTANCES OF INCIDENT: **He stated to go get someone with authority. Warden Hoyle denied Rory Mason's visit due to recent incident. Inmate Woodfox created a disturbance as a result of this**

REPORTING EMPLOYEE _(signature)_        ASSIGNMENT _PCO II_
Witness _(signature)_

INVESTIGATION REPORT:
IF NEEDED _____

_____
DATE            INVESTIGATING OFFICER

DISCIPLINARY ACTION: INMATE'S PLEA: [ ] GUILTY [✓] NOT GUILTY    FINDINGS: [ ] GUILTY [ ] NOT GUILTY

COMMENTS:

DISPOSITION:

APPROVED: _____        ACTION TAKEN BY:
REVIEWING OFFICIAL                        **CHAIRMAN** _____
(ASSOCIATE WARDEN OR        **10 days C.C.R. Isolation:**
ASSISTANT SUPERINTENDENT)        _____        **MEMBER** _____
DATE
**MEMBER** _____

APPEAL ACTION: [ ] APPEALED [ ] NOT APPEALED    DATE IF APPEALED _____
APPEAL DECISION: [ ] SUSTAINED [ ] CHANGED    DATE: _____

ACTION TAKEN IF CHANGED: _____

REASON FOR CHANGE: _____

_____
WARDEN OR SUPERINTENDENT

( ALL SECTIONS MAY USE REVERSE SIDE OR SEPARATE SHEET IF N)        AW 0322

DOC.
INMATE REPORT
1972



LOUISIANA DEPARTMENT OF CORRECTIONS

RULES VIOLATION REPORT



STATE'S
EXHIBIT
25

INSTITUTION _____

INMATE'S NAME **Albert Woodfox**        **C/M**   NUMBER **72148**   LOCATION **C.C.R.**

RULE VIOLATED _____ , **THREATING AN OFFICER** _____ , **11.00 A.M.**
     NUMBER                TITLE OR DESCRIPTION                TIME

INMATE GIVEN COPY OF REPORT:   YES ☒☒☒☒   NO ☐            **9/6/72**
                                                  DATE

SPECIFIC ACT OF INMATE __The above named and numbered inmate came out of his cell to goto__

__D.E. COURT. He refused to come off of the tier. We went to get this subject and he had a__

__armature in a sock. Which he threatened me and other officers, however he gave it to Mr. C. Bord__
CIRCUMSTANCES OF INCIDENT: __and came out On  out and went to court.__

REPORTING EMPLOYEE _~signature~_            ASSIGNMENT _____

INVESTIGATION REPORT: _____
  IF  NEEDED

_____

_____                _____
         DATE                      INVESTIGATING OFFICER

DISCIPLINARY ACTION: INMATE'S PLEA: ☑GUILTY ☑NOT GUILTY   FINDINGS: ☑GUILTY ☐NOT GUILTY

COMMENTS: _~handwritten~_

DISPOSITION: **10 Days Isolation; Suspended for 90 Days;**

APPROVED: _____            ACTION TAKEN BY: _~signature~_
  REVIEWING OFFICIAL                          CHAIRMAN
  (ASSOCIATE WARDEN OR
ASSISTANT SUPERINTENDENT) _____             _~signature~_ MEMBER
              DATE
                                                  MEMBER

APPEAL ACTION: ☐ APPEALED ☐ NOT APPEALED   DATE IF APPEALED _____
APPEAL DECISION: ☐ SUSTAINED ☐ CHANGED   DATE: _____

ACTION TAKEN IF CHANGED: _____
REASON FOR CHANGE: _____

_____
                      WARDEN OR SUPERINTENDENT

( ALL SECTIONS MAY USE REVERSE SIDE OR SEPARATE SHEET IF NEEDED )

  

STATE'S EXHIBIT 24

Blumberg No. 5109

LOCKDOWN HISTORY

INMATE'S NAME                    NUMBER                         DATE

*Albert Woodfox*                 *72148*               *4/18/72*
                                                       ~~7-15-72~~

REASON IN LOCKDOWN:

*Inmate locked up and Charged with the murder*
*of Mr. Miller*

INTERVIEWED BY: (1) *R H Butler*   (2) *Keith Brennan*   (3) *K Brown*

DATE OF INTERVIEW: *July 6, 1972*

ACTION TAKEN:   RELEASED ( )          RETAINED ( )

REASONS FOR ACTION TAKEN:

*Inmate waiting to be tried. The Board feels*
*this inmate should remain in LW because*
*he is dangerous to inmates and free personel;*
*His record shows where he stabbed another inm.* ~~_____~~



LOCKDOWN HISTORY

INMATE'S NAME                    NUMBER                         DATE

_____              _____            _____

REASON IN LOCKDOWN:

_____

_____

INTERVIEWED BY:  (1)_____(2)_____(3)_____

DATE OF INTERVIEW: _____

ACTION TAKEN:        RELEASED ( )          RETAINED ( )

REASONS FOR ACTION TAKEN:

_____

_____




LOUISIANA STATE PENITENTIARY

VIOLATION REPORT

STATE'S
EXHIBIT
25

DATE: **August 19, 1971.**

INMATE'S NAME   Albert Woodfox                    STATUS   C/M   REG. NO.   7248   CAMP   A.U.

OFFENCE:  ( DETAILS OF VIOLATION, CIRCUMSTANCES, ETC., IN DETAIL )

Refusing To Work.

The above inmate was told this morning to get him a pair of boots
and catch the farm line. He said that he had had fifty (50) years and
he had no intensions of working in the field. This inmate has been
advised of this report.

BOARD ACTION:

10 days C.C.E.:  Loss of 6 months Good-Time:

WITNESSES:

CHIEF SECURITY OFFICER

NAME OF COMPLAINANT OR COMPLAINANTS:

Approved: _____
Warden

REPORT SUBMITTED BY: _____

INSTRUCTIONS:  PREPARE AND SUBMIT ALL VIOLATION REPORTS IN TRIPLICATE (ORIGINAL AND
TWO (2) COPIES TO THE WARDEN'S OFFICE ON EACH VIOLATION OR INFRACTION OF THE RULES AND
REGULATIONS BY AN INMATE.  WHEN THE CASE IS DISPOSED OF A COPY OF THE BOARDS ACTION WILL
RECORDED ON THE BACK OF THIS FORM AND RETURNED TO THE CAMP.

AW 0333



EXHIBIT
26

UNITED STATES DISTRICT COURT

STATE OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ROBERT KING WILKERSON, ET AL

                          CIVIL ACTION

VS

                          NO. 00-304-C-M3

RICHARD STALDER, ET AL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



CONDENSED COPY

## DEPOSITION Of WARDEN BURL CAIN

Taken on Thursday, November 30, 2006
At the
LOUISIANA STATE PENITENTIARY
Angola, Louisiana 70712

Reported by: Janice Welch, CCR

**Court Reporters of Louisiana, LLC**

Office: (225) 226-1530    Baton Rouge, Louisiana    Fax: (225) 226-1531
Conference Room Available    www.courtreportersla.com    Scanned Exhibits to CD Rom
E-Transcripts  Realtime Transcripts  ASCII Disks/CD Rom  Deponent Photo ID  Videotape Depositions

Page 2

1                    INDEX
2                                    PAGE
3   CAPTION                       1
4   APPEARANCES                   3
5   AGREEMENT OF COUNSEL              4
6   EXAMINATION:
7      BY MR. HANLON              6
8   CERTIFICATE                   147
9            * * * * *
10  EXHIBITS:
11  Exhibit 1    Notice of Deposition        36
12  Exhibit 2    Policy No. CCR-04           37
13  Exhibit 3    Policy No. CCR-05           38
14  Exhibit 4    Policy No. CCR-06           39
15  Exhibit 5    Policy No. CCR-07           39
16  Exhibit 6    Regulation No. B-02-001
                 20 November 1995           49
17
    Exhibit 7    Regulation No. B-02-001
18               10 October 2001            50
19  Exhibit 8    LA Administrative Code      63
20  Exhibit 9    Directive No. 10.016 5/8/98  63
21  Exhibit 10   Directive No. 10.001 1/17/06  69
22  Exhibit 11   Directive No. 10.001 1/17/06  73
23  Exhibit 12   Directive No. 10.001
                 Special Management Inmates   76
24
25  Exhibit 13   Lockdown Updated 5/15/90     77

Page 3

1   Exhibit 14   Visitor Media Release Form    81
2   Exhibit 15   LSP-18.002 May 8, 1995       119
3   Exhibit 16   LSP-18.002 July 8, 1996      119
4   Exhibit 17   Directive No. 18.002 5/27/05 119
5   Exhibit 18   Memo from Warden Cain 6/3/99 124
6   Exhibit 19   Lockdown Summary 1-20-00     125
7   Exhibit 20   Lockdown Summary 4-7-06      131
8   Exhibit 21   Lockdown Summary 1-5-98      132
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1   APPEARANCES:
2      REPRESENTING THE PLAINTIFFS:
3         Mr. Stephen F. Hanlon
          HOLLAND & KNIGHT, LLP
4         2099 Pennsylvania Avenue, NW
          Washington, DC 20006
5
              - AND -
6
          Mr. George Kendall
7         Ms. Harmony Loube
          Mr. Samuel Spital
8         Ms. Camilla Hsu
          HOLLAND & KNIGHT, LLP
9         195 Broadway, 24th Floor
          New York, NY 70007
10
    REPRESENTING THE DEFENDANTS:
11
          Mr. Brent Hicks
12        Mr. Richard Curry
          MCGLINCHEY STAFFORD, PLLC
13        14th Floor, One American Place
          Baton Rouge, Louisiana 70825
14
    ALSO PRESENT:
15        Warden Darrel Vannoy
16
17
18                    OFFICIAL SEAL
19                    JANICE WELCH
20                Certified Court Reporter
21           in and for the State of Louisiana
22            Certificate Number 87172
23           Certificate expires 12-31-08
24
25

Page 5

1                STIPULATION
2         IT IS STIPULATED AND AGREED by
3   and between all parties that the deposition of
4   WARDEN BURL CAIN is hereby being taken under
5   the Federal Rules of Civil procedure, for all
6   purposes.
7
8         The witness reserves the right to
9   read and sign the deposition. The original is
10  to be retained by STEPHEN HANLON for proper
11  filing with the Clerk of Court.
12
13        All objections, except those as
14  to the form of the question and responsiveness
15  of the answer, are hereby reserved until the
16  time of the trial of the cause.
17
              * * * * *
18
19        Janice Welch, Certified Court
20  Reporter, in and for the State of Louisiana,
21  officiated in administering the oath to the
22  witness.
23
24
25

| Page 6 | Page 8 |
|---|---|
| 1      WARDEN BURL CAIN,<br>2   LOUISIANA STATE PENITENTIARY, ANGOLA,<br>3   LOUISIANA, having been previously sworn, was<br>4   examined and testified as follows:<br>5           * * * * *<br>6           EXAMINATION<br>7   BY MR. HANLON:<br>8   Q   All right, sir, would you state your<br>9   full name for the record.<br>10   A   My full name is Nathan Burl Cain.<br>11   Q   Mr. Cain, am I correct in my<br>12   assumption, have you had your deposition taken<br>13   before?<br>14   A   Yes, sir.<br>15   Q   I know you're familiar with the rules<br>16   then but I'm going to just go over them, okay?<br>17   I'm going to ask you some questions today and<br>18   if I don't make any question clear, I would<br>19   like you to tell me that.<br>20   A   Yes, sir.<br>21   Q   If I don't hear you ask me to make it<br>22   clear, I'm going to assume you understand my<br>23   question, fair?<br>24   A   Yes, sir.<br>25   Q   I know that you're under the weather a | 1   what's the year there?<br>2   A   LSU, I went there in 1960 then I got<br>3   my BS degree straight through and then I<br>4   graduated from Grambling State University in<br>5   May of '06 with my master's degree.<br>6   Q   '66?<br>7   A   No.<br>8   Q   '06?<br>9   A   I just did it.<br>10   Q   You just did it?<br>11   A   I just finished.  The last two years I<br>12   went to graduate school and got my master's<br>13   degree.<br>14   Q   Now, was your degree at LSU awarded in<br>15   1960?<br>16   A   No, no, no, I'm not that old.  I got<br>17   my degree at LSU in 1967.  Changed majors<br>18   several times.<br>19   Q   And give me a description of your<br>20   employment after you got out of LSU in '67?<br>21   A   In '67 my first job was Louisiana Farm<br>22   Bureau Federation and I was a field man, then I<br>23   was director of field services, and then some<br>24   eight years later --<br>25   Q   '75? |

| Page 7 | Page 9 |
|---|---|
| 1   little bit today, you told us that off the<br>2   record.  Are you taking any medication now or<br>3   are you about to take some medication which<br>4   would affect your ability to hear and<br>5   understand my questions and respond to them?<br>6   A   No, sir.<br>7   Q   Let's get the toughest one out of the<br>8   way first, how old are you?<br>9   A   I don't buy green bananas anymore.<br>10   I'm sixty-four.<br>11   Q   Where were you born?<br>12   A   In a little town of Pitkin, Louisiana.<br>13   Q   Where did you graduate from high<br>14   school?<br>15   A   Pitkin High School.<br>16   Q   What's your education after high<br>17   school?<br>18   A   Well, I have a degree from LSU in<br>19   vocational agricultural education and I have a<br>20   master's degree from Grambling State University<br>21   in criminal justice.<br>22   Q   What year was that -- did you go<br>23   straight through undergraduate?<br>24   A   No.<br>25   Q   Okay, let's take the year at LSU, | 1   A   '75, I left there and for a few months<br>2   I just did what I did because I got a divorce.<br>3   And then somewhere in '75 in September, I<br>4   believe September 10, then I went to work for<br>5   Department of Corrections, Louisiana Department<br>6   of Corrections as an assistant secretary over<br>7   what we called the agribusiness, which is the<br>8   farming industry.  And then in October, October<br>9   1981 I became the warden at Dixon Correctional<br>10   Institute.<br>11   Q   So from '75 to '81, --<br>12   A   Five years.<br>13   Q   -- you were with Department of<br>14   Corrections?<br>15   A   I was.<br>16   Q   As assistant secretary?<br>17   A   I was assistant secretary appointed by<br>18   the governor.  And then in '81 I became the<br>19   warden at Dixon Correctional Institute and then<br>20   I was a warden there until thirteen years,<br>21   1995, and I became the warden at Louisiana<br>22   State Penitentiary and I've been here from<br>23   1995, and that was in -- actually came here<br>24   January 20, I was actually officially appointed<br>25   in March.  I was detailed from February 1 until |

Page 10

1  the middle of March, March 10, and then I've
2  been here ever since, almost twelve years.
3  February 1 it will be twelve years.
4      Q   February 1 of '95?
5      A   '95.
6      Q   And Louisiana State Penitentiary is
7  otherwise known as Angola Prison; is that
8  right?
9      A   Right, everybody calls it Angola.
10     Q   Where do you reside?
11     A   I reside at Dixon Correctional
12 Institute at the warden's house, I never moved,
13 been there twenty-five years.
14     Q   How far is that from Angola?
15     A   Thirty-three miles.
16     Q   And is there any reason you didn't
17 move over to Angola when you came over to
18 Angola?
19     A   Well, two reasons, I didn't want to be
20 the warden at Angola and I got coerced into it,
21 okay, and that's true, and then the other thing
22 was, the deal was for me to take the warden at
23 Angola, they let me keep my house. The third
24 thing is, I don't micromanage, so to be here at
25 that time when I first came would put me in

Page 11

1  that position that I didn't want to be. I
2  didn't want to be here.
3      Q   And in what sense do you mean that you
4  were coerced in taking the position?
5      A   Well, it's the kind of thing, we would
6  all say, don't go be the warden at Angola
7  because the longest life you'll have is about
8  five years, you'll get fired because you lose
9  control of the place because it's a very
10 violent place. So being at the time in my
11 fifties I didn't want to come here because I
12 didn't know if I could even do it. And it was
13 just one of those things that Warden Whitley
14 left and told me he was going to leave within
15 five years and he felt like it was about as
16 long as he was going to hold it together and he
17 didn't want to have a wreck. So it was spooky
18 because of him and him telling me that and he's
19 a good friend and that's just how it's been,
20 nobody lasted very long here. I hold the
21 record.
22     Q   Who was it that asked you to come
23 here?
24     A   Secretary Stalder.
25     Q   Is that somebody that you knew before?

Page 12

1      A   Secretary Stalder, yes, he is, he's
2  the Secretary of Corrections and at one point
3  in my career he worked for me in agribusiness,
4  and at another point at Dixon Correctional
5  Institute he was my deputy warden. And he's
6  very, very, very super intelligent and
7  charismatic and he gives me real wise counsel,
8  when I was warden he was deputy warden and he
9  still does today.
10        What you do is you just call him. We
11 don't say hello much, we just get to the facts
12 and say, if this was happening what would you
13 do, Secretary Stalder? He'd say, I would do
14 this or this. I'll say, great, I think this
15 might be what I'd do. Then we just go on. He
16 don't say do this, he says this is what I might
17 do. He's usually right.
18     Q   How long have you known Secretary
19 Stalder?
20     A   When I came to work in '75, the first
21 person -- the second person I met was Secretary
22 Stalder, he was in the budget office, budget
23 analyst. He welcomed me.
24     Q   And that would be in '81?
25     A   No, in '75 when I was doing the

Page 13

1  agribusiness job, when I first came to
2  corrections. That's September 20, I met him
3  that day.
4      Q   You described him as a good friend?
5      A   He's a good friend and we don't
6  socialize a lot because our paths kind of went
7  the other way when I came here and so forth,
8  but he's a dear friend, a trusted friend.
9      Q   Do you report to him?
10     A   I do.
11     Q   Directly?
12     A   I report -- I'm a regional warden, I
13 didn't mention that, I also have Avoyelles
14 Correctional Center under me.
15     Q   A what?
16     A   Avoyelles Correctional Center is also
17 my prison.
18     Q   How do you spell that?
19     A   A-v-o-y-e-l-l-e-s.
20     Q   A-v-o-y-e-l-l-e-s?
21     A   Right.
22     Q   You're warden there too?
23     A   We'll, I'm a regional warden. They
24 have a warden there but that warden answers to
25 me too, but I don't hands-on run that prison,

Page 14

1  he and I converse. And I'm over that prison,
2  there's two other regional wardens and all of
3  the prisons function under a regional warden,
4  there's three of them and I'm just one of them.
5  And so anyway, that's how that works.
6     Q  So give me an organizational chart for
7  DOC roughly, you've got three regional wardens?
8     A  There's Secretary Stalder and then
9  Chief Johnny Creed, and Chief Creed would be my
10 direct supervisor.
11    Q  How do you spell his last name?
12    A  C-r-e-e-d.
13    Q  Okay. And then you report to him?
14    A  I report to him but I report more to
15 Secretary Stalder just because we just talk,
16 just friends and talk.
17    Q  All right, and you're a regional
18 warden and who else is a regional warden?
19    A  Chief Creed is assigned to probation
20 and parole and that takes a lot of his time and
21 he's over all of that too, so it just kind of
22 fans out that way.
23    Q  Who else is a regional warden besides
24 you?
25    A  Warden Jimmy LeBlanc, he's the active

Page 15

1  warden at Dixon Correctional Institute, my old
2  crew, and then Warden Venetia Michael, she's
3  the warden at Wade Correctional Center in north
4  Louisiana.
5     Q  So the three of you report to Chief
6  John Creed and then to, is it Commissioner
7  Stalder?
8     A  Secretary.
9     Q  Secretary Stalder, all right, sir.
10 Now, if you would, do the same thing for me
11 here at --
12    A  At Louisiana State Penitentiary?
13    Q  Yes.
14    A  I have three deputy wardens, okay, and
15 they answer to me.
16    Q  Who are they?
17    A  Warden Sheryl Ranatza.
18    Q  How do you spell her last name?
19    A  R-a-n-a-t-z-a.
20    Q  And who else?
21    A  Warden Darrel Vannoy.
22    Q  How do you spell his last name?
23    A  V-a-n-n-o-y.
24    Q  All right, sir.
25    A  And Warden Richard Peabody.

