```
                                        SID: 000602393  PAGE 5 OF 5
CHARGE 1                                        COUNTS 1
    R.S.  MURDER - 1 (NEW INDICTMENT)

--------------------------------------------------------------------------------
ARREST DATE: 02/23/1999                         LID: 72148
AGENCY: DOC ADULT SERVICES BR LA                AFIS ATN:
    NAME: WOODFOX, ALBERT

CHARGE 1                                        COUNTS 1
    R.S. 14:30.1 SECOND DEGREE MURDER
    DISPOSITION: LIFE -- DCAS

--------------------------------------------------------------------------------
THE RESPONSE TO YOUR REQUEST FOR CRIMINAL HISTORY RECORD CHECK IS
BASED ON A REVIEW OF THE STATE OF LOUISIANA'S CRIMINAL HISTORY RECORDS
DATABASE ONLY. THIS DOES NOT PRECLUDE THE EXISTENCE OF A RECORD IN A
LOCAL AGENCY, ANOTHER STATE, OR THE FBI CJIS DIVISION.

** END OF RAPSHEET **

********************************************************************************
```

```
Reference: UNKNOWN
Msg Key  : CR
Date/Time: 20081021151355
Source   : NLETS

UNKNOWN.NLETS.CR.20081021151355.
LA017025A.
CTL/
ATN/

CR.NYIII0000
13:13 10/21/2008 95240
13:13 10/21/2008 51096 LA017025A
TXT
HDR/2L01138C0019BD2QR  ATN/RANDAL BRINKHUIS
PART   1
THE FOLLOWING RECORD PERTAINS TO FBI/212957F
THIS REPLY TO YOUR QR INQUIRY MUST BE UTILIZED ONLY FOR THE PURPOSE FOR WHICH
IT WAS REQUESTED AND MUST NOT BE UTILIZED FOR EMPLOYMENT OR LICENSING PURPOSES.
IF THE SUBJECT'S RECORD IS SUBSEQUENTLY REQUIRED FOR ANOTHER PURPOSE A NEW
REQUEST MUST BE MADE TO ENSURE THE RECORD USED IS CURRENT AND COMPLETE.
DATE  10-21-08          STATE OF NEW YORK          TRAN #    III
TIME  1614          DIVISION OF CRIMINAL JUSTICE SERVICES     PART      1
FAX #                                                     B#  B773779
        CONFIDENTIAL TO: AUTHORIZED AGENCY               DOB 02-19-47
                                                         RAC BLACK
                     STATE OF LOUISIANA                  SEX MALE
                                                         HGT 5-08
                                                         SOC
------------------------------------------------------  FBI 212957F
NAME  WOODFOX,ALBERT                 NYSID: 3124905J     III MULTI SOURCE
------------------------------------------------------
                     NAMES USED BY SUBJECT
HARRIS,CHARLES                        WOODFOX,ALBERT
------------------------------------------------------------------------
            < < < < < < CRIMINAL HISTORY > > > > > > >
------------------------------------------------------------------------
!       ARREST      !  ARREST/ARRAIGNMENT  !      DISPOSITION AND        !
!   INFORMATION     !       CHARGES        !       RELATED   DATA        !
------------------------------------------------------------------------
ARR DT/PL 10-16-69! - - ARREST - -        !     - - DISPOSITION - -
NEW YORK          !ROBBERY-1ST:USE DANGER!03-09-71  NY CO SUP CRT
                  !PL  160.15      SUB 03!          CASE # 5403-69
CRM DATE: 10-16-69!CLASS B FEL  NCIC 1299!ACQUITTED
CRIME PLACE:      !                      !
NEW YORK          !RECKLESS ENDANGERMENT-!  .    .    .    .    .    .
                  !PL  120.25      NO SUB!
ARR#/AGY  B773779 !CLASS D FEL  NCIC 7099!10-27-69  CRIM CRT NEW YORK
NYCPD PCT 026     !                      !          CASE # A016631
                  !POSS DANG WEAPON 2ND O!NOT ARRAIGNED
                  !PL  265.05      SUB 03!
                  !CLASS D FEL  NCIC 5212!THE FOLLOWING CHARGE(S):
                  !                      !RECKLESS ENDANGERMENT-1ST
                  !                      !PL  120.25      NO SUB
                  !                      !CLASS D FEL  NCIC 7099
                  !                      !
                  !                      !POSSESS DANGEROUS WEAPON-FEL
                  !                      !PL  265.05      NO SUB
                  !                      !CLASS D FEL  NCIC 5212
                  !                      !
                  !                      !
                  !                      !
                  !                      !  - - PENAL/PAROLE DATA - -
                  !                      !NYC COR REC CLAS C - ADMISSION
                  !                      !01-28-70  COMMITTED
                  !                      !TERM: TERM NOT REPORTED
                  !                      !INMATE ID NO 770631
                  !                      !
------------------------------------------------------------------------
ARR DT/PL 03-10-71! - - ARREST - -       !  NO DISPOSITION REPORTED
NEW YORK          !FOA LOUISIANA         !
                  !                      !  COURT OF ARRAIGNMENT:
CRM DATE: 02-27-69!                      !  CRIM CRT NEW YORK
CRIME PLACE:      !                      !
LOUISIANA         !                      !
                  !                      !
ARR#/AGY  B773779 !                      !
NYCPD PCT 005     !                      !
```

```
----------------------------------------------------------------------
              < < < < < < OTHER INFORMATION > > > > > >
----------------------------------------------------------------------
NCIC FINGERPRINT CLASSIFICATION  PO13171612PO59141510
----------------------------------------------------------------------
 NAME/!  REPORTED ON  !      INFORMATION
 ADDR !-------------------------------------------------------------
      !10-16-69! HARRIS,CHARLES
      !01-28-70! HARRIS,CHARLES
      !03-10-71! WOODFOX,ALBERT
----------------------------------------------------------------------
WHERE AN INDIVIDUAL IS SENTENCED JUNE 1, 1981, OR LATER, ON MORE THAN
ONE CHARGE WITHIN A DOCKET, THE SENTENCES MAY BE CONSIDERED TO BE
CONCURRENT UNLESS IDENTIFIED AS CONSECUTIVE.
CAUTION:  THIS RESPONSE IS NOT BASED ON A FINGERPRINT SEARCH OR
IDENTIFICATION AND, AS SUCH, DOES NOT SATISFY THE PROVISIONS OF CPL
SECTION 390.10 FOR USE IN PRONOUNCING A SENTENCE.
     ALL ENTRIES ARE AS COMPLETE AS THE DATA FURNISHED TO DCJS.
                    DENISE E. O'DONNELL, COMMISSIONER
END OF RECORD

**********************************************************************
```



BOBBY JINDAL
Governor



JAMES M. Le BLANC
Secretary

**State of Louisiana**
Department of Public Safety and Corrections
Louisiana State Penitentiary

RECEIVED
MAR 2 0 2008
RECORDS

March 18, 2008

Ms. Rheseisha M. Robertson
261 Master Point Court
Slidell, LA. 70458

Dear Ms. Robertson,

This letter is to inform you that you have been removed from the approved visiting list of inmate Albert Woodfox #72148 and any other list for a period of six (6) months.

On March 16, 2008, Lt. Russell was randomly shaking down vehicles at the Front Gate and Mr. Bernard Robertson refused to consent to have his vehicle shook down. Duty Warden Dupont was summoned to the gate. Duty Warden Dupont approached Mr. Robertson to discuss the reason of why he was refusing the shakedown when Mr. Robertson became very disturbed and denied giving Duty Warden Dupont his name or any other information. Duty Warden Dupont again asks Mr. Robertson why he was denying to have his vehicle shook down? Duty Warden Dupont contacted Major Wilson of Investigative Services and Roving Security to come to the gate. Duty Warden Dupont walked to the rear of your vehicle in an attempt to get the license plate number. Mr. Robertson sat on the bumper of the vehicle in order to block Warden Dupont's view from obtaining the number. Ms. Rheneisha Robertson began questioning Warden Dupont as to his authority to obtain such information. Duty Warden Dupont ask both of the visitor's to leave and that their visit would be cancelled. Mr. Robertson obtained a cell phone from his vehicle and began taking pictures of Duty Warden Dupont and the officers involved. Duty Warden Dupont asks Mr. Robertson to put his cell phone back in the vehicle, but he refused. Roving Security arrived and Duty Warden Dupont ordered Master Sergeant Smith to notify the West Feliciana Parish Sheriff's Office and summon them to have the visitor's removed from the LSP grounds. At that time the visitor's got into their vehicle and left.

Ms. Robertson may appeal this decision within fifteen (15) days in writing to, James M. LeBlanc, Secretary, Department of Public Safety and Corrections, P.O. Box 94304 Capitol Station, Baton Rouge, LA. 70804.

Sincerely,

Darrel Vannoy, CCE
Deputy Warden\Security

Add'l documents produced
to plaintiffs—0749

Louisiana State Penitentiary, Angola, Louisiana 70712-9813 • (225) 655-4411 • Fax (225) 655-2319
www.doc.la.gov
An Equal Opportunity Employer

Page 2

DV: jp

XC:    James M. LeBlanc, Secretary
Front Gate Visiting
Classification Visiting
Major Wilson\Investigation Services
Inmate Records
Inmate #72148
File

Add'l documents produce
to plaintiffs—0750

EXHIBIT
State's
29

LA. STATE PENITENTIARY

STATE OF LOUISIANA

CRIMINAL DISTRICT COURT

VS.

PARISH OF ORLEANS

ALBERT WOODFOX

NO. 219-259, SECTION "E"

### INFORMATION FOR VIOLATION R.S. 14:109

Albert Woodfox was charged in a bill of information with a violation of R.S. 14:109, relative to the aggravated escape from the Orleans Parish Criminal Courts Building. Albert Woodfox was arraigned on July 20, 1971 and pled not guilty.

### STATEMENT OF FACTS

On October 9, 1969, Albert Woodfox was in lawful custody of the Orleans Parish Criminal Sheriff by reason of having been previously convicted of armed robbery and sentenced to serve fifty (50) years in the Louisiana State Penitentiary. On October 9, 1969 he was brought back to Section "B" of the Criminal Court in connection with another criminal charge. At some time while the defendant was in the criminal court building someone slipped him a German Lugar pistol. On being returned to the Parish Prison, he produced this pistol and used it to secure his release and to handcuff two criminal sheriff deputies in the elevator of the Criminal Courts Building. He then released one of the prisoners and made good his escape through the basement of the criminal courts building. He was subsequently apprehended in New York, New York and extradited to Louisiana for trial of this charge.

### S E N T E N C E

After trial by jury, and after considering the facts and the evidence, the jury returned a verdict of guilty as charged, guilty of aggravated escape. Subsequently, on January 17, 1972, Albert Woodfox was sentenced to serve a term of fourteen (14) months at hard labor at the Louisiana State Penitentiary not to run concurrent with any other sentence, with credit for time served awaiting trial. He was born 2/19/47, and he was represented by Anthony Brazzan of the New Orleans Indigent Defender Board.

This sentence, however, was this _9th_ day of _February_, 1972.

**EXHIBIT**
3

_/S/_ John W. Sinqufield
JOHN W. SINQUEFIELD
Special Counsel to the
District Attorney

_/S/_ Rudolph F. Becker, Jr.
RUDOLPH F. BECKER, JR.
Judge, Section "E"

Clerk's Office _3/13_ 19_22_
_A TRUE COPY._

B. Pelizze _Deputy Clerk,_
Criminal District Court,
Parish of Orleans

AW 0053

Case 3:06-cv-00789-JJB-RLB   Document 71-2   11/12/08   Page 7 of 120

Dear Sister Dianne,

Please excuse the delay in answering your letter. But we (Angola#4) have been having some unnecessary contradiction in the ranks of our defense committee. It seems that as a result of the many people involved, there is to many different philosophies, and political views. When things of this nature, begain to out weight the primary objective of the defense committee, then the committee becomes none functional. But mydelf, and the other comrades that make up the Angola#4, will continue to struggle to resolve all contradiction, so that the committee can begin to carry out it reason for existing.

Glad to hear that you feel that my politicals views, and intentions in life are moving in a righteous manner. But I must warn you to hold your final judgement untill you know me better. Because I have been told by many of my correspondents, that I am to extreme. But I view amerikkka, and her lies, capitalism, imperialism, racism, exploitation, oppression, and murder of the poor and oppressed people, as being highly extreme. It is my opinion that anyone who views these situations as anything other then extreme, is a petty bourgeoise, or a capitalistic fool!!!. History has taught us that revolution, is aviolent thing, but a highly necessary occurance of life. Revolution, is blood shed, deaths, sacrifices, hardships, nothing can, and will change that. The passing out of pamphlets, is only a method of avoiding the unavoidable. It is the job of the revolutionary forces in this country, to manufact revolution, instead of trying to avoid it, to do other wise, is the act of an opportunist.

I agree with you, capitalism is not the only thing that needs destroying, but it's the cause of all other things that have to be destroied. Racism, sexism, poverty, poor housing, bad education, poor medical attention, ect. ect., are by products of capitalism. To try to attack these things, is useless, sice they all stem from capitalistic conditions.

As you stated, your white middle class status has sheilded you from the lies of amerikkka. While I am the end results of that amerikkkan lie!!! But just as blacks, and other people of color must fight to get out of the bag that our ancestors have left us in, you must try to fight just as hard to change the things that your ancestors have built. The amerikkkan system, is full of hardship, unhappiness, and death, it must be destroied.

To realize what has happen, and that your skin color has allowed you t es cape it, is not good enough. As you stated, you have to constantly re-ali the lines between being a liberal, or a revolutionist. But this is on h f of the whole thing. The thing in a whole, is determining if you are, c we to be a liberal, or revolutionist.

The struggle doesn't need any liberals, because all liberals do is s how sorry they are about the way this fucked up country are. Then they y to direct your methods of liberation, and destruction of forces that ho you in inslavement, from there middle class homes, or jobs. And when you r ject their theory, they call you reactionary, or dognatic, or subjective. Bu a re- olutionist, is someone who loves lives, and dies with, and for the people. He does not try to avoid struggle at any level, he tries to organize, and direct your (our) struggle in the right direction. If you follow the later, than I say that you are moving in the right direction, but if you are following the other path, then you had better re-evaluate yourself, because you are hurting the struggle more than helping it.

Your letter was very honest, and sincer, Imx hope as time goes on, we will come closer in determinations, and ideas towards the struggle. Your views have a lot of small contradictions, but this can be expected, because contradictions are the ruling forces of the universe. From them comes struggle that brings on changes.

Well I guess thats about all for now, will right mre nexth time. If there are any questions you wish to ask, feel free to do so, no matter how personal you may feel they are, ok. Oh, whats happening with the books, I haven't received any of them as of thid letter. I am also sending you one of the pamphlets on the Angola#4, any funds, that you can pick up, will be appreciated. I remain yours in struggle.

In Solidarity/ albert

PS. Please excuse any misspelled words, and typing errors, I am just a street nigger trying to get my message over. (smile)

EXHIBIT

31

PENGAD 800-631-6989

## Kari Lydersen: In His Own Words: Albert Woodfox of the Ango[la]

Thursday, March 29 2007 @ 11:14 PM PDT
Contributed by: <u>Admin</u>
Views: 1,044

The two still-incarcerated members of the "Angola 3,"Albert Woodfox and Herman Wallace, have been in solitary confinement for 32 and 35 years, respectively – among the longest in US history.
*An exclusive Infoshop News interview.*

*Along with Robert King Wilkerson, who was released from prison in 2001, they were convicted of the 1972 murder of a white guard at the infamous Angola prison farm about 100 miles from New Orleans. As politicized members of the Black Panther Party in the Louisiana prison system, their supporters say they were framed for the guard's murder and subsequently kept isolated*



*from other inmates because of their political beliefs and activism. This winter a state judicial commissioner opined that Wallace should get a new trial; a state judge will rule on the matter after prosecutors file a response to the commissioner's decision. Woodfox, who was reconvicted in a 1998 trial with serious conflict of interest issues described below, has a habeas corpus petition pending in federal court.*

## In His Own Words: Albert Woodfox of the Angola 3

Interview by Kari Lydersen
Infoshop News Exclusive
March 30, 2007

Louisiana -- The two still-incarcerated members of the "<u>Angola 3,</u>" Albert Woodfox and Herman Wallace, have been in solitary confinement for 32 and 35 years, respectively – among the longest in US history.

Along with Robert King Wilkerson, who was released from prison in 2001, they were convicted of the 1972 murder of a white guard at the infamous Angola prison farm about 100 miles from New Orleans. As politicized members of the Black Panther Party in the Louisiana prison system, their supporters say they were framed for the guard's murder and subsequently kept isolated from other inmates because of their political beliefs and activism. This winter a state judicial commissioner opined that Wallace should get a new trial; a state judge will rule on the matter after prosecutors file a response to the commissioner's decision. Woodfox, who was reconvicted in a 1998 trial with serious conflict of interest issues described below, has a habeas corpus petition pending in federal court. The two are also both plaintiffs in a federal civil lawsuit challenging their ongoing solitary confinement as cruel and unusual punishment. For more information, visit <u>www.angola3.org</u>. On March 24 and 25, I talked with Albert Woodfox in Angola.

Q: How do you feel about your chances for freedom at this point?



EXHIBIT

4

tabbies

AW: Hope is eternal. But I'm worried about the conservative tilt of the federal court since Bush has been in office. If they go by the letter of the law, I should get a new trial.

Q: It seems incredible that one of the members of the Grand Jury that led to your 1998 trial was Anne Butler, the wife of the former Angola warden, who had written a book about the guard's murder. How can this be? [As a side note, that warden later was sentenced to prison himself for trying to murder his wife, shooting her five times.]

AW: Not only did she write the book "Dying to Tell," but she took it into the Grand Jury room and talked about the case. Anyone with pre-knowledge of the crime is not supposed to sit on a Grand Jury. This came up in my appeal to the state, but it was denied. This clearly violates my 14th Amendment right to due process under the law. And the trial was moved to this small town of Amite. We heard that some of the jurors didn't want to convict me, but they were beaten down. In a small town it's guaranteed that people will run into each other, and so on a jury that small town mentality sets in. They don't want to be the ones known for letting this man go free. They think, I'm not going to go out on a branch and isolate myself for someone I don't even know. I think they (prosecutors) counted on that small town mentality, that's why they moved the trial.

Q: Do you think the justice system has changed or improved at all since the 1970s?

AW: I think the justice system is exactly the same. It's corrupt, prejudicial, racist. There's the saying why fix something that isn't broken. From their perspective, why change something that's worked so well for them for so many years? You hear politicians say the justice system isn't perfect but it's best in the world. Well we've had hundreds of people freed by DNA evidence now. If this was the best system in the world all those innocent people wouldn't be in there. Attorneys seem more concerned with getting convictions than the guilt or innocence of the person charged. And under the theory that District Attorneys and police need to do their job free from intimidation, they are given immunity. So they can continuously violate the law without any fear of being punished for it.

Q: Is Louisiana one of the worst states as far as having a racist and corrupt justice system? Roy Hollingsworth (a fellow inmate in the isolation wing and Angola 3 supporter) said he represents himself because he'd be afraid to have a lawyer in Louisiana.

AW: I've only been exposed to two justice systems, in Louisiana and New York, and while all systems are corrupt and racist, procedurally Louisiana has got to have one of the most chaotic justice systems in the US. In everything except capital cases, it still operates under the old Napoleonic system where [to get an indictment] the DA just has to produce a bill of information, saying so and so did such and such, without any evidence showing a crime occurred.

Q: So you and Herman have been in solitary your whole time at Angola?

AW: For Herman it will be 35 years on April 18. The guard was killed on April 17, and he was put in solitary the next day. I've been in CCR or Camp J (both solitary confinement) my whole time in Angola, for a total of 32 years. I was discharged to the St. Francisville Sheriff's Department in April 1996 [pending his new trial], and then when I was returned to Angola in

March 1999 after being convicted again, I was put back in CCR. When I was in general population [in St. Francisville], it was strange to sit at a table and eat a meal with another human being, to be in the yard with other people. I didn't know what to do with my hands or how to stand naturally [without restraints]. One of the most important issues in this country is how they are building all these Supermax prisons where they isolate individuals, it's sensory deprivation. This case could affect the prison system across America if we win.

Q: You said you can't talk about your personal experience in solitary because of the pending lawsuit. What is it like for someone in solitary in general?

AW: It's cruel and unusual. You're locked in a cell 23 hours a day. It denies you the opportunity to interact with human beings and just be a human being. The conditions in CCR are much better than most Supermax prisons. We have color TV, microwaves, a hot water tap. But the issue is constitutional, our constitutional due process rights to be treated like other prisoners have been violated. No matter how well we behave, we don't have a way to get out of solitary. What is a color TV if you can't be with other human beings?

Q: With your lawsuit and others in the past few years, do you think public awareness of the human rights issues raised by Supermax prisons and solitary confinement is growing?

AW: No, the American people can only see their immediate needs, and how things affect them on a personal level. So they're not concerned with someone who is locked in a cell 23 hours a day if they feel safe because people are being arrested and locked up. America trains its citizens in "me-ism." So the American government and the American judicial system are winning. People are brainwashed by all these shows like "CSI" and "Law and Order." They just show perfect situations where everyone who is arrested is guilty.

Q: How about public awareness of police brutality?

AW: People tend to say that can't happen, police wouldn't do that. Until it happens to them, you hear families of [police brutality] victims on TV saying, "I can't believe this happened, this is America." Now that it happened to them, the outrage becomes personal.

In general people have too much blind trust in public institutions. You should respect and support a government when it does the right thing, but you should never trust it. People have this blind trust, then they're shocked when it's violated.

Look at Sean Bell in New York [killed outside a nightclub before his wedding day]. Fifty shots fired into a van, when no criminal act, no act of violence had occurred. And they'll be found not guilty. In New York they think the police can do no wrong, especially if there is a minority involved.

Q: What's the status of Herman's case since the commissioner said he should get a new trial?

AW: The state was supposed to have 10 days to appeal, but they didn't file anything in those days, then the judge still let them file late. And to add insult to injury, the judge gave them 30 extra days, and then 60 extra days, to put their brief together.

Q: Do you see any parallels between what's going on with the war and imprisonment on a global scale and your situation?

AW: Guantanamo and Abu Ghraib are prime examples of the American justice system. Most of the people involved in torture at Abu Ghraib were correctional officers – that's a fact lost in the media. A lot of the techniques they used were created right here in our prisons. Everything they're trying to do in Iraq is an extension of America. That's why they're never going to win this war. You can't take people and force them to live in a western system so different from what they've been used to for centuries. It's gun barrel democracy.

Q: Can you tell how Katrina has affected New Orleans and the region at this point?

AW: Katrina showed people exactly what America is about. That how you're treated by state, federal and local governments depends on the color of your skin. I think the political machine in this country, particularly Republicans, have done a lot of things trying to destroy New Orleans as a predominantly African American city. New Orleans has always been a thorn in the Republicans side. They'll be leading in the region and then when it comes to New Orleans the vote is 97 percent Democrat. After Katrina they did a lot to try to embarrass Governor Kathleen Blanco for things she had no control over. And it worked, she's not running for governor again. That leaves it wide open for [Republican] Bobby Jindal.

Q: What have you heard about how the recovery is going?

AW: I don't know that the city will ever be around 65 percent African American again. The system is doing everything it can to make sure that doesn't happen. [Grassroots activist group] Common Ground has made a difference. And the media ignores them – they'll call every other Baptist and Catholic organization and government agency by name, but they never mention Common Ground. I'll see clips on TV and say, 'Oh there's [Common Ground founder and Black Panther] Malik [Rahim], that's Common Ground;' but they'll just say 'community activists.' Two of the founders of Common Ground – Malik and [former A-3 inmate] King were Black Panthers. It is based on the Ten Point Program, and Common Ground shows that 30 some years later, that still proves an effective tool for serving the community.

*Kari Lydersen is a freelance writer whose work has appeared in the Washington Post, In These Times, LiP Magazine, Clamor, and The New Standard.*

**Kari Lydersen: In His Own Words: Albert Woodfox of the Angola 3**
Authored by: Pomegranate on Friday, March 30 2007 @ 04:41 PM PDT
Thanks for a great interview.

All power to the people!


---

When the going gets weird, the weird turn pro.


**Kari Lydersen: In His Own Words: Albert Woodfox of the Angola 3**
Authored by: ThePeoples Elbow on Friday, March 30 2007 @ 08:09 PM PDT

Excellent interview and a perfect example of why I frequent infoshop. Keep up the good work!

**Kari Lydersen: In His Own Words: Albert Woodfox of the Angola 3**
Authored by: Perica on Sunday, April 01 2007 @ 12:26 PM PDT
If you are intrested in the case of The Angola 3 make sure to check out Three Black Panthers and the Last Slave Plantation, a film made by Texas Anarchists, narrated my Mumia Abu Jamal and containing interviews with all 3 members of the Angola 3 as well as a number of members of the black panthers (David Hilliard, Geronimo Pratt, Malik Rahim etc) and other political prisoners (Rod Coronado, Fred Hampton Jr. etc). you can get it from the website or from
Houston Anarchist Black Cross
PO Box 667614
Houston, TX, 77266
houstonabc@riseup.net

STATE'S EXHIBIT No.

# SHERIFF'S OFFICE
## BUREAU OF IDENTIFICATION
### PARISH OF LAFOURCHE

# ARREST REPORT

Arrest Number

| Surname | First Name | Middle Name | Complainant | Name & Address |
|---|---|---|---|---|
| Woodfox | Albert | | Deputy Ernest Baye | |

Alias

Residence

CHARGE: Simple Escape and Auto Theft.

538 Bertrand Street New Orleans, La.
Place Arrested

Date & Time of Arrest

ARRESTING OFFICER                    Ward

St. Ann St. New Orleans, La. 4-27-65
Birth Place                Birth Date          Age

Major Diaz, Capt. Waguespack
Dets. A. Perret and R. Kennedy, NOPD

| Race | Sex | Height | Eyes | Weight | Comp. |

New Orleans La.            2-19-47      18   W    M   5-7   brn
Occupation                              Scars & Marks

Porter Fontenblue Motor Hotel

Time Paroled & Date

PAROLED BY AND FOR WHOM

Remarks:

The above subject was serving a sentence for theft in the Lafourche Parish Jail which he received on 4-9-65 ans was serving as a trustee performing duties around the Parish Jail. On the night of 4-26-65 subject left the Parish Jail without the authority of the Desk Sergant and was unalble to be located by the Destk sergant on duty. The New Orleans Police Dept. was notified of his escape and to be on the look out for the subject. Major Diaz and Capt. Waguespack proceeded to New Orleans to assist the New Orleans Police to search for the subject. Upon reaching the NOPD it was learned at that time that Pelican Construction reported a stolen truck to the Lafourche Parish Sheriff's Office which was a 1962 Red Ford truck bearing '64-65 La. 769-013 and motr nunber F75FU240315 and futher learing that Unit 109 of the NOPD had stoped the truck at Claiborne and St. Bernad Ave about 2 A.M. and the subject fleed the scene after being stopped and the truck was towed by the NOPD officers. Upon checking this truck Detectives A. Perret and R. Kennedy and Depuies Diaz and Waguespack found a brown wallet with identification papers and birth certificates and social Secutiry card of the above subject. The subject was then placed on theft charges at the Thibodaux Office. Under the escape warrant the search for the above subject was still under way. At the 1200 block of St. Ann street in New Orleans the above subject was located and when the four arresting officers approached the subject attempted to run away again but changed him mind and offered no resistance at that time, Subject was taken back to the Lafourche Parish Jail and thecharges of escape and theft was sent on on the subject.

Disposition

Signature of Official


STATE'S EXHIBIT
32

# AFFIDAVIT

STATE OF LOUISIANA
PARISH OF LAFOURCHE

BEFORE ME, THE UNDERSIGNED AUTHORITY, PERSONALLY CAME AND APPEARED:

Norman R. Diaz, Deputy Sheriff

who having been by me duly sworn, deposes and says:

That one    Albert Woodfox, 538 Bertrand Street New Orleans,La.

on or about the __26__ day of __April__ , 19 _65_ in the Parish and State aforesaid did unlawfully escape confinment

form the Lafourche Parish Jail where teh above was serving a

2 years sentence for auto theft and was sentenced on 4-9-65 to said

sentence, in violation of R. S. 14:110

contrary to the form of the statutes of the State of Louisiana in such cases made and provided, in contempt of the authority of said State, and against the peace and dignity of the same.

WHEREFORE, affiant prays that one    Albert Woodfox

be arrested and dealt with according to law.

WITNESSES:

_Ernest Baye_

_Norman R Diaz_
AFFIANT

SWORN TO AND SUBSCRIBED before me this __26__ day of __April__ ___ 19_65_.

_signature_
Justice of the Peace J. P. Ward __2__
Or
JUDGE, District Court Div._____ Lafourche Parish, La.

NOTE: Write names of witnesses on back of Affidavit, detach same from warrant and mail to District Attorney's Office.

③

# STATE OF LOUISIANA
## SEVENTEENTH JUDICIAL DISTRICT COURT
### In and for the Parish of Lafourche

**Wollen J. Falgout    (or)    Herbert O'Niell**, Assistant District Attorney of the Seventeenth Judicial District of the State of Louisiana, who, in the name and by the authority of the said State, prosecutes in its behalf, in proper person comes into the Seventeenth Judicial District Court of the State of Louisiana, in the Parish of Lafourche, and gives to the said Court here to understand and be informed that one       Albert Woodfox

late of the Parish of Lafourche, on or about the 26th       day of    April             in the year of our Lord, One Thousand Nine Hundred and    Sixty-five (1965),
with force and arms in the Parish of Lafourche, aforesaid, and within the jurisdiction of the Seventeenth Judicial District Court in and for the Parish of Lafourche,  did escape
confinement from the Lafourche Parish Jail where he was serving a 2 year sentence for auto theft, having been sentenced on April 9, 1965, thereby committing the crime of simple escape, all in violation of R. S. 14:110.

contrary to the form of the statute of the State of Louisiana, in such cases made and provided and against the peace and dignity of the same.

