UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | : | |
| ALBERT WOODFOX | : | |
| | : | |
| Petitioner, | : | |
| | : | CIVIL ACTION |
| v. | : | NUMBER: 3:06-00789-JJB-CN |
| | : | |
| BURL CAIN, Warden of the Louisiana | : | |
| State Penitentiary, et al., | : | |
| | : | |
| Respondents. | : | |
| | : | |

_____

**Memorandum in Support of the State's Motion to Exclude the
Testimony of Petitioner's Expert Witness Orville Burton**

Petitioner Woodfox intends to call Orville Vernon Burton as an expert in the field of race relations during the May 29 evidentiary hearing. Specifically, Professor Burton intends to testify that that the selection of grand jury forepersons in West Feliciana Parish during the 1980s and 90s could not have been based on race-neutral selection criteria. But Burton's "expert" opinion is nothing of the sort. His report draws largely on disciplines such as sociology, psychology, demography, and statistics, about which he is unqualified to testify. Moreover, his conclusions are the product of manifestly unreliable methodology—namely, heavy reliance on anecdotes, speculation, and subjective impressions. Finally, Burton fails to make even a superficial effort to connect his findings of generalized racism in West Feliciana Parish to the issue before the Court: whether Woodfox's indictment was tainted by discrimination in the selection of grand jury forepersons. To the contrary, Burton expressly disclaims

any intent to do so.  For these and the reasons discussed below, Respondents Cain and Caldwell (collectively, the "State") accordingly request that Court exclude the evidence based on Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## I. BACKGROUND

### A.    Procedural History

The Court's amended scheduling order of November 11, 2011 (Doc. 188) required the State to identify its experts and produce its expert reports by December 2, 2011.  By the terms of the order, Woodfox had until February 13, 2012 to do the same.  The State timely submitted their expert reports in compliance with this order; however, on February 13, 2012, Woodfox filed a motion for extension (Doc. 198) in which he sought, among other things, an extension until March 12, 2012 to identify an additional expert.  But Woodfox was not able to meet that deadline either, and, by Motion for an Enlargement of Time Set for Discovery and Hearing Deadlines (Doc. 205) Petitioner sought another extension of the deadline to submit an expert report, this time until March 23, 2012.

Woodfox's new expert—Professor Burton—finally produced his expert report on March 23, 2012, and the State immediately requested an opportunity to depose him.  His deposition began on April 12, 2012 but was improperly terminated after only three and a half hours.  This forced the State to file an April 16, 2012 motion to compel (Doc. 208), which the Court granted on April 19, 2012 (Doc. 213).  By agreement of parties, Woodfox then finally produced Burton for the conclusion of his deposition on May 9, 2012.

408746.1

2

The State did not receive the transcript of the deposition from the Court's reporter until the evening of May 17, 2012, and has endeavored to file this motion as soon as possible afterwards.

**B.   Summary of Burton's Testimony**

Orville Burton is a professor of history and computer science at Clemson University.  April 12, 2012 Deposition of Orville Burton ("Depo. I"), at p. 26. (Exhibit A contains all *in globo* excerpt pages from Depo. I).  Burton Autobiography (attached as Exhibit "B") at 1.  He indicates that his academic specialty is "race relations, politics and society" and that he has written extensively on issues of race in American society.  *See* Burton's Expert Report ("Report") (attached hereto as Exhibit "C") at 1; Burton Autobiography at 1. According to his expert report, he was contacted by Woodfox's attorneys and asked to address the following two issues:

> [D]o either the State's report, entitled Demographic Analysis of West Feliciana Parish, authored by Mr. Rigamer, or an e-mail submitted by counsel for the State identify the existence of permissible race-neutral criteria that explain stark racial disparities in foreperson selection?

> [D]oes good character evidence concerning a judge in other contexts (i.e. contexts other than his role as a judge) support an inference that the judge used permissible, race-neutral criteria in selection grand jury forepersons?

Report at 2.  As discussed below, he ultimately answers both questions in the negative.

