**Historical, Social, and Demographic Analysis of West Feliciana Parish**

Dr. Orville Vernon Burton, Director Clemson CyberInstitute and Professor
History and Computer Science
Clemson University
Clemson, South Carolina
vburton@clemson.edu

# 1    Summary and Finding

The habeas proceeding of Albert Woodfox involves a claim of racial discrimination in the selection of the grand jury foreperson. Mr. Woodfox was indicted by a grand jury in West Feliciana Parish, Louisiana, in 1993, in connection with the 1972 murder of Officer Brent Miller at Louisiana State Penitentiary, also known as Angola prison. I have been asked to study demographic characteristics of West Feliciana Parish, and historical and sociological factors relevant to those characteristics, to ascertain whether any permissible, race-neutral factors and/or selection criteria have been identified by the state of Louisiana that explain a stark disparity – one that held throughout the 1980s and 1990s – in the proportion of West Feliciana Parish grand jury forepersons who were African American and African Americans in the Parish population who were eligible for grand jury service. I conclude that the observed disparities cannot be explained by any of the possible race-neutral factors or selection criteria identified by the State of Louisiana. To the contrary, evidence of prevalent racial discrimination in the historical and social fabric of West Feliciana support a determination that race was a factor in the selection of forepersons in West Feliciana during the 1980s and 1990s.

# 2    Qualifications and Compensation

I am a professor of History and Computer Science and director of the Clemson CyberInstitute. I have written extensively on issues of race in American society, with a focus on the American South. I am President of the Southern Historical Association and past president of the Agricultural History Society. An autobiographical account of my educational and professional experience, as well as a detailed *curriculum vitae* (CV) are attached hereto as Appendix A. My CV lists my books and publications, and the autobiography lists the cases I testified in within the last five years.

I am being compensated at a rate of $175/hour. Compensation for my work preparing this report is capped at $7,500.00.

# 3    Documents and Materials Reviewed and Assumptions Relied Upon

I reviewed the report prepared by CEO & Principal Gregory C. Rigamer and the material described at page 5 of his report. I also reviewed the report of Professor Tumulesh K.S. Solanky, Ph.D., and the report of Professor Brian D. Marx, Ph.D.

Pursuant to my research and preparation of this report, I have relied upon and examined a wide range of sources. Some of these sources include material from previous research, and authoritative texts from the fields of political science, sociology, and history, including demographic analysis and on race, community, and identity studies. The remainder was collected and reviewed specifically to



EXHIBIT

C

tabbies*

respond to the inquiries I was asked about in connection with this case. As a matter of course, I began by reviewing peer-reviewed published work by historians, political scientists, and sociologists, as well as Ph.D. theses relevant to the issues being investigated and pertinent to my inquiry. Some of these scholarly works will appear in specific citations. I read newspapers with a high circulation in the locale of West Feliciana, including the St. Francisville *Democrat* and the Baton Rouge *Advocate*, concentrating on the period from 1980 through 1999. I reviewed statutes and legislative proceedings relevant to race relations in Louisiana, and to race relations in West Feliciana specifically.

I consulted various data from the U.S. Censuses of 1970, 1980, 1990, and 2000. I examined pertinent constitutional and statutory provisions, resolutions, bills and reports, as well as published federal and state court judicial opinions. I read depositions, excerpts of expert reports, and court filings from other cases. I reviewed the published opinions of certain cases and relevant correspondence from the office of the Attorney General of Louisiana. I reviewed correspondence of the United States Department of Justice and parts of the United States House of Representatives record concerning enforcement and reauthorization of the Voting Rights Act of 1965. I examined the surveys of grand jury forepersons and venire persons conducted by Attorney General's office. I also conducted eighteen interviews with people familiar with West Feliciana Parish (most were lifelong residents), including one focus group of eight people and one with an individual who served as the foreperson of a West Feliciana grand jury. I spoke informally with four city workers as well. I also drove around the Parish, and visited, *inter alia*, the local West Feliciana library, tourism office, historical society, and courthouse grounds.

In preparing my report and my testimony in this case, the sources and types of documentation that I have used are those an expert normally consults in investigating questions of this nature. The methodology that I have employed in preparing my report is the same methodology I and other scholars in my field employ when examining issues of the sort investigated here.

## 4    The Statistical Disparity in African American Foreperson Appointments in West Feliciana is Not Explained by Race-Neutral Factors or Selection Criteria

As discussed, Petitioner's counsel have asked me to study demographic characteristics of West Feliciana Parish, and the historical and sociological factors relevant to those characteristics, to ascertain whether any permissible, race-neutral factors and/or selection criteria that have been identified by the State of Louisiana explain stark disparities in the proportion of selected West Feliciana Parish grand jury forepersons who were African American and the proportion of African Americans in the Parish population who were eligible for grand jury service. Related to this overarching issue, counsel have asked me to address two specific issues:

> First, do either the State's report, entitled *Demographic Analysis of West Feliciana Parish*, authored by Mr. Rigamer, or an e-mail submitted by counsel for the State identify the existence of permissible race-neutral criteria that explain stark racial disparities in foreperson selection?

> Second, does good character evidence concerning a judge in other contexts (*i.e.* contexts other than his role as a judge) support an inference that the judge used permissible, race-neutral criteria in selection grand jury forepersons?

In my analysis of these questions, I use methods and analytical principles fundamental to the fields of sociology, history, political science, and demography. Where appropriate I explicitly identify assumptions upon which my conclusions rely. I address these questions in turn, below.

### A    Neither Mr. Rigamer's Report Nor the State Identifies Permissible Race Neutral Criteria That Explain the Stark Racial Disparities in Foreperson Appointments

Specifically with respect to whether the State's demographic analysis shows the existence of permissible race-neutral criteria that explain the stark racial disparity in foreperson selection, I conclude that it does not. I also have reviewed potential race-neutral criteria which have been identified by counsel for the State and conclude that the factors listed therein also do not explain the statistical disparity between the numbers of white and black forepersons.

I have read Gregory C. Rigamer's "Demographic Analysis of West Feliciana" (the "Rigamer Report"). The Rigamer Report explicitly assumes "that, in selecting grand jury forepersons in the 1980s and early 1990s, State Court Judges in West Feliciana Parish took into consideration certain socioeconomic factors such as education, poverty and employment." This is a significant assumption in the "the context of an examination into how judges selected grand jury forepersons during [the 1980s and early 1990s]."  The Rigamer Report goes on to find that whites in West Feliciana Parish enjoyed higher education and employment levels, and lower levels of poverty.[1]

There are other notable assumptions in Mr. Rigamer's analysis. Mr. Rigamer states that he relies on certain assumptions about group quarters populations and household populations. He assumes, for example, that "given the history of segregation within the region, the race of those residing in [a] given household likely resembles the race of the householder." But even after slavery and into the era of legally enforced segregation, it was not uncommon in the plantation communities of the South for households headed by whites to include African Americans in the residence who worked for and/or were related to whites.[2] Mixed households may have occurred in the 1980s and 1990s in West Feliciana.[3]

---

[1] Rigamer Report, 1.

[2] On extended households, see Burton, *In My Father's House Are Many Mansions.*  West Feliciana can accurately be described as such a plantation community. As a flier, attached hereto as Appendix B, from the West Feliciana Historical Society Museum & Tourist Information Center reads:

> St. Francisville survives and reflects the growth and character of the surrounding plantation country….A stroll through the town's National Register Historic District of 146 structures awakens a sense of that grand history and also the simpler small town life that came before and after it.

[3] Rigamer Report, 9-10.

Apart from these assumptions there are also certain vulnerabilities in Mr. Rigamer's data. For example, his data as to educational attainment relies on persons who were 25 and older. One can register to vote at age 18. It is possible that an evaluation of the education attainment of West Feliciana residents who are 25

From what I have reviewed, Mr. Rigamer's assumption that West Feliciana judges considered the education, poverty, and employment levels of those selected to be forepersons is not well founded. As discussed below, my review of materials related to this case, including *inter alia* biographical information about forepersons who actually served through the 1980s and the 1990s, do not support a conclusion that West Feliciana judges in fact treated a person's level of education, poverty, and/or employment as a "critical area" to consider when selecting a foreperson.[4]

Even taking all of Mr. Rigamer's assumptions at face value, however, the Rigamer Report does not provide support for the proposition that permissible, race-neutral criteria explain the stark disparity in foreperson selection--even assuming that levels of education and employment are permissible race-neutral criteria.

