UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ALBERT WOODFOX, | ) CIVIL ACTION |
| | ) NO. 3:06-00789-JJB-CN |
| ) PLAINTIFF, | ) |
| | ) JUDGE BRADY |
| VERSUS | ) |
| | ) MAGISTRATE JUDGE NOLAND |
| BURL CAIN, WARDEN OF | ) |
| THE LOUISIANA STATE | ) |
| PENITENTIARY, ET AL, | ) |
| | ) |
| DEFENDANTS. | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF
**ORVILLE VERNON BURTON**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PURSUANT TO NOTICE OF DEPOSITION AND/OR AGREEMENT
IN THE ABOVE-ENTITLED CASE, THE DEPOSITION OF **ORVILLE
VERNON BURTON** WAS TAKEN ON **THE 9TH DAY OF MAY, 2012,**
COMMENCING AT THE HOUR OF 2:30 P.M. EST, AT THE LAW OFFICES
OF ARTIGLIERE AND CLARK, PA, 196 KEOWEE TRAIL, CLEMSON,
SOUTH CAROLINA.

REPORTED BY:   KAREN E. HOLLEY, CVR-M

SANDRA K. BROWN AND ASSOCIATES
POST OFFICE BOX 1175
LAURENS, SOUTH CAROLINA 29360
(864) 982-2118


EXHIBIT
D

**APPEARANCES:**
MS. CARINE WILLIAMS, ESQUIRE
MR. SAMUEL SPITAL, ESQUIRE
MR. GEORGE KENDALL, ESQUIRE
SQUIRE SANDERS
30 ROCKEFELLER PLAZA
NEW YORK, NEW YORK 10112


        ATTORNEYS FOR PLAINTIFF,



MR. RICHARD CURRY, ESQUIRE
MR. DAN WEST, ESQUIRE
MCGLINCHEY STAFFORD
14TH FLOOR, ONE AMERICAN PLACE
BATON ROUGE, LOUISIANA 70825


        ATTORNEYS FOR DEFENDANTS.

A.    -- I did -- you know, I called to see how she was doing,
      things like that and we may have mentioned the case, but
      we didn't discuss anything as far as I remember.

Q.    Okay, anybody else that you can remember talking to or other
      documents that you've reviewed?

A.    I don't -- oh, my daughter, who I paid to do research for
      me on the case, sent me an article on Angola.  It was not
      about -- or blogs -- it was not about the case at all, but
      it was just -- so maybe that's relevant, but she did --

Q.    Well what was the website, if there was one?

A.    It was some woman who was doing a blog on Angola.

Q.    What was the subject?

A.    It was Angola Prison and her being a -- well, I don't
      remember.  I read it quickly, just looked at it.  I thought
      it was not relevant except in the larger issues and things,
      but certainly did not effect anything I had said or done.

Q.    Was it related to the Angola Reed case?

A.    I'm sorry, the Angola?

Q.    Reed case?

A.    I don't remember.  I don't believe so, but I just don't
      remember.

Q.    Okay, and --

A.    It was more --

A.   That's correct.

Q.   And what -- I think she mentioned that she had spent quite
     a bit of hours on this case, like 70 hours; was most of that
     doing -- preparing these summaries?

A.   Well other things too, like getting books for me or articles
     or running them down, but it was primarily going through
     the depositions, guiding me what was important there, so
     that was most of what she had done, as my memory was working,
     on the depositions so that when I went I wouldn't just go
     in cold to -- there was such a short time period to work
     on these; looking for specific things in the depositions,
     facts that could be used that we could establish.

Q.   Dr. Burton, have you further reviewed or commented on the
     other expert reports by Marx, Solanky, or Rigamer since the
     April 12th deposition?

A.   No, I have not.  In other words -- excuse me, could you
     re-ask the question?

Q.   I asked whether you had been asked to comment or review --
     let me restate it then.   Have you in fact reviewed the Marx,
     Solanky, or Rigamer report since the April 12 deposition?

