UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

ALBERT WOODFOX

CIVIL ACTION

VERSUS

NO. 06-789-JJB

BURL CAIN, WARDEN, LOUISIANA
STATE PENITENTIARY, ET AL

## RULING

This matter is before the Court on Petitioner Albert Woodfox's ("Woodfox") petition for habeas relief on the claim that Woodfox's March 1993 indictment by a West Feliciana Parish grand jury was tainted by grand jury foreperson discrimination. An evidentiary hearing was held on May 29-31, 2012. Both Woodfox and the State have filed post-hearing memoranda. (Docs. 259 and 258 respectively). Both Woodfox and the State have also filed post-hearing reply memoranda. (Docs. 267 and 266 respectively). Finally, Woodfox filed a motion to strike portions of the State's post-hearing response memorandum and motion for leave to file in reply. (Doc. 268). The State filed an opposition (Doc. 270), to which Woodfox filed a reply. (Doc. 272). The Court will not strike any portions of the State's post-hearing response memorandum. For the foregoing reasons, Woodfox's habeas relief is GRANTED.

I.

In March 1993, Woodfox was indicted by a West Feliciana Parish grand jury, and in December 1998, Woodfox was convicted of second-degree murder.[1] On October 11, 2006, Woodfox filed a Petition for Habeas Corpus Relief in this Court, challenging his 1998 conviction and sentence. On June 10, 2008, Magistrate Judge Noland ruled that Woodfox had presented sufficient evidence to support a *prima facie* case of grand jury foreperson discrimination.[2] (Doc. 33 at 64). This Court adopted the Magistrate Judge's findings and granted Woodfox's petition on July 8, 2008. (Docs. 35 and 48). The United States Court of Appeals for the Fifth Circuit reversed this Court's ruling on the issues presented for review and remanded for a determination concerning the selection of the grand jury foreperson. *Woodfox v. Cain*, 609 F.3d 774, 817-18 (5th Cir. 2010). Upon remand, Woodfox presented his claim based upon statistics. On February 16, 2011, after oral argument, this Court concluded that AEDPA deference to the Louisiana First Circuit Court of Appeals was unwarranted and ordered an evidentiary hearing, which was held on May 29-31, 2012. (Doc. 100).

II.

To establish a *prima facie* case of grand jury foreperson discrimination, a defendant must show: (1) the group to which the defendant belongs is a

---

[1] Because the procedural history of this case is lengthy, the Court will not repeat it. A more complete description of the procedural history can be found in the Magistrate Judge's ruling (Doc. 33), which this Court has previously adopted. (Doc. 48).

[2] For the purposes of this ruling, this Court will not discuss the other issues in this case, which have been resolved. This ruling focuses solely on the issue before the Court, the matter of whether there was grand jury foreperson discrimination.

"recognizable, distinct class, singled out for different treatment under the laws, as written or as applied"; (2) "the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time; and (3) "a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." *Castaneda v. Partida*, 430 U.S. 482, 494 (1977) (internal citations omitted). Once the defendant has made a *prima facie* showing of grand jury foreperson discrimination, the burden shifts to the State to rebut the showing. *Id.*  Both the Magistrate Judge and this Court have found that Woodfox made a *prima facie* showing of grand jury foreperson discrimination. (Docs. 33, 100, and 237).

Woodfox is African-American, and African-Americans constitute a distinct, cognizable class. *Rose v. Mitchell*, 443 U.S. 545, 565 (1979). Woodfox has also shown substantial underrepresentation by comparing the proportion of African-Americans in West Feliciana Parish to the proportion called to serve as grand jurors over a substantial period of time. This Court has ruled that the relevant period of time is 1980 through March 1993. (Doc. 237). During this time period, there were 297 non-foreperson grand jurors, and the voter registrar and deputy registrar were able to identify the race of 277 of those jurors. Out of the 277 non-foreperson grand jurors, 113 were African-American, or 40.8%. 5 out of the 27 forepersons appointed were African-American, or 18.5%. (Doc. 229). However, in 1990, the percentage of African-Americans in West Feliciana Parish, excluding

African-Americans incarcerated in Louisiana State Penitentiary at Angola, was 44%. Similarly, the percentage of African-Americans among registered West Feliciana Parish voters between 1980 and 1993 was 43.5%. Finally, Louisiana's procedure for selecting grand jury forepersons prior to 1999 was "unquestionably subject to abuse according to subjective criteria that may include race and gender." *State v. Langley*, 1995-1489 (La. 4/3/02); 813 So.2d 356, 371.

Upon making a *prima facie* case, the burden of proof is shifted to the State to "dispel the inference of intentional discrimination." *Castaneda*, 430 U.S. at 497-98. The State may rebut the *prima facie* case by showing "evidence that objective, racially neutral criteria were used in the selection process." *Johnson v. Puckett*, 929 F.2d 1067, 1072 (5th Cir. 1991); *see also Alexander v. Louisiana*, 405 U.S. 625, 632 (1972) (finding that the burden of proof shifts to the State "to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result."); *see also Guice v. Fortenberry*, 722 F.2d 276, 280 (5th Cir. 1984) (finding that the State "must show that the pattern of underrepresentation proved . . . was the result of a 'racially neutral selection procedure.'")(citing *Alexander*, 405 U.S. at 632). "Affirmations of good faith in making individual selections are insufficient to dispel a prima facie case of systematic exclusion." *Alexander*, 405 U.S. at 632.

III.