Page 16

1     Q  What are their respective functions?
2     A  Vannoy is security.
3     Q  All right, sir.
4     A  Ranatza does administration and
5  medical, pertaining to the hospital.
6     Q  All right.
7     A  And Peabody does the other programs.
8     Q  Such as?
9     A  Classification, mental health,
10 chapels, all that kind of stuff, education.
11    Q  Education?
12    A  Yeah.
13    Q  Anything else in terms of programs?
14    A  No, I don't believe, right off the
15 cuff that I can think of.
16    Q  How much time in a typical week are
17 you physically here at Angola?
18    A  I'm probably here -- physically here?
19    Q  Yeah.
20    A  Probably sixty hours, at least. I'm
21 here almost every day of the week. I go to
22 church on Sunday with the inmates and sometime
23 during the week.
24    Q  Church?
25    A  Church. We have a wonderful church.

Page 17

1     Q  What time do you typically arrive
2  here?
3     A  Usually about, it could be --
4  normally, sometime between seven and eight in
5  the morning.
6     Q  What time do you typically go home?
7     A  Between six and seven in the evening,
8  usually seven I'm leaving, I'm getting home
9  about eight, 8:30. And you have the weekend on
10 that, and like this weekend I'll be here
11 Saturday for sure and I'll be here Friday late,
12 if I'm well.
13    Q  How do you pronounce that?
14    A  Avoyelles. That's an Indian name.
15    Q  Is it?
16    A  Yes.
17    Q  I'm from Missouri and we've got a town
18 up there called Versailles so I've got to be
19 careful.
20       What do you do over there, are you
21 physically over there?
22    A  I never go over there. If I feel like
23 he has a problem then I make him come over
24 here, cross the ferry and come see me so he's
25 on my turf, and I talk to him, I e-mail him

WARDEN BURL CAIN                    11/30/2006

Pages 18 to 21

Page 18

1  every once in awhile but I don't do much of
2  that. I'll call him on the phone and he tells
3  me everytime something is happening and
4  something is not cool and I send an
5  investigator over there. He don't have a
6  doctor right now so I send a doctor on
7  Saturday, maybe two doctors on Saturday. And
8  he's just like a little brother and I take care
9  of him and we're cool.
10   Q   Why don't you give me a description of
11  each of these prisons, start with that one.
12   A   Avoyelles?
13   Q   Yes, how many inmates are there?
14   A   About fifteen hundred.
15   Q   And what kinds of inmate housing is
16  over there, what kinds of inmates?
17   A   He's medium-minimum.
18   Q   Medium-minimum?
19   A   Yeah.
20   Q   Tell me what that means.
21   A   Well, it's really, we pretty much
22  define it by sentence and then also by behavior
23  is what you are, and so when I get someone
24  that's fifty years short, I'm going to usually
25  send him away or I'm going to keep him ten

Page 19

1  years for these life sentences and then if he
2  does real well I might status reduce him
3  because I'm so full, and then he can go to Wade
4  or to Hunt normally. It doesn't mean at DC I
5  don't have a few life prisoners and not a few
6  struggling around that's really, really good
7  behavior, so it's all basically behavior but
8  it's sentence. So when somebody gets sentenced
9  to a life sentence or over fifty years, they're
10  on the road to Angola. Now, if they get to
11  that prison and --
12   Q   You say they're on the road to Angola?
13   A   They're coming to me.
14   Q   Okay.
15   A   And then if they're violent, if they
16  attack officers or they do something violent,
17  then he has the option of sending them to me or
18  he can keep them and deal with his own problem.
19  And sometime they send them to us and sometime
20  they don't, it doesn't matter to me. If they
21  want to show the other inmates that they can
22  keep them and house them, then they can keep
23  them, it's up to the warden.
24   Q   On the initial assignment are all of
25  your inmates at Angola fifty years or over?

Page 20

1   A   What now?
2   Q   On the initial placement in Angola are
3  all of the inmates fifty years or over, fifty
4  year term or sentence?
5   A   Normally.
6   Q   Is there any typical kind of exception
7  to that that you can think of?
8   A   No, not really.
9   Q   So there's no maximum at Avoyelles?
10   A   No.
11   Q   How about Dixon, how many inmates?
12   A   He's got about fifteen hundred.
13   Q   And again, --
14   A   Same as Avoyelles.
15   Q   Minimum-medium?
16   A   Yeah.
17   Q   No maximum?
18   A   No maximum. It doesn't mean he don't
19  have a lifer but no maximum.
20   Q   Okay. And generally speaking, with
21  some exceptions his inmates will be under fifty
22  years on the sentence?
23   A   Yes, normally.
24   Q   And Venetia Michael at Wade, how many
25  prisoners there?

Page 21

1   A   She's got about fifteen hundred. She
2  has two satellites, one Forcht-Wade for old
3  inmates and I think it has about three hundred.
4   Q   What's an old inmate?
5   A   That's a geriatric thing.
6   Q   What's the other satellite?
7   A   I don't even know, it's at Tallulah.
8   Q   What's that, sir?
9   A   I don't really know, it used to be a
10  juvenile institution but she's managing it now
11  but it's not juvenile. Actually they call it
12  Hoyle Correctional Center. I don't know what
13  she has there.
14   Q   How do you spell that?
15   A   H-o-y-l-e.
16   Q   Let's do the same thing for Angola,
17  what's your prison population here?
18   A   5108.
19   Q   And just to be clear, we have gone
20  through Avoyelles, Dixon and Wade and those two
21  satellites, and Angola, does that cover the
22  entire prison facilities in Louisiana?
23   A   No, sir.
24   Q   What else we got?
25   A   We got Phelps Correctional Center,

WARDEN BURL CAIN                    11/30/2006

Pages 22 to 25

Page 22

1   Dabadie Correctional Center.
2       Q    What is that?
3       A    Dabadie.
4       Q    How do you spell that?
5       A    D-a-b-a-d-i-e.
6       Q    Uh-huh.
7       A    Winn Correctional Center.
8       Q    How do you spell that?
9       A    W-i-n-n.
10      Q    Uh-huh.
11      A    Allen Correctional Center.  Did I say
12  Phelps?
13      Q    Yes.
14      A    Okay, we have LCIW, Louisiana
15  Correctional Institute for Women, we have Hunt
16  and we have Rayburn Correctional Facility, and
17  DCI, yes, it should be eleven of them.
18      Q    Each of these have wardens?
19      A    Yes.
20      Q    And who do these wardens report to?
21      A    Well, they report to their regional
22  warden.
23      Q    And who is that?
24      A    Well, Warden Jimmy LeBlanc, he has
25  DCI, Phelps, LCIW, Hunt, Rayburn.

Page 23

1       Q    Okay.
2       A    Warden Venetia Michael has the rest,
3   except Avoyelles and I have Avoyelles.
4       Q    Do you know the approximate inmate
5   capacity for Phelps?
6       A    About 850.
7       Q    Do any of these prisons house maximum?
8       A    Hunt and Wade.
9       Q    And do all of them house medium as
10  well as minimum?
11      A    Yes, sir.
12      Q    Dabadie's approximate population?
13      A    Dabadie is a minimum security prison
14  and it has about three or four hundred.. I
15  don't really know the actual counts on these
16  prisons.
17      Q    I understand, I'm just asking you to
18  give me your best estimate of the number.
19      A    Three or four hundred.
20      Q    Winn?
21      A    Fifteen hundred.
22      Q    Allen?
23      A    Fifteen hundred.
24      Q    LCIW?
25      A    About twelve hundred.

Page 24

1       Q    Hunt?
2       A    Twenty-two hundred.
3       Q    And Rayburn?
4       A    Fifteen hundred.  That's estimates.
5       Q    I appreciate that.
6            Let's go to Angola now.  You've got
7   fifty-one hundred and eight, how many are
8   maximum?
9       A    Well, we consider all of them maximum,
10  basically, but even though by sentence they are
11  but obviously we have some mediums that are
12  trustees.
13      Q    And give me, if you would, a
14  description, let's start with the lowest
15  security and work our way up to the highest
16  security of the housing options that you have
17  available to you here at Angola.
18      A    I don't understand that question.
19      Q    Okay, is it fair to say that inmates
20  are housed in different places at Angola
21  according to their security risk?
22      A    Yes, sir.
23      Q    Can you start with the lowest security
24  risk housing and describe that for me?
25      A    It would be the dog pen, and the dog

Page 25

1   pen has fifteen inmates and those inmates don't
2   have a correctional officer with them all the
3   time, they have a correctional officer that
4   comes by and counts them every hour, so that's
5   the least restricted, the most trusted inmates.
6   And then you'll have Camp F, which is basically
7   a trustee camp with about 400 inmates in it.
8   And then other than that the rest of them are
9   basically the same, they have medium, minimum,
10  maximum.
11      Q    But you have them housed in different
12  places?
13      A    I do.
14      Q    Are you telling me, does their
15  security level, their risk level have anything
16  to do with where they're placed in the
17  remaining housing facilities here?
18      A    It could, doesn't have to.
19      Q    Doesn't have to, all right.  Let's
20  just take them one by one and you tell me where
21  they're --
22      A    Well, they're all alike other than
23  Camp F, Camp F is trustees and the other camps
24  you're going to have medium, minimum and some
25  maximum because you have cellblocks.

Page 26

1   Q   And what are those camps?
2   A   Camp C, Camp D, Camp J, RC, reception
3   center.
4   Q   Inmates are housed there?
5   A   Yes, RC and death row, the same place.
6   Q   Same place?
7   A   Yes. The main prison east yard.
8   Q   I'm sorry?
9   A   The main prison east yard.
10  Q   Main prison --
11  A   And main prison east yard and main
12  prison west yard.
13  Q   What else?
14  A   That's it.
15  Q   What about TU, CCR?
16  A   Yes, I forgot about that. CCR and TU,
17  thank you.
18  Q   Is that two different things?
19  A   They're really two different things,
20  but it's 181 cells in there.
21  Q   In where?
22  A   In CCR and TU, and then you have the
23  hospital, there's some inmates that's in
24  hospice, there's hospice inmates that they're
25  pretty much permanent.

Page 27

1   Q   How many inmates there?
2   A   Oh, I don't know, it varies, there's
3   thirty-nine beds but hospice could be five, it
4   could be one, it could be none, it could be
5   ten.
6   Q   Thirty-nine beds in the hospital and
7   you might be having hospice for --
8   A   There's two wards, one ward would be
9   where the hospice is and some others, and the
10  other ward would be for whatever.
11  Q   Whatever illness; is that right?
12  A   Yes, just sick.
13          (Off the record.)
14  BY MR. HANLON:
15  Q   Let's start with Camp C, do you have
16  both dorm facilities there and cellblocks
17  there?
18  A   Yes, sir.
19  Q   And is there a reason why somebody
20  there is assigned to a dorm as opposed to a
21  cellblock and vice versa?
22  A   Yes, sir.
23  Q   What's that?
24  A   It could be because of protection, he
25  wanted to be locked up; it could be

Page 28

1   disciplinary; it could be for investigation.
2   Q   Anything else, sir?
3   A   I don't think so.
4   Q   Do you know approximately how many
5   beds you have in the dorm at Camp C?
6   A   I don't know exactly, about 850. No,
7   not in the dorm, that's total capacity. Let's
8   see, probably about 600.
9   Q   When you say 850 total capacity, what
10  were you referring to?
11  A   The whole camp, Camp C has about 850
12  inmates.
13  Q   And 650 dorm beds?
14  A   Probably, yes, I'm not sure.
15  Q   I appreciate that, I'm asking you for
16  estimates.
17  A   Yeah, about that. Warden Vannoy is
18  going to tell you exactly when you ask him.
19  Q   And is it fair to say then there's
20  about 250 cellblocks in Camp C?
21  A   Yes, sir. Camp D is exactly the same.
22  Q   Camp J?
23  A   Camp J is all cells, there's about
24  five hundred cells in it.
25  Q   And for what reason are inmates

Page 29

1   assigned to Camp J?
2   A   Disciplinary cellblock.
3   Q   Is that the most confined housing that
4   you have here?
5   A   What's the question exactly again?
6   Q   Is that the most confined housing you
7   have here, Camp J?
8   A   Yes, sir.
9   Q   Is it fair to say that that's
10  considered the worst punishment you have for
11  somebody here?
12  A   Yes, sir, that would be fair to say.
13  Q   And describe for me, if you would,
14  what the housing conditions are in Camp J, the
15  cellblock?
16  A   Camp J has a program, I don't have it
17  with me, that we set up. Camp J, when you go
18  there you go to level two and at level two you
19  either do good and you go to level three and
20  after a period of time you get out, or you do
21  bad and you go to level one and you get less
22  things and less benefits and you work your way
23  back from level one, back to level two by good
24  behavior, not getting write-ups and so forth
25  and you finally work your way out. That's how

Page 30

1  it works.
2  Q   How many inmates per cell in Camp J?
3  A   One.
4  Q   And how big is the cell?
5  A   I believe it's six by eight,
6  forty-eight square feet. I'd have to measure
7  to be sure but I think they are.
8  Q   And how much of a day is in the cell?
9  A   We give them an hour tier time per day
10 on the cell.
11 Q   Are they in restraints then?
12 A   No, sir.
13 Q   And outside exercise?
14 A   They get an hour a day, three days a
15 week on the yard, and if it's stormy weather
16 they miss it because it's stormy weather, it
17 may be lightening, unsafe.
18 Q   And the outside is without restraints?
19 A   No, sir. It depends.
20 Q   Depends?
21 A   You're going to have some restraints.
22 Q   Any inmate will have some restraints
23 outside; is that right?
24 A   Yes, sir.
25 Q   What are the restraints?

Page 31

1  A   He could have handcuffs, he could have
2  leg irons and he would have -- his hands would
3  be cuffed behind his back if he masturbates
4  toward the tower, you can't do that, when he's
5  on the yard, or masturbates anywhere.
6  Q   Do you know approximately the average
7  length of time in Camp J for an inmate?
8  A   Not really. Depends on their
9  behavior.
10 Q   Depends on their behavior?
11 A   Yes, sir.
12 Q   Now you said the reception center and
13 death row, same thing?
14 A   No, sir.
15 Q   I mean at the same place?
16 A   They're at the same place.
17 Q   And how many inmates do you have on
18 death row?
19 A   Eighty-nine I believe today.
20 Q   The main prison east yard, what's your
21 capacity there?
22 A   East and west yard each have about
23 1250 inmates.
24 Q   Again, is that broken down between
25 dorm and cellblock?

Page 32

1  A   The cellblocks are basically in the
2  center of it right here then the east side is
3  dorms. The cellblocks kind of go with just the
4  main prison.
5  Q   And how many cellblocks you got there?
6  A   I've got four buildings, two buildings
7  with four tiers each, that's going to be about
8  150 to 200, I don't know exactly.
9  Q   And the balance is dorm?
10 A   The balance is dorm.
11 Q   In CCR you've got 181 cells?
12 A   Yes, sir.
13 Q   And you said TU and CCR.
14 A   In that building TU takes up part of
15 it.
16 Q   All right, what's TU?
17 A   Treatment unit.
18 Q   And what does that mean, sir?
19 A   Mental health.
20 Q   And how many inmates do you have
21 there?
22 A   I don't know exactly how many cells
23 are dedicated to it but I'm going to guess,
24 probably out of 181, half of it.
25 Q   And in TU you've got, is that one

Page 33

1  inmate per cell?
2  A   Yes, sir.
3  Q   Same thing with CCR?
4  A   (Witness nods head affirmatively.)
5      One inmate per cell.
6  Q   And the conditions are confinement in
7  CCR, can you describe them?
8  A   Describe them?
9  Q   Yes, twenty-three hours a day?
10 A   Twenty-three hours a day they're in
11 the cell, one hour a day they have tier time,
12 three days a week they can go on the yard and
13 have yard time, an hour in the yard.
14 Q   And what do they have in their cells
15 besides a bunk?
16 A   Well, they have food, stuff from the
17 canteen, clothes, that sort of thing.
18 Q   Books?
19 A   Books.
20 Q   Newspapers?
21 A   They could.
22 Q   TV?
23 A   On the wall outside.
24 MR. HICKS:
25      Just for clarity, are you asking

Page 34

1  what they have available to them or what they
2  actually have?
3        MR. HANLON:
4              Available to them.
5  BY MR. HANLON:
6    Q   Is that what you understood me to ask?
7    A   Let me read it to you. I've got it
8  somewhere. They have jeans, shirts, shorts,
9  underwear, T-shirts, handkerchiefs, socks,
10 sweat shirts, sweat pants, shoes, pajamas,
11 belt, small buckle, they can have a cap, a
12 watch battery, winter underwear, personal
13 letters, books, magazines, Bible and/or
14 religious books, newspaper, photo album, wrist
15 watch, wedding ring, toilet articles, no glass,
16 writing material, legal papers, smoking
17 material, storage lockers, small bag, ash tray,
18 sheet, blanket, pillow case, pillow, picture,
19 picture frame, towels, wash cloths, commissary
20 articles, they can have a radio, tape player,
21 or radio/tape/CD player combination, CD,
22 cassette tapes. It's not on the list but they
23 also can have art supplies, water colors,
24 that's what they can have.
25   Q   Is that a document you brought with

Page 35

1  you here today?
2    A   Yes, sir.
3    Q   Let's take that notice of the depo.
4        MR. HICKS:
5              For the record, the witness was
6  reading from Louisiana State Penitentiary
7  Posted Policy Number CCR-04. Under the
8  subject, Items Inmates in CCR May Have In Their
9  Cells.
10       MR. HANLON:
11             Thank you.
12       MR. CURRY:
13             I don't know if you want to put
14 that in the record, I mean that's obviously
15 been produced, y'all have that from us.
16       MR. HANLON:
17             I appreciate that.
18 BY MR. HANLON:
19   Q   Let me show you a document that I've
20 marked as Exhibit 1 entitled Notice of
21 Deposition of Burl Cain. Have you seen this
22 document before?
23   A   Me?
24   Q   Yes.
25   A   I don't remember it. When was it?