_(signature)_
Assistant District Attorney for the 17th Judicial District
of the State of Louisiana

No. 1570

17TH JUDICIAL DISTRICT COURT

PARISH OF LAFOURCHE

STATE OF LOUISIANA

VS.

ALBERT WOODFOX

INFORMATION FOR

THEFT

FILED April 30 196___

E. J. Faucet

CLERK

a TRUE COPY
Clerk of Court's Office
Thibodaux, La. APR 15, 1998
[signature]
Dep. Clerk of Court

# STATE OF LOUISIANA
## SEVENTEENTH JUDICIAL DISTRICT COURT
### In and for the Parish of Lafourche

**Wollen J. Falgout (or) Herbert O'Niell**, Assistant District Attorney of the Seventeenth Judicial District of the State of Louisiana, who, in the name and by the authority of the said State, prosecutes in its behalf, in proper person comes into the Seventeenth Judicial District Court of the State of Louisiana, in the Parish of Lafourche, and gives to the said Court here to understand and be informed that one        Albert Woodfox

late of the Parish of Lafourche, on or about the  26th     day of      April           in the year of our Lord, One Thousand Nine Hundred and   Sixty-five (1965),
with force and arms in the Parish of Lafourche, aforesaid, and within the jurisdiction of the Seventeenth Judicial District Court in and for the Parish of Lafourche,   did unlawfully and intentionally misappropriate or take somethong of value, to-wit:
a 1962 model Ford Truck, having a value of more than $100.00,
from the Pelican Construction Company, without the consent of the
said owner, and with the intent to permanently deprive them of
the property taken, thereby committing the offense of theft,
all in violation of R. S. 14:67.

contrary to the form of the statute of the State of Louisiana, in such cases made and provided and against the peace and dignity of the same.

Assistant District Attorney for the 17th Judicial District
of the State of Louisiana

STATE OF LOUISIANA                    STATE OF LOUISIANA

VS. NO. 15700                         Parish of Lafourche

ALBERT WOODFOX                        17TH JUDICIAL DISTRICT COURT

CHARGE - AUTO THEFT

SENTENCE

The accused in this case was brought to the bar of the Court, and upon being duly arraigned pleaded guilty; and by reason of said plea and the law and the evidence;

IT IS ORDERED, ADJUDGED AND DECREED that Albert Woodfox be and he is hereby sentenced to serve 2 years at hard labor.

THUS RENDERED, READ AND SIGNED in open court at _Thibodaux_ _May 24th_, 1965.

JUDGE

FILED

MAY 24 1965

CLERK OF COURT



# AFFIDAVIT

STATE OF LOUISIANA

PARISH OF LAFOURCHE

BEFORE ME, THE UNDERSIGNED AUTHORITY, PERSONALLY CAME AND APPEARED:

Norman R. Diaz, Deputy Sheriff

who having been by me duly sworn, deposes and says:

That one   Albert Woodfox

on or about the  26th day of  April , 19 55 , in the Parish and State aforesaid did unlawfully  commit  a  theft

of  a 1962 model Ford Truck  bein the property of the Pelican Construction

company without the, consent of the said owners  all in violation of R. S.

of R. S. 14:67

_____

_____

_____

contrary to this form of the statutes of the State of Louisiana in such cases made and provided, in contempt of the authority of said State, and against the peace and dignity of the same.

WHEREFORE, affiant prays that one   Albert Woodfox

be arrested and dealt with according to law.

WITNESSES:

Harry Maquesnack
Alaysius Perret, NOPD
Roland Kennedy  NOPD

_____
Norman R. Diaz
AFFIANT

SWORN TO AND SUBSCRIBED before me this  28  day of  April , 19 65

_____
Justice of the Peace J. P. Ward   2
Or,
JUDGE, District Court Div._____ Lafourche Parish, La.

NOTE: Write names of witnesses on back of affidavit, detach
same from warrant and mail to District Attorney's Office.

ANGOLA, LA. May 25th 1965 _____ 196 __ FROM THE SHERIFF OF THE PARISH OF

Parish of Lafourche _____ STATE OF LOUISIANA, THE FOLLOWING PRISONERS.

| NAME & NUMBER | CRIME | TERM | CAMP |
|---|---|---|---|
| Albert Woodfox C/M | 61826 | New commitment | |
| Jack Daoner W/M | 61827 | New commitment | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

FILED

JUN 14 1965

FILED

JUN 14 1965

CLERK OF COURT

WARDEN

BY: _____

RO-101                                    RECORD CLERK

STATE OF LOUISIANA

PARISH OF LAFOURCHE

    I HEREBY CERTIFY THAT the following one (1) page is a true and correct copy of the minutes of the 17th Judicial District Court in and for the Parish of Lafourche, Louisiana, dated MAY 18, 1965, INSOFAR, as they relate to the matter entitled:

STATE OF LOUISIANA VS. ALBERT WOODFOX, NUMBER 15699, 15700 of the Criminal Docket of said Court.

    IN TESTIMONY WHEREOF, witness my hand and official seal, this 15TH day of SEPTEMBER, A.D., 1998, at Thibodaux, Louisiana.

JUDGE REMY CHIASSON Presiding this day.

VERNON H. RODRIGUE
CLERK OF COURT

DEPUTY CLERK OF COURT

STATE OF LOUISIANA )
VS.   NO. 15700 )
ALBERT WOODFOX )

CHARGE:  THEFT

THE ACCUSED WAS THIS DAY BROUGHT TO THE BAR OF THE COURT
FOR SENTENCING AND AFTER HAVING HAD HIS SAY WAS SENTENCED TO
IMPRISONMENT IN THE STATE PENITENTIARY AT HARD LABOR FOR A
PERIOD OF TWO (2) YEARS.

*****************************************************************

STATE OF LOUISIANA )
VS.   NO. 15699 )
ALBERT WOODFOX )

CHARGE:  SIMPLE ESCAPE

THE ACCUSED WAS THIS DAY BROUGHT TO THE BAR OF THE COURT
FOR SENTENCING AND AFTER HAVING HAD HIS SAY WAS SENTENCED TO
IMPRISONMENT IN THE PARISH JAIL FOR A TERM OF SIX MONTHS, HOWEVER
THIS SENTENCE IS SUSPENDED DURING GOOD BEHAVIOR. . . . . . . . . .

NO. _LSCf 7_

17TH JUDICIAL DISTRICT COURT

PARISH OF LAFOURCHE

STATE OF LOUISIANA

VS.

ALBERT WOODFOX

INFORMATION FOR

NO DRIVER'S LICENSE

FILED _March 18_ 196___

_____
CLERK

## LOCKDOWN REVIEW SUMMARY

No.: 72148    Name: ALBERT WOODFOX    BM    Location: UPPER "D"    Date: 10-3-79.

Date of Original Placement in Extended Lockdown: 4/18/73

### REASONS FOR ORIGINAL LOCKDOWN

STATE'S EXHIBIT 33  Blumberg No. 5138

✓ Disciplinary Board Action        ____ Own Request
____ Rule Violation Report
____ Incident Report               ____ Initial Classification
✓ Investigation

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### ACTION OF LOCKDOWN REVIEW BOARD

____ RELEASED to_____. Why:_____
_____

✓ NOT RELEASED. Reasons:

✓ Nature of Commitment Offense     ____ Escape Risk

____ Inmate's Request              ____ New Rule Infractions Since Last Review

____ Pending Felony Charges

✓ Nature of Original Reason for Lockdown

____ Inmate's Protection (explain):_____
_____

✓ Physically Dangerous to Himself or Others as Evidenced by:
____ Psychiatric Evaluations    ____ Self-Mutilation
✓ Serious Rule Infractions      ____ Other_____
✓ Pattern of Violence           _____

____ Continuing Investigation. By Whom:_____
For:_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Reviewed by:_____        _____
Name_____        Title_____
_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMMENTS:

inmate declined to meet the Board

RECEIVED
LA STATE PENITENTIARY
RECORDS OFFICE

AW 0271

STATE'S EXHIBIT

34

## LOCKDOWN REVIEW SUMMARY

No.: __72148__    Name: __ALBERT WOODFOX__    Location: __C.C.R.__    Date: __4-5-77__

Date of Original Placement in Extended Lockdown: __4-4-73__

## REASONS FOR ORIGINAL LOCKDOWN

_____ Disciplinary Board Action                    _____ Own Request
_____ Rule Violation Report
_____ Incident Report                              _____ Initial Classification
__✓__ Investigation *convicted of murder*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## ACTION OF LOCKDOWN REVIEW BOARD

_____ RELEASED to _____. Why: _____

_____ NOT RELEASED. Reasons:

_____ Nature of Commitment Offense    _____ Escape Risk

_____ Inmate's Request                _____ New Rule Infractions Since Last Review

_____ Pending Felony Charges

__✓__ Nature of Original Reason for Lockdown

_____ Inmate's Protection (explain): _____

RECEIVED
APR 6 1977
LA. STATE PENITENTIARY
RECORDS OFFICE

__✓__ Physically Dangerous to Himself or Others as Evidenced by:
_____ Psychiatric Evaluations    _____ Self-Mutilation
__✓__ Serious Rule Infractions    __✓__ Other *conviction of murder of*
_____ Pattern of Violence        *a correctional officer*

_____ Continuing Investigation. By Whom: _____
For: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Reviewed by: *H. Burgdorn*                    Title *C.O.II*
            Name *Walter H. Pann*                  *Co II*
            *J. Polk*                               *Class. Off II*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMMENTS: *Inmate refused to meet board*

STATE'S EXHIBIT
35

LOCKDOWN REVIEW SUMMARY

No.: _72148_    Name: _Woodfox, A._    Location _Ccr "D" tier_    Date: _5-4-76_

Date of Original Placement in Extended Lockdown: _4-18-73_

REASONS FOR ORIGINAL LOCKDOWN

_____ Disciplinary Board Action          _____ Own Request
_____ Rule Violation Report                                        _(Convicted)_
_____ Incident Report                     _____ Initial Classification
__X__ Investigation  _Murder of Security officer_

ACTION OF LOCKDOWN REVIEW BOARD

_____ RELEASED to _____. Why: _____
_____

__X__ NOT RELEASED.  Reasons:

   __X__  Nature of Commitment Offense    _____  Escape Risk

   _____  Inmate's Request               _____  New Rule Infractions Since Last Review

   _____  Pending Felony Charges

   __X__  Nature of Original Reason for Lockdown

   _____  Inmate's Protection (explain): _____
   _____

   __X__  Physically Dangerous to Himself or Others as Evidenced by:
          _____  Psychiatric Evaluations    _____  Self-Mutilation
          __X__  Serious Rule Infractions    _____  Other _____
          __X__  Pattern of Violence         _____

   _____  Continuing Investigation.  By Whom: _____
           For: _____

Reviewed by: _____          _May_
             Name _____             Title _Capt_
                  _M. Borne_

COMMENTS:

RECEIVED
MAY 6 1976
LA STATE PENITENTIARY
RECORDS OF...

AW 0299

LOCKDOWN REVIEW SUMMARY

No.: 72148    Name: ALBERT WOODFOX    Location: "D" - 7    Date: 7/21/77

Date of Original Placement in Extended Lockdown: 4/18/73

REASONS FOR ORIGINAL LOCKDOWN

✓ Disciplinary Board Action                    ____ Own Request
____ Rule Violation Report
____ Incident Report                            ____ Initial Classification
✓ Investigation

STATE'S EXHIBIT
36
Blumberg No. 5138

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ACTION OF LOCKDOWN REVIEW BOARD

____ RELEASED to _____ . Why: _____

✓ NOT RELEASED. Reasons:

____ Nature of Commitment Offense    ____ Escape Risk

____ Inmate's Request                ____ New Rule Infractions Since Last Review

____ Pending Felony Charges

____ Nature of Original Reason for Lockdown

____ Inmate's Protection (explain): _____

____ _____

✓ Physically Dangerous to Himself or Others as Evidenced by:
____ Psychiatric Evaluations    ____ Self-Mutilation
✓ Serious Rule Infractions      ____ Other *Convicted of murder*
✓ Pattern of Violence                *of correctional officer*

____ Continuing Investigation. By Whom: _____
For: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Reviewed by: *A.K. Byargea*
Name                                Title *Classification*
*_____*                      *Major*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMMENTS: *refused to meet the Brd*

RECEIVED
JUL 22 1977

LA. STATE PENITENTIARY
RECORDS OFFICE

AW 0282

STATE'S EXHIBIT

Blumberg No. 5138

37

## LOCKDOWN REVIEW SUMMARY

No.: __72148__     Name: __ALBERT WOODFOX__     Location: __CCR "D"__     Date: __OCT. 4, 1977__

Date of Original Placement in Extended Lockdown: __4/18/73__

### REASONS FOR ORIGINAL LOCKDOWN

_____ Disciplinary Board Action                    _____ Own Request
_____ Rule Violation Report
_____ Incident Report                              _____ Initial Classification
__✓__ Investigation *Convicted of murder*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### ACTION OF LOCKDOWN REVIEW BOARD

_____ RELEASED to _____ . Why: _____

RECEIVED
OCT 7 1977

__✓__ NOT RELEASED.  Reasons:                    LA. STATE PENITENTIARY
                                                  RECORDS OFFICE

_____ Nature of Commitment Offense    _____ Escape Risk

_____ Inmate's Request                _____ New Rule Infractions Since Last Review

_____ Pending Felony Charges

__✓__ Nature of Original Reason for Lockdown

_____ Inmate's Protection (explain): _____

__✓__ Physically Dangerous to Himself or Others as Evidenced by:
      _____ Psychiatric Evaluations    _____ Self-Mutilation
      __✓__ Serious Rule Infractions    __✓__ Other *conviction of*
      _____ Pattern of Violence        *the murder of*
                                        *correctional officer*

_____ Continuing Investigation.  By Whom: _____
       For: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Reviewed by: *[signature]*                    *[signature]*
             Name *[signature]*     Title *Major*
                                          *Class.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMMENTS: *refused to meet board*

AW 0252

STATE'S
EXHIBIT
30

## LOCKDOWN REVIEW SUMMARY

No.: 72148    Name: ALBERT WOODFOX    Location: CCR "D" TIER Date: JANUARY 18, 1978

Date of Original Placement in Extended Lockdown: 4-18-73

### REASONS FOR ORIGINAL LOCKDOWN

✓ Disciplinary Board Action                    ____ Own Request
____ Rule Violation Report
____ Incident Report                           ____ Initial Classification
✓ Investigation of Murder of corr. off.

### ACTION OF LOCKDOWN REVIEW BOARD

____ RELEASED to_____. Why:_____
_____

✓ NOT RELEASED. Reasons:

____    Nature of Commitment Offense    ____ Escape Risk

____    Inmate's Request                ✓ New Rule Infractions Since Last Review

____    Pending Felony Charges

✓    Nature of Original Reason for Lockdown

____    Inmate's Protection (explain):_____
_____

✓    Physically Dangerous to Himself or Others as Evidenced by:
        ____ Psychiatric Evaluations    ____ Self-Mutilation
        ✓ Serious Rule Infractions      ✓ Other convicted of Murder of
        ____ Pattern of Violence        correctional officer.

____    Continuing Investigation. By Whom:_____
        For:_____

Reviewed by: _____    _____
             Name                          Title
             W. R. Dougatty                Major
             R. Dwayne McFatte             R C Class Supe.

COMMENTS: 1-18-78 refused to meet board

RECEIVED
JAN 18 1978
LA STATE PENITENTIARY
RECORDS OFFICE

AW 0247

STATE'S EXHIBIT
Blumberg No. 5138
39

LOCKDOWN REVIEW SUMMARY

No.: 72148    Name: ALBERT WOODFOX    BM    Location: C.C.R.    Date: October 27, 197

Date of Original Placement in Extended Lockdown: 4-18-73

## REASONS FOR ORIGINAL LOCKDOWN

☑ Disciplinary Board Action ____ Own Request
____ Rule Violation Report
____ Incident Report ____ Initial Classification
☑ Investigation

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## ACTION OF LOCKDOWN REVIEW BOARD

____ RELEASED to _____. Why: _____
_____

☑ NOT RELEASED. Reasons:

____ Nature of Commitment Offense    ____ Escape Risk

____ Inmate's Request    ____ New Rule Infractions Since Last Review

____ Pending Felony Charges

RECEIVED
OCT 27 1978

☑ Nature of Original Reason for Lockdown

____ Inmate's Protection (explain): _____    LA. STATE PENITENTIARY
_____ RECORDS OFFICE

☑ Physically Dangerous to Himself or Others as Evidenced by:
____ Psychiatric Evaluations    ____ Self-Mutilation
☑ Serious Rule Infractions    ☑ Other _Conviction of murdering_
☑ Pattern of Violence    _a correctional officer_

____ Continuing Investigation. By Whom: _____
For: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Reviewed by: _Th. B. Guyer_    _Lt. Col_
Name    Title
_R. Giguistone_    _Class. Off._
_Th. Bonyant_    _Major_

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMMENTS: _Declined to meet board._

AW 0240

<u>LOCKDOWN REVIEW SUMMARY</u>

No.: __72148__    Name: __ALBERT WOODFOX__ __BM__ Location: __CCR LD__    Date: __JAN. 29 7.__

Date of Original Placement in Extended Lockdown: __4-18-73__

<u>REASONS FOR ORIGINAL LOCKDOWN</u>

✓ Disciplinary Board Action          ____ Own Request
____ Rule Violation Report
____ Incident Report                 ____ Initial Classification
✓ Investigation

Blumberg No. 5138
STATE'S EXHIBIT
40

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

<u>ACTION OF LOCKDOWN REVIEW BOARD</u>

____ RELEASED to _____. Why: _____

✓ NOT RELEASED. Reasons:

   ✓ Nature of Commitment Offense    ____ Escape Risk

   ____ Inmate's Request              ✓ New Rule Infractions Since Last Review

   ____ Pending Felony Charges

   ✓ Nature of Original Reason for Lockdown

   ____ Inmate's Protection (explain): _____

RECEIVED
JAN 29 1979
LA. STATE PENITENTIARY
RECORDS OFFICE

   ✓ Physically Dangerous to Himself or Others as Evidenced by:
     ____ Psychiatric Evaluations    ____ Self-Mutilation
     ✓ Serious Rule Infractions     ____ Other _____
     ✓ Pattern of Violence          _____

   ____ Continuing Investigation. By Whom: _____
   For: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Reviewed by: _____    _____
Name  _____    Title _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMMENTS:

declined to meet the board.

AW 0234

STATE'S EXHIBIT

41

Blumberg No. 5138

## LOCKDOWN REVIEW SUMMARY

No.: __72148__    Name: __ALBERT WOODFOX__    BM    Location: __CCR LD__    Date: APRIL _26,_ 1979

Date of Original Placement in Extended Lockdown: __4-18-73__

### REASONS FOR ORIGINAL LOCKDOWN

__✓__ Disciplinary Board Action        ____ Own Request
____ Rule Violation Report
____ Incident Report              ____ Initial Classification
__✓__ Investigation

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### ACTION OF LOCKDOWN REVIEW BOARD

____ RELEASED to _____. Why: _____

_____

__✓__ NOT RELEASED. Reasons:

__✓__ Nature of Commitment Offense    ____ Escape Risk

____ Inmate's Request           __✓__ New Rule Infractions Since Last Review

____ Pending Felony Charges

__✓__ Nature of Original Reason for Lockdown

____ Inmate's Protection (explain): _____

__✓__ Physically Dangerous to Himself or Others as Evidenced by:
____ Psychiatric Evaluations    ____ Self-Mutilation
__✓__ Serious Rule Infractions   ____ Other __LA. STATE PENITENTIARY__
__✓__ Pattern of Violence

____ Continuing Investigation. By Whom: _____
For: _____

RECEIVED
APR 26 1979
LA. STATE PENITENTIARY
RECORDS OFFICE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Reviewed by: _____          _____
Name _____          Title _____
_____          _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
COMMENTS:

*Inmate declined to meet the board.*

AW 0233

## LOCKDOWN REVIEW SUMMARY

No.: __72148__   **Name:** __ALBERT WOODFOX  B/M__   **Location:** __C.C.R. L.D.__  **Date:** 7-18-79

Date of Original Placement in Extended Lockdown: __4-18-73__

### REASONS FOR ORIGINAL LOCKDOWN

__✓__ Disciplinary Board Action          ___ Own Request
___ Rule Violation Report
___ Incident Report                          ___ Initial Classification
__✓__ Investigation

STATE'S EXHIBIT
Blumberg No. 5138
42

### ACTION OF LOCKDOWN REVIEW BOARD

___ RELEASED to _____. Why: _____

__✓__ NOT RELEASED.  Reasons:

__✓__ Nature of Commitment Offense       ___ Escape Risk

___ Inmate's Request                        ___ New Rule Infractions Since Last Review

___ Pending Felony Charges

__✓__ Nature of Original Reason for Lockdown

___ Inmate's Protection (explain): _____

__✓__ Physically Dangerous to Himself or Others as Evidenced by:
  __✓__ Psychiatric Evaluations       ___ Self-Mutilation
  __✓__ Serious Rule Infractions      ___ Other _____
  ___ Pattern of Violence

___ Continuing Investigation.  By Whom: _____
For: _____

Reviewed By: _____
Name _____          Title _____

COMMENTS:

inmate declined to meet the Board.

AW 0232

STATE'S
EXHIBIT
43

Blumberg No. 538

<u>LOCKDOWN REVIEW SUMMARY</u>

No.: __72148__   **Name:** __ALBERT WOODFOX__   **Location:** UPPER "D"   **Date:** JAN 9 , 1980

Date of Original Placement in Extended Lockdown: __4|18|73__

## REASONS FOR ORIGINAL LOCKDOWN

✓ Disciplinary Board Action                    ____ Own Request
____ Rule Violation Report
____ Incident Report                           ____ Initial Classification
✓ Investigation

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## ACTION OF LOCKDOWN REVIEW BOARD

____ RELEASED to _____. Why: _____
_____

✓ <u>NOT RELEASED</u>. Reasons:

  ✓ Nature of Commitment Offense      ____ Escape Risk

  ____ Inmate's Request               ____ New Rule Infractions Since Last Review

  ____ Pending Felony Charges

  ✓ Nature of Original Reason for Lockdown

  ____ Inmate's Protection (explain): _____
  _____

  ✓ Physically Dangerous to Himself or Others as Evidenced by:
        ____ Psychiatric Evaluations    ____ Self-Mutilation
        ✓ Serious Rule Infractions      ____ Other _____
        ✓ Pattern of Violence           _____

  ____ Continuing Investigation. By Whom: _____
        For: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Reviewed By: _____      _____
            Name                        Title

_____               _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMMENTS:

RECEIVED
JAN 0 1980
LA. STATE PENITENTIARY
RECORDS OFFICE

AW 0230

C3-118                          LOCKDOWN REVIEW SUMMARY
                                                    UPPER "D" TIER.
No.: 72148      Name: ALBERT WOODFOX    B/M   Location: CCR LD    Date: APRIL 28 1980

Date of Original Placement in Extended Lockdown: ____4-18-73____

                        REASONS FOR ORIGINAL LOCKDOWN

                                                              ┌─────────────┐
__✓_ Disciplinary Board Action        ____ Own Request        │   STATE'S   │
____ Rule Violation Report                                    │   EXHIBIT   │
____ Incident Report                  ____ Initial Classification │    44    │
__✓_ Investigation                                            └─────────────┘

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                        ACTION OF LOCKDOWN REVIEW BOARD

____  RELEASED to_____.  Why:_____
      _____

_✓__  NOT RELEASED.  Reasons:

        _✓__ Nature of Commitment Offense    ____ Escape Risk

        ____ Inmate's Request                ____ New Rule Infractions Since Last Review

        ____ Pending Felony Charges

        _✓__ Nature of Original Reason for Lockdown

        ____ Inmate's Protection (explain):_____
             _____

        _✓__ Physically Dangerous to Himself or Others as Evidenced by:
             ____ Psychiatric Evaluations    ____ Self-Mutilation
             _✓__ Serious Rule Infractions   ____ Other_____
             Pattern of Violence             _____

        ____ Continuing Investigation.  By Whom:_____
             For:_____
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Reviewed by:_____  _____
        Name_____  Title_____
        _____  _____
        _____  _____
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
COMMENTS:

Inmate declined to meet with [RECEIVED]

                                        APR 28 1980

                                    LA. STATE PENITENTIARY
                                        RECORDS OFFICE

                                                                      AW 0229

## LOCKDOWN REVIEW SUMMARY

Blumberg No. 5138

STATE'S
EXHIBIT
45

No.: 72148    Name: ALBERT WOODFOX B/M    Location: UPPER "D"    Date: 7/30/80

Date of Original Placement in Extended Lockdown: 4-18-73

### REASONS FOR ORIGINAL LOCKDOWN

✓ Disciplinary Board Action          _____ Own Request
_____ Rule Violation Report
_____ Incident Report                 _____ Initial Classification
✓ Investigation

RECEIVED
JUL 30 1980

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### ACTION OF LOCKDOWN REVIEW BOARD

_____ RELEASED to_____. Why:_____ LA. STATE PENITENTIARY
                                                    RECORDS OFFICE

✓ NOT RELEASED. Reasons:

  ✓ Nature of Commitment Offense      _____ Escape Risk

  _____ Inmate's Request              _____ New Rule Infractions Since Last Review

  _____ Pending Felony Charges

  ✓ Nature of Original Reason for Lockdown

  _____ Inmate's Protection (explain):_____

  ✓ Physically Dangerous to Himself or Others as Evidenced by:
       _____ Psychiatric Evaluations     _____ Self-Mutilation
       ✓ Serious Rule Infractions        ✓ Other convicted of murder of
       ✓ Pattern of Violence             a correctional officer

  _____ Continuing Investigation. By Whom:_____
       For:_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Reviewed by:_____        _____
            Name                          Title  Major

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMMENTS:

Inmate declined to meet the Board -

AW 0228

STATE'S EXHIBIT

46

Blumberg No. 5

C3-118

## LOCKDOWN REVIEW SUMMARY

No.: __72148__    Name: __WOODFOX, Albert__    Location: __Upper D__    Date: __7-26-83__

Date of Original Placement in Extended Lockdown: __4 - 18 - 72__

### REASONS FOR ORIGINAL LOCKDOWN

✓ Disciplinary Board Action               ____ Own Request
____ Rule Violation Report
✓ Incident Report                          ____ Initial Classification
____ Investigation

### ACTION OF LOCKDOWN REVIEW BOARD

____ RELEASED to _____ . Why: _____
_____

____ NOT RELEASED.  Reasons:

____    Nature of Commitment Offense      ____    Escape Risk

____    Inmate's Request                  ____    New Rule Infractions Since Last Review

✓    Pending Felony Charges

✓    Nature of Original Reason for Lockdown

____    Inmate's Protection (explain): _____
_____

✓    Physically Dangerous to Himself or Others as Evidenced by:
         Psychiatric Evaluations   ____   Self-Mutilation
✓        Serious Rule Infractions  ____   Other _____
         Pattern of Violence              _____

____    Continuing Investigation.  By Whom: _____
         For: _____

Reviewed by: _____
         Name _____              Title _____

JUL 29 1983
La. State Penitentiary
Records Office
Angola, LA.