Burton first concludes that the race-neutral selection criteria identified by the State "do not explain the statistical disparity between the numbers of white and black forepersons."  *Id.* at 3.  He bases this conclusion on his findings that:

- There is "no support" for the assumption by the State's expert, Gregory C. Rigamer, that, "in selecting grand jury forepersons in the 1980s and early 1990s, State Court Judges in West Feliciana Parish took into consideration certain socioeconomic factors such as education, poverty and unemployment," and that whites in West Feliciana were generally fared better as to all of these factors. *Id.* at 3-4.

- Even if he were to take Rigamer's assumptions about the race-neutral criteria considered by judges at face value, those criteria could not explain the disparities in foreperson selection because: (a) even though Rigamer's figures demonstrate some correlation between race and economic factors, "a judge looking out at a venire pool would be wrong to draw conclusions based on the skin colors he saw about who did or did not" possess such characteristics, Report at 4; and (b) any correlations between race and socioeconomic factors would not be "strong enough to support a conclusion that these factors account for the racial disparity seen in West Feliciana foreperson selections." *Id.*

- The judges' consideration of factors such as leadership, intelligence, responsibility, and independence could not explain the disparities because (a) "there is no evidence that race causes any of these factors to be more or less prevalent among blacks as opposed to whites," Report at 5; and (b) it would have been very difficult for judges to make reasoned decisions about whether venire members possessed these qualities. *Id.*

- No more than three of Judge Ramshur's appointments had college degrees, and that "based on what I have been told by counsel," there were blacks on the venires who had "comparable educational, employment, and leadership backgrounds." *Id.* at 6.

Burton then moves on to address the State's potential use of good character evidence concerning judges in contexts other than their role as judges. The State can show, for example, that Judge Ramshur had close ties with the black community and in fact raised two black children as his own. Burton opines that such evidence is irrelevant for purposes of assessing a claim of racial discrimination, noting that race relations in West Feliciana in the 1980s and 90s "showed markers of the legacy of paternalism," Report at 7, which he defines as "a phenomenon whereby persons in positions of authority, or with greater access to power, treat subordinates with kindness and favor even as they limit the freedoms and responsibilities of those subordinates, as a father might with a child." *Id.* at 6-7.

In support of this conclusion, Burton offers lengthy historical discussion of the evolution of black civil rights in the South, focusing largely on the period between the Civil War and the 1960s. *Id.* at 9-12. With respect to the periods relevant to this litigation—the 1980s and 90s—Burton relies primarily on anecdotes from his discussions with selected residents during a two-day visit to the area. Depo. I, at 88-96. His findings: "[R]acial relations in West Feliciana have improved very slowly," Report at 20, and there still is "ample evidence of racial discrimination in West Feliciana in the 1990s." *Id.* at 13.

Burton concludes his report with the following statement:

> Evidence of prevalent racial discrimination in the historical and social fabric of West Feliciana Parish during the 1980s and 1990s does support a determination that race was a factor in the disparate selection of forepersons in West Feliciana.

Report at 20.

## II. ARGUMENT

### A. Federal Rule of Evidence 702, as interpreted by *Daubert*, governs the admissibility of expert evidence

Pursuant to the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 275 (5th Cir. 1998). Rule 702 is the "primary locus of this obligation."   *Daubert v. Merrell Dow Pharmaceutical, Inc.,* 509 U.S. 579, 589 (1993).  Rule 702 provides:

> A witness who is qualified as an expert, by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert*, the United States Supreme Court provided the analytical framework for this determination under Rule 702. *See Daubert*, 509 U.S. at 589-95; *see also United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004). Under the *Daubert* framework, district courts "act as gate-keepers overseeing the admission of scientific and non-scientific expert testimony."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

First, Rule 702 requires the district court to initially determine whether the purported expert witness is "qualified" to give the proffered testimony.  Fed. R. Evid. 702.  To be qualified as an expert, a witness must possess specialized "knowledge, skill, experience, training, or education." *Id.*  Thus, "[t]he court must determine whether the proposed expert's training or experience are sufficiently related to the issues and evidence before the court that the expert's testimony will

assist the trier of fact." *Whitney Nat. Bank v. Air Ambulance by B & C Flight Mgmt., Inc.*, 516 F. Supp. 2d 802, 815 (S.D. Tex. 2007) (citing *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562-63 (5th Cir. 2004)).