First, while this data shows some correlation between race and socioeconomic factors, it does not at all show *causation*. There is indeed nothing inherent about being African American which *causes* one to be poor, or unemployable, or uneducable. Because there is no causation, a judge looking out at a venire pool would be wrong to draw conclusions based on the skin colors he saw about who did or did not have their high school diploma, for example. Indeed, such a conclusion would amount to subjecting people to an invidious racial stereotype.

Second, while the data in the Rigamer Report show some correlations between race and the socioeconomic factors of education and employment they do not show degrees of correlation strong enough to support a conclusion that these factors account for the racial disparity seen in West Feliciana foreperson selections.

Thus, even if we assume that being employed is a permissible, race-neutral criteria, and a factor that was critical in the foreperson considerations of judges in West Feliciana Parish; and even if we

---

and older skews the comparison of whites and African Americans, especially given that the period of the 1970s and 1980s was a period of rapid change in the equal access to education afforded by the Parish to African Americans.

Other data in the Rigamer Report do not control for age. If the black population of West Feliciana had a larger proportion of those older than 65, for example, this could also skew the data regarding education, employment, and poverty. If a larger proportion of African Americans were old enough to have been educated under the severely unequal segregated educational system, that would partly account for educational disparities, but a younger cohort of blacks might suffer fewer educational disadvantages relative to whites than the whole black population. Mr. Rigamer states: "[i]n 1980, Black residents comprised 57.9% of West Feliciana's overall population and 58.8% of the adult population" and in 1990, "55.4% of the overall population while black adults compromised 57.3% of the adult population." (Rigamer Report, 7.) Mr. Rigamer suggests this difference is "likely due to the presence of Angola prison," but he does not rule out that there could be other alternative explanations.

[4] Mr. Rigamer provides no evidence or social science theory that affluence, employment, or education correlate with better performance as foremen. There is no social science theory, for example, that says poverty makes worse juror or foreperson, or that richer people make better jurors or forepersons of juries than poorer people. The State does not appear to contend that income or wealth were criteria relied on by judges in making foreperson selections.

assume that it is accurate that blacks represented 36.3% of the employed population of the Parish, a stark racial disparity – very unlikely to be the result of chance – remains, as explained in Professor Marx's statistical report.[5] If one accepts these major assumptions, then one would still anticipate, for example, that 6 or 7 of Judge Ramshur's 18 permanent and temporary foreperson appointments in West Feliciana between 1983 and March 1999 would have been African American, as opposed to just one.

The socioeconomic factors which Mr. Rigamer assumes were considered by judges selecting grand jury forepersons in West Feliciana simply do not explain the statistical phenomena of African American foreperson appointments in this case.

I have attached as Appendix C an e-mail to Sam Spital (an attorney for Petitioner) from Kurt Wall (counsel for the State), dated Friday, February 03, 2012 where he responds to the question of what constituted the race-neutral criteria in this case. In it, Mr. Wall states that each Judge had his own reasoning process for selecting forepersons and that he "cannot at this point predict exactly what criteria any individual judge will cite as important to his selection of forepersons—except that the judges did _not_ rely on race in selecting forepersons." Counsel lists a number of potential race neutral criteria: "[M]any judges might have sought individuals with leadership qualities, intelligence, responsibility (someone who would likely show up each time and take the position seriously), facilitators (someone who could effectively manage and work with individual jurors) and independence (someone who could effectively stand up and not be controlled by the district attorney). Also, hardships may have been a factor leading a judge to exclude a possible candidate."

I conclude that the factors detailed above also do not explain the racial disparities in foreperson selections in West Feliciana, and especially do not explain virtually monochromatic selection of grand jury forepersons by Judge Ramshur. First, there is no evidence that race causes any of these factors to be more or less prevalent among blacks as opposed to whites. There is no support, for example, for the position that blacks are inherently less intelligent, or less responsible, or less independent or less able to facilitate than whites. In addition, neither expert for the State has submitted evidence of a correlation between any of these factors and race. So a judge's allegedly race-neutral desire to have intelligent forepersons fails to explain why he appointed only one African American to be foreperson in West Feliciana Parish the entire time he sat on the bench.

In addition, as the e-mail suggests, and as I have been asked by counsel to assume, it appears that the selection process for choosing a foreperson from the venire was entirely discretionary. Such total discretion creates ample opportunity for racial bias to be a factor in foreperson appointments. I am informed by counsel that transcripts of the selection process show that little to no questioning was made of venire members about their backgrounds, so it would have been very difficult for a judge to make a reasoned decision about venire members' leadership qualities, intelligence, responsibility, facilitation skill, independence, or hardship.

Third, I have reviewed the State's notes based on their interviews with forepersons selected by Judge Ramshur between 1983 and 1994. There is no way to tell from these notes whether these

---

[5] I use the 36.3% figure submitted by Mr. Rigamer for the segment of unemployed African Americans for this example because it is the lowest figure submitted.

forepersons exhibited such qualities as, for example, leadership, intelligence, responsibility, facilitation skills, or independence. But these notes, attached as Appendix D, reveal that, out of 12 appointments made by Judge Ramshur during this period, no more than 3 had college degrees. Most, but not all, had some postsecondary education short of college. Based on what I have been told by counsel--which counsel have asked me to assume to be correct for purposes of this report—there were on the venires blacks and whites with comparable educational, employment, and leadership backgrounds, but Judge Ramshur overwhelmingly selected whites as forepersons; a single African American was the exception, although other African Americans were clearly qualified under the criteria discussed above.

In light of the foregoing, I conclude that neither Mr. Rigamer's Report nor the State has identified permissible race-neutral criteria that explain the stark statistical disparities in foreperson appointments.

### B    General "Good Character" Evidence About a Judge is Not Relevant to an Inquiry into Whether Racial Bias Infects Judicial Decision Making

I was also asked to give my opinion on the use of general good character evidence concerning a judge in other contexts (*i.e.* contexts other than his role as a judge) to support an inference that the judge used permissible, race-neutral criteria in his selection of grand jury forepersons. In my opinion, general "good character" evidence is not useful for assessing a claim of racial discrimination from a sociological perspective because personality and character attributes are not indicative of whether someone harbors racial biases in a particular dimension, such as when selecting a foreperson. Racial biases can be triggered in certain contexts, or present in one dimension but not another. The question of whether racial bias infects judicial selections of forepersons must turn instead on whether race played a role in judges' decisions to appoint people to serve as forepersons. History, and particularly the history of the plantation South, confirms that racial discrimination and bias are often invidious even in communities where cultural norms prize kindness, gentility, hospitality, and other positive character attributes, as well as among individuals who embrace those norms.[6]

This opinion relies on both my familiarity with secondary source sociological scholarship; the history of the region in which West Feliciana lies; and my own primary source research into the late 20th century history of West Feliciana, particularly as it relates to race relations in the community.

Sociological and historical literature document that one of the most significant legacies of slavery, especially in the Southern plantation context, is that of paternalism.[7] Paternalism describes a phenomenon whereby persons in positions of authority, or with greater access to power, treat

---

[6] The mammy archetype in the South is exemplary. She is an African American domestic servant, beloved by--but viewed and treated as subordinate and submissive--to the whites she serves. This archetype is well-represented in the area around West Feliciana Parish, as is clear from a local West Feliciana book excerpt attached hereto as Appendix E, about a nearby Natchez, Mississippi, restaurant, Mammy's Cupboard: "what better symbol of good old-fashioned Southern hospitality and good old down home Southern cookin' than *Mammy*, so enormous she wears a becoming 5-foot chain as a necklace and horseshoes as earrings." Anne Butler. *Audubon Plantation Country Cookbook.*

[7] Johnson, *Shadow of the Plantation*; Myrdal, *An American Dilemma.*

- 6 -

subordinates with kindness or favor even as they limit the freedoms and responsibilities of those subordinates, as a father might with a child. There is much sociological and historical literature describing the pervasiveness of paternalism in American race relations, particularly where plantation economies dominated in the South. Slaveholding "reformers," for example, denounced cruelty to slaves--insisting that caretaking of slaves was a moral duty--even as they worked to strengthen the political power of the slave states.[8] Postbellum, white landlords protected black tenants from abuses, but charged them "paternalism premiums," resulting in black cash tenants paying higher cash rents per acre than white cash tenants. Likewise, even as some white activists in the 1960s and 1970s fought valiantly for the enfranchisement of African Americans, they were unwilling to share leadership roles within their civil rights organizations with blacks.[9] These historical examples of paternalism in American race relations demonstrate that whether someone is nice, or friendly, or generous, or polite, or pious, or genteel, or hospitable is not necessarily connected to whether someone has a specific racial bias in a particular context.[10]

My study of the community of West Feliciana involved a review of depositions from a federal voting rights case litigated in the 1990s; interviews with persons who have lived in the parish and/or spent time in the parish (many of whom were active in the local civil rights movement of the 1960s and 1970s); and a review of whatever contemporaneous source material I came across, including local and regional newspaper articles from the time period, as well as tours of the courthouse grounds, the local library, and the headquarters of the local historical society.