A.   No, I have not.

Q.   I'd like to run through the people who assisted you on this
     report real quickly.  We've talked a little bit about your

daughter.  What is her training, Dr. Burton?

A.    She is an all but dissertation, that is completed her exams,

write her dissertation, student at University of Georgia.

In other words, she completed her, what they call prelim

exams that moves you to the stage where you then work and

write on your dissertation.

Q.    Your wife, what is her name?

A.    Georgeanne Burton.

Q.    Georgeanne; and what has her role been in preparing the

report?

A.    Would get some things for me, photocopy or just finding

them, point them to me, and did some proofreading.

Q.    Both your wife and your daughter have been to assist -- more

as a clerical and organizational role?

A.    Yes, although my daughter went beyond, I would say, that

in terms of taking notes for me, particularly on the

depositions, has been guiding me.  And my wife also got some

notes, you know, for me that then I could use to go -- when

I say notes, page numbers and things, and would say "You

need to look at this," so a little bit more than cler --

research assistant would be probably -- certainly a better

term for my daughter.

(Phone connection was lost briefly.)

A.    That's right.

Q.    On things like the demography issues you just mentioned?

A.    Well also on race relations.

Q.    Have you ever taught a sociology course that was not related to race relations or the demographic family history issue?

A.    I don't think so.

Q.    What degrees do you have in sociology?

A.    I have study in a second discipline, it's called; it's not a degree, but it's a certification where you can take a year off and study in a different department.

Q.    And from what institution did you get that certificate?

A.    University of Illinois.

Q.    And was it a more narrow title than certificate?

A.    It was called study in a second discipline.

Q.    Okay, but the second discipline, what was that?

A.    It was sociology.

Q.    Okay.  What client has accounted for the largest portion of your expert consulting and testimony in the last 15 years?

A.    In the last 15 years?

Q.    Right.

A.    I don't know if there was one.  I did a lot for the NAACP. And let's see, the amount of time -- are you talking about

A.   I don't know.

Q.   Okay.  Other than those maybe seven organizations, you

     don't recall testifying in court on -- for any other client?

A.   Well I testified in court in Charleston and the people who

     ran the case was the Justice Department along with the --

     yeah, it was the Justice Department, but it was worked

     together with the ACLU, the NAACP, and I believe just

     Justice.  The person -- one of the persons who did it went

     over to the Lawyers' Committee afterwards -- oh, and the

     Lawyers' Committee, but I don't believe I testified when

     I worked for the Lawyers' Committee.

Q.   Who retained -- who retained you in the Charleston case,

     Dr. Burton?

A.   I believe it was NAACP, but I do not remember specifically.

     It could have been the ACLU.  The ACLU actually paid me,

     so maybe it was the ACLU, but I worked with the NAACP, and

     the Justice Department lawyers are the ones who prepped me,

     talked with me, all that, and -- but they were --

Q.   But you've never testified in a case where you were retained

     by the Department of Justice, have you?

A.   No, but I was retained by them and did a report.

Q.   Okay.  Who else has retained you besides those clients that

     I just mentioned -- that you just mentioned?

whether or not there was racial discrimination in the
community, was it?

A.  Only to the extent that it was part of answering those two
questions, and of course, it lays the historical context
of looking at how social science literature would address
these issues.

Q.  If the State Defendants today, Dr. Burton, if the State
Defendants were to acknowledge that there was racial
discrimination in West Feliciana in the 1980s and 1990s,
they do not make that acknowledgment, but if the State did
acknowledge such discrimination existed in the 1980s and
1990s, then what other relevant expertise would you bring
to this case?

A.  I would bring the relevance of a social scientist who
studies issues of race and how they play out in
decision-making processes.

Q.  What would you call that expertise?  What's the area of
expertise?

A.  Race relations.

Q.  Race relations?

A.  That's right.  Sociology and historian.

Q.  Wait, wait, wait.  Let's look at them.  Have you ever been
qualified in court as a race relations expert?

A.    I would think that I have.  I don't remember, but I would

      think that since that was what my testimony often was about

      that I would have been qualified, but I don't specifically.