In making its rebuttal argument, the State relied on two categories of evidence to dispel the inference of discrimination. First, the State presented expert statistics testimony to show that the data relied on by Woodfox in his *prima facie* case does not support an inference of discrimination in the grand jury foreperson selection process for the relevant period of time. (Doc. 258 at 4-5). Second, the State presented evidence to show that judges in West Feliciana Parish relied on racially neutral criteria in making their foreperson selections. (*Id.* at 5).

The State presented the reports and testimony of its expert, Tumulesh Solanky, PhD., to demonstrate that any observed racial disparity is statistically insignificant. The State argued that courts have recognized that data, which demonstrates a racial disparity on its face, can be misleading without deeper analysis. The State cites *Moultrie v. Martin*, 690 F.2d 1078 (4th Cir. 1981) for the proposition that courts should use statistical analysis methods to evaluate grand jury discrimination claims. (Doc. 258 at 5). However, in *Moultrie v. Martin*, the United States Court of Appeals for the Fourth Circuit was considering whether the petitioner had made a *prima facie* showing through the use of statistical evidence, and not whether the State had dispelled an inference of discrimination. *Moultrie*, 690 F.2d at 1079 (finding that the petitioner's claim was "based wholly on statistics . . . [and because] he did not establish a prima facie case . . . [w]e need not address the matter of rebuttal." *Id.*). The State also cites *Hillery v.*

*Pulley*, 563 F.Supp. 1228 (E.D. Cal. 1983) for support. Similarly, in *Hillery*, the court analyzed statistical evidence to determine whether the petitioner had made out a *prima facie* case of discrimination, not whether the State had dispelled such an inference. *Hillery*, 563 F.Supp. at 1249 (finding that the petitioner's statistical evidence and analysis "make out a prima facie case of intentional discrimination" and further finding that "[o]nce a prima facie showing is made out, the burden of proof [shifts] to the State to dispel the inference of intentional discrimination.") (internal quotations and citations omitted). Although this Court has already found that Woodfox made a *prima facie* showing, the Court will consider the statistical evidence put forward by both the State and Woodfox in assessing whether the State has met its burden.

IV.

As a threshold matter, the Court will first assess the proper baseline to be used when determining whether the observed racial disparities were statistically significant. The State argues that the proper baseline is 36.62%, whereas Woodfox argues that the proper baseline is 40.8%.

*The State's Proposed Baseline of 36.62%*

The State's statistical analysis "was based on a comparison between an *observed* figure to an *expected* figure." (Doc. 258 at 6). The observed number is 5 out of 27, or 18.5%, of African-American grand jury forepersons selected between 1980 and March 1993. The State correctly points out that in order to establish a *prima facie* case, the petitioner may compare the "proportion of the

group in the total population to the proportion called to serve as grand jurors."

*Castaneda*, 430 U.S. at 494. Woodfox did just that: he compared the proportion

of African-Americans in the total population, which was 44%, to the proportion of

African-Americans selected as forepersons, which was 18.5%. However, the

State argues in its rebuttal, that the correct figure for assessing whether there

was discrimination should be what the State refers to as the "expected figure,"

instead of the "observed figure." The State explains that general population

figures distort the analysis because not every member of the general population

is eligible to serve on a grand jury, noting that Louisiana law does not permit

felons or illiterates to serve. *See* La. Code Crim. Proc. Art. 401.

    The State posits that in order to determine whether African-Americans

were underrepresented in the grand jury foreperson selection process, it is

incorrect to compare the percentage of total African-Americans in the parish to

the percentage of African-Americans selected to serve as grand jury forepersons.

Rather, the State argues that it is more accurate to compare the percentage of

total African-Americans in the parish that were eligible to serve to the percentage

of African-Americans that actually served. However, because there is no

recorded evidence showing how many African-Americans were eligible to serve

as grand jury forepersons in West Feliciana Parish during the relevant time

period, the State developed an estimate of eligible African-Americans based on

available data, and concluded that 36.2% is the proper baseline.

In reaching the baseline value of 36.62%, the State's expert, Dr. Solanky, first looked to West Feliciana voter rolls because the voter registration process "screens out certain individuals" who would be ineligible to serve as grand jurors, such as the mentally incompetent and felons. However, as the State points out, this is not conclusive because "illiterates may vote but are not eligible to serve as grand jurors," and notes that Dr. Solanky accounted for illiterates when estimating eligibility. (Doc. 258 at 8). Dr. Solanky obtained illiteracy data for the years 1980-85 and 1988-93 via public records. Dr. Solanky utilized the following numbers to reach its conclusion of a proper baseline of 36.62%.

- 1980-85 Illiteracy data available: This data was broken down by race, and African-Americans constituted between 97.8 and 98% of illiterate voters. Dr. Solanky determined that the percentage of eligible African-Americans based on literacy was 34.8% during these years.

- 1988-93 Illiteracy data available: This data was not broken down by race and Dr. Solanky used the data from 1980-85 to estimate what percentage of illiterate voters from 1988-93 were African-American. He selected 97.8% (the smaller number from the 1980-85 data set) and concluded that between 1988-93, 36.47% would have been eligible.

- 1986-87 No illiteracy data available: Dr. Solanky used a regression analysis and concluded that in 1986, there was 615 total illiterates and in 1987, there were 643 total illiterates.

- 36.62% eligibility: Dr. Solanky combined data from the three time periods and concluded that the overall percentage of eligible African-Americans was 36.62%. The State argues that this is a conservative number because Dr. Solanky assumed that the 167 voters from 1986 to 1993 whose race was listed as "other" were ineligible, and had they been considered eligible, this would have decreased the proportion of eligible African-Americans. Dr. Solanky also calculated his figures setting the relevant time period as 1980 through 1994, instead of this Court's ordered time period of 1980 through March 1993. Had Dr. Solanky adhered to this time period, the eligibility would have been slightly lower: 36.58% instead of 36.62%. Finally, Dr. Solanky did not account for federal illiterates beyond 1985, which the State claims would have further decreased the eligibility because federal illiterates tended to be African-American.