Page 36

1  Yeah, that's just the same we just got. Yes,
2  sir.
3        (Whereupon the document referred to by
4         Counsel was marked for identification
5         as Exhibit 1.)
6  BY MR. HANLON:
7    Q   After you got that did you check your
8  records to see if you had any of the records
9  that are called for there?
10   A   I told my secretary to do it and she
11 did it.
12   Q   And did you find any such documents?
13       MR. HICKS:
14             Let me just say for the record
15 that counsel spoke or I spoke with Harmony
16 Loube concerning the items and I was told that
17 it was not necessary that we produce the items
18 that have already been produced, and we have
19 already produced all items with the exception
20 of number five, which is interviews, articles,
21 publications, and then numbers eight and nine
22 and I don't think anything existed. But other
23 than items five, eight and nine, those
24 documents have already been produced.
25       MR. HANLON:

Page 37

1              And with respect to five, eight
2  and nine, he has brought some materials with
3  him?
4        MR. HICKS:
5              The witness has.
6        MR. HANLON:
7              Thank you very much.
8  BY MR. HANLON:
9    Q   Let's start with the document you were
10 just reading from. Would you hand me that?
11   A   Yes, sir.
12   Q   And this is I think what you just read
13 in, this is a Department Regulation B-O9-005
14 and C-O3-007, Posted Policy Number CCR-04. I'm
15 going to mark that as Exhibit 2.
16       (Whereupon the document referred to by
17        Counsel was marked for identification
18        as Exhibit 2.)
19   A   I have some additional things they
20 have in their cell, do you want the rest of it?
21   Q   You have some additional things?
22   A   I have some other documents that I
23 read from but it still pertains to CCR. Was
24 that CCR-05?
25   Q   I have CCR-04

Page 38

1    A    This is CCR-05. Okay, they can have
2  two plastic containers purchased from the
3  canteen.
4    Q    Are you reading from 05 now?
5    A    I'm reading from 05. Do you want me
6  to do that?
7    Q    Hang on just a minute and let me mark
8  that as Exhibit 3.
9    A    Here's 06, too.
10        (Whereupon the document referred to by
11        Counsel was marked for identification
12        as Exhibit 3.)
13 BY MR. HANLON:
14    Q    All right. CCR-05, is it fair to say
15 that that supplemented Exhibit 2, which was 04?
16    A    Right.
17    Q    All right, sir.
18    A    Here's 06.
19    Q    We'll mark that Exhibit 4, and is it
20 fair to say that that supplemented the 05?
21    A    Yes, sir. Here's 07.
22    Q    You have an 07?
23    A    Yes, sir. Laundry bag, tooth brush,
24 tooth paste, watch cloth, towel.
25    Q    All right, sir. Am I correct that 07

Page 39

1  has not been produced to us before?
2        MR. HICKS:
3            I think all of these policies
4  have been produced. The witness was just
5  reviewing them before the deposition and
6  happened to have them in his possession, but
7  it's my understanding that all of these
8  policies have been.
9        (Whereupon the document referred to by
10        Counsel was marked for identification
11        as Exhibit 4 and Exhibit 5.)
12 BY MR. HANLON:
13    Q    I would like you to give me what you
14 have pursuant to the notice, that is, documents
15 that you haven't produced before that you
16 brought with you.
17    A    Have we produced these before?
18        MR. HANLON:
19            Brent, I would like him to
20 produce what he hasn't produced before or that
21 you all haven't produced before.
22        THE WITNESS:
23            We produced these before.
24        MR. HICKS:
25            No, we haven't. The witness has

Page 40

1  brought with him in response to your request,
2  news articles, some news articles that were
3  posted on the internet, one is from The Gamut
4  Weekly, dated July 3, 2001; the next one is an
5  article in The Times Picayune which is dated
6  May 2, 2002. I think that was it, wasn't it?
7  In addition, the witness also has with him just
8  some selected policies that pertain to CCR,
9  which we believe have been produced and are
10 available for inspection.
11        MR. HANLON:
12            So is it fair to say that the
13 only thing that hasn't been produced to us
14 before that he brought with him today are these
15 two news articles?
16        MR. HICKS:
17            That were requested in the
18 documents, I mean in the Notice of Deposition,
19 that's correct. The witness didn't have any
20 copies of depositions. I think that was the
21 other thing.
22 BY MR. HANLON:
23    Q    All right, sir. Let's go to the
24 capacity of the Angola prison right now. You
25 have testified I believe you had 5108 prisoners

Page 41

1  here?
2    A    Yes, sir.
3    Q    Are you over capacity or under
4  capacity here in Angola?
5    A    Besides taking in the prisoners from
6  Orleans, 200 at the time every other week or so
7  forth, I'm okay, I'm on capacity, I'm right,
8  then I put them in my gym.
9            Just to answer your question
10 accurately and honestly, when I get the Orleans
11 Parish prisoners then I have to give up my gym,
12 but Katrina is causing that, it's an emergency
13 so I can't help that, and the inmates all
14 understand that.
15    Q    You're familiar with this book by
16 Dennis Khere, I think, Cain's Redemption?
17    A    It's a good book. Have you read it?
18    Q    I have.
19    A    Did you enjoy it?
20    Q    I did.
21    A    Good.
22    Q    Let me read you a sentence here that
23 he attributes. When he says "he" here he means
24 you, okay?
25    A    Okay.

Page 42

1    Q    "He believes, for instance, that some
2    men in Angola, now old and growing increasingly
3    frail, should be set free but his reason is
4    pragmatic as well as compassionate. Angola is
5    running out of room for men whom he calls
6    predators who deserve to be locked up in a
7    maximum security prison." Is that a fair
8    statement?
9    A    Yes, sir.
10   Q    In what sense are you running out of
11   room for men that need to be locked up in
12   maximum?
13   A    Are we discussing the answer?
14   Q    I want to know what you meant by that
15   when you said it.
16   A    Well, some people should die in
17   prison; some people, when you get dying old men
18   you can't -- some people should be released
19   from prison based on their behavior and we have
20   no mechanism to release some people from prison
21   who maybe should be released from prison.
22   Prison should be a place for predators and not
23   dying old men, that's what it says.  Some
24   people should die in prison.
25   Q    In what sense are you running out of

Page 43

1    room for men who you call predators, who need
2    to be locked up in maximum security prison?
3    A    There was a time when Wade and Hunt
4    did not house the lifers, now they have to
5    start taking some lifers.  I explained that.
6    If you're ten years short, if you've been here
7    ten years I can status reduce you to another
8    prison.  That used to not happen.  That
9    happened during my time.
10   Q    When did that start happening?
11   A    I don't know, I just run out of room a
12   few years ago so we had to start -- I don't
13   know, I don't know exactly, I don't know when
14   exactly.
15   Q    Is it fair to say a few years ago
16   you --
17   A    Probably four or five years ago.
18   Q    -- started discharging men to Wade and
19   Hunt --
20   A    Transferring, status reducing.
21   Q    Status reducing.  What does status
22   reducing mean?
23   A    It means I change your status from
24   Angola to another prison and I'll submit that
25   to Secretary Stalder and then they are -- to

Page 44

1    Chief Creed, and they will determine if they
2    really want to let that inmate go from this
3    prison to that prison, and if they do then they
4    status reduce them and that makes room for me
5    to take a lifer who comes in the reception
6    center at Hunt.
7    Q    And these were lifers?
8    A    Not necessarily.  It could have been
9    people over fifty years.
10   Q    Were they in maximum here or were any
11   of them in maximum here?
12   A    No, sir.
13   Q    In the 1970s Angola was a much
14   different place than it is today; is that fair
15   to say?
16   A    Yes, sir.
17   Q    I would like you to give me your
18   understanding of what was going on here in the
19   '70s at Angola, let's just start with that.
20   A    It was a violent prison.  I wasn't
21   here so I just heard what you heard, a lot of
22   violence.
23   Q    When you came here in '95, what was
24   your sense of Angola?
25   A    Pretty violent.

Page 45

1    Q    Still pretty violent.  I mean in '95
2    when you came.
3    A    To qualify that, I left a medium
4    security prison with the third inmates, so
5    therefore this prison became way more complex
6    and more violent than the one I left, and it
7    did.
8    Q    Did you at some point in time decide
9    you wanted to institute some reforms in Angola?
10   A    Oh, yeah.
11   Q    When was that, when did you start
12   instituting reforms at Angola?
13   A    Probably within the first year.
14   Q    What were the reforms that you
15   instituted?
16   A    Union management, warden over each
17   camp, accountability.
18   Q    At what point did you institute
19   religious programing?
20   A    I came with it.  It's not necessarily
21   religious programs, it's moral programs.  Moral
22   people don't break rules and commit crimes, so
23   the more mortality I get in the prison, the
24   less violence is in the prison.
25   Q    And what did you do specifically that

WARDEN BURL CAIN                                            11/30/2006

Pages 46 to 49

| Page 46 | Page 48 |
|---|---|

Page 46

1  was different in terms of moral programs?
2      A  I let the outside community, the moral
3  community have access to the prison far more
4  than it had before, and then in '96 the Bible
5  college came along, the Pell grants. There
6  were no higher education in prison. Being a
7  teacher, I believe in education. How can you
8  read the rules if you can't read and I wanted
9  everybody to learn to read. And so the Bible
10  college started a trend, that's helped change
11  the culture.
12      Q  Did you institute purely educational
13  courses too for reading or was that associated
14  with the Bible college?
15      A  They already had educational programs
16  but no higher education. We had a literacy
17  program, we just built on it, the low back
18  program, one inmate teaches another to read.
19      And the Bible college I replaced
20  because the higher education was out, no Pell
21 . grants and nobody would do higher education
22  other than you pay for it yourself, so the
23  Bible college filled that void. It was a very
24  nondenominational thing.
25      Q  Did it teach reading?

Page 48

1  they taught too, so it hit it real hard in
2  every direction, the inmate teachers. It was a
3  good thing, kind of unorthodox.
4      Q  But you had paid staff that also --
5      A  I did but I didn't have nearly enough.
6      Q  Let me show you a document that I'm
7  going to mark, I'm going to mark this document
8  Exhibit 6 and this is a page from Department
9  Regulation B-02-001, dated November 20, 1995,
10  and ask you if you recognize that document?
11      A  It describes custody levels.
12      MR. HICKS:
13      Do you have a copy of the entire
14  policy?
15      MR. HANLON:
16      Have we got the entire policy?
17      MS. HSU:
18      We don't have the entire policy
19  but from the records.
20      MR. HANLON:
21      And this is the only part of the
22  policy I want to ask him about. I tell you
23  what I will do, I'll give him also --
24      MR. HICKS:
25      We have a copy of the entire

Page 47

1      A  Well, you had to qualify to go to
2  college so you had to already know how to read
3  and have a GED to be there.
4      Q  And how did you deal with teaching
5  inmates to read?
6      A  The literacy program, and that's
7  basically one inmate would teach another inmate
8  to read and the other inmate would teach
9  another inmate to read and it just snowballed.
10      Q  That was inmate by inmate?
11      A  Inmate by inmate but we certainly had
12  staff to oversee it and see that it worked, but
13  it's just learn to read, just learn to read.
14      Q  But there was no formal program; is
15  that fair to say?
16      A  Yes, we had a formal education
17  program, we had a GED program, we had a
18  vocational program, we had teachers and they
19  taught to read too.
20      Q  Teachers on staff?
21      A  Yes, sir.
22      Q  So the teachers --
23      A  It was two-fold, the teachers taught
24  you and they actually helped train the literacy
25  teachers, the inmate literacy teachers, but

Page 49

1  regulation.
2      (Whereupon the document referred to by
3      Counsel was marked for identification
4      as Exhibit 6.)
5  BY MR. HANLON:
6      Q  Do you recognize that policy?
7      A  Yes, sir, this is the policy right
8  here.
9      Q  What role, if any, did you play in the
10  development of this policy?
11      A  Not a whole lot.
12      MR. HICKS:
13      Let me just state for the record,
14  he's looking at a regulation, not a department
15  policy.
16  BY MR. HANLON:
17      Q  In the development of this
18  departmental regulation, what is your role?
19      A  My role is to review and sign off on
20  it.  This is not a department -- is this the
21  department or this is Angola?  The department
22  regs, it come out of Stalder's office, so we
23  make comments and he puts those out.
24      Q  Are they developed in the Secretary's
25  office, Department Regulations?

Page 50

1    A    Basically they are, with comments from
2    the field.
3        Q    Let me show you the current version of
4    that policy. You may want to get it. I take
5    that back, the 2001 version of that policy,
6    I'll mark that as Exhibit 7.
7            (Whereupon the document referred to by
8            Counsel was marked for identification
9            as Exhibit 7.)
10           MR. HICKS:
11               Let me see it. Are you asking
12   him to assume that this is a 2001 and current
13   version?
14           MR. HANLON:
15               Yes, I represent that you all
16   presented that to us. Not current, 2001.
17               That's a document that's been
18   produced to us in discovery and is the October
19   10, 2001 version of this Department Regulation
20   B-02-001. It's also page two and I want to ask
21   him questions about these two documents.
22       A    What's your question?
23       Q    First of all, on November 20 of 1995,
24   when we look at Exhibit 6 here, you were here
25   at Angola at that time as the warden; is that

Page 51

1    right?
2        A    Yes, sir.
3        Q    And I would like you to read in
4    paragraph C 3 on Maximum Custody.
5        A    C 3.
6        Q    Right.
7        A    Maximum Custody.
8        Q    Right.
9        A    "Assignment of an inmate to a cell
10   based upon the need to protect the inmate,
11   other inmates, the public, staff, or the
12   institution. This includes Disciplinary
13   Detention/Extended Lockdown and Working
14   Cellblocks and may include Protective
15   Custody/Extended Lockdown. Movements inside
16   the secure perimeter of a facility by maximum
17   custody inmates are closely monitored by staff
18   and may include utilization of restraints in
19   accordance with the institutional policy.
20   Movement outside of a secure perimeter is
21   accomplished only under armed supervision or
22   when appropriately restrained."
23       Q    Now, that's the Exhibit 6 and it's the
24   1995 regulation on maximum custody.
25       A    Yes, sir.

Page 52

1        Q    I would like you to take a look at
2    Exhibit 7, which is the October 10, 2001
3    regulation on Maximum Custody.
4        A    Read it?
5        Q    You're having a little cold trouble
6    today so I'll just read it into the record and
7    you can follow.
8        A    Okay, cool.
9        Q    "Assignment of an inmate to a cell
10   based upon the need to protect the inmate,
11   other inmates, the public, staff, or the
12   institution. This includes temporary
13   assignment to Administrative Segregation or
14   permanent assignment to Disciplinary
15   Detention/Extended Lockdown and Working
16   Cellblock and may include Protective
17   Custody/Extended Lockdown. Movements inside
18   the secure perimeter of a facility by maximum
19   custody inmates are closely monitored by staff
20   and may include the utilization of restraints
21   in accordance with the institutional policy.
22   Movement outside of a secured perimeter is
23   accomplished only under armed supervision or
24   when appropriately restrained or when otherwise
25   secured and appropriately supervised."

Page 53

1            And my question to you is this, it
2    does not appear to me that the notion of
3    permanent assignment, which is in the third
4    line of the 2001 regulation, exists in the 1995
5    C 3 Maximum Custody. Would you agree with me
6    on that?
7        A    It's not there, it's not there, you're
8    right.
9        Q    Do you know why that change was made
10   in October of 2001?
11       A    Well, I would like to accommodate
12   death row for instance and probably to
13   accommodate, you know, CCR and then had added
14   the N 5 cellblock at David Wade and they also
15   did it at Hunt, which kind of confirms five
16   years or so ago and they have other places for
17   lifers.
18           MR. HICKS:
19               So the record is clear, is the
20   witness testifying that that's what he assumes
21   happened or is that his personal knowledge as
22   to what happened?
23           THE WITNESS:
24               I don't know why.
25   BY MR. HANLON:

Page 54

1   Q   Yes.
2   A   Oh, I don't know.
3   Q   You had death row in 1995 and you had
4   death row in 2001, right?
5   A   Yes.
6   Q   Of your own personal knowledge do you
7   know of anything factually that changed between
8   '95 and 2001, which would serve as a basis for
9   this change to permanent assignment here?
10  A   I don't know of anything factually
11  that would have caused that.
12  Q   This lawsuit that we're in here was
13  filed in March of 2000, do you know if this
14  policy was changed in whole or in part because
15  of the filing of the lawsuit?
16  A   I have no idea, I wouldn't think so.
17  Q   Is it your testimony that you weren't
18  involved in this change?
19  A   I wasn't involved in that. Other than
20  to read it and make comments, I don't recall it
21  at all.
22  Q   In fairness to you, the words
23  permanent assignment is something you're just
24  not familiar with being involved in that
25  change?

Page 55

1   A   Right.
2   Q   Am I correct though that when changes
3   in departmental regulation, such as this, are
4   developed by the Secretary or his office, they
5   are as a matter of course submitted to you for
6   review and comment?
7   A   To all the wardens.
8   Q   All the wardens.
9   A   (Witness nods head affirmatively.)
10  Q   That's correct, right?
11  A   Right.
12  Q   Who makes the determination about when
13  rule revisions are required, is that solely up
14  to the Secretary after receiving comments from
15  wardens?
16  A   Yes, sir.
17  Q   Do wardens from time to time ask for
18  rules to be changed?
19  A   We can.
20  Q   Have you ever done that?
21  A   Probably.
22  Q   Do you have any recollection of a
23  specific one?
24  A   Yes.
25  Q   What would that be?