COMMENTS:

AW 0205

STATE'S
EXHIBIT
C17

C3-118

## LOCKDOWN REVIEW SUMMARY

No.: __72148__   Name: __ALBERT WOODFOX*__   Location: __UPPER D__   Date: __OCTOBER 25, 198__

Date of Original Placement in Extended Lockdown: __4-18-72__

### REASONS FOR ORIGINAL LOCKDOWN

__✓__ Disciplinary Board Action          ____ Own Request
    __✓__ Rule Violation Report
    ____ Incident Report              ____ Initial Classification
    ____ Investigation

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### ACTION OF LOCKDOWN REVIEW BOARD

____ RELEASED to _____.  Why: _____

__✓__ NOT RELEASED.  Reasons:

        ____  Nature of Commitment Offense     ____  Escape Risk

        ____  Inmate's Request               ____  New Rule Infractions Since Last Review

        ____  Pending Felony Charges

        __✓__  Nature of Original Reason for Lockdown

        ____  Inmate's Protection (explain): _____
                _____

        __✓__  Physically Dangerous to Himself or Others as Evidenced by:
                ____  Psychiatric Evaluations    ____  Self-Mutilation
                ____  Serious Rule Infractions   ____  Other_____
                __✓__  Pattern of Violence

        ____  Continuing Investigation.  By Whom:_____
                For:_____

Reviewed by: _____
          Name                              Title   PCOII

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

COMMENTS:

AW 0206

# Exhibit B

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ROBERT KING WILKERSON, ET AL

VS.                                          CIVIL ACTION NO. 00-304-C-M3

RICHARD STALDER, ET AL
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



## **DEPOSITION OF ALBERT WOODFOX**

TAKEN ON THURSDAY, JANUARY 31, 2008
AT THE
LOUISIANA STATE PENITENTIARY
ANGOLA, LOUISIANA

REPORTED BY:  JANICE WELCH, CCR

## CONDENSED COPY

## Court Reporters of Louisiana, LLC

Office: (225)-201-9650   Baton Rouge, Louisiana   Fax: (225)-201-9651
Conference Room Available   www.courtreportersla.com   Video Depositions
E-Transcripts   ASCII Disks/CD Roms   Digital Audio CD Roms   Realtime Transcripts   Deponent Photo ID

ALBERT WOODFOX

(Pages 2 to 5)

## Page 2

INDEX

|   |   | PAGE |
|---|---|---|
| 1 | INDEX | |
| 2 | | PAGE |
| 3 | CAPTION | 1 |
| 4 | APPEARANCES | 3 |
| 5 | AGREEMENT OF COUNSEL | 4 |
| 6 | **EXAMINATION:** | |
| 7 | BY MR. HICKS | 5 |
| 8 | CERTIFICATE | 150 |
| 9 | * * * * * | |

10 **EXHIBITS:**

| 11 | Exhibit #1 | Notice of Deposition | 6 |
|---|---|---|---|
| 12 | Exhibit #2 | Master Record | 12 |
| 13 | Exhibit #3 | Statement of Facts | 14 |
| 14 | Exhibit #4 | Kari Lydersen Interview | 41 |
| 15 | Exhibit #5 | Letter to Sister Dianne | 44 |
| 16 | Exhibit #6 | The Planted | 63 |
| 17 | Exhibit #7 | In Globo  Accurate Disciplinary Reports | 91 |
| 18 | Exhibit #8 | In Globo  Inaccurate Disciplinary Reports | 91 |
| 19 | Exhibit #9 | Disciplinary Report Not remembered by witness | 91 |

## Page 3

1 **APPEARANCES:**
2   **REPRESENTING THE PLAINTIFFS:**
3     Mr. Samuel Spital
    Mr. George Kendall
4     Ms. Camilla Hsu
    Ms. Harmony Loube
5     HOLLAND & KNIGHT, LLP
    195 Broadway, 24th Floor
6     New York, NY   10007-3189
7   **REPRESENTING THE DEFENDANTS:**
8     Mr. Brent Hicks
    Mr. Richard Curry
9     Ms. Erin Diez
    MCGLINCHEY STAFFORD, PLLC
10     14th Floor, One American Place
    Baton Rouge, Louisiana  70825
11
  ALSO PRESENT:
12     Nick Trenticosta
    Herman Wallace

## Page 4

1      S T I P U L A T I O N
2     IT IS STIPULATED AND AGREED by
3 and between all parties that the deposition of
4 ALBERT WOODFOX is hereby being taken under the
5 Federal Rules of Civil procedure, for purposes
6 of discovery and impeachment.
7
8     The witness reserves the right to
9 read and sign the deposition.  The original is
10 to be retained by BRENT HICKS for proper filing
11 with the Clerk of Court.
12
13     All objections, except those as
14 to the form of the question and responsiveness
15 of the answer, are hereby reserved until the
16 time of the trial of the cause.
17
    * * * * *
18
19     Janice Welch, Certified Court
20 Reporter, in and for the State of Louisiana,
21 officiated in administering the oath to the
22 witness.

OFFICIAL SEAL
JANICE WELCH
Certified Court Reporter
In and for the State of Louisiana
Certificate Number 87472
Certificate expires 12-31-08

## Page 5

1     ALBERT WOODFOX,
2 LOUISIANA STATE PENITENTIARY, ANGOLA,
3 LOUISIANA, having been previously sworn, was
4 examined and testified as follows:
5     * * * *
6     EXAMINATION
7 **BY MR. HICKS:**
8   **Q   Good morning, Mr. Woodfox.**
9   A   Good morning.
10   **Q   My name is Brent Hicks, I represent**
11 **the State of Louisiana in a lawsuit that you**
12 **filed against the state and Angola, along with**
13 **Mr. Wallace and Mr. Wilkerson.  I would like to**
14 **ask you a few questions about that, okay?**
15   A   Yes.
16   **Q   If there's anything I ask you that**
17 **isn't clear, please let me know and I'll be**
18 **happy to rephrase it, okay?**
19   A   Okay.
20   **Q   And please speak verbally so the court**
21 **reporter can take down everything that you say,**
22 **she can't take down gestures, okay?**
23   A   Yes, sir.
24   **Q   And try to let me finish all of my**
25 **questions before you answer, that way the court**

PH: 225-201-9650
E-transcripts * Video Depositions

Court Reporters of Louisiana, LLC
www.courtreportersla.com

FX: 225-201-9651
Realtime Transcripts * Deponent Photo ID

ALBERT WOODFOX

1/31/2008

(Pages 6 to 9)

Page 6

1  reporter will be able to get everything down,
2  okay?
3      A   Yes.
4      Q   What did you do to prepare for today?
5      A   Talk to my attorney.
6      Q   Did you review any documents?
7      A   No.
8      MR. HICKS:
9          And Counsel, this deposition is
10 for impeachment and discovery purposes only; is
11 that correct?
12     MR. KENDALL:
13         That's correct.
14     MR. HICKS:
15         I will mark as Exhibit 1, the
16 Notice.
17     (Whereupon the document referred to by
18     Counsel was marked for identification
19     as Exhibit #1.)
20 BY MR. HICKS:
21     Q   Mr. Woodfox, you're here in response
22 to this Deposition Notice; is that correct?
23     A   (Witness examines document.)
24     Yes.
25     Q   You said you met with your attorneys

Page 7

1  to get ready for today, when did you meet with
2  your attorneys?
3      A   The last two days.
4      Q   Yesterday?
5      A   Yes.
6      Q   The day before that?
7      A   Yes.
8      Q   And who did you meet with yesterday?
9      A   Mr. Kendall and Ms. Camille.
10     Q   And the day before that who did you
11 meet with?
12     A   I met with Mr. Kendall and Ms. Camille
13 the day before yesterday and I met with Mr.
14 Kendall yesterday.
15     Q   Just Mr. Kendall yesterday?
16     A   Yes.
17     Q   What's your full name?
18     A   Albert Woodfox.
19     Q   What is your current address?
20     A   Louisiana State Penitentiary at
21 Angola.
22     Q   How are you feeling today?  Is there
23 any reason you can't give your best testimony?
24     A   No.
25     Q   Are you on any medication that would

Page 8

1  affect your ability to testify today?
2      A   No.
3      Q   Have you ever given a deposition
4  before?
5      A   No.
6      Q   Do you have any siblings?
7      A   Four brothers, one sister.  My sister
8  is deceased though.
9      Q   What are the names of your siblings?
10     A   My sister's name is Violetta, I have a
11 brother James, a brother Michael, a brother
12 Donald, a brother Hayward.
13     Q   And are all the last names Woodfox?
14     A   No, Mable, M-a-b-l-e.
15     Q   Could you go back and tell me the
16 first name and last name of your siblings,
17 please.
18     A   My oldest brother next to me is James
19 Mable, next to him is my brother Donald Mable,
20 next to him is my brother Michael Mable and
21 next to him, my youngest brother is Hayward
22 Mable, and my sister name is Violetta Augustine
23 but she passed away several years ago.
24     Q   Are your parents still alive?
25     A   No, both deceased.

Page 9

1      Q   You don't have any children, do you?
2      A   One daughter.
3      Q   What's your daughter's name?
4      A   Brenda.
5      Q   How old is Brenda?
6      A   She's about 43, 44 now.
7      Q   Who is Brenda's mother?
8      A   Barbara.
9      Q   What is her last name?
10     A   Lemon.
11     Q   Do you still have a relationship with
12 Ms. Lemon?
13     A   With my daughter, we communicate
14 through mail occasionally; not with my ex-wife.
15     Q   How far did you get in school?
16     A   I didn't complete the tenth grade.
17     Q   Where did you go to school?
18     A   In elementary school, Joseph A. Craig;
19 in junior high, McDonald 41 and Joseph Bell;
20 and high school, Booker T. Washington.
21     Q   These are in New Orleans?
22     A   Yes.
23     Q   Is it fair to say that New Orleans is
24 where you grew up?
25     A   Well, my parents, my stepfather was in

ALBERT WOODFOX    1/31/2008

(Pages 10 to 13)

Page 10

1  the Navy so we did a lot of traveling in my
2  earlier years.
3      Q    What time period were you in New
4  Orleans?
5      A    Maybe the longest period was from the
6  late '50s all the way up to '69 when I was
7  arrested.
8      Q    What year were you born?
9      A    February 19, 1947.
10      Q    You said you lived in New Orleans,
11  what year in the '50s did you move to New
12  Orleans?
13      A    Well, we moved back -- my mom and my
14  dad separated and we moved from LaGrange, North
15  Carolina back to New Orleans, the late '50s, I
16  can't give you the exact year.
17      Q    And you lived there until 1969 when
18  you were arrested you said?
19      A    Yes.
20      Q    Now, before you were arrested in 1969,
21  did you have any serious medical conditions?
22      A    No.
23      Q    Were you on any medication during that
24  time?
25      A    No.

Page 11

1      Q    What about mental illnesses, did you
2  have any mental illnesses before you were
3  arrested?
4      A    No.
5      Q    Any treatment for mental illness?
6      A    None.
7      Q    Did you undergo any counselling before
8  you were arrested?
9      A    Excuse me?
10      Q    Counselling?
11      A    No.
12      Q    Were you a heroin addict?
13      A    In my younger years at one time I used
14  heroin but I wasn't addicted to it.
15      Q    When did you use heroin?
16      A    Late teens.
17      Q    So about what time period?
18      A    Around early '60s.
19      Q    Had you quit using heroin at the time
20  you were arrested?
21      A    Yes.  I never was addicted to it.
22  During that time, at one time or another I
23  experienced shooting heroin.
24      Q    Did you use any other drugs at that
25  time?

Page 12

1      A    No.
2      Q    Did you go through any detoxification?
3      A    No.
4      Q    You were able to get off of heroin on
5  your own?
6      A    Well, I was never addicted to it,
7  there is no need for detoxification.
8      Q    Before you were arrested in '69, were
9  you employed?
10      A    Yes.
11      Q    Where were you employed?
12      A    At various jobs, I was a porter at a
13  hotel, Cabrina Hotel, and I drove a truck for a
14  meat packing company.
15      Q    I'm now going to show you a document I
16  marked Exhibit 2, it's bates number AW 0029 and
17  30 from your Master Prison Record.
18          (Whereupon the document referred to by
19          Counsel was marked for identification
20          as Exhibit #2.)
21  BY MR. HICKS:
22      Q    Go down to the Offense Information, do
23  you see that on the first page?
24      A    Excuse me, say it again.
25      Q    Do you see Offense Information on the

Page 13

1  bottom of the first page?
2      A    Yes.
3      Q    The item is second degree murder,
4  sentence date, February 23, 1999.  Do you know
5  what that charge is for?
6      A    Yes.
7      Q    What is that?
8      A    Death of Correctional Officer Brent
9  Miller.
10      Q    What was your involvement in that
11  crime?
12      A    None.
13      Q    You didn't commit the crime?
14      A    No, I did not.
15      Q    Do you know where the incident took
16  place?
17      A    Main Prison Complex Dormitory Pine.
18      Q    And where were you at the time of the
19  murder?
20      A    Eating breakfast, dining hall.
21      Q    At the main prison?
22      A    Yes.
23      Q    I marked as Exhibit 3, a document
24  bates numbered AW 0053, which is a document
25  from your prison record.  Take a look at the

ALBERT WOODFOX

(Pages 14 to 17)

Page 14

1  Statement of Facts for me, just read that to
2  yourself.
3      A    (Witness examines document.)
4      Yes.
5      (Whereupon the document referred to by
6      Counsel was marked for identification
7      as Exhibit #3.)
8  BY MR. HICKS:
9      Q    Do you recall being convicted of
10  aggravated escape?
11     A    Yes, I do.
12     Q    And does the Statement of Facts there
13  accurately portray what happened?
14     A    As far as the escape, yes.
15     Q    So you did escape from Orleans Parish
16  Criminal Sheriff at that time?
17     A    Yes.
18     Q    And you used a pistol to secure your
19  release?
20     A    Yes.
21     Q    How did you obtain the pistol?
22     A    One of the correctional officers sold
23  it to me.
24     Q    How much did he sell it to you for?
25     A    Thirty, forty something dollars, I'm

Page 15

1  not quite sure it's been so long ago.
2      Q    Who was the correctional officer?
3      A    I have no idea.
4      Q    Did this correctional officer assist
5  you in escaping?
6      A    No.
7      Q    Do you know if this correctional
8  officer was convicted of a crime as a result of
9  that?
10     A    No.
11     Q    And is it correct that you escaped
12  through the basement of the criminal courts
13  building?
14     A    Yes.
15     Q    And how did you end up in New York?
16     A    Greyhound bus.
17     Q    After you got out of prison you went
18  to the bus station and got on a bus?
19     A    Not immediately but eventually I did.
20     Q    How long between the time you escaped
21  to getting on the bus?
22     A    Maybe a day, day and a half.
23     Q    And you were caught in New York; is
24  that right?
25     A    Yes.

Page 16

1      Q    How did you get caught in New York?
2      A    Well, I was charged with armed
3  robbery.
4      Q    In New York?
5      A    Yes.  I was under the alias name of
6  Charles Harris.  I was innocent.  I went to
7  trial and found not guilty by a jury.
8      Q    So while in New York you were arrested
9  for a robbery?
10     A    Yes.
11     Q    Were you tried in New York?
12     A    Yes.
13     Q    But you were found not guilty?
14     A    By a jury.
15     Q    And then what ended up happening after
16  that, were you brought back to Louisiana?
17     A    Not immediately.  In the process of me
18  being arrested, an extradition warrant was
19  filed by the State of Louisiana, eventually I
20  had a hearing which returned to New Orleans
21  Parish Prison.
22     Q    To face this charge of escape; is that
23  correct?
24     A    Yes.
25     Q    And then you were ultimately convicted

Page 17

1  of that escape; is that correct?
2      A    Yes.
3      Q    And is that what sent you to Angola?
4      A    Well, I was already in Angola, I was
5  transferred back to the Parish Prison in New
6  Orleans to face trial for the aggravated
7  escape.
8      Q    You were already in Angola for a
9  previous armed robbery; is that correct?
10     A    Yes.
11     Q    And did you commit that armed robbery?
12     A    No, I did not.
13     Q    When did that allegedly take place?
14     A    Summer of '69.  June, July, somewhere
15  up in that area.
16     Q    So in 1969 you were arrested and
17  convicted of armed robbery; is that correct?
18     A    Yes.
19     Q    And you were being held in New Orleans
20  Parish Prison?
21     A    Yes.
22     Q    And while you were being held, is that
23  when you escaped from New Orleans Parish
24  Prison?
25     A    Yes, the day I was brought to court to

ALBERT WOODFOX
1/31/2008

(Pages 18 to 21)

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  be sentenced.
2    Q    And you went to New York, correct?
3    A    Yes.
4    Q    You were arrested for another armed
5  robbery.
6    A    Yes.
7    Q    Was found not guilty of that one.
8    A    Yes.
9    Q    Was brought back to Orleans and was
10  convicted of the escape that we just talked
11  about; is that correct?
12    A    Yes.
13    Q    And when did you end up going to
14  Angola?
15    A    I think it was June or July, since
16  1971.
17    Q    Was that your first time to go to
18  Angola?
19    A    Second time. The first time I was at
20  Angola for car theft.
21    Q    When were you in Angola for car theft?
22    A    Between '64 and '65.
23    Q    You were in Angola for about one year
24  for car theft?
25    A    Yes.

**Page 20**

1    Q    Were you convicted of that crime?
2    A    Yes. I pled guilty to a plea bargain.
3    Q    Did you commit the crime?
4    A    Well, we had a fight, I was the one
5  that got arrested.
6    Q    You pled guilty?
7    A    Yes.
8    Q    You stayed in Orleans Parish Prison
9  during that time?
10    A    Yes.
11    Q    How long were you in Orleans Parish
12  Prison?
13    A    About an eighteen month sentence, I
14  think I did half of that, nine months.
15    Q    When was that, what year?
16    A    Somewhere around '65, '66, I'm not
17  sure exactly.
18    Q    Do you attribute racial motivation of
19  Orleans police to that?
20    A    No.
21    Q    To the fact that you had to stay in
22  the Parish Prison?
23    A    No.
24    Q    Was there any racial motivation there?
25    A    No, sir.

**Page 19**

1    Q    Then you were released and then it was
2  in 1969 you got in trouble again?
3    A    Yes.
4    Q    Did you commit the car theft?
5    A    Yes.
6    Q    While you were in Angola in '64 to
7  '65, were you in general population?
8    A    Yes. Trustee side, Cypress 1
9  Dormitory.
10    Q    In July of 1971, when you went back to
11  Angola, were you in general population?
12    A    Yes, main prison complex, medium
13  security.
14    Q    And you were in general population
15  until April of 1972?
16    A    Yes.
17    Q    And that's when you went to CCR after
18  the murder of Brent Miller?
19    A    Yes, April 18, 1972.
20    Q    Before the car theft in '64, were you
21  arrested for aggravated battery?
22    A    Yes.
23    Q    What happened there?
24    A    I had a domestic dispute with a female
25  I had a relationship with.

**Page 21**

1    Q    To your conviction?
2    A    No.
3    Q    Have you been convicted or arrested
4  for any other crimes that we haven't talked
5  about?
6    A    No.
7    Q    The dispute with your girlfriend, did
8  you have a weapon?
9    A    No.
10    Q    Do you know why it was aggravated
11  battery as opposed to just plain battery?
12    A    That's what the district attorney
13  office charged me with.
14        (Mr. Trenticosta enters room.)
15  BY MR. HICKS:
16    Q    I want to go through these just to
17  make sure I've got it all straight in my head.
18  The first crime, you were convicted in 1965 of
19  aggravated battery and it is your contention
20  that you did commit that crime; is that right?
21    A    The first crime I was convicted of was
22  car theft, I think that was in '64.
23    Q    Car theft was before the aggravated
24  battery?
25    A    Yes.

ALBERT WOODFOX                                           1/31/2008

(Pages 22 to 25)

Page 22

1    Q    So the first crime was car theft and
2  you said you did commit that crime.
3    A    Yes.
4    Q    Then you were convicted of aggravated
5  battery, I guess that was in '65 after you were
6  released?
7    A    Yes, '65, '66, I think I was released
8  on parole in '65 or '66.
9    Q    And you did commit that crime?
10   A    Well, as I said earlier, she and I had
11 a fight but being a male, it's usually common
12 to charge me.  There was no injuries, no
13 weapons used, anything.
14   Q    In 1969 you were convicted of armed
15 robbery?
16   A    Yes.
17   Q    But you did not commit that crime?
18   A    No, I did not.
19   Q    In 1969 you escaped from the Orleans
20 Parish Prison and you did commit that crime.
21   A    Yes, I did.
22   Q    In about 1970 you were arrested in New
23 York for robbery, armed robbery?
24   A    Yes.
25   Q    But you were not convicted.

Page 23

1    A    No, I didn't commit the crime.
2    Q    And you did not commit the crime.  And
3  then in 1972 you were convicted of the murder
4  of Brent Miller.
5    A    '73.
6    Q    '73, I'm sorry.  And you did not
7  commit that crime?
8    A    No, I did not.
9    Q    You were also retried for that crime
10 in '98; is that correct?
11   A    Yes.
12   Q    And you were convicted a second time;
13 is that correct?
14   A    Yes.
15   Q    After Brent Miller's murder what
16 happened to you?
17   A    Placed in CCR on investigation of
18 Brent Miller's death.
19   Q    Were you placed there in a cell alone
20 or were there other people?
21   A    CCR has always been maximum security,
22 one-man cell.
23   Q    Were you abused by any officers at
24 that time?
25   A    The day I was transferred, yeah, they

Page 24

1  beat the hell out of me.
2    Q    Is that the only time that they beat
3  you?
4    A    Over a period of time, you know, being
5  gassed and beaten on a regular basis.
6    Q    Over regular time, during what time
7  period?
8    A    From '72 maybe all the way to '79,
9  various times there were confrontations between
10 security and various tiers at CCR.
11   Q    Were you questioned about the murder
12 by security?
13   A    Yes.
14   Q    When did that take place?
15   A    I don't know the exact day, several
16 days after we were transferred to CCR.  Warden
17 Henderson questioned me about it.
18   Q    Was it just you and he in the room?
19   A    Some other correctional officer, I
20 really don't know his name, I really can't
21 recall his face.
22   Q    Do you remember what was said in that
23 conversation?
24   A    He basically asked me did I have
25 anything to do with Brent Miller's murder, I

Page 25

1  said no.
2    Q    Anything else?
3    A    That was basically it.  He said a few
4  other things and I was eventually transferred
5  back to the tier.
6    Q    You said you were having breakfast in
7  another part of the prison when the murder took
8  place earlier; is that right?
9    A    Based upon the time that they estimate
10 Mr. Miller was killed.
11   Q    You were having breakfast at that
12 time?
13   A    Yes.
14   Q    Why do you think you were a suspect if
15 you were in another part of the prison?
16   A    I have no idea.
17   Q    You have no idea why you were
18 considered a suspect, you don't have any idea?
19   A    Not at that time.  I mean, eventually
20 it was made clear to us because of our
21 political beliefs we were suspects.
22   Q    Let's talk about that, you think you
23 were a suspect in the murder because of your
24 political beliefs?
25   A    That's what I was told later on.

ALBERT WOODFOX

1/31/2008

(Pages 26 to 29)

| Page 26 |
| --- |

1    **Q    Who told you that?**
2    A    Various security people.
3    **Q    What security people?**
4    A    I can't -- I really don't remember
5    their names.  During that time it was real
6    intense at Angola.
7    **Q    When were you told this by security,**
8    **that is, that you were a suspect?**
9    A    Immediately the officer that worked
10   the tier, the supervisor in this camp at that
11   time, you know, we were constantly being
12   accused of killing Officer Miller.
13   **Q    My question was the time period, what**
14   **time period were you told this by correctional**
15   **officers?**
16   A    Repeatedly between '72 and '79.
17   **Q    Do you have reason to believe that**
18   **these officers may have thought you did not**
19   **kill Brent Miller?**
20   A    Do I have reason to believe?
21   **Q    Yes.**
22   A    Over the years, you know, we've had
23   correctional officers at one point in time
24   express the belief that we had been framed for
25   Officer Miller's death.

| Page 27 |
| --- |

1    **Q    What correctional officer told you**
2    **that?**
3    A    I really don't remember their names,
4    just one time or another, mostly the officers
5    that worked the tiers that we live on.
6    **Q    So you don't remember any officers who**
7    **told you that you were a suspect due to your**
8    **political beliefs?**
9    A    Excuse me?
10   **Q    You don't remember the names of any**
11   **officers who told you that you were a suspect**
12   **due to your political beliefs?**
13   A    Well, it wasn't so much them telling
14   me, it was accusations, you know.
15   **Q    Like what, I don't understand.**
16   A    They would say, you know, call us the
17   N word or Black Panther, it was Black Panthers
18   who killed Brent Miller, along that line, you
19   know.  They would come down the tier, they
20   would feel free to just express their opinion,
21   you know.
22   **Q    So as a result of them expressing**
23   **their opinion, you surmised that that's why you**
24   **became a suspect?**
25   A    Yeah.

| Page 28 |
| --- |

1    **Q    No one actually told you you were a**
2    **suspect due to your political beliefs, did**
3    **they?**
4    A    Yeah, the day I was interrogated and
5    placed in isolation.
6    **Q    Who told you that?**
7    A    Warden Butler, Sheriff Daniels.  They
8    had some other correctional officers in there,
9    I can't remember their names but I specifically
10   remember Warden Butler and Sheriff Daniels from
11   St. Francisville.
12   **Q    This was right after the incident?**
13   A    The very same day.
14   **Q    Have you been told anything like that**
15   **recently?**
16   A    No.
17   **Q    The last time you were told anything**
18   **concerning your political beliefs as being the**
19   **reason you were a suspect was in the '70s?**
20   A    Somewhere around '79, everything kind
21   of tapered off after that.
22   **Q    Were you affiliated with the Black**
23   **Panther Party?**
24   A    Yes, I was.
25   **Q    How did you become affiliated with the**

| Page 29 |
| --- |

1    **Black Panther Party?**
2    A    When I first -- prior to me going to
3    New York, everyone knew about the Black Panther
4    Party because abuse was part of what was going
5    on in America at that time.  And my first
6    actual contact was when I escaped and went to
7    New York and I was living in Harlem and I used
8    to see them move around the community, selling
9    papers, escorting the senior citizens to make
10   groceries, food programs, clinics they had were
11   running in the neighborhood.
12   **Q    Did you join the Black Panther Party?**
13   A    Not at that time.
14   **Q    When did you join the Black Panther**
15   **Party?**
16   A    When I was extradicted back from New
17   York, I think it was '70 or '71, and I was
18   placed on a tier with some of the members of
19   the Black Panther Party that were awaiting
20   trial during that time for a shoot-out that had
21   took place between the Black Panther Party
22   headquarters and New Orleans police department.
23   **Q    Where did the shoot-out take place?**
24   A    Somewhere in the Ninth Ward, it was
25   around the Desire projects.

ALBERT WOODFOX                                          1/31/2008

(Pages 30 to 33)

Page 30

1    Q   How many people were involved in that
2  shoot-out were in the Orleans Parish Prison
3  with you?
4    A   I was in New York at the time the
5  actual shoot-out was.  They had maybe somewhere
6  between eight to twelve members of the Party on
7  the tier that I was placed on.
8    Q   When you got back from New York?
9    A   Yes.
10   Q   Any particular individual who was
11 influential in your decision to become a member
12 of the Black Panther Party?
13   A   Not any individual.  When I was
14 arrested in New York and I was awaiting trial,
15 I was housed on a tier with some Black Panther
16 Party members and they used to conduct classes
17 on the tier for anyone who wanted to attend
18 political classes, reading and writing classes,
19 history classes, along that line.  And when I
20 was extradicted back to New Orleans and placed
21 on the tier with the Panthers, that's when I
22 decided to join the Black Panther Party.
23   Q   Did you participate in the education
24 that was going on in New York?
25   A   Yes.

Page 31

1    Q   Were you a teacher or a student?
2    A   Student.
3    Q   Did you know how to read and write at
4  that point?
5    A   Yes.
6    Q   And they helped you improve your
7  reading and writing?
8    A   Well, they didn't really help me, I
9  knew how to read and write, but there were
10 other people on the tier who could not read at
11 all or who read very poorly.
12   Q   What kind of classes did they conduct
13 for you?
14   A   Well, the classes weren't for me
15 individually, the classes were for anyone that
16 wanted to attend that lived -- in the Manhattan
17 House of Detention, at the time you lived on
18 floors one, two, three, I was on the eighth
19 floor.
20   Q   Now, you came back to New Orleans and
21 there were these eight to twelve Black Panthers
22 in prison with you, do you remember any of
23 their names?
24   A   Charles Scott was in the leadership
25 position, he's passed away now, Donald Guiden,

Page 32

1  Donald Ellsworth, and some of the other names
2  escape me, I just can't recall them now.
3    Q   And did these people influence your
4  decision to join the Black Panther Party?
5    A   Yeah, in a sense.  Basically the
6  exposure that I had to the Panthers in New York
7  while I was in the neighborhood and the
8  exposure to the Party, members in Manhattan
9  House of Detention.
10   Q   How did you join, what did you have to
11 do to join?
12   A   I asked Charles how would I go about
13 becoming a member of the Black Panther Party
14 and since I was in prison was it possible and
15 he explained that it was.  He took down my
16 information and he submitted it to the
17 headquarters in Oakland, California.
18   Q   Did you receive any sort of
19 confirmation that you were accepted or anything
20 like that?
21   A   Yeah, Scott said I was now a member of
22 the Black Panther Party.
23   Q   Did you receive anything from
24 headquarters?
25   A   No.  I think he did acknowledging that

Page 33

1  I had been accepted as a member of the Party
2  and in turn he passed that on to me.
3    Q   What did the Black Panther Party
4  represent at that time?
5    A   The Black Panther Party is self
6  defense, so it's named the Black Panther Party.
7  They had a ten point program that all members
8  were required to learn and to practice.  That's
9  basically it, you know, what being a member of
10 the Black Panther Party was.
11   Q   Do you remember the ten point program?
12   A   Not all, not specifically but, you
13 know, basically the Black Panther Party
14 program, freedom for African-Americans, want
15 the right to control our communities, feel we
16 had an obligation to join the military because
17 of the way the American government treated
18 African-Americans in the country at that time.
19 I believe that all people in the country had a
20 right to a decent house, clothing, food,
21 education, medical treatment, opportunities.
22   Q   Did the Black Panther Party advocate
23 violence?
24   A   No.
25   Q   This was all peaceful?