Under *Daubert*, the district court must also make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether the reasoning or methodology can be applied to the facts at issue [the relevance analysis]." *United States v. Abdallah*, 629 F. Supp. 2d 699, 749-50 (S.D. Tex. 2009) (quoting *Skidmore v. Precision Printing & Pkg., Inc.*, 188 F.3d 606, 617 (5th Cir. 1999)). The proponent of the expert testimony bears the burden of demonstrating that the expert's findings and conclusions are reliable and therefore admissible under Rule 702. *See Moore*, 151 F.3d at 276. This burden is not satisfied by the expert witness's "assurances that he has utilized generally accepted scientific methodology." *Id*. Rather, the proponent must "prove by a preponderance of the evidence that the testimony is reliable." *Id*.

Hence, to be reliable, the proposed testimony must be "supported by appropriate validation" and must not be based on the purported expert's "subjective belief or unsupported speculation." Id. at 275. According to *Daubert*, in order to determine whether the expert's methodology is reliable, courts should consider:

> (1) whether the expert's theory has been and can be tested;
>
> (2) whether the theory has been subjected to peer review and publication;
>
> (3) the known or potential rate of error of the particular scientific technique; and

(4) whether the technique is generally accepted in the scientific community.

509 U.S. at 593-94. In subsequent cases, the Supreme Court identified additional factors that may inform a district court's evaluation of proffered expert testimony, including:

(5) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; and

(6) whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.

*See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Kumho Tire*, 526 U.S. at 152.

Even if the plaintiff establishes that a proposed expert's testimony is scientifically reliable, the district court should still exclude the evidence if it lacks relevance to, or does not "fit," the issues to be decided in the case. *Daubert*, 509 U.S. at 591. The condition that the expert's testimony "assists the trier of fact to understand the evidence or determine a fact in issue . . . goes primarily to relevance." *Id.* Thus, "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* Furthermore, "[c]onjectures that are probably wrong are of little use." *Id.*

**B.     The Court should exclude Burton's testimony**

**1.     *Burton is not qualified to offer an opinion***

As an initial matter, Professor Burton does not satisfy *Daubert*'s threshold requirement of being qualified as an expert to provide an opinion on the ultimate issues considered in his report—i.e., whether the disparities in foreperson

appointments can be explained by race-neutral factors, and whether a judge's reputation as a non-racist is relevant to a determination of whether the judge discriminated during his foreperson appointments. *See* Report at 2.

Burton has a PhD in history. Autobiography at 1. He works as a professor of history and computer science, and has published extensively on the subject of of race relations. Report at 1. Even assuming the subject was relevant to this litigation, *see* Part II.A.2., *infra*, the State does not dispute that Burton would be qualified to offer an expert opinion on the history of race relations in the South, and perhaps even in Louisiana. Yet critical components of his opinion go far beyond these subjects into various other fields—such as sociology, psychology, demographics, and statistics—in which Burton simply lacks the specialized knowledge or training to serve as an expert under Rule 702 and *Daubert*.

Burton's expert report is replete with these ventures into wide-ranging academic disciplines. Examples include the following:

- In contending that demographic factors could not have accounted for the foreperson appointment disparities, Burton criticizes the statistical methodology of the State's expert, Gregory Rigamer. Burton contends, for example, that Rigamer's report does not demonstrate "degrees of correlation strong enough to support a conclusion that these factors account for the facial disparity . . . ." Report at 4. He also suggests that Rigamer failed to account for variations in educational attainments between older and younger blacks in calculating the correlations between race and educational attainment. *Id.* at 4 n.3.

- In concluding that levels of education, poverty, and/or unemployment were not "critical area[s]" considered by judges

when selecting forepersons, Burton states that "[t]here is no social science theory, for example, that says poverty makes worse juror or foreperson [*sic*]. Report at 4 & n.4. He further concludes that there is "no evidence that race causes any of these factors [mentioned in an email by counsel for the State, such as leadership, intelligence, and independence] to be more or less prevalent among blacks as opposed to whites." *Id*. at 5.