I found that race relations in this community in the 1980s and 1990s showed markers of the legacy of paternalism, and that racial bias and discrimination were prevalent in the community into the 1990s when Mr. Woodfox was indicted (and even beyond, to today).

One racial bias I founded echoed throughout these materials was that whites saw African Americans as not qualified to lead whites, and/or undeserving of such authority. This negative stereotype is debunked not only by sociological and historical authority, but by the history of West Feliciana, where African Americans, with little or no support from the local white community, led an important civil rights movement which enfranchised the black community of the Parish. This bias was ongoing even into the mid-1990s, as my review of the federal voting rights case, *Wilson v. St. Francisville*, scholarship and other primary source material shows. Notably, white officials offered testimony in the depositions for that case which exhibited good character on their part, even as they also expressed views that evidenced racial bias in certain contexts.

I detail below the scholarship and primary support materials that inform and bolster my opinion that general "good character" evidence is not useful for assessing a claim of racial discrimination.

---

[8] Genovese, *Roll Jordan Roll*; Ford, *Deliver Us from Evil*; Harris, *Deep Souths*.

[9] Carmichael, et al. *Black Power*; Carson, *In Struggle* .

[10] Fairclough, *Race and Democracy*; de Jong, *A Different Day*; Frystak, *Our Minds on Freedom*.

i.    **Scholarship Relevant to Race Relations in West Feliciana**

Historians often try to understand motivation and intent to assess the factors that pushed change over a period of time. Sociologists, however, are more interested in understanding how people act. To look at race relations from both a historical and sociological perspective requires assessing factors that push change in the power dynamics between different racial groups and individuals, and to observe the impact of these changes.

We need to understand "racism," and the difference between "prejudice" and "discrimination." Variations on these definitions can be found in any number of standard sociological sources.

> *racism*, treating people differently and unfavorably who are of different racial or cultural group membership.

> *prejudice*, learned attitudes, beliefs, and values that cause individuals to be biased for or against members of a particular group.

> *discrimination*, treating one group of people unfavorably because of some characteristic not related to their qualifications.

As these defined terms show, prejudice concerns belief, and discrimination concerns conduct. It is possible for prejudiced people (people with a racial bias) to refrain from acting on their bias, and to behave in nondiscriminatory ways. [11] This is particularly true when the biased actor is engaging in conduct outside of a context where the bias is relevant. For example, someone with a prejudice against Jews that involves the belief that Jews steal money might be very kind to Jews and even have close relationships with Jews. The same actor can even be very sympathetic to the Jewish plight broadly, and think that the Holocaust was a horror. Yet, because of his or her bias, he might refuse to bank with Jews or avoid engaging in commercial transactions with Jews.

In addition, because prejudice concerns beliefs, people can easily hide or be covert about their racial bias and engage in discrimination on pretextual grounds. Multiple sociological studies show that seemingly unprejudiced people engage in discrimination based on racial bias. [12]

Historical scholarship about the antebellum and postbellum plantation South confirms these sociological observations. Because of the experience of slavery, the vast majority of whites in

---

[11] Definitions are from James W. Loewen "The Difference Race Makes," an introductory essay on the sociology of race in America, printed by the College of Arts and Sciences at the University of Vermont. An extended treatment of the definitions of these terms can also be found in Jones and Carter, "The Concept of Racism and its Changing Reality.

[12] Deutscher, *What We Say, What We Do*. People will go to greater efforts to be covert about prejudice when they feel they are in a circumstance wherein it would be socially unacceptable to express their prejudice. For example, in a sociology experiment completed decades ago, whites interviewed by interviewers who "look Jewish" and who had stereotypically Jewish last names expressed much less anti-Semitism than when they were asked the same questions by interviewers who "looked white and non-Jewish" and had stereotypically white, Ango-Saxon protestant last names.

Louisiana developed hierarchical and racial prejudices about black people.[13] This did not mean they were necessarily people of bad character. People raised to believe in prejudices that were used to rationalize and justify slavery could be, and often were, kind, genteel, hospitable, and otherwise "good" people.

Although Louisiana had one of the larger free black populations before the Civil War, that free black population was mostly around New Orleans. Most black people in Louisiana before the Civil War were enslaved, and in West Feliciana Parish, which was replete with large cotton plantations, almost all black people were enslaved. Slavery itself was a form of oppression and a comprehensive form of race and social control. Black people had almost no rights, not even the legal right to marry; they could be sold away from family and were at the mercy of whites for corporal punishment.

After the Civil War, African Americans wanted sanctity of family, education for their children, the end of corporal punishment, and the payment of reasonable wages. African Americans recognized that education, long denied formally under the institution of slavery, was a key element of freedom and political participation. Black churches fostered education. Often proceeding under church leadership, freed people contributed their labor and their very limited funds to build new schools, hire teachers, and organize supervisory committees. These schools, students, and teachers met with white resistance. Despite acts of violence and arson committed against churches and school houses, African Americans in Louisiana persisted and made progress in educating their children and reducing illiteracy.

In the aftermath of the Civil War, as a means of continuing to exert control over African Americans, the former Confederate states passed Black Codes. These codes regulated labor in much the same way slavery had. Codes legally coerced work, requiring African Americans to sign annual contracts to perform agricultural labor. In Louisiana, one law specified how African American children could legally be taken away from their families and used as apprentices, perpetuating the offenses of slavery.

In most states it became nearly impossible for blacks to rent land, to market their own produce, or to seek effective legal redress against whites. Laws forbade freedpeople from possessing knives or firearms, buying or selling alcohol, or preaching the Gospel without license from white authorities. More egregious regulations merely replicated slave code clauses with the substitution of *freedmen* for *slaves*. Section 40 of the New Orleans code went further still. "Free people of color ought never to insult or strike white people," it declared, "nor presume to think of themselves equal to the white."

The passage of the Civil Rights Act of 1866 guaranteed African Americans, as U.S. citizens, the right to own or rent property, to make and enforce contracts, to have access to the courts as parties and witnesses, and generally to enjoy the "full and equal" benefit of all laws white citizens enjoyed. Depriving a citizen of these civil rights was a federal crime, enforceable by the federal courts and military. Congress further decided that America's most sacred document, the Constitution, must codify the new birth of freedom. The Thirteenth Amendment ending slavery was not enough. Race was no longer an excluding factor to citizenship. The Fourteenth Amendment stated that "All

---

[13] Unless otherwise stated, this and the following pages of discussion come from research for my book, Burton, *The Age of Lincoln*. All the notes for the sources are on my website at AgeofLincoln.com.

persons born or naturalized in the United States...are citizens" and as such are entitled to "due process" and "the equal protection of the laws."

Louisiana was one of the states that refused to ratify the Fourteenth Amendment. In reaction to this and to the Black Codes, and in trying to create a new political system in which whites and blacks would work together, Congress enacted the Reconstruction Act of 1867. This Act had wide-reaching implications. It abolished state governments in the former Confederacy, disfranchised Confederates, and put in place a military government. Under this system, Louisiana wrote a new state constitution ensuring universal male suffrage, and it ratified the Fourteenth Amendment. The results in Louisiana were similar to other Southern states: with a fair and efficient system of registration, approximately 90% of black men of voting age in Louisiana registered in 1867. (A few years later, the Fifteenth Amendment, ratified in 1870, codified the right to vote regardless of race, a right that Louisiana had already passed to its citizens.)