Q.    And when you were qualified to testify as an expert in these

      cases, in these voting rights cases, are you telling us

      today that you do not know the field of expertise in which

      you were tendered?

A.    I do not remember.

Q.    Not a single field of expertise you can tell us?

A.    Well I remember the statistics and I believe, you know, as

      a historian, and on race relations.

Q.    Well --

A.    That's my memory, but I just don't remember specifically.

Q.    Do you think somebody -- you think somebody said "We tender

      Dr. Burton as an expert historian."  You think that could

      have happened?

A.    I think that could have happened.

Q.    In order that you could give testimony about the history

      of race discrimination in a community?

A.    Is that a question?

Q.    Yes.

A.    Yes.

Q.    What expertise do you claim that would enable you to give

me look at the circumstances of that context and the

material -- for the material that was presented to me.

Q.    Your training as a social scientist, that's what you deem

your expertise to be?

A.    That's part of -- excuse me, my expertise for what?

Q.    Well that's my question.  Your expertise to claim that the

judges of the 20th Judicial District Court did or did not

rely on race-neutral criteria.  That's the expertise I'm

trying to pin down, Dr. Burton.  What expertise do you have

that would enable you to give such an opinion?

A.    My training as a social scientist and a historian looking

in the historical context of those decisions.

Q.    How is your training as a historian relevant to giving an

opinion that the judges of the Judicial District Court did

or did not rely on race-neutral criteria?  How could your

training as a historian be relevant to that?

A.    Directly relevant.

Q.    I said how?

A.    It is in the context of the society and culture and history

that people make those decisions.  I look -- well...

Q.    You've never testified in other cases regarding racial

discrimination in the selection of jurors or jury

forepersons, have you?

A.   No.

Q.   Have you ever previously been asked to opinion -- to give
     an opinion whether a disparity in the selection of black
     jurors or forepersons could be explained by race- neutral
     criteria?

A.   No.  Well, how did you phrase the question?  I'm sorry.

Q.   Have you ever previously been asked to give an opinion
     whether a disparity in the selection of black jurors or
     black jury forepersons could be explained by race-neutral
     criteria?

A.   I have never done so or been asked.

Q.   Identify for us --

A.   Wait a minute -- excuse me --

Q.   -- a case in which you did testify that involved an issue
     that you think is most similar to the opinions that you're
     giving in this case?

A.   Well, I would say the Charleston case is relevant, in terms
     of studying the historical context and background and
     coming to an intent, how one goes about --

Q.   Okay, give me the -- is that the one case that you would
     point to that you think might be the most -- the closest
     to this case?

A.   Well there's several; that is one, the Charleston County

intent?

A.   No, I was not asked to show his intent.   I was asked to look

and see about Judge Ramshur, if the supposedly good

character evidence that the State had suggested would

explain his decision-making process.   I was not asked --

Q.   But Dr. Burton, first of all, you gave a second opinion,

didn't you?  Wasn't the second opinion that race was a

factor in the selection of forepersons in West Feliciana

during the 1980s to 1990s?  Wasn't that your second

opinion?

A.   I don't --

Ms. Williams:  Objection.

A.   I don't remember -- I know I was not asked to come to that

conclusion or to make an opinion on that so I don't remember.

Q.   Look at the first page of your report, please.

A.   Okay.

Q.   You found that "Evidence of prevalent racial discrimination

in the historical and social fabric of West Feliciana

support a determination that race was a factor in the

selection of forepersons in West Feliciana during the 1980s

and 1990s."  Do you see that, Dr. Burton?

A.   I do.

Q.   Doesn't it look like there you're saying, in your opinion,

that the historical and social history of discrimination

support a finding that Judge Ramshur discriminated in his

decision?

A.    I do not.  That is not what I say.  What I'm saying is it

is consistent that we do not know, of course, all of the

factors that are there, but from what I have looked at, that

would suggest this, that it's consistent with this.  That's

quite different than pulling --

Q.    Dr. Burton --

A.    -- or

Q.    Excuse me.  That's not what you said.  Look at the sentence

carefully.  It says that it "Supports a determination."