Thus, the State argues that 36.62% is the correct baseline to assess whether any racial disparity was significant.

In Woodfox's post-hearing brief, he argues that Dr. Solanky's baseline is "fundamentally flawed," and urges the Court to reject it. (Doc. 259 at 14). Woodfox asserts that the State did not show the premises underlying Dr. Solanky's literacy calculation, and the State focused on only one factor that affected the composition of the jury panel, literacy. Woodfox contends that the data relied upon by Dr. Solanky is unreliable for several reasons.

- 1980-85 illiteracy data: This data stems from a document with handwritten tables, but the State failed to show how literacy was determined. The current Registrar testified that this document was not hers, and Woodfox posits that the tables were likely prepared by her predecessor, who was the registrar during the Civil Rights era and allegedly was "responsible for the egregious discrimination against blacks in the Parish." (Doc. 259 at 15). In the State's reply brief, the State asserts that this is speculation as to who prepared the data and even if the previous registrar were indeed a racist, it does not logically follow that he would register African-Americans to vote in an effort to "artificially inflate the number of black illiterates." (Doc. 266 at 15).

- Illiteracy rates in West Feliciana Parish v. East Feliciana Parish: Woodfox argues that Dr. Solanky testified that the illiteracy rate in West Feliciana Parish was 9.1% in 1989, but in East Feliciana Parish it was 1.8%. Woodfox contends that there is no reasonable explanation for this, other than discrimination by the West Feliciana voter registrar, pointing out that not only does the State not provide any explanation, but the State explained that degrees of educational attainment were higher in West Feliciana than in East Feliciana. In response, the State argues that Dr. Solanky only testified from a chart that Woodfox provided and that Woodfox never questioned the current registrar of voters, Bobbie Ross, at the evidentiary hearing about literacy rate in East Feliciana Parish.

Moreover, the State argues that historical data suggests that East Feliciana Parish underreported its illiterates because the National Center for Education Statistics (NCES) estimated in 1989 that 16% of adults in Louisiana were illiterate. However, the data that Woodfox objects to shows that the illiteracy rate in 1989 in East Feliciana Parish was 1.8%. Moreover, the State argues that both census and NCES data shows that educational attainment was higher in West Feliciana Parish during the relevant time period. The State asserts that Woodfox's critique on the State's literacy estimate based on the 1989 East Feliciana literacy data is "plainly misguided." (Doc. 266 at 17).

- Federal illiterate voters: Woodfox points out that Dr. Solanky reduced the number of literate African-American voters by assuming that voters listed in the hand-written table with a "fed" notation were illiterate, even though there was no evidence to support this. Woodfox further points out that voters with a "fed" notation were not included in the tally of total illiterate people. In response, the State argues that the West Feliciana Registrar affirmed that these individuals were, in fact, illiterate. Moreover, even if they were not illiterate and Dr. Solanky erred in assuming that they were, this erroneous assumption would not have resulted in a meaningful difference in Dr. Solanky's results.

- Incompleteness of data: Woodfox argues that there is only reported data for literacy by race for 5 of the 14 years that Dr. Solanky considered. For

the years that did not have data for literacy by race, Dr. Solanky made

assumptions, which Woodfox contends are unsupported. The State

objects, arguing that Dr. Solanky was able to estimate the number of

African-American illiterates for the years that did not break literacy

statistics down by race based on the overall figures that African-Americans

constituted the majority of illiterates.

- Incompleteness of model: Woodfox points out that Dr. Solanky's model

  only accounts for one factor in determining the composition of the grand

  jury, literacy, when there were other available factors to consider. Such

  factors include residency requirements, exemptions under state law, and

  the fact that many people called for venire did not appear. The State

  objects, noting that these other variables are not race-specific, but literacy

  is race-specific.

*Woodfox's Proposed Baseline of 40.8%*

Woodfox argues that the correct baseline must be calculated from the

"demographics of the people who were actually selected to serve on grand juries,

excluding the forepersons." (Doc. 259 at 18).  Woodfox asserts that between

1980 and 1993, there were 297 non-foreperson grand jurors in West Feliciana

Parish. Out of the 297 jurors, 277 of those jurors' races were identified, and 113

of them, or 40.8%, were African-American. Therefore, Woodfox contends, this is

the proper baseline for determining whether African-Americans were

underrepresented as grand jury forepersons.

Woodfox points out that in Dr. Solanky's testimony, Dr. Solanky noted that non-foreperson grand jurors are randomly selected from the available grand jury pool but that he did not use their demographics in determining the baseline. Dr. Solanky explained that he did not use their demographics because race information is missing for 20 of the non-foreperson grand jurors. However, as Woodfox correctly notes, Dr. Solanky relied on more incomplete data in making his calculations because he only had data for 5 of the 14 years that went into his calculations. Woodfox contends that even though data information is missing for 20 of the grand jurors, data about the 277 identifiable grand jurors is the best evidence available. Moreover, Woodfox points out that the Supreme Court of Louisiana has stated that "common sense tells us that the group of grand jurors who actually served is, by virtue of La. Code Crim. Proc. art 413(B), a randomly-selected sample or subset of the total grand jury venire." *Langley*, 813 So. 2d at 360-61.