Page 56

1   A   I wanted them to add more things to
2   the canteen list.
3   Q   And did you ask for that, for a change
4   in department regulation?
5   A   Yes, sir.
6   Q   And did that happen?
7   A   I think so.
8   Q   You're not certain?
9   A   No, sir. Probably. I don't even
10  remember the incident.
11  Q   Any other incident that you can
12  remember where you asked for a change in
13  department regulation?
14  A   Uniform change.
15  Q   Uniform change?
16  A   Yes.
17  Q   What would that be, sir?
18  A   For the chase team, let them wear more
19  comfortable clothes when they're running the
20  dogs in the woods, change the kind of clothes.
21  Q   The chase team is what?
22  A   Bloodhound team. The field crew, let
23  them wear blue jeans when they ride the horses
24  instead of those hot knit pants in the summer.
25  I've asked for that and got it.

Page 57

1   Q   And got it?
2   A   Yes.
3   Q   And that would be a change in
4   departmental regulation?
5   A   Yes. That's about it.
6   Q   What sorts of jobs are available for
7   inmates?
8   A   Almost every kind of job there is on
9   the street.
10  Q   Just give me your --
11  A   All kinds, mechanic, to an orderly, to
12  a dishwasher, to an electrician, to a tractor
13  driver, to a bulldozer operator, to a farmer,
14  cattleman, a horse trainer, a dog trainer.
15  Everything.
16  Q   Which inmates are eligible for jobs
17  while they're here?
18  A   Well, most, if you're not in lockdown.
19  If you're not sick or disabled then pretty much
20  we can find you something to do, most
21  everybody. And some of them in the lockdown we
22  have work in cellblocks that go out to work.
23  Q   Which cellblocks are those?
24  A   That's going to be the main prison
25  cellblocks, it's going to be some of the

| Page 58 | Page 60 |
|---|---|

Page 58

1 cellblocks in each camp.
2 **Q Is it fair to say that's not available**
3 **for prisoners in CCR?**
4 A They don't go out to work, nor death
5 row.
6 **Q How about Camp J?**
7 A Don't go out to work.
8 **Q Any others?**
9 A No, that's it.
10 **Q Are there jobs for elderly prisoners?**
11 A Yes.
12 **Q What kind of jobs are there for**
13 **elderly prisoners?**
14 A Radio station disc jockey, orderlies,
15 tier walkers.
16 **Q Jobs for disabled prisoners?**
17 A What do you mean disabled?
18 **Q Somebody that's got a disability of**
19 **one kind or another.**
20 A Yeah, we'll try to find him a job if
21 he can possibly do anything, a job.
22 **Q Do you know if Mr. Wallace or**
23 **Mr. Woodfox or Mr. Wilkerson ever participated**
24 **in any of those jobs while they were here at**
25 **Angola?**

Page 59

1 A No, they didn't, not on my watch.
2 **Q Not on your watch. And that would be**
3 **because they were in CCR?**
4 A Yes, CCR, Camp J.
5 **Q Or Camp J. Other than the -- I think**
6 **you prefer the word moral programs, right?**
7 A Yes.
8 **Q Or education programs that you've**
9 **discussed earlier, what other programs are**
10 **available for rehabilitation for prisoners**
11 **here?**
12 A Rehabilitation?
13 **Q Yes, sir, or for any other purpose.**
14 A Well, hospice, you learn to be
15 caregivers. You mean for rehabilitation you're
16 asking?
17 **Q Yes, I don't mean just physical**
18 **rehabilitation, I mean personal rehabilitation,**
19 **reform.**
20 A You have the vo-technical school, the
21 paint shop, body shop, carpenter school, the
22 cooking school, you have the prep schools, all
23 kind of schools, we believe in schools.
24 There's lots of schools, lots of training once
25 you have a skill.

Page 60

1 **Q What's the purpose of these programs?**
2 A Rehabilitation.
3 **Q So you're using that term the same way**
4 **I am, the prisoner reforming their life.**
5 A Yes, they have to have a skill, they
6 might get out of jail and they have to
7 contribute, meaningful work.
8 **Q What about correspondence educational**
9 **programs, do you have those available? Are**
10 **prisoners entitled to access those?**
11 A They are.
12 **Q Do they?**
13 A I think so, I don't know for sure, I
14 think, I'm sure they do.
15 **Q They pay for it themselves?**
16 A Yes, sir.
17 **Q Are there any of those programs that**
18 **you don't allow that you know of?**
19 A No.
20 **Q Do you know if Mr. Wallace on your**
21 **watch, do you know if Mr. Wallace has attempted**
22 **to do that and been unable to do that?**
23 A I don't know, I don't know that.
24 **Q The same question for Woodfox, do you**
25 **know?**

Page 61

1 A I have no idea.
2 **Q Or for Wilkerson?**
3 A Don't know.
4 **Q I want to go back for a minute on Camp**
5 **C and Camp D, I believe you told me that there**
6 **are disciplinary cellblocks in Camp C and Camp**
7 **D; is that correct?**
8 A Yes, sir.
9 **Q Are those the same things, do they**
10 **serve the same purpose as CCR?**
11 A No, sir.
12 **Q What's the difference?**
13 A Well, most of them are going to be
14 working cellblocks and they're transitioning
15 out of Camp J, third level, and you move on out
16 to one of those others.
17 **Q So that doesn't serve as an overflow**
18 **for CCR?**
19 A We have one cellblock that kind of
20 does.
21 **Q What's that?**
22 A It's at Camp D, I don't know the exact
23 name of it, Warden Vannoy would know. It's
24 just kind of an overflow from it.
25 **Q What about Camp A and Camp B, do you**

Page 62

1  have such a thing
2      A   Camp A?
3      Q   Yes.
4      A   That's the old antique camp.
5      Q   What does that mean?
6      A   That's an old camp that has been
7  discontinued, it's right across the road down
8  here from us and it's like a museum thing.
9  Camp B doesn't exist anymore, that's where
10 B-line is, where the employees live, it's an
11 old history camp, historical things.
12     Q   Do you have somebody who is here who
13 is specifically in charge of the educational
14 programs?
15     A   Yes, sir.
16     Q   Who is that?
17     A   That's under Warden Peabody.
18     Q   Warden Peabody?
19     A   Yes, sir.
20     Q   All right, I want to show you two
21 documents I marked Exhibit 8 and Exhibit 9, one
22 is a May 8, 1998 Directive 10.016, and the
23 other is from the Louisiana Administrative Code
24 and the section that I'm going to ask you about
25 is on education, and I'd like you to take a

Page 63

1  look at both of these documents.
2      A   Okay.
3          (Whereupon the documents referred to
4          by Counsel were marked for identifica-
5          tion as Exhibit 8 and Exhibit 9.)
6  BY MR. HANLON:
7      Q   The section I want to ask you about is
8  Section 3115 B on education from the Louisiana
9  Administrative Code.
10         MR. HICKS:
11             Could you repeat the section
12 again?
13         MR. HANLON:
14             Yes, the section on the
15 Administrative Code is 3115 B.
16     A   What's the question?
17     Q   Okay, first of all, on the
18 Administrative Code, Section 3115 B, it appears
19 to approve correspondence or special courses at
20 the inmate's expense if no security problems
21 are involved.  Do you know of any security
22 problems that would be involved in a
23 correspondence or special course that an inmate
24 might take here?
25     A   An example, if you're studying

Page 64

1  something about how to escape or some kind of
2  mercenary deal, of course, or something like
3  that you have to look at, I mean everything.
4      Q   What about the contents of the
5  material, what if it has to do with political
6  views?
7      A   I don't care what your political views
8  are.
9      Q   So you wouldn't sensor or not let an
10 inmate read documents that have political views
11 stated?
12     A   Excuse me, but political views are all
13 encompassing so you have to define what you
14 mean by political views, because if it's a
15 political view that's suggestive and it's going
16 to be causing unrest in the prison, then that
17 kind I'd have concern with.
18     Q   What's a good example of that in your
19 experience?
20     A   Ku Klux Klan.
21     Q   Are you familiar with the fact that
22 the three inmates who are plaintiffs in this
23 case have from one time or another, from time
24 to time expressed interest in and read about
25 the Black Panther party?

Page 65

1      A   I know about that.
2      Q   Is that a political view that you
3  would consider unacceptable for them to be
4  studying?
5      A   Not necessarily.  You could go to
6  muslim and you have the radicles, probably the
7  Black Panther would be the same.
8      Q   Probably be what?
9      A   The same, maybe, I don't know.
10     Q   Have you ever, since you've been here,
11 have you ever taken a position that any of
12 these three inmates couldn't read anything
13 about Black Panthers or receive correspondence
14 or books about the Black Panther party?
15     A   It's in the content of the book, if
16 its content is advocating violence then it's
17 not going to get in.
18     Q   I'm not asking you to speculate on it,
19 I'm just asking you, since you've been here
20 from 1995 forward, have you ever seen anything,
21 has anything come across to your attention that
22 the inmates wanted to read about the Black
23 Panther party where you said I'm not going to
24 allow them to read that?
25     A   I don't recall that.  Just anything,

WARDEN BURL CAIN

11/30/2006

Pages 66 to 69

Page 66

1  I'll just say no you can't read about that? I
2  don't recall.
3      Q   Do you recall anything about the Black
4  Panther party that these inmates wanted to read
5  about it where you said they're not going to
6  read that?
7      A   I don't recall saying that.
8      Q   Or doing that.
9      A   Doing that. I've been here a long
10 time so I don't know for sure but I don't
11 recall that.
12     Q   That's all I'm asking you, sir.
13     A   Okay, twelve years is a long time.
14     Q   I understand that. Look at Exhibit 9,
15 which is the May 8, 1998 Administrative Seg
16 Directive, 10.016. Go down to section number
17 four on that, "In-cell education programs
18 (correspondence courses) shall be provided to
19 inmates who are in a nondisciplinary status."
20 Would an inmate in CCR be in a nondisciplinary
21 status?
22     A   I think yes, yes, they would be in a
23 nondisciplinary status.
24     Q   So in-cell education programs, under
25 this at least provision would be available to

Page 67

1  them; is that right?
2      A   Yes.
3      Q   Are some of the inmates in CCR in a
4  disciplinary status?
5      A   No, they would go to J and then they
6  would go and be assigned to living at CCR, same
7  as death row.
8      Q   And then is it fair to say that
9  inmates in Camp J would fall under this
10 provision and would be in a disciplinary status
11 and would not have in-cell education programs
12 available?
13     A   Right, they would be disciplinary
14 status.
15     Q   All right, sir. That's all I have on
16 those two documents for you.
17         With respect to, let's take them one
18 at a time, on CCR, is one of the purposes of
19 CCR punitive?
20     A   No, I don't think so, I wouldn't say
21 so. Punitive means punishment.
22     Q   That's what I mean.
23     A   No.
24     Q   Is one of the purposes of CCR
25 deterrence?

Page 68

1      A   Is it what?
2      Q   Deterrence.
3      A   Deterrent?
4      Q   Yes, to act as a deterrent.
5      A   That's a hard one there.
6      Q   What's hard about the question?
7  Deterrence is a prison concept that's familiar
8  to you, isn't it?
9      A   Well, if your behavior in the prison
10 lands you in CCR, then that certainly would be
11 a deterrent to the ones who aren't there to not
12 do the same behavior, so in that sense it would
13 be a deterrent to others. But to them it's a
14 consequence of your behavior maybe.
15     Q   Well, I understand it's a deterrent to
16 others, is it also a deterrent to the inmate
17 who is placed in CCR?
18     A   I wouldn't think, I would think no.
19     Q   It wouldn't deter him from aggressive
20 conduct?
21     A   Maybe it would. It should. It's
22 really kind of an ambiguous question, it's hard
23 to get hemmed up in the corner on that; it's
24 kind of a round pen. It's just how you look at
25 it, you know.

Page 69

1      Q   Is one of the purposes of CCR to
2  rehabilitate the prisoner?
3      A   Not necessarily.
4      Q   Not at all or not necessarily?
5      A   Well, I mean, it's not to rehabilitate
6  him as much as it is for the purpose of CCR. I
7  have here the reasons that we would lock you
8  down.
9      Q   Let's mark that as an exhibit.
10     A   Read it to you?
11     Q   Yes. Let me mark it and look at it
12 and then I'll ask you a question about it.
13         MR. HANLON:
14             I take it this is a document
15 that's already been turned over to us?
16         MR. HICKS:
17             Yes.
18         MR. HANLON:
19             I'm going to mark this Exhibit
20 10.
21         (Whereupon the document referred to by
22         Counsel was marked for identification
23         as Exhibit 10.)
24 BY MR. HANLON:
25     Q   What is this document? It's 10.001.

Page 70

1      MR. HICKS:
2           If you want, we have the entire
3   policy if you want to mark the entire policy.
4      MR. HANLON:
5           Let's do that. I think that's
6   page two. I'll just put Exhibit 10 on the
7   outside of it.
8   A    You may want to ask me the question
9   again and let's just kind of keep going with
10  whatever you want to ask. What's the question?
11  Q    The question is, is one of the
12  purposes of placement in CCR, rehabilitation of
13  the inmate?
14  A    CCR is a living area just like the
15  rest of the prison has living areas, and so the
16  whole prison is based on rehabilitation. So
17  you can have rehabilitation in CCR and a living
18  area where you can -- we evangelize it, we
19  educate it and we do all of that to it, and we
20  care about it and we let it have things to help
21  itself to be better.
22  Q    So the answer is yes?
23  A    Yes.
24  Q    The same questions with regard to Camp
25  J, is one of the purposes of placement in Camp

Page 71

1   J deterrence?
2   A    Yes, sir.
3   Q    Is one of the purposes for placement
4   in Camp J rehabilitation?
5   A    You got my sheet. I would say
6   indirectly rehabilitation.
7   Q    You would say indirectly
8   rehabilitation?
9   A    Yes. It gives them time to think.
10  Q    Now, is one of the purposes of
11  placement in Camp J punitive?
12  A    Camp J is punitive.
13  Q    Same question with the working
14  cellblocks, is one of the purposes for placing
15  in a working cellblock deterrence?
16  A    It is, it's on the way out, yeah.
17  Q    On the way out to what?
18  A    Dormitory.
19  Q    And is one of the purposes of
20  placement in the working cellblocks
21  rehabilitation?
22  A    Again, everywhere is rehabilitation.
23  Q    And is one of the purposes for
24  placement of an inmate in the working
25  cellblocks safety for the other inmates?

Page 72

1   A    Yes.
2   Q    Do you ever review the effectiveness
3   of these placements, say working cellblocks,
4   CCR, Camp J as a whole? Do you have a six
5   month review, an annual review, any review like
6   that of how these units as a whole are working
7   to achieve these purposes?
8      MR. HICKS:
9           Are you asking him personally or
10  are you asking him if the institution
11  undertakes this sort of a review process?
12  BY MR. HANLON:
13  Q    Let's start with the institution, does
14  the institution have any formal review process
15  for how the three placements are working?
16  A    I wouldn't think that we have a formal
17  review process of how those three work.
18  Q    Do you personally?
19  A    Not really. Now, let me qualify that.
20  We're going to produce stats and the stats are
21  going to tell us if our overall prison is
22  working, if our violence is down and so forth,
23  that's our review.
24  Q    And how often do you do that?
25  A    Periodically.

Page 73

1   Q    I'm going to show you a document that
2   I've marked Exhibit 11, this is Directive
3   10.001 on Lockdown. It's dated 1-17-06.
4   A    Okay.
5           (Whereupon the document referred to by
6           Counsel was marked for identification
7           as Exhibit 11.)
8   BY MR. HANLON:
9   Q    Do you know if this Directive has been
10  updated since 1-17-06?
11  A    I don't know for sure.
12  Q    I would ask that you check and if
13  there is an update we would like to see it.
14  A    I don't think but I'll look.
15      MR. HICKS:
16          It's my understanding that this
17  is the most up to date, January 17, 2006.
18      THE WITNESS:
19          That's what I thought.
20  BY MR. HANLON:
21  Q    I direct your attention to the
22  paragraph on the first page on Policy, just the
23  first paragraph there and you don't have to
24  read it into the record, I'll ask you some
25  questions on it.

Page 74

1    A    Okay, I got it.
2    Q    Okay. Now, first of all, if you turn
3    to page six it's got your signature on it, I
4    think. Is that your signature?
5    A    Yes, sir.
6    Q    And you customarily sign off on these
7    Directives; is that right?
8    A    Yes, sir.
9    Q    Is anyone else authorized to do that
10   or is it just you?
11   A    I'm usually the one that signs off.
12   Q    Now, the statement on the first page
13   here is, "It is the policy of the Louisiana
14   State Penitentiary to house as many inmates as
15   possible in the general population and that
16   they be assigned to meaningful work." I take
17   it since you signed off on that document that
18   you agree with that statement?
19   A    I do.
20   Q    Do you also agree that, "Long-term
21   confinement to cells is not in the best
22   interest of the penitentiary or the population,
23   or its population, unless release threatens the
24   security of the individual, other inmates,
25   prison employees or the general public"?

Page 75

1    A    Yes, I do.
2    Q    How often do you review this policy?
3    A    We have ACA accreditation and we're
4    going to do that every three years for sure,
5    but we're going to review our policies as we
6    feel needed and we update them periodically.
7    We're going to review them and look at them and
8    we practice on them, no specific time.
9    Q    Do you have a dorm -- well, do you
10   have a housing unit for older men?
11   A    No, sir.
12   Q    Are you familiar with a unit called
13   Camp D Eagle?
14   A    I am.
15   Q    What is the purpose of that housing?
16   A    That mostly would be homosexual.
17   Q    Mostly homosexual?
18   A    Those that are that or weak.
19   Q    Or weak?
20   A    Weak.
21   Q    W-e-a-k?
22   A    W-e-a-k.
23   Q    Is there a geriatric dorm in the
24   prison?
25   A    No, sir. I don't believe in them.