ALBERT WOODFOX

1/31/2008

(Pages 34 to 37)

Page 34

1    A    Well, by advocate violence, if you're
2  saying to the point that they teach you to go
3  out and attack people, no, I've never been
4  taught by the Black Panther Party to attack any
5  individual or organization.
6    Q    Were phrases such as "kill the pigs"
7  affiliated with the Black Panther Party?
8    A    Affiliated with all organizations
9  during that time.  That was, I guess, for lack
10  of a better word, it was a political rhetoric
11  at the time.
12    Q    What did that phrase mean?
13    A    I guess it meant a lot of different
14  things to different people.  I know to the
15  Black Panther Party it didn't mean literally to
16  kill anyone, it was more or less defining the
17  cause or rally the cause to fight against
18  police corruption, police racism, government
19  racism, government corruption.
20    Q    Did you use the phrase?
21    A    Yes.
22    Q    In what context would you use the
23  phrase?
24    A    As I said, it was a part of political
25  culture, political rhetoric that was being used

Page 35

1  at that time.
2    Q    Was a raised clinched fist a symbol of
3  the Black Panther Party?
4    A    It was a symbol of all organizations
5  at that time.  It was a symbol of unity.  It
6  has been misunderstood and misquoted over the
7  years but the clinched fist meant you were in
8  unity and there was strength.
9    Q    Unity of what?
10    A    Unity of the community, unity of the
11  people of America against government
12  corruption, unity of people, workers against
13  unfair working conditions.
14    Q    Do you think the government was
15  corrupt at that time?
16    A    Yes, I did.
17    Q    Why did you think that?
18    A    Because of the policies of the
19  government.
20    Q    What policies?
21    A    The racism, blatant racism that was
22  allowed to be practiced in a country against
23  African-Americans and other minorities,
24  oppression of the communities across America,
25  unemployment, the wealth of the country,

Page 36

1  unequal distribution of the wealth of the
2  country.
3    Q    Do you think the government was
4  involved in racism?
5    A    Yes, I do.
6    Q    How so?
7    A    Because they allowed the racist
8  practices of the country:  African-Americans
9  couldn't move into certain neighborhoods, they
10  couldn't get certain jobs, other minorities,
11  and the government failed to enforce
12  constitutional rights to every citizen in this
13  country, to live where they wanted, to work if
14  they were qualified, to have the right to have
15  access to education, opportunities that were
16  not based upon the color of their skin.
17    Q    You felt that's what existed in the
18  1970s?
19    A    I knew it, I lived it, I saw it, I
20  experienced it personally.
21    Q    Do you still believe that today?
22    A    I still think there is a lot of racism
23  in this country.  It's not as bad as it was in
24  the '60s.
25    Q    Do you still think the American

Page 37

1  government is corrupt?
2    A    Oh, yeah.
3    Q    Do you think the American government
4  supported oppression?
5    A    Yes, the fact that the American
6  government did nothing, they put into place no
7  social programs to alleviate some of the things
8  or some of the problems that were going on in
9  this country, and they knew these things were
10  going on so the fact that they failed to
11  protect the citizens, especially
12  African-Americans and other minorities, I think
13  that was corruption on their part.
14    Q    Do you still feel that same way today?
15    A    To some extent.  I mean obviously the
16  country has changed somewhat in the last thirty
17  years or more, but yeah, I think there are very
18  large pockets of government neglect going on in
19  the country.
20    Q    Government oppression going on in this
21  country?
22    A    Yes.
23    Q    You said you think the government
24  supported unemployment or did I misunderstand
25  you?

ALBERT WOODFOX                                                          1/31/2008

(Pages 38 to 41)

Page 38

1    A   Yeah.  I think the government has a
2  responsibility to all its citizens.  I think
3  they have a responsibility to protect them from
4  events that take place in society they have no
5  control over, such as unemployment, and I think
6  the government has an obligation when
7  unemployment, when this country goes through a
8  recession that the federal government has an
9  obligation to make sure that all its citizens
10  has adequate homes, clothing, food, medical
11  care, education and opportunities, and when the
12  federal government or state government refuses
13  to do this, I think that is a form of
14  corruption.
15    Q   And you think this corruption was
16  going on in the 1970s?
17    A   I think it's going on right now.
18    Q   What about unequal distribution, you
19  talked about that a moment ago.
20    A   Yes.
21    Q   Explain what you mean by that.
22    A   Underpaid employees, benefits being
23  throwed back, medical care being rolled back,
24  working more hours for less pay.
25    Q   And when you talk about unequal

Page 39

1  distribution, are you talking about it being
2  unequal based on race?
3    A   No, I mean being unequal period.
4  Those who own the resources of this country,
5  who own the means of production in this
6  country, the industries, you know, when they
7  pay a man for less than his work is worth, when
8  they refuse to allow him the benefits from the
9  wealth that they're making from his labor, when
10  they cut back on medical care, when they cut
11  back on benefits and trust funds or loss, I
12  think that's a form of corruption.
13    Q   In the 1970s did you advocate violence
14  in order to overthrow this corrupt government?
15    A   No.  I advocated unity, organizing to
16  petition the government to protest.
17    Q   Did you advocate that a revolution had
18  to take place?
19    A   Yes.
20    Q   Explain that to me.
21    A   Revolution meaning that things just
22  need change, that the country had to change,
23  that the government had to start protecting all
24  of its citizens, that private enterprise had to
25  stop being consumed, was accumulating all of

Page 40

1  this obscene amount of wealth and not paying
2  workers decent salaries, not giving them
3  medical coverage or retirement benefits.
4    Q   So you advocated a peaceful revolution
5  as opposed to a bloody revolution.
6    A   Yes.
7    Q   Do you think you've reformed these
8  political views?
9    A   I'm not quite sure I understand what
10  you mean, reform.
11    Q   Do you think you've reformed these
12  political views since the 1970s?
13    A   Again, I'm not quite sure what you
14  mean.
15    Q   Do you still have these same political
16  views?
17    A   Yes, against corruption, abuse,
18  racism.  I think it's wrong, I think it's
19  morally wrong for an individual to be this way
20  or for the government to allow it to go on.
21    Q   So your political views haven't
22  changed since the 1970s?
23    A   No.
24    Q   Do you still consider yourself to be a
25  member of the Black Panther Party?

Page 41

1    A   Black Panther Party no longer exists
2  but I still believe in the principles of the
3  Black Panther Party.
4    Q   The principles we've been talking
5  about this morning?
6    A   The ten point program, yes.
7    Q   Mr. Woodfox, I'm going to show you a
8  document that I took off the Internet marked as
9  Exhibit 4.
10        (Whereupon the document referred to by
11        Counsel was marked for identification
12        as Exhibit #4.)
13  BY MR. HICKS:
14    Q   Do you see the photograph at the top
15  of the picture?
16    A   Yes.
17    Q   Is that you?
18    A   Yes, it is.
19    Q   Do you recall when that photograph was
20  taken?
21    A   Not exact year but we were at Camp
22  TURC -- I mean, Camp TUCCR.  We were in another
23  building otherwise.
24    Q   About what year was that photograph
25  taken?

ALBERT WOODFOX                                                        1/31/2008

(Pages 42 to 45)

Page 42

1      A    Somewhere in 2000, I'm not sure.
2  Anywhere from 2001 to maybe 2005.
3      Q    Who were you photographed with?
4      A    Herman Wallace.
5      Q    You guys were allowed to visit
6  together?
7      A    Yes.
8      Q    And this was taken during a
9  visitation?
10     A    Yes.
11     Q    Who took the photograph?
12     A    Inmates.  Each visiting tier has a
13  club that has a concession stand and they also
14  take pictures.
15     MR. KENDALL:
16         Can we run a copy of this or is
17  that the only one you have?
18     MR. HICKS:
19         I think that's the only one I
20  have.
21  BY MR. HICKS:
22     Q    In the photograph you're raising your
23  arm in a clinched fist; is that correct?
24     A    Yes.
25     Q    And what are you symbolizing, what are

Page 43

1  you trying to say in that photograph?
2      A    Unity, that I stand for unity.
3      Q    Can you identify what is on
4  Mr. Wallace's shirt?
5      A    A black panther, it's a symbol of the
6  Black Panther Party.
7      Q    In 2000, at the time that photograph
8  was taken, were you still a member of the Black
9  Panther Party?
10     A    No, Black Panther Party stopped,
11  disband as an organization I think somewhere in
12  the late '70s.
13     Q    But is it fair to say that you still
14  espouse their political beliefs?
15     A    I still believe in the philosophy
16  part, which was the ten point program.
17     Q    And does that photograph symbolize
18  that you still believe in what the Black
19  Panther Party symbolizes?
20     A    Yes.
21     Q    Let me show you a letter marked as
22  Woodfox 1866.  Is that your signature at the
23  bottom of the letter?
24     A    Yes.
25     Q    Did you write this letter?

Page 44

1      A    Yes.
2      MR. KENDALL:
3         That's Exhibit 5?
4      MR. HICKS:
5         Yes.
6      (Whereupon the document referred to by
7      Counsel was marked for identification
8      as Exhibit #5.)
9  BY MR. HICKS:
10     Q    I'm sorry, Mr. Woodfox, you said you
11  did write this letter?
12     A    Yes.
13     Q    I note that you spell America,
14  A-m-e-r-i-k-k-k-a.  Did you not know how to
15  spell America, was that intentional?
16     A    Again, that was the symbol of the
17  times, not just Black Panther Party but usually
18  all political organizations in America spelled
19  America that way.
20     Q    When you arrived at Louisiana State
21  Penitentiary, was there an Angola chapter of
22  the Black Panther Party in existence?
23     A    No.
24     Q    Did you start the Angola chapter?
25     A    Yes.

Page 45

1      Q    How did you do that?
2      A    As I said, I was put in population by
3  the classification department.  They knew my
4  political beliefs and when I went before the --
5  we used to have a process that lasted about
6  thirty days and I was assigned to medium
7  security and my job assignment was the skuller
8  (Phonetic) in the kitchen of the dining hall
9  area.
10     Q    So how did you actually go about
11  organizing a new chapter of the Black Panther
12  Party?
13     A    When I got here I observed the
14  conditions that existed in Angola at the time.
15  I felt that these were inhumane conditions and
16  that the administration should do something
17  about them.
18     Q    I'm not asking you why you did it, I
19  think that's what you're telling me, why you
20  did it, I'm asking you how you actually went
21  out and got people to join your organization.
22     A    By talking to inmates, you know.  I
23  mean, the walkway was open, you know, when
24  inmates wasn't working they were allowed to
25  congregate on the walk, there was a large area

Page 46

1    in the prison complex, football field, boxing
2    rings, those kind of things at that time.
3        Q    You talked about another inmate being
4    a leader of the Party in Orleans Parish Prison.
5    Did you consider yourself to be the leader of
6    the Party in Angola at the time?
7        A    You mean the leader of the chapter?
8        Q    Correct.
9        A    Yeah.
10       Q    Who were the other leaders of the
11   chapter?
12       A    Herman Wallace.
13       Q    Anyone else?
14       A    No.
15       Q    Was there resistance to this movement
16   by administration?
17       A    No.
18       Q    Administration didn't oppose or have
19   any problem with you starting a Black Panther
20   Party and getting people to join?
21       A    They never said anything to us, we
22   weren't warned by any supervisors or wardens or
23   anything who said you stop doing that or you
24   stop talking about the Black Panther Party.
25       Q    Who was the antirape squad?

Page 47

1        A    We felt that it was wrong for these
2    young kids that were coming into the main
3    prison population, being raped, forced to be
4    sexual slaves in Angola, so we tried to stop
5    it.
6        Q    How did you go about trying to stop
7    it?
8        A    Well, we would offer them protection,
9    advice, not what to do, and we actually went
10   down there on the day when they, you know, like
11   every Thursday, everyone is classified into a
12   population or RC, which is this building, or be
13   transferred down there to the main prison
14   complex.  Those that were going on trustee, the
15   trustee load that were coming into medium
16   security and they used to transfer them, used
17   to bring them to what was called the supply
18   room where you get your mattresses and all that
19   kind of stuff, you're assigned to a dormitory.
20       Q    Did you ever refer to that day as
21   fresh fish day?
22       A    Well, that's a term, I don't know when
23   it started but that was a term that was used in
24   the prison long before I came here.  When I
25   came to Angola way back in the '60s that's what

Page 48

1    it was referred to as, fresh fish day.
2        Q    Did you use that term?
3        A    You mean fresh fish, yeah, it was a
4    term used.  It just meant that they had new
5    prisoners coming into the system.
6        Q    Do you recall an incident where Roy
7    Mason attacked Mike Gunnels, a correctional
8    officer?
9        A    Yeah.
10       Q    Did the Black Panther Party have any
11   involvement in that?
12       A    No.
13       Q    Do you recall how that happened?
14       A    No more than I learned about it like
15   everybody else learns about it, news travels up
16   and down the walk.  As a matter of fact I think
17   I was working that day when it happened.  You
18   hear inmates talking, you know, free man just
19   got burned up.  At that time that was the term
20   they used for correctional officers, free man.
21   Everybody was talking, what happened, somebody
22   burned a free man up.
23       Q    It was a day or so before Brent Miller
24   was killed?
25       A    I'm not sure how many days prior to

Page 49

1    Mr. Miller being killed.
2        Q    You learned about it from other
3    inmates?
4        A    You mean the correctional officer
5    being burned?  Yeah.  Well, it was a grapevine,
6    I mean something like that, it happened on a
7    regular basis in Angola so it was like
8    spreading up and down the walk.  That's the
9    term they used for a new prison complex.
10       Q    Did you feel at the time, did you feel
11   that that furthered your political objectives?
12       A    No.
13       Q    Mr. Woodfox, I'm going to refer to
14   Exhibit 4, which is the article by Karl
15   Lydersen, In His Words:  Albert Woodfox of the
16   Angola 3.  Do you recall giving that interview?
17       A    Yes, I do.
18       Q    On March 29, 2007 at 11:14, at the top
19   of the article, is that when the interview took
20   place?
21       A    I'm not sure of the exact day, I just
22   know it was on a visit.
23       Q    Did it take place last year?
24       A    Last year or the year before last.  I
25   know we were at TUCCR building at the time.

Page 50

1    Q   Have you had a chance to read this
2  article since it was published?
3    A   Yeah, but not lately.
4    Q   What I would like to know is if
5  anything is misquoted in here or is there
6  anything in here that you think is not
7  accurate.
8    A   Any particular paragraph or question?
9  They got some words omitted and had to clarify
10  what I said, but overall it's accurate.
11    Q   It's accurate other than what, I'm
12  sorry?
13    A   A few words may have been left out or
14  things I said that would help clarify my
15  meaning and my answer, but overall, yes, it's
16  accurate.
17    Q   Is there anything you saw as you read
18  it that you think is particularly misleading?
19    A   No.
20    Q   You say on page three, the last
21  sentence of the first paragraph, "This case
22  could affect prison systems across America if
23  we win." How do you think your case is going
24  to affect prison systems?
25    A   Well, we already filed this case in

Page 51

1  the state courts and the Department of
2  Corrections filed and had it moved to federal
3  court, and the federal court usually governs
4  the land and that's basically what I'm saying,
5  if this case is won in the federal court, then
6  it would go beyond just Louisiana, had it been
7  tried in the state court.
8    Q   In the third paragraph of that page
9  you say, "The conditions in CCR are much better
10  than most Supermax prisons." What do you base
11  that statement off of?
12    A   What I observed on TV, what I read in
13  papers. It's not on and running now, but they
14  have a program that comes on Discovery about
15  prison systems and they show various supermaxes
16  and the conditions they function under.
17    Q   And from what you've seen on these
18  television shows, your conditions at CCR are
19  better than the supermax?
20    A   Yeah.
21    Q   Do you think you're well-known with
22  the other inmates at Angola?
23    A   I would imagine so. We've been
24  isolated from the prison population for thirty
25  something years, so I would imagine they know

Page 52

1  who we are, everybody in the prison probably
2  know who we are.
3    Q   Do you think they know who you are
4  even though you've been isolated from them for
5  all this time?
6    A   Yeah.
7    Q   Why is that?
8    A   Well, I mean this is a small
9  community, you know, security people talk about
10  us still, you know, a lot of prisoners who were
11  here when Mr. Miller was killed are still here.
12  There's so many ways that people in this prison
13  can or do know about us.
14    Q   Do you think you're well-known by
15  security officers?
16    A   I'm pretty sure I am.
17    Q   What about the security officers or
18  inmates who are in general population who would
19  have no affiliation with CCR?
20    A   Yes. Like I say, I would imagine that
21  we are known throughout the prison.
22    Q   You think that's in part because
23  you're one of the members of the Angola 3?
24    A   I really couldn't say as to exactly
25  why they know about us.

Page 53

1    Q   How do you think you're viewed by
2  these other inmates in general population?
3    A   Again, the fact that we're isolated
4  from the main prison population, I only speak
5  to those inmates in CCR, those who work here
6  and those who are housed in CCR.
7    Q   How do you think you're viewed by the
8  guards outside of CCR?
9    A   It depends. I mean, some correctional
10  officers are very professional, they come here,
11  this is a job to them. And you have
12  correctional officers who are not, they may
13  take everything personally and it becomes a way
14  of life rather than a job. Usually those
15  correctional officers have a negative view of
16  me and those correctional officers who conduct
17  themselves in a professional manner, I have no
18  trouble with them.
19    Q   Do you see yourself as a leader today
20  at Angola?
21    A   I see myself as Albert Woodfox.
22    Q   You don't see yourself as a leader?
23    A   No.
24    Q   Was there a time that you ever
25  considered yourself a leader?

ALBERT WOODFOX

(Pages 54 to 57)

Page 54

1      A    Yeah, '72, when I helped start the
2   Black Panther Party chapter in the main prison
3   complex.
4      Q    You felt like you were a leader before
5   you went to CCR?
6      A    Yeah, that's when I was in the
7   population.
8      Q    You think you've earned the respect of
9   other inmates or correctional officers?
10     A    Those in my immediate presence, I
11  think they respect me because of the way I
12  conduct myself.
13     Q    Do other inmates call you Mr. Woodfox?
14     A    Some, some call me Albert, some call
15  me Woodfox, some call me Fox.  Same thing with
16  some security officers, you know, some say
17  Mr. Woodfox.  I would rather think that has to
18  do with my age than anything else.  I'm 60
19  years old, I am a senior citizen, you know.
20     Q    Do you have a preference of what you
21  like to be called?
22     A    No.
23     Q    What is the Angola 3?
24     A    Three former members of the Black
25  Panther Party who at one time tried to organize

Page 55

1   and unify the entire inmate population about a
2   lot of conditions that were going on in Angola,
3   a lot of corruption that was going on, a lot of
4   brutality that was going on in Angola and a lot
5   of the inmate-on-inmate crimes such as murder,
6   stabbing, cuttings, beatings, raping young
7   kids.
8      Q    What does the Angola 3 stand for
9   today?
10     A    A lot of things have changed since the
11  '70s, a lot of things we tried to organize and
12  get exist in the penitentiary now.  I think
13  what the Angola 3 stands for today is pretty
14  much the same thing we stood for then, you
15  know, and that was to better the condition of
16  the prison population.
17     Q    What about the National Coalition to
18  Free the Angola 3?
19     A    Support committee that was formed by
20  former Panthers and uplift for advocates in the
21  street.
22     Q    Who are members of that organization?
23     A    I only know a few names, Malik Rahim,
24  Marina Drummer, you know, people like that, you
25  know.  Of course Robert King.  I mean there's a

Page 56

1   lot of people who support the A-3 but I just
2   can't sit here and give you every name.  I
3   don't know them all on an intimate basis, I
4   know them mostly through letters of support.
5      Q    Is A-3 just a short code for Angola 3?
6      A    Yes, it is.
7      Q    What about Angola 4, I've read about
8   that as well.
9      A    That was the original name or support
10  committee they formed when we were originally
11  charged with the death of Mr. Millar.
12     Q    Who was the fourth member?
13     A    It was myself, Herman Wallace, Gilbert
14  Montague and Chester Jackson.
15     Q    Do you think inmates and guards have
16  heard of the Angola 3 or heard that term?
17     A    Yeah.  Some of them even go on our web
18  site.
19     Q    You think you've attained a certain
20  status as being a part of the Angola 3?
21     A    I really couldn't answer that, I mean,
22  how people interpret is --
23     Q    Do you think your status as a member
24  of the Angola 3 would help or hurt you if you
25  were released in the general population?

Page 57

1      A    That's hard to answer, because again,
2   we're talking about how other people would
3   interpret me.  I would like to think that the
4   way I conduct or carry myself would allow me to
5   function very well in the population.
6      Q    But do you think that this status
7   would help you, hurt you, not make any
8   difference?
9      A    Not just being a member of the Angola
10  3, but again, the type of individual I am, I
11  believe in respect, I show respect and in
12  return I hope I will get respect back.  And
13  that will determine how I am accepted by
14  inmates or security if I'm released from CCR.
15     Q    Do you think there's anyone, either an
16  inmate or correctional officer, who may want to
17  hurt you as a result of being a member of the
18  Angola 3, if you were in general population?
19     A    Again, I couldn't answer that.  If you
20  go on human nature, I would imagine there would
21  be.
22     Q    You think you may need additional
23  security precaution to protect you in general
24  population?
25     A    No.

Page 58

1    Q    Even though based on human nature that
2    there may be people who want to hurt you?
3    A    They may not want to hurt me because
4    I'm a member of the Angola 3, I mean, this is
5    Angola, people dislike people for various
6    reasons that really don't have any basis in
7    fact or reality.
8    Q    Following the murder of Brent Miller
9    in April of 1972, you went to CCR, correct?
10    A    The next day.
11    Q    And you remained there until April 29,
12    1996, when you went to Amite to the Tangipahoa
13    Parish Prison.
14    A    Yes.
15    Q    And you stayed at the Amite prison
16    until March 15, 1999, when you went to the
17    reception center at Hunt?
18    A    Yes.
19    Q    And then from Hunt you were
20    transferred to Louisiana State Penitentiary on
21    March 22, 1999?
22    A    Yes.
23    Q    Were the conditions different in the
24    Amite jail than they were in CCR?
25    A    Well, I'm not quite sure I understand

Page 59

1    what you're saying.
2    Q    Let me be specific.  Were you held in
3    a single cell or in a dormitory?
4    A    When I was initially transferred to
5    Amite City Jail I was placed in an observation
6    cell, called E-11, and that was based upon
7    whatever paperwork that came from Angola.  But
8    after being in the cell for about six months
9    without any problems with inmates or security,
10    the security made a decision that they didn't
11    see any reason why I couldn't be put in the
12    population.
13    Q    So for the first six months you were
14    in a single cell?
15    A    Yes.
16    Q    Were you allowed out of that cell
17    during that time period?
18    A    Yes.  They had the same situation,
19    they had three yards a week, the yards were
20    groups, all of the other.  I was on what was
21    called west wing, so all the inmates in the
22    dorms on that wing, we would all be on the yard
23    together at the same time.
24    Q    So that three days a week you were out
25    with other inmates?

Page 60

1    A    Yes.
2    Q    So you were not in a single pen as you
3    are at CCR?
4    A    Not for the first six months.  The
5    first six months I was in E-11, eventually they
6    moved me on the west wing in a dorm.
7    Q    Okay, I misunderstood.  When you would
8    go out your three times a week, were you in a
9    single pen like you are in CCR?
10    A    Yes, but they would take me, bring me
11    to the yard.  Really they didn't take you, they
12    just open your door.  They have a system of
13    cameras and they open the door by remote and
14    stuff, so they would just call me, you're going
15    on the yard, get ready, then my door would
16    open, I would come out and just walk.  I knew
17    where to go, I go down the hallway, when I got
18    to the door to the yard I would go on the yard
19    and then about five minutes later all the other
20    inmates on that wing who wanted to go on the
21    yard would come out in the yard.  It was a
22    concrete enclosure with a basketball goal.
23    Q    This was during the first six months?
24    A    After the first six months.  But I
25    mean, even when I was in the cell by myself I

Page 61

1    was still allowed to go in the yard with
2    inmates on the west wing.
3    Q    So that didn't change.
4    A    Going on the yard with other inmates?
5    Q    Right.
6    A    No.  When I was released from -- E-11
7    was the name of the cell, and I was put on the
8    west wing in B dorm, then I was in a group
9    dorm.
10    Q    After the first six months you were in
11    a group dorm.
12    A    Yes.
13    Q    And how many inmates were on that
14    group dorm?
15    A    They had four lower and upper cells,
16    two and by sixteen when it was at full
17    capacity.
18    Q    So you would have been in a dorm
19    environment for about two years; is that fair?
20    A    Yes.
21    Q    And you're not aware of any incidents
22    during that time?
23    A    There was an incident with a mentally
24    disturbed immigrant prisoner and he attacked me
25    one day and he bit me on the finger and I had

Page 62

1  to stay in the hospital for four days because
2  of that, because I am allergic to penicillin,
3  so they had to keep me on a drip. And an
4  incident report was filed and I went to DB
5  court and was found not guilty, because
6  everybody in the dorm, plus the officer
7  observing in the dorm saw me attacked. I was
8  sitting on the table and he just attacked me
9  because I wasn't Cuban, you know.
10     Q   Were you involved in any other
11  incident reports while in the general
12  population?
13     A   No.
14     Q   After you returned from Amite after
15  the second conviction for killing Brent Miller,
16  you were placed on CCR again and you remain
17  there today; is that correct?
18     A   Yes.
19     Q   I'm going to mark as Exhibit 6 an
20  article from the Angolite entitled The Planted
21  from the January/February 1995 edition by Lane
22  Nelson. Do you recall being interviewed for
23  this article?
24     A   Yes, I do.
25         (Whereupon the document referred to by

Page 63

1          Counsel was marked for identification
2          as Exhibit #6.)
3  BY MR. HICKS:
4     Q   Turn to page 35, please.
5     A   (Witness complies.)
6     Q   And read to yourself the first full
7  paragraph that starts, "Albert Woodfox was
8  convicted."
9     A   (Witness examines document.)
10        Okay.
11     Q   Go ahead and read the last paragraph
12  as well.
13     A   (Witness examines document.)
14        Okay.
15     Q   In the middle of the first full
16  paragraph it states, "He does not believe his
17  lengthy stay in the cell is a repercussion for
18  once being a Panther. He feels he is being
19  made an example." Quote, "I think we're being
20  held here as an intimidation factor for the
21  other inmates." Is that an accurate quote?
22     A   Yes.
23     Q   Is that how you felt at that time?
24     A   Yes.
25     Q   Is that what you believe today?

Page 64

1     A   Yes.
2     Q   Mr. Woodfox, you were interviewed for
3  that article?
4     A   Yes, I was.
5     Q   Assuming you committed the crime for
6  which you were convicted, that is killing Brent
7  Miller, do you think you would have been
8  appropriately placed in CCR initially?
9     A   Yeah. At the time Mr. Miller was
10  killed, yeah.
11     Q   I'm assuming, based on the allegations
12  of your lawsuit, that you're contending at some
13  point you believe that that classification,
14  that you being in CCR ceased to be appropriate,
15  and I'm wondering what time that occurred, when
16  do you think you should have been released?
17     A   After we had been in CCR about fifteen
18  years or somewhere, based upon our conduct,
19  which is the only thing that can be evaluated
20  when you're in CCR, I just felt I should have
21  been given an opportunity to go back in the
22  prison population.
23     Q   So fifteen years, that would have been
24  around 1987?
25     A   Yes.

Page 65

1     Q   Do you think around 1987 you should
2  have been released from CCR?
3     A   I thought I should have been released
4  four or five years after, but that's when we
5  took legal action, when we filed our first suit
6  about CCR.
7     Q   In 1987?
8     A   No, it was in the '80s, I'm not sure
9  of the exact year.
10     Q   I want to be clear. When do you think
11  you should have been released into general
12  population?
13     A   Well, my personal belief was four or
14  five years after we had been held in CCR, and
15  as time went on and as I said, the only thing
16  that was being used to evaluate prisoners as to
17  whether or not they should be released from CCR
18  is their conduct, since my conduct was
19  excellent I thought that we should be released
20  but it wasn't going to happen without the court
21  intervening, so Herman and myself filed a suit
22  about being released from CCR.
23     Q   Is it your belief that you had an
24  excellent conduct record back in the '70s?
25     A   Yes. Compared to what's standard.

Page 66

1    Q    Possession of handcuff keys, do you
2    remember being caught with handcuff keys back
3    in the '70s?
4    A    I remember having a Disciplinary
5    Report filed against me for it.
6    Q    Do you remember being caught with a
7    firing pin for a zip gun?
8    A    I remember also taking a screwdriver I
9    had made to work on my radio and called him and
10   traded it for a zip gun.
11   Q    Do you remember being found with
12   gunpowder in your possession in 1976?
13   A    I was wrote up for it, it was not my
14   gunpowder.
15   Q    Do you remember throwing glass jars at
16   officers and destroying a commode and throwing
17   pieces at the officer in 1975?
18   A    Yes.
19   Q    But you still maintain you had an
20   excellent conduct record in the '70s?
21   A    Those were not continuous incidents
22   but some time in years passed before the next
23   incident.
24        The incident with the throwing the jar
25   at the officer, the officer was standing in

Page 67

1    front of my cell shooting gas canisters in my
2    cell with one of these guns, riot guns that
3    they use.  It was an incident on the whole tier
4    that didn't even involve me.  It was an inmate
5    in front of the tier, they wanted to move him
6    to another tier, he didn't want to move, they
7    called, and the term we used at that time was
8    the goon squad.  They called in the goon squad,
9    the goon squad come on the tier and they
10   attacked the whole tier.
11        They was also standing in front of my
12   cell trying to hit me with these, whatever you
13   call them, gas canisters, so I started throwing
14   jars at them.  I ran out of jars, I broke off,
15   kicked the shitter out and threw that.
16   Q    So you think you should have been
17   released somewhere around 1978, '79; is that
18   fair?
19   A    Yes.
20   Q    I say released, released out of CCR
21   into general population.
22   A    Yes.
23   Q    Is that the point that you believe
24   your institutional rights started to be
25   violated?

Page 68

1    A    Yes.
2    Q    Why do you think you remain in CCR?
3    A    It's a mystery to me.
4    Q    You said in The Planted that you were
5    being made an example of, is that what you
6    believe?
7    A    Yes, but we're talking twelve years
8    later.  At that time I still think that we --
9    there's a lot of things that take place, like
10   cadets that go to the academy to be trained
11   coming here.  They would come and work out of
12   the tiers and when they would encounter us for
13   whatever reason, they would say, oh, yeah, I
14   heard about you in the academy, you and Wallace
15   and Wilkerson.  You know, they would say, y'all
16   the worst prisoners in the prison and this is
17   how y'all should be handled and stuff like
18   that.  But now that I'm working around you, I'm
19   not seeing what I was being told in the
20   academy.
21   Q    What did they tell you that they were
22   told in the academy about how you should be
23   handled?
24   A    You know, with high security, always
25   watch us when they moving us out of the cell,

Page 69

1    you know, along that line.
2    Q    Did you have any theories of why these
3    cadets are being told that about you, if it's
4    not true?
5    A    I would imagine it was part of their
6    training.  From what they said it was part of
7    their training as to how to handle different
8    inmates in the institution.
9    Q    But I'm asking, do you have a theory
10   of why they're being trained like that if it's
11   not true?
12   A    I imagine because we were charged and
13   convicted of killing Officer Miller.
14   Q    Would you agree that inmates who kill
15   correctional officers need to be handled with
16   extreme care?
17   A    As long as it's not abusive, yeah.
18   Q    So why do you think you remain in CCR?
19   I don't think I ever got an answer to that.
20   A    Again, I think it goes directly, I was
21   being charged and convicted of killing Officer
22   Miller.
23   Q    So today you think you remain there
24   because you killed Officer Miller, because you
25   were convicted of killing Officer Miller?