- Burton opines that, even accepting Rigamer's demographic assumptions, "one would still anticipate . . . that 6 or 7 of Judge Ramshur's 18 permanent and temporary foreperson appointments in West Feliciana between 1983 and March 1999 would have been African American, as opposed to just one." *Id*. at 5.

- On the issue of "good character evidence" about judges, Burton declares that "general 'good character' evidence is not useful for assessing a claim of racial discrimination from a sociological perspective because personality and character attributes are not indicative of whether someone harbors racial biases in a particular dimension." *Id*. at 6. Burton goes on to state that he based his opinion partly on his "familiarity with secondary source sociological scholarship." *Id*.

- In explaining how the influence of "paternalism" would undercut general character evidence, Burton notes that prejudiced individuals may behave in nondiscriminatory ways, especially when "engaging in conduct outside of the conduct where the bias is relevant." Report at 8. Burton further contends that "[m]ultiple sociological studies show that seemingly unprejudiced people engage in discrimination based on racial bias." *Id*.

These multi-disciplinary explorations culminate not simply with Burton concluding, as a historian of race relations, that West Feliciana had and still may have problems with racism and discrimination. Instead, he makes a substantial

and unexplained inferential leap to opining that his research "supports a determination that race was a factor in the disparate selection of forepersons in West Feliciana." *Id*. at 20.

Woodfox presumably intends to tender Burton as an expert in the field of "race relations."[1]  But he has not offered any evidence that Burton should be deemed qualified as an expert on sociological theories, demographic statistics, or the psychology of unconscious biases. Nor could he, as demonstrated by Burton's deposition testimony: when asked to explain his qualifications to opine on such a wide array of subjects, Burton repeatedly claimed that he was not merely a historian but a "social scientist." *See, e.g.,* [May 9, 2012] Deposition of Orville Burton ("Depo. II"), at 46.  (Exhibit D contains *in globo* all excerpt pages from Depo. II.)  ("I would bring the relevance of a social scientist"), 49 ("My training as a social scientist and historian").   Burton explained that "social science" includes the fields of "economics, sociology, political science, history, [and] anthropology." Depo. II, at 81.  But despite Burton's assertions that he is "trained" in all of these fields, *id*., he admits that he had no degree in any of these fields other than history. Depo. II, at 26, 56, Burton Autobiography at 1; Resume at 1 (attached as Exhibit F).   And his explanations of his qualifications in these and other fields were underwhelming, at best.  Depo. II, at 26, 56.  For instance, his sociology training consists of a certificate for attending sociology classes while teaching history at the University of Illinois, *id*. at 26; his behavioral psychology training

---

[1]    The intended area of Burton's expertise has never actually been made clear.  Burton himself could not identify the fields in which he would be tendered as an expert at trial.  *See* Depo. II, at 46-47 ("Q: And when you were qualified to testify as an expert in these cases, in these voting rights cases, are you telling us today that you do not know the field of expertise in which you were tendered? A: I do not remember.")

comprises attending a single guest lecture in graduate school and taking part in reading groups that discussed the subject—mostly around 1970, *id.* at 56-57.

Burton simply overstates his competence to testify as an expert in these fields. Whether or not Burton is the polymath he purports to be is largely beside the point: being well-read in a field does not render one an expert for purposes of expert qualification. Rather, the witness must possess "specialized knowledge, skill, experience, training, or education in the relevant field," in order to be qualified to express his expert opinion on the topic in issue. *Christopherson v. Allied–Signal Corp.*, 939 F.2d 1106, 1110 (5th Cir. 1991). Accordingly, courts often exclude even highly credentialed and experienced expert witnesses when their proponent has failed to establish that the expert's knowledge directly relates to the particular issue that is the subject of his proposed testimony. *See, e.g., Kozak v. Medtronic*, 512 F. Supp. 2d 913, 918-19 (S.D. Tex. 2007) (finding that an expert witness who had twenty-three years of experience as an orthopedic surgeon, biomedical engineer, product consultant, and inventor of interbody fusion devices, was not qualified to testify on the future damages of the defendant's misappropriation of trade secrets in developing an anterior lumbar plating system).[2]