On March 7, 1868, Louisiana passed a new constitution granting citizenship and the right to vote to previously enslaved men and was admitted back into the Union. The new state legislature in Louisiana in 1868 was approximately half white and half African American. African Americans in Louisiana held the offices of lieutenant governor (who served one month as governor), state superintendent of education, and state treasurer. Where there was a majority black population in communities across Louisiana, African Americans served in elected and appointed local offices. For a brief period of time, Louisiana had an effective interracial democracy.

These developments challenged prejudice regarding, among other things, blacks in leadership and authority positions. Whites reacted to these developments with brutal and repressive discrimination. Between 1866 and 1876 more than 1,300 African Americans were killed by whites in rural Louisiana; political motivations underlay the vast majority of these murders. Death and intimidation devastated the interracial Republican organization and the community. White "Restoration" of the mid-1870s and 1880s ushered in a new phase of violence. The violence proved effective. Conservative whites wrested back all political power. The next stage of restoring the subordination of blacks was legal disfranchisement. In December of 1879, white Democratic leaders organized a new constitution which codified African American disfranchisement.

Southern whites generally worked to limit African American freedom in other ways, including segregation and violence. Louisiana was the focus of one of the most notorious cases in U.S. jurisprudence, *Plessy v. Ferguson*. In ruling against the plaintiff, Plessy, in 1896, the Supreme Court, while not using the exact words, instituted the infamous dictum of "separate but equal." This dictum was enforced as far as "separate," but schools and facilities were never "equal." The African American community continued the struggle for equality but, throughout Louisiana, lynching kept the political, economic, and social system in place. One historian accounted that lynch mobs claimed over 400 lives in Louisiana between 1878 and 1930.[14]

---

[14] (http://www2.state.lib.la.us/doeafsr/);  Pfeifer, "Lynching and Criminal Justice in South Louisiana, 1878-1930." The Tuskegee Institute provides a slightly different count of lynchings, with 56 white and 335 African Americans lynched in the state from 1882 to 1968. (http://law2.umkc.edu/faculty/projects/ftrials/shipp/lynchingsstate.html. Accessed on March 7th, 2012 at 12:15 pm).

The white community in West Feliciana Parish fought rural union organizing in the late 1930s. The entrenched planter elite responded adversely when threatened from below. The prime targets of their ire were Willie and Irene Scott, local African Americans who led the effort of the Louisiana Farmer's Union (LFU) in the Parish. The Scotts met with considerable early success, being able to establish four locals, with the support of approximately two hundred people. White planters resorted to violence; they beat Irene Scott with a pistol and sought to lynch Willie Scott. The Scotts fled to New Orleans. Efforts by the Louisiana League for Constitutional Rights to mount a prosecution for assault demonstrated that it would be impossible for a jury to render a guilty verdict. Historian Greta de Jong argued that in the aftermath of the attack, African Americans in the parish remained dedicated to the mission of the LFU. That may be, but one should not forget that the attack on the Scotts served as an object lesson for local blacks, and the movement soon collapsed. West Feliciana Parish remained outside the debate between modernizers and conservatives that dominated Louisiana politics in the 1940s and 1950s.[15]

As in similar communities all over Louisiana, for the white elite that dominated West Feliciana Parish, racial discrimination served as a way to protect their power. Racial discrimination was so thorough and effective, it proved to be relatively immune to efforts at reform: the governorship of Huey Long, the New Deal, the LFU, and CORE, all failed in a meaningful way to transform the racial order.[16]

In the 1960s, the Congress on Racial Equality ("CORE") made the question of voting rights in Southern Louisiana a major priority. The issue spawned a civil rights movement in West Feliciana. A very real threat of violence overshadowed this movement. Ronnie Moore, an African American CORE volunteer who played an important role in leading the voter registration drive, quickly learned that even staying in the Parish overnight was too dangerous.

Although in the first month, Moore had failed to convince even one person to agree to challenge disfranchisement voting requirements, locals nevertheless began to organize around the issue of black voter registration. Eventually, in August of 1962, Joseph Carter and Rudolph Davis, two African American ministers, agreed to attempt to register to vote in West Feliciana. Under Jim Crow, the registrar had tremendous subjective power to determine qualifications for voting. Fletcher Harvey, the registrar for West Feliciana Parish, thus used the powers of his office to prevent African Americans from registering to vote. Harvey made extraordinary demands to prevent their registration. Davis eventually left in disgust, but Carter remained until the sheriff arrested him.[17]

African Americans, without support from the local white community, organized and attended voter registration classes in September and October of 1963. The first to register was Reverend Carter. He was soon joined by others. Moreover, the Justice Department had their eyes on developments in the

---

[15] quote in Fairclough, *Race and Democracy,* 52, also cf. 51-53; de Jong, *Different Day,* 110-115.

[16] Useful information on West Feliciana Parish for the period can be found in de Jong, *A Different Day;* and in Frystak, *Our Minds on Freedom.*

[17] quote in Fairclough, *Race and Democracy,* 305, also cf. 303-305; de Jong, *Different Day,* 175-183; Dittmer, *Local People.*

Parish and brought suit against denials of the right to vote. There were consequences for this activity. Some individuals lost their jobs, an individual had shots fired at his home, and two attempts at arson were made by whites against the Masonic Hall where the classes took place.[18]

Before passage of the 1965 Voting Rights Act, less than 100 African Americans had been able to make it through Harvey's screening process. But with enforcement of the 1965 Voting Rights Act the environment radically changed. By October of 1965, some 700 African Americans had registered to vote, and the numbers continued to increase.

Consolidating the gains from the passage of this new law would take time, however, and the effects of whites' various efforts at forestalling blacks from playing a meaningful role in the political process would be felt for years. Nevertheless, gradually race relations in the Parish shifted and a new political system emerged in the Parish.[19]

As is confirmed by my primary source research into more recent West Feliciana history, the social activism among African Americans which brought about a civil rights movement in West Feliciana subtly reshaped race relations because whites could not so freely express prejudices. Elected officials could not afford to ignore the black vote entirely and had to occasionally appease interests of the African American community. On the other hand, public servants who challenged the power and authority structure, which remained largely in white hands, risked alienating the support of the white elite and losing white voters. The voting rights movement in West Feliciana therefore eased but did not erase the discriminatory treatment African Americans faced, nor did it erase prejudices and biases about African Americans.

---

[18] de Jong, *A Different Day,* 1, also cf. 183-187; Fairclough, *Race and Democracy,* 305-306; Bob Adelman, "Birth of a Voter: Louisiana Parish Registers 1st Negro in 61 years," *Ebony* (Feb. 1964): 88-98.

[19] On Louisiana's efforts to deprive African American of an effective vote, see Richard L. Engstrom, Stanley A. Halpin, Jr., Jean A. Hill, and Victoria M. Caridas-Butterworth, "Louisiana," chap. 4, pp. 109 - 38, 413-17, on constitutions, see pp. 104-05 in *The Quiet Revolution in the South: The Impact of the Voting Rights, 1965-1990.* Editors Chandler Davidson and Bernard Grofman. Published congressional hearings on the Voting Rights Act included extensive quantitative evidence concerning racial discrimination in voter registration in Louisiana, drawn from the various federal court cases filed by the Department of Justice, and in almost all instances West Feliciana Parish was included. In addition, the hearings, a portion of the record of which is hereto is attached as Exhibit F reproduced substantial evidence of racial disparities in educational expenditures by the state over several decades and documentation that these disparities were a product of the state's official policy of racial discrimination in education. *Hearings Before the Committee on the Judiciary, United States Senate, Eighty-Ninth Congress, First Session... Part 2,* 1103-59, 1189, 1191-92, 1199-1201, 1208-10, 1220-21, 1224-26, 1229-34, 1250-52, 1263-70, 1280-81, 1412-41, 1447-55, 1479-84. In addition, two objection letters by the U.S. Justice Department are attached hereto as Appendix G and discussed further *infra*; they are dated October 25, 1991 and May 18, 1993. See de Jong, *Different Day,* 208, 211, also cf. 195-196, 208-213; Fairclough, *Race and Democracy,* 466.