It doesn't say it's consistent with it.  Do you see that

distinction?

A.    Well I think support -- I think you're misreading support.

Q.    Okay, you think support means the same as consistent with

in that context?

A.    Yes, I think it's consistent with the deter --

Q.    Okay, let's move on then.

What area of expertise do you have that is most relevant

to your opinion that race-neutral criteria is consistent

with the selection of fore -- forepersons in West Feliciana?

A.    You broke up there a little bit on me.  I think I heard the

whole question, but read it a little bit slower, please,

or the Court Reporter, I don't know if she got it or not.

Q.   I'm just going to move on.

Do you have any expertise in behavioral psychology?

A.   Just the interdisciplinary work that I did and was assigned,

as a student, getting my PhD.  We were trained as social

scientists at Princeton and that was part of a course, but

I don't claim to be an expert in psychology, but I use those

insights --

Q.   Be more specific about your -- the course work that you had

in behavioral psychology.

A.   We were assigned readings, as graduate students, in our

general methodology course at Princeton by Arnold Mayer and

Lawrence Stone and they brought in -- oh, the psychologist

that wrote the -- he came to the class and we met with him

-- that wrote the major book on Martin Luther and the

Protestant Reformation.  I'm blanking on his name.  Was it

Herbert --

Q.   How many times did this guest lecturer come to your class?

A.   Once; that was -- one.  You -- do you want me to go through

each of them that were there?  Then we had readings and were

asked to --

Q.   In behavioral psychology?

A.    Yes.

Q.    Or is this just in psychology in general?

A.    It was behavioral psychology, I'm pretty certain.   Now it's

      been a long time.  This was 1969 and '70.

Q.    Have you studied it any since then?

A.    Some.

Q.    When and how and what context?

A.    We were parts of reading groups that included behavioral

      psychology when I was at Illinois.   We had someone who was

      making a major study of happiness and he did readings.   I

      did his -- we read and discussed his readings and it was

      part of the reading groups and he would give us particular

      readings in psychology.   I was also, after my book "In My

      Father's House Are Many Mansions," came out, there was a

      big move about psychology in history and anthropology and

      they put together a reading group out of Northwestern and

      they would pay for me to actually fly up or drive up to

      Chicago from Urbana to be part of --

Q.    Okay, Dr. Burton --

A.    -- this group and we would --

Q.    -- do you consider yourself an expert in behavioral

      psychology?

A.    No, I do not, but I consider myself informed of some of the

conclusion I came to in my report.

Q.    Okay.  The quotation I just read you has a footnote which
      starts -- which, to me, is a non-sequitur.  How do you view
      the mammy archetype as authority for your statement that
      -- in the text?

A.    Can I take a moment to read the footnote?

Q.    Sure.

                    (Deponent views document.)

A.    It is referring to paternalism; the hospitality, that sort
      of notion, so the cultural norms there where you were
      thinking of as hospitality is referring to the paternalism
      as a specific example that I saw when I was there
      researching.  That -- not that it is a -- but the place of
      blacks in the community, how they're presented and
      represented in terms of the sort of magnolia myth of the
      South.

Q.    Again, it was not your intent or findings that Judge Ramshur
      -- to say that -- to find that Judge Ramshur was infected
      by that moonlight and magnolias mentality?

A.    I was not asked to do that so I did not draw a conclusion
      in this report on Judge Ramshur.

Q.    Or on any of the judges of the 20th Judicial District Court?

A.    No, it's -- not to the extent that they were part of this

culture is all.

Q.    Okay.  Let's talk a little bit about your expertise in

methodology.  Actually, let me refer you back to the

interview.  Do you still have the interview transcript

handy?

A.    Is this the one by Roy Rosenzweig?

Q.    That's right.

A.    Okay.

Q.    Look at page 6, two-thirds of the way down or so, there's

a statement attributed to you that, you know,

acknowledging, I guess, that "Historians disagree over what

the facts are as well as over interpretations."