Turning to the State's objection to Woodfox's 40.8% baseline, the State argues that it is misleading because it "fails to account for the effect of variation." (Doc. 258 at 15). The State urges the Court to consider that there is a difference between a sample and a population, and Dr. Solanky's estimate is based on the population, whereas Woodfox's expert, Dr. Marx, based his estimate on a sample. The State contends that estimates based on samples "inherently have some variation," which is why polls always have a reported margin of error. There are two ways to report the variation in an estimate based on samples: either (1)

the sampling error, or margin of error, or (2) confidence intervals. The State argues that assuming the 277 out of 297 is a random sample, the 40.8% estimate is subject to a sampling error of +/- 5.8%, meaning that the State's eligibility figure of 36.62% is within the margin of error. Additionally, the "95% confidence interval for the target population of all seated non-foreperson jurors is 35% to 46.8%," so the State's 36.62% baseline is within the confidence interval. The State argues that Dr. Marx's failure to consider these variations undermines the validity of his calculations.

Moreover, the State argues that comparing a sample to another sample skews the results because of the inherent margin of error within the sample. Because Dr. Marx compared a sample (5 out of 27 grand jury forepersons were African-American) to another sample (113 out of 277 seated grand jury members were African-American), the State argues that Woodfox's results are meaningless.

In response, Woodfox argues that the State's arguments against the 40.8% are baseless. First, Woodfox objects to the State's argument that 40.8% is derived from a non-random sample. Woodfox asserts that this figure is a random sample because the seated grand jurors do "reflect a random sample of a subset of the population, i.e. registered voters in West Feliciana Parish who are qualified to sit on a grand jury." (Doc. 267 at 16). Woodfox asserts that this number accounts for all of the variables that would affect the composition of the group, such as who appeared or took an exemption.

Woodfox also objects to the State's argument that Dr. Marx did not account for the margin of error in his sample. First, Woodfox argues that the State withheld this argument until after the hearing, not giving Woodfox the opportunity to have his expert testify about the importance of variation or give Woodfox the opportunity to examine Dr. Solanky about the margin of error associated with the 36.2% figure. Woodfox also asserts that it is incorrect to assume that Dr. Solanky's estimate has no variability and that it is incorrect to assume that any number that is below 40.8% "and is within the margin of error rate . . . can just as readily be relied on as baseline data." (*Id.* at 17). Woodfox argues that the State wants the Court to "rely on a number on the low end of the margin of error band," when the State has no reason for "such favorable treatment." (*Id.* at 18). Woodfox asserts that because the State has the evidentiary burden, the State must show that "at least at a *majority* of the confidence interval, there is statistical insignificance," which the State cannot do. (*Id.*).

*The Appropriate Baseline is 40.8%*

After careful consideration of the parties' arguments, the Court finds that Woodfox's baseline is appropriate. The Court finds that the State's arguments are similar to the ones considered, and rejected, in *State v. Langley*. In *Langley*, the district court rejected the State's argument that the defendant "should have compared the percentage of black and female forepersons selected only to the percentage of blacks and females in the population eligible to sit on the grand jury, i.e., eliminating from the gross population figures those persons not eligible

to serve as grand jurors under La.Code Crim. Proc. art. 408." *Langley*, 813 So.

2d at 364. On appeal, the Louisiana Supreme Court explained that:

> This pre-qualification of venire members, according to
> neutral criteria, does arguably suggest that eligible
> population statistics might generally be more precise
> than gross population statistics in calculating the degree
> of under-representation of minorities in the grand jury
> venire, for example. In this vein, our courts of appeal
> have generally required that eligible population statistics
> be presented to prove jury discrimination claims.

*Id.* at 369. For example, the court cited a Louisiana appellate court, *State v.*

*Young*, in which "the racial and gender composition of the general or grand jury

venire was not available." *Id.* at 369. In *State v. Young*, 31.3% of the parish was

African-American and the parties stipulated that 6.6% of grand jury forepersons

were African-American. *State v. Young*, 569 So. 2d 570, 575 (La. Ct. App. 1990).

In finding that the defendant failed to make a *prima facie* showing, the court

explained that the defendant "failed to show the percentage of minority persons

in the general or grand jury venires, or the percentage of qualified minority

persons in the general population." *Id.* at 576.

  However, the Louisiana Supreme Court in *Langley* distinguished the

Appellate Court's reasoning in *Young*, noting that *Langley* "presents a unique set

of facts." *Langley*, 813 So. 2d at 369. In *Langley*, the defendant presented

evidence of "the racial and gender composition of the gross or general

population" for the relevant time period, as well as evidence of "the racial

composition of voter registration rolls . . . and the racial and gender composition

16

of the grand jurors who actually served" during the relevant time period. *Id.*
During the relevant time period, the percentage of African-Americans in the
parish "ranged from 21.7% to 23.2%" and the percentage of seated grand juror
African-Americans was 22.95. *Id.* at n. 17. The court explained that "common
sense tells us that the group of grand jurors who actually served is, by virtue of
La. Code Crim. Proc. art. 413(B), a randomly-selected sample or subset of the
total grand jury venire." *Id.* at 369-70.  Moreover, because the percentages of
African-Americans in the general population and the percentages of persons who
actually served were "all statistically nearly identical," the court concluded that
"the percentages of those classes in either the eligible population or the total
grand jury venire for the relevant time period would not be significantly
statistically different." *Id.* at 370.