Page 76

1    Q    Pardon?
2    A    I don't believe in them.
3    Q    Why not?
4    A    I just don't. We just live like we do
5    on the street, like we would in the real world.
6    Q    I've got too many documents attached
7    there, I need to pull them apart. I'm going to
8    take just the first six pages of what I
9    previously put in as 11 and take that out and
10   keep that as a separate document. And I'm
11   going to give you as Exhibit 12 what I
12   originally had attached to 11, which is the
13   October 2, 1992 version of Directive 10.001 and
14   ask you to take a look at that. And I want to
15   direct your attention, go to the fourth page on
16   Review there, Section C, Review, and just take
17   a moment to read it and I'm going to ask you a
18   question about it.
19   A    Read C?
20   Q    Yes.
21   A    Okay.
22        (Whereupon the document referred to by
23        Counsel was marked for identification
24        as Exhibit 12.)
25   BY MR. HANLON:

Page 77

1    Q    You'll notice in the second paragraph
2    of C, the second to last sentence,
3    "Recommendation from officers," this is on the
4    review process, okay, on lockdown.
5    "Recommendations from officers in charge of his
6    custody and the views of other employees who
7    have had contact with the inmate may be taken
8    into consideration by the Board." And I want
9    you to go back to 11 now. Well, Camilla
10   corrected me, I don't want you to go back to
11   11, I'm going to give you 13.
12        (Whereupon the document referred to by
13        Counsel was marked for identification
14        as Exhibit 13.)
15   BY MR. HANLON:
16   Q    This is the lockdown policy, it
17   doesn't say 10.001 but it's 1990. And again I
18   recognize that these documents are before your
19   time but I want to ask you a question about the
20   contents in them.
21   MR. HICKS:
22        Exhibit 12 does not have a bates
23   number, I'm just curious as to why it's not
24   bates numbered and the other documents are
25   produced with bates numbers and I think what

Page 78

1 you guys copied were all bates numbered.
2    MR. HANLON:
3       That's true. Noted for the
4 record, true of 13 also.
5       (Off the record.)
6 BY MR. HANLON:
7    Q  I'm not going to go through Exhibits
8 12 and 13 right now, we'll review them later
9 and we'll move on.
10      What's the relationship between an
11 aging, if any, between and aging prisoner and
12 the likelihood of criminal conduct in prison by
13 that prisoner as he ages, if any?
14    A  It's an individual thing. We had
15 inmate Daddy-O here, eighty years old that
16 killed his wife. It's an individual thing.
17    Q  He killed his wife when his wife was
18 visiting here?
19    A  No, he came here for killing his wife
20 and he was age eighty. But he committed a
21 crime, so it's an individual thing.
22    Q  So in your view is it impossible to
23 make a generalization about aging prisoners and
24 disruptive behavior in the prison?
25    A  Normally, the older you get the less

Page 79

1 violent you are, but with the exceptions.
2    Q  There are individual cases where there
3 is some violence?
4    A  The potential is there.
5    Q  Let me mark as, we'll make it 14 here.
6 This is a Louisiana Department of Public Safety
7 & Corrections Master Plan, August '03.
8    MR. HICKS:
9       We don't have page 45 and 46?
10   MR. HANLON:
11      Right.
12   MR. HICKS:
13      Is there more?
14   MR. HANLON:
15      There is but the only part I want
16 to talk to him about is Special Needs Inmates.
17 BY MR. HANLON:
18   Q  Directing your attention to the
19 Special Needs Inmates, do you agree with the
20 statement in the first sentence there that,
21 "Inmates who have spent most of their lives
22 going in and out of prison and inmates who have
23 been incarcerated for a long period of time
24 generally age more rapidly than the population
25 at large"?

Page 80

1    A  Yes, sir.
2    Q  And do you agree that consequently in
3 prison, geriatric is defined as fifty and
4 older, is that a fair age to use the term
5 geriatric?
6    A  Okay.
7    Q  Do you agree or disagree?
8    A  I agree but it's an individual thing.
9 I've got a lot of inmates over fifty that's
10 working really hard, like in the tractor shed
11 and all of that. Is that all?
12   Q  Yes, sir. You can put that back here.
13   A  Okay. We're working on that stack,
14 aren't we.
15   Q  What percentage of inmates, in your
16 best estimate, who come here die at Angola?
17   A  About ninety percent is going to die
18 here, maybe more.
19   Q  Has that increased or decreased since
20 you've been here, or neither?
21   A  It's pretty stable. Probably
22 increased because the sentencing laws changed a
23 few years ago.
24   Q  And how did the change in sentencing
25 laws affect that?

Page 81

1    A  Do eighty-five percent of your
2 sentence and that sort of thing.
3    Q  Which means they stay here longer; is
4 that right?
5    A  Life is life. If you've got 200
6 years, you've got 85 percent of it, probably
7 can't make it.
8    Q  I'm going to show you a document that
9 I'm going to mark as Exhibit 14. This appears
10 to be the Louisiana Administrative Code on
11 Disciplinary Rules and Procedures for Adult
12 Offenders. Have you ever seen that document
13 before?
14   A  I don't recall ever seeing that.
15      (Whereupon the document referred to by
16      Counsel was marked for identification
17      as Exhibit 14.)
18 BY MR. HANLON:
19   Q  Why don't you describe for me, if you
20 would, what your disciplinary rules and
21 procedures are in terms of hearings that you
22 conduct for disciplinary infractions.
23   A  Not referencing this document?
24   Q  Yes, without reference to the
25 document. If you haven't seen the document,

Page 82

1 I'm not going to --
2   A   Okay, you're talking about just
3 violating rules what happens?
4   Q   Right.
5   A   If you violate the rules they're going
6 to write you up.
7   Q   There's a potential of loss of good
8 time?
9   A   Could be, depends on the DB court, and
10 they have different schedules for different
11 kind of rules and violations, A's and B's, and
12 they got different kinds of sentences that the
13 DB board can give to the inmate and then it's
14 all relative to how serious it is. And then
15 after he gets sentenced or whatever he gets
16 sentenced to, if he's sentenced for a long time
17 then he's going to have review boards, they're
18 going to review it periodically. That's it.
19   Q   Does the inmate have a right to have
20 counsel with him at the disciplinary process?
21   A   He does, he has an inmate lawyer.
22   Q   That's another inmate?
23   A   That's another trained inmate.
24   Q   Who is not a lawyer but who is
25 trained; is that fair to say?

Page 83

1   A   Oh, yeah, he's committed.
2   Q   Does an inmate have a right of appeal?
3   A   He does.
4   Q   In the classification review boards
5 does an inmate have the right to have an inmate
6 lawyer there?
7   A   I don't think so, no.
8   Q   Does he have a right to an appeal?
9   A   That's not a disciplinary, so he
10 wouldn't.
11   Q   Does he have a right to an appeal?
12   A   He can write to me, he can write to
13 us, he can write always and we'll answer the
14 letter and we do that. A formal appeal, are
15 you talking about a classification board?
16   Q   Exactly.
17   A   A formal appeal of that, I don't know
18 if there is one. I don't think there is.
19   Q   Is there any reason that you know of
20 why the disciplinary procedures provide more
21 protection for the hearing and appeal than the
22 classification procedures?
23   A   The reason would have to be because
24 the disciplinary thing is punitive, the
25 classification is not. It's just where you fit

Page 84

1 and where you live and where we put you and we
2 have to assign you somewhere. And then if you
3 have enemies we have to move you over here or
4 move you over there. It's not disciplinary so
5 therefore there's no punishment, it's just a
6 move.
7   Q   Would there be any administrative
8 burden to you to have the same kinds of
9 procedure for classification that you do with
10 discipline?
11   A   We may know more than the inmate about
12 why we're moving him. He may have an enemy
13 that he don't know, so therefore, if he were to
14 appeal, and I'm just speculating and I
15 shouldn't be doing that in a deposition, but
16 the appeal process I don't think would fit in
17 the classification process.
18   Q   What about counsel?
19   A   What purpose would it serve? I don't
20 think it would be necessary.
21   Q   Do you think that it would be unduly
22 burdensome to you to have inmate counsel for
23 the classification process?
24   A   Not unduly burdensome but I don't see
25 the purpose.

Page 85

1   Q   Would it be unduly burdensome to have
2 an appeal process, a formal appeal process in
3 the classification system?
4   A   I don't see the point because we
5 choose where you live and we're going -- the
6 thing we read earlier about where we place you
7 for all the reasons we do, then that's the
8 reason we use for the classification, that
9 we're safe, secure, the best interest of the
10 institution and of the inmate.
11   Q   Is the inmate's interest in
12 classification greater or lesser than the
13 inmate's interest in the punishment and
14 disciplinary process?
15   A   I think it's way more in the -- he's
16 more interested in not being punished but he's
17 very interested in being a trustee, he's very
18 interested in where he lives.
19   Q   So is his interest greater in the
20 classification process?
21   A   That's hypothetical, I have no idea,
22 it depends on him, he may have somebody he
23 wants to live with, a home boy, he's real
24 passionate about living at Camp C because
25 that's where his buddy lives.

Page 86

1   Q   So you can't say generally.
2   A   I really can't.
3   Q   How do you go about classifying
4   somebody when they arrive at Angola?
5   A   Well, where is my deal. It's his
6   sentence. That policy I gave him said why we
7   put people where. I think I have it here.
8   It's going to be the length of sentence, it's
9   going to be what the sentence is, it's going to
10  be all the things we went over. I think I gave
11  it to him.
12         What's your name again? You didn't
13  give me a card.
14   Q   I didn't give you a card. My name is
15  Steve Hanlon.
16   A   Mr. Hanlon?
17   Q   Yes, sir.
18   A   H-a-n-l-a-n?
19   Q   L-o-n.
20   A   Hanlon, okay, Mr. Hanlon. Pleasure to
21  meet you. It doesn't matter.
22         Did I answer it?
23   Q   Let me be more specific on the
24  question. Who makes the decision on
25  classification when an inmate first arrives

Page 87

1   here?
2   A   Initial board, we have what we call an
3   initial board where he comes to prison and he
4   meets, he goes to the reception center and from
5   there he's going to get talked to about being
6   here and get processed in as an initial board
7   we call it, and that board is going to decide
8   where he lives when he first gets here.
9   Q   Who's on that board?
10   A   That's going to be a classification
11  officer, security person, about like the same
12  other boards are composed. And I say
13  classification, it should be a treatment person
14  and a security person, someone on the treatment
15  side.
16   Q   Who is it now?
17   A   I have no idea. They change probably
18  every week. I think medical may be on it.
19   Q   Medical may be on it?
20   A   I'm sure that they're involved.
21         Keep going.
22   Q   Do you have the authority to override
23  that decision?
24   A   Sure.
25   Q   Have you ever done that?

Page 88

1   A   No.
2   Q   Not once since you've been here
3   since --
4   A   I don't believe.
5   Q   That's on the initial classification?
6   A   That's right.
7   Q   How about on subsequent
8   classifications and placements of inmates when
9   they come up for their reviews, the first
10  question is, do you have the authority to
11  override that?
12   A   Yes.
13   Q   Have you ever done that since you've
14  been here?
15   A   Rarely.
16   Q   Well, tell me the ones you remember.
17   A   I might walk through Camp J and tell
18  this guy, why in the world do you want to live
19  in here, why don't you be good, why don't you
20  do right. He says, I want to.
21         I'm talking too much but I'm
22  explaining it to you.
23         And he'll say, I've been good, I just
24  got all messed up. I'll say, why don't you do
25  me six months and don't get a write-up, act

Page 89

1   right and behave and I'll let you out of here.
2   Write me a letter. Six months he writes me a
3   letter, I didn't get any write-ups, I did good.
4   So I go and I'll look at the deal and I'll say,
5   we need to give him a chance, boom him out.
6   But he would had to have been somebody that we
7   don't mind living out. But that's an example,
8   picking somebody to go live at the dog pen.
9   Q   Do you remember anybody who you have
10  made an override decision on? Keep it to Camp
11  J.
12   A   That wasn't a count -- let's qualify
13  this override. That wasn't where the DB court
14  or some court had a ruling. I've never
15  probably overridden them because the court has
16  to be -- you have to recognize that the court
17  is the court.
18   Q   When you say the court, are you
19  talking about the review board?
20   A   Sure, review board. I'm talking about
21  the DB court.
22   Q   What is DB court?
23   A   What we talked about awhile ago when
24  we have a rule for violation then you go to the
25  board and you have a paralegal there and they

WARDEN BURL CAIN                              11/30/2006

Pages 90 to 93

| Page 90 | Page 92 |
|---|---|

Page 90

1  make lawyers that help them.
2  **Q  And you have the authority to override**
3  **that if you want?**
4  A  I do but I'd be foolish.
5  **Q  You haven't done it?**
6  A  No.
7  **Q  That was disciplinary, right?**
8  A  Right.
9  **Q  Now let's talk about classification.**
10 A  Yeah.
11 **Q  I think you told me you have never**
12 **overruled an initial classification since**
13 **you've been here.**
14 A  No.
15 **Q  Have you overruled the classification**
16 **board since you've been here or overridden them**
17 **on any decision up or down?**
18 A  No, not the board.
19 **Q  So on both of those you have the**
20 **authority but you have no recollection of ever**
21 **exercising it; is that correct?**
22 A  That's right.
23 **Q  What factors in classification -- and**
24 **let's limit it to CCR right now, okay?**
25 A  Okay.

Page 91

1  **Q  -- are relevant to the Board's**
2  **determination when it's deciding whether to**
3  **continue somebody in CCR or to release them**
4  **into a lower custody setting?**
5  A  The safety of all concerned and the
6  potential for violence and escape.
7  **Q  What role does the original offense**
8  **play?**
9  A  A big deal.
10 **Q  Has that changed at all since you've**
11 **been here?**
12 A  Not much.
13 **Q  How has it changed, if at all?**
14 A  It probably hasn't changed, it
15 probably hasn't changed at all.
16 **Q  Is the weight of the original offense**
17 **in that determination the same now as it was**
18 **when you came here?**
19 A  Not quite.
20 **Q  How does it differ?**
21 A  We mellow with age.
22 **Q  What does that mean?**
23 A  I mean, it's just like John Simonas.
24 **Q  Is that an inmate?**
25 A  Yes.

Page 92

1  **Q  What about John Simonas?**
2  A  He fell out nearly dead two times, we
3  give him mouth to mouth resuscitation and saved
4  his life.
5  **Q  Was he in CCR?**
6  A  In CCR, on the yard, has heart trouble
7  and the correctional officer give him mouth to
8  mouth and saved him twice.  And he's thankful
9  and he's appreciative and you just have to be
10 moved a little bit by both sides, the
11 correctional officer having the compassion to
12 save him and him being appreciative.  It's just
13 sad, I mean it's just a sad thing.
14 **Q  My question was, has the weight given**
15 **to the original offense in the classification**
16 **decision made by the classification board up or**
17 **down, has that weight changed since you've been**
18 **here?**
19 A  Not much.
20 **Q  Well, how?**
21 A  Well, it hasn't, really.  I'll just
22 say no.  I'll be more brief.  I'm trying to
23 help.
24 **Q  Is the inmate's behavior while in CCR**
25 **a factor?**

Page 93

1  A  Yeah.
2  **Q  How so?**
3  A  Well, if he has bad behavior in CCR he
4  might go to Camp J, and then he's got a bad
5  record and that weighs him too.
6  **Q  Camp J would be more punitive?**
7  A  He gets a write-up and the write-ups
8  count.
9  **Q  Is the frequency of his behavior a**
10 **relevant factor, bad behavior, the frequency of**
11 **bad behavior a relevant factor?**
12 A  Not really.
13 **Q  Is the recency of his bad behavior a**
14 **relevant factor?**
15 A  Could be.
16 **Q  When would it not be?**
17 A  When the reason he's there overpowers
18 his behavior.
19 **Q  By the reason he's there, do you mean**
20 **his original sentence?**
21 A  Right.
22 **Q  Is the seriousness of his behavior a**
23 **relevant factor, the seriousness of his bad**
24 **behavior?**
25 A  It is.

Page 94

1   Q   Can an inmate earn his way out of CCR?
2   A   Some can.
3   Q   Are there some who can't?
4   A   Probably.
5   Q   You don't know?
6   A   The only things permanent change, so I
7   don't know for sure.
8   Q   In your experience at Angola, since
9   you've been here, are you familiar with any
10  inmates who cannot earn their way out?
11  A   Ever?
12  Q   Ever.
13  A   Not really.
14  Q   Are there some inmates that you know
15  here, right now, who in your view cannot earn
16  their way out?
17  A   Ever?
18  Q   Ever.
19  A   I think most all of them could earn
20  their way or could get out, maybe not earn
21  their way out but could get out sometime under
22  certain circumstances.
23  Q   Such as?
24  A   In the hospital, old, infirmed,
25  wheel-chair ridden, hospice.

Page 95

1   Q   What about Herman Wallace?
2   A   Probably not, other than those
3   circumstances.
4   Q   How about Albert Woodfox?
5   A   Only under the circumstances I just
6   said.
7   Q   Why is that?
8   A   Because I think threat, potential
9   threat to the stability of the institution, the
10  safety of the employees and the other inmates.
11  Q   What's the potential threat to the
12  stability of the institution?
13  A   Well, you're talking about Wallace and
14  Woodfox?
15  Q   Let's take them one at a time, let's
16  take Herman Wallace.  What's the potential
17  threat to the stability of the institution?
18  A   He had the will and the nerve to
19  fatally assault a correctional officer and
20  therefore, how do I know he wouldn't have it
21  again.
22  Q   All right.  So his behavior is not
23  going to earn him out?
24  A   No.
25  Q   What's the safety of others that's

Page 96

1   involved with Herman Wallace?
2   A   We just talked about him, didn't we?
3   Q   We talked about threat to the
4   stability of the institution.  You named two
5   factors, threat to the instability of the
6   institution and safety.
7   A   What was your question now?
8   Q   How do you analyze safety to others
9   with respect to Herman Wallace?
10  A   Well, like I told you, he had the
11  nerve and the will to participate in killing
12  the correctional officer; therefore, he would
13  have the nerve and the will to take a hostage
14  to escape, or kill another correctional
15  officer.
16  Q   Is there anything in his behavior in
17  the last five years, independently now of the
18  original reason he was placed here, that would
19  indicate that he's a threat to the stability of
20  the institution?
21  A   I think there's a write-up, I had
22  something on it, that plus the original
23  sentence, the reason why he's there.
24  Q   I want to examine this question
25  independently of the original sentence.