Page 70

1    A   Yes.
2    Q   Were you ever told that?
3    A   Well, not in those terms but we've
4   been told over the years by various
5   correctional officers, we've gone before the
6   classification boards we been told, well, you
7   know, I can't do nothing for you, it's out of
8   my hands.  Things of that nature.  Correctional
9   officers, like the tier sergeant or something,
10  will say, man, they ain't never going to let
11  you out if the courts don't say nothing, along
12  that line.
13   Q   So you've been told by officers that
14  you would never be released from CCR?
15   A   Unless the courts said, you know, that
16  we should be released.
17   Q   What officer told you that?
18   A   There's so many officers over the
19  years.
20   Q   Did they tell you the source of that
21  information?
22   A   No.
23   Q   Can you give me the name of an officer
24  that's told you that?
25   A   No.

Page 71

1    Q   You don't remember or --
2    A   I don't remember.  It's been awhile
3   since a correctional officer said that to me
4   but at one time or another it had been said.
5    Q   Do you recall any discussions with
6   officials regarding the reason you remain in
7   CCR?
8    A   I've never had an official discussion
9   with any supervisor or administrative warden or
10  anything like that, no.
11   Q   You say official, have you had
12  discussions while they're on the tier or
13  something like that?
14   A   No, no warden that was on the tier or
15  colonels or majors or any have come down and
16  talked about why we still in CCR, no.
17   Q   Let's talk about the conditions in CCR
18  now.  When I ask you my questions I want you to
19  look at the time period from 1999 to present,
20  okay?
21   A   Okay.
22   Q   I just want to talk about '99 to
23  present, not what happened in the early '90s,
24  '80s or '70s.
25   So during that time period have you

Page 72

1   had access to reading materials?
2    A   Yes.
3    Q   What books have you read this year?
4    A   The last book I read was Lies My
5   Teacher Told Me.
6    Q   Who is that by?
7    A   I can't remember the author's name
8   right now.
9    Q   Do you read a lot?
10   A   Everyday.
11   Q   About how long?
12   A   A minimum, I try to get at least two
13  hours a day reading, sometime longer.
14   Q   In the Angolite article, which I've
15  marked as Exhibit 6, you're quoted as saying,
16  "I've used the time to educate and reeducate
17  myself in just about everything, economics,
18  politics, history, psychology, sociology, to
19  study anything I can get my hands on."  Is that
20  accurate?
21   A   Yes.
22   Q   That was back in 1995.  Do you still
23  read books on these different subjects?
24   A   Yes.
25   Q   Is there a particular subject you're

Page 73

1   working on currently?
2    A   No.
3    Q   Do you have access to television in
4   CCR?
5    A   Yes.
6    Q   How many channels?
7    A   I'm not sure how many, a lot of
8   channels, I would say more than twenty.  Basic
9   cable.
10   Q   At one point did you have HBO?
11   A   Yes, we did.
12   Q   Was that in this time period?
13   A   No, I think they started premium cable
14  in the '70s somewhere and we had it.  I think
15  they stopped HBO and some other channels when
16  Warden Cain came in.
17   Q   What shows do you enjoy?
18   A   I like educational shows, I watch a
19  lot of history channels, Discovery, Animal
20  Planet, Travel Channel, sports, football.
21   Q   Do you participate in any hobby
22  crafts?
23   A   No.
24   Q   Are hobby craft items accessible?
25   A   Only painting.

Page 74

1    Q    Are you visited by inmate preachers or
2  other spiritual advisers?
3    A    Yes, they're allowed to come here.
4    Q    Do you practice a religion?
5    A    No.
6    Q    Are you allowed contact visits?
7    A    Yes. We have to write in for them.
8    Q    Who visits with you other than your
9  lawyers?
10    A    Family, friends, supporters of the A-3
11 over the years, and my mother passed away and
12 my sister passed away several years ago. My
13 primary family that visits now is my brother.
14    Q    Are you allowed to write letters?
15    A    Yes.
16    Q    Who do you write letters to other than
17 your attorneys?
18    A    Family, friends and supporters.
19    Q    Do you receive money from anybody?
20    A    Yes.
21    Q    Who sends you money?
22    A    My brother, when he comes and visits
23 he leaves money; friends, when they come to
24 visit they leave money. We also have a support
25 committee, National Coalition to Free the

Page 75

1  Angola 3, they provide us with money.
2    Q    How much money do you receive from the
3  support committee?
4    A    It varies, can go anywhere from ten
5  dollars to a thousand dollars.
6    Q    How often do you get money from them?
7    A    My brother usually comes once a month
8  without fail to visit, if I have what I
9  consider to be an adequate amount of money in
10 my account I ask him not to leave any money.
11    Q    Over the years how much money do you
12 think you've received from the Angola 3 support
13 committee?
14    A    Probably a couple thousand dollars in
15 various donations.
16    Q    Canteen items are made available?
17    A    Yes. There are restrictions though as
18 to what we can buy at the canteen, as to if we
19 were in the main prison population.
20    Q    What items do you like?
21    A    I don't really have a preference,
22 whatever I see on the list that may appeal to
23 me at the time.
24    Q    There's a variety of candy and chips,
25 that sort of thing?

Page 76

1    A    I'm not a big eater of candy or chips,
2  basically potato chips.
3    Q    Do you have access to mental health
4  services on CCR?
5    A    Yes, mental health come on the tier I
6  think once or twice a week.
7    Q    Do you see a social worker once or
8  twice a week?
9    A    They come on the tier, usually they'll
10 pass by your cell and ask the individual,
11 mental health, are you having any problems you
12 want to talk about.
13    Q    Do you have access to medical care?
14    A    Yes.
15    Q    If you need immediate access to mental
16 health care or medical care, do you declare
17 yourself an emergency?
18    A    Yes.
19    Q    Have you ever done that?
20    A    No. Excuse me, one time I declared
21 myself an emergency. I had a tooth that was
22 driving me crazy and they told me the only way
23 I could get to the dentist, I would have to
24 declare myself an emergency, so I done that and
25 the next day I was brought to the dentist

Page 77

1  without an appointment.
2    Q    And did the dentist give you the
3  treatment you needed?
4    A    Yeah. My gum had got infected so he
5  put me on antibiotics and eventually the tooth
6  was pulled, a wisdom tooth.
7    Q    The system worked in that case, didn't
8  it?
9    A    Well, the system always worked, it's
10 always a matter of how well or how fast you can
11 get medical care when you need it.
12    Q    But you were in a lot of pain and got
13 to see a dentist the next day?
14    A    Yeah, and I suffered a lot between
15 when I saw the EMT and I was actually brought
16 to the dentist. I must have ate about two
17 bottles of aspirin.
18    Q    You're allowed to talk to other
19 inmates?
20    A    Yes, I am.
21    Q    And throughout this period have there
22 always been an inmate on either side of you
23 that you can talk to?
24    A    Yes, although it don't work like that.
25 Sometime an inmate may have like personalities,

Page 78

1 the same interests and stuff and you may talk
2 to them all the time.  And you have inmates on
3 one or both sides of you that are fools that
4 you just don't care about, so you stay to
5 yourself.  You have less contact with them as
6 possible.
7     Q    But you've always had the ability to
8 talk to inmates?
9     A    Yes.
10    Q    You're allowed out of your cell for
11 one hour a day?
12    A    Yes.
13    Q    And during that hour you can walk the
14 tier and talk to the other inmates on the tier?
15    A    Yes.
16    Q    You go outside three times a week,
17 weather permitting?
18    A    Yes.
19    Q    In an individual pen?
20    A    Yes.
21    Q    Has there ever been a time while you
22 were on CCR that you could not talk to other
23 people?
24    A    No.
25    Q    Is the food okay?

Page 79

1     A    Depends on who cooking.  Some shifts
2 cook well, some shifts don't.
3     Q    It's eatable, it's not unsanitary; is
4 that correct?
5     A    Well, now it isn't.  There was a time
6 when they slid our food under the door and they
7 only clean the tier once a week and the floors
8 are filthy and they would have debris hanging
9 off the bottom of the doors.
10    Q    When was that?
11    A    I think back in the '80s.  It was from
12 the '70s until the '80s.
13        MR. SPITAL:
14            Is your question still from '99
15 on?
16 BY MR. HICKS:
17    Q    That hasn't happened from 1999 on?
18    A    No.
19    Q    How is the food delivered now?
20    A    Excuse me?
21    Q    How is the food delivered to you now?
22    A    Well, as a result of a hunger strike
23 by the entire CCR, they eventually cut food
24 slots in the bars and they hand the trays
25 through the food slots now.

Page 80

1     Q    So a more sanitary method?
2     A    Yes.
3     Q    Are you provided with sufficient
4 clothing?
5     A    Well, fortunately I'm one of the few
6 inmates that have family support where I can
7 buy whatever -- before they stopped us from
8 receiving items, clothing from the street, you
9 know, my family or friends would provide me
10 with any items of clothing, now we have to buy
11 them inside the institution.
12    Q    From '99 on, have you always had
13 enough clothing or sufficient clothing, either
14 through family and friends or through the
15 institution?
16    A    Well, never from the institution.  I
17 mean, to get a pair of underwear is like
18 getting teeth pulled sometime, you know, for
19 various reasons, they didn't have any or you
20 got to wait six months.  You just made a
21 request and as I said, for various reasons.
22    Q    Have you always had enough clothing
23 since 1999?
24    A    Yes.
25    Q    Has bedding been sufficient since

Page 81

1 1999?
2     A    Yes.
3     Q    Is your tier sanitary?
4     A    Excuse me?
5     Q    Is the tier in your cell sanitary?
6     A    My cell is sanitary because I try to
7 keep it clean, and the tier, they clean the
8 tiers once a day.
9     Q    Is it warm in the winter?
10    A    Sometime.  The heating system, when
11 you turn it on it takes hours sometime for the
12 tier to warm up and by the time the tier warm
13 up they turn it off.  So you may have that two
14 or three hours where it's actually warm on the
15 tier and the rest of the time it's cold.
16    Q    If it's cold outside they do have a
17 heating system that they turn on?
18    A    Sometime.
19    Q    Sometimes?
20    A    I don't know what data they use, what
21 system they use to determine when the heat
22 needs to be turned on.  Usually it's early in
23 the morning when they turn the heaters on.
24 You'll go to sleep, it's cold; you wake up, if
25 you can't feel the heat you can smell the odor

(Pages 82 to 85)

Page 82

1   of the heaters being on.
2   **Q    Is there ventilation and fans in the**
3   **summer?**
4   A    Yes.
5   **Q    Do you have access to legal materials?**
6   A    Yes.
7   **Q    Pens, papers?**
8   A    Well, you know, I think there is an
9   indigent inmate system.  Again, because I have
10  support of the family and friends, I'm able to
11  provide myself with paper, envelopes, stamps,
12  whatnot.
13  **Q    What time do you generally go to bed?**
14  A    It varies, depends on my workload from
15  the day, for that day, you know, when I decide
16  to read or not.  Earliest is usually 11:00,
17  12:00.
18  **Q    What time do you get up?**
19  A    Usually about -- it varies, I get
20  medication for hypertension, sometime they
21  bring it at three, 3:30, sometime four, and
22  that's usually when I'm up.
23  **Q    Tell me about a typical day, how does**
24  **your day usually go after you get up, what do**
25  **you normally do?**

Page 83

1   A    Same.  Everything is repetitive in the
2   cell, you know.  I get up, I straighten my cell
3   up, I may GI my cell with a cloth or something.
4   Depending on my mood I may read.
5   **Q    Do you do any exercises?**
6   A    Yes, I do.
7   **Q    What exercises do you do?**
8   A    Mostly calisthenics.
9   **Q    Do you do any pushups?**
10  A    Yes.
11  **Q    How may pushups do you do a day?**
12  A    It varies, I may do a hundred, some
13  days I may do more, you know.
14  **Q    What about sit-ups?**
15  A    Yes.
16  **Q    How many sit-ups do you do a day?**
17  A    Again, it varies, I may do a hundred,
18  two hundred sit-ups and I may go days without
19  doing sit-ups.  It all depends on being in that
20  cell, whatever mood you in.
21  **Q    What other calisthenics or what**
22  **calisthenics do you do?**
23  A    Jumping jacks, I try to stretch, leg
24  lifts, along that line.
25  **Q    Keep going through your day, so you'll**

Page 84

1   get up and go read some?
2   A    Well, breakfast will come between six,
3   6:30, after that I'll try to start answering
4   some of the mail I get, I may watch some news
5   on TV or some program that catch my interest.
6   There's not a lot to do.  I may listen at my
7   radio.  Other than educational programs I don't
8   watch a lot of TV, so the TV don't serve me
9   that well.  On weekends if they have sporting
10  events on I'll look at that.
11  **Q    Do you get a lot of mail?**
12  A    Yes.  Even more so since the support
13  committee was started.
14  **Q    When was that?**
15  A    I don't know, somewhere around '98,
16  '99.
17  **Q    Are you claiming any of these**
18  **conditions we've talked about are**
19  **unconstitutional in this suit?**
20  A    Our suit was not about conditions.
21  **Q    What's your suit about?**
22  A    The fact that when we go before the
23  reclassification board we're not allowed any
24  due process, meaningful due process.
25  **Q    So you're not claiming there have been**

Page 85

1   **any specific violations since 1999, other than**
2   **the failure of you to be released from CCR?**
3   A    Yes.
4   **Q    Overall do you think security in CCR**
5   **treats you fairly?**
6   A    Overall, yes.
7   **Q    In this suit you're not alleging abuse**
8   **by anybody at Angola, are you?**
9   A    Not physical abuse, we're claiming the
10  fact that we've been here in the cell so long
11  constitutes cruel and unusual punishment.
12  **Q    Do you think you've been treated any**
13  **differently than other inmates on CCR?**
14  A    Yes.
15  **Q    How so?**
16  A    Well, the basic difference, that's
17  what's happening right now, for twenty
18  something years Herman Wallace and I have not
19  been allowed to have contact, families came and
20  went, we lost parents together, we lost
21  siblings together.  And then because Wilkerson
22  got out and stayed out for the required amount
23  of time and wasn't in any trouble, he came back
24  to see another inmate and since that time
25  Wallace and I have been denied the right to

Page 86

1  have contact visits on the same day.  And now
2  they have started restricting us on our
3  noncontact visits.
4      Q   So you think you're treated different
5  than other inmates in CCR --
6      A   We're the only ones they're doing it
7  to.
8      Q   Let me finish my question.
9      A   Excuse me.
10     Q   Do you think that you're being treated
11 differently than other inmates because you and
12 Mr. Wallace are not allowed to have contact
13 visits at the same time, is that what I'm
14 understanding?
15     A   We're the only ones to my knowledge
16 that they're doing that to.
17     Q   Any other ways you're treated
18 differently than other inmates at CCR?
19     A   Not that I can think of.
20     Q   And you're not seeking a remedy for
21 any conditions that occurred or occurrences in
22 the 1970s, '80s or '90s in this lawsuit, are
23 you?
24     A   Excuse me?
25     Q   You're not seeking a remedy for

Page 87

1  anything that occurred or conditions from the
2  1970s, '80s or '90s, are you?
3      A   Yes, we seeking remedies for the
4  entire period of time we've been held in CCR.
5      Q   To be released, correct?
6      A   Yes.
7      Q   But you're not alleging any particular
8  conditions or any particular occurrence from
9  that time, are you?
10     A   Well, the conditions of CCR has
11 changed over the thirty something year period
12 we've been here.  They have went from good to
13 bad to good, you know, depending on the
14 administration or the supervisors at the camp.
15     Our complaint has always been that we
16 are not given true meaningful equal treatment
17 and due process when we go before the board.
18 There's nothing we can do on our behalf to be
19 released, given an opportunity to go back in
20 prison population.
21     Q   So it's not about more yard time or
22 more blankets or anything like that on CCR,
23 correct?
24     A   Not the suit, it doesn't mean that we
25 haven't had these problems at one time or

Page 88

1  another but this suit is about the
2  reclassification system that's being used at
3  this time.
4      MR. HICKS:
5          I guess this is a good spot to
6  take a break if y'all want to take about a five
7  minute break.
8          (A short break was taken.)
9      MR. HICKS:
10         I provided Mr. Woodfox and his
11 counsel with a copy of a series of Disciplinary
12 Reports from Mr. Woodfox's record and I have
13 asked them to place those Disciplinary Reports
14 in various categories, one being those
15 Disciplinary Reports that Mr. Woodfox considers
16 to be accurate; the second category, those
17 which he deems to be inaccurate; and a final
18 category in which he doesn't remember.
19         Counsel, have y'all done that?
20     MR. SPITAL:
21         Yes.  We would like to go through
22 how we categorized each as we did yesterday.
23 As Mr. Hicks said, there's three categories, a
24 don't remember category, an accurate category
25 and an inaccurate category.  The accurate

Page 89

1  category means simply that to the best of Ms.
2  Woodfox's knowledge and recollection there are
3  no facts asserted in the description of
4  incident or the circumstances of incident that
5  he knows to be inaccurate.  I would like to
6  read one specific example into the record just
7  so it's completely clear.  There is an Incident
8  Report dated 10-12-87, it's bates number AW
9  0179 and it contains the following statement:
10 "On 10-9-87 I received information from three
11 confidential informants that inmate Woodfox had
12 made a statement that he was going to get
13 Sergeant David Ross any way he could, that he
14 may have to pay for it in the long run but it
15 would be worth it to him."
16         By charactering this as accurate,
17 Mr. Woodfox is not saying that Mr. Woodfox ever
18 made such a statement, instead he is simply
19 saying that based on his knowledge and
20 recollection, he has no reason to disbelieve
21 the report that the officer received this
22 information from three confidential informants.
23 That's the accurate category.
24         In the inaccurate category
25 there's at least one statement, that based on

Page 90

1   his best recollection and knowledge Mr. Woodfox
2   believes to be inaccurate.
3        The don't remember category, as
4   the title suggests, means simply that
5   Mr. Woodfox does not actually remember the
6   incident to characterize it as inaccurate or
7   accurate.
8        MR. HICKS:
9        Thank you, Counsel.
10       MR. SPITAL:
11       Can we do the same thing we did
12  yesterday where we read the bates numbers?
13       MR. HICKS:
14       I will.
15       MR. SPITAL:
16       Thank you.
17       MR. HICKS:
18       I'm going to mark as Exhibit 7 In
19  Globo, the Disciplinary Reports that the
20  witness has marked as accurate, those being,
21  all the bates numbers start with AW, 140, 143,
22  179, 180, 188, 200, 215, 220, 235, 248, 260,
23  276, 277, 280, 283, 288, 307, 326, 333.
24       Now I'm going to mark as Exhibit
25  8 In Globo, the Disciplinary Reports that the

Page 91

1   witness has marked as inaccurate.  Again, all
2   bates numbers begin with AW, these documents
3   are bates numbered 84, 99, 173, 278, 309, 324.
4        And finally I'm going to mark as
5   Exhibit 9, one Disciplinary Report that the
6   witness has marked as not being remembered, and
7   it is bates number AW 237.
8        (Whereupon the documents referred to
9        by Counsel were marked for identifica-
10       tion as Exhibit #7 In Globo, Exhibit
11       #8 In Globo and Exhibit #9.)
12  BY MR. HICKS:
13   Q   I'm going to show the witness bates
14  number 140, which is a Disciplinary Report
15  dated September 22, 1992, which has been marked
16  as being accurate.
17       Mr. Woodfox, there was a telescopic
18  pole concealed in a large envelope inside your
19  locker box; is that correct?
20   A   Yes.
21   Q   And that was in fact inside your
22  locker box?
23   A   Yes.
24   Q   What is that used for?
25   A   They call it a remote.  We use that to

Page 92

1   change the TV with.
2    Q   What do you use the empty burned Coke
3   can for?
4    A   At the time we didn't have hot or cold
5   water in our cells so we used it to warm water,
6   to make coffee.  They sold instant coffee in
7   the canteen but we didn't have any hot water in
8   the cell.
9    Q   Next I'm going to show you bates
10  number 143, Disciplinary Report dated February
11  5, 1992.  According to this report,
12  Mr. Woodfox, you had a homemade spear in your
13  cell; is that correct?
14   A   Yes.
15   Q   That would extend eight feet long?
16   A   Yes.
17   Q   Is that a weapon?
18   A   Same thing, TV changer.  We use them
19  to turn the TV with.  It's a routine practice
20  at CCR at the time.
21   Q   I don't understand how it works,
22  explain to me how it works.
23   A   All right, the TV is set up across the
24  hall from the cell, nobody is in the hall to
25  change the TV or somebody is in the shower, so

Page 93

1   you want to change the TV to a certain station,
2   you stick the stick out, press the button and
3   change the TV with.
4    Q   How would you make a spear from a roll
5   of toilet paper?
6    A   You just roll it up.  I mean, you
7   shove it hard against the wall or something, it
8   just collapses.  Some officers didn't have a
9   problem with it, some officers did.
10   Q   The next one I'm going to show you is
11  bates number 179 and 180, Incident Report dated
12  October 12, 1987.  Did you make a statement
13  that you were going to get David Ross?
14   A   No, I did not.
15   Q   Did you make any statements about
16  Sergeant Ross?
17   A   No, I did not.
18   Q   Do you know why somebody would have
19  fabricated this story if it wasn't true?
20   A   Usually for favors.  You have
21  confidential informants that buy information
22  and most of the time it's an outright lie or
23  it's an exaggeration.  They trying to gain some
24  favor for their correctional officer or
25  supervisor or whatever.

ALBERT WOODFOX                                          1/31/2008

(Pages 94 to 97)

Page 94

1    Q   Do you know who Sergeant David Ross
2  is?
3    A   Yes, he was over the work line that
4  was in use at CCR at that time. CCR was being
5  housed and Guard Unit at Camp J at the time
6  while they renovated this building.
7    Q   And had you and he had a dispute or
8  argument around this time?
9    A   Yes, I became ill in the field, he
10 refused to call the EMT. Eventually when he
11 did call EMT they couldn't get a blood pressure
12 reading, my blood pressure had dropped so low
13 they couldn't get a reading. I was immediately
14 transported to the hospital and as a result I
15 filed a civil suit against him.
16   Q   During what time period did CCR
17 inmates go out in the field?
18   A   Well, it actually had two times, they
19 had a line up here that they started, that
20 didn't last long, and then when we moved to
21 Camp J in '86 while they repaired this
22 building, renovated, they started another work
23 line and I don't know how long it lasted, six
24 months or so. They discontinued it when we
25 moved back in this building.

Page 95

1    Q   Not the last time?
2    A   Yes, the last time.
3    Q   You're saying you were on a work line
4  in the past couple of years?
5    A   In the '80s.
6    Q   I understand you guys moved to this
7  building last year.
8    A   No, no, we moved from TURC. In the
9  time period you just asked me about was with
10 Sergeant Ross. Sergeant Ross was a field
11 foreman over the work line for CCR that existed
12 in the '80s. At that time CCR was being housed
13 at Camp J, Guard Unit. This building was being
14 repaired and renovated. We moved back to this
15 building in '89.
16   Q   What was the outcome of your suit
17 against Sergeant David Ross?
18   A   We tried it and the jury ruled in his
19 favor.
20   Q   The suit was dismissed?
21   A   No, we actually had a trial and the
22 jury found for the defendant.
23   Q   Was that in Baton Rouge?
24   A   Yes, it was district.
25   Q   Who was the judge?

Page 96

1    A   Judge Polozola.
2    Q   Was this Disciplinary Report made
3  before or after the trial?
4    A   After. I think after, it's been a
5  long time but it was around -- I'm almost
6  certain it was after because I wasn't even on
7  the work line when I filed the suit, they had
8  moved me -- no, before, because they removed me
9  from the work line as a result of this
10 incident. But I had filed my suit already
11 while I was still in the work line.
12   Q   I'll show you Disciplinary Report
13 bates number 200, dated December 4, 1985. Did
14 you get in a fight with Otis Lewis?
15   A   Yes, I did. Everyone knew him and I
16 didn't get along. He was in the hall, I was in
17 my cell while he was in the hall and we got
18 into a fistfight. I was merely protecting
19 myself. He should not have opened my door
20 while another man was in the hall.
21   Q   Are you implying that the officer did
22 it on purpose so you guys would fight?
23   A   He opened my door.
24   Q   You think he may have?
25   A   I think he did it on purpose. Otis

Page 97

1  Lewis was not a well-liked inmate at the time
2  by inmates or security.
3    Q   Were you told to stop fighting and you
4  refused?
5    A   I would imagine so. We were fighting,
6  I mean, we was fighting and would not really
7  listen to anything that was being said, you
8  trying to protect yourself. And for the
9  record, he attacked me, I didn't attack him
10 first.
11   Q   You were sent to the hospital?
12   A   Yes.
13   Q   What kind of injuries did you suffer?
14   A   None.
15   Q   I'll show you a Disciplinary Report,
16 bates numbered 215, dated July 11, 1982. Did
17 you have a rash at this time?
18   A   Yes. A very bad rash.
19   Q   And why did you declare yourself an
20 emergency?
21   A   Because I was in pain.
22   Q   The rash was causing pain?
23   A   Great pain, the rash was bleeding --
24 I'm allergic to the rubber in underwear, which
25 is why even to the day I wear my underwear

ALBERT WOODFOX                                               1/31/2008

(Pages 98 to 101)

Page 98

1  inside out. And as a result of me wearing
2  underwear, a rash developed, circled completely
3  around my waist. And the rash, in spite of me
4  putting ointment and stuff on it, it continued
5  to get worse and worse and worse. So when I
6  seen the ointment wasn't working, I declared
7  myself as an emergency. Pus had actually
8  started oozing out of it, I had to take toilet
9  paper and make a cummerbund like around to keep
10  pus from soiling my underwear. At that point I
11  figured I better go to the hospital.
12      Q    You wrote a letter to the doctor about
13  that, didn't you, asking for some new medicine;
14  is that right?
15      A    I may have, I really can't say.
16      Q    I think we'll get to this in a little
17  bit. Ultimately did you get the medicine you
18  needed to correct the rash?
19      A    Yes, which is why I was confused as to
20  why I had a Disciplinary Report filed on me.
21  They took me to the hospital and treated me,
22  peeled all the skin and stuff that accumulated,
23  they rinsed the waste off with some kind of
24  foam solution and they bandaged my waist up and
25  sent me back with some kind of ointment they

Page 99

1  had prescribed, which is why I couldn't
2  understand, after being treated I got this
3  Disciplinary Report.
4      Q    I'll show you Disciplinary Report
5  number 235, dated February 15, 1979. What
6  would you use an empty clorox bottle and
7  Kool-Aide container for?
8      A    Because ever since we've been
9  deprived, renovating this building, this
10  building was horrible with rats, roaches, ants
11  and stuff like that. They didn't sell us
12  containers out of the canteen at that time so
13  we used to use containers from other products
14  we would buy at the store to store stuff in, to
15  keep ants or rats from getting in it. So
16  whenever they found you with a container in
17  your cell they would write you up.
18      Q    Did you use these containers to store
19  things?
20      A    Yeah.
21      Q    I'll show you a Disciplinary Report
22  dated October 5, 1977, bates number 248.
23  According to this you cursed this officer,
24  refused to let him do a shake down and tried to
25  escape from his office; is that true?