---

[2]   *See also, e.g., Kumho Tire*, 526 U.S. at 154-55 (finding the proffered expert qualified as an expert in mechanical engineering, but that his methodology in analyzing a particular tire failure was not reliable); *Weisgram v. Marley Company*, 169 F.3d 514, 518 (8th Cir. 1999) (holding that a city fire captain, although qualified as an expert on fire investigation, and therefore qualified to testify as to his opinion that a fire started in the entryway and radiated to a sofa, was not qualified to testify as to his unsubstantiated theories of a malfunction that might have caused the fire); *Allison v. McGhan Medical Corp.*, 184 F.3d 1300 (11th Cir. 1999) (proposed expert testimony of pathologist not permitted upon basis of unreliable methodologies in silicon breast implant case); *Cummins v. Lyle Indus.*, 93 F.3d 362, 371 (7th Cir. 1996) (industrial engineer not permitted to render an expert opinion regarding the adequacy of warnings, the adequacy of an instruction manual, and the feasibility of alternative designs for a trim press).

408746.1

Because Burton—who has never testified in another case regarding racial discrimination in the selection of jurors or forepersons, Depo. II. at 50—lacks the specialized training and experience to render an opinion on whether discrimination motivated the judges' foreperson selections, the Court should find him unqualified to present such expert testimony. *See Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir.1999) ("A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.").

## 2. *Burton's testimony is the product of flawed and unreliable methodology*

Even if Professor Burton was qualified to offer expert testimony on the topics in his opinion, his testimony should be still be excluded under Rule 702 and *Daubert* because it is unreliable. Burton described in some detail the methodology that he used and the source material that he relied on. In his report, Dr. Burton indicates that his opinion relies upon "both my familiarity with secondary source sociological scholarships; the history of the region in West Feliciana lies; and my own primary source research into the late 20th century history of West Feliciana particularly as it relates to race relations in the community." Report at 6. He also indicated that he reviewed depositions from a Federal voting rights case litigated in the 1990s, interviewed individuals who lived in the Parish and spent time in the Parish (2 days), and reviewed contemporaneous source materials that he "came across", including local and regional newspaper articles from the time period as well as "tours" of the

408746.1

13

courthouse grounds, the local library, the tourism office, and the headquarters of the local historical society. *Id.* at 7.

But a purported expert witness's "use of a general methodology cannot vindicate a conclusion for which there is no underlying . . . support." *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999). Here, beyond making use of a body of seemingly suitable source material, Burton's "methodology" in reaching his ultimate conclusions consisted almost entirely of unsupported speculation, subjective beliefs, and heavy reliance on anecdotal hearsay. Burton, in other words, unjustifiably extrapolated from an accepted premise—that racism has and, to a lesser extent, continues to be a problem in West Feliciana Parish—to the utterly unfounded conclusion that the judges of the 20th Judicial District must have considered race in their selection of grand jury forepersons. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The Supreme Court explained in *Joiner*, however, that:

> [n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* As the following examples illustrate, however, the analytical gap between the proferred data and Burton's opinion is unacceptably wide:

- In flatly asserting that West Feliciana judges did not venire members' levels of education, poverty, and/or employment to be "critical area[s]" to consider when selecting a foreperson, Burton simply states that "no social science theory" would support the use of such factors. Report at 4 & n.4.

- Burton states, with no explanation whatsoever, that the degree of correlation between race and socioeconomic factors such as education and

employment discussed in the Rigamer report were not strong enough to support a conclusion that these factors could account the racial disparity in the foreperson selections. *Id*. at 4. Nor does he provide any support for his bald speculation that, even accounting for these socioeconomic factors, "6 or 7" of Judge Ramshur's appointments should have been black. *Id*. at 5.

- Further, in discussing the correlation between race and socioeconomic factors, Burton makes the blanket statement that "there is no evidence that race causes any of these factors to be more or less prevalent among blacks . . . ." *Id*.