### ii.   Additional Materials Relevant to Race Relations in West Feliciana

I reviewed a number of primary source materials in preparing this report. That material included deposition testimony and documents collected in connection with *Wilson v. St. Francisville*, a 1992 voting rights case challenging district line drawing in West Feliciana's largest town and the Parish seat, St. Francisville. It also included interviews with residents of West Feliciana (many who were born and raised there), and tours of the local courthouse, the local library and the historical society. Finally, I reviewed newspaper coverage of the town in the St. Francisville weekly paper, *The Democrat*, and select articles from the Baton Rouge paper, *The Advocate*.

These materials show that even into the 1990s, discrimination was prevalent in employment, public positions, social organizations, and the initiatives of the town's governing bodies. My review of these materials--particularly the *Wilson* depositions--showed a striking lack of African American participation in leading town institutions, even though St. Francisville at the time was over 30% African American.

### Evidence of Discrimination through the 1990s

In my primary source research I found ample evidence of racial discrimination in West Feliciana in the 1990s.

Ongoing existence of official racial discrimination at that time with respect to blacks obtaining leadership positions in government is revealed in two letters by the U.S. Department of Justice ("DOJ"), which are attached hereto as Appendix G. The DOJ denied preclearance under Section 5 of the Voting Rights Act to voting changes proposed by the Parish and the Town of St. Francisville after the 1990 census. On October 25, 1991, the Department of Justice interposed an objection to West Feliciana Parish's plan for redistricting police jury districts. The Department of Justice determined that the plan proposed by the Parish fragmented geographically concentrated groups of black voters, reduced the percentage of black voters in the only two majority-black districts, and involved malapportioned districts, with the majority-black districts being significantly overpopulated. The Department explained that these aspects of the redistricting plan "appear calculated to minimize minority voting strength," and further noted that the Parish had failed to implement readily available, non-discriminatory alternatives.[20]

Then, in May 1993--just two months after the foreperson selection and indictment at issue in this case--the Department of Justice denied preclearance to a change in the method-of-election for the Town of St. Francisville. The Department explained:

> Town officials appear to have decided early in the process that any new method of election would provide for only one black-majority district, and for no other district in which black voters would have even a significant influence on the outcome of the election.

---

[20] October 25, 1991 letter of John R. Dunne to E. Kenneth Selle, 2, attached hereto in Appendix G.

Town officials adopted an unusual method-of-election plan containing one single-member district and one four-member district. They did this even though representatives of the town's black community opposed the plan at public hearings, and the town was not able "to identify the legitimate governmental interests that led the town to adopt the proposed plan."[21]

Additional examples of racial bias and polarization in West Feliciana in the 1980s and 1990s abound:[22]

- A 1994 study of elections in the 1980s and early 1990s documented significant racially polarized voting, that is blacks and whites voted differently in West Feliciana.
- In the school context, I learned that West Feliciana Parish Schools were under federal desegregation order throughout the 1990s. That order was lifted recently, in 2007.
- In the 1990s, the town high school had separate proms for white and black students, and even until 2006, white and black students alternated years as prom king and queen, such that one year a black prom king and queen were selected, and the following year a white prom king and queen were selected.
- I also learned from my interviews that although the town generally lauds history, schools were reluctant to recognize the Martin Luther King holiday until the African American community organized in the 1990s to that effect.
- On the property of the Parish courthouse—the courthouse where forepersons were selected and where Woodfox was indicted—there was, and remains today, a statue commemorating the Confederate soldier, inscribed with the Confederate flag and a poem that proclaims that Confederate soldiers fought "for Right and for Home and for God," photos of which are attached hereto as Appendix H.
- African American residents, including one resident who worked in the West Feliciana Parish clerk's office between 1988 and 1990, spoke to me of a perception that there were significant racial disparities in sentencing for similar crimes.
- Several people I spoke with recalled the killing of a black teen by a white teen in 1992. The trial had to be moved to a different venue because of racial tensions in the community; some blacks reportedly felt the killing (and another killing which had happened one month earlier), as well as the response of police and prosecutors, were race-related while many whites in the community were of the view that the tragedy was not race-related at all.
- I also toured the West Feliciana Historical Society where I spoke with docents, watched films about the locale, and read through various pamphlets and materials about West Feliciana. I learned that, while the town invests much in recording and disseminating historical literature, it touts a "moonlight and magnolias" narrative of the plantation past of the area. This romanticized narrative subconsciously suggests that "in the good ole days" slavery was not that bad, that African Americans were inferior and happy to remain in subservient roles. In my research of all the available literature on West Feliciana Parish in the public library, I found that every book, article, pamphlet, every single piece of historical writing was imbued with that moonlight and magnolia mentality. The historical accounts ignore or omit any reference to the contributions of African Americans. Where African Americans are depicted, they are token gestures.

---

[21] May 18, 1993 letter from James P. Turner to William D'Aquilla, 1, attached hereto in Appendix G.
[22] Cole, "Report of Steven P. Cole, Ph.D." which is attached as Appendix Q.

- In addition, although the civil rights movement that led to the enfranchisement of African Americans in West Feliciana is a dramatic historical moment in West Feliciana's past, (and similar movements have been used as a tourist draw in other Southern cities), my interviews emphasized the refusal of the white establishment to include it in any of their many promotions for tourism.[23]

### *Lack of African Americans in St. Francisville's Leading Institutions*

The *Wilson* depositions, which were taken in 1994 and are attached as Appendices I-P, identify racial disparities in a number of St. Francisville institutions even in the 1990s, including in the police departments, the fire department, the town's central office, the Chamber of Commerce, the Board of Alderman, the Historic District Commission, the Tourist Commission, and social clubs, such as the Jaycees, the Civic Club, and the Women's Service League, among others. These were either all-white or nearly all-white institutions in the early 1990s. Depositions also mentioned some majority black organizations, such as the Voters League and Happi Llandiers. (I learned during interviews that Happi Llandiers was started pre-integration by black school teachers.)[24]

In 1994, the police department had between eight and ten officers and a police chief. The police department reportedly employed one or two black officers, a development within the past fifteen years, but there had never been a black police chief. I was told in interviews that, in the past, a black officer in West Feliciana could not arrest whites. He would have to advise his white colleagues if he wanted to make an arrest, and they would decide if the arrest could proceed.[25]

The town's fire department employed a fire chief, and the rest of the fire department in 1994 was a volunteer force. Richard G. Holcomb, who served on the Board of Aldermen--which itself had been an all-white legislative body until 1992—testified in the *Wilson* depositions that he knew there were black firefighters, but was unsure how active they were in the department. African American Willie Williams stated that his elderly cousin was on the force. Williams believed, however, that his cousin was accepted as a volunteer only to forestall a federal discrimination lawsuit. Williams said he did not fill out an application himself because he already knew what the outcome would be, that he would be denied. As was the case with the police department, the fire chief had always been white. In 1994, the current chief was the son of the previous chief. As Mr. Holcomb explained, "it's kind of been a hands-down."[26]

The mayor of the town, William D'Aquilla, reported in 1994 that opportunities for African Americans had improved in the parish and identified several black candidates for parish-wide boards and positions who, he felt, had been well qualified to serve in leadership roles. According to Mr.

---

[23] Interviews, by Orville Vernon Burton, February 29-March 1, 2012. Hackney, *Magnolias Without Moonlight.*

[24] Focus Group interview.

[25] Wilson, 21-22; Holcomb, 33-34; Focus Group interview.

[26] Williams, 16-19; Wilson, 136; Holcomb, 35-36.