A.    It's page 6 and whereabouts is it?

Q.    Page 6, let's see, the third -- the larger paragraph

two-thirds of the way down; the end of the paragraph.

A.    My first -- oh, yes, yes, I see it.

Q.    "Historians disagree over what the facts," and "facts" is

italicized for emphasis; "Historians disagree over what the

facts are as well as over interpretations."  Do you see that

language?

A.    "If this is the only -- it was more important that they know

that historians disagree over what the facts are as well

as over interpretations."  Yes.

(Deponent views document.)

A.    Yes, I agree with it.

Q.    Okay, and look at one more, the next page, in the middle

of the page there's a paragraph that begins "I also stress

in the early lectures -- that first sentence says "I also

stress in the early lectures that all historians, including

myself, and also the textbooks, select certain facts, and

how someone selected these facts tell us something."  Do

you see that?

A.    Just a moment.  Yes, yes.

Q.    And does that look like something you might have said?

A.    Yes.

Q.    And do you agree with that today?

A.    I do.

Q.    Okay, let me ask you a few questions about your methodology

in this case.  I believe you testified in your earlier

deposition that the only white person you actually

interviewed for -- in preparing this report was Lisa Reese,

is that right?

A.    I -- I don't remember, but that sounds right.  Do I need

to look at the depositions?

Q.    No, no.  I think that's what you said.  I think it's page

106, but regardless of what you said then, I mean she's the

only one that you can recall today that you spoke with live,
the only white person that you spoke with?

A.    No, no, that's not true.

Q.    Well other than the librarians and other incidental
contacts, anyone --

A.    Right.

Q.    -- else that you -- anyone that you spoke to, even including
Lisa Reese, who provided any information that was
incorporated into your report?

A.    That sounds accurate.  It's page 106?  I want to find it.
Is that where we are?

Q.    Well yes, but my question is whether you can identify any
white person who provided any information that was
incorporated into your report?  That's the question.

A.    And I said I talked to another gentleman who had been there.
I'm trying to remember who that was now.  And your question
to me about this statement is what?

Q.    My question really is not about that statement.

A.    Okay.

Q.    My question is, is -- was there any white person, whom you
can identify today, who provided any information to you that
was incorporated into your report?

A.    Did you say interviewed or who -- or --

Q.    Interviewed.

A.    Interviewed; that I interviewed?

Q.    Yes.

A.    No, that I -- not that I remember.

Q.    Okay.  And in fact the only source of any information about
      -- let's start over.  And in fact, your only primary source
      of information for what white persons might say about the
      issues in your report came from the deposition summaries
      that your daughter prepared for you?

A.    No.

Q.    What other sources did you rely on?

A.    The depositions themselves.  I read through the
      depositions myself.  I used her notes to help, to remind
      --

Q.    So you read her notes and then you read the depositions
      themselves?

A.    That's right, and sometimes I had read the depositions while
      she was making the notes, some of them, would use them to
      guide me --

Q.    What do you recall about those depositions?  First of all,
      how many of them were there?  How many white people
      depositions did you read?

A.    I don't remember.  Somehow the idea of eight comes to mind,

but I don't remember.

Q.   And you can confirm that we've been provided with copies
     of all the deposition transcripts on which you relied?

A.   I would hope so, in the sense that they were provided to
     me by Mr. Woodfox's counsel and so I would assume they would
     have sent you the same ones.

Q.   Okay, well just list for me the names that you remember?
     And I'm asking right now if you remember this, so I'm asking
     that you not look at the report, please.

A.   Oh, okay.  Well --

Q.   Are you able to remember any of the names?

A.   Yeah, Ms. Bonaventure, uh -- I'm blanking; Williams is
     African-American; Aquilla, the Mayor; Aquilla, Billy
     Aquilla; it's been a while.