Here, the Court finds that the 277 seated grand jurors was representative
of the entire eligible population. While the State argues that literacy should be
taken into account to reduce the proportion of eligible African-Americans in the
general population, common sense leads the Court to believe that literacy was a
factor in selecting the seated grand jury members. Illiterates are ineligible to
serve as grand jurors and thus, logic leads this Court to presume that all of the
seated grand jurors were literate. The process of selecting seated grand jurors
accounts for all of the possible variables that determine eligibility. Thus, 113 of
the African-American seated grand jurors were all eligible to be selected as
grand jury forepersons. It is the State's burden to show that "the pattern of

underrepresentation proved . . . was the result of a 'racially neutral selection procedure.'" *Guice*, 722 F.2d at 280 (citing *Alexander*, 405 U.S. at 632). Here, the State is attempting to show that any underrepresentation was the product of chance and to do that, the State has altered the numbers to reduce the baseline of eligible African-Americans. This argument might work if Woodfox were unable to show how many seated grand jurors were African-American, and instead, relied on general population figures. If Woodfox relied on general population figures to show that the percentage of African-American grand jury forepersons was under representative of the percentage of African-Americans in the parish as a whole, then the State's argument about determining who was actually eligible to serve might be more persuasive.

However, this is not the case here. The State's burden is to show that there was some racially neutral reason as to why only 5 out of the 27 grand jury forepersons were African-American. The judges did not select the grand jury foreperson from the population as a whole. Rather, the judges selected the foreperson from the eligible seated grand jurors who were before them. The State's argument about the appropriate baseline does not help the State meet its burden.

Once the appropriate baseline is established, it is necessary to determine whether the disparity is statistically significant. In other words, is the disparity so stark that it cannot be explained by chance? In order to determine this, hypothesis testing is utilized and the statistician formulates a null hypothesis. A

null hypothesis is an expected number against which the observed number can be tested. David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, Reference Manual on Scientific Evidence, 249 (Federal Judicial Center 2011). Here, the null hypothesis is 40.8% and the observed number is 5 out of 27, or 18.5%. Hypothesis testing compares the disparity between 40.8% and 18.5%, and the result is the likelihood of obtaining a disparity this great, or greater. *See id.* The likelihood, or probability, is called the P-value. If the P-value is small, then this "discredits the null hypothesis," and demonstrates that the difference is statistically significant. *Id.* at 251. There are two P-value significance levels: 5% and 1%. *Id.*

When testing the null hypothesis, statisticians will either use a one-tailed or two-tailed test. The parties agree that for a two-tailed test, a P-value that is greater than 5% is not significant. (Doc. 258 at 11 & Doc. 259 at 20). The parties disagree about the significance level required for a one-tailed test. The State argues that a P-value for a one-tailed test is weak evidence, and that a P-value of .025 is more appropriate. (Doc. 258 at 11). *See* Reference Manual on Scientific Evidence at 256 n. 110 ("One-tailed test at the 5% level are viewed as weak evidence – no weaker standard is commonly used in the technical literature.") The parties also disagree about which test is more appropriate to establish underrepresentation. Woodfox maintains that a one-tailed test examines either underrepresentation or overrepresentation, whereas a two-tailed

test examines both underrepresentation and overrepresentation. (Doc. 259 at 22).

The Court does not find that it is necessary to determine which test is appropriate, nor to determine which P-value (.025 or .05 ) is appropriate for a one-tailed test. Using the baseline of 40.8%, the one-sided P-value is .0126 and the two-sided P-value is .0185. (Doc. 259 at 20). Therefore, because the P-value is below both of the thresholds (.025 and .05), the Court finds that regardless of the test used, the disparity is significant.

V.

Because Woodfox has made a *prima facie* case, the State must prove "objective, racially neutral criteria were used in the selection process." *Johnson v. Puckett*, 929 F.2d 1067, 1072 (5th Cir. 1991). Until 1999, Louisiana state law mandated that the judge presiding over the grand jury would select the foreperson. *See* La. Code Crim. Proc. art 413(B), amended by Acts 1999, No. 984. In West Feliciana Parish, there were two judges who appointed forepersons: the Honorable William Kline and the late Honorable Wilson Ramshur, the judge who appointed the grand jury foreperson who presided over Woodfox's indictment. Thus, it follows that the State must prove that the judges utilized objective, racially neutral criteria to rebut Woodfox's *prima facie* case.

The State asserts that judges in West Feliciana Parish used race neutral criteria, such as employment, education, character, and independence, when selecting forepersons. Judge Kline testified that he would often determine who he

thought would be a good foreperson and he would attempt to contact them before the morning of the venire. (Tr. 2, 49). However, if Judge Kline did not know someone who was in the venire, he "sought facts about the person, rather than an opinion, as to whether he or she would be a good foreperson." (Tr. 2, 50).

Judge Kline stated that character was one of the first factors he considered when selecting a foreperson. (Tr. 2, 50). Judge Kline also stated that communication skills, patience, independence, reputation and education were also important factors. (Tr. 2, 51-52). He explained that while employment and education were important, they were not the sole factors by which he selected a foreperson. (Tr. 2, 52). Judge Kline looked for "basic education" and he looked for employment because it "reflected some dependability." (Tr. 2, 52). However, he did not want to only appoint people "who had master's degrees or advanced degrees" because that would "eliminate consideration of a whole body of good folks with good common sense." (Tr. 2, 52). Judge Kline noted that he made a conscious effort to include women and African-American citizens in order to be inclusive and appointed an African-American female foreperson and a craftsman who did not have as much education as others in the pool but was "representative of the community." (Tr. 2, 53-54).

Because Judge Ramshur passed away in 2006, the State presented evidence of other officials who were familiar with the grand jury foreperson selection process. *See Johnson*, 929 F.2d at 1073. The Honorable George H.