Page 97

1        MR. HICKS:
2             I think what was asked before
3   that question, we need to find out if he's
4   familiar with his record and all of that.
5   BY MR. HANLON:
6        Q   Are you familiar with Mr. Wallace's
7   record?
8   A   I would have to see if I'm familiar
9   with it, but I had it with me, I don't know
10  what happened to it.
11  Q   All right.
12  A   You know, but that's still just his
13  record, it doesn't really matter a lot.  The
14  original sentence, that's why he's there,
15  that's why he's there and that's why he's going
16  to stay there, you know, because of the
17  safetiness and the security of the institution
18  and the potential that he has for violence
19  against authority, which he exhibited way back
20  when he killed Brent Miller.
21  Q   His behavior over the course of the
22  last five years, how would you describe him as
23  a prisoner?
24  A   He hasn't been a model prisoner
25  because he's been in Camp J some, so he's

Page 98

1  broken the rules and he hasn't been a model
2  prisoner. I wish he had but still, like Burger
3  King, have it his way.
4      Q   No violent behavior by Mr. Wallace in
5  the last five years?
6      A   I didn't say that, I haven't really
7  read his record.
8      Q   We'll go over that with you after
9  lunch.
10     A   All right.
11     Q   Anything, as you sit there now without
12 reference to his record, from what you remember
13 now, anything in his record in the last five
14 years that would indicate he presents a problem
15 with respect to safety to others?
16     A   I don't really know, I don't have the
17 records. I don't know but I think there's
18 something in there but I don't have it so I
19 can't say. That's not why he's in there
20 though, he's in there because of what he did
21 way back when.
22     Q   Same question with respect to Albert
23 Woodfox, anything in his -- just on behavior
24 now, anything in his record in the last five
25 years that would indicate that he's a threat to

Page 99

1  the stability of the institution, as far as you
2  know now without reference to the record?
3      A   Without reference to the record, no,
4  but he has the same issues about why he's in
5  CCR.
6      Q   What are those?
7      A   Albert Woodfox participated in the
8  murder of Brent Miller, a correctional officer,
9  which showed he had the nerve and the
10 willingness to do it, which is more than I can
11 expose my correctional officers to.
12     Q   All right, sir. But nothing in his
13 behavior in the last five years as far as you
14 know right now that indicates he's a threat to
15 the stability of the institution?
16     A   His actual behavior, no, because he's
17 in CCR, so he's in a controlled environment.
18     Q   Does he go up and down the hall there?
19     A   He does.
20     Q   Is he in restraints? He does have one
21 hour out every day, right?
22     A   Yes.
23     Q   Is he in restraints at that time?
24     A   No, sir.
25     Q   Do you know if he's ever exhibited any

Page 100

1  problem when he does that?
2      A   I don't know.
3      Q   Same thing on Albert Woodfox with
4  respect to safety of others, anything in the
5  last five years?
6      A   No, that I know of, other than he's
7  been in CCR in that enclosed environment so he
8  didn't have the opportunity to have exposure to
9  others to display any violent tendencies.
10     Q   I want to make sure we exhaust all the
11 factors that are relevant here. You've talked
12 about the threat to the stability of the
13 institution, the safety of others, any other
14 factor?
15     A   Safety of the public. You mean what
16 -- ask me again, I'm getting to where I'm not
17 being really very focused.
18     Q   Do you want to take a break?
19     A   I'm hearing my bronchials breathe, can
20 y'all hear them too?
21     Q   I can hear them.
22     A   It's embarrassing. You can hear them
23 too?
24     Q   Yeah.
25     A   Let's try to do a little more.

Page 101

1      Q   All right. Safety to the public?
2      A   Okay, I understand. The reason that
3  we have them in there is safety to the public,
4  safety to the institution and that's why we
5  have CCR and that's why he's there. I'm really
6  getting off the question but you're asking me
7  why people in CCR --
8      Q   Well, in particular with respect to
9  Mr. Woodfox.
10     A   Okay, because there's potential for
11 violence towards and for the safety of the
12 institution and what I've said.
13     Q   Does he present a threat to the safety
14 of the public?
15     A   I think so.
16     Q   Why?
17     A   Well, because if he got away from us
18 he will kill you, obviously, I mean, he's done
19 it before, under certain circumstances he might
20 would.
21     Q   Is he an escape risk?
22     A   I think so.
23     Q   Is Herman Wallace an escape risk?
24     A   I think so. He wouldn't be here.
25     Q   How about protective custody, is that

## Page 102

1  one of the reasons that Herman Wallace is in
2  CCR?
3      A   No, not to me, really, no.
4      Q   How about for Albert Woodfox?
5      A   No.
6      Q   Before we break for lunch let's take
7  these same factors with regard to Robert
8  Wilkerson.
9      A   I don't want to break for lunch. Go
10 ahead, keep going.
11             (Off the record.)
12 BY MR. HANLON:
13     Q   Robert King Wilkerson, before he was
14 released into society was he a threat to the
15 stability of the institution?
16     A   I think so.
17     Q   Was he a threat to the safety of
18 others in the institution?
19     A   I think so.
20     Q   Was he a threat to the safety of the
21 public?
22     A   I think so.
23     Q   Was he in CCR because he was in some
24 sort of protective custody?
25     A   No.

## Page 103

1      Q   Does his incident-free adjustment in
2  normal society give you any reason to question
3  your classification and placement of him while
4  he was here?
5      A   No, we must have did a good job.
6      Q   So he would have been okay to go out
7  in the public as far as you were concerned?
8      A   I didn't know that, but he's worked
9  out so that's good, there's no victim.
10     Q   Any reason to believe that would be
11 different for Herman Wallace?
12     A   Yeah.
13     Q   What's different?
14     A   Well, I think Wilkerson surprised me.
15 I don't know that Wallace would.
16     Q   Can you think of any reason though
17 that Wallace would be in a different situation,
18 you wouldn't have done as good a job on Wallace
19 as you did on Wilkerson?
20     A   Well, I don't want to encounter
21 another surprise.
22     Q   But you don't have any factual reason
23 to differentiate those two?
24     A   No, there's no way.
25     Q   Same thing for Albert Woodfox, no

## Page 104

1  factual reason to differentiate from Wilkerson?
2      A   It's whether or not you want to gamble
3  or not and I don't like gambling.
4      Q   Okay.
5          MR. HANLON:
6              All right, let's break for lunch.
7              (A lunch break was taken.)
8  BY MR. HANLON:
9      Q   We retained an expert in this case
10 who's reviewed the inmates' files and he
11 summarized them. So I want you to assume these
12 facts are true, I'm going to read them to you.
13     A   All right.
14     Q   I'll just read it. Let's start with
15 Woodfox. "The most recent disciplinary report
16 of any kind for Mr. Woodfox was almost four
17 years ago, 12-4-02, were aggravated
18 disobedience that resulted in loss of a minor
19 privilege, two weeks canteen, which was
20 suspended for ninety days. According to Mr.
21 Woodfox, this charge arose when he requested
22 that his cell light be turned on during a
23 cloudy day. When he persisted in his request
24 to see a supervisor, he was accused of, quote,
25 'hollering and shaking the bars on his cell,'

## Page 105

1  at which time he was moved to isolation for two
2  days. See LSP Disciplinary Report, Albert
3  Woodfox, 12-4-02. Since 1992 Mr. Woodfox had
4  one other disciplinary report of 5-5-99 for a
5  threat to security. The disciplinary charge
6  was based on his assertion that a hunger strike
7  for contesting the conditions of extended
8  lockdown would continue. He served nine months
9  in disciplinary detention Camp J for his part
10 in the hunger strike. A review of his conduct
11 report documents the chronicles. All
12 disciplinary events indicate that from 1971 to
13 present he was charged with a single act of
14 violence in 1985, which was an inmate fight for
15 which he received a suspended sentence based on
16 his good conduct record. See Disciplinary
17 Report, Albert Woodfox, 12-4-85."
18     I want you to assume that those facts
19 are true.
20     A   Right.
21     Q   How would you describe that prisoner?
22     A   How would I describe what?
23     Q   How would you describe that prisoner,
24 Mr. Woodfox?
25     A   He didn't cause very much trouble,

| Page 106 | Page 108 |
|---|---|

**Page 106**

1 reflecting in his suspended sentence, that was
2 good.
3    Q    He could almost be, in the last five
4 years he could almost be described as a model
5 prisoner?
6    A   Yes.
7        MR. HICKS:
8           And to clarify, that's based upon
9 the description that you just read.
10       MR. HANLON:
11          That's exactly right.
12    A   Here's the thing, the review board
13 reviews him and they never have brought to me a
14 recommendation that he go out, so I'm pretty
15 oblivious to that because the board have their
16 hearings and I don't have to deal with that
17 because they haven't ever said we need to let
18 him go. So really, the board, like I told you
19 before, I don't ever overrule them hardly.
20    Q    But you've got the authority to
21 overrule them?
22    A   I do have the authority but it's just
23 never gotten that far.
24    Q    If they were doing something that you
25 thought constituted cruel and unusual

**Page 108**

1 Your objection is well taken.
2 BY MR. HANLON:
3    Q    Based upon his conduct as set forth,
4 that I just set forth I want you to assume, and
5 taking away out of any consideration the
6 original charge that he's in for, he doesn't
7 belong in CCR?
8    A   No, probably not.
9    Q    Now we'll go to Wallace.
10 "Mr. Wallace's most recent disciplinary report
11 for institutional violence occurred some 22
12 years ago. He was a principal in the May 1999
13 hunger strike. From May '99 through March
14 2002, Mr. Wallace maintained a clear conduct
15 record. On March 11, 2002, Mr. Wallace was
16 charged with possession of contraband; metal
17 pen clip characterized by security personnel as
18 a quote 'homemade handcuff shim.' His most
19 recent disciplinary report was December 2005,
20 when he was found in the possession of excess
21 number of postage stamps, for which he received
22 thirty days cell confinement. See LSP
23 Disciplinary Report, Herman Wallace, 12-2805.
24 Between March 2002 and December 2005,
25 Mr. Wallace received disciplinary reports for

**Page 107**

1 punishment, would you overrule them?
2    A   I would, I'm not going to do cruel and
3 unusual punishment.
4    Q    I understand.
5    A   I'll do all I can. I'm the one that
6 gave them contact visits.
7    Q    These three prisoners or prisoners in
8 CCR generally?
9    A   CCR generally.
10    Q    When did you do that?
11    A   Oh, gosh, I don't remember, a long
12 time.
13    Q    Shortly after you arrived, wasn't it?
14    A   Not too long after.
15    Q    Let me just add further on that.
16 Based on his conduct, Mr. Woodfox, based on his
17 behavior, if you take the original charge away,
18 just look at Mr. Woodfox's behavior, he doesn't
19 belong in CCR, does he?
20       MR. HICKS:
21          I'm going to object to the form.
22 Is that based upon the fact that you're still
23 assuming, that is still assuming --
24       MR. HANLON:
25          Good question, I'll clean it up.

**Page 109**

1 possessing a pen cap, chewing gum, Snicker's
2 bar," --
3    A   What was the first one?
4    Q    Pen cap. "Possessing a pen cap,
5 chewing gum, Snicker's bar, tooth brush
6 fashioned to be used as a window crank,
7 Disciplinary Report 12-15-04; possessing
8 handmade earrings and a poem, 'A Defying
9 Voice,' Disciplinary Report 12-8-04; damaging a
10 light fixture, Disciplinary Report 12-28-05;
11 wearing a handmade necklace with a black fist,
12 Disciplinary Report 5-17-04; possessing altered
13 nail clippers and pen clip, Disciplinary
14 Report, 11-14-04; possessing the publication,
15 It's About Time, a Black Panther publication
16 containing articles/photos on the Angola three,
17 characterized as, quote, 'racist literature' by
18 security personnel, Disciplinary Report
19 10-9-02."
20          Now, assuming that those are the facts
21 of his behavior, how would you describe this
22 prisoner?
23    A   Bad.
24    Q    Bad prisoner?
25    A   Yeah.

Page 110

1  Q  How so?
2  A  The serious things, the nail clipper
3  altered and the homemade shim, the two made
4  like the deal, damage the light. He wouldn't
5  have the homemade shim and the clip, the paper
6  -- the pen cap would be to make the shim to do
7  the handcuffs, and handcuffs are kind of easy
8  to do so you want to get out of your handcuffs,
9  when you get out of your handcuffs the next
10 thing you're going to do is you've to deal with
11 the officer, and he's dealt with an officer
12 before, and we know how he dealt with an
13 officer before. So he wouldn't be wanting to
14 get out of his handcuffs -- he wouldn't have
15 his shim if didn't want out of his handcuffs.
16 That was bad. That's bad.
17 Q  So if you took his original conviction
18 away, out of consideration, and just used these
19 assumed facts, does he properly belong in CCR?
20 A  Pretty much.
21 Q  Isn't there a less secure placement
22 that he could be placed in?
23 A  He wants to get away.
24 Q  You think he wants to escape?
25 A  He got the shim. He's made up all the

Page 111

1  tools to do it with.
2  Q  You wouldn't just describe him as a
3  tinkerer?
4  A  No.
5  Q  He wants to escape?
6  A  He wants to get out of those
7  handcuffs, when he gets out of that, the next
8  step is how he's going to deal with the
9  correctional officer.
10 Q  In the ten years prior to
11 Mr. Wilkerson's discharge from prison, February
12 2001, he received the following disciplinary
13 reports: Disobedience for talking to a fellow
14 inmate while on the recreation yard,
15 Disciplinary Report 5-17-00; principal in the
16 May 1999 hunger strike with Woodfox and
17 Wallace; property destruction for converting a
18 laundry bag into a book sack, Disciplinary
19 Report 1-21-93; contraband for possessing six
20 pills for which he was given a suspended
21 sentence based upon "improved conduct record,"
22 Disciplinary Report 6-24-91. Mr. Wilkerson's
23 conduct report which encompasses a time period
24 of April 1972 through his release in February
25 2001, reflects a single act of violence for

Page 112

1  fighting in 1986. According to Mr. Wilkerson,
2  this fight was precipitated by an incident in
3  which another offender threw bodily fluids on
4  him while the two were in the same cellblock.
5        The same question, how would you
6  describe that prisoner?
7  A  That's better. That's good.
8  Q  So we got one good, one better and one
9  bad; is that right?
10 A  Two good and one bad.
11 Q  Two good.
12    MR. HICKS:
13        I want to clarify that as based
14 upon the accounts in, is that Mr. Aiken's
15 report?
16    MR. HANLON:
17        Mr. Martin's report.
18    MR. HICKS:
19        Mr. Martin's report.
20    MR. HANLON:
21        Right.
22    MR. HICKS:
23        Not based upon review of the
24 records and his independent review of the
25 actual facts.

Page 113

1  BY MR. HANLON:
2  Q  All right. Again, with regard to
3  Mr. Wilkerson, if you take away the original
4  conviction for consideration and you focus only
5  on his behavior, he's not properly in CCR, is
6  he?
7  A  He is.
8  Q  He is, why?
9  A  Well, Wilkerson is out, they're in,
10 they want out. So to lighten up the security
11 on them to make it easier for them to be out
12 illegally, I'm not willing to gamble that.
13 Q  Well, I'm not sure I understand your
14 answer. Let me go back and rephrase my
15 question. On the last day that Wilkerson was
16 in CCR, based on this disciplinary record,
17 assuming this is factually correct, and taking
18 the original conviction out of consideration,
19 did he belong in CCR on that last day?
20 A  Taking out the original conviction?
21 Q  Yes.
22 A  No sir.
23 Q  Where did he belong?
24 A  Somewhere in Angola.
25    MR. HICKS:

Page 114

1    I want to clarify between the
2  original conviction, are you talking about just
3  his conviction for escape out of Orleans Parish
4  and/or the murder of another inmate while he
5  was in CCR?
6       MR. HANLON:
7           Based upon his initial
8  classification, not the murder of the inmate.
9  BY MR. HANLON:
10    Q  Based upon that original
11 classification, and I'm saying taking that out
12 of consideration, okay, I think your testimony
13 is that if you look at his record on the last
14 day that he was in CCR, he didn't belong there,
15 he belonged somewhere else in Angola; is that
16 correct?
17    A  Because you took out the murder of the
18 inmate and all the stuff in New Orleans, yeah.
19 In reality though he was classified properly.
20    Q  Because?
21    A  Because of all of those things that we
22 took out.
23    Q  I understand.
24       I take it, and you can correct me if
25 I'm wrong on this, I want to read you something

Page 115

1  that my expert said and you tell me if you
2  think this is right or wrong. Do you agree
3  with this statement, a basic premise, in terms
4  of principals of classification for prisoners,
5  okay, based on your experience in prison work,
6  do you believe that it is a basic premise that
7  every prisoner should be in the lowest custody
8  believed suitable for adequate supervision and
9  warranted by his or her behavior?
10    A  Yeah.
11    Q  Do you believe that no offender should
12 be kept in a more secure condition or status
13 than his potential risk dictates?
14    A  Yes.
15    Q  Do you believe that segregation should
16 be a last resort?
17    A  Yes.
18    Q  Do you believe that prisoners should
19 not be released directly from confinement like
20 CCR into the streets?
21    A  Do what now?
22    Q  Do you believe that prisoners should
23 not be released directly from confinement, like
24 CCR, into the streets?
25    A  Not necessarily.