Page 100

1      A    Yes.
2      Q    The next Disciplinary Report is number
3  260, dated September 24, 1977. Was this
4  another incident of you refusing to allow a
5  shake down?
6      A    Yes.
7      Q    Did you guys file a lawsuit to stop
8  the strip searches?
9      A    Yes, we did and we won.
10      Q    When was that?
11      A    I'm not sure of the exact time,
12  somewhere in the '80s I think, myself and
13  another inmate named Charles Nolan, N-o-l-a-n,
14  were the plaintiffs. The ruling was not to
15  stop them but to set standards and limits on
16  when they could strip search, when they could
17  conduct rectal searches.
18      Q    I'll show you a Disciplinary Report,
19  bates number 307, dated April 4, 1975. Can you
20  tell me what brought this incident about, that
21  is you cursing the guards, throwing glass jars
22  and tearing out the commode?
23      A    As I said earlier, it was an incident
24  and I see now that it was inmate Wilkerson,
25  they wanted to move him to another tier, he

Page 101

1  didn't want to move. Eventually, about ten or
2  fifteen officers came up, I think we were upper
3  B tier at the time, and they started issuing
4  all of us to go back in the cells, pretty much
5  everybody. Everybody went back in their cell.
6  It come down the tier they made Wilkerson move.
7  I couldn't help him, I was in the back of the
8  tier and just everybody in the tier was cursing
9  and screaming and hollering, they was cursing
10  us and we was cursing them back and then they
11  started shooting, I forget what they call it,
12  it was like these riot rifles with these
13  canisters in them. When they would shoot, they
14  would shoot and hit us with them, and they were
15  hitting some of us with them. So to protect
16  ourselves, you know, people just standing in
17  front of their cell, we started throwing
18  anything we could get our hands on in our cell
19  to stop them from standing in front of the
20  cells shooting these gas canisters at us.
21      Q    So you were throwing glass jars and
22  parts of your toilet to protect yourself, is
23  that what you're saying?
24      A    Yes.
25      Q    Do you know why inmate Wilkerson was

ALBERT WOODFOX                                                    1/31/2008

(Pages 102 to 105)

Page 102

1  being moved?
2      A    Even to this day they don't give you
3  reasons when they want to move you from one
4  cell to another or one tier to another.  They
5  just come and tell you, pack your stuff, you're
6  moving.
7      Q    Why were you guys, the other inmates
8  upset that he was being moved?
9      A    Because at the time we were in fear
10 for his life.
11     Q    Why did you think that his life may be
12 in danger?
13     A    Because he had been identified by
14 administration as a Black Panther and a leader
15 and a troublemaker, et cetera, et cetera.  They
16 came late at night to move him and if I recall
17 correctly that's what his concern was.
18     Q    According to the report the incident
19 took place at 3:00; is that correct?
20     A    I don't care what time they got on
21 here, when they came on our tier it was at
22 nighttime.
23     MR. SPITAL:
24         And to clarify for the record,
25 that was not a description of the incident so

Page 103

1  it's not something that Mr. Woodfox would have
2  been focused on when he was characterizing
3  these reports as accurate or inaccurate.
4  BY MR. HICKS:
5      Q    So did the disturbance in the cell
6  start before the officers were firing their
7  canisters or did they start firing canisters
8  and then you guys started tearing up your
9  cells?
10     A    They started firing canisters after
11 everybody went in their cell and came on the
12 tier.
13     Q    So they were walking down the tier
14 shooting at men that were in locked cells?
15     A    Yeah.  And they were also saying all
16 kinds of derogatory things.
17     Q    The next set of Disciplinary Reports
18 I'm going to show you are the ones you marked
19 inaccurate that are part of Exhibit 8.  The
20 first one is bates number 84 and is dated
21 December 4, 2002.  What is your version of what
22 happened on that day?
23     A    It started to rain.  At the time I was
24 writing a letter, it started to rain, it got
25 extremely cloudy and dark.  I asked the officer

Page 104

1  at least five different times to turn my cell
2  light on, he kept ignoring me, I told him that
3  I wanted to see the supervisor.  At that time
4  he told me that I wasn't running nothing, he
5  would turn the light on when he wanted, to step
6  back away from the bars; I complied.  He
7  started telling me to calm down and he left off
8  the tier.  He come back later with a jump suit
9  and told me I was going to isolation, get
10 dressed; I did that.  I packed all my
11 belongings and I was put in isolation.  When I
12 got this, my copy of the Disciplinary Report I
13 was actually surprised that some of the things
14 that were put in there.
15     Q    The next one I'm going to show you is
16 bates number 99, dated May 5, 1999.  Did you
17 try to start a second hunger strike?
18     A    No, I did not, and the investigative
19 report cleared me of this incident.
20     Q    Were you involved in the first hunger
21 strike?
22     A    Yes, I was, in as far as I didn't eat.
23     Q    Did you lead the first one?
24     A    No.
25     Q    What brought it about?

Page 105

1      A    I have no idea, the situation had
2  already been in progress when I returned to CCR
3  from Amite.
4      Q    You were in Amite when the hunger
5  strike started?
6      A    No, I'm saying whatever conditions
7  that led to the hunger strike, it had already
8  been in process when I was returning to CCR.
9      Q    Do you know the conditions that
10 brought about the hunger strike?
11     A    Yeah, most of the privileges that CCR
12 had been granted, this warden had started to
13 either restrict them or take them altogether.
14     Q    Were there particular privileges you
15 guys wanted to get back?
16     A    Use of the phone, I just can't
17 remember all the things.  As I said, when all
18 of this initially started I was still in Amite.
19     Q    As a result of the hunger strike, were
20 privileges, additional privileges granted?
21     A    I think so.  At some point in time the
22 warden came and talked.  I was in isolation at
23 the time.  An investigation of this incident
24 report at TU and at some time Warden Cain came
25 over and talked with one inmate from each tier

ALBERT WOODFOX                                    1/31/2008

(Pages 106 to 109)

Page 106

1  and he pretty much restored all the things that
2  had caused this hunger strike.
3      Q    But you never made a threat to do a
4  second hunger strike?
5      A    As I said, disciplinary -- the
6  investigating officer on this incident report
7  cleared me, he said he could find no proof of a
8  planned second hunger strike or my involvement
9  in planning a second hunger strike.
10     Q    The next Disciplinary Report I want to
11 show you is bates 278, dated September 14,
12 1977.  Did you have a handcuff key?
13     A    No, I did not.
14     Q    Did you have anything?
15     A    Yes.
16     Q    What did you have?
17     A    A homemade screwdriver to work on my
18 radio.
19     Q    Could this screwdriver be used as a
20 handcuff shim?
21     A    No.
22     Q    Was the screwdriver an authorized
23 item?
24     A    No, it was not.
25     Q    I'm going to show you an Incident

Page 107

1  Report dated April 4, 1975, bates number 309.
2  Is this the same incident we were talking about
3  earlier where Wilkerson was being taken out of
4  his cell and there was a disturbance?
5      A    Yes.
6      Q    There was a second incident?
7      A    This is the first time I've ever seen
8  this report.
9      MS. DIEZ:
10         Do y'all want to put that with #7
11 as accurate?
12     MR. SPITAL:
13         I think that there's different
14 facts discussed in the two reports.
15     MR. HICKS:
16         Well, just keep them separate.
17     THE WITNESS:
18         This is an Incident Report.
19     (Discussion held off the record.)
20     A    As I remember it's inaccurate, the
21 incident about inmate Wilkerson throwing jars
22 through the bars is inaccurate and the stuff
23 about gum in the locks and all of that, I don't
24 know anything about all of that.
25     Q    I'm going to show you a Rules

Page 108

1  Violation Report, bates number 295, which was
2  not in any of the stacks.  Did you have
3  gunpowder in a tube of tooth paste?
4      MR. KENDALL:
5         Hold on just a minute.
6      (Discussion off the record.)
7  BY MR. HICKS:
8      Q    Was there gunpowder found in your
9  cell?
10     A    No.  Gunpowder was brought in my cell.
11     Q    What makes you think it was brought in
12 your cell?
13     A    Because I seen the officer take it out
14 of his pocket and I asked him, what you taking
15 out of your pocket, and he turned around and
16 told me none of my F-ing business.
17     Q    He took gunpowder out of his pocket
18 and put it in a tube of tooth paste?
19     A    At the time I didn't see what it was,
20 I just saw him taking something out of his
21 pocket and I asked him, you know, what you
22 taking out of your pocket, and he turned and
23 looked at me and said, none of your F-ing
24 business.  And he shook my cell down, I was
25 never told anything about this at that

Page 109

1  particular time.  Later on they came in my cell
2  and told me I was going to isolation, that they
3  had found gunpowder in my cell.
4      Q    I'm going to show you another
5  Disciplinary Report, bates number 237, dated
6  November 1, 1978.  You marked it as you didn't
7  remember.  You don't remember being caught with
8  a firing pin for a zip gun?
9      A    No, I never been involved with bullets
10 that I can recall, a zip gun or anything.  I
11 had never had a Disciplinary Report.  This is
12 the first I've even seen any of this.
13     Q    You don't remember an incident where
14 you were caught with a sharpened end of a radio
15 antenna?
16     A    Yeah, we used to make -- in order to
17 get back our radios we used to take antennas or
18 whatever and make screwdrivers.  When a
19 correction officer come in there and find a
20 particular, at that time it's just whatever he
21 said it is, I have no control over that.
22     Q    But you don't recall this incident,
23 correct?
24     A    Not as being a zip gun, trigger for a
25 zip gun and bullets and all, no.

ALBERT WOODFOX                                    1/31/2008

(Pages 110 to 113)

Page 110

1      Q    And you deny ever having a firing pin
2    for a zip gun?
3      A    Yes.
4      MR. HICKS:
5          We can go ahead and take a lunch
6    break.
7          (A lunch break was taken.)
8    BY MR. HICKS:
9      Q    Mr. Woodfox, I would like to talk
10   about the Lockdown Review Boards and the
11   lockdown review process for a little while.
12         Do you understand that Angola holds a
13   Lockdown Review Board to review the confinement
14   of all inmates on a quarterly basis?
15     A    Yes.
16     Q    Has your status been quarterly
17   reviewed by the Lockdown Review Board since
18   you've been at CCR?
19     A    Yes.
20     Q    And have you had the opportunity to
21   meet quarterly with the Lockdown Review Board?
22     A    Yes.
23     Q    Tell me about your last Review Board,
24   who were the officers on it?
25     A    Major DeMar, camp supervisor, and

Page 111

1    classification officer, a female, I'm don't
2    know her name.
3      Q    There were three officers?
4      A    Two.
5      Q    Two officers.
6      A    Just Major DeMar and the
7    classification officer.
8      Q    How long did it take?
9      A    About a minute.  When they removed me
10   from my cell they were holding the board on the
11   bridge of the tier.  You got an A tier and B
12   tier and they have the bridge area out and they
13   have a desk set up there, so by the time I come
14   off my tier and got to the table, they were
15   already signing.  The classification officer
16   had already signed on there, him and Major
17   DeMar was marking initial classification and
18   they just sign it and they hand it to me and I
19   went back to my cell.
20     Q    Did you say anything?
21     A    No.  I wasn't asked any questions by
22   any members of the Board either.
23     Q    So you walked up there, got your piece
24   of paper and went back?
25     A    Yes.

Page 112

1      Q    Could you have spoke if you wanted to?
2      A    Probably.
3      Q    They have a copy of your record?
4      A    They had my entire record from my
5    understanding.
6      Q    When you walked up there did it appear
7    they had looked at your record?
8      A    I don't know.  My record wasn't
9    displayed on the desk or nothing, they were
10   just filling out the review form that they give
11   to us.
12     Q    The officers that were there, do you
13   think they knew who you were?
14     A    Yeah, Major DeMar is the camp
15   supervisor.
16     Q    So he's familiar with you and your
17   situation?
18     A    I would imagine so.
19     Q    And at your last review board you were
20   given a copy of the decision?
21     A    Yes.
22     Q    Are you always given a copy?
23     A    Yes.
24     Q    Is there a particular officer you
25   think believes you should be released from CCR?

Page 113

1      A    Not to my knowledge.  I mean, it's two
2    worlds, it's the world of when they're around
3    us and both of the desk sergeants speak to us
4    and they express personal opinions, and there's
5    the supervisors who actually do the actual
6    boards, the actual reviewing of the records or
7    whatever.
8      Q    Do you think they say different things
9    in these different environments about you guys,
10   is that what you're saying?
11     A    Yes, I'm saying you have supervisors
12   who have very little contact with us and you
13   have the tier officers who work the tiers in
14   the yard and stuff and they're around us on a
15   daily basis.
16     Q    Do you know if the officers who
17   conduct the Lockdown Review Board get or seek
18   input from the tier officers?
19     A    I don't have any idea.  It has never
20   happened in front of me while I was before the
21   Review Board.
22     Q    Are there particular members of the
23   Lockdown Review Board that you think don't like
24   you or wouldn't release you due to their
25   personal dislike of you?

ALBERT WOODFOX                                                          1/31/2008

(Pages 114 to 117)

Page 114

1     A    Are you asking me my personal?
2     Q    Yes, your personal opinion.
3     A    Well, I would imagine over the last
4   thirty something years there's some people who
5   held the board that didn't like me and there
6   are people who held boards that I would imagine
7   didn't have any animosity toward me.  I mean
8   personally, you know.  It's my experience that
9   it is an unwritten understanding that they're
10  not going to release us from CCR.
11    Q    What is that understanding based upon?
12    A    I have no idea.  The most I've ever
13  heard is a couple of times some major heard the
14  board or the colonel said, you know, I can't do
15  nothing for you, it's out of my hands.
16    Q    Who's told you they couldn't do
17  anything for you, it's out of their hands?
18    A    Well, the last board member, what I
19  remember was a Major Mayoux, and that was some
20  time ago.
21    Q    Do you understand that someone other
22  than the Lockdown Review Board is going to have
23  to make a decision to release you before you'll
24  be released?
25    A    It's the general understanding that

Page 115

1   there are always a preboard to pass before the
2   actual board.  Who's a part of it, I have no
3   idea.
4     Q    Do officers discuss matters unrelated
5   to your status during the boards?
6     A    At times I went before the Board and
7   they'll be talking about hunting trips or
8   fishing trips or their wives, their kids or
9   something going on in the prison, yeah.
10    Q    Do you think the members of the
11  Lockdown Review Board know that you were
12  convicted of killing Brent Miller?
13    A    Yeah.
14    Q    You think that's been consistent that
15  they've known that, people on that board?
16    A    They have my record right there.  I
17  mean, it's common knowledge in this prison that
18  Herman and I have been convicted of killing
19  Officer Miller.
20    Q    Have you ever been told what you can
21  do or what you could do to become released from
22  CCR?
23    A    I've been told verbally but, I mean,
24  I've lived at CCR thirty something years, I
25  know -- the only thing at CCR that can be

Page 116

1   determined whether or not you're released or
2   not released is disciplinary, your conduct, and
3   at times, more often it depends on who they
4   want released and who they don't want released.
5   I don't think any of this matters.
6     Q    Have you ever been told to keep a
7   clean conduct record and that would help you be
8   released?
9     A    No.
10    Q    Have you ever been told it didn't
11  matter what your conduct was, you're never
12  going to be released?
13    A    Not in those words, but yeah, as I
14  said, some members of the Board has said,
15  there's nothing I can do.
16    Q    It was my understanding of what you
17  said earlier that you were told that they can't
18  do anything for you, it's out of their hands.
19  I understand that to be different from a
20  statement that there's nothing you can do to
21  get out of CCR, you're going to stay there
22  forever.
23    A    Well, they're talking about releasing
24  me from CCR.
25    Q    Right.

Page 117

1     A    Otherwise, it's not their decision to
2   make.
3     Q    That's the first instance, now my next
4   question is, have they told you that you will
5   not be released from CCR, has anybody told you
6   that?
7     A    Yeah, a long time ago, in the '70s,
8   '80s, when this stuff was still fresh and a lot
9   of hatred toward us was still being acted out
10  one way or the other.
11    Q    Anytime since the '70s?
12    A    As I said, around '79 or '80 things
13  seemed to like mellow out as far as us being on
14  constant harassment, constant attacks, and then
15  it may pick up.  It usually depends on the
16  officer or the supervisor, the type of
17  personality they have.
18    Q    Did something happen in '79 or '80
19  that caused things to kind of taper off?
20    A    Not that I'm aware of.
21    Q    Do you know why they tapered off at
22  that time?
23    A    Time I would imagine, you know, enough
24  time had passed.
25    Q    Have you been told that you need to

ALBERT WOODFOX                                              1/31/2008

(Pages 118 to 121)

Page 118

1  reform your political beliefs before you'll be
2  released?
3     A    Never.
4     Q    Have you heard that?
5     A    No.
6     Q    What do you understand needs to happen
7  in order for you to be released from CCR?
8     A    What do I understand?  I understand
9  that unless the courts intervene in this matter
10  I will never be released from CCR.
11     Q    What is that based upon?
12     A    The last thirty something years when I
13  go before the Review Board, the way I'm
14  treated.
15     Q    Are you aware of any inmates who have
16  committed similar crimes than you that have
17  been released from CCR?
18     A    You mean being charged with killing a
19  correctional officer?
20     Q    Yes.
21     A    No.
22     Q    Okay, let's talk about mental health
23  for a little while.  Since you've been in CCR
24  do you feel like you've been provided with
25  appropriate mental health services?

Page 119

1     A    There was a time that there was no
2  mental health for CCR.  Mental health now
3  usually consists of a social worker coming
4  around saying mental health and every once in
5  awhile they may go to the cell and say, you
6  have any problems, and depending on what you
7  say, they move on to the next cell.
8     Q    Have you ever suffered from a serious
9  mental health need that you thought went unmet?
10     A    Claustrophobia, I suffer from
11  claustrophobia and I get real severe headaches
12  sometimes, I get depressed sometimes.
13     Q    Have you received any treatment for
14  those conditions?
15     A    I've never sought treatment.
16     Q    Do you have any reason to believe that
17  if you sought treatment you would be refused?
18     A    Not that it would be refused but at
19  some point in time it may be used against me.
20     Q    By who?
21     A    Administration.  I'm in CCR for thirty
22  years, I've seen a lot of inmates who sought
23  mental health and later on they find themselves
24  in programs, mental health programs, and that
25  has been used by another reason not to release

Page 120

1  them into prison population.
2     Q    But you would agree that you have
3  access to mental health services if you do need
4  it, correct?
5     A    Yes.
6     Q    Do you feel like you're being
7  punished?
8     A    Yes.
9     Q    Why do you feel like you're being
10  punished?
11     A    Because I've been held in a cell for
12  thirty something years and no matter what my
13  self-improvements I've made, no matter what my
14  conduct is, I've not been given an opportunity
15  to work my way back into the main prison
16  population.
17     Q    You feel like you're under constant
18  pressure?
19     A    Yeah, from being in a cell
20  twenty-three hours a day.
21     Q    You mentioned a moment ago that you
22  have claustrophobia?
23     A    Yes.
24     Q    But you haven't sought any treatment
25  for that?

Page 121

1     A    No.
2     Q    Do you recall meeting Dr. Dvoskin?
3     A    Yes.
4     Q    Have you read his report?
5     A    Briefly.
6     Q    Have you read it recently?
7     A    No.
8     Q    Would you agree with his conclusion
9  that you've adapted to CCR reasonably well?
10     A    No.
11     Q    You don't think you've adapted
12  reasonably well to CCR?
13     A    I've managed to survive CCR without
14  going insane, without having a nervous
15  breakdown of being in a cell twenty-three hours
16  a day.
17     Q    What do you attribute that to?
18     A    I find things to do.  I read, I study,
19  I exercise.  I think these things have
20  contributed to me not just totally breaking
21  down, mentally and physically.
22     Q    You think you've been subject to
23  extreme forms of punitive isolation?
24     A    I'm not quite sure I understand in
25  what text you mean.

ALBERT WOODFOX                                                    1/31/2008

(Pages 122 to 125)

Page 122

1    Q    What about, do you think that you've
2    withstood harsh conditions?  Do you think
3    you're resilient?
4        A    I think I've endured harsh conditions.
5    CCR has changed from '72 when I was originally
6    placed here, and as I said, at times there have
7    been improvements and at times it has went
8    astray, and it depends on the administration or
9    the camp supervisor.
10       Q    Do you remember meeting with Dr.
11   Haney?
12       A    Yes.
13       Q    Let's talk about medical care for a
14   moment.  While you've been housed at CCR, do
15   you think you've been provided with the
16   appropriate medical attention?
17       A    Yes and no.
18       Q    Could you explain that for me?
19       A    You know, you can have a physical
20   problem and it can take forever for you to get
21   to the hospital.  I broke my glasses one time
22   and it took almost six months for me to get to
23   see the eye doctor, to get a new pair of
24   glasses.  I don't think it should have took six
25   months for me to go to the eye doctor and be

Page 123

1    examined and get a new pair of glasses.  Over
2    the years I've had chest pains at various times
3    and they only begin to address this issue after
4    this suit was filed.
5        Q    Have you suffered from a serious
6    medical need that went unmet?
7        A    What do you mean have I suffered?  As
8    I stated earlier with the tooth ache situation,
9    it's more or less the length of time that it
10   takes you to get medical care at Angola than
11   being denied medical care altogether, and in
12   that period, depending on what's hurting, you
13   can do a lot of suffering.
14       Q    But you certainly have the ability to
15   declare yourself an emergency to expedite the
16   process; is that right?
17       A    Yes, and I've observed other inmates
18   declare themselves an emergency and then didn't
19   go to the hospital until a day or two later.
20       Q    Are you currently suffering from any
21   medical condition that you're aware of?
22       A    I have hypertension, diabetes.
23       Q    What about high blood pressure?
24       A    Yes, hypertension.
25       Q    Hypertension is part of your blood

Page 124

1    pressure?
2        A    Yes.
3        Q    Are you receiving medical care for
4    those conditions?
5        A    Yes, I am.
6        Q    What are you receiving?
7        A    I take a combination of hypertension
8    medication and Glucophage for the diabetes.
9        Q    What do you take for high blood
10   pressure?
11       A    Fetopin (Phonetic), Vasotec and I
12   think Lopressor.
13       Q    When was the last time you saw a
14   doctor?
15       A    About three or four months ago.  We
16   have periodic clinic call-out.
17       Q    You've seen Dr. Sing?
18       A    Yes, I think he was the last doctor I
19   seen.
20       Q    You saw him a few months ago?
21       A    Yes.
22       Q    Do you have hepatitis C?
23       A    Yes.
24       Q    Do you run or walk fast regularly?
25       A    Couple of times a week.  Sometime when

Page 125

1    I go on the yard, you know, I have a back
2    problem, it may be due to old age, it depends
3    on how my back feels whether or not I run or
4    not or do any exercise.  Sometime my back
5    stiffens up on me and it may be a couple of
6    days or a week or two before I can do anything.
7        Q    You spend your hour out in the yard
8    running sometimes?
9        A    Yes.
10       Q    While you've been on CCR, did you help
11   teach other inmates to read?
12       A    In the past, yeah.
13       Q    When did you do that?
14       A    Mostly in the '70s or '80s.
15       Q    Why did you stop doing it?
16       A    Well, I usually do it when someone
17   come and ask me to help them to read or to
18   learn how to write, and it just hasn't happened
19   in awhile.
20       Q    When was the last time it happened?
21       A    Somewhere in the '80s.
22       Q    What did you teach other inmates, just
23   reading and writing?
24       A    They may need help in math, to my
25   ability in math, history, social studies, you

ALBERT WOODFOX                                        1/31/2008

(Pages 126 to 129)

Page 126

1  know.
2      Q    Were there other inmates on your tier
3  teaching inmates to read, write, math?
4      A    I can recall at times, you know, some
5  other inmates helping.  It depends on who the
6  inmate feel comfortable going to to ask for
7  help as to whether or not somebody helping
8  somebody learn how to read or write or, you
9  know, any other kind of help they may need.
10     Q    Is this something that you would do
11  during your hour of tier time?
12     A    Yes.  And when they come out I would
13  come out of the shower, see if anybody wants
14  any ice or anything and I would go sit in front
15  of their cell and they would do the same thing.
16  There have been times when someone was right
17  next door to me and it was much easier and we
18  spent more time.
19     Q    Do you recall a particular inmate you
20  taught to read or write?
21     A    The last inmate was Charles Nolan,
22  N-o-l-a-n.
23     Q    What was the last name?
24     A    The last inmate I remember helping to
25  learn how to read and write was Charles Nolan,

Page 127

1  N-o-l-a-n.
2      Q    Did you have certain material you
3  used?
4      A    Just any book that was handy,
5  basically the dictionary.
6      Q    Did you find this rewarding?
7      A    I've always found it rewarding to be
8  able to help someone.
9      Q    Have you accomplished other positive
10  things on CCR?
11     A    I'm sorry?
12     Q    Have you accomplished other positive
13  things on CCR?
14     A    Well, it's not a lot we can do in CCR,
15  other than help somebody either read or write;
16  if they're trying to work on their case, file
17  an appeal or something, I can help them do
18  research.
19     Q    Has there been any security officers
20  that have been supportive of your situation or
21  needs or helped you out?
22     A    Not that I can remember, no.
23     Q    Are you familiar with the Common
24  Ground Coalition?
25     A    Yes, I am.

Page 128

1      Q    What is that organization?
2      A    It's a community, self-help
3  organization that was started after Hurricane
4  Katrina.
5      Q    Are you a member of that organization?
6      A    No, I'm not.
7      Q    Do you know who runs the organization?
8      A    Well, I know one of the men who helped
9  start the organization, Malik Rahim.
10     Q    Are you familiar with the Capital
11  Postconviction Project of Louisiana?
12     A    I think I've read something about it,
13  I don't think I'm in constant communication
14  with anybody in that organization.
15     Q    It's not an organization you're
16  involved in?
17     A    Excuse me?
18     Q    It's not an organization you're
19  involved with?
20     A    No.
21     Q    What about The Center for Equal
22  Justice to help death row inmates?
23     A    Again, I may get material from them.
24  We get a lot of material, I get a lot of
25  material from various organizations across the

Page 129

1  country, most of them I'm not in communication
2  with anyone in those organizations.
3      Q    Do you know Wilbert Rideau?
4      A    I know of him, I don't know him
5  personally.  I've never had a conversation with
6  him.
7      Q    Have you and he exchanged any letters?
8      A    No.
9      Q    Do you know why he's listed as a
10  witness in your case?
11     A    I have no idea.
12     Q    Do you know what he's going to testify
13  about?
14     A    No, I do not.
15     Q    Do you know Mathew Berlin?
16     A    Mathew Berlin, the name doesn't
17  register.
18     Q    Do you know Bob Tucker?
19     A    The name doesn't -- a lot of people I
20  know, you know them by nicknames, you don't
21  know their actual birth names.  So I may know
22  him by some other name but not know his actual
23  birth name.
24     Q    Do you know a Bob Tucker that's going
25  to testify in your trial?

ALBERT WOODFOX                                                    1/31/2008

(Pages 130 to 133)

Page 130

1     A    No, not by that name.
2     Q    **Do you know him by another name?**
3     A    That's what I'm saying, in prison you
4  know people by nicknames. Usually every
5  prisoner has a nickname. You can know someone
6  for twenty years and not know their birth name,
7  you just know them by their nickname.
8     Q    **What about Malik Rahim?**
9     A    Malik Rahim?
10    Q    **Do you know him?**
11    A    Yes.
12    Q    **Who is he?**
13    A    He's an ex-conrad of the Black Panther
14 Party, he helped start the National Coalition
15 to Free the Angola 3 and he's the head of
16 Common Ground Relief.
17    Q    **Have you spoken to him?**
18    A    Not in years.
19    Q    **When was the last time you talked to**
20 **him?**
21    A    Maybe ten or more.
22    Q    **Did he come visit you here?**
23    A    At one time he did.
24    Q    **Have you received any letters from**
25 **him?**

Page 131

1     A    It's been years since I've had any
2  direct contact with Malik.
3     Q    **Years, ten years?**
4     A    Yeah, maybe, maybe longer.
5     Q    **It's been over ten years since you've**
6  **talked to him or received any letters from him?**
7     A    To my remembrance, yes.
8     Q    **Did you meet him in Orleans Parish**
9  **Prison?**
10    A    Yes, I did.
11    Q    **How did you guys meet?**
12    A    He was one of the Panthers being
13 housed in the Orleans Parish Prison when I was
14 extradicted back from New York.
15    Q    **Was he one of them from the Desire**
16 **Street housing project situation we talked**
17 **about earlier?**
18    A    I think so.
19    Q    **Was he present when you defused a**
20 **potentially disruptive situation in the Orleans**
21 **Parish Prison?**
22    A    Excuse me?
23    Q    **Was he there when you defused a**
24 **potentially disruptive situation in Orleans**
25 **Parish Prison?**

Page 132

1     A    Yes, I think. As I said, when I
2  returned from New York I was housed on the
3  tier, which was C1, with all of the members of
4  the Black Panther Party involved in the
5  shoot-out incident.
6     Q    **What type of situation was brewing**
7  **there?**
8     A    Horrible conditions, horrible food,
9  they had melt plates welded over all the
10 windows on C1 and some other tiers, inmates
11 were provided with no help, no tooth paste, no
12 deodorant, hygiene, no writing material, no
13 legal law library. It was a horrible
14 situation.
15    Q    **What did you do to try to help that**
16 **situation?**
17    A    I didn't do nothing, I was just there
18 when it happened, when the Parish Prison went
19 up.
20    Q    **Did you encourage people to act in a**
21 **certain way?**
22    A    Again, all of this stuff was brewing
23 before I was extradicted from New York back to
24 New Orleans. When I got there all of this was
25 already, these complaints had already been

Page 133

1  forwarded to the warden of the Parish Prison by
2  petitions and when there was no relief coming
3  or anything, you know, the whole prison just
4  went up.
5     Q    **What do you mean the whole prison went**
6  **up?**
7     A    Well, inmates just created whatever
8  disturbance they could to get the press and the
9  city officials to come to the Parish Prison and
10 see what was going on.
11    Q    **This next witness I'm just going to**
12 **spell the first name, M-w-a-l-i-m-u Johnson.**
13    MR. TRENTICOSTA:
14          Mwalimu.
15    A    I know Mwalimu from back when I was in
16 Angola in the '60s and he was here. He did his
17 time, he got out, he led a productive life
18 since that time to my understanding.
19    Q    **When is the last time you talked to**
20 **him?**
21    A    Years ago.
22    Q    **Have you communicated with him in**
23 **writing in the last few years?**
24    A    No.
25    Q    **Do you know what he's going to testify**

ALBERT WOODFOX                                           1/31/2008

(Pages 134 to 137)

|  | Page 134 |
|---|---|

1  about at your trial?
2      A   I have no idea.
3      Q   Do you know Bob Force?
4      A   Bob Force, no, not by that name.
5      Q   Michael Mable?
6      A   My brother.
7      Q   When is the last time you talked to
8  him?
9      A   Last month.
10      Q   Does he visit you?
11      A   Every month.
12      Q   Where does he live?
13      A   He lives in Houston now, he got
14  flooded out at Katrina and pretty much like
15  everybody in New Orleans, he was part of a
16  large contingency that went to Texas and he
17  decided to make his home there.
18      Q   Do you know what he's going to testify
19  to at your trial?
20      A   No.  If I had to guess it would be his
21  relationship with me.
22      Q   And how would you describe your
23  relationship with your brother?
24      A   Excellent.
25      Q   Y'all are close?

|  | Page 135 |
|---|---|

1      A   Very close.
2      Q   Do you know John Thompson?
3      A   Yes.
4      Q   How do you know John Thompson?
5      A   He was on death row at Angola and at
6  one time he lived on a tier at CCR that I was
7  on.
8      Q   What time period was that?
9      A   I think in the '80s somewhere.  It may
10  have been the '90s.
11      Q   Were you guys next to each other so
12  you could talk?
13      A   Excuse me?
14      Q   Were y'all next to each other?
15      A   No, he was several cells down from me.
16      Q   You were able to talk during tier
17  time?
18      A   Yes.
19      Q   Do you know what he's going to testify
20  about at your trial?
21      A   I have no idea.
22      Q   Do you know Roy Hollingsworth?
23      A   Yes, I do.
24      Q   Who is that?
25      A   An inmate in the prison.

|  | Page 136 |
|---|---|

1      Q   When did you meet him?
2      A   About, around '99, when I came back
3  from Amite.  I lived on the tier with him.
4      Q   Do you know why he's listed as a
5  witness in your case?
6      A   No, I do not.
7      Q   Did he witness you holding any
8  literary classes that we've talked about?
9      A   No.
10      Q   Has he seen you defuse disruptive
11  situations?
12      A   The only thing Roy has witnessed as
13  far as me is the hunger strike when I came back
14  from Angola in '99.
15      Q   I thought you said the hunger strike
16  had already taken place when you came back.
17      A   I said prior to me coming back, the
18  problems that existed and inmates attempting to
19  get issues resolved by sending petitions and et
20  cetera had already been done, they were waiting
21  for a response from the warden's office.  So
22  when I come back after maybe a month or so of
23  not getting any response, that's when the
24  hunger strike took place.
25      Q   Do you know Kenneth Whitmore?

|  | Page 137 |
|---|---|

1      A   Yes, I do.
2      Q   Who is that?
3      A   An inmate who lived on the tier with
4  me for some time.
5      Q   When did you meet him?
6      A   Came to Angola I think somewhere in
7  the mid '70s and he was put on a tier that I
8  was on.
9      Q   Do you know why he was listed as a
10  witness?
11      A   I would imagine because he's lived in
12  CCR a long time and he's been exposed to the
13  same situations with the Review Board.
14      Q   How long has he been in CCR?
15      A   I don't know the exact time.  The
16  first time he lived on the tier with me was
17  about eight years and he was released into
18  population.  And we were at Camp J in the '80s
19  when he was returned to CCR and he's been in
20  CCR ever since.  So on and on, I would imagine
21  that would be something like twenty something
22  years.
23      Q   Do you know what he did in general
24  population to go back to CCR?
25      A   No.