- In dismissing the possibility that a judge's personal characteristics could be relevant to a consideration of discrimination, Burton declares, absent any supporting citations, that "personality and character attributes are not indicative of whether someone harbors racial biases in a particular dimension." *Id*. at 6. The sole justification Burton provides for this sweeping statement amounts to nothing more than a subjective personal opinion: "For example, someone with a prejudice against Jews that involves the belief that Jews steal money might be very kind to Jews and even have close relationships with Jews. . . . Yet, because of his or her bias, he might refuse to bank with Jews or avoid engaging in commercial reaction with Jews." *Id*. at 8.

- In sole support of his assertion that "discrimination and bias are often invidious even in communities where cultural norms prize kindness [and] gentility," Burton cites the *Audubon Plantation Family Cookbook*, which refers to a restaurant in <u>Natchez, Mississippi</u> that bears the offensive name "Mammy's Cupboard" and is fronted by a large statue of a black domestic servant. *Id*. at 6 & n.6.

- Burton goes on to claim that "race relations in this community in the 1980s and 1990s showed markers of the legacy of paternalism, and that racial bias and discrimination were prevalent in the community into the

1990s when Mr. Woodfox was indicted (and even beyond, to today). He offers no further explanation for this specific proposition. Report at 7.

- As for the continuing existence of racial polarization in the 1980s and 90s, Burton offers "evidence" such as (a) different voting patterns for blacks and whites, (b) a preexisting school desegregation order that persisted throughout the 1990s, (c) an unsupported assertion that the town high school had segregated proms into the 1990s, (d) unnamed interviewees' assertions that schools were "reluctant" to recognize the Martin Luther King, Jr. holiday, (e) a statue in the West Feliciana courthouse honoring Confederate war dead, (f) unnamed local residents' "perceptions" that there were significant racial disparities in sentencing for similar crimes, (g) memories by unnamed local residents of a killing of a black teen by a white teen in 1992, and (h) Burton's own perception, formed while touring the West Feliciana Historical Society, that the historical literature on offer touted a "moonlight and magnolia" narrative of the "good old days" of plantation society. *Id.* at 14.

- Burton's assertion that blacks did not participate in West Feliciana's "leading institutions" is supported solely by interviews with a handful of local residents who did not recall any blacks serving on those institutions. For example, one interviewee reported that when he asked the mayor about serving on the tourism board, the mayor supposedly replied that "some of these boards ain't for nothing but whites." *Id.* at 19.

- Finally, Burton claims that the Audubon Pilgrimage, an annual tour of homes in St. Francisville, fostered the "plantation myth" and "nostalgia for a slave society" that alienates black residents. *Id.* at 17.

Further, Burton's report relies heavily on information he obtained during interviews with a handful of local residents during his short visit to West Feliciana. *See* Burton Deposition, Part I, at 88-96. But these interviews were anything but representative: Burton admits that he did not interview a single

white person.  Depo. II, at 64-65.  Burton explained in his deposition that he
would have liked to have interviewed white citizens, but that he simply did not
have time to do so.  *Id.* at 71.  He defends this omission, however, by emphasizing
that he read several depositions given by whites in an unrelated redistricting
case.  *Id.* at 66-67.

The above examples are but a few among many demonstrating the glaring
methodological flaws that permeate Burton's expert report.  But Burton cannot
simply "provide assurances that he has utilized generally acceptable scientific
methodology" while offering conclusions seemingly drawn from thin air.  *See*
*Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 275 (5th Cir. 1998).  Rather,
Woodfox must "prove by a preponderance of the evidence that the testimony is
reliable."  *Id.*  Given Burton's patently shoddy methodology, Woodfox can make
no such showing.

In addition to Burton's unfounded conclusions, two other factors draw the
reliability of his methodology into question.  First, courts have recognized that an
expert opinion that was developed expressly for the purposes of litigation is more
likely to be biased than opinions based on research conducted in the regular
course of business.  *See Anderson v. Bristol Myers Squibb Co.*, No. Civ.A. H-95-
0003, 1998 WL 35178199, at *3 (S.D. Tex., April 20, 1998) (quoting *Daubert v.*
*Merrell Dow Pharmaceuticals, Inc.* (Daubert II), 43 F.3d 1311, 1317 (9th Cir.
1994) and explaining that "experts whose findings flow from existing research are
less likely to have been biased toward a particular conclusion by the promise of
remuneration.").  Here, Burton inarguably carried on his West Feliciana-specific