Williams, however, the town's central office did not employ any African Americans, despite available qualified applicants. Mr. Holcomb admitted the town's administrative staff had always been all white, with the small exception of one black temporary employee. When Otis Wilson, an African American who served on the West Feliciana police jury, asked Mayor D'Aquilla to hire African Americans, D'Aquilla had replied that he was unable to because the positions were all filled. Five years later the town still did not have black office employees.[27]

James Rucker Leake was a *Wilson* deponent who was white and served on the Board of Aldermen. He had also been a member of numerous clubs and organizations, such as the Board for the Chamber of Commerce. His recollection was that there had been an African American on the Chamber of Commerce Board in the past, but the Chamber did not have many African American members. Leake did not believe its low African American membership was related to discrimination. He responded, "I wouldn't suspect that at all. I find this community to be extremely open." Wilson, however, believed the Chamber of Commerce had no African American members and thought the Chamber never seemed to work in the interests of minorities.[28]

The Board of Aldermen appointed members of the town's Planning and Zoning Commission, which also had been a mostly white commission. The city council had appointed Mr. Wilson to the zoning board, but one or two weeks later, Wilson received a letter removing him from the board without explanation. The council appointed Oscar Robinson to the Commission in 1988, and he served until 1992, when he resigned in order to run for city council. He was the first African American member of the town council.[29]

Mr. Leake thought the disparity in the make-up of the Planning and Zoning Commission was due to a lack of African Americans who were willing and able to serve: "There have always been black appointments as long as I can remember, and part of our problem has been we've had some who have resigned, and we've had a hard time finding people to serve. And I know we've made a very asserted effort to make sure it was racially balanced." But this "racially balanced" committee of five to seven members never had more than one African American member at a time.[30]

The Board of Aldermen also appointed the Historic District Commission. The Historic District Commission's board consisted of five members. Two of those members must be homeowners in the historic district, two must be business owners in the historic district, and the final member is from the Planning and Zoning Commission. No African American had ever served on this board at the time of the depositions.[31]

---

[27] D'Aquilla, 15-20; Williams, 4-7; Holcomb, 34; Wilson, 20

[28] Leake, 31-34; Wilson, 59-60.

[29] Wilson, 17; Robinson, 43-44.

[30] Leake, 115; D'Aquilla, 47-49; Holcomb, 59.

[31] D'Aquilla, 69-73; Leake, 36-38; Holcomb, 9-11.

When Leake, who had been on the board since the 1980s, was asked why African Americans were not on the board, he appeared to think it was a matter of African Americans choosing not to participate: "The blacks are not as actively involved in tourism." Even given the exclusionary requirements for the board--few African Americans owned homes or businesses in the historic district--an obvious remedy existed for appointing a black representative to the board: the fifth member could be an African American serving on the Planning and Zoning Commission. The town never made such an appointment.[32]

One major annual event for the Historic Society in St. Francisville is the Audubon Pilgrimage, a tourist-attracting festival centered on tours of antebellum homes usually not open to the public. While extant antebellum homes are often beautiful, this festival provides an example of the plantation myth. Celebrating the homes of elite Southerners exists under a shadow of nostalgia for a slave society – enslaved labor built the houses themselves and allowed the gentry the leisure that many of the homes' admirers envy. Each year at this festival, African Americans of St. Francisville confront the continued observation of moonlight and magnolias. An illustrative remembrance by one African American resident of West Feliciana of when he was a student makes the point: After working on the preparations for the inaugural festival with his classmates for days, his teacher sent him home on the day the Pilgrimage launched, stating he could not be part of it because he was black and so had no role to play.[33]

In one interview I was told that, in the late 1970s or 1980s, the town underwent new zoning restrictions. The new laws required the purchase of multiple acreage in order to build a house. The sentiment among African Americans I spoke with was that zoning laws were intentionally discriminatory, as town leaders wanted to decrease the proportion of African Americans in town and knew that blacks could not afford to purchase such large land plots. The *Wilson* depositions show the Board of Aldermen members were aware of housing issues influencing the local black community. When Mr. Wilson and Mr. Williams, approached Mayor D'Aquilla in 1991 about public housing, Mr. Wilson recalled the mayor telling him he was "not in the housing business." (The mayor did not recall this). Ms. Bonaventure thought blacks had the same housing options as whites. She acknowledged economic constraints that limited home ownership for African Americans but thought that African Americans had a higher rate of unemployment because they did not look for jobs because they did not want to work.[34]

Another issue the Board of Aldermen confronted at the time was annexation. Mr. Wilson approached the mayor about the possibility of annexing a black community bordering St. Francisville. According to Wilson, Mayor D'Aquilla responded: "We got enough blacks in town. We don't need no more." (In his deposition D'Aquilla stated he did not oppose annexation if it would not cost the city any money but that the area proposed for annexation would be a liability because of a bad sewage system.) After this exchange, the mayor formed a committee of three or five people, and the committee decided not to annex because the areas at issue had roads and lights that did not

---

[32] Leake, 37.

[33] Holcomb, 9-11; Leake, 36-38; Focus Group Interview; Hackney, Magnolias Without Moonlight.

[34] Focus Group interview; Wilson interview; Williams, 7-11; D'Aquilla, 31-34; Bonaventure, 15.

conform to city ordinances. At the time, the town ran the bordering area's utilities, such as gas, solid waste, and water, but following this meeting, the town turned those responsibilities to the Parish's police jury.[35]

Racial disparities were apparent in other leading social organizations. The councilmen and mayor who had belonged to the Jaycees could not remember any black members, even in the 1990s. Mayor D'Aquilla assured the club was open to African Americans, and Mr. Leake recalled, "But never once was race an issue or a discussion in any topic that I can remember or anything ever coming up in the Jaycees." He presumed that no African Americans members belonged to the club because none had asked to join.[36]

The Civic Club had roughly one hundred members. Many of the Aldermen had been members, and one had been president of the club in the 1970s. None of the *Wilson* deponents remembered any African American members. Mr. Leake had also been involved in the Boy Scouts in the 1980s when his son was younger. At that time, there was one all-white troop in town and one all-black troop outside town. In 1994, he believed the troop in town had been integrated, although he believed an all-black troop also existed. I heard similar stories of segregated Girl Scout troops in my interviews. One story recounted an event that took place in the 1980s. Both of the West Feliciana Girl Scout troops were at an integrated camp. The leader of the white St. Francisville troop, who was also a teacher at the school, reportedly made children in her troop leave the pool when African American Girl Scouts got in to go swimming.[37]

According to Board of Alderman member Lynn Bonaventure, no African Americans had served on the six-member board of Parks and Recreation, no African Americans belonged to the Women's Service League, and none belonged to the Professional Women's Network. She thought that if African Americans were not members, it was because they were not interested.[38]

In the interviews I conducted, African Americans expressed very different perceptions about why there were racial disparities in St. Francisville's institutional leadership organizations at the time of the *Wilson* depositions. Many observed that they thought discrimination was prevalent in the 1990s, and perceived whites in the community generally as being resistant to black participation in the town's leading institutions not because whites were "bad people," but because doing so was a means of holding on to the power, authority and control that had been handed down generationally. Many interviewees believe this pattern continues today. As one person said, there were "a lot of decent white folks" in St. Francisville, but the problem was that they wanted to keep authority and control,

---

[35] Williams, 70-76; Wilson, 122-27; D'Aquilla, 81-84.

[36] D'Aquilla, 55-57; Davis, 28-32; Leake, 30-31.

[37] Leake, 34-35, 41-43; Bonaventure, 30-31; Holcomb, 12-14; Armstrong interview.

[38] Bonaventure, 25-40.

- 18 -

they have always had it, and doing so meant keeping things status quo and making sure blacks stayed in their place, that is, subordinate to whites.[39]

The *Wilson* deposition testimony suggests that, to the extent white West Feliciana leaders in the 1990s thought that having racial disparities across leading town institutions, organizations, and social clubs was a problem, they believed the exclusion of blacks was unavoidable. For example, when Mr. Wilson had asked Mayor D'Aquilla about serving on the Tourism Board, he recalled that the mayor replied: "Well, Otis, you know some of these boards ain't for nothing but whites." But my primary source research suggests that blacks thought the exclusion was intentional. As Otis Wilson said in his deposition: "Also, by not giving blacks an opportunity to serve on the City Council. Not giving blacks the opportunity to serve on different boards or to work in the main office, denying blacks to have any supervisory position, anything, you know, with any clout to it, we always took the lesser jobs with this town."[40]

Through my research I found that racial relations in West Feliciana have improved very slowly. Several people I spoke with described racial discrimination as being different today because it is no

---

[39] Further evidence of differences in the perceptions of whites and blacks generally in West Feliciana can be found in Dr. Steven Cole's expert report in *Wilson v. St Francisville*. Dr. Cole found voting polarization along racial lines, African American political cohesion, and that white voters "vote as a bloc so as usually to defeat the candidate(s) of choice of African American voters." In 96% of the elections he analyzed, the majority of white voters vote differently than the majority of black voters. In addition, across all the contests he studied, black cohesion averaged 78% and white bloc voting a staggering 93% (Cole Report). Appendix Q.