Q.   What do you remember about the substance of the depositions?
     What is it that struck you from there that you used in your
     report?  What remembrance do you have of things in those
     depositions that you incorporated into the report?

A.   Well, I haven't -- I know this -- I may just be tired, but
     I don't understand what you're asking.

Q.   I'm asking -- I'm trying to find out what it is you took
     away from these deposition transcripts since these were the
     source of, you know, white persons' input into your report,

welcomed on the different clubs, but didn't want to be part

of them.  I mean I remember a lot of things, but I'm not

-- you want to know the things -- almost all of it -- what

I tried to do is establish facts and ideas that came out

of that and then look for how they come together to give

us a framework for understanding and for me to answer the

two questions I was asked.

Q.   Dr. Burton, when your daughter summarized -- you said your

daughter summarized these and then you used those to go look

at the -- pertinent parts of the deposition transcripts

themselves?

Ms. Williams:   Objection; mischaracterizing his

testimony.

Examination resuming by Mr. Curry:

Q.   You can answer, Dr. Burton.

A.   No, what I said was, I read all of the depositions.  I had

her go through and put the notes together for me because

it's a huge amount of material to read, so that I would have

notes.  So I read them so that I could read through

everything and then I had her to put together the outlines

of the -- of the depositions, specific things that she saw,

as well, for me to go back and study or to guide me as I

tried to put together a report under very, very, incredible

time constraints.

Q.    Do you -- well tell me about the time constraints?

A.    There was not much time to get this report done from the
      time I was engaged by counsel and the huge amount of material
      there was to cover.

Q.    What was -- when was the start time for your project?

A.    I don't remember, but it was -- it was -- we had just, it
      seems like, several weeks to get it done in.

Q.    The whole thing was done within several weeks?

A.    I don't remember.  I remember -- I mean I can look all this
      up, I've got a record, but I don't --

Q.    You remember just that it was several weeks?

A.    It might have been a month, I don't know.

Q.    Okay.  Did you -- do you think that white individuals in
      the community might have had input on any of the issues that
      you addressed with blacks in your focus group?

A.    Do I think --

Q.    Do you think that white individuals in the community might
      have had impact -- input -- I'm sorry, input, on any of the
      issues that were discussed with blacks in the focus group?

A.    Any influence -- maybe I need to -- let me not take a break,
      but say it one more time.  Do I think --

Q.    Do you think that white individuals in the community might

have had input on any of the issues that you discussed with

blacks in your focus group?

A.   I must be tired, I can't figure out what you're asking me.

One more time, slowly.

Q.   Do you think that white individuals in the community might

have had opinions or input on the issues that you discussed

with blacks in your focus group?

A.   Yes.

Q.   What did you do to try to get that input and to get the white

opinions on those issues?

A.   I read these depositions which had been taken around the

time of the actual court case and, of course, I would have

loved to have had time to have interviewed whites and to

ask if we could find some people to talk to, but there was

not enough time and all the sources  -- almost all the

sources that I had were, in fact, from the white

perspective, so as a social scientist, I need to try to

balance this by focusing, as quickly as I could, to get --

Q.   Wait, you said all the sources were from the white

perspective?

A.   Almost everything -- the newspapers were from the white

perspective, the history that had been written had been from

the, pretty much, the white perspective.  There were no

A.   Social sciences include, in general, and these are somewhat
     debatable, economics, sociology, political science,
     history, anthropology to a certain extent.

Q.   Okay, but you don't have training in all those individual
     disciplines, do you?

A.   I have some training in most of those.  Some being relevant,
     but yes I have been trained, as I said, in particular, when
     I was at -- well, yes, I do have some training.

Q.   Anthropology, economics, all of those?

A.   Yes.

Q.   Okay.  What is a social scientist?

A.   Someone who studies the science of society.

Q.   Is it one who's a scientist in any of those fields and others
     that you just mentioned?

A.   Yes, they would be social scientists.

Q.   Okay, let me ask you a few questions about "In My Father's
     House."  You wrote a book entitled "In My Father's House
     Are Many Mansions," correct?