Ware, Jr., who was the District Attorney in West Feliciana from 1985 through 1996, and Jesse Means, the Assistant District Attorney for the 20th Judicial District Court from 1985 through 2006, testified about the grand jury forepersons selection process.  Ware testified that he would meet with the judges when they were in the process of selecting forepersons and discuss the potential forepersons. (Tr. 1, 160). He testified that the questions the judges asked suggested

> that they were seeking information about a community leadership role, responsibility in the community, background, whether or not this person was a gossip, so to speak, because in state court the grand jury proceedings are in secrecy, and so you don't want someone on the grand jury, and particularly the foreman, discussing in the community at large what was going on in the grand jury. Occasionally, the subject of job, do you know where this person works, a question about the person's family.

(Tr. 1, 160).

Means testified that while Judge Ramshur never asked him specifically for advice, on one occasion, Means advised him not to select a person that Means believed "would not understand the case and would not maintain the requirement of secrecy." (Tr. 3, 41). However, Means did not give "specific advice for specific people" because Judge Ramshur "didn't need to be advised."(Tr. 3, 45).

The State asserts that character, education, employment, independence, and reputation are all race-neutral factors that the judges used, and these factors have been approved by other courts when considering whether a state has

rebutted the *prima facie* case. In *United States v. Perez-Hernandez*, the Eleventh Circuit approved of the guidelines used by the judges, which "generally consisted of four separate factors: (1) occupation and work history; (2) leadership and management experiences; (3) length of time in the community; and (4) attentiveness during the jury empanelment." *United States v. Perez-Hernandez*, 672 F.2d 1380, 1387 (11th Cir. 1982).

The State argues that the procedure for selecting a grand jury foreperson was not random and was never designed to be random. (Doc. 258). The State points out that it demonstrated that the race neutral criteria, such as education and employment, were not distributed proportionally among the African-American and Caucasian population. Because evidence showed that there was a large disparity in education and employment levels, the State contends that this explains the "higher percentage of whites" appointed because "whites were more educated and employed in West Feliciana in the 1980s and early 1990s." (Doc. 258 at 26). The State asserts that despite the disparity, evidence shows that Judge Kline attempted to include African-Americans when selecting grand jury forepersons.

Moreover, the State argues that the empirical data for the 27 forepersons selected between 1980 and 1993 shows that Judges Kline and Ramshur "took education and employment into consideration" and "acted affirmatively to include blacks with less education." (Doc. 258 at 29). 22 of the 27 forepersons selected were Caucasian and 5 were African-American. By stipulation of the parties, 24 of

the selected forepersons had at least a high school diploma, and 3 did not. The 3 selected forepersons who did not have a high school diploma were African-American. The State contends that the disparity between Caucasian and African-American forepersons can be explained by the "fact that the judges were applying race-neutral criteria – except to the extent the judges were affirmatively attempting to include blacks among their selection." (Doc. 258 at 30).

Woodfox asserts that the State's argument that the judges in West Feliciana relied on race neutral criteria is insufficient to dispel the inference of discrimination as established by the *prima facie* case. (Doc. 267 at 20). Woodfox suggests that the testimony of Judge Kline and Ware amount to "affirmations of good faith in making individual selections," which "are insufficient to dispel a *prima facie* case of systematic exclusion." *Alexander*, 405 U.S. at 632. Moreover, Woodfox argues that the law requires that the State show "evidence that objective, racially neutral criteria were used in the selection process," and the criteria that the State showed was not objective, but subjective. *Johnson*, 929 F.2d at 1072. For example, Woodfox contends that reputation, standing in the community and character are subjective criteria and argues that these are "unlikely to be applied race-neutrally." (Doc. 267 at 22).

Woodfox further asserts that the State has not shown any evidence, except for testimony by Judge Kline and Ware, that the judges applied the selection criteria in a race neutral fashion.. Woodfox argues that there is no evidence demonstrating that Judge Ramshur asked questions of the venire

assessing the members' educational and employment background. (Doc. 259 at 9).

Woodfox points to Ware's testimony concerning the questions asked of him by Judge Ramshur. Ware testified that Judge Rahmshur would ask him more frequently about potential forepersons in East Feliciana Parish, but "very rarely for West Feliciana . . . because Judge Ramshur lived in West Feliciana . . . [and] was much more familiar with the people in West Feliciana." (Tr. 1, 158). Woodfox argues that this factual scenario is similar to the one in *Guice,* where the judge testified that in "the other two parishes in his jurisdiction he often made inquiries as to the qualifications of the members of the grand jury venire." *Guice,* 722 F.2d at 278. However, the judge "[a]pparently felt no need to do so in Madison Parish, where he resided and where he was often acquainted with members of the venire." *Id.* Woodfox argues that here, as in *Guice,* "[n]o evidence was presented of any systematic attempt to obtain objective information about the qualifications of venire members" in the Parish. *Id.* Woodfox contends that the State did not show that Judge Ramshur used objective criteria, nor did the State present testimony from anyone "to provide information on the actual operation of the selection process." *Castaneda*, 430 U.S. at 491.

VI.

The State must rebut the inference of discrimination by showing that "the pattern of underrepresentation proved . . . was the result of a 'racially neutral selection procedure.'" *Guice*, 722 F.2d at 280 (citing *Alexander*, 405 U.S. at 632).