Page 116

1    Q  Why not?
2    A  Because in CCR he wants out, in Angola
3  he wants out, once he's out and free and the
4  law let's him out and free, then he very well
5  might function well, but it's between here and
6  there. While he's here he wants out and he may
7  think he's not going to ever get out so
8  therefore he's going to want out worse and
9  therefore his desire to get out is going to
10 cause him to do something really bad.
11    Q  Wouldn't it be better prison practice
12 if you knew that a guy's release date was
13 coming up, and if he was otherwise secure, that
14 you'd want him out of CCR and in some less
15 secure position in the prison?
16    A  It doesn't matter on the release date
17 on a lot of people, it just matters about their
18 character. I've had them run away seven days
19 short and I've had them do horrible things the
20 week before they get out.
21    Q  In fact, aren't they an increased risk
22 as they approach their release date?
23    A  No, not necessarily. It's an
24 individual thing.
25    Q  Let me read you this from my expert

Page 117

1  here. He says, "It is axiomatic that criminal
2  behavior depends as much or more on age than
3  any other demographic characteristic, that as
4  offenders age out, their criminal behavior
5  typically diminishes."
6           I take it you don't agree with that,
7  do you?
8    A  It's an individual thing, you know,
9  like I gave you the example of the old man that
10 won't act right, so you just have to deal with
11 an individual thing. You can't start
12 stereotyping prisoners, you're going to make a
13 bad mistake. It's an individual thing.
14    Q  So you're concerned that that
15 statement has the word typically, you're not
16 comfortable with typical, you think it's an
17 individual thing.
18    A  They normally would be what he says is
19 true but there's an exception and the exception
20 causes you to manage for the exception and not
21 be entirely normal, they get better.
22    Q  Then you agree with it, then you agree
23 with typically, don't you?
24    A  I don't know which ones get better
25 though, and since I don't know which ones get

| Page 118 | Page 120 |
|---|---|
| 1 better, that is meaningless to me. | 1 listen as I read it. This is on Exhibit 15. |
| 2    **Q**  I'm not asking you to figure out which | 2 "Generally the Board" -- paragraph C 4, under |
| 3 ones get better, I'm just asking you if | 3 Cellblock Review Board. "Generally the Board |
| 4 typically or generally that statement is true. | 4 will base its decision on the reason the inmate |
| 5 You've told me there are many exceptions to it. | 5 is assigned to maximum custody and the inmate's |
| 6    **A**  With the exceptions it could be true, | 6 conduct while assigned to maximum custody; |
| 7 but with lots of exceptions. | 7 however, other applicable factors may be |
| 8    **Q**  All right, fine. | 8 considered. The original reason for assignment |
| 9    **A**  And I don't know which ones they are. | 9 will play a large role in the board's |
| 10 And in the last statement, I'm responsible for | 10 decision." Okay? |
| 11 public safety. | 11    **A**  Okay. |
| 12    **Q**  Now, I'm going to give you three | 12    **Q**  Now, that was the policy here at |
| 13 documents that I want you to look at. Exhibit | 13 Angola when you came here in 1995, March of |
| 14 15 is the 18.002 from 1995, and it's only page | 14 '95, right? |
| 15 four of six; Exhibit 16 is that same 18.002, | 15    **A**  Okay. |
| 16 page four of six from July 8, '96; and Exhibit | 16    **Q**  And a year later, now we go to Exhibit |
| 17 17 is 18.002 dated 5-27-05, and I believe we | 17 16, we look at C 4 there and it says, |
| 18 think this is the current policy. These are | 18 "Generally the board will base its decision on |
| 19 all on classification. | 19 inmate's progress and conduct since his |
| 20      In the '95 document I want you to look | 20 original placement in maximum custody; however, |
| 21 at paragraph four, the '96 document I want you | 21 other applicable factors may be considered." |
| 22 to look at paragraph four and in the '05 | 22 And the statement, "The original reason for |
| 23 document I want you to look at Subsection C and | 23 assignment will play a large role in the |
| 24 page five. | 24 board's decision" is eliminated. You agree |
| 25    MR. HICKS: | 25 with that, right? |

| Page 119 | Page 121 |
|---|---|
| 1       On Exhibit 16 you want us to look | 1    **A**  That's what it says. |
| 2 at C 4? | 2    **Q**  You were the warden then, did you have |
| 3    MR. HANLON: | 3 anything to do with this change of policy? |
| 4      Yes. | 4    **A**  No. |
| 5    THE WITNESS: | 5    **Q**  Do you know how it came about? |
| 6      What are we looking at on this | 6    **A**  No. |
| 7 one? | 7    **Q**  In fact, you would disagree with the |
| 8    MR. HICKS: | 8 change in policy, wouldn't you? It's your view |
| 9      On 15 C 4? | 9 that the original reason for assignment should |
| 10    MR. HANLON: | 10 play a large role in the board's decision. |
| 11      Right. | 11    **A**  I agree with it like it is. It's kind |
| 12    MR. HICKS: | 12 of saying that now, "however, other applicable |
| 13      And on 17, what section? | 13 factors may be considered," so that's how other |
| 14    MR. HANLON: | 14 applicable factors and that's how you interpret |
| 15      Page five, C at the top. | 15 that, it could be that back to the original |
| 16      (Whereupon the documents referred to | 16 reason for being there, and then the one now is |
| 17 by Counsel were marked for identifica- | 17 what I really agree with. |
| 18 tion as Exhibit 15, Exhibit 16 and | 18    **Q**  The one now? |
| 19 Exhibit 17.) | 19    **A**  Yes, "other applicable factors may be |
| 20    **A**  (Witness examines documents.) | 20 considered." |
| 21      Okay. | 21    **Q**  Before we go to the one now let me |
| 22    **Q**  All right? | 22 just stick on the change in this language here. |
| 23    **A**  All right. | 23 Do you agree that eliminating the words, "the |
| 24    **Q**  Now, if we look at the 1995 policy -- | 24 original reason for assignment will play a |
| 25 I'm going to read them, okay, you can just | 25 large role in the board's decision," and indeed |

Page 122

1  in 1996 having nothing in that paragraph with
2  regard to the original reason for assignment,
3  specifically, is a change in policy?
4      A   Not really.
5      Q   Not really. Were you aware of this at
6  the time it was done?
7      A   Not really because I hadn't been here
8  very long, May 8, 1995.
9      Q   You would have had to sign off on an
10 LSP policy like this, wouldn't you?
11     A   Well, one thing they did, I just got
12 here and they were changing from Whitley's name
13 to my name on a lot of these policies.
14     Q   On July 8, 1996, you had been there
15 for --
16     A   That one we would have been doing
17 differently for whatever.
18     Q   You would have been the warden for
19 about a year and four months at that point,
20 July of '96, right?
21     A   Yes.
22     Q   So I take it you just don't recall
23 this change as you sit there today.
24     A   I really don't.
25     Q   That's fine. Now the one you like you

Page 123

1  say is Exhibit 17, subparagraph C on page five
2  of Exhibit 17, and it says, "Generally the
3  board will base its decision on the inmate's
4  progress and conduct since his original
5  placement; however, other factors may be
6  considered." It does don't even mention the
7  reason for the original commitment. It's my
8  understanding you disagree with that.
9      A   No. What do you mean I disagree with
10 it?
11     Q   Isn't it a fact that it's your view
12 that in considering a release from CCR, the
13 reason for the original placement is a very
14 important thing?
15     A   It is.
16     Q   Well, that certainly doesn't say that
17 here, does it?
18     A   Well, it comes under "applicable
19 factors may be considered."
20     Q   May, but you think it not only should
21 but it shall be considered; isn't that a fair
22 statement?
23     A   Yes.
24     Q   Is it your understanding that your
25 views are now being carried out by the board

Page 124

1  that review CCR placements?
2      A   Say that again.
3      Q   Are the boards that review CCR
4  placements, are they carrying out your views on
5  this matter?
6      A   Yes.
7      Q   So to the extent that they conflict
8  with this subparagraph C here, it represents
9  kind of a trumping of your views over this
10 paragraph; isn't that right?
11     A   Well, it's my views and all of them
12 are pretty much considered to me -- the way I
13 read the King's English is saying basically the
14 same thing.
15     Q   Let me just ask you, I'll mark this
16 18. Here's a letter dated June 3, 1999 from
17 you to Albert Woodfox, I marked it number 18.
18 Is that your signature?
19     A   Yes.
20         (Whereupon the document referred to by
21         Counsel was marked for identification
22         as Exhibit 18.)
23 BY MR. HANLON:
24     Q   Do you recall what incident that is,
25 what you're writing to Mr. Woodfox about?

Page 125

1      A   No.
2      Q   That's all I have on that. Let's go
3  to this set here. I'm going to mark as Exhibit
4  19, this will be a composite Exhibit 19, it's
5  twelve Lockdown Review Summaries for Albert
6  Woodfox, the last one is dated 1-20-06, and the
7  others are the months in '05. These are the
8  latest ones we have and I would like to request
9  that they be brought up to date for all three
10 of these guys, can you do that for us?
11         MR. HICKS:
12             Yes, I can.
13         MR. HANLON:
14             Thank you.
15         (Whereupon the document referred to by
16         Counsel was marked for identification
17         as Exhibit 19.)
18 BY MR. HANLON:
19     Q   Take a look at that and let's start at
20 the top on the 1-20-06 one. Whose signatory is
21 down here?
22     A   That's Warden Smith.
23     Q   Samuel Smith?
24     A   Yes.
25     Q   And who is the other one?

| Page 126 | Page 128 |
|---|---|
| 1   A   Augustine. | 1   says, "Nature of original reason for lockdown." |
| 2   Q   What's his first name, do you know, or | 2   That comports with your view about why |
| 3   her? | 3   Mr. Woodfox should be in; is that right? |
| 4   A   I don't know. | 4      A   Right. Yes. |
| 5   Q   Do you know Samuel Smith? | 5      Q   He's not in there on his own request |
| 6   A   Yes, sir. | 6   because that box isn't checked, right? |
| 7   Q   Have you ever talked with him about | 7      A   No. |
| 8   board reviews of any of these three gentlemen? | 8      Q   He's not in there on a new rule |
| 9   A   No. | 9   infraction since the last review, that box |
| 10   Q   Never? | 10   isn't checked. |
| 11   A   Never. | 11      A   No. |
| 12   Q   Have you ever talked with anyone who | 12      Q   He's not in there as an escape risk, |
| 13   does board reviews, who has done board reviews | 13   right? |
| 14   since you've been here with respect to these | 14      A   Right, but you probably could have |
| 15   three gentlemen? | 15   checked that one just as easy but he didn't. |
| 16   A   I don't believe. | 16      Q   He didn't.  In fact, if you look |
| 17   Q   Now, with regard to Mr. Woodfox, do | 17   through these twelve you'll see that the only |
| 18   you have -- first of all, are you familiar with | 18   ones that were ever checked were, "Nature of |
| 19   this form, have you ever seen this form? | 19   original reason for lockdown."  Never checked |
| 20   A   I probably have, I don't ever look at | 20   release. |
| 21   these forms.  I've seen them in the record, | 21      A   Yes. |
| 22   I've gone through it. | 22      Q   Would it surprise you to find out |
| 23   Q   Do you ever talk to anybody who does | 23   that that's true for every one of these for Mr. |
| 24   these reviews about how these reviews are going | 24   Woodfox since he's been there and these review |
| 25   to be conducted? | 25   boards have been done? |

| Page 127 | Page 129 |
|---|---|
| 1   A   I only tell Warden Vannoy to be sure | 1      A   Not really. |
| 2   they do it right and be sure we do the things | 2      Q   He's not in there for inmate |
| 3   exactly like they're supposed to be, and that's | 3   protection, right?  That box isn't checked. |
| 4   that, that's all I talk to them. | 4      A   No. |
| 5   Q   What does that mean? | 5      Q   And you agree with that? |
| 6   A   Be sure it's proper and right and | 6      A   That's right. |
| 7   good, you do it right and go down and have a | 7      Q   And he's not in there because he's |
| 8   review. | 8   "Physically dangerous to himself or others as |
| 9   Q   How would you do a proper review? | 9   evidence by," one of those factors, that box |
| 10   A   Well, do it, I mean you know, look at | 10   isn't checked, right? |
| 11   it, talk to the inmate, whatever you're going | 11      A   Where is that, I don't see that box. |
| 12   to do, do it. | 12      Q   Take that one right under inmate |
| 13   Q   So you're not ever aware of any | 13   protection, it says, "Physically dangerous to |
| 14   specific procedures on it? | 14   himself or others as evidence by," and it's got |
| 15   A   No, never seen one, never watched a | 15   a line there for other. |
| 16   review, never been there. | 16      A   Well, I would say he is kind of there |
| 17   Q   Do you know what happens there? | 17   for that too but I wasn't holding the board. |
| 18   A   No. | 18      Q   I thought you described Albert Woodfox |
| 19   Q   No one has ever told you? | 19   as a model prisoner? |
| 20   A   Never asked.  We have a review board. | 20      MR. HICKS: |
| 21   Q   You see what's classified, it says, | 21         I'm going to object to the form |
| 22   "Reason for original lockdown," and then | 22   of the question.  That was based on the |
| 23   initial classification is checked, and then it | 23   narrative that you read from Steve Martin's |
| 24   says, "Action of lockdown review board," and | 24   report. |
| 25   not released is checked, and under reasons it | 25      MR. HANLON: |

Page 130

1  Well, that's true, let me just
2  back up for a minute.
3  BY MR. HANLON:
4  Q  I thought earlier you testified, based
5  upon the narrative that I gave you from
6  Martin's report, that he was a model prisoner?
7  A  Yeah, I also said he was in that
8  environment where he can't get to others, so
9  he's very good in there and others is my
10  concern. So while he's in CCR he is a model
11  prisoner.
12  Q  And I take it you agree that he is not
13  "Physically dangerous to himself or others"?
14  A  No, I don't.
15  Q  Why not?
16  A  I think he could be dangerous to
17  others.
18  Q  What leads you to believe that he
19  could be dangerous to others?
20  A  Because he's been dangerous to others
21  before, as I explained to you before.
22  Q  When?
23  A  Well, when he killed Brent Miller.
24  Q  All right, sir. Let's go to Herman
25  Wallace and we'll make this 20.

Page 131

1  (Whereupon the document referred to by
2  Counsel was marked for identification
3  as Exhibit 20.)
4  BY MR. HANLON:
5  Q  Now, we have an Exhibit 20 here. The
6  Lockdown Review Summary for Herman Wallace, the
7  last one is 4-7-06, and we have twelve straight
8  back. And as you review those you'll see for
9  Mr. Wallace each time the same thing as we had
10  for Mr. Woodfox. "Reason for original
11  lockdown," "Initial Classification," "Action of
12  lockdown review board," not released checked
13  and "Nature of original reason for lockdown,"
14  checked but nothing else checked, right?
15  A  Right.
16  Q  Let me ask you something, who knows
17  more about these guys, you or the people that
18  are signing these things off here, on the
19  Lockdown Review Summary?
20  A  I don't know. I'm sure they probably
21  do, they're the board and they're hearing them.
22  Q  Theoretically, at least, they're
23  supposed to know what the facts are about those
24  guys, right?
25  A  That's right.

Page 132

1  Q  And I would assume since you've got
2  charge of over 5801 prisoners, --
3  A  5108.
4  Q  5108, that if you're talking about two
5  or three people, these people would be expected
6  to know more about these prisoners than you do.
7  A  Right.
8  Q  They don't think he's an escape risk
9  because they haven't checked escape risk, do
10  you disagree with them on that?
11  A  Yes, I do disagree with them on that.
12  Q  And they don't check, "Physically
13  dangerous to himself or others," do you
14  disagree with them on that?
15  A  Yes.
16  Q  Let's go to what we'll mark as 21.
17  (Whereupon the document referred to by
18  Counsel was marked for identification
19  as Exhibit 21.)
20  BY MR. HANLON:
21  Q  This is the Lockdown Review Board
22  Summary for Robert Wilkerson, and the last one
23  is dated 1-5-98. That's the earlier one, we're
24  running backwards, we're running the other way.
25  These are all through '98 and '99, okay?

Page 133

1  A  Yes.
2  Q  That's right, we started at 1-5-98.
3  Yes, 2000. Now, as we go through these and
4  let's just take the top one first in '98,
5  because the form is similar to the form we used
6  before, it's a little different but it's
7  similar. Actually it's the same form, we just
8  copied it differently on Exhibit 21 here.
9  Initial classification is checked, not
10  released. I'm sorry, the reason for original
11  lockdown is initial classification, the action
12  of the Lockdown Review Board is not released
13  and the reason given is nature of original
14  reason for lockdown. He's not considered an
15  escape risk. At that time would you have
16  agreed with that?
17  A  This is '98, I don't even know, I
18  don't have a clue. I mean, I don't know way
19  back there whether he's an escape risk or not.
20  I think he would have been an escape risk
21  because he wants to get out. I don't know, I
22  don't really know back then, that far back.
23  Q  Well, let's make sure we're not
24  talking about two different things. When I say
25  an escape risk I would assume that every

Page 134

1 prisoner wants to get out, isn't that true?
2   A  Yeah, some more than others.
3   Q  So not every prisoner is classified as
4 an escape risk, are they?
5   A  No.
6   Q  So what we're talking about is the
7 degree of wanting to get out such that you
8 think this guy is an escape risk, right?
9   A  Right. So you're asking me in '98 is
10 he an escape risk?
11   Q  Yes. Let me see if I can make it a
12 little bit -- let's go to the last one, okay,
13 get it a little closer in time for you. We're
14 into 2000 now. Now, on this one we've had an
15 incident report, do you see where the incident
16 report is checked?
17   A  Yes.
18   Q  We've got him not released and the
19 reason is, nature of original reason for
20 lockdown, okay?
21   A  Uh-huh.
22   Q  They started to put pending felony
23 charges but they scratched that out, but they
24 don't have him down as an escape risk, what is
25 your view on that?

Page 135

1   A  I think he's probably an escape risk.
2   Q  What about, physically dangerous to
3 himself or others?
4   A  I think that.
5   Q  You think he would have been?
6   A  I do. Not himself but others.
7   Q  Do you believe that these review
8 boards, classification review boards, that
9 recommendations from officers, your officers
10 who have had contact with this inmate should be
11 taken into consideration by the board?
12   A  Sure.
13   Q  Do you know if they do that or not?
14   A  If the review board does what now?
15   Q  If they take into consideration
16 recommendations from officers in charge of this
17 inmate who have had contact with him?
18   A  I think so.
19   Q  Do you know?
20   A  I don't know, I'm not there.
21   Q  It sounds to me like this is not a
22 process that you have hands-on contact with, is
23 that fair to say?
24   A  I really don't, the board does, the
25 board.