ALBERT WOODFOX                                    1/31/2008

(Pages 138 to 141)

Page 138

1    Q    Do you know Joseph Rainey?
2    A    Yes.
3    Q    Who is that?
4    A    Inmate I lived in the cell next to at
5    Camp J when I was sent to Camp J in '99 because
6    of the hunger strike.
7    Q    Is he in CCR?
8    A    No, he's in one of the other camps
9    now, I'm not sure which one.
10   Q    You just met him at Camp J, correct?
11   A    Yes.
12   Q    Did you encourage him to be positive?
13   A    Yes, I did.
14   Q    Tell me about that.
15   A    Well, they put me on the tier, we was
16   on a short unit, I was in twelve and I think he
17   was in thirteen.  Eventually we started talking
18   initially about his case and from there we just
19   held conversations in general.  And he said
20   that he had heard about me and Herman and King,
21   you know, being in the Party and the good
22   things we had done in prison and he had a lot
23   of questions, you know, why we was trying to
24   help inmates that didn't seem to care about
25   themselves, things like that.

Page 139

1    Q    Do you know Kurt Hall?
2    A    The name's familiar but I just can't
3    place a face.
4    Q    Would it help you to remember if I
5    told you he was an inmate counsel?
6    A    I still can't draw a face.  I see the
7    name's familiar but I just can't draw a face to
8    go with it.
9    Q    Do you know why he's listed as a
10   witness?
11   A    No, I do not.
12   Q    Do you know Sean Anderson?
13   A    Yes.
14   Q    Who is that?
15   A    Inmate, I'm not sure if I ever lived
16   on a tier with him or not.  I don't even know
17   where he at now, where he lives at, whether
18   he's still in CCR.
19   Q    When is the last time you communicated
20   with him?
21   A    I can't recall communicating with him
22   to be honest.  Again, it may be a situation
23   where I know him by a nickname and I know him.
24   I can't place a face to Sean Anderson.
25   Q    What about Randolph Welch?

Page 140

1    A    Yes, I know Randy.
2    Q    Who is that?
3    A    An inmate I lived on the tier with.
4    Q    When?
5    A    In the '90s.
6    Q    Do you know why he's listed as a
7    witness?
8    A    Again, I would imagine his experience
9    in CCR and with the Review Board.
10   Q    Do you know Darrel Cryder?
11   A    Excuse me.
12   Q    Darrel Cryder?
13   A    Yes.
14   Q    Who is that?
15   A    Inmate who lived on the tier with me.
16   He was in the cell next to me for several
17   years.
18   Q    Was he next to you during the hunger
19   strike?
20   A    No, he was on the tier I was on but
21   didn't live next to me, he lived about six,
22   maybe seven cells down.
23   Q    Do you know George Gibson?
24   A    Yes, I do.
25   Q    How do you know George?

Page 141

1    A    CCR.  Never lived on the tier together
2    but before they stopped allowing different
3    tiers to go on the yard together, over a period
4    of years, at some point in time we would be on
5    the exercise yard at the same time.
6    Q    So y'all would just talk on the
7    exercise yard?
8    A    Mostly run laps or run behind the
9    ball.  But yes, we have at times had
10   conversations.
11   Q    Do you know Donald Wooley?
12   A    Yes, I do.
13   Q    Who is that?
14   A    Inmate who lived on the tier with me
15   for a while.
16   Q    Do you know why he's listed as a
17   witness?
18   A    Probably living in CCR and his
19   experience with the Review Board.
20   Q    Trent Wells?
21   A    Another inmate that I lived on the
22   tier with for a while.
23   Q    When did you live with him?
24   A    In the '90s.  He was on the tier with
25   me maybe less than a year, maybe a year but

ALBERT WOODFOX

1/31/2008

(Pages 142 to 145)

## Page 142

1  not a long time.
2      Q    Do you know why he's listed as a
3  witness?
4      A    Living in CCR and his experience with
5  the Review Board I would imagine.
6      Q    What do you hope to gain by this
7  litigation?
8      A    To be released from CCR, given the
9  opportunity to go back in the prison
10 population.
11     Q    Do you seek money?
12     A    I think in light of what has been done
13 to us, I think we should be compensated.
14     Q    What kind of housing arrangements at
15 Angola would you deem to be acceptable?
16     A    Any housing arrangement that's not in
17 the cell.
18     Q    When you say not in the cell, you mean
19 not in the cell twenty-three hours a day?
20     A    Not in a cell. I've been housed in a
21 cell thirty something years, I would like to
22 have an opportunity to live in the dorm.
23     Q    What about working cell blocks, are
24 you familiar with those?
25     A    Yes, I am. For me there's no

## Page 143

1  difference. As I said earlier, I've been in a
2  cell for thirty-five years. I think I've been
3  in the cell long enough.
4      Q    What work assignments at LSP do you
5  think you could perform?
6      A    I don't see a limit as to what type of
7  job I could do as long as my age is taken into
8  consideration, my health.
9      Q    You said you wanted to be in a dorm,
10 would it matter to you if the dorm was at LSP
11 or at a different facility?
12     A    No, it wouldn't.
13     Q    For example, Wade Correctional?
14     A    As long as I'm not in a cell. I don't
15 have any control where the Department of
16 Corrections houses me, whether it's some other
17 correctional institution, it really wouldn't
18 matter.
19     Q    Would you expect to go to a working
20 cell block before you went to a dormitory?
21     A    Would I expect it? No.
22     Q    Do you think you'd be able to work in
23 the field?
24     A    Again, within the confines of my age
25 and my health, yeah.

## Page 144

1      Q    Do you think your biggest complaint
2  would be satisfied if you had the right to be
3  out of your cell for work details and meals?
4      A    No.
5      Q    How would it be satisfied?
6      A    Some process put in place where any
7  inmate, irregardless of where he's at, can get
8  a fair classification, reclassification or
9  classification hearing.
10     Q    You understand that you're not seeking
11 relief for anyone other than yourself, do you
12 not?
13     A    Myself and Herman and Mr. Wilkerson.
14     Q    But you were just talking about other
15 inmates. You're not asking --
16     A    I'm in prison, it's kind of hard not
17 to talk about other inmates.
18     Q    Do you remember filing an ARP on July
19 31, 2007 concerning the rejection of a magazine
20 named King?
21     A    Yes.
22         MR. KENDALL:
23             Do you have a copy of that?
24         MR. HICKS:
25             I don't know if I made extras but

## Page 145

1  I can show it to you.
2  BY MR. HICKS:
3      Q    Do you recall the outcome of that ARP?
4      A    If I filed an ARP on it I'm certain
5  what the outcome was, it was denied.
6      Q    What was the basis of your complaint
7  about the King magazine?
8      A    That it was no penological reason for
9  denying the magazine after it being allowed in
10 prison for years. I also felt that it was part
11 of a faith-based program that's going on in
12 Angola.
13     Q    What about the magazine XXL?
14     A    Same type of magazine, different name.
15 Basically in our culture, the magazine speaks
16 of hip-hop culture.
17     Q    What about the Vibe magazine?
18     A    Vibe is more or less mainstream, it
19 covers all spectrum of music.
20     Q    Have you filed any other ARPs about
21 mail room requests or mail room rejections?
22     A    A book a friend of mine sent us that
23 was written by Dr. Charles Young, University of
24 Georgia, called the Black Panther Party
25 Revisited. I wasn't allowed to have that.

Page 146

1    Q   When was that?
2    A   Several years ago.  I was also not
3  allowed to have a book on the Cointelpro.  It
4  was a book, Cointel Papers.
5    Q   In 2006 you filed an ARP about the
6  change for contact visits; do you recall that?
7    A   Yes.
8    Q   What was objectionable to you about
9  the change of contact visits?
10   A   That contact visits that weren't
11 approved for me, for any member on my approved
12 list, right to have a contact visit on that day
13 was not protected.  That eventually came to
14 happen on the 11th of January.  My niece, who
15 had been approved on my regular visiting list,
16 wanted to surprise me for a visit and the form
17 that we sent in, I had just listed my brother's
18 name as always because we had been told that
19 contact visits for anyone on your approved list
20 was protected, that it was the actual day that
21 was approved, not individuals.  As a result, we
22 were instructed that we just had to put
23 somebody name on the visitor form that was on
24 our approved list, and as I've always done, I
25 put my brother name.  And as I said, between

Page 147

1  the time that the contact visit was approved,
2  my niece was approved on my regular visiting
3  list.  So she wanted to pay me a surprise visit
4  so she came up with my brother, and when she
5  got here my brother and all was told that she
6  couldn't have a contact visit because her name
7  was not on the request form and that she could
8  sit in the car and I could have a contact visit
9  with my brother, and when that was over, she
10 could come in and have a noncontact visit or
11 contact visit could be for a visit and they
12 could visit with me behind the screen, so they
13 choose to have a noncontact visit.
14   Q   Was what was the outcome of that ARP?
15   A   Sir?
16   Q   What was the outcome of your ARP?
17   A   I didn't file an ARP, haven't filed it
18 yet, what I did do was write a letter to Deputy
19 Warden Darrel Vannoy who was over security and
20 who has the final say-so on contact visits.
21 And this was my second letter to him concerning
22 this issue.
23   Q   I'm showing you some documents that
24 are marked 336 through 342, and see if that
25 refreshes your memory about filing an ARP to

Page 148

1  change the contact visits.
2    A   (Witness examines document.)
3        Yes, I'm familiar with this.
4    Q   Is that the letter you were talking
5  about a few minutes ago?
6    A   No, that was the actual ARP but I
7  wrote an additional letter to Warden Darrel
8  Vannoy.  The warden's name was Laskey, I guess
9  he became warden at Camp TURC and he instituted
10 a new policy which we had to provide all of
11 this information for people who had already
12 been approved to visit and was on our regular
13 visiting list by the classification department.
14   Q   The ARP I just gave you is different
15 than the incident you were just talking about?
16   A   Well, what happened is, they initially
17 put out a new form that required all of that
18 information, and not only myself but other
19 inmates at CCR felt as though this information
20 had already been provided to classification,
21 these people were already on our approved list,
22 they were entitled to two visits per month.  We
23 were being asked because we were in CCR to
24 provide additional information that was already
25 available.

Page 149

1        I also wrote a letter to Warden Vannoy
2  about this policy when it was first put into
3  effect.  This is the letter here to Warden
4  Vannoy, separate from the ARP that I filed.
5    MR. KENDALL:
6        Brent, are you going to mark
7  these as an exhibit?
8    MR. HICKS:
9        No.
10       Thank you, Mr. Woodfox, I don't
11 have any other questions at this time.
12 (Thereupon, the witness' testimony was
13 concluded.)
14            * * * * *
15
16
17
18
19
20
21
22
23
24
25

ALBERT WOODFOX

(Page 150)

Page 150

```
 1     R E P O R T E R ' S   C E R T I F I C A T E
 2          I, Janice Welch, a Certified Court
 3     Reporter (Certificate No. 87172), in good
 4     standing with the State of Louisiana, do hereby
 5     certify that the foregoing pages constitute the
 6     transcript of the proceedings in the
 7     above-entitled and numbered cause; that the
 8     said witness was duly sworn and thereafter
 9     testified as hereinbefore set forth;
10          That the proceedings were reported by
11     me in Stenographic shorthand, and transcribed
12     thereafter by me using Computer-Aided
13     Transcription, and that the same is a true and
14     correct transcript to the best of my ability
15     and understanding;
16          That I am not of Counsel nor related
17     to counsel or the parties hereto, and am in no
18     way interested in the outcome of this event.
19
20          _____
             Janice Welch, CCR
21          CERTIFICATE NO. 87172
22
23
24
25
```

# Exhibit C1-C6

| | | | | 8 | 2 | 2 | 2 |
|---|---|---|---|---|---|---|---|

Name - Sing, First, M. I.

WOODFOX   ALBERT

49850

ans Dept. of Police
ORLEANS, LA.
ST REGISTER
FINGERPRINTS COPY

**49850**

1405 DUMAINE ST.                          C   M   20

SAME AS 2

1. Charges:

**WANTED** RS#14 ART 42 AGGRAVATED

NEW ORLEANS  LA.                          2-19-47

2.

1405 DUMAINE ST.        K-13330-67  1  K

RARE

3.

12-15-67    3-10PM    4-00PM    12-15-67

4.

1405 DUMAINE ST.

$   NONE

11-20-67    9-05AM    MONDAY    C D C    OPEN

PTN T BACKES, N FONSECA                    156   38   OPEN    OPEN

NONE                                       5/7   157  BLK    MAR    MED    MED

TATTOO RIGHT FOREARM

U S        Local Identity No.
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

City's License No.
2317274

LABORER        NONE

NONE

NONE

Second Adult
☐ Yes   ☒ No

Arresting Officer
☐ Yes   ☒No

Sober   ☒ No   ☐ Intoxicated

ARREST    156

NONE

118 222

COLBERT, JUANITA M        3527 WASHINGTON        NONE

SUBJECT WAS OBSERVED SITTING AT THE ABOVE LOCATION.  UPON SEEING THE POLICE
STARTED TO WALK AWAY.  WHEN QUESTIONED BY PTN BACKES IT WAS LEARNED WHAT
THE SUBJECTS NAME WAS, WHO IDENTIFIED BY THE B OF I, WAS WANTED FOR AGG. RAPE

FELONY

10/30/2008  10:12   5046587665                    NOPD RECORDS                        PAGE  02/30

# 1 8 2 2 2

WOODFOX, ALBERT NMN

538 BERTRAND ST

N.O.LA.

715 S. BROAD ST.

SGT. E. FIELDS AND R. HUNTER

116117

N  M  21

2-19-47

2-13-69

B-3513-69 B

New Orleans Dept. of Police
NEW ORLEANS, LA.
ARREST REGISTER

116117

FINGERPRINTS COPY

11AM

S        3139        25

R,S. 14 ART 42 SGG, RAPE OF JERRYDINE SMITH NF    23   2-30PM    2-13-69

R,S. 14 ART 42 AGG. RAPE OF MARY DOWNS NF 22                     OPEN

R,S. 14 ART 64 ARMED ROBBERY OF THREE BROTHERS
BAR AMT. OF 1,778.00

CDC                 OPEN

OPEN                OPEN

1835 ST. PHILLIP ST.                                 ABR. OFF    3139

2002-1-4-59     10-08PM     SATURDAY     3 UNK CAL. REVOLVERS

NONE                        5-2  137     BLK    BRN    LGT    MED

TATTOO ON RIGHT ARM

U.S.            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          2317274 LA.

TRUCK DRIVER                   NONE

NONE

NONE                           ☐ Yes  ☐ No        ☐ Yes    ☐ No

☐ Sober  ☐ HBD      ☐ Intoxicated

BRUISED UP                                    118-222

SMITH, JERRYDINE                 1425 GOV. NICHOLS

DOWNS, MARY                      931 N. DERBIGNY

SUBJ. ARRESTED FOR ARMED ROBBERY OF LOUIES GREEN RM. AND ADMITTED PARTICIPATING
IN THIS ROBBERY ALSO, RIGHTS FORM 38893

10/30/2008  10:12    5046587665              NOPD RECORDS                    PAGE  27/30





New Orleans Dept. of Police
NEW ORLEANS, LA.
ARREST REGISTER

117921

WOODFOX, ALBERT NMN
338 BERTRAND ST.
NOLA

117921

FINGERPRINTS COPY

715 SO. BROAD ST.

2-19-47

2-24-69   3-00PM

DET. E. FIELDS-C. MILLER-WILLIAM MC DONALD

AS. 14 -64 ARMED ROBBERY DOROTHYS BAR 734.50
RS 14-42 A68 RAPE OF FERRIODEAN SMITH M/F 23

ORLEANS AVE.

1-20-69        11-50PM       MONDAY

TATOOS ON RIGHT ARM

RE-BOOKED    RE-BOOKED

RE-BOOKED

STEVES, DOROTHY                      3232 ORLEANS AVE.

ITH, FERRIODEAN                      2518 ST. LOUIS

SUBJECT REBOOKED ON ABOVE CHARGERS AFTER BEING IDENTIFIED IN A LINE UP
HELD ON 2-24-69.





10/30/2008  10:12    5846587666                    NOPD RECORDS                          PAGE  05/30

WOODFOX, ALBERT NMN                    T16109

538 BERTRAND ST.                   N    M    21          NEW ORLEANS, LA.
                                                         ARREST REGISTER              116109
N.O.LA.                                 2-19-47                 FINGERPRINTS COPY

715 S. BROAD ST.                        2-19-47          11AM

SGT. HUNTER AND SGT E. FIELDS      8-19806-69 8                     3139              25

R.S. 14 ART 54 ARMED ROBBERY OF STAR LIQUOR STORE    2-15PM                        2-13-69

IN AMOUNT OF 303.00                                                                  OPEN

                                                             CDC                     OPEN

                                                            OPEN                     OPEN

3908 ST. BERNARD AVE.                                      ARM. OFF                  3139

XXX  1-29-69        12-34AM          WEDNESDAY           5-  .38 CAL. REVOLVERS

NONE                                  5-7   137         BLK     BRN      LGT    MED

TATTOO ON RIGHT ARM

□      X  □                      U.S.          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         2317274 LA.

TRUCK DRIVER                                           NONE

NONE

NONE                                                  □ Yes   ☒ No      □ Yes   ☒ No

                                                      ☒ Sober  □ HBO      □ Intoxicated

BRUISED UP                                              118-222

SYARKS, ROGGO              Address - Block No. & Street
                                       2535 PENNISTON                          PIC

                                                                              PDR

SUBJ. ARRESTED FOR ARMED ROBBERY OF LOUIES GREEN ROOM, ADMITTED PARTICIPATING
IN THIS ROBBERY ALSO. RIGHTS FORM 38893

W. SEWELL

10/30/2008  05:03    15844712875                    LADD0J-KENNER                        PAGE  05/29

10/30/2008  10:12    5046587665                NOPD RECORDS                    PAGE  04/36

WOODOFOX, ALBERT NMN

538 BERTRAND ST.

N.O.LA

715 S. BROAD ST.

SGT. E. FIELDS AND DT. P. P. DALE B-9822-69 B

R.S. 14 ART 64 ARMED ROBBERY OF ROSE MARIE
GREEN AT LOUIES GREEN ROOM

R.S. 14 ART 108 RESISTING ARREST

1400 N. GALVEZ

2-13-69        2-34AM

NONV

TATTOO ON RIGHT ARM

TRUCK DRIVER

NONE

NONE

BRUISED LIP

GREEN, ROSE MARIE

1.1614

N   M   21

2-19-47

2-13-69        11AM

B-9822-69 B        3130

2-30PM

CDC

OPEN

OPEN

ARR.OFF

THUR        5-7    137

U.S.

New Orleans Dept. of Police
NEW ORLEANS, LA.
ARREST REGISTER

116114

FINGERPRINTS COPY

25

2-13-69

FINGERPRINT        OPEN

OPEN

OPEN        3130

FOUR , 38 CAL., REVOLVERS

BLK    BRN    LGT    MED

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        2317274 LA.

NONE

1. □ Yes   ☒ No      □ Yes   ☒ No

☒ Sober   □ HBD    □ Intoxicated

118-272

WOO N. GALVEZ

SUBJ. IMPLICATED BY ONE OF PERSONS CAUGHT IN THE ACTUAL HOLDUP, ARRESTED SUB.
WHEN TRAPPED WHILE PULLING ARMED ROBBERY POSED AS ONE OF THE WITNESSES...AND WAS
CONVEYED     TO THE DETECTIVE BUREAU FOR STATEMENTS, WHILE THERE WAS CONFRONTED WITH
IMPLICATION BY ONE OF OTHER ARR. SUBJ AID CONFLICTING STATEMENTS AND SUBJ.
ADMITTED IN HIS PARTICIPATION IN OTHER HOLDUPS.



# Exhibit C

10/30/2008   10:12    5046587665              NOPD RECORDS                        PAGE  26/30



STATE OF LOUISIANA
## DEPARTMENT OF PUBLIC SAFETY
DIVISION OF STATE POLICE

BUREAU OF IDENTIFICATION
BATON ROUGE

118-222

The following is the record of State Police No. 602393
F. B. I. No.

| CONTRIBUTION OF FINGERPRINTS | NAME AND NUMBER | ARREST OR RECEIVED | CHARGE | DISPOSITION |
|---|---|---|---|---|
| House of Detention New Orleans, La. | Albert Woodfox #HO 12667 | 3-6-64 | Malicious mischief | 20 days |
| PD, New Orleans, La. | Albert Woodfox #118222 | 2-20-65 | Loitering | |

PAGE  17/29                    LADD3-KENNER              1504471287S      10/30/2008 05:03

10/30/2008  10:12    5046587665                NOPD RECORDS                      PAGE  13/30



NEW ORLEANS POLICE DEPARTMENT
ARREST REPORT

FINGERPRINTS

Woodfox," Albert.

A-12239-65    New Orleans, La.            2-19-47

918 N. Villere        N.O. La.

1200 Orleans Ave.     1   M        9:15 P.M.

2-20-65    Sgt. B. Murry, J. Arceneaux, Vega    39

828 MCS 42-85. 7 Loitering        J. Ottasen

Complaint or Evidence of Illness or Injury, By Whom Treated - If Intoxicated (Describe)
Laceration of the right leg . K-9 Bite  Taken to Charity Hospital

118 222

Brief Summary of Arrest, Additional Charges, Reports, Etc.
Subject arrested after seen taking money for parking cars in the auditorium parking lot
and when he saw Officer Vega approach he began to run into the freight yard and the Off.
called for the subj. to halt.  The subj. continued to run and the dog K-9 Al was turned loose &
app. the subj. in the freight yard.

10/30/2008  10:12   5046587665               NOPD RECORDS                    PAGE  14/30



# SHERIFF'S OFFICE
# BUREAU OF IDENTIFICATION
## PARISH OF LAFOURCHE
# ARREST REPORT

Arrest Number

Complaint No.

| Surname | First Name | Middle Name | Complainant | Name & Address |
|---|---|---|---|---|
| Woodfox | Albert | | Tr. Leroy Lecompte. State Po. | |

| Alias | Residence | CHARGE |
|---|---|---|
| | 538 Bertrand St, New Orleans,La. | auto Theft.No Dr.License. Ressiting arrest, Speeding |

| Place Arrested | Date & Time of Arrest | ARRESTING OFFICER | Ward |
|---|---|---|---|
| Raceland. a. | 3-7-65.5.15 P.M. | Tr. Leroy Lecompte | |

| Birth Place | Birth Date | Age | Race | Sex | Height | Eyes | Weight | Comp. |
|---|---|---|---|---|---|---|---|---|
| New Orleans.La. | 2-19-47 | 18 | N | M | 5'7 | | Brn | |

| Occupation | Scars & Marks |
|---|---|
| Porter. | |

| Time Paroled & Date | PAROLED BY AND FOR WHOM |
|---|---|
| | |

Remarks:                                                              ⁊ Houma .P.D.

While on regular patrol got a call from Tr. Leroy Lecompte

recived a call to be on look out for  ten 1960 Olds. occupied by severn

negros wanted for  hit an run  ,Trooper first scene car driving East

put of City Limit Houma tryed to stop same.subject was driving at 105

mile per hour an  passing car on both side the high way. Subject run

road block at High way one an ninety proceded South on High way 90

passing raceland excessive rate of speed. Final car came to stop at

Camile Foret Super Market. Driver was apprehend running on Sake Lane.

All the other listed below was with Woodfox.

Alvin Roma  N.M.15      Ruth Janes N F/M 16      Diane Jones N F/M
lo15 St. Claude St.     421 N. Villery.St.       421 N. Villery St.
New Orleans,La          New Orleans.La.          New Orleans.La.

Walter Kimble N.M 14    Fredrick Jones N M 15    Alvin Dellate
1423 Dumanine St.       421 N. Villery St.       909 North Roman St.
New Orleans.La          New Orleans.            New Orleans.La.

The car that was stolen was the property of Mr. Michel T. Odornell

Disposition 1925 Cooper Road, Gretna. He advise his car was stolen in New Orleans.
See State Police Troop M  summons number Moo37559-- MO37660.

Signature of Official

NO. 15867

17TH JUDICIAL DISTRICT COURT

PARISH OF LAFOURCHE

STATE OF LOUISIANA

VS.

ALBERT WOODFOX

INFORMATION FOR

NO DRIVER'S LICENSE

FILED March 18 196___

_____ CLERK

A TRUE COPY
Clerk of Court's Office
Thibodaux, La. ___ 19___
_____
Clerk of Court

# STATE OF LOUISIANA

### SEVENTEENTH JUDICIAL DISTRICT COURT

In and for the Parish of Lafourche

---

**Wollen J. Falgout (or) Herbert O'Niell**, Assistant District Attorney of the Seventeenth Judicial District of the State of Louisiana,    who, in the name and by the authority of the said State, prosecutes in its behalf, in proper person comes into the Seventeenth Judicial District Court of the State of Louisiana, in the Parish of Lafourche, and gives to the said Court here to understand and be informed that one                Albert Woodfox

late of the Parish of Lafourche, on or about the    7th    day of    March    in the year of our Lord, One Thousand Nine Hundred and    Sixty-five (1965), with force and arms in the Parish of Lafourche, aforesaid, and within the jurisdiction of the Seventeenth Judicial District Court in and for the Parish of Lafourche,    did willfully and intentionally operate a motor vehicle on a Louisiana Highway without a driver's license, thereby committing the offense of driving without a license, all in violation of R. S. 32:52.

contrary to the form of the statute of the State of Louisiana, in such cases made and provided and against the peace and dignity of the same.

Assistant District Attorney for the 17th Judicial District
of the State of Louisiana

DEPARTMENT OF PUBLIC SAFETY—DIVISION OF STATE POLICE

State of Louisiana } ss. { Jud. Dist. } Court
Parish of _____ { Municipal }

## SUMMONS

M03760

YOU ARE HEREBY SUMMONED TO APPEAR PERSONALLY BEFORE THIS
COURT TO ANSWER FOR THE FOLLOWING OFFENSE WHICH OCCURRED:

ON THE ___ DAY OF _____ 19__ AT ___ M.

NAME _____ _Woodford_

STREET _____ BIRTH-DATE _____

CITY-STATE _____ OCCU-PATION _____

RACE & SEX ___ HT. ___ WT. ___ HAIR ___ EYES ___ COMP. ___

OPR. LIC. NO. _____ DID UNLAWFULLY OPERATE

MTR. VEH. (REG. NO.) _____ STATE & YR. ___

YR. & MAKE _____ BODY TYPE _____ COLOR _____

UPON A PUBLIC HIGHWAY, NAMELY AT (LOCATION) _____

AND DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE: **R.S.** _____

| | |
|---|---|
| ☐ SPEEDING ___ MPH IN ___ MPH ZONE. | ACCIDENT? ☐ YES ☐ NO |
| ☐ RECKLESS OPERATION OF A VEHICLE | |

Principal Causes of Accidents

| IMPROPER TURN | ☐ From wrong lane<br>☐ Into wrong lane<br>☐ Cut corner<br>☐ No signal | IMPROPER PASSING | ☐ Wrong side<br>☐ Cut in<br>☐ At intersec.<br>☐ Other | DISREGARD OF TRAFFIC SIGNAL | ☐ Red light<br>☐ Stop sign<br>☐ Slow sign<br>☐ Other |

☐ OPERATE A VEHICLE WHILE INTOXICATED    Alcohol Test? ☐ Yes ☐ No    Results ___ %

☐ OTHER VIOLATION    (Describe in words) _____

YOU ARE NOTIFIED THAT *THE OFFICER WHOSE SIGNATURE APPEARS*
BELOW WILL FILE A SWORN COMPLAINT IN THIS COURT CHARGING YOU WITH
THE OFFENSE SET FORTH ABOVE AND THAT A WARRANT FOR YOUR ARREST
WILL BE ISSUED SHOULD YOU FAIL TO APPEAR AS DIRECTED.