research to serve Woodfox's interests.[3]  That, in itself, would not necessarily call into question the reliability of Burton's methods.  Instead, the more troubling issue is that key conclusions in Burton's report appear to have been driven directly by Woodfox's counsel.  *See* Depo. I, at 88-89.  For example, Burton's conclusion that the foreperson selection disparity could not be explained by race-neutral factors is based partly on Woodfox's counsel's representations to Burton that the judges of the 20th Judicial District engaged in "little to no questioning" of perspective forepersons," Report at 5, and that black and white members of the relevant venires possessed "comparable educational employment, and leadership backgrounds,"  Report at 6 (explaining that this conclusion was "[b]ased on what I have been told by counsel—[and on facts] which counsel have asked me to assume to be correct for purposes of this report").  Additionally, Burton based his conclusion that racial bias and polarization permeated West Feliciana largely on interviews conducted with an all-black "focus group" at a meeting arranged by Woodfox's counsel.  *See* Depo. I, at 88-89.  He also admits that he relied on notes taken by Woodfox's attorneys during the focus group meeting.[4]  Id. at 111. Burton's conclusions, in short, were plainly biased by Woodfox's counsel, and should accordingly be deemed unreliable.

---

[3]    Of course, the fact that "[t]hat an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office."  *Daubert II*, 43 F.3d at 1317.

[4]    Apart from relying on input from Woodfox's attorneys, Burton also admitted that his opinions depended roughly 70 hours of paid assistance from his daughter, who is a student at the University of Georgia, Depo II. at 7, 12, 13.  This division of duties is likely explained by Burton's admission that he had been under intense time pressure to complete his report.  *See* Depo II. at 69, 70 ("I tried to put together a report under very, very, incredible time constraints.").  These factors further call into question the reliability of Burton's report.

408746.1

Second, there is evidence to suggest that Burton's opinions were biased by his own personal beliefs and experiences. Burton testified that he has worked extensively for the NAACP, and that former NAACP chairman Julian Bond recognized him has having done "more [expert work] for the NAACP than anyone." Depo. II at 29. Additionally, Burton indicated in a 2001 interview that he became active in the civil rights movement in 1968 and that he does not "hesitate" to bring his experiences to the courtroom as an expert witness for minority plaintiff in voting rights or discrimination cases. Burton Interview (attached as Exhibit "E") at 5. He shared in the same interview that he hoped to "inspire students to confront their passivity [and] to think about and apply social justice issues at the grass roots level." *Id.* These factors would seem to suggest that Burton was predisposed to reach conclusions favorable to Woodfox. But "[c]ommon sense and Federal Rule of Evidence 702 require the exclusion of any expert opinion that was reached prior to conducting the research necessary to form that opinion." *In re Viagra Products Liability Litigation*, 658 F. Supp. 2d 950, 963 (D. Minn. 2009).

In sum, "[e]ven a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Professor Burton's speculative and subjective opinions were the result of no apparent methodology whatsoever, and should be accordingly be excluded pursuant to Rule 702 and *Daubert*.

### 3.   Burton's opinions are irrelevant to the ultimate issue before the Court

Finally, even assuming that Burton is qualified to offer an opinion and that his methods were reliable, his opinion should nonetheless be excluded as irrelevant.   Rule 702 requires that "the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R.  But "the word 'knowledge' connotes more than subjective belief or unsupported speculation."  *Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996) (quoting *Daubert,* 509 U.S. at 590).  Yet that is exactly what Burton's opinions amount to.   Burton devoted his entire investigation and the large majority of his report to finding evidence of historical discrimination in West Feliciana.   But he has made no effort whatsoever to demonstrate how those findings of racial discrimination could translate into a relevant issue in this litigation.   To the contrary, Burton expressly and repeatedly *disclaims* any undertaking or finding that would even suggest that Judge Ramshur's foreperson selections were influenced by the racial bias that Burton claims to have found evidence for:

> Q:   [W]ould there by any, in your view, any evidence of discriminatory intent [in] anything that Judge Ramshur did that you've seen or heard?
>
> A:   Again, I want to put on record that I was not asked to come to a conclusion about Judge Ramshur and race influencing him. . . .