Almost all those deposed in *Wilson* agreed that David Duke, a white supremacist and former Grand Wizard of the Ku Klux Klan, used racially charged rhetoric and made racial appeals during his campaigns, which included a run for the U.S. Senate in 1990 and a 1991 run for governor. (Only Lynn Bonaventure disagreed that these campaigns were racially charged) (Leake, 64-66; Davis, 19-21; Robinson, 28-32; D'Aquilla, 18-20; Bonaventure, 12).

Robinson, Leake, Davis, and D'Aquilla all believed Duke would not have received much support in the town because his racist campaign would not appeal to local voters. But despite this perception, the voter return numbers show that white voters in St. Francisville did in fact vote overwhelmingly for Duke.

Cole found that in the 1990 Primary for U.S. Senate, 75% of whites in the area voted for Duke while 95% of African Americans voted for other candidates. In the 1991 primary for Governor, Duke received 54% of the white vote, despite running against ten other white candidates. In the same election, 93% of African Americans voted for other candidates. Duke came in second in the primary, so he and the Democrat Edwin Edwards had a runoff election. In the run-off, David Duke received 62% of white St. Francisville vote, while 97% of African Americans voted for Edwards (Cole, Appendix Q, "Town of St. Francisville, Summary of Regression Analysis: David Duke Contests;" the fourth election, the 1992 Presidential Preference Primary for the Republican Party, was an outlier).

[40] Wilson, 18-19; 133-34. Wilson still vividly remembered this incident regarding the Tourist Commission when I interviewed him. (Wilson interview).

longer overt, but persistent. One person said, "[t]oday Jim Crow has on a pin striped suit."[41] Another remarked, "Klan is probably still here, just dressed up in different clothes."[42] At the time of my interviews the town had only very recently had its first African American Parish Manager and African American Police Jury President (although each left his post after controversies which many of the people I interviewed felt were aggravated if not driven by race related tensions). Those I interviewed who were present and participated in the 1960s civil rights movement expressed views that any progress which has been made was attributable to the enfranchisement of African Americans. With increased black voting, the form of racial discrimination shifted and whites in positions of authority, particularly elected positions, had to appease the minority population. Now there is a level of tokenism, although it remains difficult to find people willing to address discrimination and risk upsetting the still mostly white power structure. One person stated he believed sometimes black people who are "allowed" leadership positions are chosen because they "stay in their place" and will not fight for the rights of the minority population.[43]

## 5    Conclusion

After studying the demographic characteristics of West Feliciana Parish described in the Rigamer Report, as well as historical and sociological factors relevant to those characteristics, I conclude that the possible permissible, race-neutral factors and/or selection criteria which have been identified by the state of Louisiana do not explain stark racial disparities in West Feliciana foreperson appointments. Evidence of prevalent racial discrimination in the historical and social fabric of West Feliciana Parish during the 1980s and 1990s does support a determination that race was a factor in the disparate selection of forepersons in West Feliciana.

## 6    References

Bartley, Numan V. *The New South, 1945-1980*. Baton Rouge: Louisiana State University Press, 1995.
---. *Jimmy Carter and the Politics of the New South*. St. Louis: Forum Press, 1979.
Bartley, Numan V., and Hugh D. Graham. *Southern Politics and the Second Reconstruction*. Baltimore: Johns Hopkins University Press, 1975.
Bogle, Donald. *Toms, Coons, Mulattoes, Mammies, and Bucks: An Interpretive History of Blacks in American Films*. New York: Continuum, 2001.
Bowser, Benjamin and Hunt, Raymond eds., Impacts of Racism on White Americans. Beverly Hills: Sage Publishers.

Bridges, Tyler. *The Rise of David Duke*. Jackson: University Press of Mississippi, 1994.
Burton, Orville Vernon. *The Age of Lincoln*. New York: Hill and Wang, 2007.
_____. *In My Father's House Are Many Mansions: Family and Community in Edgefield, South Carolina*. Chapel Hill. University of North Carolina Press, 1985.

---

[41] Group Interview.

[42] Minor Interview.

[43] Focus Group interview.

---. "Race Relations in the Rural South since 1945. In *The Rural South since World War II*, edited by R. Douglas Hurt. Baton Rouge: Louisiana State University Press, 1998: 28-58.

---. "Reaping What We Sow: Community and Rural History." Presidential Address in *Agricultural History* 76: 4 (Fall 2002): 631-58.

Carter, Dan T. *From George Wallace to Newt Gingrich: Race in the Conservative Counterrevolution, 1963-1994.* Baton Rouge: Louisiana State University Press, 1996.

---. *The Politics of Rage: George Wallace, the Origins of the New Conservatism, and the Transformation of American Politics.* Baton Rouge: Louisiana State University Press, 2000.

Carmichael, Stokely, et. al. *Black Power: The Politics of Liberation.* New York: Vintage, 1992.

Carson, Clayborne. *In Struggle: SNCC and the Black Awakening of the 1960s.* Cambridge: Harvard University Press, 1995.

Casdorph, Paul D. *Republicans, Negroes, and Progressives in the South, 1912-1916.* Tuscaloosa: University of Alabama Press, 1981.

Cash, W. J. *The Mind of the South.* Garden City, New York: Doubleday, 1941.

Caffery, Debbie Fleming. *Carry Me Home: Louisiana Sugar Country in Photographs.* With Essays by Pete Daniel and Anne Wilkes Tucker. Washington: Smithsonian Institution Press, 1990.

Cell, John W. *The Highest Stage of White Supremacy: The Origins of Segregation in South Africa and the American South.* Cambridge: Cambridge University Press, 1982.

Clark, Clinton, Elizabeth Davey and Rodney Clark, eds. *Remember My Sacrifice: The Autobiography of Clinton Clark, Tenant Farm Organizer and Early Civil Rights Activist.* Baton Rouge: Louisiana State University Press, 2007.

Cole, Steven P. "Report of Steven P. Cole, Ph.D." in Wilson, et al., v. St. Francisville, Louisiana, et al., Sept. 15, 1994.

Daniel, Pete. *Breaking the Land: The Transformation of Cotton, Tobacco, and Rice Cultures since 1880.* Urbana: University of Illinois Press, 1985.

Davison, Chandler, and Bernard Grofman, eds. *Quiet Revolution in the South: The Impact of the Voting Rights Act, 1965-1990.* Princeton: Princeton University Press, 1994.

de Jong, Greta. *A Different Day: African American Struggles for Justice in Rural Louisiana, 1900-1970.* Chapel Hill: University of North Carolina Press, 2002.

Deutscher, Irwin. *What We Say/What We Do: Sentiments & Acts.* Scott Foresman, 1973.

Dittmer, John. *Local People: The Struggle for Civil Rights in Mississippi.* Urbana: University of Illinois Press, 1994.

Dollard, John. *Caste and Class in a Southern Town.* Madison: University of Wisconsin Press, 1988.

Fairclough, Adam. *Race and Democracy: The Civil Rights Struggle in Louisiana, 1915-1972.* Athens: University of Georgia Press, 1995.

Follett, Richard. *The Sugar Masters: Planters and Slaves in Louisiana's Cane World, 1820-1860.* Baton Rouge: Louisiana State University Press, 2005.

Emanuel, Rachael L. and Alexander P. Tureaud, Jr. *A More Noble Cause: A. P. Tureaud and the Struggle for Civil Rights in Louisiana.* Baton Rouge: Louisiana State University Press, 2011.

Frystak, Shannon L. *Our Minds on Freedom: Women and the Struggle for Black Equality in Louisiana, 1924-1967.* Baton Rouge: Louisiana State University Press, 2009.

Ford, Lacy. *Deliver Us From Evil: The Slavery Question in the Old South.* New York: Oxford University Press, 2009.

Genovese, Eugene D. *Roll Jordan Roll: The World the Slaves Made.* New York: Pantheon Books, 1974.

Grantham, Dewey W. *The Life and Death of the Solid South: A Political History.* Lexington: University Press of Kentucky, 1988.

---. *The South in Modern America: A Region at Odds.* Fayetteville: University of Arkansas Press, 2001.

---. *Southern Progressivism: The Reconciliation of Progress and Tradition.* Knoxville: University of Tennessee Press, 1983.

Green, Melissa Fay. *Praying for Sheetrock: A Work of Non-Fiction.* London: Secker & Warburg, 1992.