A.   Yes, I think the full title was a little bit longer than
     that, but yes.

Q.   Okay, it is.  You cite that book a couple of times in your
     report, right?

A.   I don't remember, but I think so.

A.    Well I haven't been given all the evidence of course.  I
      mean all I have is what we were discussing, the assumptions
      that I had, that I were given, to make this report and I
      did not -- I was not asked to come to that conclusion at
      all, but --

Q.    All right --

A.    So you're asking me, you know, after studying this, from
      the evidence that I have, and from the evidence that I was
      given, and from the assumptions that were -- that I made,
      were given to me, evidence would point to that there was
      a discriminatory process that will result in one of eighteen
      jury forepersons, only one being African-American selected
      by Judge Ramshur.

Q.    Would you be able to give an opinion if you had not assumed
      that he appointed only one out of eighteen forepersons?

A.    I believe -- well it depends on what other assumptions I
      had been given.  This is about the good character evidence
      assumption?

Q.    No, it's not limited at all.  It's exactly what you just
      said.  You said you think that, in a very qualified way,
      you said you thought there was some evidence of
      discriminatory intent, I think, based on the one in eighteen
      selections.  And I'm asking you if you took away the one

in eighteen selections, would there be any, in your view, any evidence of discriminatory intent and anything that Judge Ramshur did that you've seen or heard?

A.    Again, I want to put on record that I was not asked to come to a conclusion about Judge Ramshur and race influencing him.   But, of course, in doing this, I do look at the context and looked at it and it would depend on what I was being asked because I was asked to do the one in eighteen and make the assumption that that was the number and there were other assumptions given to me too, like the -- that the Judge did not ask questions of the -- of the jury before they're selected, and --

Q.    I tried to get you to list some of this earlier, and you declined, but okay --

A.    Well, what I --

Q.    -- so one out of eighteen forepersons, that was an assumption?

A.    That's right.

Q.    And another assumption was the Judge did not ask questions. Any other assumptions?

A.    Well I thought I had listed them here, the ones I had been given.  That --

Q.    And you assume that -- I think you told us before that you

assume based on what the attorneys told you that the Judges

-- that there were others -- that there were

African-American jurors --

A.   That's right --

Q.   -- who were equally qualified in all instances to serve as

foreperson?

A.   That's -- I don't know if it was said in all instances, but

there were equal qualified African-Americans and whites who

were selected to be jury forepersons that were not anymore

qualified than African-Americans, so that was another

assumption.

Q.   And that was an assumption?

A.   That's right, that I was to take as -- as truth and work

from that and come to my conclusion.  And I did receive --

so, I guess, another -- I did receive the State's interviews

with the jury forepersons that had been selected, or a copy

of those notes.

Q.   Have you considered the foreperson selections that were

made by Judge Ramshur in East Feliciana Parish?

A.   No, I have not considered them.

Q.   Even as of today, have you been told the number of

forepersons selected in East Feliciana Parish by Judge

Ramshur?

A.    I -- this is, again, by my memory, but it seems like in the
      first deposition, you told me to -- or maybe -- I can't
      remember if I was told, but you suggested that there were
      a number -- but I'm not sure I was ever told or if it was
      always in a hypothetical or an assumption or what if it had
      of been, but I have not --

Q.    You've never been told by anyone other than me?

A.    As far as I know, no.

Q.    Even after the deposition, you did not ask anybody as to
      whether Judge Ramshur had made a much higher percentage of
      black foreperson selections in East Feliciana?

      Ms. Williams:  Objection.  I'm going to instruct the
      witness not to answer that as it gets into attorney client
      --

      Mr. Curry:  I didn't ask him if he told attorneys, I told
      him anybody; if he asked anybody?

A.    I --

      Ms. Williams:  Well, you can answer that to the extent that
      you are able to answer that without disclosing whether you
      --

      Mr. Curry:  I'll restate the question.

Examination resuming by Mr. Curry:

Q.    Dr. Burton, have you made any inquiries from any source as