The *prima facie* case will not be rebutted if the State fails to put on any evidence about the selection process. *See Castaneda*, 430 U.S. at 498 (noting that "the State introduced practically no evidence" in their rebuttal). The *prima facie* case will also not be rebutted if the State puts on evidence that amounts to good faith affirmations, which are "insufficient to dispel a prima facie case of systematic exclusion." *Alexander*, 405 U.S. at 632. In *Johnson v. Puckett*, the Fifth Circuit found that testimony which "merely indicates that the judges in Panola County never stated or indicated to the circuit clerk that they selected grand jury foremen based on their race" was insufficient to dispel the inference of discrimination. *Johnson*, 929 F.2d at 1073. The court noted that "the testimony neither denies the use of racial criteria nor advances any other objective non-discriminatory criteria used by the judges." *Id.*

Similarly, in *Crandell v. Cain*, the Western District of Louisiana found that while the judge affirmed "that he did not intend to discriminate on the basis of race," there was "no evidence of objective criteria known in advance of the selection. *Crandell v. Cain*, 421 F.Supp. 2d 928, 943 (W.D. La. 2004). Judge Kitchens, the appointing judge, "would be provided a list of the names and addresses of the 35 persons on the venire," which did not include the venire members' races. *Id.* at 937. Judge Kitchens "would review the list to see if he recognized someone who would make a good foreman." *Id.* Because he was not from the parish, he did not know many of the citizens and would review the list with the Clerk of Court, Ms. Wilna Mabry, a "longtime political figure in Bossier

Parish [who] knew many of its citizens." *Id.* Judge Kitchens testified that he looked "for a 'responsible person' with a measure of leadership skills and education." *Id.* He also examined the person's occupation. He obtained the majority of this information from Ms. Mabry, and if neither she nor he knew a member of the venire, that person would not be considered as a potential foreperson. *Id.* After he selected a person that he thought would be a good foreperson, he would meet with him or her in his office to ask if he or she could serve. *Id.* The court found that the judge's testimony amounted to an "affirmation of good faith," which was insufficient to rebut the presumption of discrimination. Thus, *prima facie* cases are not rebutted when the testimony is lacking as to the selection process or when the testimony is an "affirmation of good faith."

In *Guice v. Fortenberry*, the Fifth Circuit noted that the testimony "revealed that no objective criteria were used in his selection of grand jury foremen; rather, he selected individuals, always white, who were known to him." *Guice*, 722 F.2d at 281. The testifying judge explained that he selected forepersons based on "his personal knowledge of the qualifications of potential foremen." *Id.* at 278. The Fifth Circuit noted that while the judge would ask about the "qualifications of the members of the grand jury venire" for two of the three parishes in his jurisdiction, he did not ask questions about the venire in the parish in which he lived. *Id.* "No evidence was presented of any systematic attempt to obtain objective information about the qualifications of venire members in Madison Parish," where the judge

lived. *Id.* The judge explained that "when we have a Black Judge, they're gonna know who's the most qualified amongst the Blacks to be a foreman." *Id.* at 281.

*Prima facie* cases are rebutted when the State puts forth affirmative evidence showing that objective and racially-neutral criteria are used. For example, in *United States v. Breland*, the Northern District of Georgia found that the testimony of eleven district judges indicated that objective and racially-neutral criteria were used. *United States v. Breland*, 522 F.Supp. 468, 480 (N.D. Ga. 1981). The judges testified that they "generally relied solely on information provided in the juror questionnaires and made no independent investigation of the qualifications of persons drawn as grand jurors." *Id.* at 471.The judges considered age, education, occupation, and leadership experience. *Id.* at 471-74. The court explained that "the predominant criteria of occupation, education, and age, were standards not only objective but clearly relevant to the specific tasks required by Rule 6(c), F.R.Crim.P., to be performed by forepersons and deputies and as visualized by the judges." *Id.* at 480. The court further explained that "most important, the substantial evidence is that the stated criteria were in fact faithfully applied." *Id.* The record indicated that the grand jurors who were appointed as forepersons "actually possessed the qualities which the judges were seeking, i.e., they had in large part responsible employment positions and/or significant education, and were of mature age." *Id.* The court noted that the defendants in the case did not "challenge the sufficiency of the qualifications of the persons appointed but maintain only that others on each grand jury might

28

have been no less qualified." *Id.* Finally, the court rejected the argument that "judges were required to elicit additional information from, or about, randomly-drawn grand jurors to seek out for appointment blacks and women who might be 'qualified' as forepersons but whose jury questionnaires did not affirmatively indicate such 'qualification.'" *Id.* (explaining that the Constitution "did not require the appointing judges to accord preferential treatment to any group but imposed upon them no more than the obligation to use nondiscriminatory, neutral criteria in selecting persons deemed adequate to perform the role of foreperson." *Id.*).

Similarly, in *United States v. Perez-Hernandez*, the Eleventh Circuit found that the State had rebutted the *prima facie* case. *Perez-Hernandez*, 672 F.2d at 1388. Eight district judges testified about their selection processes, and while each judge testified "that he acted independently," the judges "employed similar guidelines in making a selection." *Id.* at 1387. The guidelines typically consisted of these four factors: "(1) occupation and work history; (2) leadership and management experiences; (3) length of time in the community; and (4) attentiveness during the jury empanelment." *Id.* The court explained that these criteria were not "arbitrary and unrelated [to the duties of a grand jury foreperson]." *Id.* However, the court did note that if the record had shown "that these judges abused their discretion by selecting foremen without regard to the stated criteria or by excluding equally qualified blacks and women, then we would conclude that the presumption established by the prima facie test was not rebutted." *Id.* at 1388. "This kind of evidence would establish that the gender and

racially neutral selection procedures were not in fact applied in a neutral manner." *Id.*

## VI.

Here, the Court finds that the State has failed to rebut the *prima facie* case. The record indicates that the only information that the judges received prior to selecting the panel was a list that contained the names, addresses, and in later years, the telephone numbers of the members of the venire. Pet'r. Ex. 13. Judge Kline testified that "we normally would have in mind somebody . . . to be foreman of the grand jury." (Tr. 2, 49). Judge Kline explained that he would contact the person that he had in mind ahead of time. If he did not know anybody who was in the list of the venire, he would attempt to seek facts about that person. (Tr. 2, 50). However, like the venire list in *Crandall*, there was no evidence of objective criteria that was available to the judges in advance. The record does not indicate that the judges had education or employment data prior to making the decision. While Judge Kline testified that he did seek out facts about people that he did not know, he stated that normally, he would select the foreperson in advance and contact him or her. "That's how that process worked." (Tr. 2, 49).