Page 136

1   Q  And the best that you can recall or
2 the most specific you can recall is you've just
3 told them to do what is proper and right; is
4 that fair?
5   A  They have the rules, they have the
6 post orders and they have everything that's
7 written they're supposed to do and they're
8 supposed to follow all of that and do it and
9 that's what the deal is, what they do.
10   Q  And you think they should consider the
11 officers in charge of these guys who have
12 contact with them say, but you don't know if
13 they do that; is that fair?
14   A  I don't know if they do it.
15   Q  Do you know how often these reviews
16 are conducted?
17   A  Every ninety days.
18   Q  There's really no purpose for
19 conducting ninety day reviews for Woodfox and
20 for Wallace, is there? They're in, they're not
21 getting out of there.
22   A  Well, it needs to be done.
23   Q  Why?
24   A  They need to be talked to, looked at,
25 they need to do it, they need to think about

Page 137

1 it. It's what we're supposed to do and we need
2 to do what we're supposed to do.
3   Q  Really?
4   A  You never know.
5     MR. HANLON:
6       We're going to take a break for a
7 minute.
8     THE WITNESS:
9       Don't take long because I'm going
10 to crash on you.
11       (Off the record.)
12 BY MR. HANLON:
13   Q  Let's go back to Exhibit 17 and this
14 paragraph C up here.
15   A  All right.
16   Q  Let's read this again. "Generally,
17 the board will base its decision on the
18 inmate's progress and conduct since his
19 original placement in extended lockdown;
20 however, other factors may be considered."
21     Let's just limit it to the inmate's
22 progress and conduct since his original
23 placement in extended lockdown as a basis for
24 the board's decision. There's really no reason
25 for this board to meet to review that for these

WARDEN BURL CAIN                                    11/30/2006

Pages 138 to 141

Page 138

1  three individuals, now two individuals,
2  wouldn't you agree with that?
3     A   No.
4     Q   Why not?
5     A   The board has to know, the board needs
6  to know, it can change.
7     Q   What could change?
8     A   It just could, you just never know,
9  we're all human, you know, and we have emotion
10 and it just needs to be done, because if it's
11 not done there's no chance.  As long as it's
12 done there's a chance and that's what's
13 important, I mean, it has to be done, it just
14 has to be done.  That's why I tell them to do
15 it right, you've got to always do it right for
16 everybody up there and some of them sometime
17 get off.
18    Q   You took a real risk with Grady
19 Brewer, didn't you?
20    A   No telling.
21    Q   What do you mean by no telling?
22    A   I don't know Grady Brewer, bring me up
23 to date on Grady Brewer.
24    Q   You never heard of Grady Brewer?
25    A   I probably have, that's one of those

Page 139

1  story things?
2     Q   Grady Brewer had 350 disciplinary
3  reports before he was released and then
4  eventually went back into CCR.  Name doesn't
5  ring a bell with you?
6     A   No.  Did the board recommend he get
7  out?
8     Q   I'm not supposed to answer questions.
9     A   I'm just curious.
10    Q   How about Sammy Robinson, does that
11 one ring a bell?
12    A   I don't know them, I really don't know
13 them that well.  Warden Vannoy is going to know
14 all of them.
15    Q   All right.  Are you aware of any
16 thirty day reviews that are going on with these
17 guys, with Woodfox and Wallace?
18    A   The only way I think we would have a
19 thirty day is if they were doing some kind of
20 disciplinary time that they have to review it
21 in thirty days, but I don't know of any other
22 it would be that.
23    Q   Is it ever appropriate to place an
24 inmate on his initial placement in Camp J?
25    A   I think we have maybe a time or two.

Page 140

1     Q   Did you do that with an inmate named
2  B. Williams, I don't know the first name, but
3  B., the first initial, Williams?
4     A   I don't know.
5     Q   You don't know, you don't have any
6  recollection?
7     A   I don't know.
8     Q   An inmate who participated in the '99
9  hunger strike, got out, was released into
10 society and then came back in?
11    A   I don't remember that, I don't know
12 anything about it.
13    Q   Did you recently tell inmates in CCR
14 that once this lawsuit was over, maybe you
15 could do something about their position in
16 there?
17    A   No.
18    Q   Did you recently talk to inmates in
19 CCR?
20    A   I went to CCR I guess about two or
21 three weeks ago.
22    Q   You don't recall saying something to
23 the effect that once these lawsuits were over
24 we'll take care of you?
25    A   No, I don't recall saying anything

Page 141

1  like that.
2     Q   How long had it been before that visit
3  with inmates on CCR since you had had a visit
4  with inmates at CCR?
5     A   It's been a pretty good while, I go up
6  there once in awhile, I'll see one or two.
7  It's been a long time.  I don't know how long.
8     Q   Years?
9     A   No, it hasn't been that long.
10    Q   Within a year you've been up there?
11    A   I've been up there within a year.
12    Q   Do you keep a separate correspondence
13 file with regard to these inmates or does
14 everything goes in their institutional file?
15    A   I don't keep any separate
16 correspondence unless every once in awhile I'll
17 just help the secretary.  To make it personal
18 I'll just write them a note and send them a
19 little hand-written note.  I don't think that
20 probably gets in their file.
21    Q   Where do you keep that?
22    A   I don't keep a copy.
23    Q   You don't keep a copy.  So when you've
24 turned over to us the institutional files of
25 these three individuals, we can rest assured

| Page 142 | Page 144 |
|---|---|
| 1 that we've got everything that you had on them? | 1 2000 you were in New Orleans and you spoke and |
| 2   A   Yes. | 2 there was a teacher there and you said, our |
| 3   Q   Do you recall writing a letter to a | 3 clients would remain in CCR until they change |
| 4 woman named Anita Rodick about confiscation of | 4 their political beliefs. Does that refresh |
| 5 a book she sent to Herman Wallace? | 5 your memory at all? |
| 6   A   I don't remember it. | 6   A   No, I don't believe I said that, I do |
| 7   Q   How about Anna Crackman? | 7 not believe that. I've got all kinds of |
| 8   A   I don't remember. | 8 beliefs here which I could care less, I care |
| 9   Q   What do you know about the political | 9 about how moral you are. |
| 10 beliefs of Herman Wallace? | 10   Q   I take it your view is that neither |
| 11   A   I don't know much about them. | 11 Woodfox nor Wallace have aged out, as that term |
| 12   Q   Anything? | 12 is used. Let me back up. Does the term aged |
| 13   A   He's supposed to be a Black Panther, I | 13 out mean anything to you? |
| 14 know that. | 14   A   Not a lot. |
| 15   Q   How about Albert Woodfox? | 15   Q   You don't think their ages are reason |
| 16   A   Same thing. | 16 to release them out of CCR; is that fair, |
| 17   Q   How about Robert King Wilkerson? | 17 right? |
| 18   A   Same thing. | 18   A   I don't think their age is a factor in |
| 19   Q   Do you know anything more than that | 19 releasing them out of CCR at this time. |
| 20 specifically about what political beliefs they | 20   Q   Are you aware of any other prison in |
| 21 have with respect to the Black Panther party? | 21 America that has kept an inmate in extended |
| 22   A   Nothing really more, that's all I | 22 lockdown for this length of time? |
| 23 know. | 23   A   I have no idea. |
| 24   Q   Have you ever told anybody that | 24       MR. HANLON: |
| 25 they're not getting out of there until they | 25           I just want one more break and I |

| Page 143 | Page 145 |
|---|---|
| 1 change their political beliefs? | 1 think we're done. |
| 2   A   No. | 2       THE WITNESS: |
| 3   Q   Never said that speaking to a crowd | 3           I'm going to go. I can't hardly |
| 4 where there's a teacher present? | 4 keep making it. I'm really about ready to just |
| 5   A   I don't believe, I wouldn't have said | 5 fall out on you. Can you give me a break? |
| 6 that. | 6       MR. HANLON: |
| 7   Q   Do you believe that? | 7           I'll give you a break. |
| 8   A   No. Their beliefs have nothing do | 8       THE WITNESS: |
| 9 with it. | 9           Can we do it in the morning? |
| 10   Q   Do you know what their beliefs are | 10 Look, I slept four hours last night, at 2:00 I |
| 11 about religion or morals? | 11 was up, I was coughing, every time I cough my |
| 12   A   No. | 12 stomach hurts me. |
| 13   Q   Do you know if they engage in | 13       MR. HANLON: |
| 14 religious services here? | 14           Okay, Mr. Kendall says you're |
| 15   A   I have no idea. | 15 released. |
| 16   Q   If they did would it help them, in | 16       THE WITNESS: |
| 17 terms of getting released out of CCR? | 17           I appreciate it. |
| 18  ·A   I was fixing to say yeah, it would | 18           (Off the record.) |
| 19 help them, until you qualified it. The board | 19       MR. HANLON: |
| 20 has to look at that, the board has to review | 20           We have no further questions for |
| 21 it, I don't deal with that and I'm glad. It's | 21 this witness. |
| 22 the board. | 22       MR. HICKS: |
| 23   Q   Let me just be more specific to you | 23           We have no questions. |
| 24 about the comments on changing their political | 24       THE WITNESS: |
| 25 beliefs. I have information to believe that in | 25           Thank you so very much. |

Page 146

1     MR. HANLON:
2            What do you want to do about
3   reading or waiving?
4         MR. HICKS:
5            We'll read and sign.
6   (Thereupon, the witness' testimony was
7   concluded.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 147

1   R E P O R T E R ' S   C E R T I F I C A T E
2         I, Janice Welch, a Certified Court
3   Reporter (Certificate No. 87172), in good
4   standing with the State of Louisiana, do hereby
5   certify that the foregoing pages constitute the
6   transcript of the proceedings in the
7   above-entitled and numbered cause; that the
8   said witness was duly sworn and thereafter
9   testified as hereinbefore set forth;
10        That the proceedings were reported by
11  me in Stenographic shorthand, and transcribed
12  thereafter by me using Computer-Aided
13  Transcription, and that the same is a true and
14  correct transcript to the best of my ability
15  and understanding;
16        That I am not of Counsel nor related
17  to counsel or the parties hereto, and am in no
18  way interested in the outcome of this event.
19
20   _____
              Janice Welch, CCR
21            CERTIFICATE NO. 87172
22
23
24
25

STATE'S EXHIBIT
27
Blumberg No. 5138

```
Reference: 02HC00002J
Msg Key  : C5
Date/Time: 20081021151947
Source   : CCHC

02HC00002J.CCHC.C5.20081021151947.
LA017025A.
CTL/
ATN/

C5.LA017025A..138C0019BF..10/21/2008 15:19:47
SID: 000602393  PAGE 1 OF 5
REQUESTED BY: RANDAL BRINKHUIS
             S T A T E   O F   L O U I S I A N A
         *FOR USE BY AUTHORIZED CRIMINAL JUSTICE AGENCIES ONLY*
             (FINGERPRINTS ARE NECESSARY FOR A POSITIVE ID)
```

```
   INVESTIGATIVE REPORT                        CONFIDENTIAL RECORDS
-------------------------------------------------------------------------
CRIMINAL RECORD OF: WOODFOX, ALBERT                    FBI: 212957F
STATE ID: 000602393    BIRTH DATE: 02/19/1947   PLACE: LA    DOC: 72148
RACE: B        HEIGHT: 5' 06"      HAIR: BLK       DNA ON FILE:
NO
SEX: M         WEIGHT: 138         EYES: BRN        STATUS:
SSN:           OLS/OLN:                             III: MSO
-------------------------------------------------------------------------
                    ********************
                    *                  *
                    *   SEX OFFENDER   *
                    *                  *
                    ********************
-------------------------------------------------------------------------
A L I A S E S                  SSN          OLS/OLN
HARRIS, CHARLES
-------------------------------------------------------------------------
ARREST DATE: 03/06/1964                             LID: HC12667
AGENCY: HOUSE OF DET NO, LA                         AFIS ATN:
   NAME: WOODFOX, ALBERT

CHARGE 1                                            COUNTS 1
   R.S.  MALICIOUS MISCH
   DISPOSITION: 20 DAS
-------------------------------------------------------------------------
ARREST DATE: 02/20/1965                             LID: 118222
AGENCY: PD NEW ORLEANS LA                           AFIS ATN:
   NAME: WOODFOX, ALBERT

CHARGE 1                                            COUNTS 1
   R.S.  LOITERING
-------------------------------------------------------------------------
ARREST DATE: 04/27/1965                             LID: 118222
AGENCY: PD NEW ORLEANS LA                           AFIS ATN:
   NAME: WOODFOX, ALBERT

CHARGE 1                                            COUNTS 1
   R.S.  FUGITIVE
   DISPOSITION: FROM THIBODAUX, LA RET'D
-------------------------------------------------------------------------
ARREST DATE: 05/25/1965                             LID: 61828
AGENCY: SPEN ANGOLA, LA                             AFIS ATN:
   NAME: WOODFOX, ALBERT


                            SID: 000602393  PAGE 2 OF 5

CHARGE 1                                            COUNTS 1
   R.S. 14:67 THEFT CHARGE
   DISPOSITION: 2 YEARS; PAROLED 2-11-66
-------------------------------------------------------------------------
ARREST DATE: 07/13/1966                             LID: 118222
AGENCY: PD NEW ORLEANS LA                           AFIS ATN:
   NAME: WOODFOX, ALBERT
```

```
CHARGE 1                                                 COUNTS 1
    R.S. 32:724 POSS OF STOLEN VEHICLE
    DISPOSITION: AFF 195-354
--------------------------------------------------------------------------------
ARREST DATE: 10/24/1966                                  LID: 61828
AGENCY: SPEN ANGOLA, LA                                  AFIS ATN:
    NAME: WOODFOX, ALBERT

CHARGE 1                                                 COUNTS 1
    R.S.  PAROLE VIOLATION
    DISPOSITION: BAL OF TERM; DISCH 8-31-67
--------------------------------------------------------------------------------
ARREST DATE: 12/15/1967                                  LID: 118222
AGENCY: PD NEW ORLEANS LA                                AFIS ATN:
    NAME: WOODFOX, ALBERT

CHARGE 1                                                 COUNTS 1
    R.S. 14:42 AGGRAVATED RAPE
    DISPOSITION: 2-28-68 15 MOS PO

--------------------------------------------------------------------------------
ARREST DATE: 02/13/1969                                  LID: 118222
AGENCY: PD NEW ORLEANS LA                                AFIS ATN:
    NAME: WOODFOX, ALBERT

CHARGE 1                                                 COUNTS 3
    R.S. 14:64 ARMED ROBBERY
    DISPOSITION: 7-31-69, 50
CHARGE 2                                                 COUNTS 1
    R.S. 14:35 SIMPLE BATTERY
    DISPOSITION: YEARS ANGOLA
CHARGE 3                                                 COUNTS 2
    R.S. 14:42 AGGRAVATED RAPE
    DISPOSITION: PEN MULTIPLE
CHARGE 4                                                 COUNTS 1
    R.S. 14:108 RESISTING AN OFFICER
    DISPOSITION: OFFENDER

--------------------------------------------------------------------------------
ARREST DATE: 10/16/1969                                  LID: B773779
AGENCY: PD NY, NY                                        AFIS ATN:
    NAME: HARRIS, CHARLES


                                 SID: 000602393  PAGE 3 OF 5

CHARGE 1                                                 COUNTS 1
    R.S. 14:65 SIMPLE ROBBERY
    DISPOSITION: (1ST)
CHARGE 2                                                 COUNTS 1
    R.S.  POSS DANG WEAPON
CHARGE 3                                                 COUNTS 1
    R.S.  REC ENDANGERMENT

--------------------------------------------------------------------------------
ARREST DATE: 11/22/1969                                  LID:
AGENCY: SUPREME COURT, NY,NY                              AFIS ATN:
    NAME: HARRIS, CHARLES

CHARGE 1                                                 COUNTS 1
    R.S. 14:62 SIMPLE BURGLARY
       STATUTE MODIFIER: 14:27 ATTEMPT
    DISPOSITION: (3RD DEG)NYC PEN 1 YEAR
CHARGE 2                                                 COUNTS 1
    R.S. 14:59 CRIMINAL MISCHIEF
    DISPOSITION: (3RD DEG)NYC PEN 1 YR CC
--------------------------------------------------------------------------------
ARREST DATE: 01/28/1970                                  LID: 770681
AGENCY: NYC RECEPT & CLASS CTR                           AFIS ATN:
    NAME: WOODFOX, ALBERT

CHARGE 1                                                 COUNTS 3
    R.S. 14:62 SIMPLE BURGLARY
    DISPOSITION: 1 YEAR
```

```
--------------------------------------------------------------------
ARREST DATE: 03/10/1971                        LID: 773779
AGENCY: PD NY,NY                               AFIS ATN:
   NAME: WOODFOX, ALBERT

CHARGE 1                                       COUNTS 1
   R.S.  PETTY LARCENY
   DISPOSITION: FUGITIVE
--------------------------------------------------------------------
ARREST DATE: 08/05/1971                        LID: 72148
AGENCY: SPEN ANGOLA, LA                        AFIS ATN:
   NAME: WOODFOX, ALBERT

CHARGE 1                                       COUNTS 1
   R.S.  HFC - ARMED ROBB
   DISPOSITION: 50 YRS
--------------------------------------------------------------------
ARREST DATE: 04/02/1973                        LID: 74819
AGENCY: SPEN ANGOLA, LA                        AFIS ATN:
   NAME: WOODFOX, ALBERT

                              SID: 000602393  PAGE 4 OF 5

CHARGE 1                                       COUNTS 1
   R.S. 14:30 FIRST DEGREE MURDER
   DISPOSITION: NATURAL LIFE CS W/BAL OF TERM
--------------------------------------------------------------------
ARREST DATE: 05/08/1973                        LID: 72148
AGENCY: SPEN ANGOLA, LA                        AFIS ATN:
   NAME: WOODFOX, ALBERT

CHARGE 1                                       COUNTS 1
   R.S.  HFC - ARMED ROBB
   DISPOSITION: 50 YRS; COURT ORDER LIFE CS W/BAL: ATTY GENL'S  RULING DROPPED
   FROM COUNT 5-8-73 AS LSP #74819 & PICKED UP ON COUNT 5-8-73 UNDER PREVIOUS
   LSP #72148 SUBJ CONVICTED OF MURDER BUT INDICT- MENT THROWN OUT & ORDERED
   RETRIED. WAS DISCH FROM NEW LSP #74819 & RE
--------------------------------------------------------------------
ARREST DATE: 03/05/1974                        LID: 74819
AGENCY: SPEN ANGOLA, LA                        AFIS ATN:
   NAME: WOODFOX, ALBERT

CHARGE 1                                       COUNTS 1
   R.S. 14:30 FIRST DEGREE MURDER
   DISPOSITION: NATURAL LIFE CS W/BAL OF TERM
--------------------------------------------------------------------
ARREST DATE: 03/13/1974                        LID: 72148
AGENCY: SPEN ANGOLA, LA                        AFIS ATN:
   NAME: WOODFOX, ALBERT

CHARGE 1                                       COUNTS 1
   R.S.  HFC - ARMED ROBB
   DISPOSITION: 50 YRS
--------------------------------------------------------------------
ARREST DATE: 01/06/1981                        LID: 72148
AGENCY: SPEN ANGOLA, LA                        AFIS ATN:
   NAME: WOODFOX, ALBERT

CHARGE 1                                       COUNTS 1
   R.S. 14:30 FIRST DEGREE MURDER
   DISPOSITION: LIFE CS W/BAL
CHARGE 2                                       COUNTS 1
   R.S.  AGGRAVATED ESCAPE
   DISPOSITION: OF TERM; ORIG
CHARGE 3                                       COUNTS 1
   R.S.  HFC - ARMED ROBB
   DISPOSITION: TERM: (14 MOS- 50 YRS-CS)
--------------------------------------------------------------------
ARREST DATE: 03/25/1993                        LID: 5766
AGENCY: SO ST.FRANCISVILLE LA                  AFIS ATN:
   NAME: WOODFOX, ALBERT
```