_____
(Signature, rank and badge number)

NOTICE TO VIOLATOR: READ BACK OF THIS SUMMONS CAREFULLY. BRING
SUMMONS WITH YOU.

APPEARANCE ___ DAY OF ___ 19 ___ AT/BY ___ M.

ADDRESS _____

I hereby promise to appear at the time and place specified above.

(Defendant's Signature) _____

Conditions

| ROAD SURFACE | ☐ Dry<br>☐ Wet<br>☐ Snow<br>☐ Ice | AREA | ☐ Business<br>☐ Industrial<br>☐ School<br>☐ Residential<br>☐ Rural | VISIBILITY | ☐ Clear<br>☐ Rain<br>☐ Fog<br>☐ Other |
| TRAFFIC | ☐ Light<br>☐ Heavy<br>☐ Medium | | | HIGHWAY TYPE | ☐ 2 lane<br>☐ 4 lane<br>☐ Divided<br>☐ Other |

FORM SP 15.48

NO. 13488

17TH JUDICIAL DISTRICT COURT
PARISH OF LAFOURCHE

STATE OF LOUISIANA

VS.

ALBERT WOODFOX

INFORMATION FOR

THEFT

FILED March 18   196

_____
CLERK

# STATE OF LOUISIANA

## SEVENTEENTH JUDICIAL DISTRICT COURT

In and for the Parish of Lafourche

---

**Wollen J. Falgout (or) Herbert O'Niell**, Assistant District Attorney of the Seventeenth Judicial District of the State of Louisiana,    who, in the name and by the authority of the said State, prosecutes in its behalf, in proper person comes into the Seventeenth Judicial District Court of the State of Louisiana, in the Parish of Lafourche, and gives to the said Court here to understand and be informed that one          ALBERT WOODFOX

late of the Parish of Lafourche, on or about the    7th      day of    March        in the year of our Lord, One Thousand Nine Hundred and          Sixty-five (1965), with force and arms in the Parish of Lafourche, aforesaid, and within the jurisdiction of the Seventeenth Judicial District Court in and for the Parish of Lafourche,  did unlawfully and intentionally misappropriate or take something of value, to-wit: a tan 1960 Oldsmobile              , having a value of
Dollars
over One Hundred and no/100 ($100.00)  from Mr. Michel T. Odornell, 1925 Cooper Road, Gretna, Louisiana, without the consent of the said owner, and with the intent to permanently deprive him of the property taken, thereby committing the offense of theft, all in violation of R. S. 14:67.

contrary to the form of the  statute of the State of Louisiana, in such cases made and provided and against the peace and dignity of the same.

Assistant District Attorney for the 17th Judicial District
of the State of Louisiana

DEPARTMENT OF PUBLIC SAFETY---DIVISION OF STATE POLICE

State of Louisiana } ss. ------- { Jud.  Dist. } Court
Parish of_____                   { Municipal }

## SUMMONS

M 0 3 7 5 9

YOU ARE HEREBY SUMMONED TO APPEAR PERSONALLY BEFORE THIS
COURT TO ANSWER FOR THE FOLLOWING OFFENSE WHICH OCCURRED:

ON THE____DAY OF_____, 19____AT____M.,

NAME_____

STREET_____ BIRTH-DATE_____

CITY-STATE_____ OCCU-PATION_____

RACE & SEX_____ HT.____WT.____ HAIR____ EYES____ COMP.____

OPR. LIC. NO._____DID UNLAWFULLY OPERATE

MTR. VEH. (REG. NO.)_____STATE & YR._____

YR. & MAKE_____ BODY TYPE_____ COLOR_____

UPON A PUBLIC HIGHWAY, NAMELY AT (LOCATION)_____

AND DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE:  R.S.____

| Principal Cause of Accidents | |
|---|---|

☐ SPEEDING____MPH IN____MPH ZONE.    ACCIDENT? ☐ YES
                                                ☐ NO

☐ RECKLESS OPERATION OF A VEHICLE

| IMPROPER TURN | ☐ From wrong lane ☐ Into wrong lane ☐ Cut corner ☐ No signal | IMPROPER PASSING | ☐ Wrong side ☐ Cut in ☐ At intersec. ☐ Other | DISREGARD OF TRAFFIC SIGNAL | ☐ Red light ☐ Stop sign ☐ Slow sign ☐ Other |

☐ OPERATE A VEHICLE WHILE INTOXICATED    Alcohol Test? ☐ Yes ☐ No
                                          Results_____%

☐ OTHER VIOLATION    (Describe in words)_____

YOU ARE NOTIFIED THAT THE OFFICER WHOSE SIGNATURE APPEARS
BELOW WILL FILE A SWORN COMPLAINT IN THIS COURT CHARGING YOU WITH
THE OFFENSE SET FORTH ABOVE AND THAT A WARRANT FOR YOUR ARREST
WILL BE ISSUED SHOULD YOU FAIL TO APPEAR AS DIRECTED.

_____
(Signature, rank and badge number)

NOTICE TO VIOLATOR: READ BACK OF THIS SUMMONS CAREFULLY. BRING
SUMMONS WITH YOU.

APPEARANCE____DAY OF_____, 19____, AT/BY_____M.

ADDRESS_____

I hereby promise to appear at the time and place specified above.

(Defendant's Signature)_____

| Conditions | | | | | | | |
|---|---|---|---|---|---|---|---|
| ROAD SURFACE | ☑ Dry ☐ Wet ☐ Snow ☐ Ice | AREA | ☐ Business ☐ Industrial ☐ School ☐ Residential ☐ Rural | VISIBILITY | ☐ Clear ☐ Rain ☐ Fog ☐ Other | HIGHWAY TYPE | ☑ 2 lane ☐ 4 lane ☐ Divided ☐ Other |
| TRAFFIC | ☐ Light ☐ Heavy ☐ Medium | | | | | | |

FORM SP 15-49

10/30/2008  10:12    5046587665                     NOPD RECORDS                        PAGE 10/30

NEW ORLEANS POLICE DEPARTMENT
DETECTIVE BUREAU

DATE OF PARCLE       2/11/66          B OF I #_____ 1 18- 222

DATE OF INTERROGATION  2/15/66

NAME  albert neudfox           COLOR N Q SEX M  AGE 18  BIRTH 2/19/47

ADDRESS 538 Bertrand    MARRIED____ SINGLE x  DIVORCED____

FLACE OF EMPLOYMENT  Earl Hamilton (Reffin)    ADDRESS 538 Bertrand
                     (Stepfather)
OCCUPATION           Lab.                      SALARY

NAME OF EMPLOYER     same                      ADDRESS

FATHER'S NAME        same as above             ADDRESS

MOTHER'S NAME        Ruby Mable                ADDRESS 538 Bertrand

WIFE'S MAIDEN NAME   none                      ADDRESS

AUTOMOBILE MAKE      none  MODEL____ COLOR_____ LICENSE

OWNER OF CAR:

------------------------------------------------------------

ON ░░░░░░░░░░ PARCLE FOR:        Theft (Thibadeaux)

NAME OF OFFICER                  Thomas

------------------------------------------------------------

REMARKS: Served 5 months on 2 yr. term.  Expires 5/25/67

10/30/2008  10:12    5046587665    NOPD RECORDS    PAGE 11/30

John J. McKeithen
Governor

STATE OF LOUISIANA
DEPARTMENT OF INSTITUTIONS
DIVISION OF PROBATION AND PAROLE
NEW ORLEANS DISTRICT

February 15, 1966

Room 207
Wildlife & Fisheries Bldg.
418 Royal Street
New Orleans, Louisiana 70130

Chief of Detectives Lawrence Cassanova
Criminal Courts Building - Room 161
2700 Tulane Avenue
New Orleans, Louisiana

Attention:  Detective Joseph Bolden

Dear Chief Cassanova:

Re:  WOODFOX, Albert, C/M
     LSP No. 61828

The bearer of this letter, _____Albert Woodfox_____
is being referred to you for processing.  __He__
was placed on parole/~~probation~~ on _____February 11, 1966_____
and will remain on ~~probation on until~~ parole until May 25, 1967.

When this person has been processed, we will appreciate your
furnishing us with all pertinent information you have received and
especially a picture and fingerprint classification.

If at any future date you need more information, do not hesitate
to call us.  Please be assured of our cooperation at all times.

Sincerely yours,

~~XXXXXXXXXXXXXXXXXX~~
~~XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX~~
JOHN D. WILLIAMS, ACTING DISTRICT SUPERVISOR
NEW ORLEANS DISTRICT OFFICE

By: _____
Ernest A. Thomas
Probation and Parole Officer I

NOD-C
RAT/ab

PAGE  22/29    LADOJ-KENNER    15044712875    10/30/2008  05:03

10/30/2008  10:12    5046587665    NOPD RECORDS    PAGE 12/30



W • FILE CHECKED

PRINTS VERIFIED

PRINTED

PHOTOGRAPH

DESCRIPTION

IBM

N.D.P.D. No.    118-222

LEFT HAND

FBI No.

DISPOSITION    UNABLE TO GET DISPOSITION

RIGHT HAND

NO. 45-468-9

17TH JUDICIAL DISTRICT COURT

PARISH OF LAFOURCHE

STATE OF LOUISIANA

VS.

ALBERT WOODFOX

INFORMATION FOR

SPEEDING

FILED *March 18*   196 __

*A. P. Landry Jr.*
CLERK

# STATE OF LOUISIANA

### SEVENTEENTH JUDICIAL DISTRICT COURT

In and for the Parish of Lafourche

**Wollen J. Falgout (or) Herbert O'Niell**, Assistant District Attorney of the Seventeenth Judicial District of the State of Louisiana,    who, in the name and by the authority of the said State, prosecutes in its behalf, in proper person comes into the Seventeenth Judicial District Court of the State of Louisiana, in the Parish of Lafourche, and gives to the said Court here to understand and be informed that one        Albert Woodfox

late of the Parish of Lafourche, on or about the        7th  day of        March        in the year of our Lord, One Thousand Nine Hundred and        Sixty-five (1965),

with force and arms in the Parish of Lafourche, aforesaid, and within the jurisdiction of the Seventeenth Judicial District Court in and for the Parish of Lafourche, did intentionally and
unlawfully operate a motor vehicle on Louisiana Highway # 1
at a rate of speed in excess of the legally established
speed limit, thereby committing the offense of speeding,
all in violation of R. S. 32:54.

contrary to the form of the statute of the State of Louisiana, in such cases made and provided and against the peace and dignity of the same.

Assistant District Attorney for the 17th Judicial District
of the State of Louisiana

NO. _15456_

17TH JUDICIAL DISTRICT COURT

PARISH OF LAFOURCHE

STATE OF LOUISIANA

VS.

ALBERT WOODFOX

INFORMATION FOR

RESISTING AN OFFICER

FILED *March 18*  196 ✓

_[signature]_

CLERK

# STATE OF LOUISIANA

### SEVENTEENTH JUDICIAL DISTRICT COURT

In and for the Parish of Lafourche

_____

**Wollen J. Falgout** [or] **Herbert O'Niell**, Assistant District Attorney of the Seventeenth Judicial District of the State of Louisiana,    who, in the name and by the authority of the said State, prosecutes in its behalf, in proper person comes into the Seventeenth Judicial District Court of the State of Louisiana, in the Parish of Lafourche, and gives to the said Court here to understand and be informed that one              Albert Woodfox

late of the Parish of Lafourche, on or about the    7th         day of    March              in the year of our Lord, One Thousand Nine Hundred and          Sixty-five (1965)++ with force and arms in the Parish of Lafourche, aforesaid, and within the jurisdiction of the Seventeenth Judicial District Court in and for the Parish of Lafourche,    did intentionally and unlawfully oppose, resist and obstruct a State Trooper acting in his official capacity and making an arrest authorized by law and with knowledge that the said State Trooper was acting in his official capacity, thereby committing the offense of resisting an officer, all in violation of R. S. 14:108.

contrary to the form of the statute of the State of Louisiana, in such cases made and provided and against the peace and dignity of the same.

Assistant District Attorney for the 17th Judicial District
of the State of Louisiana

STATE OF LOUISIANA

PARISH OF LAFOURCHE


     I HEREBY CERTIFY THAT the following one (1) page is a true and
correct copy of the minutes of the 17th Judicial District Court in
and for the Parish of Lafourche, Louisiana, dated APRIL 9, 1965,
INSOFAR, as they relate to the matter entitled:
STATE OF LOUISIANA VS. ALBERT WOODFOX, NUMBER 15487-15490 of the
Criminal Docket of said Court.

     IN TESTIMONY WHEREOF, witness my hand and  official seal, this
15TH day of SEPTEMBER, A.D., 1998, at Thibodaux, Louisiana.


JUDGE P. DAVIS MARTINEZ Presiding this day.


VERNON H. RODRIGUE
CLERK OF COURT

_____
DEPUTY CLERK OF COURT

```
**************************************************************
                    )  CHARGE:
STATE OF LOUISIANA  )      THE ACCUSED WAS THIS DAY BROUGHT TO THE BAR OF THE
   VS.  NO. 15488   )  COURT FOR IMPOSITION OF SENTENCE WHICH HAD BEEN DEFERRED
ALBERT WOODFOX      )  BY THE COURT UNTIL THIS DAY, AND AFTER HAVING HAD HIS
                       SAY WAS SENTENCED TO IMPRISONMENT IN THE PARISH JAIL FOR
                       A PERIOD OF TWO YEARS.
**************************************************************
                    )  CHARGE:  RESISTING AN OFFICER
STATE OF LOUISIANA  )      THE ACCUSED WAS THIS DAY BROUGHT TO THE BAR OF THE
   VS.  NO. 15490   )  COURT FOR IMPOSITION OF SENTENCE WHICH HAD BEEN DEFERRED
ALBERT WOODFOX      )  BY THE COURT UNTIL THIS DAY, AND AFTER HAVING HAD HIS
                       SAY WAS SENTENCED TO IMPRISONMENT IN THE PARISH JAIL FOR
                       A PERIOD OF THREE MONTHS, HOWEVER, THIS SENTENCE IS TO RUN
                       CONCURRENTLY WITH THE SENTENCE IMPOSED IN THE MATTER EN-
                       TITLED"STATE OF LOUISIANA VS. NO. 15488 ALBERT WOODFOX".
**************************************************************
                    )  CHARGE:  NO DRIVER'S LICENSE
STATE OF LOUISIANA  )      THE COURT ORDERED THAT THE IMPOSITION OF SENTENCE
   VS.  NO. 15487   )  HEREIN BE SUSPENDED
ALBERT WOODFOX      )
**************************************************************
                    )  CHARGE:  SPEEDING
STATE OF LOUISIANA  )      THE COURT ORDERED THAT THE IMPOSITION OF SENTENCE
   VS.  NO. 15489   )  HEREIN BE SUSPENDED.
ALBERT WOODFOX      )
```

No. 15659

17TH JUDICIAL DISTRICT COURT

PARISH OF LAFOURCHE

STATE OF LOUISIANA

VS.

ALBERT WOODFOX

INFORMATION FOR

SIMPLE ESCAPE

FILED April 30        196 8

_____

CLERK

# STATE OF LOUISIANA
## SEVENTEENTH JUDICIAL DISTRICT COURT
### In and for the Parish of Lafourche

**Wollen J. Falgout (or) Herbert O'Niell**, Assistant District Attorney of the Seventeenth Judicial District of the State of Louisiana, who, in the name and by the authority of the said State, prosecutes in its behalf, in proper person comes into the Seventeenth Judicial District Court of the State of Louisiana, in the Parish of Lafourche, and gives to the said Court here to understand and be informed that one          Albert Woodfox

late of the Parish of Lafourche, on or about the 26th          day of       April             in the year of our Lord, One Thousand Nine Hundred and    Sixty-five (1965),
with force and arms in the Parish of Lafourche, aforesaid, and within the jurisdiction of the Seventeenth Judicial District Court in and for the Parish of Lafourche,  did escape
confinement from the Lafourche Parish Jail where he
was serving a 2 year sentence for auto theft, having
been sentenced on April 9, 1965, thereby committing
the crime of simple escape, all in violation of R. S. 14:110.

contrary to the form of the statute of the State of Louisiana, in such cases made and provided and against the peace and dignity of the same.

Assistant District Attorney for the 17th Judicial District
of the State of Louisiana

SHERIFF'S OFFICE
## BUREAU OF IDENTIFICATION
## PARISH OF LAFOURCHE
# ARREST REPORT

| Arrest Number | | Complaint No. |
|---|---|---|



| Surname | First Name | Middle Name | Complainant | Name & Address |
|---|---|---|---|---|
| Woodfox | Albert | | Deputy Ernest B**a**ye | |

| Alias | Residence | CHARGE |
|---|---|---|
| | | Simple Escape and Auto Theft. |

538 Bertrand Street New Orleans, La.

| Place Arrested | Date & Time of Arrest | | Arresting Officer | Ward |
|---|---|---|---|---|
| St. Ann St. New Orleans, La. | 4-27-65 | | Major Diaz, Capt. Waguespack Dets. A. Perret and R. Kennedy, NOPD | |

| Birth Place | Birth Date | Age | Race | Sex | Height | Eyes | Weight | Comp. |
|---|---|---|---|---|---|---|---|---|
| New Orleans La. | 2-19-47 | 18 | W | M | 5-7 | brn | | |

| Occupation | Scars & Marks |
|---|---|
| Porter Fontenblue Motor H**o**tel | |

| Time Paroled & Date | PAROLED BY AND FOR WHOM |
|---|---|
| | |

Remarks:

The above subject was serving a sentence for theft in the Lafourche Parish Jail which he received on 4-9-65 ans was serving as a trustee performing duties around the Parish Jail. On the night of 4-26-65 subject left the Parish Jail without the authority of the Desk Sergant and was unalble to be located by the Destk sergant on duty. The New Orleans Police D**e**pt. was notified of his escape and to be on the look out for the subject. M**a**jor Diaz and Capt. Waguespack proceeded to New Orleans to assist the New Orleans Police to search for the subject. Upon reaching the NOPD it was learned at that time that Pelican Construction reported a stolen truck to the Lafourche **P**arish Sheriff's Office which was a 1962 Red Ford truck bearing '64-65 La. 769-013 and motr nunber F75FU240315 and futher learing that Unit 109 of the NOPD had stoped the truck at Claiborne and St. Bernad Ave about 2 A.M. and the subject fleed the scene after being stopped and the truck was towed by the NOPD officers. Upon checking this truck Detectives A. Perret and R. Kennedy and Deptuies Diaz and Waguespack found a brown wallet with identification papers and birth certificates and social Secutiry card of the above subject. The subject was then placed on theft charges at the Thibodaux Office. Under the escape warrant the search for the above subject was still under way. At the 1200 block of St. Ann street in New Orleans the above subject was located and when the four arresting officers appoached the subject attempted to run away again but changed him mind and offered no resistance at that time. Subject was taken back to the Lafourche Parish Jail and the charges of escape and theft was sent on on the subject.

Disposition

Signature of Official

# AFFIDAVIT

STATE OF LOUISIANA
PARISH OF LAFOURCHE

BEFORE ME, THE UNDERSIGNED AUTHORITY, PERSONALLY CAME AND APPEARED:

Norman R. Diaz, Deputy Sheriff

who having been by me duly sworn, deposes and says:

That one   Albert Woodfox, 538 Bertrand Street   New Orleans, La.

on or about the   26   day of   April   19 65 in the Parish and State aforesaid did unlawfully  escape confinment
from the Lafourche Parish Jail where teh above was serving a
2 years sentence for auto theft and was sentenced on 4-9-65 to said
sentence, in violation of R. S. 14:110

contrary to the form of the statutes of the State of Louisiana in such cases made and provided, in contempt of the authority of said State, and against the peace and dignity of the same.

WHEREFORE, affiant prays that one   Albert Woodfox
be arrested and dealt with according to law.

WITNESSES:

Ernest Baye

Norman R Diaz
AFFIANT

SWORN TO AND SUBSCRIBED before me this   26   day of   April   19 65.

Harold Charbes
Justice of the Peace J. P. Ward   2
Or
JUDGE, District Court Div.____ Lafourche Parish, La.

NOTE: Write names of witnesses on back of affidavit, detach same from warrant and mail to District Attorney's Office.

No. 15709

17TH JUDICIAL DISTRICT COURT

PARISH OF LAFOURCHE

STATE OF LOUISIANA

VS.

ALBERT WOODFOX

INFORMATION FOR

THEFT

FILED April 30 196__

_____ Clerk

A TRUE COPY

Clerk of Court's Office

Thibodaux, La. _____ B, 1998

_____

Clerk of Court

# STATE OF LOUISIANA
## SEVENTEENTH JUDICIAL DISTRICT COURT
### In and for the Parish of Lafourche

_____ _ _____

**Wollen J. Falgout (or) Herbert O'Niell**, Assistant District Attorney of the Seventeenth Judicial District of the State of Louisiana, who, in the name and by the authority of the said _State, prosecutes in its behalf, in proper person comes into the Seventeenth Judicial District Court_ of the State of Louisiana, in the Parish of Lafourche, and gives to the said Court here to understand and be informed that one          Albert Woodfox

late of the Parish of Lafourche, on or about the   26th     day of        April          in the year of our Lord, One Thousand Nine Hundred and    Sixty-five (1965),
with force and arms in the Parish of Lafourche, aforesaid, and within the jurisdiction of the Seventeenth Judicial District Court in and for the Parish of Lafourche,    did unlawfully and intentionally misappropriate or take somethong of value, to-wit:
a 1962 model Ford Truck, having a value of more than $100.00,
from the Pelican Construction Company, without the consent of the said owner, and with the intent to permanently deprive them of the property taken, thereby committing the offense of theft,
all in violation of R. S. 14:67.

contrary to the form of the statute of the State of Louisiana, in such cases made and provided and against the peace and dignity of the same.

_Falgout_
Assistant District Attorney for the 17th Judicial District
of the State of Louisiana

STATE OF LOUISIANA                    STATE OF LOUISIANA

VS. NO. 15700                         Parish of Lafourche

ALBERT WOODFOX                        17TH JUDICIAL DISTRICT COURT

---

CHARGE - AUTO THEFT

---

SENTENCE

    The accused in this case was brought to the bar of the Court, and upon being duly arraigned pleaded guilty; and by reason of said plea and the law and the evidence;

    IT IS ORDERED, ADJUDGED AND DECREED that Albert Woodfox be and he is hereby sentenced to serve 2 years at hard labor.

    THUS RENDERED, READ AND SIGNED in open court at *Thibodaux* *May 24th*, 1965.

*[signature]*
JUDGE

**FILED**

**MAY 24 1965**

*[signature]*
CLERK OF COURT

A TRUE COPY

Clerk of Court's Office
Thibodaux, La.

*[signature]*
Clerk of Court

# AFFIDAVIT

STATE OF LOUISIANA

PARISH OF LAFOURCHE

BEFORE ME, THE UNDERSIGNED AUTHORITY, PERSONALLY CAME AND APPEARED:

Norman R. Diaz, Deputy Sheriff

who having been by me duly sworn, deposes and says:

That one     Albert Woodfox

on or about the _26th_ day of _April_, 1965, in the Parish and State aforesaid did unlawfully   commit a theft

of a 1962 model Ford Truck bein the property of the Pelican Construction

company without the consent of the said owners all in violation of R. S.

of R. S. 14:67

contrary to the form of the statutes of the State of Louisiana in such cases made and provided, in contempt of the authority of said State, and against the peace and dignity of the same.

WHEREFORE, affiant prays that one     Albert Woodfox

be arrested and dealt with according to law.

WITNESSES:

Harry Maguespack, NOPD

Alaysius Perret, NOPD

Roland Kennedy NOPD

SWORN TO AND SUBSCRIBED before me this _27_ day of _April_ 19 _65_

_Norman R. Diaz_
AFFIANT

_____
Justice of the Peace J. P. Ward _2_
Or
JUDGE, District Court Div._____ Lafourche Parish, La.

**NOTE:** Write names of witnesses on back of affidavit, detach same from warrant and mail to District Attorney's Office.

RECEIVED AT THE LOUISIANA STATE PENITENTIARY

ANGOLA, LA. _May 25th 1965_____ 196 ___ FROM THE SHERIFF OF THE PARISH OF

Parish of Lafourche _____STATE OF LOUISIANA, THE FOLLOWING PRISONERS.

| NAME & NUMBER | CRIME | TERM | CAMP |
|---|---|---|---|
| Albert Woodfox C/M | 61326 | New commitment | |
| Jack Dagmar W/M | 61327 | New commitment | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

FILED

JUN 14 1965

CLERK OF COURT

WARDEN

BY: _____

RECORD CLERK

RO-102

STATE OF LOUISIANA

PARISH OF LAFOURCHE


    I HEREBY CERTIFY THAT the following one (1) page is a true and correct copy of the minutes of the 17th Judicial District Court in and for the Parish of Lafourche, Louisiana, dated MAY 18, 1965, INSOFAR, as they relate to the matter entitled:

STATE OF LOUISIANA VS. ALBERT WOODFOX, NUMBER 15699, 15700 of the Criminal Docket of said Court.

    IN TESTIMONY WHEREOF, witness my hand and official seal, this 15TH day of SEPTEMBER, A.D., 1998, at Thibodaux, Louisiana.


JUDGE REMY CHIASSON Presiding this day.


VERNON H. RODRIGUE
CLERK OF COURT

_____
DEPUTY CLERK OF COURT

STATE OF LOUISIANA )
VS.    NO. 15700 )
ALBERT WOODFOX )

CHARGE: THEFT

THE ACCUSED WAS THIS DAY BROUGHT TO THE BAR OF THE COURT FOR SENTENCING AND AFTER HAVING HAD HIS SAY WAS SENTENCED TO IMPRISONMENT IN THE STATE PENITENTIARY AT HARD LABOR FOR A PERIOD OF TWO (2) YEARS.

************************************************************

STATE OF LOUISIANA )
VS.    NO. 15699 )
ALBERT WOODFOX )

CHARGE: SIMPLE ESCAPE

THE ACCUSED WAS THIS DAY BROUGHT TO THE BAR OF THE COURT FOR SENTENCING AND AFTER HAVING HAD HIS SAY WAS SENTENCED TO IMPRISONMENT IN THE PARISH JAIL FOR A TERM OF SIX MONTHS, HOWEVER THIS SENTENCE IS SUSPENDED DURING GOOD BEHAVIOR.



NEW ORLEANS POLICE DEPARTMENT
ARREST REPORT

FINGERPRINTS

Fugitive from Thibodeaux, La.

J. Black

118-222

Subject arrested on warrant from Thibodeaux, La.

10/30/2008  10:12    5046587665                NOPD RECORDS                    PAGE  17/30



NEW ORLEANS POLICE
ARREST REPORT

albert                        19  1  745

2/19/45

538 Bertrand  St.NOLA

St Charles and Poydras    I            10:00

2/12/66   Paon , Braiser, Litua, Monvision  36

R.B. 14 art 67and 69 Rel. to Theft of a 1966
Opel also Possession of same
valued at 2,000.00 dollars

None

118 232

Subject was observed driving a 1966 Opel valued at 2,000.00 in a reckless
manner. The arresting officer stoped the above auto and when doing so
found the car stolen.

#195-354 "D"

J.

PARISH OF ORLEANS

The State of Louisiana { SS.

CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS

JOHN P. VOLZ,             Assistant District Attorney for the Parish of Orleans, who in the name and by the authority of the said State, prosecutes, in this behalf, in proper person comes into the Criminal District Court for the Parish of Orleans, in the Parish of Orleans, and gives the said Court here to understand and be informed that one _____

ALBERT WOODFOX,

late of the Parish of Orleans, on the ___twelfth___ day of ___July___ in the year of our Lord, one thousand nine hundred and _sixty-six_ with force and arms in the Parish of Orleans aforesaid, and within the jurisdiction of the Criminal District Court for the Parish of Orleans, committed a theft of a 1966 Opal Automobile of the value of Two Thousand ($2,000.00) Dollars in the lawful money of the United States of America, belonging to EDWARD BOESCH,

    SEPT. 26, 1966
    THE COURT, CONSIDERING THE TESTIMONY ADDUCED ON THE TRIAL, THIS DATE, AFTER THE STATE AMENDED THE INFORMATION TO READ "COMMITTED UNAUTHORIZED USE OF A 1966 OPAL AUTOMOBILE, FOUND THE DEFENDANT, ALBERT WOODFOX, GUILTY OB UNAUTHORIZED USE," (R.S.14:68).
    THE DEFENDANT, ALBERT WOODFOX, AFTER WAIVING LEGAL DELAYS, SENTENCED BY THE COURT TO SERVE FOUR (4) MONTHS IN THE PARISH PRISON WITH CREDIT FOR TIME SERVED.

THOS. M. BRAHNEY, JR., JUDGE, SECTION "D"
CRIMINAL DISTRICT COURT, PARISH OF ORLEANS,
STATE OF LOUISIANA

9-17-19

A True Copy

Deputy Cl
Criminal District Court
Parish of Orle

JUL 21 1966   2

contrary to the form of the Statute of the State of Louisiana in such case made and provided and against the peace and dignity of the same.

Assistant District Attorney for the Parish of Orleans