Depo. II at 92-93.

> Q:   Again, it was not your intent or findings that Judge Ramshur . . . was infected by that moonlight and magnolias mentality?
>
> A:   I was not asked to do that so I did not draw a conclusion in this report on Judge Ramshur.

408746.1

> Q:    Or on any of the judges of the 20th Judicial District Court?
>
> A:    No, it's—not to the extent that they were part of this culture is all.

Depo. II at 61-62.

In fact, when pressed in deposition, Burton clarify that his report—in which he says that the racial prejudice supposedly pervading West Feliciana "supports" a finding that the judge was infected by racial animus—really just shows that the judge's actions were "consistent" with the racial views of the community:

> Q:    Doesn't it look like there you're saying, in your opinion, that the historical and social history of discrimination support a finding that Judge Ramshur discriminated in his decision?
>
> A:    I do not. That is not what I say. What I'm saying is it is consisting that we do not know, of course, all of the factors that are there, but from what I've looked at, that would suggest this, that it's this. . . .

*Id*. at 54-55 (emphasis added).

Burton's report instead traces the history of race relations in Louisiana back to 1868 and provided a historical summary of reconstruction after slavery, the Jim Crow era, and the voting rights act of 1964. But while race relations may be an issue in voting rights cases and in redistricting matters where historical racial discrimination is an actual element of the cause of action, it irrelevant in this case. *Compare Village of Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S. 252, 265 (1977) (listing "the historical background of the attacked decision" as a one factor to be assessed when determining whether "invidious discriminatory purpose" was a motivating factor in government body's decisionmaking); *with Castaneda v. Partida*, 430 U.S. 482, 494 (1977) (explaining that, in grand jury discrimination cases, "the burden of

proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result").

Burton was also asked by the Woodfox team to comment on whether otherwise good character could support an inference that Judge Ramshur used racial neutral criteria in the selection of forepersons.  But he admitted in his deposition that he had made no inference of personal discrimination by Judge Ramshur and that he was not personally familiar with the race neutral criteria allegedly used by Judge Ramshur.  Depo. II, 93-95.  He testified that, while certain race neutral criteria might have had some affect on the observed disparity, he did not believe they could explain the disparity.  Yet he admitted to having done no statistical analysis and that he was only assuming those numbers were correct.

Burton's report, in sum, offers no explanation whatsoever into how the history of discrimination it discussed somehow impacted Judge Ramshur in the jury foreperson selection process.  In other words, his opinions "do[] not relate to any issue in the case" and are therefore "not relevant . . . ergo, non-helpful." *Daubert*, 509 U.S. at 591.  "Under *Daubert*, a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).  Regardless of Professor Burton's undeniable contributions to the study of historical race relations, his contributions to this case amount to nothing more than unfounded

speculation.  The Court should therefore exclude them as irrelevant under Rule 702 and *Daubert*.

### III. CONCLUSION

For the reasons stated above, the Court should grant the State's motion and exclude the expert testimony of Professor Burton.


Respectfully submitted,


JAMES D. "BUDDY" CALDWELL
Louisiana Attorney General


By: */s/Richard A. Curry*
        RICHARD A. CURRY (La. Bar No. 4671)
        DAN E. WEST (La. Bar No. 13372)
        McGlinchey Stafford, PLLC
        15th Floor, One American Place
        Baton Rouge, Louisiana 70825
        Telephone:   (225) 383-9000
        Fax:    (225) 343-3076


        KURT WALL (La. Bar No. 23349)
        Assistant Attorney General
        Director, Criminal Division

        Louisiana Department of Justice
        Office of the Attorney General
        P.O. Box 94005
        Baton Rouge, LA  70804-9005
        Telephone:   (225) 326-6200
        Fax:   (225) 326-6297
        COUNSEL FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I CERTIFY that a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all known counsel of record in this matter by operation of the court's electronic filing system.

Baton Rouge, Louisiana, this 18th day of May, 2012.


*/s/Richard A. Curry*
Richard A. Curry