Hackney, F. Sheldon, *Moonlight Without Magnolias: The American South from Regional Confederacy to National Integration.* New Brunswick: Transaction Press, 2005.

Hair, William I. *Bourbonism and Agrarian Protest: Louisiana Politics, 1877-1900.* Baton Rouge: Louisiana State University Press, 1969.

---. *The Kingfish and His Realm: The Life and Times of Huey P. Long.* Baton Rouge: Louisiana State University Press, 1991.

Harris, J. William. *Deep Souths: Delta, Piedmont, and Sea Island Society in the Age of Segregation.* Baltimore. Johns Hopkins University Press, 2001.

*Hearings Before the Committee on the Judiciary, United States Senate, Eighty-Ninth Congress, First Session... Part 2.* Washington, D.C., G.P.O., 1965.

Hill, Lance E. *The Deacons for Defense: Armed Resistance and the Civil Rights Movement.* Chapel Hill: University of North Carolina Press, 2004.

Johnson, Allan. *Privilege, Power, and Affluence.* New York: McGraw-Hill, 2001.

Johnson, Charles S. *Shadow of the Plantation.* Chicago: The University of Chicago Press, 1934.

Jones, James M., and Robert T. Carter. "Racism and White Racial Identity: Merging Realities." In *Impacts of Racism on White Americans,* edited by Benjamin P. Bowser and Raymond G. Hunt, 1-23. Beverly Hills: Sage Publications, 1996.

Jordan, Winthrop D. *White Over Black: American Attitudes Toward the Negro, 1550-1812.* Chapel Hill: University of North Carolina Press, 1968.

Key, V. O., Jr., *Southern Politics in State and Nation.* New York: Alfred A. Knopf, 1949.

Kirby, Jack Temple. *Rural Worlds Lost: The American South, 1920-1960.* Baton Rouge: Louisiana State University Press, 1987.

Kousser, J. Morgan Kousser. *Color Blind Injustice: Minority Voting Rights and the Undoing of the Second Reconstruction.* Chapel Hill. University of North Carolina Press, 1999.

_____. *The Shaping of Southern Politics: Suffrage Restriction in the One-Party South, 1880-1910.* New Haven: Yale University Press, 1974.

Kruse, Kevin M. *White Flight: Atlanta and the Making of Modern Conservatism.* Princeton: Princeton University Press, 2005.

Kurtz, Michael L., and Morgan D. Peoples. *Earl K. Long: The Saga of Uncle Earl and Louisiana Politics.* Baton Rouge: Louisiana State University Press, 1990.

Kuzenski, John C., Charles S. Bullock, III, and Ronald Keith Gaddie, eds. *David Duke and the Politics of Race in the South.* Nashville: Vanderbilt University Press, 1995.

Lamis, Alexander P. *Southern Politics in the 1990s.* Baton Rouge: Louisiana State University Press, 1999.

---. *The Two-Party South.* New York: Oxford University Press, 1990.

Lassiter, Matthew D.. *Silent Majority: Suburban Politics in the Sunbelt South.* Princeton: Princeton University Press, 2006.

Liebling, A. J. *The Earl of Louisiana.* Baton Rouge: Louisiana State University Press, 1970.

Litwack, Leon. *Trouble in Mind: Black Southerners in the Age of Jim Crow.* New York: Vintage Books, 1999.

Loewen, James W. "The Difference Race Makes: Outcomes and Causes," in *Multicultural Education in Colleges and Universities: A Transdisciplinary Approach,* edited by Howard Ball, S. D. Berkowitz, and Mbulelo Mzamane, 35-66. Mahway, New Jersey: Lawrence Erlbaum Associates, 1988.

McCrary, Peyton. "Declaration of Dr. Peyton McCrary." IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA SHREVEPORT DIVISION.

RAY HAYS, et al.,v. State of Louisiana, et al., United States of America, Defendant-Intervenor, CV 92-1522S, July 19, 1994

McMillen, Neil. *Dark Journey: Black Mississippians in the Age of Jim Crow.* Urbana: University of Illinois Press, 1989.

Malone, Ann Patton. *Sweet Chariot: Slave Family and Household Structure in Nineteenth-Century Louisiana.* Chapel Hill: University of North Carolina Press, 1992.

Marable, Manning. *Black Leadership.* New York: Columbia University Press, 1998.

---. *Race, Reform, and Rebellion: The Second Reconstruction and Beyond in Black America, 1945-2006.* Jackson: University Press of Mississippi, 2007.

Martin, Michael S. *Louisiana Beyond Black and White: New Interpretations of Twentieth-Century Race and Race Relations.* Lafayette: University of Louisiana at Lafayette Press, 2011.

McIntosh, Peggy. "White Privilege: Unpacking the Invisible Knapsack." *Peace and Freedom Magazine* (July/August 1989): 10-12.

Myrdal, Gunnar. *An American Dilemma: The Negro Problem and Modern Democracy.* New York: Harper & Brothers, 1944.

Nussbaum, Raymond O. "'The Ring is Smashed!' The New Orleans Municipal Election of 1896." *Louisiana History* 17, no. 3 (Summer 1976): 283-297.

O'Reilly, Kenneth. *Nixon's Piano: Presidents and Racial Politics from Washington to Clinton.* New York: Free Press, 1995.

Perman, Michael. *Struggle for Mastery: Disfranchisement in the South, 1888-1908.* Chapel Hill: University of North Carolina Press, 2001.

Pfeifer, Michael J. "Lynching and Criminal Justice in South Louisiana, 1878-1930." *Louisiana History* 40, no. 2 (Spring 1999): 155-177.

Rodrigue, John C. *The Reconstruction in the Cane Field: From Slavery to Free Labor in Louisiana's Sugar Parishes, 1862-1880.* Baton Rouge: Louisiana State University Press, 2001.

Roediger, David R. *Towards the Abolition of Whiteness.* London: Verso, 1994.

Schott, Matthew J. "Progressives against Democracy: Electoral Reform in Louisiana, 1894-1921." *Louisiana History* 20, no. 3 (Summer 1979): 247-260.

Scott, John H., and Cleo Scott Brown. *Witness to the Truth: My Struggle for Human Rights in Louisiana.* Columbia: University of South Carolina Press, 2003.

Scott, Rebecca J. *Degrees of Freedom: Louisiana and Cuba after Slavery.* Cambridge: Belknap Press of Harvard University Press, 2005.

Sartain, Lee. *Invisible Activists: Women of the Louisiana NAACP and the Struggle for Civil Rights, 1915-1945.* Baton Rouge: Louisiana State University Press, 2007.

Terry, Robert. *For Whites Only.* Grand Rapids: Eerdmans, 1971.

Tunnell, Ted. *Crucible of Reconstruction: War, Radicalism, and Race in Louisiana, 1862-1877.* Baton Rouge: Louisiana State University Press, 1984.

Vandal, Gilles. *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884.* Columbus: Ohio State University Press, 2000.

Wise, Tim. *Affirmative Action : Racial Preference in Black and White.* New York: Routledge, 2005.

---. *Colorblind: The Rise of Post-Racial Politics and the Retreat from Racial Equality.* San Francisco: City Lights Books, 2010.

---. *White Like Me.* New York City: Soft Skull Press, 2005.

Woodward, C. Vann. *Strange Career of Jim Crow.* Oxford: Oxford University Press, 2002.

Zatarain, Michael. *David Duke: Evolution of a Klansman.* Gretna, Louisiana: Pelican, 1990.

**Interviews**

Focus Group (Alice Armstrong, Ken Dawson, Anthony Long, Greta Scales, Olton Scott, Ambrose Sims, Helen Whitfield, and Emily S. Williams), in conversation with Orville Vernon Burton, Samuel Spital, and Carine Williams, February 29, 2012 in St. Francisville, Louisiana.

Don Hernandez, interview by Orville Vernon Burton, March 8, 2012, by phone.

Raymond Minor and John Vessal, interview by Orville Vernon Burton and Carine Williams, March 1, 2012 in St. Francisville, Louisiana.

Lisa Reece, interview by Orville Vernon Burton, March 6, 2012, by phone.

Otis Wilson, interview by Orville Vernon Burton, Samuel Spital, and Carine Williams, February 29, 2012 in St. Francisville, Louisiana.

Respectfully Submitted,

_____

Professor Orville Vernon Burton