The State has argued extensively that the empirical data shows that the judges did take education and employment into consideration when making their selections. However, the evidence shows that the only objective criteria that was known in advance to the judges was a name and an address. There is no evidence that education and employment data was actually provided to the

judges prior to making their selection. The parties stipulated to the State's Exhibit 4, which lists the education and employment data of the selected grand jury forepersons. However, this information was compiled based on affidavits and transcripts, not based on what the judges had in front of them.  For example, in *United States v. Breland*, the judges made their selections based on information contained in juror questionnaires. *Breland*, 522 F.Supp. at 471. While the questionnaires did list the venire members' race and sex, the questionnaires also listed race-neutral criteria, such as education and employment. The judges testified that they looked to race-neutral criteria on the questionnaire to make their decisions. Here, there is no evidence that there were any forms or questionnaires that outlined race-neutral criteria.

The State argued that "West Feliciana is not Orleans Parish or a federal district encompassing a large portion of the state – it is a small rural parish where people know most everyone else." (Doc. 266 at 10) The State posited that "Judges Kline and Ramshur were well positioned to select qualified forepersons of *any* race based on their personal knowledge about their neighbors." (Doc. 266 at 11). While it may be correct to say that West Feliciana Parish is a small, rural Parish where everyone knows everyone else, this is insufficient to rebut the *prima facie* case. In *Crandall*, while the appointing judge did not live in the Parish and did not know many of its citizens, his clerk of court did know many of the citizens and advised him about the members' education, leadership skills, and occupation. *Crandall*, 421 F. Supp.2d at 937. However, the court, while finding

that his "affirmation that he did not intend to discriminate" was "credible," it was not enough to rebut the presumption of discrimination.

Here, the Court finds that while Judges Ramshur and Kline may very well have known the majority of the West Feliciana Parish citizens, much like how Ms. Mabry knew the majority of the citizens in *Crandall*, this does not relieve the State of its obligation to put forth evidence that objective, race-neutral criteria was used. The evidence and testimony put forth by the State is an affirmation of good faith, which the jurisprudence has made clear is insufficient to rebut a *prima facie* case.

VI.

As a final matter, the Court will address the State's arguments and concerns regarding the three stages of evidence presented in this case as well as evidence presented concerning the individual selections of Judge Ramshur. The State objects to this Court's May 11, 2012 order, in which this Court ordered that the evidentiary hearing would consist of three stages. First, Woodfox would present his *prima facie* case, then the State would rebut by showing evidence of race neutrality, and finally, Woodfox would have the opportunity to rebut the State's showing. (Doc. 229). The State also objects to this Court's order permitting Woodfox to present evidence concerning Judge Ramshur's individual selections.

The State argues that *Castaneda* mandates a two-stage framework and that this Court has improperly introduced a third-step by permitting Woodfox to

32

present evidence rebutting the State's rebuttal argument. This Court's previous order explained that this third stage "comports with general notions of burden-shifting motive analysis." (Doc. 229 at 1) (citing *Miller-El v. Dretke*, 545 U.S. 231, 239-40). The State objects, noting that *Miller-El* was a burden-shifting analysis for examining the discriminatory use of peremptory challenges under *Batson v.* Kentuckyk, 476 U.S. 79 (1986), and is not applicable here. The State argues that unlike *Batson*, *Castaneda* examines the actions of the judges who appoint grand jury forepersons over a "significant period of time." *Castaneda*, 430 U.S. at 494. (Doc. 258). Additionally, *Castaneda* does not require the State to show a plausible reason for its actions. Instead, the State is required to show the court that "racially neutral selection criteria and procedure have produced the monochromatic result." *Id.*

The State further argues that it is inappropriate to consider any evidence that is specific to Judge Ramshur. The State asserts that *Castaneda* focuses on whether or not the procedure was allegedly tainted by discrimination, and not whether any particular judge had discriminatory intent. The State notes that in rebuttal arguments, testimony from other judges other than the actual appointing judge is often used to explain the procedures, suggesting that the selection practices of both Judges Kline and Ramshur are equally important.

Woodfox argues that the State is confusing the distinct stages of the litigation. Woodfox points to *Guice*, in which the Fifth Circuit stated that "it has been our task to determine whether in fact the petitioners were indicted by a

33

grand jury whose foreman was chosen in a discriminatory manner," and the Fifth Circuit did consider the selection procedures of the actual appointing judge. *Guice*, 722 F.2d at 281-82.

The Court does not find it necessary to revisit these arguments. The Court explained in a previous order that "[i]f and when the State's production rebuts the *prima facie* case, the presumption of discrimination appearing from the statistical *prima facie* case disappears, and at that point Woodfox is entitled to introduce evidence to meet his ultimate burden of persuading the Court as to Judge Ramshur's discriminatory intent in making foreperson selections." (Doc. 237 at 6). Because the Court finds that the State failed to rebut the *prima facie* case, any further evidence is immaterial and will not be considered.


VII.

Accordingly, Woodfox's habeas relief is GRANTED.


Signed in Baton Rouge, Louisiana on February 26th, 2013.


_____

**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**


34